**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 19-5130**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL WOMEN'S LAW CENTER et al.,

Plaintiffs-Appellees,

v.

OFFICE OF MANAGEMENT AND BUDGET et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

DANIEL TENNY
LINDSEY POWELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5372*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.     Parties and Amici.**  Plaintiffs-appellees are the National Women's Law Center and the Labor Council for Latin American Advancement.  Defendants-appellants are the Office of Management and Budget (OMB), John Michael Mulvaney in his official capacity as Director of OMB, Paul Ray in his official capacity as Acting Administrator of the Office of Information and Regulatory Affairs, the Equal Employment Opportunity Commission (EEOC), and Janet Dhillon in her official capacity as EEOC Chair.[1]  The following entities participated as amici in district court:

- American Society of Employers
- Associated Builders and Contractors
- Associated General Contractors of America
- Center for Workplace Compliance
- Chamber of Commerce of the United States
- DirectEmployers Association, Inc.
- HR Policy Association
- Institute for Workplace Equality
- National Association of Manufacturers
- National Federation of Independent Business
- National Retail Federation
- Restaurant Law Center
- Retail Litigation Center, Inc.
- Society for Human Resources Management

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), EEOC Chair Janet Dhillon has been automatically substituted for Acting Chair Victoria Lipnic.

**B.**   **Rulings Under Review**.  The rulings under review are the following orders of the United States District Court for the District of Columbia (Chutkan, J.) in case number 17-2458: (1) the March 4, 2019, memorandum opinion and order granting summary judgment for plaintiffs; and (2) the April 25, 2019, order issuing declaratory and injunctive relief.  The district court's March 4 opinion is published at 358 F. Supp. 3d 66, and the court's orders of March 4 and April 25 are unpublished.

**C.**   **Related Cases**.  This case has not previously been before this Court, and counsel is not aware of any related case within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Lindsey Powell
LINDSEY POWELL

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION ...................................................3

STATEMENT OF THE ISSUES.........................................................3

PERTINENT STATUTES AND REGULATIONS ........................3

STATEMENT OF THE CASE ............................................................4

    A.    Statutory Background.............................................4

    B.    Factual Background ................................................6

    C.    Prior Proceedings...................................................8

SUMMARY OF ARGUMENT......................................................... 13

STANDARD OF REVIEW ............................................................... 15

ARGUMENT ....................................................................................... 16

I.    Plaintiffs Lack Standing Because Their Only Alleged Injury Is an Informational One, and They Have No Legally Protected Interest in the Information at Issue.......................................................... 16

II.    After the District Court Set Aside OMB's Stay of the Collection, Plaintiffs Were Entitled to No Further Relief, and the Court Exceeded Its Authority in Requiring EEOC To Complete the Collection to the Court's Specifications.................................. 26

CONCLUSION .................................................................................. 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Action Alliance of Senior Citizens v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986) ................................................................. 21, 22

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ...................................................................31

*ASPCA v. Feld Entm't, Inc.*,
   659 F.3d 13 (D.C. Cir. 2011) ........................................ 1, 15, 16, 17, 18, 20, 21, 23, 24

*Bennett v. Donovan*,
   703 F.3d 582 (D.C. Cir. 2013) ...................................................................28

*Cody v. Cox*,
   509 F.3d 606 (D.C. Cir. 2007) ...................................................................30

*Dole v. United Steelworkers of Am.*,
   494 U.S. 26 (1990) ...........................................................................4, 17, 18

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) .................................2, 13, 18, 19, 20, 21, 23, 24

*FEC v. Akins*,
   524 U.S. 11 (1998) ............................................................................ 17, 20

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) .......................................................1, 9, 17, 18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ........................................................................... 17, 23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................... 16, 24

*Mendoza v. Perez*,
   72 F. Supp. 3d 168 (D.D.C. 2014) ...............................................................32

*National Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
   736 F.3d 517 (D.C. Cir. 2013) ...................................................................31

*Northern Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012) ...................................................................26

*Palisades Gen. Hosp. Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005) ................................................. 2, 14, 26, 27

*PETA v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) .................................................. 21, 22, 23, 24

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ...............................................................................16

*United States v. Philip Morris USA, Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ...................................................................15

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ............................................................................ 24, 25

*West v. Lynch*,
   845 F.3d 1228 (D.C. Cir. 2017) ............................................................ 24, 26


**Statutes:**

Civil Rights Act of 1964:
   42 U.S.C. § 2000e *et seq.* .........................................................................5
   42 U.S.C. § 2000e-8(c)(1).................................................................. 5, 17
   42 U.S.C. § 2000e-8(c)(3).................................................................. 5, 17

Papework Reduction Act:
   44 U.S.C. § 3506(c)(2)(A) ........................................................................4
   44 U.S.C. § 3507(a)(1)-(2) ........................................................................4
   44 U.S.C. § 3507(c)(1)-(2) ........................................................................4
   44 U.S.C. § 3507(e)(1) ..............................................................................4
   44 U.S.C. § 3507(g) ...................................................................................4

28 U.S.C. § 1291 ...............................................................................................3

28 U.S.C. § 1331 ...............................................................................................3

**Regulations:**

5 C.F.R. § 1320.10(f) ..............................................................................4, 5, 7, 29

5 C.F.R. § 1320.10(g)............................................................................5, 7, 28, 29

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ..........................................................................................3

**Other Authorities:**

81 Fed. Reg. 5113 (Feb. 1, 2016) ...........................................................................6

81 Fed. Reg. 45,479 (July 14, 2016) ..........................................................6, 10, 25

82 Fed. Reg. 43,362 (Sept. 15, 2017) .................................................................. 8, 28

84 Fed. Reg. 18,383 (May 1, 2019)...................................................................... 15, 28

84 Fed. Reg. 18,974 (May 3, 2019).................................................................... 15, 28

EEOC, *Statement on the 2018 EEO-1 Portal Opening for Component 1 Data*,
https://www.eeoc.gov/employers/eeo1survey/statement-2018-opening.cfm ........10

OMB, *Notice of Office of Management and Budget Action* (Sept. 29, 2016),
https://www.reginfo.gov/public/do/DownloadNOA?requestID=275763 .............6

## GLOSSARY

| APA | Administrative Procedure Act |
|-----|------------------------------|
| EEOC | Equal Employment Opportunity Commission |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |
| PRA | Paperwork Reduction Act |

**INTRODUCTION**

Plaintiffs challenge a determination by the Office of Management and Budget (OMB) to stay, pursuant to the Paperwork Reduction Act (PRA), a discretionary collection of information conducted by the Equal Employment Opportunity Commission (EEOC) under authority granted by Title VII of the Civil Rights Act of 1964. In addition to setting aside OMB's stay, the district court ordered EEOC to complete the collection of information in accordance with an extensive set of requirements devised by the district court.

The district court committed two fundamental errors. First, the court held that the plaintiff organizations have standing to sue based solely on injuries allegedly resulting from a lack of access to information even though it is undisputed that plaintiffs have no legal right to the information at issue. To demonstrate standing based on an informational harm, a plaintiff must show that "a statute requires the government or a third party to disclose" the information at issue, and that the plaintiff "suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). This requirement applies equally whether the plaintiff is an individual or is an organization suing on its own behalf. *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).

The district court correctly concluded that plaintiffs could not meet the standard for establishing informational standing, but it nevertheless held that precisely

the same informational harm could support organizational standing because "the stay of EEOC's data collection deprives [plaintiffs] of information that they use to educate their members and the public." JA 156. That conclusion is squarely at odds with the rule that a plaintiff "cannot ground organizational injury on a non-existent interest" in information. *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017). The cases on which the district court relied are distinguishable either because the agency had an alleged legal duty to collect and disclose the information at issue or because the plaintiff's argument for standing did not rest entirely on an alleged informational harm.

Second, even assuming the district court properly set aside OMB's stay of EEOC's collection, the court exceeded its authority in directing EEOC to proceed with the collection in a particular manner. That order contravenes the established rule that, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). That rule applies here *a fortiori* because the complaint did not challenge the lawfulness of EEOC's conduct, EEOC made no error of law, and nothing in the PRA or Title VII constrained EEOC's conduct in collecting the information. The district court thus had no authority to superintend how EEOC chose to respond to the court's vacatur of OMB's stay.

2

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction pursuant to 28 U.S.C. § 1331, alleging that OMB's actions in reviewing and staying the collection of pay information were inconsistent with federal law.  JA 290.  On March 4, 2019, the district court entered an order granting plaintiffs' motion for summary judgment and vacating OMB's stay.  JA 132.  On April 25, 2019, the court entered an order directing EEOC to take specified actions with respect to the information collection.  JA 3-4.  On May 3, 2019, the government filed a timely notice of appeal of both orders.  JA 1; Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether plaintiffs failed to establish Article III standing when their only alleged harm results from a lack of information to which plaintiffs concededly have no legal right and which EEOC may choose not to publish.

2.  Whether the district court exceeded its authority in directing EEOC to take specific measures concerning the implementation of the information collection following the court's vacatur of OMB's stay.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory Background

**1.** The Paperwork Reduction Act "set forth a comprehensive scheme designed to reduce the paperwork burden" imposed by the federal government. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990). As relevant here, the Act requires agencies to minimize the burden of information collections on those who are required to respond, and to ensure that the information has practical utility and is necessary to the proper performance of the agency's functions. 44 U.S.C. § 3506(c)(2)(A). To promote these objectives, an agency that wants to collect information must provide notice of that intent and solicit public comment on the proposal. *Id.* "After an agency has satisfied itself that an instrument for collecting information . . . is needed, the agency must submit the request to OMB for approval" and provide a further opportunity for public comment. *Dole*, 494 U.S. at 33; 44 U.S.C. § 3507(a)(1)-(2).

Within sixty days of receiving an agency proposal, OMB must approve or disapprove the collection of information or direct the agency to revise the proposal. 44 U.S.C. § 3507(c)(1)-(2), (e)(1). OMB may approve a collection for a period of up to three years. *Id.* § 3507(g). Before the end of the period for which OMB has approved a collection, OMB "may decide on its own initiative, after consultation with the agency, to review the collection" to ensure that it comports with the PRA, and in those circumstances the agency must again "submit it to OMB for review." 5 C.F.R. § 1320.10(f). OMB regulations provide that such a decision "will be made only when

4

relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error." *Id.* In addition, "[f]or good cause, after consultation with the agency, OMB may stay the effectiveness of its prior approval of any collection of information that is not specifically required by agency rule." *Id.* § 1320.10(g). "[I]n such case, the agency shall cease conducting or sponsoring such collection of information while the submission is pending, and shall publish a notice in the Federal Register to that effect." *Id.*

**2.** Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, authorizes EEOC to direct employers to "make and keep such records relevant to the determination[] of whether unlawful employment practices have been or are being committed," and to "make such reports therefrom," as EEOC determines is "reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder." *Id.* § 2000e-8(c)(1); *see also id.* § 2000e-8(c)(3) (directing that reporting requirements be "prescribe[d] by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder"). Nothing in Title VII requires EEOC to collect particular information. Once EEOC determines that information should be collected, its authority to direct employers to provide such information is subject to the foregoing provisions of the PRA. After EEOC has collected information, there is no requirement that the Commission disclose the information to the public, but it may choose to do so, and it has previously made some information

publicly available.  Neither Title VII nor the PRA substantively constrains EEOC's discretion concerning how it internally implements an information collection that OMB has approved.

### B.    Factual Background

For decades, EEOC has required certain employers to submit information each year regarding the number of people they employ by job category, sex, race, and ethnicity.  This collection of information is referred to as the EEO-1.  In February 2016, EEOC announced its intent to use the PRA process outlined above to seek OMB approval of a revised EEO-1 that would additionally require employers to submit information regarding employees' W-2 earnings and hours worked.  81 Fed. Reg. 5113, 5114 (Feb. 1, 2016).  Following a public hearing, EEOC published a second notice, and it requested that OMB approve the revised EEO-1 for a three-year period.  81 Fed. Reg. 45,479, 45,495 (July 14, 2016).  The notice proposed that employers submit the revised EEO-1 report for the first time in March 2018; that report would reflect 2017 pay data.  *Id.* at 45,484.  A second cycle of collection and reporting was to follow a year later.  *Id.*  OMB approved the collection on September 29, 2016, for a three-year period ending September 30, 2019.[2]

Following OMB's approval, EEOC issued further instructions to employers regarding the submission of information in connection with the revised EEO-1.

---

[2] https://www.reginfo.gov/public/do/DownloadNOA?requestID=275763.

JA 140.  These instructions included new data file specifications for both components of the data collection and a sample form for employers who planned to submit information by uploading an electronic file.

In August 2017, OMB initiated a review of the portion of the revised EEO-1 that provides for the collection of pay information, based in part on the release of the new data file specifications.  JA 175.  As explained in a memorandum from the then-Director of the Office of Information and Regulatory Affairs, OMB determined that the new specifications constituted a changed circumstance within the meaning of 5 C.F.R. § 1320.10(f), which provides for OMB review of an approved collection of information "when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."  The memorandum also noted that "EEOC's burden estimates did not account for the use of these particular data file specifications."  JA 175.  In addition, OMB "decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as [it] believe[d] that continued collection of this information is contrary to the standards of the PRA."  JA 176.  The memorandum noted OMB's concern that "some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues," and it directed EEOC to submit information-collection materials for review.  *Id.*  As required by regulations implementing the PRA, 5 C.F.R. § 1320.10(g), EEOC published a notice in the Federal Register announcing a stay of the collection and

7

directing employers that they did not need to submit pay information to EEOC while the stay remained in effect.  82 Fed. Reg. 43,362 (Sept. 15, 2017).

### C.    Prior Proceedings

Plaintiffs, the National Women's Law Center and the Labor Council for Latin American Advancement, filed suit in November 2017 alleging that OMB acted unlawfully in reviewing and staying EEOC's collection of pay information.  JA 287. The complaint named as defendants OMB, EEOC, and their respective officials, but the claims are based on OMB's actions.  Plaintiffs asked the district court to vacate the stay, alleging that the stay exceeded OMB's authority, JA 312-13, was contrary to regulation, JA 313-14, was contrary to statute, JA 314, and was arbitrary and capricious, JA 314-15.  With respect to the EEOC defendants, by contrast, the complaint explains that they were included "as necessary parties for relief in this case because the EEOC acted consistently with a directive from OMB Defendants to notify employers that they were not required to submit pay data."  JA 287.  The only reference to EEOC in the complaint's prayer for relief asks that the court "[o]rder EEOC Defendants to publish a Federal Register notice announcing this reinstatement or to take other equivalent action necessary to immediately reinstate the pay data collection."  JA 315.  The plaintiff organizations sued on their own behalf, alleging that OMB's stay injured their organizational interests by denying them access to pay information that they could otherwise have used in their advocacy and outreach. JA 290-96.

8

On March 4, 2019, the district court granted summary judgment for plaintiffs and vacated OMB's stay.  The court first held that plaintiffs have standing.  The court acknowledged that it is "undisputed that Plaintiffs here do not have a statutory right to the information they allege forms their injury in fact" and therefore do not have "informational standing."  JA 145 (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).  But the court nevertheless held that plaintiffs' alleged "loss of information [could] serve as an injury in fact as a component of organizational standing."  JA 145-46.  In assessing organizational standing, the court asked, "first, whether the agency's action . . . injured the organization's interest and, second, whether the organization used its resources to counteract that harm."  JA 146 (alteration omitted).  The court answered both questions in the affirmative, holding that plaintiffs had adequately alleged that the stay deprived them of information relevant to their advocacy and education efforts, and that plaintiffs had used their resources to counteract that harm by engaging with employers to encourage voluntary compliance, creating model state and local legislation for pay-data collection, and generating educational materials demonstrating the need for such data.  JA 148-51, 156.

The court also held that plaintiffs had satisfied the other elements of standing.  Although "EEOC has discretion whether to publicly report" any pay information it collects, the court held that an order lifting the stay would redress plaintiffs' alleged harms because EEOC previously stated that it "'expect[ed] to periodically publish

9

reports on pay disparities,'" making it likely that plaintiffs would have access to pay information absent the stay.  JA 152 (emphasis omitted) (quoting 81 Fed. Reg. at 45,491).  Further concluding that OMB's stay decision was reviewable final agency action, JA 158-62, and was arbitrary and capricious and inconsistent with regulations implementing the PRA, the court granted summary judgment for plaintiffs and vacated the stay.  JA 163-73.

Following the court's order, EEOC needed time to determine how best to proceed in light of the court's order vacating the stay and reinstating OMB's approval of the collection of pay information.  Consistent with that need, EEOC posted a statement on its website on March 18, 2019, explaining that the Commission was "working diligently on next steps in the wake of the court's order" and would "provide further information as soon as possible."  https://www.eeoc.gov/ employers/eeo1survey/statement-2018-opening.cfm (emphasis omitted).

At plaintiffs' urging, the court ordered further proceedings to ascertain EEOC's plans for collecting pay information.  The government's supplemental briefing explained that EEOC planned to take expedited measures to collect 2018 pay information from employers by the September 30, 2019, expiration date for the collection of information.  A government declaration detailed the many challenges EEOC anticipated in connection with collecting pay information on that expedited timeline, which required outsourcing the data collection and using an unproven process.  JA 126-27.  The government's briefs urged that the entry of further relief by

10

the court was inappropriate because plaintiffs had sought review only of OMB's stay

and had obtained all the relief to which they were entitled when the court set aside

that decision and reinstated OMB's approval of the collection.  Dkt. No. 69, at 2-9.

The government emphasized that EEOC's actions concerning implementation of the

collection had not been challenged in the suit and could not properly be

superintended by the district court.  *Id.*; Dkt. No. 63, at 1-2.

Following hearings on April 16 and 25, the district court issued a second order

declaring that its summary judgment order had "require[d] that Defendant EEOC

collect EEO-1 [pay information] for calendar years 2017 and 2018."  JA 3.  The order

further directed EEOC to "immediately take all steps necessary to complete the [pay

information] collections for calendar years 2017 and 2018 by September 30, 2019,"

and to issue a statement directing employers to submit the required data by that date.

JA 3-4.[3]  The court additionally required that, "beginning on May 3, 2019 and

continuing every 21 days thereafter, EEOC must provide reports to Plaintiffs and the

court of all steps taken to implement" the information collection since the prior

report and "all steps to be taken during the ensuing three-week period," and must

indicate "whether EEOC is on track to complete the collection(s) by September 30,

2019."  JA 4.  The court provided that the "data collection(s) will not be deemed

complete, for the purpose of this Order, until the percentage of EEO-1 reporters that

---

[3] The court's order gave EEOC the option of collecting pay information for
2019 instead of 2017.  JA 3.  EEOC declined that option.

have submitted their" pay information "equals or exceeds the mean percentage of EEO-1 reporters that actually submitted EEO-1 reports in each of the past four reporting years." *Id.* In addition, the court directed that OMB's stay "tolled the three-year period of th[e] approval for the duration of the stay, which lasted 553 days." JA 3. Accordingly, "barring further interruptions of the approval or extensions," the court directed that the approval of the pay-data collection for calendar years 2017 and 2018 "shall expire no later than April 5, 2021." *Id.*

The district court's order was not accompanied by a written opinion, but statements at the hearings on April 16 and 25 indicate that the order was premised on concerns about certain aspects of the government's conduct in connection with this litigation. In particular, the court expressed frustration that EEOC had not been taking measures during the pendency of the litigation to be prepared to collect pay information in the event the court vacated the stay. JA 12-13, 112-13. And the court faulted the government for failing to convey earlier in the proceedings that it could take EEOC an extended period of time to prepare to collect that information— particularly in light of the September 30, 2019, expiration of the approval for the EEO-1 collection. JA 6-11, 48. The court explained that, because it did not "have adequate assurances from the Government that it will complete [the] data collection," "the Court finds it necessary to order additional ancillary relief." JA 21.

12

## SUMMARY OF ARGUMENT

**1.** Although the district court correctly held that plaintiffs lack "informational standing" because they concededly have no legal right to the information at issue, it erred in holding that plaintiffs could nevertheless demonstrate so-called "organizational standing" based on the same alleged informational harm. JA 145-46. As this Court has recognized, a plaintiff "cannot ground organizational injury on a non-existent [informational] interest." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017). Here, plaintiffs challenge the application of the PRA, which is designed to reduce the paperwork burden on private parties and to ensure that information collections are justified. There is no aspect of the statute that was meant to compel the public disclosure by a federal agency of any information collected consistent with the Act.

The district court acknowledged the tension inherent in its approach but thought its holding was warranted by this Court's precedent. Contrary to the district court's conclusion, an organization does not automatically have standing when it asserts that an absence of information harms its ability to perform its mission, without regard to the well-settled prerequisites for informational standing. The cases on which the district court relied are inapposite either because the agency had an alleged legal duty to collect and disclose the information at issue or because the plaintiff's argument for standing did not rest entirely on an alleged informational harm. Here, plaintiffs' claim to standing is premised entirely on a desire for information in which

13

they have no cognizable interest. A holding that plaintiffs have standing in these circumstances would largely eliminate the requirements for informational standing when the plaintiff is an organization.

**2.** Even assuming the district court properly concluded that plaintiffs were entitled to relief, it erred in entering remedial orders against EEOC that went well beyond vacating OMB's challenged stay. "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). Here, having set aside OMB's stay, "the court's inquiry" should have been "at an end." *Id.*

Instead, the district court further directed EEOC to take a number of highly specific actions to collect the information—mandating that EEOC collect two years of pay information by a date certain, and directing that the collection of information would not be deemed complete until a specified number of employers had complied. JA 3-4. The court exceeded its authority in entering such relief, particularly given that EEOC's own conduct was not challenged in the suit, and EEOC has no legal obligation to undertake the conduct directed by the court.

Plaintiffs' complaint did not ask the court to review or set aside any action taken by EEOC. Instead, the complaint stated that EEOC was included based on its publication of a Federal Register notice announcing OMB's stay, and on plaintiffs'

14

attendant interest in requiring EEOC to publish a further notice announcing the reinstatement of OMB's approval of the collection. JA 287, 315. EEOC has already complied with that portion of the court's order, *see* 84 Fed. Reg. 18,974 (May 3, 2019); 84 Fed. Reg. 18,383 (May 1, 2019), and it is not at issue on appeal. The district court plainly exceeded its authority in mandating that EEOC undertake a number of actions in connection with the information collection—none of which EEOC is required by any statute or regulation to undertake. Relief of this type, superintending the agency's conduct, would be inappropriate even if plaintiffs had challenged the lawfulness of EEOC's actions. The impropriety is all the more striking given that plaintiffs instead challenged only the lawfulness of OMB's stay, not EEOC's hypothetical response to the reinstatement of OMB's approval of the collection.

## STANDARD OF REVIEW

This Court reviews the district court's standing determination and other conclusions of law de novo. *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011). "To the extent it is not based on legal error, [the Court] review[s] the district court's decision to issue [equitable relief] for abuse of discretion." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1110 (D.C. Cir. 2009) (per curiam).

15

## ARGUMENT

I.  **Plaintiffs Lack Standing Because Their Only Alleged Injury Is an Informational One, and They Have No Legally Protected Interest in the Information at Issue.**

To demonstrate Article III standing, a plaintiff must show that it suffered an injury in fact that is fairly traceable to the challenged conduct and is likely to be redressed by a favorable decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An injury in fact will be found only if the plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Because the plaintiff organizations bring this action on their own behalf, they "must make the same showing required of individuals" to establish standing.  *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).

The only harm that plaintiffs allege in this case is an informational one.  The district court properly recognized that plaintiffs' alleged harm is not an informational injury sufficient to support standing because plaintiffs concededly have no legal right to the information at issue.  JA 145.  The court nevertheless concluded that plaintiffs could demonstrate organizational standing based on precisely the same alleged informational harm.  JA 148, 156.  This was error.

**A.**  As the district court recognized, plaintiffs cannot establish informational standing.  "A plaintiff suffers a sufficiently concrete and particularized informational injury" only where the plaintiff alleges that "(1) it has been deprived of information

16

that, on its interpretation, a statute *requires* the government or a third party to disclose

to it, and (2) it suffers, by being denied access to that information, the type of harm

Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828

F.3d 989, 992 (D.C. Cir. 2016) (emphasis added); *see FEC v. Akins*, 524 U.S. 11, 21

(1998).  Thus, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), the

organizational plaintiff was able to demonstrate informational standing where it

alleged that the defendant had denied it truthful, non-discriminatory housing

information to which the Fair Housing Act established a right.  By contrast, where a

plaintiff is not suing to vindicate an alleged right to receive information, diminished

access to that information does not suffice to establish an injury-in-fact to support

standing.  *See Jewell*, 828 F.3d at 994; *Feld*, 659 F.3d at 24 (declining to "extend

informational standing to a situation where, as here, the plaintiff's view of the statute

would not directly entitle it to the information it seeks").

   Here, the only harm plaintiffs allege as a result of OMB's stay is a loss of access

to pay information that they claim would have furthered their organizational interests.

JA 290-96.  But plaintiffs have no cognizable right to that information.  Title VII does

not even require EEOC to collect pay information, much less require that it be

disclosed to the public.  *See* 42 U.S.C. § 2000e-8(c)(1), (3).  And far from creating a

right for the public to access information, the PRA—the statute on which plaintiffs'

suit is based—was intended "to reduce the paperwork burden" imposed by the

federal government, and to ensure that information collections are justified.  *Dole v.*

17

*United Steelworkers of Am.*, 494 U.S. 26, 32 (1990).  It is therefore "undisputed that Plaintiffs here do not have a statutory right to" pay information.  JA 145. Accordingly, plaintiffs' asserted loss of access to the information is not the type of concrete injury that can support informational standing.  *See Jewell*, 828 F.3d at 994; *Feld*, 659 F.3d at 24.  The district court properly acknowledged that plaintiffs lack "informational standing" based on their lack of a cognizable interest in the information at issue.  JA 145.

        **B.**  Incongruously, though, the district court held that plaintiffs could establish "organizational standing" premised on precisely the same alleged harm found insufficient to support informational standing.  JA 148; *see* JA 156 (holding that plaintiffs "have shown that the stay of EEOC's data collection deprives them of information that they use to educate their members and the public").  But this Court has made clear that a plaintiff "cannot ground organizational injury on a non-existent interest" in accessing information.  *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017).  That principle controls this case.

        In *EPIC*, the plaintiff alleged that the E-Government Act required the Presidential Advisory Commission on Election Integrity to prepare a privacy impact assessment before collecting voter roll information.  EPIC asserted that the Presidential Advisory Commission's failure to prepare an assessment caused two types of injuries: an "informational injury" based on the lack of access to the information that would have been contained in the assessment, and an "organizational injury"

18

based on the harm caused to EPIC's mission as a result of the lack of information. 878 F.3d at 377. This Court held that the plaintiff lacked informational standing because the alleged loss of information was not the type of harm that Congress sought to prevent through the E-Government Act. *Id.* at 378. The Court then rejected EPIC's asserted "organizational injury" on the same basis, reiterating that "the E-Government Act does not confer any such informational interest on EPIC." *Id.* at 379.

In a concurring opinion in *EPIC*, Judge Williams expressly rejected the plaintiff's framing of the case as presenting two distinct interests—one informational, and the other organizational. As the opinion explained, "organizational standing is merely the label assigned to the *capacity* in which the organization contends it has been harmed; it is not a separate *type* of injury." *EPIC*, 878 F.3d at 381 (Williams, J., concurring). It is thus appropriate to juxtapose "organizational standing," through which an organization seeks to establish standing on behalf of itself, not with informational standing but with "associational standing," through which an organization seeks to establish standing on behalf of its members. *See id.* Accordingly, "[w]here an organization's only asserted injury is an informational one, [this Court] ha[s] not engaged in a separate analysis of informational and organizational injury." *Id.* In those circumstances, "additional discussion of the same facts under the 'organizational' rubric will not clarify the court's reasoning." *Id.* An

19

organization suing on its own behalf must make "the same showing required of individuals," including "an actual or threatened injury in fact." *Feld*, 659 F.3d at 24.

    *EPIC* squarely forecloses plaintiffs' attempt to establish standing based "on a non-existent [informational] interest." 878 F.3d at 379. As discussed, it is "undisputed that Plaintiffs here do not have a statutory right" under either the PRA or Title VII "to the information they allege forms their injury in fact." JA 145. Nor have plaintiffs alleged that they "suffered the type of harm that [these statutes] seek[] to prevent." *EPIC*, 878 F.3d at 378; *accord Akins*, 524 U.S. at 20 (asking whether "[t]he injury of which respondents complain—their failure to obtain relevant information—is injury of a kind that [the relevant statute] seeks to address").

    The district court attempted to distinguish *EPIC* on two grounds, JA 155, but the proffered distinctions are illusory. First, observing that the statute in *EPIC* "was designed to protect individuals' privacy rights," in which EPIC, as an organization, had no cognizable interest, the court held that in this case "[p]laintiffs have sought information that is designed to protect far more than individuals' privacy rights." *Id.* (citing *EPIC*, 878 F.3d at 378). This distinction misapprehends the point. *EPIC* does not suggest that the inquiry is always about privacy rights. Rather, it establishes that a plaintiff will have informational standing only if it is suing to vindicate the interests the relevant statute was meant to protect. As in *EPIC*, the interests plaintiffs seek to vindicate here are not those with which Congress was concerned, and neither the

20

PRA nor Title VII "confer[s] any such informational interest" on plaintiffs to support standing. *EPIC*, 878 F.3d at 379.

The district court also sought to distinguish *EPIC* on the ground that the plaintiff's harm in that case was the product of "entirely discretionary budgetary choices." JA 155. But in that respect, too, *EPIC* is on all fours with this case. *EPIC* explained that, because the plaintiff had no cognizable interest in the information it sought, "[i]t follows that any resources EPIC used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were 'a self-inflicted budgetary choice that cannot qualify as an injury in fact.'" 878 F.3d at 379 (quoting *Feld*, 659 F.3d at 25). Similarly here, because plaintiffs have no cognizable interest in the information at issue, any decision to spend organizational resources to obtain that information through private means is a self-inflicted choice that cannot establish an injury in fact.

**C.** The cases on which the district court relied—*Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), and *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015)—are inapposite. In neither case did the Court allow the plaintiff to recast an inadequate informational injury as a sufficient organizational inquiry without any additional showing.

The plaintiffs in *Action Alliance* challenged a regulation of the Department of Health and Human Services that declined to require certain recipients of federal funding to provide self-reports or to submit compliance information absent an agency

request, thereby foreclosing "a generous flow of information regarding services available to the elderly." 789 F.2d at 937. Government-wide regulations implementing the statute at issue required such reporting, and the plaintiffs urged that the absence of such a requirement in the challenged agency-specific regulations made them inconsistent with the government-wide regulations. *Id.* at 935. The plaintiffs alleged that, by omitting the requirement to make this information available, the agency "den[ied] the [plaintiff] organizations access to information and avenues of redress they wish[ed] to use in their routine information-dispensing, counseling, and referral activities." *Id.* at 937-38. The plaintiffs thus alleged that the agency was *legally required* by the government-wide regulations to provide access to the information at issue, and that, by having such access, plaintiffs would be better able to further the interests that Congress intended the statute to protect. Based on those showings, the Court held that plaintiffs had standing. *Id.* As discussed above, plaintiffs in this case have made neither of these showings.

In *PETA*, although the plaintiff did not have a clear legal right to the information at issue, its argument for standing was not premised solely on an alleged informational harm. The plaintiff in that case alleged that the Department of Agriculture had acted unlawfully in adopting a policy of not enforcing its animal-welfare regulations with respect to birds. It was conceded that, if the agency took the measures the plaintiff alleged were required, the agency would investigate complaints of avian abuse and generate publicly available inspection reports. *PETA*, 797 F.3d at

22

1095.  PETA alleged that the agency's inaction had "impaired [its] mission in two respects: it precluded PETA from preventing cruelty to and inhumane treatment of these animals through its normal process of submitting USDA complaints[,] and it deprived PETA of key information that it relies on to educate the public." *Id.* at 1094 (quotation marks omitted).  Plaintiff's claim to standing was thus supported by two independent harms—one informational, relating to the lack of inspection reports, and the other non-informational, relating to the unavailability of a means for PETA to initiate formal investigations of suspected bird mistreatment.  *Cf. Feld*, 659 F.3d at 22-26 (considering, without deciding, whether a *separate* allegation of harm could suffice to demonstrate organizational standing after holding that the plaintiff's alleged informational harm was insufficient because there was no legal right to the information).  The *PETA* Court nowhere suggested that an informational interest alone could suffice to support standing in the absence of any legal right to the information at issue.

In neither *Action Alliance* nor *PETA* did this Court suggest that an organization has standing any time it asserts that an agency's failure to collect information makes the organization's mission harder to accomplish.  As this Court recognized in *EPIC*, that conclusion cannot be reconciled with the requirements of informational standing, which define the bounds of cognizable injury.  878 F.3d at 379.  It would also improperly impose a reduced burden for organizations to establish standing as compared to the showing required for individuals.  *See Havens Realty*, 455 U.S. at 378

23

(foreclosing that result); *Feld*, 659 F.3d at 24 (same). As noted above, this Court has squarely rejected the notion that a plaintiff can "ground organizational injury on a non-existent interest" in accessing information. *EPIC*, 878 F.3d at 379. *Action Alliance* and *PETA* must be read in accord with that requirement.[4]

**D.** Even if plaintiffs had alleged a cognizable injury, they have failed to show that their alleged informational injury would be redressed by the relief requested. As the district court recognized, "[s]tanding is 'substantially more difficult to establish,' because Plaintiffs are not the object of the government action." JA 151 (quoting *Lujan*, 504 U.S. at 562). Where, as here, "the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury—*i.e.*, if the injury may or may not follow from the conduct, based on a chain of contingencies—the plaintiff faces an uphill climb in pleading and proving redressability," JA 151-52 (quoting *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017)), and can prevail only by establishing "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact," *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). Plaintiffs cannot meet that standard.

---

[4] At least one member of this Court has noted that *Action Alliance* and *PETA* threaten to undermine the requirements of informational standing. *PETA*, 797 F.3d at 1104 (Millett, J.) (*dubitante*). The government shares the concerns expressed in that opinion. For purposes of this case, however, it suffices to recognize—as this Court did in *EPIC*—that these precedents do not dispense entirely with the limitations on informational standing when the plaintiff is an organization.

24

Plaintiffs' complaint asked only that the court vacate OMB's stay. Neither that relief, nor the additional relief improperly directing EEOC to complete the information collection in the specified manner, would remedy plaintiff's alleged informational harm. Although that relief reinstated employers' obligation to report pay information to EEOC and directed EEOC to collect the information, it does not cause plaintiffs to receive the information because there is no legal obligation on the part of EEOC to publicly report the information submitted. Indeed, the decision whether to publish pay information is entrusted entirely to EEOC's discretion under Title VII, JA 152, which explains why plaintiffs have not asserted any right to disclosure of the information and why the district court did not order any such relief.

In nevertheless holding that plaintiffs' injury would likely be redressed by a favorable decision, the district court relied on EEOC's statement that it "expects to periodically publish reports on pay disparities." JA 152 (emphasis omitted) (quoting 81 Fed. Reg. at 45,491). That statement did not specify what form or quantity of information might be disclosed. And the stated possibility that the agency might disclose the information does not, in any event, suffice to establish "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact," as is required for Article III standing. *Vermont Agency*, 529 U.S. at 771. This is all the more true given that EEOC's statement about the possibility of disclosure was made before EEOC identified certain concerns with the feasibility and benefits of the information collection. JA 126-31. The data-quality and other concerns EEOC has identified may

25

counsel against disclosure of 2017 and 2018 pay information following its collection.

These considerations further underscore that it is at best speculative whether the relief

ordered will remedy plaintiffs' asserted injury, and such conjecture is inadequate to

support Article III redressability. *See West*, 845 F.3d at 1237 ("When conjecture is

necessary, redressability is lacking.").

## II. After the District Court Set Aside OMB's Stay of the Collection, Plaintiffs Were Entitled to No Further Relief, and the Court Exceeded Its Authority in Requiring EEOC To Complete the Collection to the Court's Specifications.

If the Court agrees that plaintiffs lack standing, both the March 4 order

vacating OMB's stay and the April 25 order entering additional relief should be

vacated in their entirety for lack of jurisdiction. But even assuming the district court

properly ruled for plaintiffs on the merits, this Court should vacate the additional

remedies against EEOC in the April 25 order, which exceeded the district court's

authority and improperly constrained EEOC's powers.

**A.** "[U]nder settled principles of administrative law, when a court reviewing

agency action determines that an agency made an error of law, the court's inquiry is at

an end: the case must be remanded to the agency for further action consistent with

the correct legal standards." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C.

Cir. 2005); *accord Northern Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir.

2012) ("When a district court reverses agency action and determines that the agency

acted unlawfully, ordinarily the appropriate course is simply to identify a legal error

and then remand to the agency."). Thus, in cases like this under the Administrative Procedure Act (APA), the court generally "ha[s] no jurisdiction to order specific relief." *Palisades*, 426 F.3d at 403.

Consistent with these settled principles, the district court's inquiry in this case should have been at an end following its March 4 decision vacating OMB's stay. As the complaint makes clear, plaintiffs' claims were limited to the lawfulness of OMB's actions. The complaint alleges that the "OMB Defendants acted unlawfully in staying the pay data collection." JA 287. And each of the four counts stated in the complaint concerns OMB's conduct. Plaintiffs allege that OMB's stay exceeded the agency's authority, JA 312-13, was contrary to regulation, JA 313-14, was contrary to statute, JA 314, and was arbitrary and capricious, JA 314-15. In its prayer for relief, the complaint principally asks the court to declare that the OMB defendants acted unlawfully and to vacate OMB's stay. JA 315. The district court's March 4 opinion and order vacating OMB's stay of its previous approval thus gave plaintiffs the relief they sought.

The complaint nowhere alleges that EEOC acted unlawfully, nor does it request judicial review of any EEOC action. As the body of the complaint explains, plaintiffs sued the EEOC defendants "as necessary parties for relief in this case because the EEOC acted consistently with a directive from OMB Defendants to notify employers that they were not required to submit pay data as part of their EEO-1 submissions for the current fiscal year." JA 287. Regulations implementing the

27

PRA required EEOC to provide notice of OMB's stay, 5 C.F.R. § 1320.10(g), and

EEOC acted in accordance with that requirement, 82 Fed. Reg. at 43,362.  The

complaint's prayer for relief asked that, after vacating OMB's stay, the court "[o]rder

EEOC Defendants to publish a Federal Register notice announcing this

reinstatement" of OMB's approval of the collection of information.  JA 315.  EEOC

has already complied with the part of the court's order (JA 4) that awarded such relief,

*see* 84 Fed. Reg. at 18,974; 84 Fed. Reg. at 18,383, and that portion of the court's

remedy is not at issue in this appeal.

The district court exceeded its authority, and went far beyond the relief sought

in the complaint, by directing EEOC to complete the information collection and to

take a number of extraordinarily specific actions in connection therewith.  In

particular, the court ordered that EEOC: (1) collect two years of pay data; (2) take all

necessary steps to complete the collection of 2017 and 2018 data by September 30,

2019; (3) file status reports with the district court every three weeks; and (4) continue

collecting the 2017 and 2018 data until the percentage of employers reporting meets

the standard established by the court.  JA 3-4.  It was "the prerogative of the agency

to decide in the first instance how best to" proceed on remand, rather than having the

court dictate its actions.  *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013).

That is particularly true in these circumstances because nothing in Title VII or

the PRA requires EEOC to take any of the additional steps set out in the district

court's order.  Just as those statutes did not require EEOC to direct employers to

28

provide pay information in the first place, they also did not require EEOC to take additional action following OMB's approval.  By approving the information collection, OMB authorized EEOC to require employers to provide information to EEOC, but it did not impose any obligations on EEOC, much less dictate the manner in which EEOC could implement the collection.  Thus, if OMB had never issued its stay but EEOC had, based on changed circumstances such as practical difficulties associated with collection, reconsidered its decision to collect the data, nothing about the existence of an approved information collection request would have given plaintiffs a legal basis in either Title VII or the PRA to force EEOC to proceed with the collection.  Likewise, after OMB decided to review and stay the collection, EEOC was obligated only to publish a Federal Register notice and support OMB's review. *See* 5 C.F.R. § 1320.10(f)-(g).  Nothing in Title VII or the PRA required EEOC to take any of the additional actions contemplated by the district court.

EEOC's limited obligations in this respect are not altered by the district court's conclusion that OMB acted unlawfully in staying the collection.  OMB regulations implementing the PRA set forth specific requirements for the review or stay of an information collection, and plaintiffs alleged that those requirements were not met in this case.  The court provided a remedy for that violation by vacating the stay and reinstating OMB's approval of the collection.  At that point, EEOC retained discretion regarding the collection of pay information.  No statute or regulation constrains EEOC's actions in these circumstances.

29

There is no basis to conclude that, because the district court held that *OMB unlawfully* stayed the collection, the court somehow gained authority to limit *EEOC's lawful* actions. The complaint does not allege any unlawful action by EEOC in this case. If plaintiffs believed that EEOC was somehow violating a statutory or regulatory command, then plaintiffs needed to state a claim to that effect, and the district court needed to adjudicate it. *Cf. Cody v. Cox*, 509 F.3d 606, 609 n.1 (D.C. Cir. 2007) (holding that the district court properly declined to consider alleged violations not stated in the complaint). But plaintiffs have not established that EEOC acted unlawfully, and the district court lacked authority to superintend EEOC's actions in these circumstances.

The district court's remedial order is not just erroneous as a legal matter but also burdensome as a practical matter. As the government has explained, there are many challenges in implementing the collection following the vacatur of the stay, JA 126-27, and the district court improperly second-guessed EEOC's expert judgment. The district court's order directing EEOC to conduct the collection in a particular way comes at a high cost to the government and the regulated community and may have ramifications for the quality of the information that EEOC collects. Completing the collection on the compressed timeframe ordered by the court required EEOC— and thus the public—to incur costs above and beyond those that otherwise would have been incurred. *Id.* Moreover, the number of years of data that employers are required to report, and the timeline for reporting, may "decrease response rates and

30

increase errors in the entire data collection process," JA 127, "rais[ing] significant issues with data validity and data reliability," JA 129.  By constraining EEOC's conduct in this way, the court's order thus threatens to reduce the utility of the information ultimately collected by the Commission.

Although there are "rare cases, when the reviewing court is convinced that remand would serve no purpose, [in which] the court direct[s] the agency how to resolve a problem," *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 n.6 (D.C. Cir. 2014), those circumstances are not presented here.  Such extraordinary relief has generally been limited to circumstances in which the court has previously remanded and the agency had repeated its errors.  For example, in *National Ass'n of Regulatory Utility Commissioners v. U.S. Department of Energy*, 736 F.3d 517, 519-20 (D.C. Cir. 2013), the Court ordered that a fee assessed by the Department of Energy in connection with the disposal of nuclear waste be changed to zero after concluding that the Department repeatedly, through multiple rounds of litigation, "declined to reach the statutorily required determination" regarding what fee should be assessed.  Thus, it was only after finding that the agency that was alleged to have acted unlawfully in the first instance was unwilling or unable to follow a clear statutory directive on remand that the Court prescribed a specific action for the agency to take.

Here, there is no allegation that EEOC's conduct violated a statutory directive in the first instance, much less that EEOC persisted in some unlawful conduct following the entry of the court's order.  While plaintiffs and the court expressed

concern that EEOC was not acting with appropriate speed following the vacatur of the stay, there was no pending claim concerning the lawfulness of EEOC's actions for the court to address, much less any basis for concluding that EEOC was legally compelled to act as the court ultimately directed.  If plaintiffs believed that EEOC had acted unlawfully, they should have sought leave to amend their complaint or filed a new action stating a claim against the Commission.  But plaintiffs did not do so. And neither plaintiffs nor the district court identified any case in which a court awarded comparable relief in analogous circumstances—particularly against an agency wholly separate from the one alleged to have acted unlawfully in the complaint. Indeed, of the four district court cases cited by the court, JA 23, only one was an APA case in which the court directed the agency to take specific actions.  And in that case, the agency had been found by this Court to have acted unlawfully in proceeding without notice and comment, and the district court on remand had directed the agency to proceed with notice and comment on the timeline proposed by the agency. *Mendoza v. Perez*, 72 F. Supp. 3d 168, 170-74 (D.D.C. 2014).  Nothing in that decision supports the relief entered here.

**B.**  Although the district court issued extraordinary relief that is usually unavailable under the APA, it provided no written opinion to support that order. Instead, the rationale for the court's order is found in statements at the April 16 and 25 hearings indicating that the decision was premised on questions raised late in these proceedings about the government's conduct in connection with this case.  At these

32

hearings, the court suggested that EEOC had not been taking adequate steps during the pendency of the litigation to prepare to collect pay information.  JA 12-13, 112-13.  And plaintiffs and the court expressed concern that the government had not made it known earlier in the proceedings that it could take EEOC an extended period of time to prepare to collect pay information in the event the court vacated the stay.  JA 6-11, 48.  The issuance of the April 25 order based on those concerns is legally and factually unfounded.

With respect to the law, OMB's stay operated to suspend actions associated with the information collection pending further review of the collection.  During the pendency of the stay, there was thus nothing that legally required EEOC either to use agency resources to prepare to collect information that might never be collected, or to ensure that EEOC could collect the pay information at issue on the same schedule as other EEO-1 information in the event the district court ultimately vacated the stay.  And once OMB's stay of EEOC's information collection was vacated, nothing in Title VII or the PRA required EEOC to proceed with the collection of that information in the manner prescribed by the court.  If plaintiffs had a different view of EEOC's obligations, that claim needed to be raised and adjudicated in the ordinary course.  There was no basis to enter a remedial order before a proper proceeding regarding the legal merits of EEOC's actions, as opposed to OMB's.

As for the facts, the question of plaintiffs' awareness of the amount of time it would take the government to complete the information collection if the stay were

vacated arose principally in correspondence between the parties in connection with a request for an extension of time to file the government's summary judgment brief.  In that correspondence, government counsel stated that, if the stay were vacated, it would take *OMB* only one day to be prepared to perform its functions in connection with the collection of information.  *See* JA 39-40.  Counsel further stated, in the same email, that she had not yet received a response from *EEOC* addressing the time needed to prepare to collect pay information.  *See id.*  Plaintiffs' counsel agreed to the extension without waiting for that response.  *See* JA 40.  Government counsel did not follow up with plaintiffs when she subsequently received tentative and preliminary information indicating that it could take EEOC a substantial period of time to prepare to collect pay information.  *See* JA 40-41.  Contrary to the district court's suggestion, nothing about this exchange justifies ignoring the APA's ordinary remedial rules and compelling EEOC to take a series of extraordinarily specific actions that are in no respect mandated by law or within the court's power to order in this case.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

DANIEL TENNY
  */s/ Lindsey Powell*

LINDSEY POWELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5372*
  *lindsey.e.powell@usdoj.gov*

August 2019

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 8,646 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Lindsey Powell
LINDSEY POWELL

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Lindsey Powell*

LINDSEY POWELL

**ADDENDUM**

# TABLE OF CONTENTS

44 U.S.C. § 3506 ..................................................................................A1

44 U.S.C. § 3507 ..................................................................................A8

5 C.F.R. § 1320.10 .............................................................................. A13

**44 U.S.C. § 3506**

**Federal agency responsibilities**

(a)

(1) The head of each agency shall be responsible for—

(A) carrying out the agency's information resources management activities to improve agency productivity, efficiency, and effectiveness; and

(B) complying with the requirements of this subchapter and related policies established by the Director.

(2)

(A) Except as provided under subparagraph (B), the head of each agency shall designate a Chief Information Officer who shall report directly to such agency head to carry out the responsibilities of the agency under this subchapter.

(B) The Secretary of the Department of Defense and the Secretary of each military department may each designate Chief Information Officers who shall report directly to such Secretary to carry out the responsibilities of the department under this subchapter. If more than one Chief Information Officer is designated, the respective duties of the Chief Information Officers shall be clearly delineated.

(3) The Chief Information Officer designated under paragraph (2) shall head an office responsible for ensuring agency compliance with and prompt, efficient, and effective implementation of the information policies and information resources management responsibilities established under this subchapter, including the reduction of information collection burdens on the public. The Chief Information Officer and employees of such office shall be selected with special attention to the professional qualifications required to administer the functions described under this subchapter.

(4) Each agency program official shall be responsible and accountable for information resources assigned to and supporting the programs under such official. In consultation with the Chief Information Officer designated under paragraph (2) and the agency Chief Financial Officer (or comparable official), each agency program official shall define program information needs and develop strategies, systems, and capabilities to meet those needs.

(b) With respect to general information resources management, each agency shall—

(1) manage information resources to—

(A) reduce information collection burdens on the public;

A1

(B) increase program efficiency and effectiveness; and

(C) improve the integrity, quality, and utility of information to all users within and outside the agency, including capabilities for ensuring dissemination of public information, public access to government information, and protections for privacy and security;

(2) in accordance with guidance by the Director, develop and maintain a strategic information resources management plan that shall describe how information resources management activities help accomplish agency missions;

(3) develop and maintain an ongoing process to—

(A) ensure that information resources management operations and decisions are integrated with organizational planning, budget, financial management, human resources management, and program decisions;

(B) in cooperation with the agency Chief Financial Officer (or comparable official), develop a full and accurate accounting of information technology expenditures, related expenses, and results; and

(C) establish goals for improving information resources management's contribution to program productivity, efficiency, and effectiveness, methods for measuring progress towards those goals, and clear roles and responsibilities for achieving those goals;

(4) in consultation with the Director, the Administrator of General Services, and the Archivist of the United States, maintain a current and complete inventory of the agency's information resources, including directories necessary to fulfill the requirements of section 3511 of this subchapter; and

(5) in consultation with the Director and the Director of the Office of Personnel Management, conduct formal training programs to educate agency program and management officials about information resources management.

(c) With respect to the collection of information and the control of paperwork, each agency shall—

(1) establish a process within the office headed by the Chief Information Officer designated under subsection (a), that is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved under this subchapter, to—

(A) review each collection of information before submission to the Director for review under this subchapter, including—

(i) an evaluation of the need for the collection of information;

A2

(ii) a functional description of the information to be collected;

(iii) a plan for the collection of the information;

(iv) a specific, objectively supported estimate of burden;

(v) a test of the collection of information through a pilot program, if appropriate; and

(vi) a plan for the efficient and effective management and use of the information to be collected, including necessary resources;

(B) ensure that each information collection—

(i) is inventoried, displays a control number and, if appropriate, an expiration date;

(ii) indicates the collection is in accordance with the clearance requirements of section 3507; and

(iii) informs the person receiving the collection of information of—

(I) the reasons the information is being collected;

(II) the way such information is to be used;

(III) an estimate, to the extent practicable, of the burden of the collection;

(IV) whether responses to the collection of information are voluntary, required to obtain a benefit, or mandatory; and

(V) the fact that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number; and

(C) assess the information collection burden of proposed legislation affecting the agency;

(2)

(A) except as provided under subparagraph (B) or section 3507(j), provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to—

(i) evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility;

(ii) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information;

(iii) enhance the quality, utility, and clarity of the information to be collected; and

(iv) minimize the burden of the collection of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology; and

(B) for any proposed collection of information contained in a proposed rule (to be reviewed by the Director under section 3507(d)), provide notice and comment through the notice of proposed rulemaking for the proposed rule and such notice shall have the same purposes specified under subparagraph (A)(i) through (iv);

(3) certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information submitted to the Director for review under section 3507—

(A) is necessary for the proper performance of the functions of the agency, including that the information has practical utility;

(B) is not unnecessarily duplicative of information otherwise reasonably accessible to the agency;

(C) reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, including with respect to small entities, as defined under section 601(6) of title 5, the use of such techniques as—

(i) establishing differing compliance or reporting requirements or timetables that take into account the resources available to those who are to respond;

(ii) the clarification, consolidation, or simplification of compliance and reporting requirements; or

(iii) an exemption from coverage of the collection of information, or any part thereof;

(D) is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond;

(E) is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond;

(F) indicates for each recordkeeping requirement the length of time persons are required to maintain the records specified;

(G) contains the statement required under paragraph (1)(B)(iii);

(H) has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected,

including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public;

(I) uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected; and

(J) to the maximum extent practicable, uses information technology to reduce burden and improve data quality, agency efficiency and responsiveness to the public; and

(4) in addition to the requirements of this chapter regarding the reduction of information collection burdens for small business concerns (as defined in section 3 of the Small Business Act (15 U.S.C. 632)), make efforts to further reduce the information collection burden for small business concerns with fewer than 25 employees.

(d) With respect to information dissemination, each agency shall—

(1) ensure that the public has timely and equitable access to the agency's public information, including ensuring such access through—

(A) encouraging a diversity of public and private sources for information based on government public information;

(B) in cases in which the agency provides public information maintained in electronic format, providing timely and equitable access to the underlying data (in whole or in part); and

(C) agency dissemination of public information in an efficient, effective, and economical manner;

(2) regularly solicit and consider public input on the agency's information dissemination activities;

(3) provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products; and

(4) not, except where specifically authorized by statute—

(A) establish an exclusive, restricted, or other distribution arrangement that interferes with timely and equitable availability of public information to the public;

(B) restrict or regulate the use, resale, or redissemination of public information by the public;

(C) charge fees or royalties for resale or redissemination of public information; or

(D) establish user fees for public information that exceed the cost of dissemination.

(e) With respect to statistical policy and coordination, each agency shall—

  (1) ensure the relevance, accuracy, timeliness, integrity, and objectivity of information collected or created for statistical purposes;

  (2) inform respondents fully and accurately about the sponsors, purposes, and uses of statistical surveys and studies;

  (3) protect respondents' privacy and ensure that disclosure policies fully honor pledges of confidentiality;

  (4) observe Federal standards and practices for data collection, analysis, documentation, sharing, and dissemination of information;

  (5) ensure the timely publication of the results of statistical surveys and studies, including information about the quality and limitations of the surveys and studies; and

  (6) make data available to statistical agencies and readily accessible to the public.

(f) With respect to records management, each agency shall implement and enforce applicable policies and procedures, including requirements for archiving information maintained in electronic format, particularly in the planning, design and operation of information systems.

(g) With respect to privacy and security, each agency shall—

  (1) implement and enforce applicable policies, procedures, standards, and guidelines on privacy, confidentiality, security, disclosure and sharing of information collected or maintained by or for the agency; and

  (2) assume responsibility and accountability for compliance with and coordinated management of sections 552 and 552a of title 5, subchapter II of this chapter, and related information management laws.

(h) With respect to Federal information technology, each agency shall—

  (1) implement and enforce applicable Governmentwide and agency information technology management policies, principles, standards, and guidelines;

  (2) assume responsibility and accountability for information technology investments;

  (3) promote the use of information technology by the agency to improve the productivity, efficiency, and effectiveness of agency programs, including the reduction of information collection burdens on the public and improved dissemination of public information;

  (4) propose changes in legislation, regulations, and agency procedures to improve information technology practices, including changes that improve the ability of the agency to use technology to reduce burden; and

(5) assume responsibility for maximizing the value and assessing and managing the risks of major information systems initiatives through a process that is—

(A) integrated with budget, financial, and program management decisions; and

(B) used to select, control, and evaluate the results of major information systems initiatives.

(i)

(1) In addition to the requirements described in subsection (c), each agency shall, with respect to the collection of information and the control of paperwork, establish 1 point of contact in the agency to act as a liaison between the agency and small business concerns (as defined in section 3 of the Small Business Act (15 U.S.C. 632)).

(2) Each point of contact described under paragraph (1) shall be established not later than 1 year after the date of enactment of the Small Business Paperwork Relief Act of 2002.

**44 U.S.C. § 3507**

**Public information collection activities; submission to Director; approval and delegation**

(a) An agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information—

  (1) the agency has—

   (A) conducted the review established under section 3506(c)(1);

   (B) evaluated the public comments received under section 3506(c)(2);

   (C) submitted to the Director the certification required under section 3506(c)(3), the proposed collection of information, copies of pertinent statutory authority, regulations, and other related materials as the Director may specify; and

   (D) published a notice in the Federal Register—

    (i) stating that the agency has made such submission; and

    (ii) setting forth—

     (I) a title for the collection of information;

     (II) a summary of the collection of information;

     (III) a brief description of the need for the information and the proposed use of the information;

     (IV) a description of the likely respondents and proposed frequency of response to the collection of information;

     (V) an estimate of the burden that shall result from the collection of information; and

     (VI) notice that comments may be submitted to the agency and Director;

  (2) the Director has approved the proposed collection of information or approval has been inferred, under the provisions of this section; and

  (3) the agency has obtained from the Director a control number to be displayed upon the collection of information.

(b) The Director shall provide at least 30 days for public comment prior to making a decision under subsection (c), (d), or (h), except as provided under subsection (j).

(c)

(1) For any proposed collection of information not contained in a proposed rule, the Director shall notify the agency involved of the decision to approve or disapprove the proposed collection of information.

(2) The Director shall provide the notification under paragraph (1), within 60 days after receipt or publication of the notice under subsection (a)(1)(D), whichever is later.

(3) If the Director does not notify the agency of a denial or approval within the 60-day period described under paragraph (2)—

(A) the approval may be inferred;

(B) a control number shall be assigned without further delay; and

(C) the agency may collect the information for not more than 1 year.

(d)

(1) For any proposed collection of information contained in a proposed rule—

(A) as soon as practicable, but no later than the date of publication of a notice of proposed rulemaking in the Federal Register, each agency shall forward to the Director a copy of any proposed rule which contains a collection of information and any information requested by the Director necessary to make the determination required under this subsection; and

(B) within 60 days after the notice of proposed rulemaking is published in the Federal Register, the Director may file public comments pursuant to the standards set forth in section 3508 on the collection of information contained in the proposed rule;

(2) When a final rule is published in the Federal Register, the agency shall explain—

(A) how any collection of information contained in the final rule responds to the comments, if any, filed by the Director or the public; or

(B) the reasons such comments were rejected.

(3) If the Director has received notice and failed to comment on an agency rule within 60 days after the notice of proposed rulemaking, the Director may not disapprove any collection of information specifically contained in an agency rule.

(4) No provision in this section shall be construed to prevent the Director, in the Director's discretion—

(A) from disapproving any collection of information which was not specifically required by an agency rule;

(B) from disapproving any collection of information contained in an agency rule, if the agency failed to comply with the requirements of paragraph (1) of this subsection;

(C) from disapproving any collection of information contained in a final agency rule, if the Director finds within 60 days after the publication of the final rule that the agency's response to the Director's comments filed under paragraph (2) of this subsection was unreasonable; or

(D) from disapproving any collection of information contained in a final rule, if—

(i) the Director determines that the agency has substantially modified in the final rule the collection of information contained in the proposed rule; and

(ii) the agency has not given the Director the information required under paragraph (1) with respect to the modified collection of information, at least 60 days before the issuance of the final rule.

(5) This subsection shall apply only when an agency publishes a notice of proposed rulemaking and requests public comments.

(6) The decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review.

(e)

(1) Any decision by the Director under subsection (c), (d), (h), or (j) to disapprove a collection of information, or to instruct the agency to make substantive or material change to a collection of information, shall be publicly available and include an explanation of the reasons for such decision.

(2) Any written communication between the Administrator of the Office of Information and Regulatory Affairs, or any employee of the Office of Information and Regulatory Affairs, and an agency or person not employed by the Federal Government concerning a proposed collection of information shall be made available to the public.

(3) This subsection shall not require the disclosure of—

(A) any information which is protected at all times by procedures established for information which has been specifically authorized under criteria established by an Executive order or an Act of Congress to be kept secret in the interest of national defense or foreign policy; or

(B) any communication relating to a collection of information which is not approved under this subchapter, the disclosure of which could lead to retaliation or discrimination against the communicator.

(f)

(1) An independent regulatory agency which is administered by 2 or more members of a commission, board, or similar body, may by majority vote void—

(A) any disapproval by the Director, in whole or in part, of a proposed collection of information of that agency; or

(B) an exercise of authority under subsection (d) of section 3507 concerning that agency.

(2) The agency shall certify each vote to void such disapproval or exercise to the Director, and explain the reasons for such vote. The Director shall without further delay assign a control number to such collection of information, and such vote to void the disapproval or exercise shall be valid for a period of 3 years.

(g) The Director may not approve a collection of information for a period in excess of 3 years.

(h)

(1) If an agency decides to seek extension of the Director's approval granted for a currently approved collection of information, the agency shall—

(A) conduct the review established under section 3506(c), including the seeking of comment from the public on the continued need for, and burden imposed by the collection of information; and

(B) after having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the control number assigned by the Director for the currently approved collection of information, submit the collection of information for review and approval under this section, which shall include an explanation of how the agency has used the information that it has collected.

(2) If under the provisions of this section, the Director disapproves a collection of information contained in an existing rule, or recommends or instructs the agency to make a substantive or material change to a collection of information contained in an existing rule, the Director shall—

(A) publish an explanation thereof in the Federal Register; and

(B) instruct the agency to undertake a rulemaking within a reasonable time limited to consideration of changes to the collection of information contained in the rule and thereafter to submit the collection of information for approval or disapproval under this subchapter.

(3) An agency may not make a substantive or material modification to a collection of information after such collection has been approved by the Director, unless the modification has been submitted to the Director for review and approval under this subchapter.

(i)

A11

(1) If the Director finds that a senior official of an agency designated under section 3506(a) is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved and has sufficient resources to carry out this responsibility effectively, the Director may, by rule in accordance with the notice and comment provisions of chapter 5 of title 5, United States Code, delegate to such official the authority to approve proposed collections of information in specific program areas, for specific purposes, or for all agency purposes.

(2) A delegation by the Director under this section shall not preclude the Director from reviewing individual collections of information if the Director determines that circumstances warrant such a review. The Director shall retain authority to revoke such delegations, both in general and with regard to any specific matter. In acting for the Director, any official to whom approval authority has been delegated under this section shall comply fully with the rules and regulations promulgated by the Director.

(j)

(1) The agency head may request the Director to authorize a collection of information, if an agency head determines that—

(A) a collection of information—

(i) is needed prior to the expiration of time periods established under this subchapter; and

(ii) is essential to the mission of the agency; and

(B) the agency cannot reasonably comply with the provisions of this subchapter because—

(i) public harm is reasonably likely to result if normal clearance procedures are followed;

(ii) an unanticipated event has occurred; or

(iii) the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed.

(2) The Director shall approve or disapprove any such authorization request within the time requested by the agency head and, if approved, shall assign the collection of information a control number. Any collection of information conducted under this subsection may be conducted without compliance with the provisions of this subchapter for a maximum of 180 days after the date on which the Director received the request to authorize such collection.

**5 C.F.R. § 1320.10**

**Clearance of collections of information, other than those contained in proposed rules or in current rules.**

Agencies shall submit all collections of information, other than those contained either in proposed rules published for public comment in the Federal Register (which are submitted under § 1320.11) or in current rules that were published as final rules in the Federal Register (which are submitted under § 1320.12), in accordance with the following requirements:

(a) On or before the date of submission to OMB, the agency shall, in accordance with the requirements in § 1320.5(a)(1)(iv), forward a notice to the Federal Register stating that OMB approval is being sought. The notice shall direct requests for information, including copies of the proposed collection of information and supporting documentation, to the agency, and shall request that comments be submitted to OMB within 30 days of the notice's publication. The notice shall direct comments to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for [name of agency]. A copy of the notice submitted to the Federal Register, together with the date of expected publication, shall be included in the agency's submission to OMB.

(b) Within 60 days after receipt of the proposed collection of information or publication of the notice under paragraph (a) of this section, whichever is later, OMB shall notify the agency involved of its decision to approve, to instruct the agency to make a substantive or material change to, or to disapprove, the collection of information, and shall make such decision publicly available. OMB shall provide at least 30 days for public comment after receipt of the proposed collection of information before making its decision, except as provided under § 1320.13. Upon approval of a collection of information, OMB shall assign an OMB control number and, if appropriate, an expiration date. OMB shall not approve any collection of information for a period longer than three years.

(c) If OMB fails to notify the agency of its approval, instruction to make substantive or material change, or disapproval within the 60-day period, the agency may request, and OMB shall assign without further delay, an OMB control number that shall be valid for not more than one year.

(d) As provided in § 1320.5(b) and § 1320.6(a), an agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

(e)

  (1) In the case of a collection of information not contained in a published current rule which has been approved by OMB and has a currently valid OMB control number, the agency shall:

    (i) Conduct the review established under § 1320.8, including the seeking of public comment under § 1320.8(d); and

    (ii) After having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the OMB control number for the currently approved collection of information, submit the collection of information for review and approval under this part, which shall include an explanation of how the agency has used the information that it has collected.

  (2) The agency may continue to conduct or sponsor the collection of information while the submission is pending at OMB.

(f) Prior to the expiration of OMB's approval of a collection of information, OMB may decide on its own initiative, after consultation with the agency, to review the collection of information. Such decisions will be made only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. Upon notification by OMB of its decision to review the collection of information, the agency shall submit it to OMB for review under this part.

(g) For good cause, after consultation with the agency, OMB may stay the effectiveness of its prior approval of any collection of information that is not specifically required by agency rule; in such case, the agency shall cease conducting or sponsoring such collection of information while the submission is pending, and shall publish a notice in the Federal Register to that effect.