**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 19-5130**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL WOMEN'S LAW CENTER et al.,

Plaintiffs-Appellees,

v.

OFFICE OF MANAGEMENT AND BUDGET et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**JOINT APPENDIX**

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

DANIEL TENNY
LINDSEY POWELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5372*

# TABLE OF CONTENTS

Notice of Appeal (Doc. 72)...........................................................................................1

April 25 Order (Doc. 71)..............................................................................................3

April 25 Hearing Transcript (Doc. 70)........................................................................5

April 16 Hearing Transcript (Doc. 66).......................................................................29

Haffer Declaration (Doc. 54-1)..................................................................................118

March 4 Order (Doc. 46).............................................................................................132

March 4 Opinion (Doc. 45).........................................................................................134

Pages from District Court Joint Appendix (Doc. 39)

- JA020 (Rao Memorandum)...........................................................................175

- JA022 (Letter Requesting Review)..............................................................177

- JA029 (Letter Requesting Review)..............................................................184

- JA046 (Letter Requesting Review)..............................................................193

- JA065 (Letter Requesting Review)..............................................................202

- JA115 (Letter Opposing Review)................................................................205

- JA126 (Mastronianni Memorandum)..........................................................216

- JA279 (Link Declaration Ex. A-G)............................................................220

Sanchez Declaration (Doc. 22-4)...............................................................................270

Johnson Declaration (Doc. 22-3)...............................................................................276

Complaint (Doc. 1)......................................................................................................282

District Court Docket Sheet........................................................................................317

82 Fed. Reg. 43,362 (Sept. 15, 2017) ................................................................ 336

81 Fed. Reg. 45,479 (July 14, 2016) ................................................................ 338

81 Fed. Reg. 5113 (Feb. 1, 2016) ................................................................ 357

Certificate of Service

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WOMEN'S LAW CENTER, *et al.*, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   Civil Action No. 17-cv-2458 (TSC) |
| OFFICE OF MANAGEMENT AND BUDGET, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants, Office of Management and Budget ("OMB"),

Director of OMB, Acting Administrator of the Office of Information and Regulatory Affairs

("OIRA"), United States Equal Opportunity Employment Commission ("EEOC"), and Acting

Chair, EEOC, hereby appeal to the United States Court of Appeals for the District of Columbia

Circuit from the Court's Orders dated March 4, 2019 (ECF No. 45) and April 25, 2019 (ECF No.

71.

Date: May 3, 2019                    Respectfully submitted,

                                     JOSEPH H. HUNT
                                     Assistant Attorney General

                                     */s/*
                                     JENNIFER D. RICKETTS
                                     Branch Director
                                     CARLOTTA WELLS
                                     Assistant Branch Director
                                     TAMRA T. MOORE
                                     Senior Counsel
                                     United States Department of Justice
                                     Civil Division, Federal Programs Branch
                                     1100 L Street, NW
                                     Washington, DC 20005
                                     Telephone: (202) 514-3671

Facsimile: (202) 616-8460
Email: Jennifer.D.Ricketts@usdoj.gov

*Counsel for Defendant*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NATIONAL WOMEN'S LAW CENTER**, *et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 17-cv-2458 (TSC) |
| **OFFICE OF MANAGEMENT AND BUDGET**, *et al.,* | ) ) ) ) | |
| Defendants. | ) ) ) | |

## ORDER

Based upon the post-summary judgment filings, the March 19, 2019 status conference, the April 16, 2019 hearing, the post-hearing summations, and the entire record herein, and for the reasons stated on the record on April 25, 2019, the court hereby issues the following declaratory and injunctive relief.  It is hereby

**ORDERED** and **DECLARED** that the court's summary judgment opinion and order, ECF Nos. 45, 46, require that Defendant EEOC collect EEO-1 Component 2 pay data for calendar years 2017 and 2018.  It is

**FURTHER ORDERED** that in lieu of collection of Component 2 data for calendar year 2017, EEOC may satisfy the court's Order requiring two years of data by collecting EEO-1 Component 2 data for 2019 during the 2020 EEO-1 reporting period.  If EEOC determines to exercise the option to collect EEO-1 Component 2 data for 2019 instead of 2017, it must notify the court and Plaintiffs of that decision by May 3, 2019.  It is

**FURTHER ORDERED** that Defendant Office of Management and Budget's August 29, 2017 stay of its approval of the revised EEO-1 form tolled the three-year period of that approval for the duration of the stay, which lasted 553 days.  Accordingly, the court **DECLARES** that barring further interruptions of the approval or extensions, the Paperwork Reduction Act approval for the revised EEO-1 form including Component 2 pay data, OMB Control No. 3046-0007, shall expire no later than April 5, 2021.  It is

**FURTHER ORDERED** that EEOC must immediately take all steps necessary to complete the EEO-1 Component 2 data collections for calendar years 2017 and 2018 by September 30, 2019.  If EEOC exercises its option to collect EEO-1 Component 2 data for 2019 in lieu of 2017, that collection must occur in the 2020 EEO-1 reporting period.  It is

Page **1** of **2**

**FURTHER ORDERED** that by April 29, 2019, EEOC must issue a statement on its website and submit the same for publication in the Federal Register notifying EEO-1 filers that they should prepare to submit Component 2 data no later than September 30, 2019.  EEOC must alert filers if it has decided by April 29, 2019 whether to collect 2017 or 2019 data.  If EEOC has not decided by April 29, 2019 whether to collect 2017 or 2019 data, it must issue a statement of its decision on its website and submit the same for publication in the Federal Register by May 3, 2019.  At minimum, on April 29, 2019, EEOC must issue a statement on its website and submit the same for publication in the Federal Register notifying EEO-1 filers that they will be submitting 2018 Component 2 data collection for calendar year 2018 no later than September 30, 2019.  It is

**FURTHER ORDERED** that beginning on May 3, 2019 and continuing every 21 days thereafter, EEOC must provide reports to Plaintiffs and the court of all steps taken to implement the EEO-1 Component 2 data collections since the prior report,[1] all steps to be taken during the ensuing three-week period, and indicating whether EEOC is on track to complete the collection(s) by September 30, 2019.  It is

**FURTHER ORDERED** that the EEO-1 Component 2 data collection(s) will not be deemed complete, for the purpose of this Order, until the percentage of EEO-1 reporters that have submitted their required EEO-1 Component 2 reports equals or exceeds the mean percentage of EEO-1 reporters that actually submitted EEO-1 reports in each of the past four reporting years.  It is

**FURTHER ORDERED** that the court will retain jurisdiction over this matter for the purposes of enforcing the March 4, 2019 summary judgment opinion and order as well as this Order.

**SO ORDERED.**

Date:  April 25, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[1] The May 3, 2019 report shall include notice of all steps taken to implement the EEO-1 Component 2 data collections since March 4, 2019.

Page **2** of **2**

```
                 UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


 NATIONAL WOMEN'S LAW            .
 CENTER, et al.,                .
                                . CA No. 17-2458 (TSC)
        Plaintiffs,             .
                                .
     v.                         .
                                . Washington, D.C.
 OFFICE OF MANAGEMENT           . Thursday, April 25, 2019
 AND BUDGET, et al.,            . 11:04 a.m.
                                .
        Defendants.             .
 . . . . . . . . . . . . . . . .
```

                TRANSCRIPT OF ORAL RULING HEARING
            BEFORE THE HONORABLE TANYA S. CHUTKAN
                 UNITED STATES DISTRICT JUDGE

 <u>APPEARANCES</u>:

 For the Plaintiffs:          ROBIN F. THURSTON, ESQ.
                              JEFFREY B. DUBNER, ESQ.
                              SUNU P. CHANDY, ESQ.
                              Democracy Forward Foundation
                              P.O. Box 34553
                              Washington, DC 20043
                              (202) 448-9090


 For the Defendants:          TAMRA T. MOORE, ESQ.
                              CARLOTTA WELLS, ESQ.
                              U.S. Department of Justice
                              Federal Programs Branch
                              1100 L Street, NW
                              Washington, DC 20005
                              (202) 305-8628


 Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001
                              (202) 354-3186


 Proceedings reported by stenotype shorthand.
 Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have Civil Action 17-2458, National Women's Law Center, et al., versus the Office of Management and Budget, et al.  We have Mr. Jeffrey Dubner, Ms. Robin Thurston, and Ms. Sunu Chandy representing the Plaintiffs.  We have Ms. Tamra Moore and Ms. Carlotta Wells representing the Defendants.

THE COURT:  Okay.  Good morning, everyone.

Sorry to have to bring you all back here, but I thought it would be appropriate to place my reasons for my findings on the record, and it was just more efficient to do it this way. So I appreciate you all being here.

We're here for my decision on the appropriate relief after the April 16, 2019, hearing.  I will give my reasoning on the record now.  After the hearing, I'll issue a written order.

Now, as a preliminary matter, the Court wants to deal first with the declaration submitted by counsel for the Government and the issues that it touches upon.

Plaintiffs, at least since the beginning of December of 2018, have been under the impression that if the Court ruled in their favor on the cross-motion for summary judgment, then the Government could begin the process of collecting Component 2 data almost immediately.  That understanding was based on communications between Plaintiffs and the Government on December 3, 2018.

1     During negotiations concerning a request by the Government

2     for an extension of time, Government counsel represented in an

3     e-mail that the Office of Management and Budget stated it would

4     take, I quote, "1 day" to, I quote, "get Component 2 'live'

5     should Plaintiffs prevail in this case."

6     The e-mail also stated that Government's counsel was

7     waiting to hear back from the EEOC.  The representation from

8     OMB that Component 2 data could go live in one day was the basis

9     for Plaintiffs agreeing to the Government's Consent Motion for

10     an extension filed on December 4, 2018.

11     In other words, this Consent Motion reflected the

12     understanding that, if the Court resolved the summary judgment

13     motions with sufficient time before the March 31, 2019, data

14     collection, that collection could include the stayed Component 2

15     information if the Court ruled in Plaintiffs' favor.

16     Whether or not the Government's earlier communication had

17     explicitly stated only that OMB could go live in a day -- and

18     there perhaps remained some uncertainty about EEOC's turnaround

19     time -- the Government certainly reinforced Plaintiffs'

20     understanding that *both* agencies could go live virtually

21     immediately when it included Plaintiffs' language about timing

22     in its Consent Motion, and for months did not reveal the

23     information it had from EEOC to Plaintiffs or to the Court.

24     Consent Motion stated, ECF No. 24: "Pursuant to Local

25     Rule 7(m), counsel for Defendants conferred via e-mail with

1   Plaintiffs' counsel regarding Defendants' request.

2   In response to Defendants' request, Plaintiffs stated the

3   following: 'Plaintiffs consent to an extension until December

4   20, 2018 and the additional proposed briefing deadlines, so long

5   as the extension gives the Court sufficient time to resolve the

6   pending motions in advance of the scheduled March 31, 2019 data

7   collection, so that the 2019 data collection could include the

8   stayed pay data collection (if the Court resolves the litigation

9   in Plaintiffs' favor.)'"  That's from ECF No. 24.

10      Counsel for the Government included this language in the

11  Consent Motion, which was filed on December 4, 2018, even though

12  she had already received information to the contrary from the

13  EEOC.  Earlier on December 4, 2018, EEOC notified Government

14  counsel by e-mail that it would take -- its estimate was that it

15  would take until January 2021 to begin national implementation

16  of pay data collection.

17      Even though the Government had information in early

18  December 2018 indicating that EEOC would not even begin

19  collecting Component 2 pay data until nearly two years after

20  Plaintiffs and the Court thought it would be completed, the

21  Government allowed Plaintiffs and the Court to continue under

22  the misimpression about how quickly collection could proceed.

23      For example, on February 5, 2019, Plaintiffs stated in a

24  pleading to the Court: "a ruling on the merits by the end of

25  February should allow EEOC to incorporate the improperly stayed

1    component of the data collection without further disruption to

2    the EEO-1 schedule."  And I'm quoting from ECF No. 38.  The

3    Government did not correct this representation from Plaintiffs

4    to the Court.

5        This background is very important because, at the time of

6    the Court's summary judgment decision on March 4, both the Court

7    and the Plaintiffs believed that the removal of the stay would

8    allow for an efficacious and prompt collection of the Component

9    2 pay data for both 2017 and 2018 as part of the timeline for

10   the Component 1 2018 pay data.

11       However, since the summary judgment decision was issued,

12   the Government has represented that EEOC could not begin

13   collecting the 2018 Component 2 data until September 30, 2019

14   and that it will not be collecting the 2017 data.

15       Moreover, the Government's failure to disclose its actual

16   position with regards to timing is affecting Plaintiffs'

17   litigation decisions now.  If the Government had revealed to the

18   Court and Plaintiffs in December 2018 that EEOC was representing

19   that it could not begin collecting Component 2 pay data until

20   2021, the Court would have provided Plaintiffs the opportunity

21   to conduct discovery and contest this factual representation.

22       Now the Court and Plaintiffs know that the 2021

23   representation was incorrect because EEOC currently states it

24   can complete the collection by September 30, 2019.  But, even

25   worse for Plaintiffs, although they know that a prior EEOC

1     factual estimation was incorrect, they are effectively being

2     forced to accept Dr. Haffer's factual assertion about EEOC's

3     timeline as true because discovery now would consume too much

4     time.

5         In its latest filing, the Government provides various

6     reasons why it did not disclose the information that it had

7     from the EEOC earlier to the Court and to the Plaintiffs.

8     The Court finds these reasons to be unpersuasive.

9         First, the Government states that it did not provide the

10    information from EEOC to Plaintiffs because it believed that

11    information would be, in quotes, "unsatisfactory" to Plaintiffs.

12    That is certainly not a reason to fail to turn over vital

13    information.  This information was critical to both Plaintiffs

14    and the Court for understanding when the Court needed to act.

15        Second, the Government also states that it did not turn

16    over the information because it would have been a diversion of

17    time and a collateral issue.  It was -- and continues to be --

18    not at all collateral, because it goes to the heart of the

19    effectiveness of any relief Plaintiffs secured.

20        Third, and most revealing, EEOC's own attorney says she was

21    not convinced that EEOC could not begin collecting information

22    until 2021.  This is troubling, because it shows that even

23    EEOC's lawyers believed that EEOC was not credible in the

24    information it was providing to Plaintiffs and to the Court

25    and what impediments, if any, stood in the way of an efficient

1    collection.  Needless to say, this misrepresentation casts

2    a shadow over the Government's current representations that

3    it cannot promptly and efficiently collect the Component 2

4    information with Component 1 information.

5        Turning to the issue of the Government's pleadings

6    since the Court's summary judgment decision and Dr. Haffer's

7    Declaration and testimony, the Court finds that some of the

8    Government's purported reasons for not collecting Component 2

9    information during the reporting period for Component 1

10    information lack merit.

11        First, EEOC's alleged privacy and data security concerns

12    are not adequate reasons for its lack of prompt compliance.

13    During questioning from the Court, Dr. Haffer conceded that his

14    goal was to exceed federal standards.  He did not contend that

15    the approved data collection would not meet current federal

16    standards.  Likewise, Dr. Haffer also testified that he knew of

17    no data breaches at EEOC and that storing aggregate pay data

18    does not make EEOC security measures less effective.

19        Dr. Haffer's concern about inadvertently releasing

20    information that could be reverse engineered to identify an

21    individual person is misplaced.  By policy, the EEOC excludes

22    information aggregated from a small number of employees,

23    eliminating the concern that this aggregated information could

24    be used to identify particular employees or employers based on

25    unusual combinations of demographic information, job category,

1    and pay band.

2         Second, the utility of the Component 2 data should

3    be irrelevant to EEOC's ability to comply promptly with

4    the collection of the Component 2 data.  Specifically,

5    while the Government questions the adequacy of the prior

6    pilot study and the decision to use pay bands, these issues

7    were previously considered and dealt with during the Paperwork

8    Reduction Act approval process.

9         I want to speak for a moment about the Government's

10    actions since the stay.  The Government's actions during

11    the time between OMB's stay and the Court's summary judgment

12    order, and between the Court's summary judgment order and

13    today, indicate that the Government is not committed to a

14    prompt collection of Component 2 information.

15         Starting with the time period between OMB's stay and the

16    Court's summary judgment decision, the Court finds that no

17    meaningful review of Component 2 pay data was conducted during

18    the stay, which was ostensibly the reason for the stay in the

19    first place.  It also appears that EEOC did not take any action

20    in response to the Rao Memorandum's directive that it prepare a

21    new information collection package for OMB to review.

22         Additionally, the EEOC failed to prepare -- or even

23    consider preparing -- a contingency plan for the Component 2

24    data collection in the event Plaintiffs prevailed in this

25    lawsuit.

In response to questioning from the Court about what steps, if any, EEOC took to prepare for the collection of Component 2 information between the time of the stay and the summary judgment decision, Dr. Haffer testified about "four major activities."

He testified that EEOC conducted an assessment of the entire data collection activity, hired staff with expertise in survey research and in data science and statistics, started the EEOC data and analytics modernization program, and began to carry out the evaluation to understand what EEOC can do better.

However, Dr. Haffer conceded that these four general activities were not done with an eye towards collecting Component 2 information, but rather with an eye to improving overall data collection activities.  And later, during questioning from Plaintiffs' counsel, Dr. Haffer testified that he was not aware of any contingency plan for implementing Component 2 information.

Furthermore, while EEOC purports to be concerned with the prior pilot study, it did not, either before the stay or during the stay, conduct a subsequent pilot study.  Dr. Haffer testified that this was because EEOC was focused on the Component 1 information.

Finally, Dr. Haffer neither knew about nor reviewed the internal work that EEOC had previously done on employer guidance for Component 2 information, even though 11 months had passed

between OMB's approval of Component 2 and its subsequent stay.

As Dr. Haffer testified, at the time of the stay, OMB was on track to begin the collection of Component 2 information in just a few months, in January 2018.  It is difficult for the Court to figure out why Dr. Haffer did not at least review this work either during or after the stay.

Turning to the time period between the Court's summary judgment decision in March of this year and today, during this time period, the EEOC has not finalized the contract with NORC, provided a reason why it has not yet alerted employers that they will be required to submit Component 2 data by September 30, 2019 at the latest, has not issued a Federal Register Notice to alert regulated entities that the stay has been lifted, it has not restored the prior Component 2 guidance from its website, and it has not revisited the internal work it did to implement the Component 2 data collection in the period before the unlawful stay.

Additionally, in the event the collection is not completed by September 30, 2019, the Government has been unable to make any satisfactory commitments that it would collect Component 2 data beyond that date.

In sum, this factual background reflects that the Government has not demonstrated a commitment to efficiently collect the Component 2 pay data, and over the course of several months has affirmatively left both the Court and Plaintiffs to

1    labor under the misimpression about when and how the Government

2    could collect this information.

3        The first issue for the Court to deal with is the timing

4    of the collection of the calendar year 2018 data.

5        Based on Dr. Haffer's testimony, Plaintiffs have withdrawn

6    their request for the Court to order that Component 2 data be

7    collected by May 31, 2019.  This concession is based on

8    Dr. Haffer's testimony that NORC at the University of Chicago

9    informed him that it would, in quotes, "walk away" if it was

10   asked to collect the data any quicker than September 30.

11       As Plaintiffs note in their summation, they did not have

12   the opportunity to depose Dr. Haffer or officials at NORC, or

13   to conduct any other type of discovery to challenge his factual

14   assertion by NORC as testified to by Dr. Haffer.  As stated

15   earlier, the Court recognizes that Plaintiffs are in a very

16   tough position because time is of the essence and discovery on

17   this matter would further delay these proceedings to Plaintiffs'

18   detriment.

19       Nonetheless, for current purposes, Plaintiffs are assuming

20   the accuracy of Dr. Haffer's representation about NORC's

21   position that it needs until September 30, 2019, to collect the

22   data.  The Court will do the same, even though the Court harbors

23   its own doubts that it is impossible for NORC or EEOC to collect

24   the data any sooner.

25       However, because Plaintiffs are agreeing to delay the

1    collection of the Component 2 data until September 30, the

2    Court must impose safeguards to ensure the completeness of the

3    collection.  These orders are even more pressing and necessary

4    because, as I have laid out, the Government does not have clean

5    hands in this case.

6        The second issue that I must decide is how many years of

7    Component 2 data EEOC must collect.  When this Court ordered the

8    vacatur of OMB's stay of the data collection, EEOC was required

9    to collect two years' worth of pay data.  The Government has

10    conceded this point in their pleadings.

11        However, the Government now contends that the Acting Chair

12    has the authority to forgo the collection of calendar year 2017

13    data.  This position conflicts with this Court's summary

14    judgment order:  Two years of pay data must be collected.

15        The EEOC is required to collect a second calendar year

16    of Component 2 data in addition to calendar year 2018 data.

17    The Government may collect 2017 pay data or 2019 pay data,

18    and the Court will get into the details of this further.

19        The Court is not convinced that EEOC is unable to collect

20    Component 2 data for calendar year 2017 this year.  While

21    Dr. Haffer expressed concerns -- both in his Declaration and

22    during his testimony -- that collecting 2017 data could decrease

23    response rates and increase errors in the collection process,

24    the Court views these concerns as speculative, generalized, and,

25    at times, unsubstantiated.

1          Dr. Haffer did not state that it would be impossible to
2     collect 2017 Component 2 data for this collection period or that
3     EEOC would be unable to resolve its concerns through various
4     means such as additional contracting support or extending the
5     period for employers to comply.
6          While it seems that EEOC would prefer to collect only 2018
7     Component 2 data for this year's collection period, the Court
8     still believes that if diligent and best efforts -- and I should
9     add "prompt" -- diligent and best efforts are made, EEOC would
10    be able to collect 2017 pay data during this year's collection
11    period.
12         Nevertheless, Plaintiffs have agreed that their summary
13    judgment relief would be satisfied if EEOC collected 2019
14    calendar year pay data during next year's reporting period
15    and, the record is clear, that this option would pose none
16    of the concerns raised about collecting 2017 data this year.
17         In response to a question from the Court, Dr. Haffer
18    testified that if EEOC collected 2019 data in 2020, that
19    scenario would resolve any concerns he had from a reliability-
20    and-validity-of-the-data perspective.
21         Therefore, the Court will be ordering and declaring that
22    the summary judgment opinion and order require the collection
23    of the missing two years of Component 2 pay data.
24         The Court will also be ordering EEOC to immediately take
25    all steps necessary to complete the Component 2 data collection

1    for calendar years 2017 and 2018 by September 30, 2019.

2         The Court will also be ordering that EEOC may satisfy the

3    Court's order requiring two years of data by collecting EEO-1

4    Component 2 data for -- excuse me -- EEOC Component 2 data for

5    2019 during the 2020 EEO-1 reporting period.

6         The Court will be ordering that if EEOC determines to

7    exercise the option to collect EEO-1 Component 2 data for 2019

8    instead of 2017, it must notify the Court and Plaintiffs of that

9    decision by May 3, 2019.

10        Next, the Court must deal with the tolling issue.  In its

11   submission in response to the Court's questions during the March

12   19, 2019 status conference, ECF No. 54, although directed to by

13   the Court, the Government did not state its position or

14   challenge Plaintiffs' contention that the illegal stay tolled

15   the expiration of the three-year authorization of the Component

16   2 data collection.

17        Although this omission was pointed out by Plaintiffs in

18   their opposing pleading, again the Government was silent on the

19   issue in its reply pleading, ECF No. 63.  As this Court stated

20   at the last hearing, the Court considers this issue conceded.

21        Notwithstanding the Court's statement that it viewed

22   this issue as conceded, for the first time, in its summation

23   pleading, the Government takes a position that there is no legal

24   basis for tolling the expiration of the authorized period for

25   collecting Component 2 pay data.

1          Assuming for purposes of argument that the Court has

2     not already treated the issue as conceded, the Government is

3     still legally and equitably incorrect.  OMB's stay tolls the

4     three-year approval period.  This ruling is supported by the

5     text and purpose of the Paperwork Reduction Act.

6          First, focusing on the statutory language, 44 U.S.C.

7     § 3507(g) expressly states that the director of OMB "may not

8     approve a collection of information from a period in excess of

9     3 years."  The three-year limitation is tied to OMB's actions.

10    When OMB stayed its approval authority, it stayed the running

11    of the three-year period.

12         The purpose of the Paperwork Reduction Act also supports

13    this Court's ruling on tolling.  The PRA has twin aims: to

14    minimize the burden to the public of information collection

15    while maximizing the utility of information collected.  Tolling

16    the three-year time period does not increase the burden on

17    filers beyond the initial three-year approval, and the

18    Government will collect the same amount of information as

19    OMB originally approved.

20         Moreover, this Court has the power to fashion a remedy

21    that extends beyond a statutory lapse date.  And I'll cite to

22    *Burr v. Ambach*, 863 F.2d 1071, from the Second Circuit;

23    *Connecticut v. Schweiker*, 684 F.2d 979, from the D.C. Circuit;

24    and *Andrulis Residential Corporation v. U.S. Small Business*

25    *Administration*, No. 90-2569, 1990 WL 169318, in the District

 1    Court of the District of Columbia.

 2         Finally, on this point, it is important not to lose track

 3    of the fact that the Government is in this position because of

 4    its own actions, including the Government's unlawful stay, the

 5    agency's failure to engage in a review during this stay, EEOC's

 6    failure to prepare any type of contingency plan for Component 2

 7    data collection, and the incorrect and incomplete information

 8    regarding timing for compliance provided by the Government to

 9    Plaintiffs and to the Court.

10         As mentioned earlier, it is apparent to the Court, on the

11    record before it, that no meaningful review of Component 2 pay

12    data was conducted during the stay.  It also appears that EEOC

13    did not take any action in response to the Rao Memorandum's

14    directive that it prepare a new information-collection package

15    for OMB to review.

16         Finally, on the tolling issue, the Court is concerned

17    about the incentives for both the Government and employers if

18    the Court did not rule that the time was tolled.  The Government

19    would have an incentive to further slow-roll the collections

20    this year, and employers that did not want to submit pay data

21    would have the incentive to delay reporting in the hopes of not

22    complying at all.

23         The Court has a responsibility to fashion an order that

24    ensures that EEOC completes the Component 2 data collection.

25    Since the Court's March 4 summary judgment order and opinion --

1    with numerous filings and court appearances -- the Court does

2    not yet have adequate assurances from the Government that it

3    will complete Component 2 data collection.  Therefore, the Court

4    finds it necessary to order additional ancillary relief.

5         As stated earlier, I will order EEOC to immediately take

6    all steps necessary to complete the Component 2 data collection

7    by September 30, 2019.

8         Component 2 data collection will not be deemed complete

9    until the typical numbers of EEO-1 reporters submit the required

10   Component 2 reports.  Plaintiffs suggest -- and the Court finds

11   it to be a reasonable suggestion -- that "typicality" be defined

12   as when the percentage of EEO-1 reporters that have submitted

13   their required EEO-1 Component 2 reports equals or exceeds the

14   mean percentage of EEO-1 reporters that actually received EEO-1

15   reports in each of the past four collection years.

16        The Court will also order the Government to provide regular

17   reports to Plaintiffs and to the Court.

18        Additionally, the Court is troubled as to why the EEOC has

19   not provided a date when it will notify EEO-1 reporters about

20   their obligation to submit Component 2 pay data no later than

21   September 30, 2019, and also why EEOC has not issued a Federal

22   Register Notice to alert the regulated community that the stay

23   has been lifted.

24        Therefore, the Court will be ordering that by April 29,

25   2019, EEOC must issue a statement on its website and submit the

1    same for publication in the Federal Register, notifying EEO-1

2    filers that they should prepare to submit Component 2 data no

3    later than September 30, 2019.  The Court is not convinced that

4    an increase in questions from the regulated community warrants a

5    delay on this front.

6         Finally, the Government still has not provided an adequate

7    plan for collecting Component 2 pay data after September 30,

8    2019.  While the EEOC has stated that it anticipates completing

9    collecting the Component 2 information by September 30, 2019,

10   this is far from an adequate assurance.

11        In fact, in the Government's summation, it stated, and I

12   quote, "If circumstances arise whereby the scheduled opening

13   of the Component 2 pay data collection is seriously delayed,

14   the EEOC could request an emergency extension of the EEO-1 PRA

15   approval from OMB in order to allow sufficient time to conduct

16   the collection of pay data from 2018."  Taken from ECF No. 69.

17   This is far from a commitment that it would.

18        Moreover, the Government has not explained how it would

19   affirmatively act to secure compliance by employers beyond

20   September 30.  While Dr. Haffer testified that EEOC could accept

21   data if employers chose to submit it, he also testified that

22   EEOC would take no steps after September 30 to retrieve the data

23   from employers who are not in compliance.

24        The Court will next deal with Plaintiffs' request that the

25   Court order, in the event that EEO-1 Component 2 pay data

1    collections for calendar years 2017 and 2018 are not complete

2    by September 30, 2019, or if the EEOC determines to collect

3    calendar year 2019 data in lieu of calendar year 2017 data,

4    that Defendants must exercise all authorities to provide for

5    emergency extensions of these data collections until the data

6    collections are complete.

7        The Court is going to hold this request in abeyance.

8    At this point, based on the limited briefing on the issue,

9    the Court believes that its ruling on the tolling issue is

10   sufficient to protect Plaintiffs' remedy.  However, the Court

11   is willing to revisit this issue if Plaintiffs wish to submit

12   additional briefing later.

13       Finally, for all the relief just discussed, the Court

14   has the authority to order such relief to ensure the Government

15   complies with the Court's summary judgment order.

16       The Court will cite to *United States Bank National*

17   *Association v. Poblete*, No. CV 15-00312, an opinion written by

18   Chief Judge Howell, 2017 WL 4736712; *Kramer v. Secretary of*

19   *Defense*, 39 F.Supp 2d 54; *National Venture Capital Association*

20   *v. Duke*, Civil No. 17-1912, decision written by Judge Boasberg

21   of this court; *Mendoza v. Perez*, 72 F.Supp.3d 168.

22       Despite the Government's contention, nothing about the

23   EEOC's Acting Chair's statutory authority alters this Court's

24   conclusion.  The EEOC is subject to the summary judgment

25   decision -- the EEOC has always been a defendant in this case --

1    and it must comply with court orders.

2        Moreover, the Acting Chair's authority is limited by EEOC's

3    regulation, which requires that employers file the operative

4    version of the EEO-1 form annually, and that's at 29 C.F.R.

5    § 1602.7.  The current EEO-1 form includes the Component 2 data

6    collection.  The Acting Chair cannot waive this requirement for

7    a reporting year.

8        For the reasons discussed, the Court will be issuing

9    the following order today with potential slight modifications:

10       • ORDERED and DECLARED that the Court's summary judgment

11   opinion and order, ECF Nos. 45, 46, require that Defendant EEOC

12   collect EEO-1 Component 2 pay data for calendar years 2017 and

13   2018.

14       • ORDERED that in lieu of collection of Component 2 data

15   for calendar year 2017, the EEOC may satisfy the Court's order

16   requiring two years of data by collecting EEO-1 Component 2 data

17   for 2019 during the 2020 EEO-1 reporting period.  If the EEOC

18   determines to exercise the option to collect EEO-1 Component 2

19   data for 2019 instead of 2017, it must notify the Court and

20   Plaintiffs of that decision by May 3, 2019.

21       • It is ORDERED that Defendant Office of Management and

22   Budget's August 29, 2017 stay of its approval of the revised

23   EEO-1 form tolled the three-year period of that approval for the

24   duration of the stay, which lasted 553 days.  Accordingly, the

25   Court DECLARES that, barring further interruptions of the

1    approval or extensions, the Paperwork Reduction Act approval for

2    the revised EEO-1 form, including Component 2 pay data, OMB

3    Control No. 3046-0007, shall expire no later than April 5, 2021.

4    • It is FURTHER ORDERED that the EEOC must immediately

5    take all steps necessary to complete the EEO-1 Component 2 data

6    collection for calendar years 2017 and 2018 by September 30,

7    2019.  If the EEOC exercises its option to collect EEO-1

8    Component 2 data for 2019 in lieu of 2017, that collection must

9    occur in the 2020 EEO-1 reporting period.

10    • It is ORDERED that by April 29, 2019, the EEOC must issue

11    a statement on its website and submit the same for publication

12    in the Federal Register notifying EEO-1 filers that they should

13    prepare to submit Component 2 data no later than September 30,

14    2019.

15    • ORDERED that beginning on May 3, 2019, and continuing

16    every 21 days thereafter, the EEOC must provide reports to

17    Plaintiffs and the Court of notice of all steps taken to

18    implement the EEO-1 Component 2 data collections since the prior

19    report, notice of all steps to be taken during the ensuing

20    three-week period and indicating whether the EEOC is on track

21    to complete the collection by September 30, 2019.

22    • It is FURTHER ORDERED that the EEO-1 Component 2 data

23    collections will not be deemed complete, for the purpose of

24    this order, until the percentage of EEO-1 reporters that have

25    submitted their required EEO-1 Component 2 reports equals or

1      exceeds the mean percentage of EEO-1 reporters that actually

2      submitted EEO-1 reports in each of the past four reporting

3      years.

4          • It is FURTHER ORDERED that the Court will retain

5      jurisdiction over this matter for the purposes of enforcing

6      its March 4, 2019 summary judgment opinion and order as well

7      as this Order.

8          I do have a clarifying question for Plaintiffs and the

9      Government.  As currently worded, by April 29, 2019, the

10     Government must issue a statement on its website and submit the

11     same for publication in the Federal Register notifying EEO-1

12     filers that they should prepare to submit Component 2 data no

13     later than September 30, 2019.

14         However, the Government has until May 3 to determine if it

15     wants to exercise the option to collect EEO-1 Component 2 data

16     for 2019 instead of 2017.  This means that on April 29, 2019,

17     EEOC may not know what to tell employers about the collections

18     of data other than 2018.

19         So, Plaintiffs, do you want to give your position or

20     clarify on that point?

21         MS. THURSTON:  Yes, Your Honor.  That's a fair

22     question.  We think that, at a minimum, by the 29th it would be

23     appropriate for the EEOC to notify employers that they will be

24     submitting some Component 2 data by September 30, at least the

25     2018 calendar-year information.  If the EEOC has decided by then

```
1    which of the other calendar years to require, they could provide

2    that notification as well.  Otherwise, I think it would be

3    acceptable for the EEOC to notify employers that they will

4    provide additional information about which of the second

5    calendar years would be required to be submitted by May 3.

6              THE COURT:  All right.  Ms. Moore?

7              MS. MOORE:  That sounds reasonable to us.

8              THE COURT:  All right.  Thank you.  That was easy.

9         All right.  Thank you all.

10        (Proceedings adjourned at 11:42 a.m.)
```

```
                    *   *   *   *   *   *

                        CERTIFICATE

        I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.




                    Bryan A. Wayne
                    BRYAN A. WAYNE
```

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2      - - - - - - - - - - - - - - - x
        NATIONAL WOMEN'S LAW CENTER,
 3      et al.,                          CA No:  1:17-cv-02458-TSC
                       Plaintiffs,
 4                                       Washington, D.C.
                                         Tuesday, April 16, 2019
 5      vs.                              2:17 p.m.

 6      OFFICE OF MANAGEMENT AND BUDGET,
        et al.,
 7
                       Defendants.
 8      - - - - - - - - - - - - - - - x

 9      _____

10              TRANSCRIPT OF HEARING ON SUBMISSIONS
            HELD BEFORE THE HONORABLE TANYA S. CHUTKAN
11                 UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:
        For the Plaintiffs:       ROBIN FRANCES THURSTON, ESQ.
13                                JEFFREY B. DUBNER, ESQ.
                                  DEMOCRACY FORWARD FOUNDATION
14                                P.O. Box 34553
                                  Washington, DC 20043
15                                (202) 448-9090

16                                EMILY J. MARTIN, ESQ.
                                  NATIONAL WOMEN'S LAW CENTER
17                                11 Dupont Circle, #800
                                  Washington, DC 20036
18                                202-588-5180

19      For the Defendants:       TAMRA TYREE MOORE, ESQ.
                                  CARLOTTA WELLS, ESQ.
20                                U.S. DEPARTMENT OF JUSTICE
                                  Civil Division, Federal Programs
21                                1100 L Street, NW
                                  Washington, DC 20005
22                                (202) 305-8628

23      Court Reporter:           Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
24                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
25                                Washington, DC  20001
                                  202-354-3187
```

I N D E X

WITNESS                                                      PAGE
 HAFFER
      (By the Court)...................................... 28
      (By Ms. Thurston).................................. 56
      (By Ms. Wells)..................................... 71

```
 1                          P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we have Civil
 3     Action 17-2458, National Women's Law Center, et al. vs. The
 4     Office of Management and Budget, et al.
 5              I would ask that lead counsel approach the lectern
 6     and identify yourself and those at your respective tables
 7     starting with the plaintiff.
 8              MS. THURSTON:  Robin Thurston for the plaintiffs,
 9     along with Jeffrey Dubner; and Emily Martin from the
10     National Women's Law Center.
11              THE COURT:  Good afternoon.  I want to apologize,
12     first of all, for the delay.  We were without a courtroom
13     deputy, and that's why we're late.  Sorry about that.
14              MS. MOORE:  Good afternoon, Your Honor; Tamra
15     Moore on behalf of defendants, and with me at counsel's
16     table is Carly Wells.
17              THE COURT:  All right.  Good afternoon.  I'm
18     sorry, you said Harley Wells?
19              MS. MOORE:  Wells.
20              THE COURT:  Okay.
21              And Ms. Moore, Ms. Thurston, you'll be speaking on
22     behalf of each side; is that correct?
23              All right.  Good afternoon.
24              All right.  We are here because we had a -- after
25     the last status conference, I ordered the parties to file
```

1    submissions in response to certain questions that I had.

2    Specifically I requested information about the government's

3    plans to come into compliance with this Court's order

4    granting summary judgment in favor of plaintiffs.  I also

5    ordered the government to provide its position on whether or

6    not OMB's stay had tolled the three-year period of its

7    original approval.

8         The government filed its submission on April 3rd

9    and included a declaration from EEO chief's data officer,

10   Dr. Samuel -- is it "Haf-fer"?

11        MS. MOORE:  "Hay-fer."

12        THE COURT:  "Hay-fer," thank you.

13        The government, among other things, stated that it

14   needed until September 30, 2019, to collect the Component 2

15   pay data with an opening to be on July 15, 2019.

16        Plaintiffs filed their response on April 8th and

17   asked this Court to, among other things, reject the

18   government's proposed compliance plan and to impose

19   plaintiffs' proposed deadlines on the government.

20        The government filed its reply on April 9th and

21   stated that the acting chair's decisions to delay the

22   Component 2 pay data collection until September 30th and to

23   forgo collecting the 2017 Component 2 pay data are

24   consistent with the acting chair's administrative authority

25   under Title VII.

5

```
1          So there are several factual disputes that are
2   apparent in the parties' pleadings, and the pleadings
3   themselves raise certain additional questions; therefore,
4   I've scheduled this hearing so that I can make factual
5   findings and to allow the parties and the Court to ask
6   limited further questions.  I'm not turning this into a
7   full-blown evidentiary hearing, but I do think that the
8   record is not complete in order for me to formulate some
9   kind of -- or approve or disapprove the government's
10  proposed plan.
11          But before we get to the collection of the data,
12  as I had mentioned earlier just now, I ordered the
13  government to give its position on whether or not OMB's stay
14  had tolled the three-year period of its original approval,
15  and Ms. Moore, I asked you twice at the last hearing.  If
16  you look at Page 16 and Pages 19 and 20 of the transcript, I
17  specifically asked you to address this.
18          From Page 16 at the last hearing, which was on
19  March 19th, I said:  "Ms. Moore, if you could address that
20  issue."
21          Let me start on Page 16, Line 15, of the
22  transcript where Ms. Thurston is speaking.  She says, "We
23  are concerned that approaching the expiration of the
24  three-year period there could be a dispute about whether the
25  EEOC is still bound by the Court's order, or other legal
```

6

 1    issues.  It would be much -- Your Honor may have to resolve

 2    those at some point.  It would be simpler if we could be

 3    assured that the collection would occur, at least for the

 4    2018 data, before that period expired."

 5         I responded, "Yes.  Ms. Moore, if you could

 6    address that issue.  Because if your position is that it

 7    might not, then I'm going to need briefing as to whether

 8    that running has been tolled.  I'm not anxious to delve into

 9    that issue unless I have to right away."

10         Then on Pages 19 to 20 I stated, Line 25,

11    "Ms. Moore, can you address, again, the issue of -- the

12    tolling issue, whether you -- in other words, whether you

13    are going to be complying within the timeline.  And, if not,

14    what your position is regarding the plaintiffs' tolling

15    argument.  You might as well tee that one up."

16         And you said, "Yes, Your Honor."

17         Now, the government ignored that request in its

18    submission because it did not address it at all.

19         Plaintiffs pointed out that omission in its

20    response.  Yet again the government did not address this

21    question in its reply.

22         So, Ms. Moore, I have to ask you, why was my order

23    ignored?  Or my request.

24         MS. MOORE:  Good afternoon, Your Honor.

25         THE COURT:  Good afternoon.

1      MS. MOORE:  I will address -- I'll address that

2   question first, and then I have a preliminary matter that I

3   would like to also address.

4      THE COURT:  Sure.

5      MS. MOORE:  With respect to that question, Your

6   Honor, my understanding was -- based on the transcript, was

7   that if -- I believe that counsel for plaintiffs raised the

8   issue of tolling, but as you specifically noted, it would be

9   much simpler if we could be assured if the collection could

10   occur, at least for the 2018 data, before the three-year

11   approval period ended.

12      In response to that issue -- in response to that

13   statement, Your Honor requested that defendants address the

14   issue if our position is it might not, and that Your Honor

15   was not anxious to --

16      THE COURT:  I don't want to have to rule on this

17   issue if I don't have to, but I asked you to tee it up.  You

18   didn't even mention it at all.

19      MS. MOORE:  Your Honor -- and I apologize.  That

20   would be on me, if Your Honor wanted us to address it.  If I

21   might -- I understood that the question was if the agency

22   cannot comply within the three-year approval period, you

23   would like to know what its position is with respect to

24   tolling.

25      THE COURT:  So by the absence of that issue in

1    your briefing, you are representing that the government will

2    comply within the three-year period?  Is that what you're

3    saying?

4         MS. MOORE:  Your Honor, we -- as the submissions

5    that we submitted expressly state, the EEOC has proposed to

6    collect 2018 pay data by September 30, 2019, which is the

7    end of the prior approval period, and for the reasons --

8         THE COURT:  Then why didn't you say that in your

9    reply?  Because the government -- I mean, the plaintiff

10   specifically pointed out that you hadn't addressed the

11   issue, and in your reply you didn't respond to that.

12        MS. MOORE:  Your Honor, I apologize.  I apologize

13   for -- I'm sorry.  I apologize for not addressing that

14   explicitly.  I understood the instruction was if the -- if

15   the EEOC had determined that it could not comply within the

16   three-year approval period or before it expires, that the

17   Court wanted the agencies to address whether tolling applied

18   because the response that the EEOC was providing was that it

19   would be going forward with responding to the Court's order

20   and collecting the pay data before the end of the --

21        THE COURT:  Right.  I'm going to take the

22   government's failure to address the issue based on their

23   representation that they can collect the pay data within the

24   schedule to mean that should the government not be able to,

25   that you have conceded the tolling argument.

 1              MS. MOORE:  Your Honor, I would -- Your Honor,

 2    I --

 3              THE COURT:  Because the time to address that

 4    argument would be in the pleadings.

 5              MS. MOORE:  Your Honor, I understand your

 6    position, and our -- I believe that our position is set

 7    forth in the declaration of Dr. Haffer, that the agency

 8    has determined that it will be able to process pay data

 9    that employers collect, the 2018 pay data.  And for the

10    reasons that are set forth in Dr. Haffer's declaration, the

11    agency has determined, through its administrative authority,

12    that --

13              THE COURT:  I understand what the agency position

14    is.  My position is that agency predictions and reality

15    sometimes don't always -- aren't always the same, and if the

16    EEOC or OMB comes before me again and hasn't been able to

17    meet their deadline, I'm going to consider -- based on the

18    record before me, I don't see how the government hasn't

19    conceded the issue of tolling because I requested that you

20    address the issue, and your position is it's not going to

21    happen so we don't need to address it.

22              Maybe.

23              Ms. Thurston, do you have a response to that?

24              You have another preliminary matter to get to

25    before --

```
 1              MS. MOORE:  Yes.

 2              THE COURT:  Okay.

 3              MS. MOORE:  I would like to, if --

 4              THE COURT:  Go ahead.

 5              MS. MOORE:  Okay.  Sorry.  Before we get started,

 6     Your Honor -- well, after addressing that issue, I would

 7     like the opportunity to clarify one issue, and that's

 8     plaintiffs' assertion that they were misled about the EEOC's

 9     ability to respond to an adverse decision and that the EEOC

10     did not timely provide this information.

11              THE COURT:  Are you referring to the email from

12     December 3rd?  Because I have some questions about that.

13              MS. MOORE:  Yes, Your Honor.  The --

14              THE COURT:  Okay.  Just so the record is clear, at

15     the last hearing plaintiffs pointed out that during some

16     discussions with regard to an expedited schedule, one of the

17     reasons that it agreed to the government's request was that

18     it had received a December 3rd email from somebody in the

19     government that said it would only take one day to get

20     Component 2 live for employer filing purposes.

21              When you were here last at the March hearing, you

22     couldn't give me any information about that, so you stated

23     to me at the hearing that the person at the EEOC who could

24     provide more information about how much time it would take

25     EEOC to comply if plaintiffs prevailed was out of the office
```

1    when you made this one-day representation to plaintiffs.

2            And so I had some follow-up questions today based

3    on that, but if you have some information, why don't I let

4    you go first.

5            MS. MOORE:  Thank you, Your Honor.

6            So, yes, Your Honor, last December -- well, let me

7    back up.

8            As I was stating, that -- plaintiffs' assertion

9    that they were misled about the EEOC's ability to respond to

10   an adverse decision and their assertion that the EEOC did

11   not timely provide this information, that is not correct,

12   and it certainly was not our intention to mislead anyone.

13           Last December, because of competing deadlines

14   faced by me and my co-counsel, we sought plaintiffs'

15   counsel's consent to an extension to file defendants' cross-

16   motion for summary judgment.  In response to plaintiffs'

17   counsel's questions about how long it would take to respond

18   to an adverse decision, I asked both OMB and the EEOC this

19   question.

20           OMB responded first, and I relayed OMB's response

21   to plaintiffs' counsel.

22           THE COURT:  Which was?

23           MS. MOORE:  Which was that it would take OMB one

24   day to go live.

25           THE COURT:  To get Component 2 live for employer

1    filing purposes.

2          MS. MOORE:  Right.  And Exhibit A, the email that

3    I provided, says at that time my understanding is that the

4    person who has this information for EEOC is not in the

5    office, and I do not have this information right now.

6          At that time I relayed OMB's information, did not

7    have EEOC's information to provide at that moment, but we

8    nevertheless were able to -- or plaintiffs' counsel

9    nevertheless granted her consent to the extension of time.

10         THE COURT:  And granted that consent based on the

11   representation that you made.

12         I mean, Ms. Moore, what is apparent even to me, as

13   a recipient of all the scheduling requests, was that time

14   was and is of the essence in this matter.  And plaintiffs

15   granted the request for extra time based on a representation

16   from you that, if we lose and you win, it won't take long to

17   get this thing underway.

18         That was the essence of it, correct?

19         MS. MOORE:  Your Honor, I -- well, if I have -- if

20   the Court would provide me just a couple of minutes, yes, in

21   response to her -- the email is in the record.  It's

22   Exhibit A.  It states, "OMB says that it would take them one

23   day to go live.  I do not have this information" -- I'm just

24   paraphrasing, but "I do not have this information for EEOC."

25         Shortly after plaintiffs' counsel granted her

1    consent, EEOC agency counsel sent me an email addressing its

2    ability to respond to an adverse decision.  The email

3    outlined the EEOC's plan --

4              THE COURT:  You provided that email to plaintiffs?

5              MS. MOORE:  No, Your Honor, we did not, and that

6    is why I wanted to take this opportunity now.  The email

7    that I was provide -- or the information that I was provided

8    from the EEOC in December expressly stated that the

9    information was very preliminary, rough estimates, and

10   predicted that --

11             THE COURT:  So now you're telling me about an

12   email that you got subsequent to your December 3rd email

13   from the EEOC telling you it was going to take longer.  When

14   did you get that?

15             MS. MOORE:  I got that shortly -- it might have

16   been December 4th.

17             THE COURT:  And why didn't you provide that

18   information at the March hearing?

19             MS. MOORE:  Your Honor, I believe at the March

20   hearing I stated that when this issue came up with respect

21   to plaintiffs' contention that they were misled, that OMB

22   said that it would go -- OMB said that it would take it one

23   day.

24             Defendant EEOC is the agency that is collecting

25   the information, and at the time I didn't have -- not at the

```
1    time of the hearing, but at the time that I was relaying

2    information to her for the extension of time the only

3    information I had at that time to provide her was OMB's.

4              I subsequently received an email from --

5              THE COURT:  Okay.  I don't mean to cut you off,

6    but I'm not following what you're saying so let me direct

7    you to the transcript.

8              MS. MOORE:  Okay.

9              THE COURT:  We had a -- you said you got an

10   email -- you sent an email to plaintiffs' counsel on

11   December 3rd saying it will take OMB one day to go live with

12   the Component 2 data pay collection, and what you're saying

13   is you hadn't gotten EEOC's position on that because the

14   person who could give you the information was out of the

15   office on December 3rd.  Is that your position?

16             MS. MOORE:  That is correct, Your Honor.

17             THE COURT:  And now you're saying to me that you

18   subsequently received an email from someone at EEOC in

19   December, right?

20             MS. MOORE:  Yes.

21             THE COURT:  Saying actually it's going to take a

22   lot longer than one day, okay?

23             MS. MOORE:  That is correct.

24             THE COURT:  Okay.  My question to you -- and I'm

25   trying to look through the transcript at the same time so
```

1  this is probably not very efficient, but my question to you,

2  Ms. Moore, is twofold.

3       One, why didn't you share that email with

4  plaintiffs in advance of the March hearing?

5       And if you didn't, you saw their motion for a

6  hearing, so you knew this was an issue.  The email was

7  attached as an exhibit.  All right?  When you came in for

8  the hearing in March, why didn't you tell me about that

9  December email?

10      MS. MOORE:  Your Honor, just to give you some

11  context, at the time that we were exchanging these emails

12  back in December it was in the context of an extension

13  motion on our opening brief.  The subject -- in our opening

14  summary judgment briefs.

15      Shortly after we were -- exchanged emails, and I

16  relayed the information for OMB and as Your Honor --

17  Exhibit A expressly states, the very second sentence says,

18  "I do not have this information for EEOC, and" -- but we

19  nevertheless were able to come to an agreement.  Plaintiffs'

20  counsel gave her consent to our extension.

21      THE COURT:  I got that.  My point is plaintiffs --

22  and maybe we're just talking at cross purposes here, but

23  plaintiffs, in their request for a hearing, said, "Hey,

24  they're taking too long.  They're not complying with your

25  order.  This email, when we were negotiating a briefing

1    schedule, says it would take them one day to go live, so why

2    are they now saying it's taking them" -- and I had you in

3    here in March, so you had the email from the EEOC then to

4    explain to me what you really meant when you said it would

5    take a day to go live.  You didn't have the -- in other

6    words, why am I just hearing about this December email now?

7         MS. MOORE:  Your Honor, maybe I should take a step

8    back.

9         I -- the -- plaintiffs brought this action against

10   the OMB.  They challenged OMB's decision to initiate a stay

11   and review of the pay data collection.  All of their counts,

12   the four counts in their complaint, are focused on OMB's

13   actions and alleging that it's unlawful.

14        When I got the email in December or when I got

15   plaintiffs' counsel's request in the context of our

16   extension motion for our opening summary judgment brief, OMB

17   responded, "It will take us one day."  That's because, as I

18   understand it, OMB grants its approval, but the actual work

19   of doing the collections falls to the various agencies who

20   have sought approval to collect the information.  I also

21   noted in the email to plaintiffs' counsel that was appended

22   to their notice, as you'll see, that at that time I did not

23   have EEOC's information, but we were nevertheless able to

24   come to an agreement about the extension.

25        As I have -- I now am trying to apologize on

1    behalf of my client, on behalf -- and to the extent that

2    this has obviously upset the Court and plaintiffs' counsel,

3    I received information that was characterized as very

4    preliminary and rough and estimated that it would take the

5    EEOC until January 2021.

6            At the time of this Court's hearing, it wasn't

7    even clear to me then that January 2021 was the date, and as

8    Your Honor now knows, based on the submissions that we've

9    submitted, that the EEOC has proposed that it can collect

10    the information by September 30, 2019.

11           So at the time that I had the information, it was

12    very preliminary.  It was rough.  I hadn't had an

13    opportunity to even figure out why it was that they were

14    projecting that it was going to take until January 2021 to

15    be able to collect this information.  And so I wanted to

16    apologize for that -- for my failure to provide that

17    information.  That was -- at the time that was my thought

18    process that this information --

19           THE COURT:  I'm just going to direct you to Page 5

20    of the transcript of the March hearing where it says, Line

21    13, "As the email that plaintiffs' counsel" -- this is you.

22    "As the email that plaintiffs' counsel appended to her

23    notice further states, I was waiting on defendant EEOC to

24    provide me information about how much time it would take it

25    to be able to comply if the Court issued an order vacating

1      the stay."

2              You didn't tell me in March -- and I eventually

3      did get the information.  You said, "I was waiting."

4              And then you go on to say:  "At the time, I did

5      not -- as that email further states, the person who had that

6      information and would be able to provide me that information

7      was out of the office.  So counsel and I went forward with

8      the information that I was able to provide about OMB and

9      agreed to a briefing schedule that we subsequently filed

10     briefs in response to."

11             You didn't tell me -- and this is in March.  You

12     didn't say, "Oh, and by the way, I did get shortly

13     thereafter an email from EEOC and here's what it said."

14             MS. MOORE:  Your Honor, I apologize for not

15     sharing that information with the Court.

16             THE COURT:  Well, it's not that you didn't share

17     it, and I understand you're an officer of the court, but

18     you -- your language to the Court certainly implies that you

19     hadn't gotten that information yet when, in fact, you had.

20             MS. MOORE:  Your Honor, at the time that we were

21     negotiating our extension motion I did not have --

22             THE COURT:  I know.  I'm talking about in March

23     when you made that statement to me in this hearing.  You

24     didn't say, "Oh, and by the way we did get the information

25     from the EEOC, and let me tell you what they said."

1           MS. MOORE:  Your Honor, I apologize.  That was --

2      when I was relaying that information, I was relaying the

3      information about the time that we were negotiating the

4      extension motion, and at the time that we had the status

5      conference, I still did not know whether this January 2021

6      date would be the final time.

7           As I have mentioned, I apologize for that.  That

8      was -- they had provided me that information.  I did not

9      have, at the time in December of 2018, and --

10          THE COURT:  Do you have a copy of the email that

11     you got from the EEOC?

12          MS. MOORE:  I don't have it with me.  I apologize.

13          THE COURT:  I'd like you to show it to plaintiffs'

14     counsel within the next couple of days.  Preferably, if you

15     have it today, I'd like them to see it.

16          MS. MOORE:  Your Honor, I'm happy to --

17          THE COURT:  Actually, can I see it?

18          MS. MOORE:  I don't have it with me.  I'm happy to

19     provide it.

20          Your Honor, I wanted to apologize for not

21     providing that information, and I am here to -- I apologize

22     for not providing it.

23          That said, the EEOC has provided this Court with

24     its proposal to collect the data within the three-year

25     approval --

20

 1          THE COURT:  Here's my concern, Ms. Moore.  I am

 2    concerned that the EEOC or the OMB, which is litigating this

 3    case, has been playing -- well, has been providing this

 4    Court and the plaintiffs with partial information.  I don't

 5    want to cast aspersions on people's motivations, but it is

 6    very difficult, in a case where time is of the essence, both

 7    for the plaintiffs, the EEOC, and the OMB, and all the

 8    employers who are waiting to see what regulations they are

 9    going to have to comply with and how quickly, that I'm

10    getting dribs and drabs of information; that OMB apparently

11    used the promise of short compliance -- a short turnaround

12    with compliance, were plaintiffs to win, to extract a

13    briefing schedule that was favorable --

14          MS. MOORE:  Your Honor --

15          THE COURT:  -- and now turns around after

16    plaintiffs have prevailed and said, "We didn't even know" --

17    "we didn't know the EEOC was going to take that long."

18          MS. MOORE:  Your Honor, again, if I can reiterate,

19    one, my apology, but two, the fact that it is difficult to

20    understand how, under these circumstances, OMB is the agency

21    that approves these collections, but the agencies that go

22    forth and collect the information, they do the work.

23          THE COURT:  I understand.

24          MS. MOORE:  And the email to plaintiffs' counsel

25    at the time that we were -- I was trying to negotiate this

```
 1   extension of time stated, "Here's OMB's information" --

 2            THE COURT:  I've seen that email.

 3            MS. MOORE:  -- "and here's -- I don't have the

 4   information for EEOC."

 5            My -- if -- well --

 6            THE COURT:  I understand all of that.

 7            MS. MOORE:  Maybe it's --

 8            THE COURT:  What I don't understand is why, when

 9   you got more information, you didn't share it with

10   plaintiffs.

11            Could you give me a moment, please.

12            (Pause)

13            THE COURT:  I think, Ms. Moore, we have mined that

14   area sufficiently.  The representation was made.  I'm

15   concerned about the information that was given to the

16   plaintiffs, and subsequently to this Court, regarding the

17   circumstances for that concession; nonetheless, I have

18   ruled.  I did grant summary judgment in favor of the

19   plaintiffs, and now we're here after my March 4th order to

20   determine why nothing has gone forward.  So I think we've

21   spent enough time on that issue.

22            I will note, though, as to your position that

23   it's, you know, EEOC who actually implements the data

24   collection, in plaintiffs' complaint, which is Document 1,

25   Page 34, in their prayer for relief, plaintiffs -- in
```

1    Paragraph 4 of their prayer for relief plaintiffs request

2    that the Court order EEOC defendants to publish a Federal

3    Register notice announcing this reinstatement or to take

4    other equivalent action necessary to immediately reinstate

5    the pay data collection.

6         I mean, you've been on notice since the beginning

7    that EEOC -- you couldn't just make representations on

8    behalf of yourself.

9         MS. MOORE:  Your Honor -- and I understand that,

10   and that is why we are here today.  I first wanted to

11   apologize, and I understand that we have mined that area,

12   and I appreciate the opportunity to move on.

13        I am here to answer the questions that you raised

14   during the March 19th status conference and in your most

15   recent order, and I will also explain why the EEOC's

16   proposal to collect pay data by September 30, 2019, is

17   responsive to the relief that this Court ordered.

18        THE COURT:  Okay.  Hold on a second, before we get

19   to that.

20        Plaintiff, do you have anything you wanted to add

21   for the record as to that email issue, and did you have a

22   response to the representations in the government's reply

23   submission regarding the EEOC and their authority?

24        MS. THURSTON:  Yes, Your Honor.  Thank you.

25        As to the question of tolling -- I believe that

```
1    was the second one you raised?

2                THE COURT:  Yes.

3                MS. THURSTON:  -- we appreciate Your Honor's

4    position that it would treat the issue as conceded if the

5    pay data collection were to extend beyond September 30th.

6    One thing that we're concerned about is that we think it

7    would be necessary to effectuate that with a court order, a

8    declaratory judgment, because employer associations have

9    already threatened collateral action, including one of the

10   amici, DirectEmployers Association, posted on its website

11   earlier this week that employer groups may sue EEOC to set

12   aside and stop the pay data reporting application should it

13   ever become final.

14               And so should it proceed beyond September 30th, we

15   think that some codification of the tolling issue would

16   protect --

17               THE COURT:  Well, Ms. Moore says it's not going to

18   happen so -- but I understand your position, and if we are

19   in that -- we are faced with that predicament, I will have

20   to address it in writing, I suppose.

21               MS. THURSTON:  And I'll note also that it doesn't,

22   of course, address the collection of the 2017 calendar year

23   data, which may also implicate the tolling issue, and we

24   would like to protect a remedy.

25               As to the email regarding the one-day
```

1    representation, we appreciate Your Honor noting that EEOC

2    has always been a named defendant.  We've always sought

3    relief as to the EEOC.

4              THE COURT:  Correct.

5              MS. THURSTON:  And beyond that and what Your Honor

6    has already observed, all I would represent is that if we

7    understood that the EEOC was estimating that the time frame

8    for compliance would be January 2021, if we then understood

9    that in December, it certainly would have impacted our

10    decision-making as to timing and when we raised timing

11    issues with the Court.

12              THE COURT:  Thank you.

13              Ms. Moore, Dr. Haffer -- I'm going to get this

14    wrong every time now.  Dr. Haffer stated in his declaration

15    that he identified concerns with collecting Component 2 data

16    collection when implementing the collection of the 2017

17    Component 1 data.  This was before the spring 2018 data

18    collection and before you made your representation about the

19    timing to plaintiffs in December.  So why didn't you provide

20    that information to the Court and to plaintiffs?

21              MS. MOORE:  I'm sorry, Your Honor, I'm not sure I

22    entirely follow.

23              THE COURT:  In his declaration Dr. Haffer says

24    that he had concerns with collecting Component 2 data

25    collection at the time he was implementing the collection of

1    the 2017 Component 1 data, so it appears that Dr. Haffer had

2    some issues and some concerns back then so I don't see how

3    that squares with your representation to plaintiffs during

4    the briefing schedule.

5             MS. MOORE:  Your Honor, I -- to be perfectly

6    honest, I was not aware that Dr. Haffer existed until after

7    this Court's March 4th order.  I understand now he's the

8    chief data officer, that he was hired in November of 2017,

9    and that he came in to, among other things, assess EEOC's

10   processes and systems and to work to modernize those

11   systems.

12            THE COURT:  Okay.  Let me just tell you how I'm

13   proceeding today in this hearing.  There are some areas I'd

14   like to cover, and we don't have all day, and so I'm going

15   to try and move quickly; but first, I'd like to cover the

16   efforts EEOC has taken to implement the collection of

17   Component 2 pay data, and I'd like to know about efforts at

18   various time periods.

19            First, the time from OMB's approval in September

20   2016 until OMB's stay, okay?  From the time period of the

21   stay through the beginning of this litigation; from the

22   initiation of the litigation until my summary judgment

23   order; and from my summary judgment order until the status

24   conference on March 19th, and between March 19th and today.

25   Those are all discrete periods of time.  And for all these

1    time periods I'd like to know how these -- the efforts

2    affected EEOC's ability to collect Component 2 pay data

3    during these time periods.

4        The second area I want to consider -- I would like

5    to cover is I'd like information on why the EEOC deleted the

6    link to a recording of a webinar, presentation slides, the

7    then-new EEO-1 form, a fact sheet for small businesses, and

8    a question-and-answer document.  The link to those materials

9    was deleted from the website, and I'd like information on

10   why it has not yet been restored.

11       Third, I'd like to know how Dr. Haffer's

12   declaration comports with EEOC's efforts to prepare

13   employers for pay data collection.

14       I'd like to know the role of NORC at University of

15   Chicago.

16       I want to cover who was involved in developing the

17   proposed timeline that's set forth in Dr. Haffer's

18   declaration.

19       Sixth, I'd like some more information on some of

20   the security concerns that Dr. Haffer identified and how

21   those comport with prior statements that the EEOC has made

22   about security.

23       Seventh, I'd like some more information about

24   collecting the 2017 pay data, and finally, whether NORC

25   could conduct the collection of Component 2 data more

1    quickly than September 30, 2019; and if so, what would that

2    take.

3        And so I will consider, Ms. Moore -- I'm going to

4    consider Dr. Haffer's declaration as the government's direct

5    examination of him.  I'm going to ask him some questions,

6    then I will give plaintiffs an opportunity to ask very, very

7    limited questions as follow-up to my questions -- this is

8    not a deposition or a trial so those questions would be

9    limited to topics raised in my questioning and his

10   declaration -- and then I'll give you the opportunity for a

11   brief redirect.

12       The government stated in its notice yesterday that

13   Dr. Mancini has knowledge about OMB's decision to stay and

14   review the EEO-1 collection, so I really don't have any

15   questions for Dr. Mancini relevant to today's hearing

16   because unless he has knowledge that is linked to EEOC's

17   ability to collect Component 2 information, I don't have any

18   questions for him.

19       All of the areas that I've identified, the eight

20   areas I've just identified, and the questions that I'm going

21   to ask were raised or addressed in the parties' pleadings or

22   a part of the April 11th order that I issued about this

23   hearing.  So pursuant to my April 11th order, I do expect

24   Dr. Haffer to have particularized and thorough knowledge of

25   the issues and questions.

```
1              Is Dr. Haffer in the courtroom?

2         MS. MOORE:  Yes.

3         THE COURT:  Yes, please stand.

4         (To Ms. Moore) You can have a seat.

5                   SAMUEL C. HAFFER, Sworn

6         THE COURT:  Good afternoon.

7         THE WITNESS:  Good afternoon, Your Honor.

8         THE COURT:  Would you state your name for the

9    record, please.

10        THE WITNESS:  Samuel C. Haffer.

11        THE COURT:  And how are you employed, Dr. Haffer?

12        THE WITNESS:  I'm employed by the U.S. Equal

13   Employment Opportunity Commission in the role of chief data

14   officer and director of the office of enterprise data and

15   analytics.

16        THE COURT:  All right.  And I'm familiar with the

17   declaration you have submitted, and obviously I assume you

18   are, too, since it's your declaration.  Is that correct?

19        THE WITNESS:  Yes, Your Honor.

20        THE COURT:  All right.  So I want to start with a

21   very general hypothetical.  If I order defendants to inform

22   relevant employers by April 19, 2019, that Component 2 data

23   collection for the 2018 reporting period will resume

24   imminently and that employers should be prepared to submit

25   Component 2 pay data during the current EEO-1 reporting
```

1    period, what harm would that cause to the EEOC?

2        THE WITNESS:  Your Honor, we are or we were in the

3    midst, on March the 4th, of beginning to implement the

4    Component 1 data for the annual EEOC data collection that

5    had been delayed, the opening of which had been delayed due

6    to the government furlough.  We have a very small staff

7    working on the survey.  In-house we have four people, and we

8    have a small business contractor who's responsible for the

9    computer programming of the data intake.  All hands were on

10   deck to begin the stand-up of the Component 1 data.

11       At the point that the notice was given to inform

12   the employers about Component 2, we weren't sure what to

13   inform them of because there were still lots of outstanding

14   questions about different definitions and items and how to

15   report items, and we didn't have the infrastructure in place

16   to be able to handle the thousands of emails and phone calls

17   that we would have gotten.

18       THE COURT:  Let me stop you for a minute, Doctor.

19   You said "at the point that notice was given to inform the

20   employers about Component 2."  What time are we talking

21   about?

22       THE WITNESS:  Was that March the 4th?

23       THE COURT:  When the Court issued its order?

24       THE WITNESS:  Correct.

25       THE COURT:  Uh-huh.  You can finish.

1      THE WITNESS:  We didn't have the infrastructure in

2  place, nor did we have -- we didn't have the infrastructure

3  in place to answer the questions that would have been

4  raised, nor did we have definitive answers to some of the

5  questions that we're sure would have been asked.

6      THE COURT:  By employers.

7      THE WITNESS:  By employers.

8      THE COURT:  And what actions has EEOC taken since

9  that time to deal with those issues?

10     THE WITNESS:  Since March the 4th -- actually,

11  March the 4th in the evening is when we first received the

12  order.  We immediately began to assess timelines and costs

13  of how much -- of how to meet what was in the March the 4th

14  order.  We first went to the contractor who's -- the small

15  business that's currently doing our Component 1 data

16  collection and asked them how fast could you open this data

17  collection.

18     And their response was, "It would take us nine

19  months."  And nine months from March -- the week of March

20  the 4th would have put us beyond the September 30th deadline

21  when the current PRA expires.

22     We then went to NORC at the University of Chicago,

23  who we had under contract for some modernization work we

24  were doing.  They also happen to be experts in data

25  collection.  And we asked them -- we actually asked them two

1    things.  "In an ideal world, were we to be doing this and

2    meeting all of the industry standards for data collection,

3    how long would that take?"  And then we also asked them, "If

4    we had to do it by September 30th" -- and "do it" meaning if

5    we had to have all data collected by September 30, 2019 --

6    "what would that look like and how much that would cost?"

7            So in that period since March the 4th we've been

8    planning how to do this.

9            THE COURT:  Okay.  Now, what implementation

10   efforts did EEOC take to prepare for the Component 2 data

11   collection between September 29, 2016 -- that is OMB's

12   initial approval -- and August 2017, which is when OMB

13   ordered the stay?

14           THE WITNESS:  Your Honor, I did not come on board

15   at the EEOC until November 12th of 2017, so I could offer

16   you my view on what was done during that period --

17           THE COURT:  Well, you can tell me, if you know.

18   This is not a trial.  You can offer me hearsay.  If you are

19   aware of what those efforts were, you can certainly testify

20   about it.

21           THE WITNESS:  Sure.  So there was a form designed,

22   a data collection form, sample form, that was designed.

23   There was an instruction -- a couple of pages on

24   instructions on how to collect the data, and also there was

25   a webinar.

1          But, Your Honor, I viewed the webinar and the

2     instructions as basically awareness-building, public-

3     awareness-building.

4          Those instructions in that webinar did not get

5     into the sufficient detail necessary to tell someone how to

6     collect the data in a step-by-step process.

7          THE COURT:  I'm going to come back to that.

8          Let me just ask you, the implementation efforts

9     that you've just described that you've been told about or

10    that you learned about, how do those efforts affect the

11    EEOC's ability to now collect Component 2 data?

12         I mean, so you're not going to be starting from

13    scratch, are you?

14         THE WITNESS:  Yes and no.  There will be a --

15    there will be a basis from which we then craft a revised

16    instruction form that gets into more detail on how to

17    collect the data, and what we're going to do is we're going

18    to try to, to the best of our ability, understand questions

19    that employers would have before we put that instruction

20    manual together.

21         And we could do that through frequently asked --

22    through revising frequently asked questions.  Most likely,

23    given the limited time frame, we're just going to have to

24    really be doing updating of frequently asked questions on

25    the fly to make this work.

1          THE COURT:  So on November 3, 2016 -- which I

2     realize is a year before you got there, but I'm sure you've

3     probably seen these materials -- the EEOC issued a press

4     release for employers.  It provided a link to a recording of

5     a webinar, presentation slides, the then-new EEO-1 form, a

6     fact sheet for small businesses, and a questions and answers

7     document.  I think those are the materials you just talked

8     about.

9          Those materials have been deleted.  Why?

10          THE WITNESS:  My understanding, Your Honor, is

11     that under the Paperwork Reduction Act, if an approved

12     information clearance package does not exist, then we are

13     not able to do anything that would demonstrate that we are

14     asking for data to be collected.

15          THE COURT:  What is an approved information

16     clearance package?

17          THE WITNESS:  That would be the approved -- I

18     think the date that's been -- the date that OMB approved our

19     request.

20          THE COURT:  All I'm saying is you had a link to

21     these materials.  You deleted the link.  Why?

22          THE WITNESS:  Because legally we couldn't keep the

23     link active.

24          THE COURT:  Why?  Because of the stay?

25          THE WITNESS:  Because of the stay; yes, Your

1    Honor.

2        THE COURT:  Okay.  So why hasn't -- now the stay's

3    been lifted.  I ordered it lifted.  Why hasn't that link

4    been restored?

5        THE WITNESS:  Because we're not sure what the data

6    collection is going to look like.

7        THE COURT:  But it would have been a start, right?

8        In other words, had you restored the link --

9    there's nothing improper about the link.  The link would

10   have certainly given businesses and employers a place to

11   start, some information.

12       I mean, you're going to have to provide them with

13   this information.  You had it.  You deleted it.  Why not

14   restore it?

15       THE WITNESS:  Because, Your Honor, as I mentioned

16   a little while ago, we didn't -- we don't have the

17   infrastructure in place right now to handle the added calls

18   and emails that that information would generate.

19       THE COURT:  But you're getting them now anyway,

20   aren't you?  I mean, there's no -- there's no FAQ.  There's

21   no link to the webinar or fact sheet or forms.  So aren't

22   you getting just as many calls as you would without this

23   information, or more?

24       THE WITNESS:  We're not, Your Honor.  We've been

25   monitoring the types of incoming calls and emails since we

1    opened Component 1 to find out what the nature of those

2    were, and it's -- the calls and emails that we're getting

3    are focused on Component 1 issues.

4           THE COURT:  In your declaration you stated that

5    the EEOC -- and I quote -- had not revised its EEO-1

6    instruction manuals and training materials to reflect the

7    2017 data collection requirements and methods for data

8    submission.  That's at Paragraph 10 of your declaration.

9           How does this statement comport with EEOC's prior

10   efforts to prepare employers for Component 2 pay data

11   collection?

12          THE WITNESS:  Your Honor, it comports in that I

13   was attempting to show that the EEOC was not well prepared

14   to collect data -- Component 1 data that they had been

15   collecting for decades, and that the potential of problems

16   in collecting a new source of data that had never been

17   collected before and the volume of data that were to be

18   collected could potentially have overwhelmed the system, and

19   EEOC may not have been prepared to collect the data.

20          THE COURT:  At the time of OMB's stay, which is

21   August 2017, when was the reporting period scheduled to open

22   for the collection period that closed on March 31, 2018?

23          THE WITNESS:  I'm sorry, Your Honor?

24          THE COURT:  Yes, that's -- in other words, when

25   OMB issued the stay in August of 2017, when was the

1    reporting period scheduled to open for the -- there was a

2    collection period that closed March 31, '18.  When was that

3    collection period supposed to open?

4            THE WITNESS:  In January.

5            THE COURT:  Okay.  And at the time of the OMB stay

6    was EEOC scheduled to open the Component 2 data collection

7    on time?

8            THE WITNESS:  Understanding that I wasn't there,

9    to my knowledge it appeared that they had been moving

10   forward in that direction.

11           THE COURT:  Now, did EEOC plan on relying on

12   outside contracting assistance in that regard?

13           THE WITNESS:  The way the EEOC currently collects

14   data and the way that it appeared that trajectory was headed

15   was using a small business concern, and that small business

16   concern is used primarily to program EEOC data systems,

17   which is a very strange set-up.  I've never seen it before

18   that way.

19           Generally, when one contracts out a data

20   collection, they contract out the entire package of data

21   collection activities.

22           But SAGE was responsible for programming the EEOC

23   systems that ingested the data.  The EEOC staff was

24   accountable for all of the other activities surrounding data

25   collection.

1    THE COURT:  Between the time of OMB's stay --

2    again, August 2017 -- and the start of this litigation,

3    which was November of 2017, right when you fortuitously came

4    on board -- talk about drinking from a fire hose -- what

5    actions, if any, did EEOC take to prepare for the collection

6    of Component 2 information?

7    THE WITNESS:  Four major activities, Your Honor.

8    One is that when I came on board I assessed our entire data

9    collection activity identifying where there were

10   opportunities for improvement.  I also began to hire staff

11   with expertise in survey research and in data science and

12   statistics.

13   THE COURT:  And this is all with an eye to

14   Component 2 -- collecting Component 2 information?

15   THE WITNESS:  Not specifically, Your Honor.  This

16   was an eye to improving our overall data collection

17   activities.

18   THE COURT:  All right.  Okay.  You said two, I'm

19   sorry.

20   Three.

21   THE WITNESS:  Three was standing up what is now

22   the EEOC data and analytics modernization program that is

23   detailed more in the declaration, but most importantly the

24   very first project in the program is to do a soup-to-nuts

25   evaluation of all of our EEOC data collection -- EEOC-1 --

1    the EEO-1, 3, 4, and 5, so all the surveys.

2              And then the final -- the final piece is to

3    actually begin to do -- to carry out the evaluation and to

4    begin to understand what we can do better and how quickly we

5    can do it and those types of issues.

6              THE COURT:  Okay.  So that's when you started in

7    November 2017.  How have these four steps affected EEOC's

8    ability to collect component data -- Component 2 data now?

9              THE WITNESS:  Well, it's allowed us to identify a

10   well-known contractor who will be able to help us --

11             THE COURT:  Is this NORC?

12             THE WITNESS:  NORC at the University of Chicago.

13   It has allowed us first to bring on board skilled staff in

14   the area of data collection, survey methods, someone who

15   will be able to oversee the data collection and ensure that

16   we meet our timelines.  And the other is to -- we were able

17   to identify a contractor who was skilled in the area, has

18   lots of experience with federal data collections, and will

19   help us meet our timelines.

20             THE COURT:  All right.  Now, between the time of

21   the start of this litigation, which is, again, around the

22   time you came on board, November 2017, and this Court's

23   order granting summary judgment, which was March 2019, what

24   actions, if any, did EEOC take to prepare for the collection

25   of Component 2 information beyond the -- so you've already

1   talked about the four steps that you've done -- you know,

2   you took and the identification of NORC.  But then going

3   forward to my order, from that time to the order in March

4   what additional steps have you taken to collect -- because,

5   I mean, obviously there was a possibility that plaintiffs

6   might prevail, so what was EEOC doing to prepare for the --

7   you know, in the eventuality that plaintiffs would prevail

8   and the stay would be removed?

9        THE WITNESS:  Well, what we could not do -- and

10   your time period, Your Honor, was between the stay and March

11   4th?

12        THE COURT:  Between the litigation -- between the

13   November 15th filing of this lawsuit and March 4th.

14        THE WITNESS:  We were still subject to the stay,

15   which meant that we could not contact employers directly and

16   make any representation that we were going to begin to

17   collect data or to signal to them that they should begin to

18   collect data.

19        THE COURT:  Right, but you certainly could take

20   steps to make sure, on the technological side, that you

21   would be ready to or you would try and get ready, should

22   plaintiffs prevail, right?

23        I mean, obviously you couldn't tell the employers

24   anything because there was nothing to tell them, but what

25   was EEOC doing internally to prepare for the possibility

1    that plaintiffs might prevail?  Just those four steps that

2    you're talking about?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  Now, between the time that I

5    granted summary judgment -- that's March of this year, last

6    month -- and the status conference on March 19th, so that's

7    essentially two weeks, in those two weeks what actions, if

8    any, did EEOC take to prepare for the collection of the

9    Component 2 data?

10             THE WITNESS:  The outreach to the contractors to

11   ascertain a budget and a timeline and to talk through any

12   significant issues, and then we have also begun to draft a

13   statement of work to be able to quickly procure the services

14   of the contractor, and we've explored the regulations that

15   will allow us to sole source this because of urgent and

16   compelling necessity.

17             So we basically have done all of the background

18   work to make sure that as soon as we're told to go we can

19   go.  That will allow us to meet that September 30th

20   deadline.

21             THE COURT:  When you say "we're told to go," who

22   is telling you to -- what do you mean by "told to go"?  Was

23   not the order direction to go?  I mean, what do you -- who

24   is going to tell you to go?

25             You're waiting -- your statement -- you said that

```
 1    "so we basically have done all of the background work to
 2    make sure that as soon as we're told to go we can go."  Is
 3    that an internal directive that you're waiting for?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Yes?
 6              THE WITNESS:  Yes.
 7              THE COURT:  Okay.  And in the interim why hasn't
 8    the link with the information for employers been -- wouldn't
 9    that help you to be ready to go?
10              THE WITNESS:  Your Honor, it would overwhelm us
11    with emails and telephone calls, and we don't -- once we
12    have the contract in place, part of the contract will be
13    that the contractor sets up a technical assistance telephone
14    line and email box, and they'll have the internal staff
15    capacity to handle the calls once the calls and emails start
16    coming.
17              Prior to that, we're in the middle of the
18    Component 1 data collection, and as I mentioned earlier, we
19    have very limited staff available on this effort, and they
20    are focused on the Component 1 data collection.
21              THE COURT:  The link that was deleted with the
22    webinar and the form and the facts and so on, that was a
23    link providing employers with information.  Did it direct
24    employers to call the EEOC with questions, or was it just
25    here's what you need to know to start getting ready?
```

1    THE WITNESS:  I believe both.  And even if it

2    didn't specifically say, "Call the EEOC with questions or

3    email the EEOC," they would have.

4    THE COURT:  As part of your -- you said, you know,

5    "We want to be ready to go.  We want to have systems in

6    place so we can go when we get the order to go."  Wouldn't

7    it be more practical for your contractor to have already

8    started giving people sort of information in advance of the

9    order to go?

10    THE WITNESS:  Your Honor, we can't ask the

11    contractor to begin to work on the contract until the

12    contract's in place.

13    THE COURT:  Okay.  And the contract won't be in

14    place until...?

15    THE WITNESS:  As soon as possible.

16    THE COURT:  What's -- I guess you'll have to

17    forgive me if I'm not familiar with how your internal

18    workings operate, but what's stopping the contract from

19    being in place?  What approval is needed?  Who needs to

20    approve the contract with the outside contractor?

21    THE WITNESS:  The chief financial officer and

22    the -- the chief financial officer, and the chief financial

23    officer needs to -- needs to vet it by the acting chair.

24    THE COURT:  And do you know if that contract has

25    been submitted to the chief financial officer and the acting

1    chair?

2             THE WITNESS:  It has not yet, Your Honor, because

3    we're still working through the details.

4             THE COURT:  Let me ask you some questions about

5    NORC at the University of Chicago.

6             When did EEOC contact NORC at the University of

7    Chicago regarding using an existing -- a contract to conduct

8    the Component 2 data collection?

9             THE WITNESS:  I reached out to them on either

10   March the 5th or March the 6th.

11            THE COURT:  Okay.  And has EEOC ever used

12   contractors -- you mentioned a small business.  Is that

13   SAGE?

14            THE WITNESS:  Yes.

15            THE COURT:  So have you used contractors other

16   than NORC and SAGE to collect or process information on an

17   expedited basis?

18            THE WITNESS:  Not since I've been at the EEOC.

19            THE COURT:  Do you know if the EEOC ever used NORC

20   to collect information on a nonexpedited basis before?

21            THE WITNESS:  My knowledge is that NORC's first

22   contract with the EEOC was the modernization contract, which

23   we awarded in September of 2018.

24            THE COURT:  All right.  Now, in your declaration

25   you have a proposed timeline.

 1           Just a minute.

 2           (Pause)

 3           It's on Page 11.  Do you have your declaration

 4      with you?

 5           THE WITNESS:  I do not.

 6           THE COURT:  Do you have a copy for him?

 7           MS. WELLS:  I do.

 8           THE COURT:  Thank you.

 9           MS. WELLS:  May I?

10           THE COURT:  Yes, please.  Thank you.

11           The witness has been handed a copy of his

12      declaration, which is Document 54-1.

13           If you could look at Page 11 of your declaration,

14      Doctor.

15           THE WITNESS:  (Witness complies)

16           THE COURT:  That's an estimated timeline for the

17      collection of Component 2 data.  Who is involved in

18      developing the proposed timeline in your declaration?

19           THE WITNESS:  I was, as well as the vice president

20      at NORC.

21           THE COURT:  All right.  Was -- so you, on behalf

22      of -- anyone else on behalf of the EEOC, or just yourself?

23           THE WITNESS:  In actually developing the timeline?

24           THE COURT:  Yes.  Yourself and people from NORC,

25      correct?

1          THE WITNESS:  Correct.  And there were two people

2     on my staff who were assisting me.

3          THE COURT:  All right.  Was OMB involved in this

4     effort, too?

5          THE WITNESS:  No, Your Honor.

6          THE COURT:  Okay.  And who was it that first

7     proposed the September timeline?

8          THE WITNESS:  The September timeline was proposed

9     because that -- as I mentioned, I first asked NORC what

10    would it take if we were to do this ideally, and they came

11    back January 2021.

12          And then I said, "Well, what if we need to do this

13    before the current -- before the current PRA package expires

14    on September 30th?"

15          THE COURT:  Right.

16          THE WITNESS:  And so that's how that September

17    30th deadline was established.

18          THE COURT:  Okay.  And so is it -- the task of

19    collecting the Component 2 data, is that going to be almost

20    all contracted out to NORC, or is it going to take EEOC

21    person-hours as well?  Because you talked about earlier

22    having a very small staff.

23          THE WITNESS:  The oversight of all of the actual

24    work will be contracted out.  We will have oversight of all

25    the work.

1          THE COURT:  Okay.  And do you know how many NORC

2    person-hours the task of collecting the component data --

3    Component 2 data will take?

4          THE WITNESS:  I don't.

5          THE COURT:  Okay.  And so do you have any idea how

6    many additional person-hours it will require of EEOC and

7    NORC to collect the Component 2 pay data by May 31, 2019?

8    Obviously it would require more hours.

9          THE WITNESS:  We could not do it by May 31, 2019.

10          THE COURT:  By "we," you mean NORC?

11          THE WITNESS:  Neither NORC or EEOC.

12          THE COURT:  And did you ever ask NORC, "What is

13    the quickest you can do this project?"

14          THE WITNESS:  I did, Your Honor.

15          THE COURT:  And what did they tell you?

16          THE WITNESS:  They said if it was any faster than

17    September 30th they would walk away because it would not

18    meet anything resembling professional standards for data

19    collection.

20          THE COURT:  Okay.  Now, apart from the EEOC's

21    current belief that there needs to be a pilot study, why was

22    the EEOC's prior work on ensuring data validity and data

23    reliability inadequate?

24          THE WITNESS:  When one wants to collect and test

25    whether data are valid, that gets at the questions that are

1    asked and how that information will be collected.  And there

2    is a lot of evidence, information available, that collecting

3    data, pay data, in pay bands is not a valid way of

4    collecting pay data for purposes of enforcing discrimination

5    laws.

6         So there is a lot of -- and if one were to look at

7    the -- and read the National Academy of Sciences report, the

8    NAS panel said as much.

9         THE COURT:  I was going to ask you a question on

10   that because EEOC claims that the National Academy of

11   Sciences recommended a true pilot study collecting real

12   data, but plaintiffs have asserted that the study did not

13   require real data.  And so what basis do you have for making

14   the assertion that this Sciences report recommended real

15   data as opposed to pay bands?  Just the report itself?

16        THE WITNESS:  Well, the National Academy reports

17   recommendations.  The first two recommendations --

18   Recommendation No. 1 is that EEOC and OFCCP should get

19   together and really figure out what they're going to use the

20   data for because once -- and these are -- I'm paraphrasing

21   the recommendations.  Once you figure out exactly what

22   you're going to use the data for, then you can begin to

23   start asking the questions about, okay, then, how does one

24   go about collecting data?  That will then allow one to

25   validly answer the question or address the need.

1          THE COURT:  How does the pilot study that EEOC

2     conducted not comport with the National Academy of Sciences

3     recommendation?  Just because they use bands?

4          THE WITNESS:  No, Your Honor.  The -- what the

5     EEOC purported as a pilot study is not a pilot study.

6          THE COURT:  Why?

7          THE WITNESS:  Because it doesn't meet the

8     definition of a pilot study.

9          A definition of a pilot study is that you

10    implement the data collection that you're proposing to

11    implement on a small scale, a test, if you will, and that

12    way you test all of your processes before you do full-blown

13    implementation to make sure that you don't run into any

14    issues or problems.  It's a way of testing and identifying

15    problems before the fact, before a full-blown implementation

16    goes on.

17         THE COURT:  So --

18         THE WITNESS:  What is in -- I'm sorry.

19         THE COURT:  I'm sorry, finish, please.  I didn't

20    mean to interrupt.

21         THE WITNESS:  What is in the so-called pilot study

22    is simply the author's opinion of the pilot -- of the policy

23    preference that the author would prefer.  There's no -- that

24    thing called a pilot study is just not a pilot study.

25         THE COURT:  So given that opinion, why didn't EEOC

1      conduct another one either before or during the stay, a

2      proper pilot study?

3              You said that the thing called a pilot study is

4      just not a pilot study, implying that it was inadequate.

5      Why didn't you do a proper pilot study?

6              THE WITNESS:  We have limited resources, and at

7      that point the stay was in place, and the need for the

8      limited resources was in standing up the Component 1 data

9      collection and ensuring that that was of the highest quality

10     possible.

11             THE COURT:  In its 30-day notice EEOC stated that

12     it has -- and I quote from the 81 Federal Register at

13     45492 -- "EEO stated that it has a comprehensive set of

14     security and privacy controls to protect organizational

15     operations and information system assets against the diverse

16     set of threats."

17             How does this statement comport with your

18     assertion in your declaration that a contributing factor to

19     the delay is a secure collection and storage of Component 2

20     data?

21             THE WITNESS:  The EEOC's systems meet the minimum

22     standards -- the minimum federal standards.

23             THE COURT:  Are those the -- are those minimum

24     federal standards the standards that are in the Federal

25     Register, a comprehensive set of security and privacy

1    controls?

2             THE WITNESS:  It would go beyond that, Your Honor,

3    to comport with the FISMA 2014, which is Federal Information

4    Security Modernization Act of 2014.

5             THE COURT:  So I guess what I'm trying to get at,

6    Dr. Shaffer --

7             THE WITNESS:  Haffer.

8             THE COURT:  Haffer, Haffer.  If EEOC has said it

9    has this comprehensive set of security and privacy controls,

10   I don't understand why security and privacy security in the

11   collection of storage of information is causing a delay

12   since EEOC says they already have those controls in place.

13            THE WITNESS:  I want to ensure that the sensitive

14   information that's coming in is stored on systems that

15   exceed federal standards.

16            THE COURT:  But the sensitive information that's

17   coming in is not individual sort of name and salary data.

18   It's pay bands, right?

19            THE WITNESS:  That's correct.

20            THE COURT:  So it's not like people can hack into

21   that and get people's names and date of birth and all of

22   that, right?

23            THE WITNESS:  It's possible.  I'll give an

24   example.

25            If we were to disclose -- if information were to

1    be disclosed or breached where one could identify very small

2    cell sizes, for instance, someone who is the only Asian

3    female executive in West Virginia who makes above $100,000,

4    you could potentially merge -- use other social media data,

5    perhaps Department of Motor Vehicles data and voter

6    registration data, to reverse-engineer and figure out who

7    that individual person is.

8           THE COURT:  What has changed regarding security

9    and privacy controls at the EEOC between the time of the 30-

10   day notice and today?

11          THE WITNESS:  We have a more secure two-factor

12   authentication system for allowing employers to log in and

13   submit their data into the EEOC systems.

14          THE COURT:  Okay.

15          THE WITNESS:  And, Your Honor, if I may, there's

16   a -- there is a -- so as I mentioned earlier, all of the

17   data that we're collecting is on EEOC servers, and the best

18   practice -- so we have people who are logging in and

19   submitting data that ultimately are on EEOC servers.  A

20   better practice would be to have employers submit data into

21   NORC's system and not have them have any access into EEOC's

22   systems.

23          THE COURT:  Has EEOC ever had a data breach that

24   compromised EEO-1 data?

25          THE WITNESS:  Not since I've been there.

1          THE COURT:  Do you know if they've had one before

2     you were there?

3          THE WITNESS:  I do not know.

4          THE COURT:  Okay.  And why does the storage of

5     aggregate pay-related data make EEOC's security measures

6     less effective?

7          THE WITNESS:  So it doesn't make the mechanisms

8     in place less effective.  My concern about data security is

9     the -- is release -- inadvertently releasing information

10    that could be reverse-engineered to identify an individual

11    person.

12         THE COURT:  Okay.  If EEOC is planning on using

13    NORC to collect Component 2 pay data, what is the source of

14    your concern about EEOC's data security related to

15    collection?

16         THE WITNESS:  I have none.

17         THE COURT:  You have none, okay.

18         And why hasn't EEOC not lifted the stay that was

19    entered in the Federal Register, if you know?

20         THE WITNESS:  I do not know.

21         THE COURT:  Okay.  Just a -- I'm almost done.

22         All right.  Why, specifically, could requiring the

23    2017 pay data, along with the 2018 data, decrease response

24    rate and increase errors in the entire data collection

25    process?

1          THE WITNESS:  So I --

2          THE COURT:  To a greater extent than might be

3    experienced in just collecting 2018 Component 2 data alone?

4          THE WITNESS:  So as Your Honor is aware, this is a

5    brand-new data collection for EEOC and for employers, and we

6    are proposing to do this collection in a very abbreviated

7    period of time, and we believe that both years of data

8    collection would be the equivalent of two separate data

9    collections, and that is because the data that are collected

10   for 2017 may not be exactly the same data that are being

11   collected from the employers' perspective in 2018.

12          And what I mean by that is employers' payroll

13   systems and human resources systems are what is known as

14   transactional systems, and what that means is that on a

15   regular basis --

16          (Pause)

17          THE COURT:  I'm sorry.  Okay.  Go on.

18          THE WITNESS:  On a regular basis, data and

19   information is being put in, and data and information is

20   being -- is coming out of it.  It's not a static or fixed

21   database.  It's constantly changing to meet business needs

22   of the employers.

23          And to meet those business needs throughout the

24   course of a year the database may be changed a number of

25   times to introduce new data elements, to delete data

1    elements that are no longer used, to program a new code to

2    meet a new business need.  And so remember, these data are

3    being collected for certain business purposes, not for --

4    not necessarily for EEOC reporting purposes.

5            And then at the end of a calendar year, those data

6    are archived and put away and -- along with the -- hopefully

7    with the documentation that would explain to someone what

8    data are in which fields and what are the definitions of

9    those data.  And the same thing would have happened for

10    2018.

11            And so now in 2019 the EEOC is saying, "You need

12    to go back to your 2018 data and pull out this information,

13    and you're also going to need to go back to the 2017 data

14    and pull out the information all in a very short period of

15    time.  Here's what we're going to be able to give you in

16    terms of documentation for what we want you to pull, and

17    we'll provide you some technical assistance, the best that

18    we can do, between -- you know, until the data collection

19    period closes."

20            And what happens, Your Honor, is that we believe

21    that by focusing on an individual year of data instead of

22    trying to do two separate collections at the same time is

23    that we have a better likelihood of receiving quality data

24    if we just focused people's attention on one year instead of

25    multiple years of data.

1           THE COURT:  All right.  I'm going to give you a

2    hypothetical.

3           Assume, for purposes of the hypothetical only,

4    that I agree that collecting the 2017 pay data along with

5    the 2018 pay data would be too risky.  If OMB used its

6    emergency extension power to allow Component 2 data

7    collection to be completed after September 30, 2019, and had

8    the 2017 reporting cycle be replaced by the 2019 data

9    collection in 2020, would that resolve the risks you

10   identified?

11          That's a lot.  I gave you a lot of dates here.

12   Let me ask again.

13          So if I agree that collecting the 2017 pay data

14   with 2018 would be too risky, if OMB used its emergency

15   extension power to allow Component 2 data to be completed

16   after the September 30th deadline and had the 2017 reporting

17   cycle be replaced by the 2019 data that was collected in

18   2020, would that resolve the problems that you talked about

19   just now?

20          THE WITNESS:  If there was a way to do that, and

21   EEOC was very diligent in how we moved forward in terms of

22   instruction manuals and frequently asked questions, then

23   from a reliability-and-validity-of-the-data perspective, my

24   answer would be yes.

25          THE COURT:  Okay.

1          Ms. Thurston, do you have questions?

2          And if you want to speak into the microphone and

3     sit down, you can.

4          MS. THURSTON:  Can you hear me?

5          THE COURT:  I can.

6          Is it on, Mr. Bradley?

7          Okay.  It's the court reporter who has to hear

8     you.

9          (To Dr. Haffer) Almost done.  We have some more

10    questions from Ms. Thurston and then from your own lawyer.

11                        EXAMINATION

12    BY MS. THURSTON:

13    Q.  Thank you for being here, Dr. Haffer.  I appreciate it.

14          Are you aware that the EEOC had put together --

15    this is in the pre-stay period -- a sample spreadsheet of

16    what it would look like for employers to report pay data?

17    A.  Yes.

18          MS. THURSTON:  Your Honor, I have copies of that

19    spreadsheet.  In the interest of time I can either provide

20    them to the Court --

21          THE COURT:  If you want to just mark them as

22    Exhibit 1 and hand one up.  And make sure that opposing

23    counsel gets one.

24          MS. THURSTON:  What I'm going to mark is the

25    first -- it's the link declaration that we submitted in

1    support of our motion for summary judgment --

2                THE COURT:  Oh, okay.

3                MS. THURSTON:  -- with the first --

4                THE COURT:  If it's already in the record, then

5    you can just hand one up to me.

6    Q.  Would you please look at the tab marked E.

7    A.  (Witness complies)

8    Q.  And is this a sample of what the Component 2 pay data

9    reporting spreadsheet was planned to look like in advance of

10   the stay?

11   A.  This is what I saw when I arrived at EEOC, yes.

12   Q.  Is there anything about this spreadsheet that would

13   change for the new Component 2 reporting that's scheduled to

14   occur this summer?

15   A.  Are you talking content or format?

16   Q.  Well, let's start with content.

17   A.  So content, the answer is no.  But format, yes.  This is

18   an unwielding -- an unwieldy instrument for trying to fill

19   out, and what I've discussed with NORC is building a data

20   intake portal that would be much more understandable and

21   customer-friendly than this form.

22   Q.  If the EEOC were to publish this form on its website

23   once again, now, would it provide employers the information

24   about what data they need to begin collecting, in terms of

25   W-2 pay information and FLSA hours worked information?

1    A.  I'm sorry, could ask the question again?  I want to make

2    sure I heard it.

3    Q.  If you were to publish this spreadsheet on the EEOC's

4    website once again, would it still provide the correct

5    information to employers about the data they would be

6    expected to report as part of the Component 2 data

7    collection?

8    A.  So if we were to publish information about reporting the

9    data here that this form purports to gather, we would

10    provide as much information as we can about a step-by-step

11    method of collecting the data that are being requested to be

12    collected.

13    Q.  So the form accurately reveals the data that employers

14    would be expected to report, if not the precise mechanism by

15    which they would report it?

16    A.  It shows the data, but it doesn't provide the

17    definitions of the data.

18    Q.  And so let's talk about the data that will be collected.

19    For example, the pay data is defined by W-2 Box 1 pay

20    information.  Is that one of the definitions that you're

21    saying needs to be clarified?

22    A.  There would be -- I've heard from people on the ground

23    that there would be questions about that data.

24    Q.  There would be questions about what W-2 Box 1 pay data

25    refers to?

1    A.  There would be questions about whether that data was an

2    accurate representation of data that's necessary to meet the

3    goals of the data collection.

4    Q.  So when you're saying there are questions about the

5    definition, am I correct to understand you're not saying

6    that you've heard employers are confused about what data to

7    report, but rather whether that data is useful?

8    A.  That, as well as questions about things like if someone

9    was FLSA-exempt in half the year and FLSA -- and subject to

10   FLSA the other half of the year, how would one report hours

11   worked?

12        Another issue would be if a company is acquired by

13   another company, and the -- or the remaining employees come

14   over to the new company but all of the payroll records and

15   human resources information stays with the other company,

16   how would that situation be handled?

17        So it's a lot of, I guess one would say,

18   clarification and dealing with issues like that.

19   Q.  Okay.  But just the W-2 data itself is clear as to an

20   employee who's been with the company for the entire calendar

21   year?

22   A.  Yes.

23   Q.  And the same would be true for the FLSA hours worked

24   information?

25   A.  Yes, yes, yes.

1   Q.   Okay.  In the pre-stay period, the plaintiffs are aware
2   of what the EEOC has made public about its data preparation,
3   collection preparation efforts, which the Court inquired
4   about.  Are you aware of whether there was any internal work
5   about clarifying the type of questions that you were just
6   referring to?
7   A.   Since which date?
8   Q.   Pre-stay, so pre-August 2017.
9   A.   So ideally that's what a real pilot study would have
10  done, but not to my knowledge.
11  Q.   So you don't know whether EEOC had begun to prepare
12  guidance on how to treat employees who began partway through
13  the calendar year or the other types of uncertainties that
14  you just referenced?
15  A.   So what I do know is that there were, I believe, two
16  webinars held at which time the EEOC announced and, in some
17  respects, reiterated and dispensed down what had been in the
18  60 -- no, the 30-day notice, and then I believe there were
19  some questions, a few questions, raised during those
20  webinars that then went into a frequently asked questions
21  revised document, and that was the extent of it.
22  Q.   And I understand that that's what EEOC did publicly.
23  Was there any internal work about preparing guidance to
24  address these kinds of questions that were arising, or do
25  you know?

1    A.  I wasn't there at the time.  I don't know.

2    Q.  But as far as you know, EEOC was on track to open the

3    Component 2 data collection on time in the pre-stay period?

4    A.  They were on -- they appeared to be on track to open

5    a portal that would have collected pay data that -- you

6    know, that doesn't -- I'm not going to speak to the quality

7    of the data that would have been reported, but they were

8    going to -- they appeared to be on track to open a data

9    collection portal.

10   Q.  And addressing briefly the pilot study, are you aware

11   that EEOC discussed the pilot study in both of its Federal

12   Register notices regarding the pay data collection?

13   A.  I am.

14   Q.  And that in the 60-day notice it discussed why using

15   synthetic data instead of real data was an appropriate

16   choice?

17   A.  Was appropriate or inappropriate?

18            THE COURT:  An appropriate.

19   Q.  An appropriate choice.

20   A.  I read what they wrote, yes.

21   Q.  And that this was the data collection package approved

22   by both EEOC and OMB at the time?

23   A.  That's correct.

24   Q.  When you were -- when the Court was inquiring about the

25   pilot study, I believe you made a statement with regard to

1  the use of pay bands and this not necessarily being a useful

2  mechanism to carry out the purposes of the data collection;

3  is that correct, or am I misremembering your testimony?

4  A.  So the information about the pay bands and whether

5  they're an appropriate way to measure differences in pay for

6  purposes of enforcement is in the National Academy of

7  Sciences report.

8        The quote, pilot study, unquote, that is just

9  simply the author of the report stating their policy

10 preference.  It's devoid of any kind of quantitative

11 analysis at all.  It just does not meet the standard

12 "Introductory Textbook to Research Methods" definition of a

13 pilot study.

14 Q.  I appreciate that that's your view, but are you aware

15 that EEOC determined, during the course of its years-long

16 process in how to collect pay data, that the use of pay

17 bands was its preferred mechanism?

18 A.  Only in terms of what I've read in the 60-day notice and

19 the 30-day notice.

20 Q.  And that this was the information collection package

21 approved by OMB, meaning that it met the standards of the

22 Paperwork Reduction Act?

23 A.  Yes.

24 Q.  Okay.  Once the stay was issued -- and at this point I

25 understand you were at EEOC; is that correct?

```
1    A.  No.  The stay was issued in August of '17, and I arrived

2    on November the 12th of '17.

3    Q.  In your testimony earlier, am I correct to understand

4    that you were saying that EEOC was somehow legally

5    restricted from taking any action that would suggest that

6    the data collection would continue or otherwise providing

7    information to employers?

8    A.  Yes, in terms of public information that we could

9    release.

10   Q.  Are you aware that as part of the stay OMB also stated

11   that it was reviewing the Component 2 data collection, and,

12   in fact, the memorandum issuing the stay instructed EEOC to

13   submit a new information collection package to OMB for

14   review?

15   A.  I am not aware of that.

16   Q.  Were you involved in any efforts to review the data

17   collection -- the Component 2 data collection as part of

18   OMB's purported review and stay order?

19   A.  Not since I arrived on November the 12th of 2017.

20   Q.  Are you aware of whether anyone else at EEOC took action

21   to respond to OMB's directive to submit a new information

22   collection package for review?

23   A.  I am not aware of that.

24   Q.  Are you aware that during the course of this litigation

25   defendants represented to the Court that the action should
```

64

1    not be reviewed because there was an active review within

2    the agencies of whether the Component 2 data collection

3    should continue?

4    A.  I'm sorry, could you say that again.

5    Q.  I'm sorry, that was a -- I used the word "review" a lot.

6            Are you aware that during the course of this

7    litigation defendants' position was that halting the

8    Component 2 data collection was not final because there was

9    an internal government review process that was ongoing?

10   A.  I have no knowledge of any of that.

11   Q.  And I apologize if the Court asked this, but when did

12   you become aware of this lawsuit?

13   A.  Probably two days after I walked in the door.

14   Q.  Were you aware that the plaintiffs have been -- have

15   stated that our preferred outcome is for the Component 2

16   data collection to resume in the current reporting period?

17   A.  I'm only aware of what I've read that's part of the

18   output from the Court.  I'm not sure exactly the right words

19   to use.

20           THE COURT:  The order.

21   A.  The order.

22   Q.  Okay.  So before the Court's summary judgment order, did

23   you have any understanding of what the time frame for

24   implementing the Component 2 data collection would be if

25   plaintiffs were successful?

```
 1    A.  I'm sorry, say that again.
 2              THE COURT:  Did you know what plaintiffs had asked
 3    for in terms of the time frame for data collection, what
 4    they were asking for in their lawsuit?
 5              THE WITNESS:  I did not.
 6              THE COURT:  Is that --
 7              MS. THURSTON:  That's my question, yes.  Thank
 8    you, Your Honor.
 9    Q.  Were you aware whether EEOC had developed any
10    contingency plans to collect Component 2 data in the event
11    that plaintiffs were successful in the lawsuit?
12    A.  During what time period?
13    Q.  At any point between when you arrived at EEOC and before
14    the Court's summary judgment order.
15    A.  And ask the rest of your question.
16    Q.  Did EEOC do anything to develop a contingency plan in
17    the event that plaintiffs were successful in the lawsuit and
18    Component 2 data collection was reinstated?
19    A.  So we -- I was first made aware of a question in terms
20    of how fast we could do this when Ms. Moore emailed our
21    office of legal counsel, who then emailed me saying
22    essentially how fast --
23              THE COURT:  When was this?
24              THE WITNESS:  December the 4th.
25    Q.  And before that you were not aware of any contingency
```

1    plan for implementing Component 2?

2    A.  No, not at all.

3    Q.  After that email did you take any action to think about

4    what it would take -- take any action to implement Component

5    2 or develop a plan for doing so if the plaintiffs were

6    successful?

7    A.  We had estimated that to do this ideally, that it would

8    take us until -- we would begin data collection in January

9    of 2021.

10   Q.  Did you understand that if the plaintiffs were

11   successful, that we were seeking to have the data collection

12   begin in March of 2019?

13   A.  No, not at all.

14   Q.  Looking at your declaration and the time frame that the

15   Court pointed to, is there a date certain by which EEOC will

16   notify employers that they are -- will be required to submit

17   Component 2 data as part of -- at some point before

18   September 30, 2019?

19   A.  I'm sorry, say -- ask the question again.

20   Q.  Sure.  Is there a date certain by which EEOC will tell

21   employers they have to submit Component 2 data this year?

22   A.  Yes.  As soon as I'm instructed to move forward.

23   Q.  Who will instruct you to move forward?

24   A.  The acting chair.

25   Q.  And looking at that time frame again, you break out July

1    1st as, I understand it, a date by which initial

2    notification via email and mail to employers will go out?

3    A.   No.  If you look back at the one right before that,

4    under "Data Quality Assurance Step, Preparation Work," we

5    would begin to -- we would create, develop, and deliver the

6    online data collection training to employers.  That would

7    start immediately.  And of course we'd start putting

8    together frequently asked questions.  We'd have a website

9    with information on it.

10           So the notification would begin -- the

11   notification from the contractor to the employers would

12   begin as soon as the contract is awarded.

13   Q.   And what does that notification amount to, the

14   notification from the contractor?

15   A.   Well, we would do email blasts.  We would do snail mail.

16   We would do webinars.  We would work through the stakeholder

17   groups.

18           THE COURT:  You mean to tell the employers you're

19   going to have to start collecting this data?

20           THE WITNESS:  Correct, Your Honor.

21   Q.   So what does the July 1st date refer to?  It's in the

22   second sub --

23   A.   Okay.  So we would -- so in the April-to-June time frame

24   we are creating and developing the how.  This is what, the

25   why, the where, the when, and the, in general, how.

1            Beginning July the 1st we would say, "This is

2    exactly where you're going to go to input the data, and

3    we're going to open that on July the 15th" --

4    Q.  Okay.

5    A.  -- "open the portal on July the 15th.  So that we've

6    spent all these months teaching you how to do it, and now

7    you may go ahead and submit."

8    Q.  Are you aware that July 1st is the same date that the

9    composition of the commission changes?

10   A.  I am not.

11   Q.  And namely that would be the date that the only

12   commissioner representing the minority parties' term

13   expires?

14   A.  I have not heard this before.

15   Q.  In putting together -- in NORC's estimate of its time

16   frame, do you know if that estimate took into account

17   employer burden concerns or employers' estimated -- there's

18   an assertion the employers had made that it would take them

19   some time to comply?

20   A.  It did not.

21            (Pause)

22            THE COURT:  Ms. Thurston?

23            MS. THURSTON:  I'm almost done.

24   Q.  So looking at the September 30th proposed deadline, does

25   that date account for employer delays and compliance?

1    A.  So as is traditional with other federal surveys or

2    information collections, if -- we would stop reaching

3    out to people on September 30th.  However, we would not

4    officially -- if we were to receive information submissions,

5    in general, one to two weeks after the -- after we were no

6    longer able to go out and remind people to send their data

7    in, we would accept those data.

8              But it's important that we do close the

9    information collection officially after the stragglers

10   have -- you know, after just a period of time to allow the

11   stragglers to submit their data.

12   Q.  So does your proposal anticipate stragglers submitting

13   data after September 30th?

14   A.  If we would receive a call on September 29th and someone

15   said, "Hey, we had a fire, and we're just restoring our

16   systems, and could we submit our data on October 1st or

17   2nd?" we would allow them to do that.

18   Q.  Regardless of the PRA expiration deadline of September

19   30th?

20   A.  The way that -- for purposes of data collection, the way

21   that the expiration generally works -- and we did this at

22   our federal agencies that I was part of, another federal

23   agency I was part of -- because the person who was

24   submitting the data made a good faith effort to get the data

25   in, and it may not have been on that particular day, we will

1    still take that data in.  But you only leave that period of

2    time open.

3           Now, you're not -- we're not reaching out to

4    people.  We're not -- after September 30th we're no longer

5    going to nonrespondents and saying, "Hey, send it in.

6    You're missing the deadline," but we would allow for lag --

7    you know, just for just certain things that might happen

8    that would -- we'd try to be accommodating because we know

9    people are putting a lot of effort into collecting these

10   data, and so we would hate not to accept it after -- if it

11   was just a few days late.

12   Q.  Is the same accommodation true for the automatic 30-day

13   extension that EEOC typically offers to reporters?

14   A.  I don't -- this is -- so I just first heard about this

15   automatic 30-day extension yesterday or the day before.

16   That is not a standard practice, nor should it be a standard

17   practice in information collection.

18   Q.  So your post time frame would not allow for any

19   extensions?

20   A.  Any official extensions?

21   Q.  If an employer requests an extension pursuant --

22          THE COURT:  So you mean if somebody calls and

23   said, "We've had a fire, we've had some unexpected problem,"

24   you might make an exception, but you're not just going to

25   give a 30-day extension?

1                    THE WITNESS:  No blanket exceptions.

2    Q.  But is it your position that EEOC could take no action

3    after September 30th to collect data from nonreporters

4    unless they submitted it voluntarily?

5    A.  If you're asking me if I believe that we could in some

6    way reach out to people after September 30th, the answer is

7    no.

8    Q.  Okay.

9                    MS. THURSTON:  No further questions.

10                   THE COURT:  Thank you, Ms. Thurston.

11                   Ms. Moore.

12                   MS. WELLS:  Your Honor, Carlotta Wells on behalf

13   of the defendants.  I'm just going to have a very few

14   questions.  Should I come up to the podium?

15                   THE COURT:  You can also direct your questions,

16   but just make sure the microphone is on.

17                   MS. WELLS:  Okay.  Thank you.

18                   THE COURT:  And that the -- and my court reporter

19   needs to able to hear.  All right.

20                   MS. WELLS:  Okay.  Thank you.

21                             EXAMINATION

22   BY MS. WELLS:

23   Q.  Dr. Haffer, you testified earlier in response to

24   questions from the judge that when you came to the EEOC at

25   first that you identified a number of concerns and issues

1    relating to the data analytics and the processes for

2    collecting data; is that right?

3    A.  Yes.

4    Q.  And are you aware of whether or not there was any other

5    evaluation of the EEOC's data and analytics issues?

6    A.  Yes.  On the second or third day that -- after I

7    arrived at EEOC, I was asked to come to a meeting by the

8    Office of the Inspector General because they had just

9    started a report -- an evaluation of data and analytics at

10    the EEOC.

11    Q.  And do you know what the OIG, the Office of Inspector

12    General, was investigating?

13    A.  Yes, that the current processes and systems that the

14    agency used for its data and analytics functions were

15    outdated, antiquated, that we weren't getting maximum

16    benefit out of the use of our data, that we weren't

17    exploring the potential of using other data from other

18    federal agencies to meet our agency goals and missions.

19    And so it was basically looking at our whole data and

20    analytics --

21            THE COURT:  Excuse me a minute.

22            Please don't use cell phones in the courtroom.

23            UNIDENTIFIED SPECTATOR:  I'm sorry.

24    Q.  Were you finished?

25    A.  Yes.

1    Q.  Do you know if the OIG was issued a report?

2    A.  Yes.  The OIG did issue a report, and it was issued in

3    the spring of 2018, and it is available on the EEOC website.

4    Q.  And are you familiar with the report and its findings?

5    A.  I am.

6    Q.  And can you just tell us sort of a bird's eye view of

7    what some of the issues or the findings were that are

8    relevant to our conversation here in court today.

9    A.  That how we collect data was outdated, that there were

10   methods and techniques for improving how we collect data,

11   and how we use data was outdated.

12          They provided just evidence, kind of external

13   validity, of what some of the things I myself had been

14   finding.  And, in fact, that's part of what led to the

15   stand-up of the EEOC data and analytics modernization

16   program.

17   Q.  Okay.  Switching gears a little bit, you testified, in

18   response to questions from Judge Chutkan and also in

19   response to questions from Ms. Thurston, about, on Page 11

20   of your declaration, sort of the timeline for responding to

21   the Court's order.

22          Can you explain what role NORC will play in either

23   the data quality assurance or the data quality control

24   aspects of the timeline that are set forth here?

25   A.  So they will be responsible for the entire -- all

1    processes and systems related to Component 2 data

2    collection.  And that is very standard practice in the 21st

3    Century when federal agencies are collecting their data.

4         Because we have limited human resources, and we --

5    and because there are contractors who have decades of

6    experience collecting data, valid and reliable data, they

7    know what they're doing.  They know how to get people to be

8    respondents.  They have the secure systems in place to store

9    the data and do some basic data quality checks of the data;

10   that that whole process would be contracted to NORC, and

11   they would deliver to us, at the end of the process, a clean

12   data set.  And that's very standard practice.

13        And, of course, we maintain over -- we would

14   always be involved in the oversight and operations of this,

15   but the actual boots-on-the-ground data collection work

16   would all be contracted to NORC.

17   Q.  And can you just briefly tell us how that process that

18   NORC intends to use for the Component 2 data is different

19   from the ongoing collection with the Component 1 data that's

20   being undertaken now.

21   A.  Sure.  NORC has the flexibility to be able to pull

22   resources from across their organization to focus on

23   creating a user-friendly data portal that will allow

24   employers to input data at one place, and they have the

25   secure and certified servers on the back end where the

1    security exceeds the federal minimums.

2        I mean, they have all of the processes and

3    mechanisms and systems in place to be able to handle this

4    data collection.

5    Q.  And so I gather from your answer that the processes in

6    place for a Component 1 data are not satisfying those

7    criteria.  Or do they have them?

8    A.  Well, the issue with Component 1 is really twofold.

9    One, as I mentioned earlier, the contractor that we're using

10   is a small business who just does not have the capacity to

11   be able to stand up Component 2.

12        THE COURT:  That's SAGE?

13        THE WITNESS:  That's SAGE; that's correct.

14   A.  And the other is that, as I mentioned earlier, and this

15   might be a little oblique, but over the years the way the

16   Component 1 processes evolved is that the data are entered

17   and stored on EEOC servers, and there is a real concern that

18   by -- if we were to collect Component 2 data using the EEOC

19   servers, that it could result in a compromised response

20   time, a latency issue, really bog the system down if we were

21   to do that.

22        And so the simplest and most straightforward

23   solution is to hire a contractor who has the capacity to do

24   this and knows what they're doing.

25   Q.  Okay.  And there's just one more area that I'd like to

1    cover with you.

2         Ms. Thurston asked you about pay band data and the

3    EEOC's reliance on that with respect to agent salary

4    information.  Do you remember those questions?

5    A.  I do.

6    Q.  And can you tell us like when, in your experience, in

7    what area does EEOC currently collect pay band information?

8    A.  So the EEOC currently collects pay band information on

9    the EEO-4 survey, which is a survey of state and local

10   governments.  It's my understanding that the EEOC has been

11   collecting this information since the 1970s, but it's also

12   my understanding from reading the National Academy of

13   Sciences report that both the Department of Justice as well

14   as a former EEOC commissioner have testified or presented

15   information to the National Academy panel that's documented

16   in the report that pay band data have not been useful, and,

17   in fact, they basically say that those data aren't used at

18   all.

19   Q.  Okay.

20         MS. WELLS:  I have nothing further, Your Honor.

21         THE COURT:  All right.  Thank you, all.

22         It's now six minutes after 4:00.

23         Thank you, Dr. Haffer.  You've had a lot of

24   questions to answer, and thank you for your time.  You can

25   step down.

1          THE WITNESS:  Thank you.

2          THE COURT:  We can have oral argument on this now,

3    or you all can provide me with written submissions.  What's

4    your preference?

5          But it would have to be soon.  If you want to look

6    at the transcript beforehand, that might be more prudent.

7          MS. THURSTON:  We're really open to whichever the

8    Court prefers.  I'd be happy to provide some argument now,

9    although we're also submitting brief -- simultaneous written

10   submissions would be fine.

11         MS. MOORE:  Your Honor, I think for purposes of --

12   or at least for the EEOC's ability to get some resolution to

13   what it is that --

14         THE COURT:  We're going to have to do?

15         MS. MOORE:  Well, how to respond.  As Dr. Haffer

16   mentioned, they have this contract.  I think the concern is

17   whether -- what the parameters of the contract will be.  Are

18   they -- what are the dates, and so that may be the reason

19   that --

20         THE COURT:  We're here.  So, Ms. Thurston,

21   obviously April 12th has come and gone.  You heard Dr.

22   Haffer's testimony with regard to NORC's representation.

23   What is it plaintiffs -- are plaintiffs going to change

24   their request?  I mean, what is it that plaintiffs are

25   asking the Court to do?

1          MS. THURSTON:  Yes, Your Honor.

2          As I said at the last status conference, our

3   primary concern is that the data be collected in a manner

4   that ensures it occurs and that plaintiffs obtain their

5   remedy, and, of course, we are not interested in

6   compromising quality.

7          We haven't had an opportunity to depose NORC.  We

8   don't know the basis for Dr. Haffer's assertion that it

9   could -- from them that it could not occur more quickly.

10         THE COURT:  Well, you know, yes, it's true, you

11  haven't, but you have Dr. Haffer's deposition -- I mean, his

12  testimony.  Given the tightness of the time schedule you're

13  asking for, if I were to allow you to depose NORC, which I'm

14  not at this point inclined to do, that would further delay

15  things.

16         MS. THURSTON:  Yes, which is something that we

17  acutely understand.

18         I think if we had sufficient assurances, which I

19  don't think we have right now, that the data collection

20  would be performed and completed by September 30th,

21  including both years, or that some other provision for the

22  calendar year 2017 data be reached, and that there were an

23  assurance that if there were legs beyond September 30th that

24  either there would be a mandatory emergency extension or

25  that the data collection be tolled -- the expiration would

1    be tolled or ideally both, then I think that that would

2    protect plaintiffs' remedy.

3            I would ask, as part of that, that EEOC notify

4    employers immediately that they have to start pulling this

5    data.  I understand that Dr. Haffer is concerned about the

6    influx of calls they would get.  I think that that could be

7    managed by informing employers that EEOC has limited

8    response capacity in the short run, so -- and I would also

9    request a Federal Register notice lifting the stay as we

10   requested in our complaint.  I think we would also want

11   regular reporting from the EEOC and/or NORC to plaintiffs

12   and the Court about the status of their time frame through

13   the summer.

14           And I guess I'll just note that I appreciate that

15   the data collection is an effort.  I think that Dr. Haffer's

16   testimony as to his disagreement about the utility of

17   certain types of data is really entirely irrelevant to the

18   Court's consideration today.

19           THE COURT:  I agree.

20           MS. THURSTON:  So separating that testimony out, I

21   think also the EEOC's ongoing data modernization efforts

22   have not prevented the agency from conducting its other data

23   collection, so I think that that is really kind of a red

24   herring to whether the Component 2 data collection should be

25   reinstated in a timely manner.

1          Does that respond to Your Honor's questions?

2          THE COURT:  Yes.

3          I'm not trying to hide the ball here.  I found

4     Dr. Haffer's testimony to be very helpful, especially with

5     regard to the role of NORC, which provided me with a great

6     deal more clarity regarding the EEOC's preparation for the

7     collection of this data, but I agree with plaintiff that,

8     you know, opinions regarding the relevancy or the

9     helpfulness of the data is neither here nor there.

10         But Ms. Moore or Ms. Wells, can you respond to

11    plaintiffs' very real concern that -- you know, I understand

12    the representations that have been made here that NORC will

13    complete its collection by September 30th and so, you know,

14    you didn't need to address the tolling issue, but as we all

15    know, with the best intentions things, especially if you're

16    talking about an outside contractor, don't always happen the

17    way one hopes.  And plaintiffs' concern is one -- is that

18    the September 30th deadline will come, the data collection

19    will not be complete, and the government will stand up and

20    say the period is expired, and there's no tolling.  That

21    will be pretty bold given what's happened here today, but

22    not unheard of.

23         So how can you -- how do you respond to that

24    concern?

25         MS. MOORE:  Your Honor, my understanding from

1    Dr. Haffer and his discussions with NORC is that they

2    have -- that NORC has provided its assurance that it can --

3            THE COURT:  NORC isn't before me.  I don't have

4    any jurisdiction over them.  So what I need is a

5    representation by you and/or OMB that in the event that the

6    data collection isn't completed by September 30th, that you

7    have some mechanism in place for completing that shortly

8    thereafter and you're not going to stand up here and say,

9    "Well, the deadline's passed."

10           MS. MOORE:  Your Honor, my understanding is that,

11   just as Dr. Haffer testified, once the collection is open

12   for employers to use, employers will be able to submit their

13   data up to September 30th.  And to the extent that, as he

14   mentioned before, if there are employers that --

15           THE COURT:  I don't think you're understanding my

16   question, Ms. Moore.  I'm just saying what if it's not done?

17   What if there are glitches in the software?  You know,

18   things happen that may not be foreseen right now.

19           I think that Dr. Haffer was testifying that, you

20   know, according to the plan it should be completed, but

21   things happen.  And if it's not completed, not because there

22   are some stragglers but because it didn't go as planned,

23   what's the fall-back position?

24           MS. MOORE:  Your Honor, at that point, I think

25   with enough -- sufficient time and communications between

1    NORC and the EEOC, if that were to be the case, I imagine

2    that in the ordinary course EEOC would reach out to OMB and

3    state that, "Look, here's our" -- "The expiration date's

4    coming.  Would you exercise your authority under the

5    emergency provision to give us sufficient time to complete

6    this for those purposes?"

7         THE COURT:  Okay.  Dr. Haffer also testified that

8    there's a contract.  They've discussed a timeline with NORC.

9    He testified as far as he's aware all that needs to be done

10   is for the acting chair to -- and the chief financial

11   officer to approve the contract.  Why can't that happen?  I

12   mean, what's the hold-up with that?

13        MS. MOORE:  Your Honor, the hold-up, as I alluded

14   to earlier, is the fact that -- the parameters of that

15   contract.  Are they -- as you're aware, at the last status

16   conference there were two dates that we walked away with

17   that were sort of front and foremost.  One was collecting

18   the pay data at the same time that employers were -- are

19   collecting their Component 1 data, and that Component 1 data

20   collection is supposed to close on May 31st.  The other date

21   was the end of the expiration.

22        THE COURT:  But why is that holding up whether the

23   chair approves the contract or not?

24        MS. MOORE:  Your --

25        THE COURT:  You've had the -- I mean, what's the

1    delay there?

2              MS. MOORE:  Your Honor, I do not know what the

3    delay is.  I under -- I think that they are looking for

4    some -- we were brought in because apparently we're not

5    responding to the Court's order quickly enough --

6              THE COURT:  No.

7              MS. MOORE:  -- which we understand, and as you

8    understand now, some of the realities of what the agency --

9              THE COURT:  I understand the realities.  That does

10   not allay my concern that defendants are slow-rolling this

11   process, and that is what I'm trying to avoid here.

12             MS. MOORE:  Okay, Your Honor, and I understand

13   that.

14             The EEOC is ready to move forward, and if the

15   Court -- we will -- I will relay that information to agency

16   counsel, who will then relay it to the acting chair, that

17   the -- you know, to the extent that they are to go forward

18   and collect this pay data, that they will do so.

19             Your Honor, I do think it's important -- if you

20   would just bear with me, there are a couple of things I just

21   wanted to bring to the Court's attention.

22             One, as you're aware, Your Honor, the Court, on

23   March 4th, issued an order in response to plaintiffs'

24   Section 7062 claims that they -- that OMB's decision to stay

25   and review violated the APA and PRA.

1          In response, this Court found that OMB's decision

2     was arbitrary and capricious and unlawful and vacated and

3     set aside OMB's decision and reinstated the prior approval.

4     And here we are today.

5          EEOC, as plaintiffs are aware and as defendants

6     are aware, is a party to this case, but EEOC's exercise of

7     its statutory authority to administer its collections to

8     modify the deadlines, to determine the efficacy of

9     collecting one set of data versus another year's data in

10    response to real concerns, as Dr. Haffer has mentioned, is

11    not anything that plaintiffs have challenged here or

12    anything that this Court has previously addressed, and so,

13    Your Honor, to the extent that --

14         THE COURT:  But, Ms. Moore, I'm going to interrupt

15    you because EEOC can't use those factors to delay the remedy

16    that -- you know, my order.

17         MS. MOORE:  Your Honor, we fully appreciate Your

18    Honor's order.  As Dr. Haffer mentioned, EEOC has been,

19    since March 4th, trying to figure out, "All right.  The pay

20    data collection has been reinstated.  What do we need to do

21    to get this going?"

22         THE COURT:  More -- well, my questions also went

23    to what was being done during -- since this case was filed,

24    because, you know, there was always a possibility that this

25    stay could be lifted.

1          And, you know, I don't doubt Dr. Haffer's

2    testimony that once the order issued that very night they

3    started -- EEOC started trying to figure out how to comply

4    with it, but certainly there should have been efforts made

5    before that time to get ready in case plaintiffs should

6    prevail, and what I've heard and what's been submitted to me

7    hasn't given me much reason to believe that there was

8    anything done.

9          MS. MOORE:  Your Honor, I understand the Court's

10   concerns, and I do -- I know that action -- as Dr. Haffer

11   testified, that they have been trying to modernize their

12   collections generally; and with respect to this specific

13   collection, they have proposed a process and a timeline that

14   is within the three-year approval period.  I just -- I guess

15   the last point I would make, and I just want to be clear

16   that the Court's order -- the relief that the Court -- the

17   relief that plaintiffs requested and the relief that the

18   Court ordered was vacatur or declaration that it was

19   unlawful, to vacate and set aside, and for defendants to

20   reinstate the prior approval.

21         THE COURT:  Are you saying that I don't have

22   equitable power to enforce my order?

23         MS. MOORE:  Your Honor, I'm not -- I'm not saying

24   that.  I would say that some of the relief that plaintiffs

25   have requested in their April 8th filing are outside the

1    scope of -- especially with respect to EEOC and its

2    independent, unchallenged --

3              THE COURT:  I got the message in your reply.

4              MS. MOORE:  That is the only point that I -- those

5    two points.  One, that this is now -- EEOC has responded to

6    the Court's order.  It is exercising its administrative

7    authority to put into place mechanisms and processes to do

8    this collection.  It has made decisions within that --

9    within -- that are responsive to the Court's order, and I'd

10   also just recognize that some of the relief that plaintiffs

11   have requested in their April 8th filing would be -- are

12   essentially ordering the agency to take mandatory action

13   that they wouldn't otherwise be obligated to take under the

14   APA.  And that is the only point that I would raise.

15             THE COURT:  All right.  I'll issue an order.  I'll

16   take this under advisement.

17             MS. THURSTON:  Your Honor, may I make a couple of

18   responsive points?  I will try to be very brief.

19             THE COURT:  Yes.

20             MS. THURSTON:  But in response to Ms. Moore's

21   representations about the agency's authority, the EEOC's

22   authority, the first point is that the EEO and data

23   collection is required to be performed annually by

24   regulation.  It's not an entirely discretionary data

25   collection.  And the reg, 29 CFR 1602.7, refers to the

1    current EEO-1 form.

2         So we read Your Honor's order as reinstating the

3    current EEO-1 form as including Component 2 data collection,

4    so I think the kind of implicit suggestion that if they

5    decide Component 2 no longer has utility and they don't have

6    to collect it is entirely false in light of Your Honor's

7    order.

8         I think Your Honor referenced the Court's inherent

9    equitable authority.  I just want to point to a couple of

10   recent decisions by other judges in this court in APA cases

11   where the courts use that equitable authority following a

12   vacatur to require more than just a remand to the agency and

13   to -- for the agency to respond to the vacatur.

14        In the International Entrepreneurial Rule

15   litigation -- this is *NVCA v. Duke*, Case No. 171912 -- Judge

16   Boasberg ordered discovery to determine if the agency was

17   slow-walking its obligations following the vacatur of the

18   rule delay; and in *Mendoza v. Perez*, 72 F. Supp. 3d 168,

19   after the D.C. Circuit remanded instructing the district

20   court to fashion the APA remedy, Judge Howell vacated

21   challenged guidance letters by the Department of Labor and

22   set a specific time frame for the replacement rule-making.

23   So the Court's equitable authority to ensure that

24   plaintiffs' remedy is realized encompasses things like

25   requiring compliance reports or requiring the agency to take

1    certain steps by certain dates, especially where the time is

2    as limited as it is here.

3          I want to make a point about the September 30th

4    deadline.  I think Your Honor is well aware of our concerns

5    about agency lag and possible delays.  We're also concerned

6    that employers have heard today that the EEOC is going to

7    take no action after September 30th to ensure that they

8    actually submit these legally required reports.

9          THE COURT:  That would be unfortunate, if that

10   were the take-away.

11         MS. THURSTON:  Well, we're aware that members of

12   the employer community are in the audience, have been

13   following this closely, that amici are following the

14   litigation closely and, as I mentioned before, have

15   threatened collateral legal action.  So I think some

16   instruction from the Court or assurance that the EEOC will

17   take seriously the obligation to collect data from employers

18   would help protect plaintiffs' remedy.

19         And then finally I'll mention the 2017 calendar

20   year data.  We still don't have a good plan for how that

21   will be collected by the September 30th deadline.  We would

22   be open to replacing it with 2019 calendar data, calendar

23   year data, which I believe Dr. Haffer said would be entirely

24   feasible by next spring, but, again, we would need some

25   assurance that the PRA expiration of September 30th didn't

1    prevent that from occurring.

2             THE COURT:  All right.  Thank you, all.  I

3    appreciate your briefings and arguments and testimony on

4    this matter, and I will issue an order as soon as I can.

5    Thank you.

6                    (Whereupon the hearing was

7                    concluded at 4:25 p.m.)

8

9             **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11             I, LISA A. MOREIRA, RDR, CRR, do hereby

12    certify that the above and foregoing constitutes a true and

13    accurate transcript of my stenographic notes and is a full,

14    true and complete transcript of the proceedings to the best

15    of my ability.

16        Dated this 17th day of April, 2019.

17

18                            /s/Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
19                            United States Courthouse
                              Room 6718
20                            333 Constitution Avenue, NW
                              Washington, DC 20001
21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL WOMEN'S LAW CENTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 17-2458 (TSC) |
| OFFICE OF MANAGEMENT AND BUDGET, et al. | ) ) ) | |
| Defendants. | ) ) | |

**<u>DECLARATION OF SAMUEL C. HAFFER</u>**

I, Samuel C. Haffer, Ph.D., declare as follows:

1.    I am the Chief Data Officer (CDO) and Director of the Office of Enterprise Data and

Analytics (OEDA) at the U.S. Equal Employment Opportunity Commission (EEOC or

Commission).  I hold a Bachelor of Arts in Sociology (1988) from Loyola College, and a Master

of Public Policy (1991) and Ph.D. in Public Policy (1993) from University of Maryland –

Baltimore County.

2.    I have over 27 years' federal experience in data, analytics, and research, including 14

years as Director of the National Medicare Health Outcomes Survey (MHOS) at the U.S.

Centers for Medicare and Medicaid Services (CMS), a component of the U.S. Department of

Health and Human Services.  From its inception in 1997, the MHOS program collects

sensitive and confidential physical and mental health data from millions of Medicare

recipients enrolled in hundreds of Medicare managed health care plans.  I led all aspects of

the MHOS program including question and measure design, testing, and implementation;

secure data collection systems design, programming, testing, and launch; data collection

1

training design and delivery; data collection; data cleaning; data quality assurance design,

testing, and implementation; data validity and reliability studies; data analysis; and planning,

construction, testing, creation, and dissemination of user specific analytical data files and

documentation to agency enforcement and oversight staff as well as public data users.  As a

result of my work, I received a National Institutes of Health Award of Merit for my work in

2012.

    3.   In the course of my work, I have authored or co-authored over three dozen peer-

reviewed publications, and commissioned, oversaw, critically reviewed, and approved

numerous data collection quality assurance guidelines, technical specifications, and

methodological studies.  These include the following related specifically to study design, data

collection quality assurance, and quality control:

Study Design

Functional Health Outcomes as a Measure of Health Care Quality for Medicare
Beneficiaries. 2001. Bierman AS, Lawrence WF, Haffer SC and Clancy CM.  Health
Services Research. December 2001. Volume 35(6) Part II: 90-109.

Measuring and Improving Health Outcomes in Medicare: The Medicare HOS Program.
2004. Haffer, SC and Bowen S. Health Care Financing Review. Summer 2004. Volume
25(4): 1-3.

Calculating HOS Performance Measurement Results. 2004. Rogers WH, Gandek B and
Sinclair SJ.

Data Collection Quality Assurance and Quality Control

Medicare Health Outcomes Survey (HOS) Quality Assurance Guidelines and Technical
Specifications. Washington DC: NCQA Publication. 1997-2010. www.ncqa.org

National Committee for Quality Assurance (NCQA). HEDIS® Volume 6: Specifications for
the Medicare Health Outcomes Survey. Washington DC: NCQA Publication. 1997-2010.
www.ncqa.org

2

Weight Adjustments in Estimates for the 1999 Medicare Health Outcomes Survey. 2002. Hwang Y, Bierman AS, Haffer SC and Wun LM. ASA Proceedings of the Joint Statistical Meetings. 2002. 1565-1570.

Using Multiple Survey Vendors to Collect Health Outcomes Information: How Accurate Are the Data? 2003. Haffer SC. Health and Quality of Life Outcomes. April 16, 2003. Volume 1(6).

Medicare Health Outcomes Survey: An Alternative Case-Mix Methodology. 2007. Selim AJ, Iqbal SU, Rogers W, Qian SX, Fincke BG, Rothendler J and Kazis LE.

Imputing Physical and Mental Summary Scores (PCS and MCS) for the Veterans SF-12 Health Survey in the Context of Missing Data. 2004. Spiro A, Rogers WH, Qian S and Kazis LE.

Imputing the Physical and Mental Summary Scores (PCS and MCS) for the MOS SF-36 and the Veterans SF-36 Health Survey in the presence of Missing Data. 2004. Rogers WH, Qian S and Kazis LE.

HOS/VA (Veterans Administration) Comparison Project Part 1: Measurement Equivalence of Medicare HOS SF-36 and VA Veterans SF-36 Spiro A, Lee AF, Kazis LE, Miller DR, Ren XS and Zhang M.

HOS/VA Comparison Project Part 2: Test of Reliability and Validity at the Scale Level for the Medicare HOS SF-36 and VA Veterans SF-36 (PDF, 63 KB) Kazis LE, Lee AF, Spiro A, Miller DR, Rogers W, Ren XS and Zhang M.

Final reports for the methodological studies are available at:
https://www.hosonline.org/en/publications/methodology/

4.   My entire career of nearly three decades has focused on research study design, measure development, data collection, data analysis, and data dissemination.  I am knowledgeable of the federal government's requirements for data collection, protection, security, and dissemination. In addition, I am knowledgeable of the requirements of the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283) and Foundations for Evidence-Based Policymaking Act of 2017 (Pub. L. No. 115-435), which direct federal agencies to adhere to stringent security and privacy standards.

3

5.   Data collection is by definition a process built around a range of activities designed to

maximize accuracy and consistency in the final data.  The US Department of Health and Human

Services Office of Research Integrity (ORI), created in May 1992 to implement activities and

programs to teach the responsible conduct of research, promote research integrity, prevent

research misconduct, and improve the handling of allegations of research misconduct,[1] defines

the data collection process:

> The process of gathering and measuring information on variables of interest, in an
> established systematic fashion that enables one to answer stated research questions,
> test hypotheses, and evaluate outcomes.  The data collection component of research
> is common to all fields of study including physical and social sciences, humanities,
> business, etc.  While methods vary by discipline, the emphasis on ensuring accurate
> and honest collection remains the same.
>
> . . . .
>
> [A]ccurate data collection is essential to maintaining the integrity of research. Both
> the selection of appropriate data collection instruments (existing, modified, or
> newly developed) and clearly delineated instructions for their correct use reduce
> the likelihood of errors occurring.[2]

ORI warns that the consequences of improperly collected data may include:

- o   inability to answer research questions accurately
- o   inability to repeat and validate the study
- o   distorted findings resulting in wasted resources
- o   misleading other researchers to pursue fruitless avenues of investigation
     compromising decisions for public policy.[3]

6.   I joined the EEOC in November 2017 in the newly created role of CDO (a career position

in the Senior Executive Service).  Among my duties, I am responsible for administration of the

EEO-1, -3, -4, and -5 data collections (EEO Surveys).  I am thoroughly familiar with how

---

[1] United States Department of Health and Human Services, Office of Research Integrity.  https://ori.hhs.gov/about-ori.  Accessed April 2, 2019.
[2] United States Department of Health and Human Services Office of Research Integrity.  Responsible Conduct in Data Collection:  Data Management.
https://ori.hhs.gov/education/products/n_illinois_u/datamanagement/dctopic.html.  Accessed April 1, 2019.
[3] Ibid.

4

USCA Case #19-5130      Document #1802830      Filed: 08/19/2019      Page 125 of 369

employers report, and the EEOC receives the information reported as part of the EEO-1 information collection, as I have led the agency through one entire reporting cycle.  I also am aware that, depending on their size, many employers prepare and submit multiple data reports.

**Issues Identified in Current EEO-1 Data Collection**

7.    When I arrived at the EEOC in November 2017, EEOC Acting Chair Victoria A. Lipnic tasked me with reviewing all products and services of the EEOC's 20-year-old (now former) Office of Research, Information, and Planning (ORIP), and to create a 21st century data and analytics department.  The primary role of this office was to aid the Commission in its efforts to achieve its mission and to strategically plan its goals and objectives by researching, collecting, analyzing, and disseminating relevant data and information, including administering all aspects of the EEO Surveys.

8.    Upon my arrival, I also moved quickly to review and familiarize myself with the EEO Surveys, including the record of the development of the revised EEO-1 information collection that was approved by the Office of Management and Budget (OMB), under the Paperwork Reduction Act (PRA), on September 29, 2016.  I am aware that OMB authorized the revised EEO-1 information collection for a three-year term expiring on September 30, 2019.

9.    I proceeded on two different fronts at once.  I assessed the EEOC's current EEO-1 data collection process and concluded that it needed immediate improvement.  Separately, I worked to initiate a comprehensive data collection modernization project, in coordination with OMB, to update the EEOC's data collection program (including the EEO-1), to use 21st century data collection procedures and technologies.

10. As to the current process for collecting EEO-1 data, including the EEOC's online system for collecting the data (called the Online Filing System (or the EEO-1 Survey Application)), my

initial assessment identified two key areas for immediate improvement:  quality assurance and

quality control.  Quality assurance activities take place before data collection begins and may

involve, for example, a well-designed and implemented data training plan to assure the collection

of high-quality data.[4]  I observed that the former ORIP did not have a 2017 training plan in place

and had not revised its EEO-1 instruction manuals and training materials to reflect the 2017 data

collection requirements and methods for data submission.

11. Quality control activities take place during and after data collection and include cross-

checks within the data collection processes and systems to assess the potential for errors in

individual data items, systematic errors, and violations of protocol.

12.  I found that, for several previous EEO-1 cycles, the former ORIP had not sufficiently

tested its data collection system in a rush to open data collection on time.  This necessitated

untested programming code patches and workarounds, which introduced a potential source of

error into the data collection and ultimately resulted in more delay.  For instance, the EEOC

announced that the 2016 EEO-1 report, which collected Component 1 data, would close on

September 30, 2016.  For the 2017 EEO-1 report, which also collected Component 1 data, the

announced filing deadline was March 31, 2018.  Due to such data quality control issues, the 2016

EEO-1 reporting cycle actually closed on August 4, 2017, eleven (11) months later than the

announced deadline of September 30, 2016.  The 2017 EEO-1 reporting cycle actually closed on

October 1, 2018, six (6) months later than the announced deadline of March 31, 2018.

13. When the OMB stay of the PRA authorization for Component 2 was in effect, I

understood that the EEOC could not collect Component 2 data from employers.  Therefore, the

---

[4] Ibid.  See also American Association for Public Opinion Research (AAPOR).  *Best Practices for Survey Research*.
https://www.aapor.org/Standards-Ethics/Best-Practices.aspx#best7.  Accessed April 1, 2019.

EEO-1 data collection process for calendar year 2017 data, the first one I observed at the EEOC, collected only Component 1 data. In the short time I was employed as EEOC's CDO before this collection of 2017 Component 1 data commenced, I worked to address quality assurance and quality control issues with Component 1. I became aware during this time that the EEOC had not yet supplemented its current system to collect Component 2 data and, given the challenges identified with the current system, I recognized that a Component 2 data collection would likely have needed serious reassessment.

**The Need to Modernize and Secure the EEOC's Data and Analytics Processes and Capabilities**

14. My responsibility as the new CDO was to bring the quality, usability, and actionability of products and services (deliverables) produced by the former ORIP up to industry standards. In addition to the challenges identified above, and among other issues, my assessment of the former ORIP found that the work products generated by the office were usually untimely and often methodologically and statistically unsound.

15. These findings led to a restructuring and reorganization of the former ORIP into OEDA, which was approved by Acting Chair Lipnic in May 2018, after vetting through the Commission's required internal review process. As part of the reorganization, OEDA enhanced its expert staff capacity by adding statisticians and data scientists with expertise in data collection and analytics. Hiring was completed in December 2018. In mid-December 2018, the EEOC held three days of stakeholder meetings to introduce OEDA and its staff to the public and regulated community.

16. Simultaneously, the EEOC had been working closely with OMB to begin to upgrade all of the EEO Surveys, giving rise to the EEOC Data and Analytics Modernization Program, a comprehensive evaluation of the collection, analysis, and dissemination of EEOC data.

17. As part of the Modernization Program:

o The EEOC is conducting a multi-year review of all aspects of current data collection processes for the EEO Surveys.  With this work the EEOC is looking to ensure that the data collection instruments and implementation processes for each EEO Survey comply with federal policies and align with best practices.

o The EEOC is also looking to identify opportunities to improve efficiency, as well as to minimize burden and maximize data quality.

o The EEOC will be assessing data collection processes to see how they align with industry standards and making improvements as appropriate.

o The EEOC will also be exploring potential alternative data sources to see if there are any available that the EEOC could obtain to supplement information needed to fulfill the agency's data needs.

o The EEOC plans to conduct focus groups with relevant stakeholders to ascertain views on current processes – such as what is and is not working, as well as alternative data sources and alternative methods of collection.  The EEOC will also be using focus groups to assist the EEOC in more accurately estimating the costs to employers of implementing the alternatives for each of the EEOC Surveys.

o The EEOC is in the process of gathering requirements for building out a modern centralized enterprise data analytics warehouse with secure remote access by EEOC employees.

o The EEOC is currently in the process of developing a secure network through which confidential data, such as identifiable information from the EEOC, can be stored and accessed by researchers remotely.

o To aid in releasing detailed data but still protecting our respondents, the EEOC will be creating public use files to share more detailed data with the public.

o The EEOC will be producing an agency-wide data inventory.

o The EEOC is examining how it can use other statistical agencies' data to improve on the quality of the data the EEOC produces.

o The EEOC created and is now utilizing an EEOC Data Governance Board, whose core mission is to provide executive leadership and oversight for the development and implementation of the policies and processes which govern the collection or creation, management, use, and disclosure of EEOC data.

18. To undertake the Modernization Program, in the fall of 2018 the EEOC entered into a multi-year contract with NORC at the University of Chicago (NORC), an industry-leading data and analytics organization.  NORC's tasks under the contract include, among other things, the work described above in addition to the review and modernization of the EEO-1 data collection as a whole.

19. Until that modernization is completed, however, the EEOC must continue using its current Online Filing System (or the EEO-1 Survey Application) for Component 1, with as many improvements put into place by OEDA staff as possible.

**The EEOC Cannot Begin to Collect Component 2 Data Immediately; the EEOC Could Undertake and Close a Collection of Component 2 Data by September 30, 2019**

20. Currently, the EEOC's Online Filing System (or the EEO-1 Survey Application) used for the collection of EEO-1 data is programmed to collect 140 data fields (10 Job Categories x 7 Race/Ethnicity Categories x 2 Gender Categories) for each Component 1 report required to be filed by over 80,000 employers.  The addition of the collection of Component 2 data to the EEOC's Online Filing System would increase the data reported to the EEOC by a large order of magnitude.  For each Component 2 report collected from an employer, there are 3,360 data fields to be addressed (3,360 represents the sum of the 1,680 data fields for pay data (10 Job Categories x 12 Salary Bands x 7 Race/Ethnicity Categories x 2 Gender Categories), as well as the 1,680 data fields for hours worked data (10 Job Categories x 12 Salary Bands x 7 Race/Ethnicity Categories x 2 Gender Categories)).

21. I determined that, for the EEOC to make the necessary updates, enhancements, security testing, load and performance testing, data validations and verifications, and application testing to securely collect and store this significantly increased volume of highly sensitive Component 2 data using its current Online Filing System (or the EEO-1 Survey Application), approximately

nine (9) months preparation would be required using the resources in place.  These preparations

could not be concluded until December 2019, which I understand is after the EEO-1's current

PRA authorization expires.

22. I am aware that employers believe that they are likely to experience significant issues

regarding the immediate reporting of Component 2 data, based on a March 29, 2019 letter to

Acting Chair Lipnic from the National Payroll Reporting Consortium.[5]

23. I am aware that requiring employers to collect and report calendar year 2017 Component

2 data at the same time as the collection of calendar year 2018 Component 2 data without more

extensive and well-developed quality assurance and quality control processes in place (c.f.

paragraphs 10-12) could decrease response rates and increase errors in the entire data collection

process to a greater extent than might be experienced in collecting 2018 Component 2 data alone.

24.  However, I have also determined that, through NORC, the EEOC could undertake and

close a collection of calendar year 2018 Component 2 data by September 30, 2019.  The

contractor would provide in a condensed amount of time and in an expedited manner all

processes, procedures, and systems to undertake and close a collection of calendar year 2018

Component 2 data by September 30, 2019.  This system would be utilized one time for the

collection of calendar year 2018 Component 2 data only.  It would not be utilized after the EEOC

makes its transition to the modernized data collection process.

25. The estimated cost to the EEOC to conduct this Component 2 data collection for calendar

year 2018 by September 30, 2019, would be in excess of $3 million.  Collecting 2017

Component 2 data at the same time as 2018 Component 2 data would increase the EEOC's fixed

---

[5] http://www.nprc-inc.org/blog/eeoc-may-reinstate-pay-data-reporting/.  Accessed April 2, 2019.

and marginal costs by 25 percent to approximately $4 million and would likely further

undermine data quality, including the quality of the 2018 data.

26. The estimated timeline for the collection of Component 2 data is:

  i.  Data Quality Assurance

   o  Prep Work Task – April 2019 - June 30, 2019:  Create, develop, and deliver the
      online data collection training to employers; develop, implement, and maintain
      data collection processes, procedures, and systems; contact employers with
      information on secure processes for submitting data.

  ii. Data Quality Control

   o  Data Collection Task – July 1, 2019 - September 30, 2019:  Initial notification via
      email and mail to employers, starting on July 1; collect data for a 2.5-month
      period (July 15 - September 30); contact non-respondents during the data
      collection period through email and mail letter reminders; operate a helpdesk via
      email and phone for employers starting July 1.

   o  Data Cleaning Task – October 1, 2019 - November 30, 2019:  Data cleaning (by
      contractor) to produce as accurate a data set as possible and ensure that data is
      fully comprehensive; conduct data accuracy studies to identify data submissions
      that cannot be certified as accurate or sufficiently complete.

   o  Data Delivery Task – December 1, 2019 - December 15, 2019:  Cleaned data set
      with full documentation and formatting delivered to EEOC.

27. Despite these efforts, and as discussed below, I am concerned that Component 2 data

collected by September 30, 2019, may not have sufficient integrity to support data comparisons

or other analyses because of the limited quality control and quality assurance measures that

would be implemented due to this expedited timeline.

**Component 2 Data Utility Concerns**

28. The goal of the EEO-1 data collection is to collect valid and reliable data that may be

used to enforce employment discrimination laws.  Historically, the EEOC has also released

aggregated EEO-1 data to the public once the data is determined to be valid and reliable.

Monette, Sullivan, and DeJong[6] define validity as "the accuracy of a measure:  Does it accurately measure the variable that it is intended to measure" (p. 113).  The measures used (i.e., the questions asked) must actually measure the concept that one is interested in measuring (data validity).  Monette, Sullivan, and DeJong define reliability as "a measure's ability to yield consistent results each time it is applied.  In other words, reliable measures do not fluctuate except because of variation in the variable being measured" (p. 116).  The measures used must gather the same information each time the data are collected independent of whomever is reporting the data.  Employers must understand exactly what data are being requested, and how to appropriately gather, format, and report the data so that the data gathered are consistent across all employers.  Reliably reported data enables valid group comparisons within and between employers (i.e., "apples to apples").  To ensure reliable data, employers should receive data collection training, instructions, directions, and technical assistance.  Employers use such data collection training, instructions, directions, or technical assistance to program and test their human resource management systems and to program and test their payroll systems, which may not be interoperable, to produce the necessary data; other employers may use the information to gather the data manually.

29. The proposed timeline for undertaking and closing a collection of Component 2 data by September 30, 2019, raises significant issues with data validity and data reliability.  Both the National Academy of Sciences report referenced in the 2016 30-Day PRA Notice as well as the HHS Office of Research Integrity recommend that prior to data collection, a true pilot study collecting real data in as similar a manner as possible to the proposed data collection approach be

---

[6] Monette, Duane R., Thomas J. Sullivan, and Cornell R. DeJong.  1990.  *Applied Social Research:  Tool for the Human Services.  Second Edition.*  Fort Worth, Texas.  Harcourt Brace Jovanovich College Publishers.

12

conducted.  Conducting a true pilot study is a quality assurance step that can help reduce the

likelihood of introducing measurement error into the data collection by detecting:

- Uncertainty about the timing and methods for collecting data;
- Confusion about the data required for collection;
- Vague descriptions of data collection instruments to be used in lieu of rigorous step-by-step instructions;
- Specific content and strategies for training or retraining employer staff responsible for data collection.[7]

Failure to conduct a true pilot study increases the likelihood that measurement error will be

introduced into the data.

30. The EEOC has not conducted a true pilot study of the Component 2 data collection

measures, instrument, or processes.  A pilot study is defined as "a small scale 'trial run' of all the

procedures planned for use in the main study."[8]  During a pilot study, using a subset of actual

respondents, the data collection tool will be administered, and the processes and procedures for

selecting and reporting data will be tested.  Utilizing a true pilot study "[i]mproves the validity of

the data collected and bolsters our confidence in the conclusions drawn."[9]

31. The "EEOC pilot study" referenced in the 2016 30-Day PRA Notice does not meet the

definition of a pilot study because it did not administer the data collection tool to a subset of

respondents.  It did not test or validate any data collection processes or procedures for collecting

and reporting Component 2 data.  It contained a recommendation as to the most appropriate

definition of pay and unit of pay to be collected.  It reviewed existing compensation definitions

and how compensation data are collected in other contexts and for other purposes, and it

expressed opinions about how such definitions and data collection instruments may work in the

EEOC context.

---

[7] United States Department of Health and Human Services, Office of Research Integrity.  Supra note 2.
[8] Monette, Sullivan, and DeJong. p. 11.
[9] Ibid.

13

130

32. Given the absence of a true pilot study leading up to the 2016 authorization of Components 1 and 2 of the EEO-1, and given the abbreviated period available in which to develop and implement quality assurance processes and procedures separate from the Modernization Project (i.e., data training, instructions, directions, and technical assistance for employers), it is likely that undertaking and closing the collection of Component 2 data by September 30, 2019 would raise major data validity and reliability issues. Under the circumstances, I perceive a significant risk that employers would not be reporting comparable data that can be used by the government or others in meaningful comparisons or analyses.

33. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of April, 2019, in Coral Gables, Florida.

Samuel C. Haffer, Ph.D.
Chief Data Officer
U.S. Equal Employment Opportunity Commission

14

USCA Case #19-5130      Document #1802830         Filed: 08/19/2019      Page 135 of 369

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NATIONAL WOMEN'S LAW CENTER**, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 17-cv-2458 (TSC) |
| **OFFICE OF MANAGEMENT AND BUDGET**, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## ORDER

Upon consideration of Defendants' Motion to Dismiss, ECF No. 11, Plaintiffs' Motion for Summary Judgment, ECF No. 22, and Defendants' Motion for Summary Judgment, ECF No. 27, and for the reasons set forth in the court's Memorandum Opinion dated March 4, 2019, ECF No. 45, it is hereby

**ORDERED** that Defendants' Motion to Dismiss, ECF No. 11, is **DENIED**.  It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 22, is **GRANTED**. It is further

**ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 27, is **DENIED**. It is further

**ORDERED** that OMB's stay of EEOC's revised EEO-1 form and the September 15, 2017 Federal Register Notice (Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362) announcing the same are **VACATED**.

Page **1** of **2**

USCA Case #19-5130   Document #1802830        Filed: 08/19/2019   Page 136 of 369

Date:  March 4, 2019


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL WOMEN'S LAW CENTER**, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) )   Civil Action No. 17-cv-2458 (TSC) |
| | ) ) |
| **OFFICE OF MANAGEMENT AND BUDGET**, *et al.*, | ) ) ) |
| | ) ) |
| Defendants. | ) ) |

## <u>MEMORANDUM OPINION</u>

Pending before the court are Defendants' Motion to Dismiss, ECF No. 11; Plaintiffs' Motion for Summary Judgment, ECF No. 22; and Defendants' Motion for Summary Judgment, ECF No. 27.  Having reviewed the parties' filings, the record, and the relevant case law, the court, for reasons set forth below, hereby **DENIES** Defendants' Motion to Dismiss, **GRANTS** Plaintiffs' Motion for Summary Judgment, **DENIES** Defendants' Motion for Summary Judgment, and **VACATES** the Office of Management and Budget's stay of the Equal Employment Opportunity Commission's revised EEO-1 form and the September 15, 2017 Federal Register Notice (Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362) announcing the same.  It is further **ORDERED** that the previous approval of the revised EEO-1 form shall be in effect.

## I.     BACKGROUND

### A.  The Paperwork Reduction Act

The Paperwork Reduction Act of 1995, 44 U.S.C. § 3501 *et seq*. ("PRA"), was established to "minimize the paperwork burden" that the federal government may require "for

1

individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501(1). The statute also strives to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society." *Id.* § 3501(4).

In striking the balance between minimizing the burden on the public and obtaining useful information for the government, Congress established a procedure in which federal agencies must obtain approval from the Office of Management and Budget ("OMB") to collect certain types of information from the public. Under the PRA, an agency that proposes to collect information first conducts its own "evaluation of the need for the collection of information" and the burden collecting such information would create. *Id.* § 3506(c)(1)(A)(i). Frequently, the agency is also required to publish a "sixty-day notice" in the Federal Register to solicit comments on the agency's proposal. *Id.* § 3506(c)(2)(A). After considering comments and making any revisions, the agency submits the proposed collection of information to OMB and publishes a second Federal Register notice. This notice announces the start of OMB's review and begins a 30-day comment period. *Id.* § 3507(a)-(b). "In [this] notice, the agency must set forth (1) a title for the collection of information, (2) a summary of the collection of information, (3) a brief description of the need for the information and the proposed use of the information, (4) a description of the likely respondents and proposed frequency of response to the collection of information, and (5) an estimate of the burden that shall result from the collection of information." *United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 102 (D.D.C. 2017) (citing 44 U.S.C. § 3507(a)(1)(D)(ii)(I)-(V)).

OMB may not act on the agency's request until after the comment period has closed.   44 U.S.C. § 3507(b).

Upon completion of its review, OMB, through the Office of Information and Regulatory Affairs ("OIRA"), makes one of three determinations: it (1) approves the collection of information; (2) disapproves the collection of information; or (3) instructs the agency to make changes to the collection of information. *Id.* § 3507(c)(1), (e)(1).   Before approving a proposed collection, OMB must "determine whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." *Id.* § 3508.   Once OMB grants approval, the agency may proceed with its collection, and OMB issues a control number that must be displayed on the collection-of-information form. *Id.* § 3507(a)(2), (3).   An OMB approval is for three years, after which the agency must seek an extension from OMB. *Id.* §§ 3507(g), (h)(1).

At any point before the approval period expires, OMB "may decide on its own initiative, after consultation with the agency, to review the collection of information."  5 C.F.R. § 1320.10(f).   This review can be started only "when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error." *Id.*   OMB may also stay the prior approval of a collection of information not contained in a current rule, but only for "good cause." *Id.* § 1320.10(g).

### B.  The EEO-1

Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, employers are required to "make and keep such records relevant to the determination[] of whether unlawful employment practices have been or are being committed, . . . preserve such records" and produce reports as mandated by EEOC.  42 U.S.C. § 2000e-8(c)(1)-(3).   Since

1966, EEOC has required that employers with one hundred or more employees file with EEOC the "Employer Information Report EEO-1" ("EEO-1"). 29 C.F.R. § 1602.7.[1]  The EEO-1 requires employers to report the number of individuals employed by job category, sex, race, and ethnicity.  Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1) and Comment Request, 81 Fed. Reg. 5113 (Feb. 1, 2016) ("Sixty-Day Notice"). EEOC makes aggregate EEO-1 information for major geographic areas and industry groups publicly available on an annual basis.  Compl. ¶ 59.

### C.  Revision of EEO-1 – Component 2

In 2010, the EEOC "joined other federal agencies . . . to identify ways to improve enforcement of federal laws prohibiting pay discrimination."  81 Fed. Reg. at 5114. Subsequently, the EEOC "commissioned a study, and the NAS [National Academy of Sciences] convened a Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin."  *Id.*  NAS issued a report which "recognized the potential value for enforcement of collecting pay data from employers by sex, race, and national origin through a survey such as the EEO-1, and emphasized the importance of a definitive plan for how the data would be used in coordination with other equal employment opportunity (EEO) enforcement agencies."  *Id.*  NAS also "recommended that the EEOC conduct a pilot to inform the parameters for any pay data collection."  *Id.* (footnote omitted).  Following NAS's recommendation, "EEOC commissioned an independent Pilot Study to identify the most efficient means to collect pay data."  *Id.*  The Pilot Study "made technical recommendations about several central components of a data collection, including: The unit of pay to be collected; the best

---

[1] Certain federal contractors and subcontractors with more than fifty employees are also subject to this requirement, which is enforced by the U.S. Department of Labor Office of Federal Contract Compliance Programs ("OFCCP").  41 C.F.R. § 60-1.7(a).

summary measures of central tendency and dispersion for rates of pay; appropriate statistical

test(s) for analyzing pay data; and the most efficient and least costly methods for transmitting

pay data from employers." *Id.* It "also estimated employer burden-hour costs and the processing

costs associated with the recommended method of collection." *Id.*

In 2012, the EEOC held a two-day meeting with "employer representatives, statisticians,

human resources information systems (HRIS) experts, and information technology

specialists (work group)." *Id.* at 5114-15.  This group "reviewed the current data collection

procedures, provided feedback on future modernization of the EEO surveys, and engaged in

brainstorming that led to ideas submitted individually by group participants on a number of

topics, including collecting pay data as well as multiple-race category data on the EEO-1." *Id.* at

5115.  The report from this group "reflect[ed] feedback from participants that the burden of

reporting pay data would be minimal for EEO-1 filers." *Id.*

On February 1, 2016, following this interagency process, EEOC, in accordance with the

PRA, published a Federal Register notice announcing its intention to seek a three-year approval

from OMB of "a revised Employer Information Report (EEO-1) data collection."  81 Fed. Reg.

at 5113.  The notice explained that the "revised data collection has two components.  Component

1 collects the same data that is gathered by the currently approved EEO-1: Specifically, data

about employees' ethnicity, race, and sex, by job category.  Component 2 collects data on

employees' W-2 earnings and hours worked, which EEO-1 filers already maintain in the ordinary

course of business." *Id.*  EEOC proposed "collect[ing] aggregate W-2 data in 12 pay bands for

the 10 EEO-1 job categories." *Id.* at 5117.  The notice provided a weblink to a sample data

collection form. *Id.* at 5118 ("An illustration of the data to be collected by both Components 1

and 2 can be found at [link].").[2]   The notice also anticipated that employers would provide the information either through online filing or by uploading an electronic file.  *Id.* at 5120.  EEOC estimated that the new pay data collection would increase the reporting time per filer by 3.4 hours.  *Id.* at 5119.  On March 16, 2016, EEOC held a public hearing on its proposed pay data collection.  Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), 81 Fed. Reg. 45479, 45480 (July 14, 2016).

On July 14, 2016, EEOC published a second Federal Register notice ("Thirty-Day Notice") seeking a three-year approval from OMB of a revised EEO-1 data collection.  81 Fed. Reg. 45479.  This notice explained that EEOC had to revise the EEO-1 for the enforcement of equal pay laws.  *Id.* at 45481-83.  EEOC intended to maintain its earlier "proposal to collect W-2 income and hours-worked data in the twelve pay bands . . . for each of the 10 EEO-1 job categories."  *Id.* at 45489.  The filings of EEO-1 reports would be done "either by digital upload or by data entry onto a password-protected, partially pre-populated digital EEO-1."  *Id.* at 45493. For those employers who filed through data uploads, EEOC would post online the new data file specifications "for Components 1 and 2 of the modified EEO-1 as soon as OMB approve[d] the information collection."  *Id.* at 45487.  EEOC further explained that "[t]he EEO-1 data file specifications will be for data uploads (submitting EEO-1 data in one digital file), but they also will describe the formatting of data for direct data entry onto the firm's secure EEO-1 account with the Joint Reporting Committee."  *Id.*  "For reference," EEOC provided a link to a website with the then-current EEO-1 data file specifications.  *Id.*  EEOC estimated that the addition of Component 2 would increase the filing cost for each EEO-1 filed by $416.58.  *Id.* at 45493-94.

---

[2] This webpage is no longer active.  Decl. of Benjamin Link ¶ 3, ECF No. 22-2.

The collection of pay data would begin with the 2017 reporting cycle, and EEO-1 respondents

would be required to submit their reports by March 31, 2018.  *Id.* at 45484.  On September 28,

2016, EEOC provided its Final Supporting Statement for the EEO-1 report to OMB for review.

Link Decl. ¶ 12, Ex. I.  OMB approved the proposed collection on September 29, 2016 and

issued an OMB control number for the revised EEO-1.  *Id.* ¶ 11, Ex. H.

EEOC subsequently released an instruction booklet for the March 2018 EEO-1 survey,

along with information about the revised EEO-1, including data file specifications for employers

who planned to file through data upload.  *Id.* ¶¶ 5, 6.  The data file specifications included a

sample EEO-1 form for pay data collection and a "data file layout" form.  *Id.* ¶ 5.  The data file

layout form was a spreadsheet with instructions for formatting pay data submissions to EEOC.

*Id.* ¶ 7, Ex. D.

### D.  OMB's Decision to Review and Stay Component 2

Just under a year after OMB approved the data collection, on August 29, 2017, Neomi

Rao, the OIRA Administrator, sent a memorandum to Victoria Lipnic, the Acting Chair of the

EEOC, stating that OMB had decided to initiate a review and stay of EEOC's new collection of

pay data under Component 2.  In support of this decision, the memorandum stated in pertinent

part:

> The PRA authorizes the Director of OMB to determine the length of approvals of
> collections of information and to determine whether collections of information initially
> meet and continue to meet the standards of the PRA.  In this context, under 5 CFR
> 1320.10(f) and (g), OMB may review an approved collection of information if OMB
> determines that the relevant circumstances related to the collection have changed and/or
> that the burden estimates provided by EEOC at the time of initial submission were
> materially in error.  OMB has determined that each of these conditions for review has
> been met.  For example, since approving the revised EEO-1 form on September 29, 2016,
> OMB understands that EEOC has released data file specifications for employers to use in
> submitting EEO-1 data.  These specifications were not contained in the Federal Register
> notices as part of the public comment process nor were they outlined in the supporting

statement for the collection of information.  As a result, the public did not receive an opportunity to provide comment on the method of data submission to EEOC.  In addition, EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate.

OMB has also decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as we believe that continued collection of this information is contrary to the standards of the PRA.  Among other things, OMB is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues.

Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017); JA020, ECF No. 44 ("Rao Memorandum").

The memorandum further directed EEOC to publish a notice in the Federal Register "announcing the immediate stay of effectiveness of the" pay data collection but "confirming that businesses may use the previously approved EEO-1 form in order to comply with their report obligations for FY 2017." *Id.*  EEOC published this notice on September 15, 2017.  Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362 (Sept. 15, 2017).

This stay remains in effect nearly a year and a half later.

### E.  Plaintiffs' Lawsuit

Plaintiff National Women's Law Center ("NWLC") is "a 46-year-old nonpartisan, nonprofit organization that advocates for the rights of women and girls at school, at work, at home, and in their communities."  Johnson Decl. ¶ 3.  "[C]losing the gender wage gap, and in particular the race and gender wage gaps experienced by women of color," is "[o]ne of NWLC's primary and longstanding priorities."  *Id.* ¶ 4.  As part of its mission, NWLC strives to "educate employers, the public, and policymakers about race and gender wage gaps," *id.* ¶ 5, and "has published numerous analyses and reports about workplace pay disparities."  *Id.*  Many of these reports "cite data on pay inequality across a number of factors and reflect time-consuming analysis of Bureau of Labor Statistics and Census data undertaken by NWLC staff."  *Id.*

8

Plaintiff Labor Council for Latin American Advancement ("LCLAA") is "a national 501(c)(3) representing the interests of approximately 2 million Latino/a trade unionists throughout the United States and Puerto Rico, as well as other non-unionized Latino workers," and "has 52 chapters around the country." Sanchez Decl. ¶ 3. LCLAA's "mission is to assist workers to advance their rights in their workplace and convince employers to take steps to improve working conditions, both through advocacy and through training and counseling workers and union members." *Id.* ¶ 4. Recently, "[c]losing the pay gap has been an increasing focus of LCLAA's work." *Id.* ¶ 5. For example, in 2012 "LCLAA created the Trabajadoras Initiative which specifically seeks to protect and advance the interests of Latina workers on issues that impact them, including seeking to eradicate the persistent pay gap." *Id.* ¶ 6. LCLAA's activities include educating its members, chapter presidents, and the public about the pay gap. *Id.* ¶¶ 7, 8. Starting in 2016, LCLAA has "host[ed] an annual National Latina Equal Pay Summit, which provides information, education and solutions to closing the pay gap." *Id.* ¶ 8. Moreover, as part of its education efforts, "LCLAA periodically issues reports . . . about the challenges encountered by Latinos and Latinas in the workforce. The reports discuss data compiled and published by the Government on income and employment—including EEO-I data. LCLAA uses these reports in advocating for policy change and enforcement of equal pay laws, and in educating its members on ways to negotiate with employers and encourage them to follow practices that reduce workforce discrimination." *Id.* ¶ 9.

On November 15, 2017, two months after the Rao Memorandum and the subsequent notice in the Federal Register staying the effectiveness of the EEO-1 pay data collection, Plaintiffs sued, naming as defendants: OMB; John Michael Mulvaney, Director of OMB; Neomi Rao, Administrator of OIRA; EEOC; and Victoria A. Lipnic, Acting Chair of EEOC. Plaintiffs

ask this court to: 1) declare that OMB Defendants violated the PRA and Administrative Procedure Act ("APA") and exceeded their statutory authority in reviewing and staying the collection of pay data as part of the EEO-1; 2) declare that the stay announced in the Rao Memorandum and the September 15, 2017 Federal Register notice was a nullity, and that the revised EEO-1 remains in effect; 3) vacate the stay and reinstate the revised EEO-1 reporting requirements; 4) order EEOC Defendants to publish a Federal Register notice announcing this reinstatement or take equivalent action necessary to immediately reinstate the pay data collection; 5) award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements incurred in this action; and 6) grant such other relief as the court may deem just and proper. Compl. at 34-35.

NWLC claims, among other injuries, that if OMB had not stayed the pay data collection NWLC "would have been able to make its reports and advocacy more robust with additional data and analysis." Johnson Decl. ¶ 6. Possession of the aggregate EEO-1 pay data would allow NWLC to "focus its resources, analysis, and advocacy on the jobs, industries, and regions where intervention is most urgent." *Id.* ¶ 7. LCLAA similarly claims injury from OMB's decision to stay the pay data collection. With the information that otherwise would have been collected, LCLAA would "have presented statistics on pay equity within industries and across the nation, based on this data. This information would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAA's mission of improving the condition of Latinos and Latinas in the workforce." Sanchez Decl. ¶ 11.

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), on the grounds that Plaintiffs lack standing, and pursuant to Federal Rule of Civil Procedure

12(b)(6), because Plaintiffs have not challenged a final agency action.  Both sides have moved

for summary judgment.

## II.   MOTION TO DISMISS

### A.  Legal Standard

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) "presents a threshold

challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

"[T]he core component of standing is an essential and unchanging part of the case-or-

controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The plaintiff bears the burden of establishing the elements of standing, *id.* at 561, and each

element "must be supported in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of

the litigation." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at

561).  The plaintiff must "show a 'substantial probability' that it has been injured, that the

defendant caused its injury, and that the court could redress that injury." *Sierra Club v. EPA*,

292 F.3d 895, 899 (D.C. Cir. 2002) (citation omitted).  With respect to a facial 12(b)(1) motion

to dismiss, the court must "accept the well-pleaded factual allegations as true and draw all

reasonable inferences from those allegations in the plaintiff's favor." *Arpaio*, 797 F.3d at 19.  At

the summary judgment stage, the plaintiff "must support each element of its claim to standing by

affidavit or other evidence." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 n.2 (D.C.

Cir. 2016) (quotation marks and citation omitted).

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation

omitted). However, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks and citation omitted).

### B. Informational and Organizational Standing

Because Plaintiffs are two organizations seeking to sue on their own behalf, i.e., seeking organizational standing, "like an individual plaintiff" they must show "[1] actual or threatened injury in fact [2] that is fairly traceable to the alleged illegal action and [3] likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. USDA* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quotation marks and citation omitted).

#### 1. Informational Standing

Although both plaintiffs base their claim of injury on the loss of information that Component 2 would have provided, both nevertheless lack so-called "informational standing." The D.C. Circuit has been clear that to demonstrate informational standing, a plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citation omitted). It is undisputed that Plaintiffs here do not have a statutory right to the information they allege forms their injury in fact. Therefore, any claim to informational standing "fails at the first part of the inquiry, the *sine qua non* of informational injury." *Id.*

#### 2. Organizational Standing

Whether Plaintiffs' loss of information can also serve as an injury in fact as a component of organizational standing, however, presents a more complicated question. While the D.C.

Circuit has provided some conflicting guidance, this court concludes that under binding

precedent, in particular *PETA* and *Action Alliance of Senior Citizens of Greater Philadelphia v.*

*Heckler*, 789 F.2d 931 (D.C. Cir. 1986), Plaintiffs have demonstrated organizational standing.

The Supreme Court has said that "the injury-in-fact requirement requires a plaintiff to

allege an injury that is both concrete *and* particularized." *Spokeo, Inc. v. Robins*, 136 S. Ct.

1540, 1545 (2016) (quotation marks and citation omitted) (emphasis in original). "A

particularized injury is personal, individual, distinct, and differentiated—not generalized or

undifferentiated. An actual or imminent injury is certainly impending and immediate—not

remote, speculative, conjectural, or hypothetical." *Food & Water Watch, Inc. v. Vilsack*, 808

F.3d 905, 914 (D.C. Cir. 2015) (quotation marks and citation omitted). Plaintiffs must show that

they have "suffered a concrete and demonstrable injury to [their] activities." *Id.* at 919

(quotation marks and citation omitted).

In order to determine whether an organization has suffered an injury in fact, courts

conduct a "two-part inquiry— we ask, first, whether the agency's action or omission to act

injured the [organization's] interest and, second, whether the organization used its resources to

counteract that harm." *Id.* (quotation marks and citation omitted) (alteration in original).

In *Action Alliance*, plaintiffs were "four organizations that endeavor[ed], through

informational, counseling, referral, and other services, to improve the lives of elderly citizens."

789 F.2d at 935. They sued the Department of Health and Human Services ("HHS"), alleging

that HHS's regulation "significantly restrict[ed]" the flow of "information regarding services

available to the elderly" that, if possessed by plaintiffs, "would enhance [their] capacity . . . to

refer members to appropriate services and to counsel members when unlawful age discrimination

may have figured in a benefit denial." *Id.* at 937. The D.C. Circuit found that the plaintiffs

established standing, because the regulations kept plaintiffs from "access to information and

avenues of redress they wish[ed] to use in their routine information-dispensing, counseling, and

referral activities. Unlike the mere 'interest in a problem' or ideological injury in *Sierra Club* [*v.*

*Morton*, 405 U.S. 727, 735, 739 (1972)]," plaintiffs had "alleged inhibition of their daily

operations, an injury both concrete and specific to the work in which they [were] engaged."

*Action Alliance*, 789 F.2d at 937-38 (quotation marks omitted) (footnote omitted).

In *PETA*, plaintiff, an animal rights organization, sued the USDA and requested that the

court order USDA to "extend enforcement of the AWA [Animal Welfare Act] to birds covered

by the AWA, by enforcing the general AWA standards that presently exist." 797 F.3d at 1091

(quotation marks omitted) (footnote omitted). PETA claimed that USDA's failure to investigate

allegations of bird mistreatment denied the public reports of those alleged instances, and that it

used the information in the reports to educate its members and the public. *Id.* at 1095-96. The

district court found that PETA had standing because USDA's decision not to apply the AWA to

birds "precluded PETA from preventing cruelty to and inhumane treatment of these animals

through its normal process of submitting USDA complaints and it deprived PETA of key

information that it relies on to educate the public." *Id.* at 1094 (quotation marks and citation

omitted). The D.C. Circuit affirmed, noting that "[t]he key issue is whether PETA has suffered a

concrete and demonstrable injury to [its] activities, mindful that, under our precedent, a mere

setback to [PETA's] abstract social interests is not sufficient." *Id.* at 1093 (second alteration in

original) (quotation marks and citations omitted). The Court explained that in determining

"whether an organization's injury is concrete and demonstrable," a court asks "first, whether the

agency's action or omission to act injured the [organization's] interest and, second, whether the

organization used its resources to counteract that harm." *Id.* at 1094 (alteration in original)

14

(quotation marks and citations omitted).  Applying these standards, the Court found that PETA's alleged injuries were "materially indistinguishable from those alleged by the organizations in *Action Alliance*."  *Id.* at 1094.  It held that the "USDA's allegedly unlawful failure to apply the AWA's general animal welfare regulations to birds has perceptibly impaired PETA's ability to both bring AWA violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public."  *Id.* at 1095 (quotation marks and brackets omitted). Because PETA expended resources to counters its injuries, it established organization standing. *Id.*  Significantly, plaintiffs did not allege a statutory right to the information.  *See id.* at 1103 (Millett, J., concurring dubitante) ("Even as alleged by PETA, there is no suggestion that anything in the Animal Welfare Act or any regulation gives PETA any legal *right* to such information or reports.") (emphasis in original).

Under *Action Alliance* and *PETA*, Plaintiffs have demonstrated an injury in fact.  First, they have shown that the loss of pay data caused a "concrete and demonstrable injury" that is "more than simply a setback to [their] abstract social interests."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  As part of its mission to eradicate the gender wage gap, NWLC seeks to educate the public by publishing analyses and reports about workplace pay disparities.  Johnson Decl. ¶ 4.  When NWLC became aware that EEOC was planning to publish the pay data based on the revised EEO-1, it determined that this data could have revealed new information about the race and gender gaps.  *Id.* ¶ 6.  This information would have made NWLC's reports and advocacy more robust because they would have additional data and analysis.  *Id.*  The aggregate EEO-1 pay data would have enabled NWLC to focus its efforts where intervention was most urgent.  *Id.* ¶ 7.  With respect to NWLC's efforts to enforce and redress workplace discrimination, NWLC's pro bono representation would have benefited from

the EEO-1 pay data collection.  *Id.* ¶ 8.  With the aggregate pay data, NWLC would more easily have been able to evaluate clients' claims.  *Id.* ¶ 9.  When representing their clients before the EEOC and in courts, the NWLC "bear[s] the costs of amassing evidence about internal pay inequities and comparators' pay practices to obtain redress."  *Id.* ¶ 10.  This evidence, the NWLC represents, may help persuade EEOC to act or prove claims to a court or jury.  *Id.*  Finally, the aggregate employee pay data would reduce NWLC's costs when representing clients "in the EEOC charge process and beyond."  *Id.* ¶ 11.

Similarly, as part of its advocacy and educational work, Plaintiff LCLAA issues reports "about the challenges encountered by Latinos and Latinas in the workforce."  Sanchez Decl. ¶ 9.  LCLAA would have used the EEO-1 aggregate pay data to present "statistics on pay equity within industries and across the nation, based on this data.  This information would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAAs mission of improving the condition of Latinos and Latinas in the workforce."  *Id.* ¶ 11.

Plaintiffs' declarations establish that NWLC and LCLAA would have used the EEOC pay data to advance their missions by using the data in their publications and as part of their public education and advocacy campaigns.  The loss of the pay data constitutes the type of informational harm the D.C. Circuit has found to be "both concrete and specific to the work in which [these organizations] are engaged."  *PETA*, 797 F.3d at 1095 (quotation marks and citation omitted); *see id.* at 1094 (stating that the government "deprived PETA of key information that it relies on to educate the public") (quotation marks and citation omitted); *Action Alliance*, 789 F.2d at 937-38 (noting that "the challenged regulations denied plaintiffs access to information

16

and avenues of redress they wish to use in their routine information-dispending, counseling, and

referral activities").

Second, Plaintiffs have shown that they have used their resources to "counteract [the]

harm" caused by the stay of the data collection. *Food & Water Watch, Inc.*, 808 F.3d at 919

(citation omitted).  After OMB stayed the data collection, NWLC "expended funding and staff

time that would have been unnecessary absent the stay."  Johnson Decl. ¶ 12.  These additional

expenditures included "time to engage with employers to encourage voluntary compliance with

equal pay laws and changes in compensation practices and policies" and "voluntary self-audits of

pay practices and internal wage gaps, in order to compensate for the self-evaluation of internal

wage gaps that the EEO-1 pay data collection would have required employers to undertake."  *Id.*

¶ 12.  Moreover, "in order to meet the objective of improved enforcement of pay discrimination

law and increased self-evaluation by employers of their own practices, NWLC has expended and

will expend funding and staff time" on tasks that it is "compelled" to take in pursuit of "its

mission of eradicating the pay gap."  *Id.* ¶¶ 13, 14.  These tasks require NWLC staff to "create

model state and/or local pay data collection legislation; create educational materials setting out

the need for such pay data collection and the interests it serves; build coalition and grassroots

support in targets states and/or localities for these measures; and advocate at the state and local

level for adoption and implementation of such legislation."  *Id.* ¶ 13.  These and similar

endeavors have forced NWLC staff members to divert time from their daily operations.  *Id.* ¶ 15.

LCLAA states that "[t]o replicate the same information LCLAA would obtain from the

revised EEO-l, LCLAA would have to convince thousands of employers to voluntarily provide

data and then employ statisticians to analyze the resulting raw data—efforts that would require

enormous expense and *still* likely be unsuccessful, given LCLAA's inability to require

employers to comply."  Sanchez Decl. ¶ 12 (emphasis in original).  LCLAA further represents

that "any attempt to compile such data would almost certainly underreport pay inequities,

because employers with significant disparities would be particularly unlikely to provide data

voluntarily."  *Id.*  Because of the stay, LCLAA is considering whether to use a "very costly"

survey of workers to obtain the information it otherwise would have had.  *Id.* ¶ 13.  The stay also

"forced LCLAA to redeploy its limited staff resources away from their daily operations."  *Id.*

¶ 14.  For example, LCLAA had planned to have staff work on educational materials related to

the North American Free Trade Agreement and its impact for Latino/a workers—an initiative

that "is a core and common part of LCLAA's daily operations"—but it could not do so because it

had to redeploy its resources to working on obtaining the information that it likely would have

received but for OMB's decision to stay the data collection.  *Id.* ¶ 16.

     The court must next determine whether Defendants caused Plaintiffs' injuries and

whether they can be redressed by a favorable court decision.  To establish causation, Plaintiffs

must show "a causal connection between the injury and the conduct complained of—the injury

has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of]

the independent action of some third party not before the court."  *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560 (1992) (quotation marks and citation omitted) (alterations in original).

"Redressability examines whether the relief sought, assuming that the court chooses to grant it,

will likely alleviate the particularized injury alleged by the plaintiff."  *West v. Lynch*, 845 F.3d

1228, 1235 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C.

Cir. 1996) (en banc) (footnote omitted)).  Standing is "substantially more difficult to establish,"

because Plaintiffs are not the object of the government action.  *Lujan*, 504 U.S. at 562 (quotation

marks and citation omitted).  "If the challenged conduct is at best an indirect or contributing

cause of the plaintiff's injury—*i.e.*, if the injury may or may not follow from the conduct, based on a chain of contingencies—the plaintiff faces an uphill climb in pleading and proving redressability." *West*, 845 F.3d at 1235–36 (quotation marks and citation omitted).  Thus, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks and citations omitted).

The government does not challenge the proposition that, but for OMB's stay of the data collection, EEOC would have collected the Component 2 pay data.  Therefore, the key issue with respect to causation and redressability is whether Plaintiffs have shown that EEOC likely would have publicly published the aggregate pay data collected from Component 2.

EEOC has discretion whether to publicly report the Component 2 pay data.  Therefore, this court pays particular attention to EEOC's statements about its intention to publicly publish this information.  In its Thirty-Day Notice, EEOC said: "Using aggregated EEO-1 data, Census data, and potentially other data sources, the EEOC *expects* to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area (MSA)."  81 Fed. Reg. at 45491 (emphasis added).

Based on EEOC's statement that it "expects to periodically publish reports" based on the aggregated EEO-1 date—a declaration that EEOC has never repudiated—the court finds that EEOC likely would have published the information and made it available to the Plaintiffs.  Moreover, EEOC explained how publishing the information would be useful: "Particularly after a few years of data collection, these reports will provide useful comparative data.  For smaller employers and others that do not hire consultants to analyze their compensation structures, these reports will be especially informative in light of the business case for equal pay and the need to comply with state equal pay laws."  81 Fed. Reg. at 45491.  The court has no reason not to take

the government at its word.  *Cf. Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012)

("We take the government at its word and will hold it to it.").[3]  Therefore, the court finds that

Plaintiffs have demonstrated causation and redressability.

There is some uncertainty about whether an informational injury can exist in the absence

of a statutory or regulatory right to the information.  Judge Millett expressed this doubt in *PETA*,

even as she recognized that "the majority opinion hew[ed] faithfully to precedential lines" in

finding standing where the plaintiffs lacked any statutory or regulatory right to the information.

*PETA*, 797 F.3d at 1099 (Millett, J., concurring dubitante).  In Judge Millett's view, finding

injury in fact where plaintiffs seek information unconnected to the exercise of a right conferred

by statute is "tantamount to recognizing a justiciable interest in the enforcement of the law."  *Id.*

at 1106 (quotations marks and citation omitted); *see also Food & Water Watch, Inc.*, 808 F.3d at

926 (D.C. Cir. 2015) (Millett J., concurring) ("Because the majority opinion properly applies our

precedent to keep a bad jurisprudential situation from getting worse, I concur.  But I continue to

believe that our organizational standing doctrine should be revisited in an appropriate case.").

In a difference concurrence, Judge Williams questioned whether informational injury and

organizational injury should be viewed as separate categories:  "[O]rganizational standing is

merely the label assigned to the *capacity* in which the organization contends it has been harmed;

it is not a separate *type* of injury."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on

Election Integrity*, 878 F.3d 371, 381 (D.C. Cir. 2017) (Williams, J., concurring) (emphasis in

original) ("*EPIC*").

---

[3] Plaintiffs note that EEOC's expressed intention to publish reports is consistent with its "historical practice of publishing annual reports based on aggregate EE0-1 data, in addition to periodic industry specific reports."  Pls.' Opp. to Defs.' Mot. to Dismiss at 34, ECF No. 16 (citing EEOC, Job Patterns for Minorities and Women in Private Industry (EEO-1), https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm).

Other cases have indicated that the Court intends for informational and organizational standing to continue to be viewed as distinct categories. *See Friends of Animals v. Jewell*, 828 F.3d 989, 994 (D.C. Cir. 2016) (criticizing the Sixth Circuit for conflating informational and organizational standing). Some, however, point in a different direction. *See EPIC*, 878 F.3d at 377 ("We conclude that EPIC lacks standing to obtain such relief because it has suffered no cognizable informational or organizational injury. We analyze and reject those two asserted types of injury in turn without necessarily agreeing that they are in fact analytically separate here."). Nonetheless, *Action Alliance* and *PETA* have not been overruled and remain binding on this court.

The government advances numerous arguments why Plaintiffs have not established organizational standing. All are unavailing. First, the government argues that the D.C. Circuit's decision in *EPIC* means that if an organization lacks informational standing it must also lack organizational standing. But *EPIC* could not and does not purport to overrule *Action Alliance* and *PETA*. *See General Comm. of Adjustment, GO–386 v. Burlington Northern & Santa Fe Ry. Co.*, 295 F.3d 1337, 1340 (D.C. Cir. 2002) (explaining that Circuit precedent "binds us, unless and until overturned by the court en banc or by Higher Authority") (quotation marks and citation omitted). Moreover, as indicated above, *EPIC* did not hold that informational and organizational standing are the same thing. *EPIC*, 878 F.3d at 377. *EPIC* did not make a statutory right to withheld information a necessary condition for both informational *and* organizational standing. Moreover, its analysis in rejecting standing was more nuanced than the government suggests.

In *EPIC*, plaintiff was "a nonprofit organization whose stated mission [was] to focus public attention on emerging privacy and civil liberties issues." *Id.* at 374 (quotation marks omitted). EPIC sought an injunction under the APA requiring the Presidential Advisory

21

Commission on Election Integrity to undertake privacy assessment review pursuant to the E-Government Act of 2002 before collecting voter data information.  *Id.*  EPIC based its claims of both information and organizational standing on the lack of access to these privacy assessments.  *Id.* at 377.  The D.C. Circuit found that EPIC lacked informational standing because the statute was designed to protect individuals' privacy rights, and therefore EPIC as an organization had no cognizable interest in the privacy assessment reviews.  *Id.* at 378 ("As we read it, the provision is intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information.  EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind.") (emphasis in original).  The D.C. Circuit then found a lack of organizational injury because without a cognizable interest in the information, EPIC could not show that its efforts to obtain the information were not entirely discretionary budgetary choices.  *Id.* at 378-79.

In contrast, this court has already found that both NWLC and LCLAA expended resources because of the government's refusal to collect and disseminate the Component 2 information.  And, unlike in *EPIC*, Plaintiffs have sought information that is designed to protect far more than individuals' privacy rights.

The government further argues that *PETA* is inapplicable based on the Court's decision in *Food & Water Watch, Inc.*  Defs.' Reply in Supp. of Mot. to Dismiss at 5, ECF No. 18.  However, in that case, the D.C. Circuit described *PETA* as "instructive" in explaining why plaintiffs lacked standing.  808 F.3d at 920.  The plaintiffs in *Food & Water Watch, Inc.* challenged a new USDA regulation, claiming that it would lead to an increase in foodborne illness from contaminated poultry—a claim that the D.C. Circuit found to be unsubstantiated.  The organizational plaintiff also claimed standing because it would have to spend resources

22

educating the public about the fact that the new regulations did not sufficiently protect the public

from unsafe poultry. *Id.* In *PETA*, the D.C. Circuit explained, because USDA did not apply

animal welfare requirements to birds, it did not generate inspection reports. *Id.* This "denial of

information perceptibly impaired" PETA's ability to bring statutory violations to USDA's

attention and to continue to educate the public. *Id.* at 920-21 (quotation mark and citation

omitted). In contrast, the organizational plaintiff in *Food & Water Watch, Inc.* could not "allege

that the USDA's action restricts the flow of information that FWW uses to educate its members."

*Id.* at 921. Thus, *Food & Water Watch, Inc.* does not advance the government's argument here,

because as in *PETA,* Plaintiffs NWLC and LCLAA have shown that the stay of EEOC's data

collection deprives them of information that they use to educate their members and the public.

The government further contends that it could not have caused Plaintiffs to incur costs

"because the EEOC has never before collected Component 2 pay data, let alone provided

aggregate pay data to the public." Defs.' Mot. to Dismiss at 16, ECF No. 11. Therefore, the

government argues, "OMB's decision to initiate a review and stay of the same before covered

employers ever submitted such data simply maintains the status quo." *Id.* Here, Defendants

misunderstand the law. "[T]he baseline for measuring the impact of a change or rescission of a

final rule is the requirements of the rule itself, not the world as it would have been had the rule

never been promulgated." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1068 (D.C. Cir. 2018). The

government's argument is also inconsistent with both *PETA* and *Action Alliance*, where the

Court of Appeals found injury in fact even though plaintiffs claimed an entitlement to

information to which they previously did not have access. *See PETA*, 797 F.3d at 1089

("Although the Agency has taken steps to craft avian-specific animal welfare regulations, it has

yet to complete its task after more than ten years and, during the intervening time, it has

allegedly not applied the Act's general animal welfare regulations to birds."); *Action Alliance*, 789 F.2d at 937 (plaintiffs challenging a new Department of Health and Human Services regulation).

The government advances a new standing argument in its Motion for Summary Judgment, asserting that "Plaintiffs lack standing to challenge a decision rendered in the context of an informal adjudication to which they are not a party." Defs.' Opp. to Pls.' Mot. for Summ. J. and Mot. for Summ. J. at 16, ECF No. 27-1 (citation omitted).

An adjudication is "retroactive, determining whether a party violated legal policy . . . [while] rulemaking . . . is of only future effect." *Ameren Servs. Co. v. Fed. Energy Regulatory Comm'n*, 880 F.3d 571, 584 (D.C. Cir. 2018); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) ("[A]n adjudication *must* have retroactive effect, or else it would be considered a rulemaking.") (emphasis in original).  The Rao Memorandum relieves covered employers from their obligations to provide Component 2 pay data in the future, and EEOC's notice in the Federal Register does the same.  The government provides the court with no precedent holding that an OMB determination under the PRA is considered an adjudication, and this court will not set a new course.[4]

In light of the foregoing, this court finds that Plaintiffs have met their burden to demonstrate organizational standing.[5]

_____

[4] Moreover, even if the court were to determine that OMB's stay is an adjudication, Plaintiffs would still have standing to challenge it, because they "point [] to a particular imminent application of the disputed agency policy, the firmness of which is not in dispute, on a fast-arriving date certain." *Conference Grp., LLC v. FCC*, 720 F.3d 957, 964 (D.C. Cir. 2013) (quotation marks and citation omitted) (alteration in original).

[5] Given this finding, the court does not need to reach Plaintiffs' additional standing claims.

### C.  Final Agency Action

The government moves to dismiss pursuant to Rule 12(b)(6), arguing that OMB's

decision to reconsider and stay EEOC's collection of pay data is not a final agency action and

thus not subject to judicial review.  The APA limits judicial review to "final agency action for

which there is no other adequate remedy in a court."  5 U.S.C. §704.  "To be 'final,' agency

action must 'mark the consummation of the agency's decisionmaking process' and 'be one by

which rights or obligations have been determined, or from which legal consequences will flow.'"

*Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (quoting *Bennett v. Spear*, 520 U.S.

154, 177-78 (1997)).  "Case law interpreting this standard is 'hardly crisp,' and it 'lacks many

self-implementing, bright-line rules, given the pragmatic and flexible nature of the inquiry as a

whole.'"  *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quoting *Rhea

Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1027 (D.C. Cir. 2016)).

In *Clean Air Council*, "a group of environmental organizations, challenge[d] the

Environmental Protection Agency's decision to stay implementation of portions of a final rule

concerning methane and other greenhouse gas emissions."  862 F.3d at 4.  The government

argued that the EPA's decision to stay the rule was not reviewable because it was not a final

agency action.  The D.C. Circuit followed the familiar two-pronged *Bennett* analysis and held

that the court had jurisdiction.  *Id.* at 6-7.  It found that the EPA's stay satisfied the first prong –

that the agency action "mark[s] the consummation of the agency's decisionmaking process,"

*Bennett*, 520 U.S. at 177-78 (quotation marks and citation omitted) – because it "suspended the

rule's compliance deadlines," which, "[was] essentially an order delaying the rule's effective

date, and this court has held that such orders are tantamount to amending or revoking a rule."

*Clean Air Council*, 862 F.3d at 6.  As the court explained, "By itself, EPA's decision to grant

reconsideration, which merely begins a process that could culminate in no change to the rule,

fails this [finality] test.  The imposition of the stay, however, is an entirely different matter." *Id.*
at 6.

 The Court also found that EPA's stay affected the rights or obligations of the regulated
parties.  *Id.* at 7. (quotation marks omitted).  The court explained:

> Absent the stay, regulated entities would have had to complete their initial monitoring
> surveys by June 3 and repair any leaks within thirty days.  Failure to comply with these
> requirements could have subjected oil and gas companies to civil penalties, citizens' suits,
> fines, and imprisonment.  The stay—which EPA made retroactive to one day *before* the
> June 3 compliance deadline—eliminates that threat, and thus relieves regulated parties of
> liability they would otherwise face.

*Id.* (citations omitted) (emphasis in original).

 Just as in *Clean Air Council*, OMB's decision to reconsider and stay EEOC's collection
of Component 2 pay data "mark[ed] the consummation of the agency's decisionmaking process."
*Clean Air Council*, 862 F.3d at 6 (quotation marks and citation omitted).  OMB—like EPA—did
not choose solely to reconsider or review the previously approved collection of information;
rather, it chose to review *and* stay it, thereby revoking its earlier approval of the Component 2
information collection.  OMB's stay is not interlocutory simply because OMB will conduct
future administrative proceedings to decide whether to approve EEOC's Component 2 data
collection.  "[T]he applicable test is not whether there are further administrative proceedings
available, but rather whether the impact of the order is sufficiently final to warrant review in the
context of the particular case."  *Id.* at 7 (quoting *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir.
2016).

 Moreover, OMB did not have to "review" *and* "stay" the data collection.  The
regulation's terms establish that these are separate decisions.  OMB may "review" a data
collection "when relevant circumstances have changed or the burden estimates . . . were

26

materially in error." 5 C.F.R. § 1320.10(f).  OMB may "stay" a data collection only for "good

cause."  *Id.* § 1320.10(g).  OMB concedes that it made two decisions by acknowledging that it

had "*also* decided to stay immediately the effectiveness of revised aspects of the EEO-1 form."

Rao Memorandum at 2 (emphasis added).

OMB's stay also satisfies the second step of the *Bennett* test.  Before the stay, covered

employers were legally obligated to submit the Component 2 pay data to the EEOC by March

31, 2018, and were required to file the EEO-1, 29 C.F.R. § 1602.7; 41 C.F.R. § 60-1.7(a)(1), and

false reporting subjected them to fines or imprisonment, 29 C.F.R. § 1602.8.  Covered employers

could be compelled by court order to file their EEO-1 if they failed or refused to do so.  *Id.* §

1602.9.  The stay eliminated the pay data from this mandatory requirement, therefore creating

legal consequences for the regulated entities, no matter whether OMB ultimately decides to

approve or disapprove the pay data.  *See Clean Air Council*, 862 F.3d at 7 ("Failure to comply

with these requirements could have subjected oil and gas companies to civil penalties, citizens'

suits, fines, and imprisonment.  The stay . . . eliminates that threat, and thus relieves regulated

parties of liability they would otherwise face.") (citations omitted).

The government nevertheless contends that because the stay does not directly affect the

Plaintiffs' rights or obligations it fails the second prong of the finality test because Plaintiffs do

not have any legal right to the pay data EEOC would have collected.  Defs.' Mot. to Dismiss at

26-27, ECF No. 11.  This argument fails because the correct test asks whether the stay has legal

consequences, not whether it affects the plaintiffs' legal obligations.  In *Clean Air Council*, the

D.C. Circuit found that an environmental organization had standing where the stay affected the

obligations of the regulated industries – oil and gas – not the environmentalists.  862 F.3d at 4;

*see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1281

(D.C. Cir. 2005) ("Because the Corps' [policies] mark the completion of the Corps' decision-making process and affect the [regulated entities'] day-to-day operations, they constitute final agency action regardless of the fact that the Corps' action might carry different (or no) consequences for a different challenger, such as an environmental group.").  The government relies on *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212 (D.C. Cir. 1996), but in that case the agency's actions did not have *any* legal consequence.  *Id.* at 1215 ("[This] is not a case in which legal consequences will flow from the agency action taken thus far.") (quotation marks and citation omitted).

Defendants argue that *Clean Air Council* is inapposite.  They point out that *Clean Air Council* involved the stay of a rule promulgated pursuant to notice and comment, the PRA permits the review and stay of the collection of information not contained in a rule, and permits only review but not the stay of information contained in a rule, and OMB's stay of Component 2 data is a stay of a collection of information not contained in a rule.  While each of these points is correct, the Defendants cannot weave them together in a way that demonstrates why the stay in this case is not final.

First, OMB discusses the legislative history of the PRA with respect to the decision to permit stays of some collections of information but not others, *see* Defs.' Reply in Supp. of Mot. to Dismiss at 14-15, but this discussion reveals only that Congress granted substantive authority to allow a stay in one place and withheld authority to grant a stay elsewhere.  It does not speak to the finality of a stay.[6]

---

[6] Defendants suggest that the notice and comment underpinnings of the rule stayed in *Clean Air Council* were critical to the court's finding that the stay amounted to final action.  *See* Defs.' Reply in Supp. of Mot. to Dismiss at 17.  However, the language that Defendants quote does not

In any event, Defendants have failed to account for the fact that this case involves the

interplay between two governmental entities, OMB and EEOC, and by staying EEOC's

collection of information, OMB has effectively stayed its own prior approval of the collection—

an approval which was itself granted only after two rounds of notice and comment. *See* 81 Fed.

Reg. 5113; 81 Fed. Reg. 45479.  Moreover, Defendants do not argue that judicial review would

be unavailable if OMB had initially disapproved the collection of information by EEOC.  *Cf.* 44

U.S.C. § 3507 (d)(6) (expressly stating that certain actions are not subject to judicial review).  If

such disapproval would have been judicially reviewable, it does not make any sense that OMB

could evade judicial review by first approving the collection and then staying it.

## III.    SUMMARY JUDGMENT

### A.  Legal Standard

When a plaintiff challenges an agency's final action under the APA, summary judgment

"is the mechanism for deciding whether as a matter of law an agency action is supported by the

administrative record and is otherwise consistent with the APA standard of review." *Louisiana*

*v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016) (citing *Citizens to Preserve Overton Park, Inc.*

*v. Volpe*, 401 U.S. 402, 415 (1971)).  A court must "hold unlawful and set aside agency action"

that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law."  5 U.S.C. § 706(2)(A).

---

come from the portion of the opinion dealing with the finality of the stay; it comes from the
portion of the opinion finding the stay arbitrary and capricious.

## B.  Analysis of Whether the Stay Violates OMB's Regulations or is Arbitrary and Capricious

Under its own regulations, OMB may review a previously approved collection of information only when "relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."  5 C.F.R. § 1320.10(f).  If either requirement is met, OMB may stay a prior approval of a collection of information not contained in a rule, but only for "good cause" shown and "after consultation with the agency." *Id.* § 1320.10(g).  OMB has not shown that a relevant circumstance has changed or that the burden estimate provided was materially in error.  Moreover, it has not shown good cause.

In staying EEOC's data collection, OMB stated that the "data file specifications for employers to use in submitting EEO-1 data . . . were not contained in the Federal Register notices as part of the public comment process nor were they outlined in the supporting statement for the collection of information."  Rao Memorandum at 1.  Therefore, OMB claimed that 1) "the public did not receive an opportunity to provide comment on the method of data submission to EEOC"; and 2) "EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate."  *Id.*

OMB's assertion that the data file specifications were not contained in the Federal Register, thereby depriving the public of an opportunity to comment on them, is misdirected, inaccurate, and ultimately unpersuasive.  The claim is misdirected, because the data file specifications consisted of a sample spreadsheet and formatting specifications which explained how to format a spreadsheet; they did not change the content of the information collected.  In both the Sixty-Day and Thirty-Day notices, EEOC described in detail the information it proposed to collect.  The government's argument therefore focuses on a technicality that did not affect the employers submitting the data.

30

The government's claim that employers lacked an opportunity to comment on the data file specifications is strained, because the Thirty-Day Notice explicitly stated that for employers who were going to file through data uploads, the EEOC would post online the new data file specifications "for Components 1 and 2 of the modified EEO-1 as soon as OMB approves the information collection."  81 Fed. Reg. at 45487.  Moreover, the Sixty-Day Notice directed employers to a website with sample data collection forms which provided "an illustration of the data to be collected by both Components 1 and 2 [of the revised EEO-1]."  81 Fed. Reg. at 5118. The sample spreadsheets in the data file specification match in all material respects the sample form provided in the Sixty-Day Notice.  *Compare id.* with Link Decl. ¶ 8, Ex. E.  Thus, employers not only knew that the data file specifications would be posted after OMB's approval, but also knew what the specifications would look like, putting the employers in a good position to comment if they desired.

Moreover, OMB gave its approval knowing that the Thirty-Day Notice stated that the file data specifications would be posted "as soon as" OMB approved the information collection. Plainly, OMB and employers expected *some* file specifications, so OMB's assertion that anyone was caught off guard by the mere posting of data file specifications rings hollow.  Unable to point to any material variance between the sample form in the Sixty-Day Notice and the specifications ultimately posted, OMB's burden was to show how the file data specifications altered the content of the information required from employers or significantly increased the burden on employers in producing that information.  OMB did not carry that burden.  Moreover, OMB did not explain why posting the data file specifications after OMB approved the Component 2 collection should jeopardize the collection, when OMB had previously allowed data file specifications to be submitted after it approved EEO-1 forms.  *See, e.g.*, Agency

31

Information Collection Activities: Notice of Submission for OMB Review; Final Comment

Request, 70 Fed. Reg. 71294, 71301 (Nov. 28, 2005); Agency Information Collection Activities:

Proposed Collection; Submission for OMB Review, 79 Fed. Reg. 72678 (Dec. 8, 2014).

OMB's assertion that "EEOC's burden estimates did not account for the use of these

particular data file specifications, which may have changed the initial burden estimate," Rao

Memorandum at 1, is also unavailing.  First, as noted, EEOC's sample form in the Sixty-Day

Notice and description in both the Thirty-Day and Sixty-Day notices of the pay data that would

be collected were consistent with the data file specifications.  Second, OMB did not actually *find*

that the data file specifications would change the initial burden estimates; rather, it stated that

data file specifications "*may* change the initial burden estimate."  Rao Memorandum at 1

(emphasis added).  This equivocation is not surprising given that OMB's assertion was

unsupported by any analysis.

The only "changed circumstance" alleged by OMB is the release of the data file

specifications.  But this is far from a "changed circumstance" in any meaningful sense.  As

mentioned, in the Thirty-Day Notice, EEOC informed OMB and the public that it would post file

specifications after OMB approved the collection of information.  After OMB approved the

collection of information, EEOC released the data file specifications.  There was no changed

circumstance.  EEOC proceeded exactly as planned and as OMB had approved.

Moreover, OMB merely speculated that the initial burden estimate "may" be incorrect,

while failing to support its speculation with any analysis.  This omission is remarkable because

OMB did not assert that EEOC's previous analyses were based on formats meaningfully

different from the file data specifications.  *See* 81 Fed. Reg. at 5119-20, 81 Fed. Reg. at 45492-

95 (earlier burden analyses).  OMB's unsupported conjecture falls short of showing *any* prior

error, let alone a material one.  "Though an agency's predictive judgments . . . are entitled to

deference . . .  deference to such ... judgment[s] must be based on some logic and evidence, not

sheer speculation."  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014)

(quotation marks and citations omitted) (alteration in original); *see also Water Quality Ins.*

*Syndicate v. United States*, 225 F. Supp. 3d 41, 70 (D.D.C. 2016) ("speculation … is an

inadequate replacement for the agency's duty to undertake an examination of the relevant data

and reasoned analysis") (quoting *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C.

Cir. 1994)).

     OMB also failed to demonstrate good cause for the stay.  It did not explain in any

substantive way why it believed that the revised EEO-1 was contrary to PRA standards.  *See*

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A]n agency must explain

'why it chose to do what it did.'  And to this end, conclusory statements will not do; an 'agency's

statement must be one of *reasoning*.'") (emphasis in original) (quoting *Tourus Records v. Drug*

*Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001); *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194

(D.C. Cir. 2010)); *see also Bauer v. DeVos*, 325 F. Supp. 3d 74, 105 (D.D.C. 2018) ("[T]he APA

. . . requires that agencies 'provide an explanation that will enable the court to evaluate the

agency's rationale at the time of decision.'") (citation omitted).  OMB's stated reason when

issuing the stay also conflicted with its prior findings that EEOC's data collection had practical

utility, 81 Fed. Reg. at 45481-83, was designed to minimize the burden on reporting employers,

*id.* at 45492-95, and provided adequate privacy and confidentiality protections, *id.* at 45491-92.

OMB failed to explain these inconsistencies.  *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d

46, 59 (D.C. Cir. 2015) ("We have often declined to affirm an agency decision if there are

unexplained inconsistencies in the final rule."); *Bauer*, 325 F. Supp. 3d at 109 ("[T]he

33

Department failed to acknowledge, much less to address, the inconsistency between its current view that those provisions stand on legally questionable footing, and its prior conclusion that they were legally sound. . . . [A]n unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making.").[7]

An agency's action is arbitrary and capricious if the agency "(1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) offers an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (quotation marks and citation omitted).  While "[a]gencies are free to change their existing policies," in doing so they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citations omitted).  OMB's action in staying EEOC's collection of Component 2 was arbitrary and capricious for the same reasons the agency violated its own regulation: OMB's decision to stay the collection of information totally lacked the reasoned explanation that the APA requires.[8]

In urging this court to uphold OMB's decision to stay EEOC's pay data collection, the government contends that "OMB's interpretation of its 'review and stay' regulations is entitled to deference," unless it is "plainly erroneous or inconsistent with the regulation," because "neither the PRA nor OMB's regulations define when 'relevant circumstances have changed,'

---

[7] OMB did not explain why a stay was necessary, when the percentage of employers likely to use data upload is small, perhaps as low as two percent, 81 Fed. Reg. at 5119 n.55, 5120 n.62, and no employer is required to use data upload rather than data entry.

[8] Because the court finds that OMB's stay of EEOC's pay data collection violated the PRA and was arbitrary and capricious, it does not need to reach Plaintiffs other arguments.

what constitutes a 'material error' in the burden estimates initially provided, or when 'good

cause exists.'"  Defs.' Opp. to Pls. Mot. for Summ. J and Mot. for Summ. J. at 19-20.  Plaintiffs

counter that because "the Rao Memorandum is almost entirely conclusory, parroting regulatory

language," it lacks reasoning and is not entitled to deference.  Pls.' Reply in Supp. of Mot. for

Summ. J. and Opp. to Defs.' Mot. for Summ. J. at 6, ECF No. 32.  Moreover, Plaintiffs argue

that OMB has previously articulated a definition of a "good cause" standard and should be held

to it.  In the preamble to a PRA regulation, OMB stated that good cause "exists when continued

collection of information would be significantly contrary to the standards of the Act."

Controlling Paperwork Burdens on the Public; Proposed Rulemaking, 47 Fed. Reg. 39515,

39522 (Sept. 8, 1982).  As part of this good cause standard, OMB must "take into consideration

any disruption such reconsideration would create in the agency's program."  *Id.*  The government

responds that as a general matter, preambles to rules are not binding on agency actions.  *See*

Defs.' Mot. for Summ. J. at 21 n.4.

     The court need not decide whether the good cause standard provided in the preamble

applies here.  Even without holding OMB to those requirements, the court finds that OMB

provided inadequate reasoning to support its decision to stay the data collection.  Courts "do not

defer to an agency's conclusory or unsupported suppositions."  *Nat'l Shooting Sports Found., Inc.*

*v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quotation marks and citation omitted).

     In further support of its claim that OMB's decision to stay EEOC's collection of

Component 2 information is a reasonable interpretation of the regulations and supported by the

record, the government relies on four letters OMB received in early 2017, after the posting of the

file specifications.  Defs.' Opp. to Pls.' Mot. for Summ. J. and Mot. for Summ. J. at 22-23.

These letters, according to the government, expressed concern about the lack of adequate notice

and comment and buttressed OMB's finding that "Component 2 could impose a burden on

regulated entities." *Id.* at 23.   However, the Rao Memorandum does not indicate that OMB

relied on these comments or even took them into consideration.   Moreover, one of the four letters

(from the Chamber of Commerce) does not discuss the data file specifications. *See* Letter re

Request for Review; EEOC's Revision of the Employer Information Report from Randel K.

Johnson, Senior Vice President, Labor, Immigration & Employee Benefits and James Plunkett,

Director, Labor Law Policy, U.S. Chamber of Commerce, to John M. Mulvaney, Dir., Office of

Management and Budget (Feb. 27, 2017); JA046.   The other letters do not provide any analysis

or conclude that the data formatting specifications increase the burden on EEO-1 filers.   An

agency's speculation cannot suffice for APA review purposes. *Sorenson Commc'ns Inc.*, 755

F.3d at 708.   Similarly, an agency cannot simply rely on the speculation of commenters.   Instead,

the agency must conduct a critical examination of comments on which it relies. *See Nat'l Ass'n

of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1125 (D.C. Cir. 1984) (agency may not rely

on comments "uncritically" and must apply its "expert evaluation"); *Am. Great Lakes Ports

Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 39 (D.D.C. 2017) ("Thus, an agency may, for example, rely

on comments submitted during the notice and comment period as justification for [a] rule, so

long as the submissions are examined critically.") (quotation marks and citations omitted)

(alteration in original).   Finally, the government omits mention of the comments OMB received

in support of the file data specifications.   For instance, NWLC, with 82 organization signatories,

submitted a comment on April 12, 2017, around the same time that OMB received the four

letters it cites.   NWLC explained both why the data file specifications did not increase any

burden and did not constitute a change in circumstances. *See* Letter re Opposition to Reopening

Review of the Equal Employment Opportunity Commission's Employment Information (EEO-1)

36

Report (OMB Control Number 3046-0007), from NWLC, et al., to John M. Mulvaney, Dir.,

Office of Management and Budget (Apr. 12, 2017); JA115.  Without explaining why, an agency

cannot rely on some comments while ignoring comments advocating a different position.  *AARP*

*v. U.S. Equal Emp't Opportunity Comm'n*, 267 F. Supp. 3d 14, 32 (D.D.C. 2017) ("An agency

must explain *why* it chose to rely on certain comments rather than others.") (emphasis in

original).

The government further contends that the Rao Memorandum "simply summarizes the

four months of meetings, emails, and conference calls between OMB and EEOC during which

each issue underlying the Administrator's decision to review and stay was discussed."  Defs.'

Opp. to Pls.' Mot. for Summ. J. and Mot. for Summ. J. at 30.  Nothing in the record supports this

claim.  Further, the government's assertion does not mean that the discussions involved an

analysis of evidence supporting a conclusion of changed circumstances or materially erroneous

burden estimates.  In fact, the only evidence in the record of documented agency analysis rejects

the government's current contention about the data file specifications.  According to an April 14,

2017 EEOC memorandum:

> The EEOC's published filed specifications are not a new requirement but rather simply a
> familiar tool to make it easier for employers to submit EEO-1 data to the EEOC.  The
> EEOC provided this tool to employers for use with the 2016 EEO-1, as evident on the
> EEOC website where the file specifications for the 2016 EEO-1 were published … Like
> those later published for the EEO-1 pay data collection, the 2016 specifications were in
> comma-separated values format ("csv"), a format that enables employers to convert
> tabular data (like that in the EEO-1) for importation and exportation to a database.
> Employers that used data upload technology for their 2016 EEO-1 reports used these csv
> specifications.
>
> Publication of the file specifications after OMB's approval of the pay data collection is
> not a "significant" change that warrants OMB's reconsideration.  As noted above, EEOC
> indicated in the 30-day notice its intent to post updated specifications, and stated that it
> would provide support to employers and HRIS vendors as they transitioned to the new
> reporting requirements.  EEAC had notice of these data specifications, was probably

familiar with the 2016 version, and had ample opportunity to raise questions or concerns before OMB's approval of the revised EEO-1, but did not do so.

Memorandum from Peggy Mastroianni to Victoria Lipnic, Acting Chair, EEOC (Apr. 14, 2017); JA126.

The government now claims that Component 2 required "significant formatting changes." Defs. Mem at 23. But the Rao Memorandum did not reach that conclusion. Administrator Rao's letter said only that the data file specifications "may have changed the initial burden estimate." Rao Memorandum at 1. Moreover, even if OMB had relied on a finding of "significant formatting changes" at the time of the stay, its conclusion would have lacked analytic and evidentiary support. This court cannot "fill in critical gaps in an agency's reasoning. We can only look to the [agency's] stated rationale. We cannot sustain its action on some other basis the [agency] did not mention." *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006); *see also NAACP v. Trump*, 298 F. Supp. 3d 209, 237 (D.D.C. 2018) ("[B]ecause 'a reviewing court ... must judge the propriety of [agency] action solely by the grounds invoked by the agency,' *post hoc* explanations that the agency did not articulate when it acted are insufficient." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, (1947)) (alteration in original).

The government's position rests on hyper-technical formatting changes that have no real consequences for employers. While there may be instances when formatting changes could be burdensome, that is not the case here. Similarly, it is conceivable that the government could impose formatting requirements that made the presentation of collected information far more difficult for employers. But in this case, OMB and the regulated entities knew what the formatting would look like before OMB gave its approval to the Component 2 collection, and the government has failed to demonstrate any likelihood that the data file specifications meaningfully increase the burden on employers. Indeed, neither the Rao Memorandum nor the

administrative record as a whole demonstrates that before issuing its stay, OMB ever analyzed

the data file specifications in an effort to determine whether they meaningfully changed the

burden of collecting Component 2 information.

## IV.   REMEDY

Because the court has determined that OMB's stay of EEOC's pay data collection was

illegal, it must fashion an appropriate remedy.  The APA provides that a court shall "hold

unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  The D.C. Circuit has stated that "vacatur is the normal remedy" for an APA

violation.  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The APA

"itself contemplates vacatur as the usual remedy when an agency fails to provide a reasoned

explanation for its regulations."  *AARP v. U.S. Equal Emp't Opportunity Comm'n*, 292 F. Supp.

3d 238, 242 (D.D.C. 2017).  The presumption of vacatur, "however, is not absolute, and a

remand without vacatur may be 'appropriate [if] "there is at least a serious possibility that the

[agency] will be able to substantiate its decision" given an opportunity to do so, and when

vacating would be "disruptive."'"  *Bauer v. DeVos*, 332 F. Supp. 3d 181, 184 (D.D.C. 2018)

(quoting *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999))

(alterations in original).  "Courts in this Circuit . . . have long recognized that 'when equity

demands, an unlawfully promulgated regulation can be left in place while the agency provides

the proper procedural remedy.'"  *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240,

267 (D.D.C. 2015) (quoting *Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1312 (D.C. Cir. 1991)

(citation omitted) (footnote omitted)).  A court's decision to remand without vacatur "depends on

the 'seriousness of the order's deficiencies' and the likely 'disruptive consequences' of vacatur."

*Allina Health Servs.*, 746 F.3d at 1110 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

OMB's deficiencies were substantial, and the court finds it unlikely that the government could justify its decision on remand, despite its assertion that "OMB could easily cure the defects in its memorandum by further explanation of its reasoning." Defs.' Opp. to Pls.' Mot. for Summ. J. and Mot. for Summ. J. at 33.  The government's deficiency is not that it failed to explain OMB's "reasoning," but that OMB's reasoning lacked support in the record.

The government also argues that "vacatur *could* upset the current expectation of filers, who *may* not be aware of this litigation nor its potential impact on their obligation to complete their Component 2 submissions."  Defs.' Reply in Supp. of Mot. to Dismiss or in Alt. Mot. for Summ. J. at 19 (emphasis added), ECF No. 36.  This speculation is unsupported by the record. Moreover, the revised pay data collection had been in place for almost a year by the time it was stayed.  The government's argument that a stay is only temporary further undercuts its argument that vacatur would be disruptive, because affected entities were on notice that the stay could be withdrawn at any time.  The court therefore finds that vacatur will not have potentially disruptive consequences.

Accordingly, this court finds that both *Allied-Signal* factors favor vacatur as the appropriate remedy.

## V.    CONCLUSION

For the foregoing reasons, the court hereby **DENIES** Defendants' Motion to Dismiss, ECF No. 11; **GRANTS** Plaintiffs' Motion for Summary Judgment, ECF No. 22; **DENIES** Defendants' Motion for Summary Judgment, ECF No. 27; and **VACATES** OMB's stay of the

EEOC's revised EEO-1 form and the September 15, 2017 Federal Register Notice (Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362) announcing the same.

It is further **ORDERED** that the previous approval of the revised EEO-1 form shall be in effect.

Date:  March 4, 2019


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge



EXECUTIVE OFFICE OF THE
PRESIDENT

OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

ADMINISTRATOR
OFFICE OF
INFORMATION AND
REGULATORY
AFFAIRS

## MEMORANDUM

TO:        Acting Chair Victoria Lipnic, Equal Employment Opportunity Commission

FROM:      Neomi Rao, Administrator, Office of Information and Regulatory Affairs

DATE:      August 29, 2017

SUBJECT:   EEO-1 Form; Review and Stay

---

After careful consideration and consultation with the Equal Employment Opportunity Commission (EEOC), and in accordance with the Paperwork Reduction Act (PRA) and its regulations at 5 CFR 1320.10(f) and (g), the Office of Management and Budget (OMB) is initiating a review and immediate stay of the effectiveness of those aspects of the EEO-1 form that were revised on September 29, 2016. These revisions include new requests for data on wages and hours worked from employers with 100 or more employees, and federal contractors with 50 or more employees. EEOC may continue to use the previously approved EEO-1 form to collect data on race/ethnicity and gender during the review and stay.

The PRA authorizes the Director of OMB to determine the length of approvals of collections of information and to determine whether collections of information initially meet and continue to meet the standards of the PRA. In this context, under 5 CFR 1320.10(f) and (g), OMB may review an approved collection of information if OMB determines that the relevant circumstances related to the collection have changed and/or that the burden estimates provided by EEOC at the time of initial submission were materially in error. OMB has determined that each of these conditions for review has been met. For example, since approving the revised EEO-1 form on September 29, 2016, OMB understands that EEOC has released data file specifications for employers to use in submitting EEO-1 data. These specifications were not contained in the Federal Register notices as part of the public comment process nor were they outlined in the supporting statement for the collection of information. As a result, the public did not receive an opportunity to provide comment on the method of data submission to EEOC. In addition, EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate.

JA020

OMB_0000299

OMB has also decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as we believe that continued collection of this information is contrary to the standards of the PRA.  Among other things, OMB is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues.

In these circumstances, the regulations at 5 CFR 1320.10(f) and (g) require EEOC to submit a new information collection package for the EEO-1 form to OMB for review.  In addition, the regulations require EEOC to publish a notice in the Federal Register announcing the immediate stay of effectiveness of the wages and hours worked reporting requirements contained in the EEO-1 form and confirming that businesses may use the previously approved EEO-1 form in order to comply with their reporting obligations for FY 2017.

Thank you for your attention to these matters. Please feel free to contact me with any questions.

2

OMB_0000300

EQUAL EMPLOYMENT
ADVISORY COUNCIL

SUITE 400
1501 M STREET, NW
WASHINGTON, DC 20005

TEL 202/629-5650
FAX 202/629-5651

March 20, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street NW
Washington, DC 20503

### Re: Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007)

Dear Director Mulvaney:

On behalf of the Equal Employment Advisory Council, I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act (PRA) to review the Equal Employment Opportunity Commission's (EEOC's) previously approved collection of information commonly known as the Employer Information (EEO-1) Report (OMB Control Number 3046-0007). As explained in more detail below, we respectfully urge OMB to immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

### Statement of Interest

The Equal Employment Advisory Council (EEAC) is the nation's largest nonprofit association of employers dedicated to the advancement of practical and effective programs to eliminate employment discrimination. Formed in 1976, EEAC's membership includes approximately 260 of the nation's leading and largest employers, all of which are firmly committed to the principles and practice of workplace nondiscrimination. All of our members are employers subject to the compliance, recordkeeping, and reporting requirements imposed by federal statutes and regulations prohibiting workplace discrimination. In addition, nearly all of our members are federal contractors subject to the additional recordkeeping, reporting, and compliance requirements imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and their implementing regulations.

EEAC has a long track record of working closely with the EEOC to ensure that the EEO-1 Report maintains its relevance and utility to both the Commission and the employers who file it. Over the years, EEAC frequently has been the only organization to submit public comments in response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1

177

JA022

OMB_0000305

Hon. Mick Mulvaney
March 20, 2017
Page 2

Report under the PRA.[1] And for more than four decades, we have worked and communicated less formally with Commission staff to resolve practical concerns regarding the EEO-1 reporting process in ways that benefitted both the Commission and employers.

EEAC also has a long history of researching and providing feedback on other federal agency initiatives to collect compensation data from employers on a broader scale, including those implemented or proposed by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). These include OFCCP's Equal Opportunity Survey, which collected summary compensation data from a sample of federal contractors during a five-year period between 2000 and 2004,[2] as well as OFCCP's more recent proposed Equal Pay Report.[3]

EEAC was actively engaged with both the EEOC and OMB as the EEOC sought to revise the EEO-1 Report in 2016. EEAC testified at a public hearing held by the EEOC and submitted formal comments with both the EEOC and OMB during the review process called for under the PRA. EEAC staff and members also met with OMB to express the practical concerns of our member companies about the EEOC's then-proposed revisions.

**Summary of 2016 Revisions and Employer Concerns**

Last year, the EEOC proposed, and the Obama Administration's OMB subsequently approved, significant and expansive revisions to the EEO-1 Report. Under the current version of the EEO-1, employers are required to report establishment headcount on a data grid of 180 data fields. These data fields include 10 job categories, two gender categories, and seven race and ethnicity categories, along with various subtotal and total columns. The revised EEO-1 significantly expands the report in an effort to capture summary data regarding compensation. The revised form also seeks data regarding hours worked, which the EEOC argued were necessary to make the headcount and compensation data more meaningful.

The EEOC's revisions to the EEO-1 now increase the total number of data fields for each establishment from 180 to 3,660. This is the result of: (1) adding 12 pay bands within each job category, requiring employers to report establishment headcount by pay band, job category, gender, and race/ethnicity (a total of 1,830 data fields); and (2) adding a section requiring hours worked data to be reported on a similar "grid" (a total of an additional 1,830 data fields).

Using conservative estimates on the total number of employer establishments subject to the EEO-1 Report requirement, and as detailed in our prior comments to OMB, the revised EEO-

---

[1] See, for example, the supporting documents maintained by the Office of Management and Budget related to EEOC's 2014, 2011, and 2009 information collection requests for approval of the EEO-1 Report, available at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001, http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201104-3046-003, and http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200901-3046-001.
[2] OFCCP formally repealed the EO survey in 2006. Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors, Equal Opportunity Survey, 71 Fed. Reg. 53,032 (Sept. 8, 2006).
[3] Office of Federal Contract Compliance Programs, Notice of Proposed Rulemaking, Government Contractors, Requirement to Report Summary Data on Employee Classification, 79 Fed. Reg. 46,561 (Aug. 8, 2014).

OMB_0000306

Hon. Mick Mulvaney
March 20, 2017
Page 3

1 Report will require covered employers to annually report to the EEOC nearly *3 billion* data fields to describe a covered private-sector workforce of only approximately 76 million employees

Moreover, through the EEOC's public hearing and comment process under the PRA, EEAC, and many other employer groups, raised serious concerns about the EEOC's proposed revisions beyond simply the sheer size of the new reporting burden. These concerns were based on prior experience with the government's collection of compensation data and the actual, firsthand experience of employers in conducting self-critical compensation analyses. These concerns can be very generally summarized as falling within three categories. First, we respectfully submit the data would be of low utility, meaning that it is highly unlikely to be of real help in identifying unlawful or improper pay practices. Second, the revisions will be tremendously burdensome to implement, and these burdens simply cannot be justified by any potential benefit. Finally, confidentiality concerns regarding the disclosure of potentially sensitive compensation data have not been properly addressed. We also expressed dismay that the EEOC for all intents and purposes chose to ignore the recommendations made in a 2012 report that the agency commissioned from the National Academy of Sciences, titled "Collecting Compensation Data From Employers" (NAS Report).[4]

EEAC's detailed concerns with the EEOC's expansive changes to the EEO-1 are expressed in our testimony and public comments on the revisions.[5]

## OMB's Authority Under the Paperwork Reduction Act

Among other things, the PRA's paperwork clearance process is designed to minimize the burdens and maximize the utility of information collected by the federal government.[6] OMB, and in particular, the Office of Information and Regulatory Affairs (OIRA), are charged with ensuring that agency information collection requests comply with these goals. While there is considerable attention paid to the role of agencies in developing information collection requests, and that of OIRA in reviewing and approving requests, the approval of an information collection request and assignment of an OMB control number is not the end of the process.

This is explicitly recognized in OMB's regulations implementing the PRA. These rules allow OMB, on its own initiative, to review a previously approved collection of information before the expiration of its control number.[7] These regulations permit such a review "when

---

[4] The NAS Report is available at: https://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.

[5] EEAC's March 16, 2016 testimony as prepared for delivery before the EEOC is available at: http://www.eeac.org/public/EEO-1%20Testimony%203-16-16.pdf. Note that the EEOC has not made the transcript of the hearing or the video recording publicly available. EEAC's comments made in response to the EEOC's 60-day notice are available at: http://www.eeac.org/public/Proposed%20EEO-1%20Revisions.pdf. EEAC's comments made in response to the 30-day notice are available at: http://www.eeac.org/public/EEAC_EEO-1_Comments.pdf.

[6] See, for example, the House Committee on Government Reform and Oversight's report accompanying the Paperwork Reduction Act, H.R..Rep. No. 37, 104th Cong., 1st Sess., 24 (1995).

[7] These regulations are codified at 5 CFR § 1320.10(f) for clearances other than those in proposed rules or current rules and at 5 CFR § 1320.12(i) for clearances in current rules.

JA024

OMB_0000307

Hon. Mick Mulvaney
March 20, 2017
Page 4

relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."

OMB elaborated on this authority in the preamble to its regulations implementing the PRA:

> Several agencies have questioned the authority of OMB to reconsider approval of collections of information in advance of the expiration date. This authority derives, in part, from OMB's authority to determine the duration of approval, up to a three year maximum. OMB is not obligated to set a fixed and unchanging date for expiration of approval. Rather, as a result of this rule and OMB practice, all expiration dates are expressly conditioned upon OMB's right to reconsider at a later date. Such reconsiderations are not common, but have occurred as the occasion has arisen. This has been the established practice both under the Act and under its predecessor, the Federal Reports Act. Nothing in the language or legislative history of the Paperwork Reduction Act indicates that Congress intended to cut back on OMB's well-established authority under the Federal Reports Act to reconsider approvals of collections of information in advance of the expiration date.[8]

For the reasons described below, EEAC respectfully urges OMB to exercise this authority and initiate a new review of the EEOC's expanded EEO-1 Report. OMB's regulations speak directly to OMB initiating a review in two circumstances: where the burden estimates submitted by the agency were in material error or where circumstances have changed. Both apply in this case.[9]

**The Burden Estimates Provided by the EEOC Were in Material Error**

The EEOC's burden estimate for the revisions to the EEO-1 Report were made in material error in several important respects. As summarized below, the estimates were based on a new and highly inaccurate methodology for calculating then-existing EEO-1 reporting burdens. The inaccuracies were relied upon, and multiplied, as the EEOC calculated burdens under its proposed revisions. In addition, the EEOC significantly underestimated the time that would be needed to develop or program systems for reporting. Finally, the EEOC's estimates did not appropriately consider the input from affected employers about the likely true cost of compliance.

<u>The EEOC's Estimates Were Based on Faulty Assessment of Prior EEO-1 Reporting Burdens</u>

The EEOC's burden estimates for its revisions were primarily based on burden estimates of compliance with the then-current EEO-1 Report.  While Component 1 of the revised report

---

[8] Office of Management and Budget, *Controlling Paperwork Burdens on the Public*, Notice of Proposed Rulemaking, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).
[9] This letter summarizes concerns regarding EEOC's burden estimates that were in material error and on changed circumstances because those conditions are directly referenced in OMB's regulations. Our concerns regarding low utility and confidentiality are equally valid today as when we commented on the EEOC's proposal last year.

OMB_0000308

Hon. Mick Mulvaney
March 20, 2017
Page 5

includes the same data grid as the old report, the EEOC did not use the same methodology as it had in the past. Instead, it changed the methodology in a way that dramatically understates the cost of compliance.

More specifically, in prior years, the EEOC estimated that employers would take an average of 3.4 hours per establishment to complete each report, an estimate that we believe was too low based on feedback from our member companies. EEAC's members reported that completing the old EEO-1 Report takes between 3.8 and 10.2 hours per establishment. Another association—that had surveyed 50 of its member companies—commented on the burdens of the old report and estimated an average of 6.6 hours per establishment. Rather than adjust its estimate upward, the EEOC instead concluded that completing the old report, and Component 1 of the new report, takes less time—just one hour per establishment (plus eight hours per company regardless of the number of reports filed). The EEOC largely gave no credence to the numerous comments made by employers about EEO-1 reporting burdens, and instead relied heavily on "its own experience" and untested assumptions about compliance costs.

The Inaccuracies Were Multiplied, and Relied Upon, in Determining Burdens Imposed by the Revisions

Component 2 of the new EEO-1 Report is the component that includes the new data collection of summary compensation data and hours worked data. The EEOC estimates that the reporting burden for completing Component 2 of the new report will increase reporting burdens by 90 percent. Like a house of cards, the EEOC's estimates regarding Component 2 fail for no other reason than its estimates of Component 1 are without sufficient foundation. However, even if the agency's Component 1 estimates are somehow considered adequate, EEOC provided no basis for its  calculation that the burden of submitting the revised data would be "90 percent more" other than to say it was "[b]ased on information received during the comment period."[10] This cursory explanation is simply insufficient to meet the standards of the PRA.

The EEOC Dramatically Underestimated the Time To Develop or Program Systems for Reporting

The EEOC did not account for necessary changes that must be made to employer systems and programs in order to comply with the revisions other than including a one-time implementation burden of eight hours per employer. EEOC described this estimate as a "one-time cost for developing queries related to Component 2 in an existing HRIS."[11] The EEOC did not consider any other programming changes that may be necessary (such as queries to payroll systems for W-2 data and the ability to link that data with employee lists generated from the separate HRIS) and disregarded employer comments detailing the considerable time, processes, and people that are involved in making even relatively minor changes in data systems maintained by large employers.

---

[10] 81 Fed. Reg. at 45,494.
[11] 81 Fed. Reg. at 45,497.

JA026

OMB_0000309

Hon. Mick Mulvaney
March 20, 2017
Page 6

        In sum, the EEOC's PRA burden estimates submitted to OMB are based on inaccurate
assumptions rather than a careful and objective attempt to measure actual compliance costs. They
also inappropriately ignore the comments of stakeholders with more experience at making
systems changes. We believe it is incumbent upon OMB to reconsider its approval of the EEO-1
Report to address these material errors.

**Relevant Circumstances Have Changed**

        In addition to the EEOC's grossly inaccurate and arbitrary assessment of the burdens
imposed by its revisions, the agency has now provided additional information since OMB
approved the revised EEO-1 that warrant OMB review.   In particular, the EEOC has now
published the data file specifications that employers are to use if they utilize the data file
option.[12]

        The EEOC's data file specifications indicate that the agency expects that employers will
create a spreadsheet looking nothing like the approved EEO-1 Report. Instead of two grids of
1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that
the EEOC expects employers to create a spreadsheet where all establishment data are included in
a single row of 27,934 characters. Employers with multiple establishments are to include each
establishment as a separate row of 27,934 characters. After creating this spreadsheet, employers
are required to convert the file to a CSV (comma separated value) file for upload.

        Nowhere in the EEOC's 60-day notice, 30-day notice, or relevant supporting materials
does EEOC describe how employers are to create this spreadsheet or the burdens that will be
imposed in doing so other than the general burden estimates described above. As a result, the
EEOC's partial data file specifications raise several questions that have not been adequately
addressed and warrant further review by OMB. These include the following.

- What software is capable of creating the file required by the EEOC?
- What software has the EEOC tested its data file specifications on?
- What are the limitations of the software? Is it expensive? Is it easy to manipulate and
  control for errors? What type of expertise or training is needed to use it? Is it easy to
  integrate with existing payroll and HRIS systems?
- How large will data files be?
- Will there be challenges in transmitting the data due to large file size or for other
  reasons?
- How does the EEOC envision that employers will create the required spreadsheet? Does
  the EEOC expect that employers will first create two data grids of 1,830 data fields for
  each establishment that are then converted to the required format or do they anticipate
  that software will pull data directly from HRIS and payroll systems into the required
  format?

---

[12] The data file specifications are available on the EEOC's website at:
https://www.eeoc.gov/employers/eeo1survey/2017-data-file-layout.cfm.

JA027

OMB_0000310

Hon. Mick Mulvaney
March 20, 2017
Page 7

- How difficult will it be for employers to control errors when working with a spreadsheet that contains one row of 27,934 characters of data for every one of their covered locations?

The questions generated by the EEOC's release of partial data file specifications, which occurred after OMB approved the revisions to the EEO-1 Report, by themselves provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**OMB Review Will Permit Needed Consideration of Better Alternatives and Reduce Compliance Burdens**

In addition to the reasons presented above, we also respectfully submit that OMB's reconsideration of the revisions to the EEO-1 Report will permit the EEOC and OMB to take a fresh look at alternatives that the EEOC did not seriously consider in drafting its revisions. We strongly recommend that any review of alternatives begin with the 2012 recommendations made by the National Academy of Sciences and summarized at length in our earlier comments on this matter. In addition, we strongly urge any new revisions to be subject to a pilot test among a representative sample of actual employers so that the EEOC's assumptions about burden collection and data utility, among others, can be tested.

As to the timing of review, it should be noted that employers have already begun assessing what changes must be made in order to comply with the EEOC's revisions before the March 2018 reporting deadline. While the EEOC may choose to take a fresh look at the EEO-1 revisions after the president makes two additional nominations later this year, it will likely be several months before the agency is in a position to undertake such a review. OMB has the ability to start that review today and by doing so will mitigate the burdens imposed on employers who have already begun to develop plans to modify appropriate systems.

**Conclusion**

For the compelling reasons presented in these comments, EEAC urges OMB to reconsider its prior approval of the 2016 revisions to the EEO-1 Report and immediately initiate a new review of the information collection request. Please do not hesitate to contact me if EEAC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Public Policy

OMB_0000311

| **From:** | Nye, Joseph B. EOP/OMB |
|---|---|
| **Sent:** | Friday, July 21, 2017 3:00 PM |
| **To:** | Campau, Anthony P. EOP/OMB; Mancini, Dominic J. EOP/OMB; Theroux, Rich P. EOP/OMB |
| **Subject:** | FW: CWC letter requesting reconsideration of EEO-1 Report |
| **Attachments:** | CWC ltr to OIRA re EEO-1 7-21-17 FINAL.pdf |

FYI, we had previously seen this letter when it was sent to Mick.

**From:** Michael Eastman - EEAC [mailto:meastman@eeac.org]
**Sent:** Friday, July 21, 2017 2:46 PM
**To:** Rao, Neomi J. EOP/OMB
**Cc:** Nye, Joseph B. EOP/OMB
**Subject:** CWC letter requesting reconsideration of EEO-1 Report

Administrator Rao:

Attached please find a letter from the Center for Workplace Compliance (formerly the Equal Employment Advisory Council) requesting reconsideration of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007).

Please do not hesitate to contact me if we can be of assistance in this matter.

Michael J. Eastman
Vice President, Policy and Assistant General Counsel
Center for Workplace Compliance
1501 M Street NW | Suite 400
Washington, DC 20005
202.629.5650 (p) | 202.629.5651 (f)
>www.cwc.org<

1

OMB_0000312



1501 M Street, NW | Suite 1000 | Washington, DC 20005     TEL: (202) 629-5650     FAX: (202) 629-5651     www.cwc.org

VIA ELECTRONIC MAIL

July 21, 2017

Hon. Neomi Rao
Administrator, Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

**Re:** **Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007)**

Dear Administrator Rao:

On behalf of the Center for Workplace Compliance (CWC), I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act to review the Equal Employment Opportunity Commission's (EEOC) previously approved collection of information commonly known as the Employer Information (EEO-1) Report. As explained in the attached letter, we respectfully request that OMB immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

The Center for Workplace Compliance, which recently changed its name from the Equal Employment Advisory Council (EEAC), has a long history of working with the EEOC and OMB to ensure that the EEO-1 Report maintains its relevance and utility to both the EEOC and the employers who file it. We look forward to continuing this work with you.

Please do not hesitate to contact me if CWC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Policy and Assistant General Counsel

OMB_0000313

EQUAL EMPLOYMENT
ADVISORY COUNCIL

SUITE 400
1501 M STREET, NW
WASHINGTON, DC 20005

TEL 202/629-5650
FAX 202/629-5651

March 20, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street NW
Washington, DC 20503

### Re: Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007)

Dear Director Mulvaney:

On behalf of the Equal Employment Advisory Council, I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act (PRA) to review the Equal Employment Opportunity Commission's (EEOC's) previously approved collection of information commonly known as the Employer Information (EEO-1) Report (OMB Control Number 3046-0007). As explained in more detail below, we respectfully urge OMB to immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

**Statement of Interest**

The Equal Employment Advisory Council (EEAC) is the nation's largest nonprofit association of employers dedicated to the advancement of practical and effective programs to eliminate employment discrimination. Formed in 1976, EEAC's membership includes approximately 260 of the nation's leading and largest employers, all of which are firmly committed to the principles and practice of workplace nondiscrimination. All of our members are employers subject to the compliance, recordkeeping, and reporting requirements imposed by federal statutes and regulations prohibiting workplace discrimination. In addition, nearly all of our members are federal contractors subject to the additional recordkeeping, reporting, and compliance requirements imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and their implementing regulations.

EEAC has a long track record of working closely with the EEOC to ensure that the EEO-1 Report maintains its relevance and utility to both the Commission and the employers who file it. Over the years, EEAC frequently has been the only organization to submit public comments in response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1

OMB_0000314

Hon. Mick Mulvaney
March 20, 2017
Page 2

Report under the PRA.[1] And for more than four decades, we have worked and communicated less formally with Commission staff to resolve practical concerns regarding the EEO-1 reporting process in ways that benefitted both the Commission and employers.

EEAC also has a long history of researching and providing feedback on other federal agency initiatives to collect compensation data from employers on a broader scale, including those implemented or proposed by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). These include OFCCP's Equal Opportunity Survey, which collected summary compensation data from a sample of federal contractors during a five-year period between 2000 and 2004,[2] as well as OFCCP's more recent proposed Equal Pay Report.[3]

EEAC was actively engaged with both the EEOC and OMB as the EEOC sought to revise the EEO-1 Report in 2016. EEAC testified at a public hearing held by the EEOC and submitted formal comments with both the EEOC and OMB during the review process called for under the PRA. EEAC staff and members also met with OMB to express the practical concerns of our member companies about the EEOC's then-proposed revisions.

**Summary of 2016 Revisions and Employer Concerns**

Last year, the EEOC proposed, and the Obama Administration's OMB subsequently approved, significant and expansive revisions to the EEO-1 Report. Under the current version of the EEO-1, employers are required to report establishment headcount on a data grid of 180 data fields. These data fields include 10 job categories, two gender categories, and seven race and ethnicity categories, along with various subtotal and total columns. The revised EEO-1 significantly expands the report in an effort to capture summary data regarding compensation. The revised form also seeks data regarding hours worked, which the EEOC argued were necessary to make the headcount and compensation data more meaningful.

The EEOC's revisions to the EEO-1 now increase the total number of data fields for each establishment from 180 to 3,660. This is the result of: (1) adding 12 pay bands within each job category, requiring employers to report establishment headcount by pay band, job category, gender, and race/ethnicity (a total of 1,830 data fields); and (2) adding a section requiring hours worked data to be reported on a similar "grid" (a total of an additional 1,830 data fields).

Using conservative estimates on the total number of employer establishments subject to the EEO-1 Report requirement, and as detailed in our prior comments to OMB, the revised EEO-

---

[1] See, for example, the supporting documents maintained by the Office of Management and Budget related to EEOC's 2014, 2011, and 2009 information collection requests for approval of the EEO-1 Report, available at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001, http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201104-3046-003, and http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200901-3046-001.
[2] OFCCP formally repealed the EO survey in 2006. Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors, Equal Opportunity Survey, 71 Fed. Reg. 53,032 (Sept. 8, 2006).
[3] Office of Federal Contract Compliance Programs, Notice of Proposed Rulemaking, Government Contractors, Requirement to Report Summary Data on Employee Classification, 79 Fed. Reg. 46,561 (Aug. 8, 2014).

OMB_0000315

Hon. Mick Mulvaney
March 20, 2017
Page 3

1 Report will require covered employers to annually report to the EEOC nearly *3 billion* data fields to describe a covered private-sector workforce of only approximately 76 million employees

Moreover, through the EEOC's public hearing and comment process under the PRA, EEAC, and many other employer groups, raised serious concerns about the EEOC's proposed revisions beyond simply the sheer size of the new reporting burden. These concerns were based on prior experience with the government's collection of compensation data and the actual, firsthand experience of employers in conducting self-critical compensation analyses. These concerns can be very generally summarized as falling within three categories. First, we respectfully submit the data would be of low utility, meaning that it is highly unlikely to be of real help in identifying unlawful or improper pay practices. Second, the revisions will be tremendously burdensome to implement, and these burdens simply cannot be justified by any potential benefit. Finally, confidentiality concerns regarding the disclosure of potentially sensitive compensation data have not been properly addressed. We also expressed dismay that the EEOC for all intents and purposes chose to ignore the recommendations made in a 2012 report that the agency commissioned from the National Academy of Sciences, titled "Collecting Compensation Data From Employers" (NAS Report).[4]

EEAC's detailed concerns with the EEOC's expansive changes to the EEO-1 are expressed in our testimony and public comments on the revisions.[5]

**OMB's Authority Under the Paperwork Reduction Act**

Among other things, the PRA's paperwork clearance process is designed to minimize the burdens and maximize the utility of information collected by the federal government.[6] OMB, and in particular, the Office of Information and Regulatory Affairs (OIRA), are charged with ensuring that agency information collection requests comply with these goals. While there is considerable attention paid to the role of agencies in developing information collection requests, and that of OIRA in reviewing and approving requests, the approval of an information collection request and assignment of an OMB control number is not the end of the process.

This is explicitly recognized in OMB's regulations implementing the PRA. These rules allow OMB, on its own initiative, to review a previously approved collection of information before the expiration of its control number.[7] These regulations permit such a review "when

---

[4] The NAS Report is available at: https://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.

[5] EEAC's March 16, 2016 testimony as prepared for delivery before the EEOC is available at: http://www.eeac.org/public/EEO-1%20Testimony%203-16-16.pdf. Note that the EEOC has not made the transcript of the hearing or the video recording publicly available. EEAC's comments made in response to the EEOC's 60-day notice are available at: http://www.eeac.org/public/Proposed%20EEO-1%20Revisions.pdf. EEAC's comments made in response to the 30-day notice are available at: http://www.eeac.org/public/EEAC_EEO-1_Comments.pdf.

[6] See, for example, the House Committee on Government Reform and Oversight's report accompanying the Paperwork Reduction Act, H.R..Rep. No. 37, 104th Cong., 1st Sess., 24 (1995).

[7] These regulations are codified at 5 CFR § 1320.10(f) for clearances other than those in proposed rules or current rules and at 5 CFR § 1320.12(i) for clearances in current rules.

OMB_0000316

Hon. Mick Mulvaney
March 20, 2017
Page 4

relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."

OMB elaborated on this authority in the preamble to its regulations implementing the PRA:

> Several agencies have questioned the authority of OMB to reconsider approval of collections of information in advance of the expiration date. This authority derives, in part, from OMB's authority to determine the duration of approval, up to a three year maximum. OMB is not obligated to set a fixed and unchanging date for expiration of approval. Rather, as a result of this rule and OMB practice, all expiration dates are expressly conditioned upon OMB's right to reconsider at a later date. Such reconsiderations are not common, but have occurred as the occasion has arisen. This has been the established practice both under the Act and under its predecessor, the Federal Reports Act. Nothing in the language or legislative history of the Paperwork Reduction Act indicates that Congress intended to cut back on OMB's well-established authority under the Federal Reports Act to reconsider approvals of collections of information in advance of the expiration date.[8]

For the reasons described below, EEAC respectfully urges OMB to exercise this authority and initiate a new review of the EEOC's expanded EEO-1 Report. OMB's regulations speak directly to OMB initiating a review in two circumstances: where the burden estimates submitted by the agency were in material error or where circumstances have changed. Both apply in this case.[9]

**The Burden Estimates Provided by the EEOC Were in Material Error**

The EEOC's burden estimate for the revisions to the EEO-1 Report were made in material error in several important respects. As summarized below, the estimates were based on a new and highly inaccurate methodology for calculating then-existing EEO-1 reporting burdens. The inaccuracies were relied upon, and multiplied, as the EEOC calculated burdens under its proposed revisions. In addition, the EEOC significantly underestimated the time that would be needed to develop or program systems for reporting. Finally, the EEOC's estimates did not appropriately consider the input from affected employers about the likely true cost of compliance.

<u>The EEOC's Estimates Were Based on Faulty Assessment of Prior EEO-1 Reporting Burdens</u>

The EEOC's burden estimates for its revisions were primarily based on burden estimates of compliance with the then-current EEO-1 Report.  While Component 1 of the revised report

---

[8] Office of Management and Budget, *Controlling Paperwork Burdens on the Public*, Notice of Proposed Rulemaking, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).

[9] This letter summarizes concerns regarding EEOC's burden estimates that were in material error and on changed circumstances because those conditions are directly referenced in OMB's regulations. Our concerns regarding low utility and confidentiality are equally valid today as when we commented on the EEOC's proposal last year.

OMB_0000317

Hon. Mick Mulvaney
March 20, 2017
Page 5

includes the same data grid as the old report, the EEOC did not use the same methodology as it had in the past. Instead, it changed the methodology in a way that dramatically understates the cost of compliance.

More specifically, in prior years, the EEOC estimated that employers would take an average of 3.4 hours per establishment to complete each report, an estimate that we believe was too low based on feedback from our member companies. EEAC's members reported that completing the old EEO-1 Report takes between 3.8 and 10.2 hours per establishment. Another association—that had surveyed 50 of its member companies—commented on the burdens of the old report and estimated an average of 6.6 hours per establishment. Rather than adjust its estimate upward, the EEOC instead concluded that completing the old report, and Component 1 of the new report, takes less time—just one hour per establishment (plus eight hours per company regardless of the number of reports filed). The EEOC largely gave no credence to the numerous comments made by employers about EEO-1 reporting burdens, and instead relied heavily on "its own experience" and untested assumptions about compliance costs.

The Inaccuracies Were Multiplied, and Relied Upon, in Determining Burdens Imposed by the Revisions

Component 2 of the new EEO-1 Report is the component that includes the new data collection of summary compensation data and hours worked data. The EEOC estimates that the reporting burden for completing Component 2 of the new report will increase reporting burdens by 90 percent. Like a house of cards, the EEOC's estimates regarding Component 2 fail for no other reason than its estimates of Component 1 are without sufficient foundation. However, even if the agency's Component 1 estimates are somehow considered adequate, EEOC provided no basis for its calculation that the burden of submitting the revised data would be "90 percent more" other than to say it was "[b]ased on information received during the comment period."[10] This cursory explanation is simply insufficient to meet the standards of the PRA.

The EEOC Dramatically Underestimated the Time To Develop or Program Systems for Reporting

The EEOC did not account for necessary changes that must be made to employer systems and programs in order to comply with the revisions other than including a one-time implementation burden of eight hours per employer. EEOC described this estimate as a "one-time cost for developing queries related to Component 2 in an existing HRIS."[11] The EEOC did not consider any other programming changes that may be necessary (such as queries to payroll systems for W-2 data and the ability to link that data with employee lists generated from the separate HRIS) and disregarded employer comments detailing the considerable time, processes, and people that are involved in making even relatively minor changes in data systems maintained by large employers.

---

[10] 81 Fed. Reg. at 45,494.
[11] 81 Fed. Reg. at 45,497.

JA035

OMB_0000318

Hon. Mick Mulvaney
March 20, 2017
Page 6

In sum, the EEOC's PRA burden estimates submitted to OMB are based on inaccurate assumptions rather than a careful and objective attempt to measure actual compliance costs. They also inappropriately ignore the comments of stakeholders with more experience at making systems changes. We believe it is incumbent upon OMB to reconsider its approval of the EEO-1 Report to address these material errors.

**Relevant Circumstances Have Changed**

In addition to the EEOC's grossly inaccurate and arbitrary assessment of the burdens imposed by its revisions, the agency has now provided additional information since OMB approved the revised EEO-1 that warrant OMB review.  In particular, the EEOC has now published the data file specifications that employers are to use if they utilize the data file option.[12]

The EEOC's data file specifications indicate that the agency expects that employers will create a spreadsheet looking nothing like the approved EEO-1 Report. Instead of two grids of 1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that the EEOC expects employers to create a spreadsheet where all establishment data are included in a single row of 27,934 characters. Employers with multiple establishments are to include each establishment as a separate row of 27,934 characters. After creating this spreadsheet, employers are required to convert the file to a CSV (comma separated value) file for upload.

Nowhere in the EEOC's 60-day notice, 30-day notice, or relevant supporting materials does EEOC describe how employers are to create this spreadsheet or the burdens that will be imposed in doing so other than the general burden estimates described above. As a result, the EEOC's partial data file specifications raise several questions that have not been adequately addressed and warrant further review by OMB. These include the following.

- What software is capable of creating the file required by the EEOC?
- What software has the EEOC tested its data file specifications on?
- What are the limitations of the software? Is it expensive? Is it easy to manipulate and control for errors? What type of expertise or training is needed to use it? Is it easy to integrate with existing payroll and HRIS systems?
- How large will data files be?
- Will there be challenges in transmitting the data due to large file size or for other reasons?
- How does the EEOC envision that employers will create the required spreadsheet? Does the EEOC expect that employers will first create two data grids of 1,830 data fields for each establishment that are then converted to the required format or do they anticipate that software will pull data directly from HRIS and payroll systems into the required format?

---

[12] The data file specifications are available on the EEOC's website at:
https://www.eeoc.gov/employers/eeo1survey/2017-data-file-layout.cfm.

JA036

OMB_0000319

Hon. Mick Mulvaney
March 20, 2017
Page 7

- How difficult will it be for employers to control errors when working with a spreadsheet that contains one row of 27,934 characters of data for every one of their covered locations?

The questions generated by the EEOC's release of partial data file specifications, which occurred after OMB approved the revisions to the EEO-1 Report, by themselves provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**OMB Review Will Permit Needed Consideration of Better Alternatives and Reduce Compliance Burdens**

In addition to the reasons presented above, we also respectfully submit that OMB's reconsideration of the revisions to the EEO-1 Report will permit the EEOC and OMB to take a fresh look at alternatives that the EEOC did not seriously consider in drafting its revisions. We strongly recommend that any review of alternatives begin with the 2012 recommendations made by the National Academy of Sciences and summarized at length in our earlier comments on this matter. In addition, we strongly urge any new revisions to be subject to a pilot test among a representative sample of actual employers so that the EEOC's assumptions about burden collection and data utility, among others, can be tested.

As to the timing of review, it should be noted that employers have already begun assessing what changes must be made in order to comply with the EEOC's revisions before the March 2018 reporting deadline. While the EEOC may choose to take a fresh look at the EEO-1 revisions after the president makes two additional nominations later this year, it will likely be several months before the agency is in a position to undertake such a review. OMB has the ability to start that review today and by doing so will mitigate the burdens imposed on employers who have already begun to develop plans to modify appropriate systems.

**Conclusion**

For the compelling reasons presented in these comments, EEAC urges OMB to reconsider its prior approval of the 2016 revisions to the EEO-1 Report and immediately initiate a new review of the information collection request. Please do not hesitate to contact me if EEAC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Public Policy

JA037

OMB_0000320

**CHAMBER OF COMMERCE**

OF THE

**UNITED STATES OF AMERICA**

1615 H STREET, N.W.
WASHINGTON, D.C.  20062
202/463-5522

**RANDEL K. JOHNSON**
SENIOR VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

**JAMES PLUNKETT**
DIRECTOR
LABOR LAW POLICY

February 27, 2017

**Via Email,**

John M. Mulvaney
Director
Office of Management and Budget
725 17th Street NW
Washington, D.C. 20503

## RE: Request for Review; EEOC's Revision of the Employer Information Report

Dear Director Mulvaney:

On behalf of the U.S. Chamber of Commerce (Chamber), the world's largest business federation, representing the interests of more than three million businesses and organizations of every size, sector, and region, we are writing to request your review under Section 3517 of the Paperwork Reduction Act (PRA) and the PRA's implementing regulations (5 CFR 1320.10(f)) of the Equal Employment Opportunity Commission's (EEOC or Commission) revisions to the EEO-1 Form, as proposed at 81 Fed. Reg. 5113 (February 1, 2016) and 81 Fed Reg. 45479 (July 14, 2016), and approved by OMB's Office of Information and Regulatory Affairs (OIRA) on October 18, 2016 (ICR number 201610-3046-001).[1]

In short, the Chamber requests OMB to review and reject the EEOC's revisions to the EEO-1 Form because they do not comply with the PRA as detailed below and in the Chamber's prior submissions to both EEOC and OMB. The EEOC has not met its requirement to satisfy the burden, benefit, or confidentiality prerequisites of the PRA. For example, the EEOC has grossly understated the

---

[1] The U.S. Chamber of Commerce is also an employer which must file the revised EEO-1 Report.

1

OMB_0000332

burden based on conjecture, as opposed to data, at $53.5 million per year.  In contrast, the Chamber's 2016 survey of over 50 companies with 100 or more employees demonstrates that that cost of the EEOC's revised EEO-1 is in excess of $400 million in pure labor costs alone, and carries a total burden of 1.3 billion per year for all businesses employing 100 or more employees.  This is a huge additional cost for companies of all sizes, yet has no accompanying benefit, or protections for the confidentiality of the information to be gathered under the revised government form.

Although reporting of the new information does not begin for approximately one year, employers are already making the necessary investments in software upgrades, internal reporting processes, and staffing needs in order to comply.  Therefore, as discussed in greater detail below, pursuant to Section 3517 of the PRA and 5 CFR 1320.10(f) and (g), the Chamber requests that OMB review and stay the effectiveness of, or rescind, the EEOC's revised EEO-1 as quickly as possible, as businesses are already incurring unnecessary expenses to compile 2017 data solely as a result of the requirements of the revised EEO-1.

## I.      Circumstances Leading to the EEO-1 Changes

Lawmakers on Capitol Hill and regulators in federal agencies such as the Department of Labor have long sought to force employers to report on their compensation practices.[2]  These efforts have been largely unsuccessful because none have been shown to result in the production of data relevant to the current practices in the workplace and have been shown to place a tremendous and unnecessary burden on employers.  As part of the most recent attempt during the Obama administration to collect employee salary information from employers, in 2014 the Office of Federal Contract Compliance Programs (OFCCP) issued a proposed regulation known as the compensation data collection tool.[3]  The comment period for OFCCP's proposal closed in early 2015 and the rulemaking process stalled – the proposal is currently listed as a "Long-Term Action" on the Fall 2016 regulatory agenda.

When OFCCP's effort failed – likely because the agency recognized its uselessness or otherwise knew its proposal could not pass muster under the

---

[2] For example, OFCCP's Equal Opportunity survey instrument, which began in 2000, similarly collected pay data from federal contractors.  This survey was scrapped six years later due to ineffectiveness.  Additionally, an often-forgotten component of the failed Paycheck Fairness Act would have resuscitated the fruitless EO survey.
[3] 79 Fed. Reg. 46562 (August 8, 2014).

OMB_0000333

Administrative Procedure Act ("APA") – the administration turned elsewhere to meet its quest for employee compensation data.  This time, EEOC assumed the mission and proposed revising its existing EEO-1 form to include data on employee compensation and hours worked.[4]  In order to avoid the more complex obligations under the APA, the EEOC determined that the revisions to the EEO-1 would be examined under the PRA.  Importantly, the PRA process does not provide the public with rulemaking protections as under the APA, such as a right to petition a federal court to review the agency's action.  The lack of judicial review under the PRA is a primary reason why OMB review of EEOC's changes to its EEO-1 form is so vital.

## II.     EEOC's Changes to the EEO-1 Reporting Form

The EEO-1 form requires employers and certain federal contractors to report on the demographics of their workforce.  From time to time the form has been updated to reflect the changing demographics in our country.  On February 1, 2016, the EEOC published a proposed revision to its EEO-1 reporting form. The changes would require every employer with 100 employees or more to submit not just demographic information, but also the W-2 wages and hours worked for all of their employees grouped in broad EEO-1 job categories, subdivided into twelve pay bands.

After a public hearing at EEOC as well as a public comment period, on July 14, 2016, the EEOC submitted its final proposal for revisions to the EEO-1 Form to OMB.[5]  Aside from changing the yearly reporting date to more closely align with the W-2 year and extending the initial reporting due date by six months, little substantive changes were made.  After the PRA-required 30-day comment period at OMB, EEOC announced these changes as final on September 29, 2016, though the completed Notice of Action was not authorized by former OIRA Administrator Howard Shelanski until October 18, 2016.  No EEO-1 filing will be required for 2017, but covered employers will have to file the new EEO-1 reports by the end of March 2018.

---

[4] 81 Fed. Reg. 5113 (February 1, 2016).
[5] Camille Olson, partner at Seyfarth Shaw and chair of the Chamber's Equal Employment Opportunity Subcommittee, presented testimony on behalf of the Chamber at this hearing. Additionally, the Chamber submitted comprehensive and substantive comments to the EEOC on April 1, 2016 noting that the EEOC's proposal failed to satisfy the PRA.  The Chamber also presented critical comments to OMB on August 15, 2016.

OMB_0000334

### III.    The PRA Permits Rescission of Previously Approved Collections

Section 3517(b) of the PRA allows OMB to "review any collection of information conducted by or for an agency to determine, if . . . a person shall maintain, provide or disclose the information to or for the agency."  In turn, Section 3517(b)(2) permits OMB to "take appropriate remedial action, if necessary." Further, in the regulations promulgated pursuant to the PRA, 5 CFR Part 1320, OMB is required to review its approval in the case of changed circumstances or when the burden estimates provided by the agency at the time of initial submission were materially in error.  *See* 5 CFR 1320.10(f).  If such circumstances are present, OMB may stay the effectiveness of its prior approval.

As demonstrated in further detail below, EEOC's burden estimates for compliance with the revised EEO-1 report were materially in error and OMB therefore erred in approving EEOC's revisions to its EEO-1 form.  Given the broad remedial powers under Section 3517(b)(2) and 5 CFR 1320.10(g), the proper remedy in this situation is for OMB to either stay the effectiveness of its prior approval of the information collection, or otherwise rescind the OMB Control Number (3046-0007) until EEOC demonstrates that its proposal satisfies the burden, benefit, and confidentiality standards of the PRA.

### IV.    The EEOC Never Satisfied the Requirements of the PRA

When the federal government seeks to collect information from the public, the PRA requires the issuing agency to: (1) minimize the burden on those required to comply with government requests; (2) maximize the utility of the information being sought; and (3) ensure that the information provided is subject to appropriate confidentiality and privacy protections.  EEOC failed to meet *all* of these standards throughout the entirety of the process that resulted in the changes to the EEO-1 form.

- Burden.  EEOC failed to accurately or adequately address the burden being placed on filers by the revised EEO-1 report, thereby ignoring the PRA statutory requirement that it minimize the burden.  Throughout the revision process, EEOC continually shifted its burden analysis and steadfastly refused to base its analysis on anything other than conjecture and speculation.  In contrast, the Chamber performed an empirical survey of over 50 companies who file approximately 20,000 EEO-1 reports each year.  The results are telling.  As set forth in more detail in the attached Appendix A, EEOC speculated that it would require

1,892,980 hours per year at a cost **$53.5 million** for 60,866 respondent companies to file an estimated 674,146 reports covering employment in their establishments using the "Components 1 and 2" expanded format EEO-1 form for the 2017 reporting year. The Chamber's survey feedback estimated that in reality, employers would actually spend 8,056,045 hours complying with the reporting requirements at a cost of **$400.8 million**.[6]

Along with other submissions during the comment period which showed that the EEOC's burden estimates were absurdly low, the Chamber continues to receive information from members indicating that the EEOC materially underestimated the burden that the revised form would impose. Under these circumstances and pursuant to Section 3517(b) of the PRA and 5 CFR 1320.10(f) and (g), the OMB must either rescind its approval of the EEOC submission or stay the effectiveness of its approval until the EEOC acknowledges the actual burden and justifies its imposition pursuant to the requirements of law.

- <u>Benefit</u>. EEOC failed to identify any significant or tangible benefit the revised EEO-1 report would generate, thereby failing the requirement that it maximize the benefit to be derived from the report. Indeed, the EEOC did not demonstrate that its revisions to the EEO-1 form would be of any utility in helping the Commission carry out its statutory mission to combat discrimination. The new EEO-1 form categorizes employees in broad occupational groups that inevitably results in comparison of employees in very different jobs, performing very different tasks, with very different skills. This data will be of no utility to the EEOC because courts upholding federal employment laws do not permit the aggregation of dissimilar individuals into artificial job groupings in order to prove pay discrimination. EEOC itself even admitted that the information sought will not "establish pay discrimination as a legal matter."[7] Moreover, as the Chamber demonstrated in both its comments to the EEOC as well as its comments to OMB, the significant potential for statistical false positives and false negatives further undermines the utility of the data

---

[6] This is the Chamber cost estimate based on direct labor cost only. Adding allowance for indirect overhead costs could result in an annual economic cost burden of $1.3 billion. Furthermore, as reflected in Appendix A, EEOC's burden estimate of the then-existing EEO-1 Form – referred to as Component 1 – was also materially in error.

[7] 81 Fed. Reg. at 45489 (July 14, 2016).

OMB_0000336

and even prevents the data from being used as an early warning system, of sorts.

While OMB apparently chose to disregard these submissions in its prior review of the EEO-1 submission, the Chamber submits that the failure to show any tangible benefit with the new data collection requirement, let alone that the new requirement maximizes the benefit to be derived from the massive data collection to be compelled by the revised EEO-1, requires that the OMB rescind or stay its approval of the revised EEO-1 data collection.  Further, upon a stay or rescission of the prior approval of the EEO-1 data request, the OMB should impose the stringent cost saving requirements required by the Executive Order issued by the President on January 30 regarding Reducing Regulation and Controlling Regulation Costs, to any resubmission by EEOC of its proposal to collect employee compensation data via the EEO-1 form.

- Confidentiality.  EEOC ignored the significant privacy and confidentiality concerns raised in the review process and thereby failed to ensure that the privacy and confidentiality of the revised EEO-1 data would be protected.  The EEOC is proposing to collect highly sensitive personal data regarding compensation at thousands of U.S. companies in a format which will not serve any of its statutory purposes but which will certainly be of great use to any hacker who is interested in the compensation practices of employers.  In the hands of the wrong people, the original pay data from the EEO-1 report could cause significant harm to EEO-1 responders and subject employees to potential violation of their privacy.  By letter dated September 23, 2016 we called to the attention of former Administrator Shelanski the GAO report of September 19, 2016 which criticized the government's response to cyber attacks, and noting that "[c]yber incidents affecting federal agencies have continued to grow, increasing about 1,300 percent from fiscal year 2006 to fiscal year 2015."[8]  Unfortunately, EEOC appears to be completely unaware of the enormity of this potential issue, and although it is statutorily required to do so, has failed to set forth appropriate steps or protocols to ensure the privacy and confidentiality of EEO-1 data.

---

[8] GAO 16-885-T: "Federal Information Security: Actions Needed to Address Challenges" (September 19, 2016), available at http://www.gao.gov/assets/680/679877.pdf.

OMB_0000337

In addition, the EEOC has failed to address the problem that it disseminates information collected under the current EEO-1 to other federal agencies, state and local agencies and even private researchers without the protection required of this data by Section 709(d)(e) of Title VII.  It has completely ignored the additional risk of disclosure of the significantly more sensitive information to be generated by the revised EEO-1 report.  In the previous review process for the proposed EEO-1, the Chamber asked that OMB, at the very least, exercise its authority to impose the sanctions set forth in Section 709(e) of Title VII on every recipient of EEO-1 data.  OMB did not respond to that request.

Despite EEOC's failure to satisfy the burden, benefit and confidentiality standards of the PRA, OMB nevertheless approved the information collection.  We believe that OMB erred in this decision.  Given the enormous costs associated with compliance – costs which the Chamber demonstrated through an empirical survey and which have been confirmed through recent member communications – it is imperative that OMB review the information collection and either issue a stay in the effectiveness of its prior approval or rescind its prior approval altogether; or undertake any other remedial action pursuant to Section 3517(b)(2) of the PRA, as appropriate.

## V.      Stay or Rescission of the EEO-1 Approval is Consistent with Current Regulatory Policy

In his Presidential Executive Order on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017), President Trump noted that "it is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations."  As noted above, the Commission's new EEO-1 form will place an incredible economic burden on employers to produce information that will not advance EEOC's mission.  Therefore, rescission of this extraordinarily expensive and useless requirement comports with the President's efforts to ease regulatory burdens on employers and the American public in general.

## VI.     Conclusion

We respectfully request that pursuant to Section 3517, you rescind OMB's prior approval of the EEOC's changes to its EEO-1 form, or alternatively, grant a stay of OMB's prior approval pursuant to 5 CFR 1320.10(g), until the Commission demonstrates that its revisions satisfy the PRA.

OMB_0000338

Thank you for your attention to this matter.  Please contact us if you have any questions.

Sincerely,


Randel K. Johnson
Senior Vice President
Labor, Immigration & Employee Benefits

James Plunkett
Director
Labor Law Policy

8

JA053

OMB_0000339

# Appendix A

# Comparison of EEOC and U.S. Chamber Parameters and Calculations

**Current EEO-1 Form Occupation, Gender & Race/Ethnicity Counts-
"Component 1 only"**

|   |   | EEOC | U.S. Chamber |
|---|---|---:|---:|
| 1 | Number of Respondent Firms | 67,146 | 67,146 |
| 2 | Number of Reports Filed | 683,275 | 683,275 |
| 3 | Reports per Firm (calculated 2/1) | 10.2 | 10.2 |
| 4 | Total Hours per Firm | 15.7 | 66.8 |
| 5 | Total Hours per Report | 1.5 | 6.6 |
| 6 | Total National Burden Hours | 1,055,471 | 4,485,392 |
| 7 | Cost per Burden Hour | $28.48 | $49.75 |
| **8** | **Estimated Annual Cost** | **$30,055,087** | **$223,148,252** |

**Proposed Expanded EEO-1 Form Occupation, Gender, Race/Ethnicity,
Earnings, counts and Hours "Components 1 and 2"**

|   |   | EEOC | U.S. Chamber |
|---|---|---:|---:|
| 1 | Number of Respondent Firms | 60,866 | 60,866 |
| 2 | Number of Reports Filed | 674,146 | 674,146 |
| 3 | Reports per Firm (calculated 2/1) | 11.1 | 11.1 |
| 4 | Total Hours per Firm | 31.1 | 132.4 |
| 5 | Total Hours per Report | 2.8 | 12.0 |
| 6 | Total National Burden Hours | 1,892,980 | 8,056,045 |
| 7 | Cost per Burden Hour | $28.29 | $49.75 |
| **8** | **Estimated Annual Cost** | **$53,546,359** | **$400,788,224** |

9

JA054

OMB_0000340



POLICY
ASSOCIATION®
The Association of Chief Human Resource Officers

April 13, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

Dear Director Mulvaney:

The HR Policy Association ("HR Policy" or the "Association") respectfully requests the Office of Management and Budget (OMB) to exercise its authority under Section 3517(b) of the Paperwork Reduction Act (PRA) and its implementing regulations (5 CFR 1320.10(f)) to review its approval of the Equal Employment Opportunity Commission's (EEOC or Commission) revisions to the EEO-1 Form.[1] Consistent with the PRA, "relevant circumstances have changed"[2] when President Trump issued Executive Order (EO) 13771, and under the EO your review "is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations."[3] The pay data collection in the EEO-1 Form is utterly without utility as it will likely generate significant numbers of false positives that will waste EEOC resources and inappropriately target non-discriminating employers, who will then need to spend significant time, money, and resources defending themselves against meritless allegations.

The HR Policy Association represents the most senior human resource executives in more than 380 of the largest companies in the United States. Collectively, these companies employ more than 10 million employees in the United States, nearly nine percent of the private sector workforce, and 20 million employees worldwide. All of the Association's member companies are required to file the EEO-1 Form.

The Association's member companies have a long-standing commitment to eliminating unlawful compensation discrimination in the workplace and recognize that it is the responsibility of all employers to compensate their employees in a nondiscriminatory manner. However, the Association strongly urges OMB to rescind its prior approval of the EEOC's changes to the EEO-1 Form for the following reasons:

- Relevant circumstances under the PRA have changed; and

- The revised EEO-1 will misdirect and waste agency and employer resources.

---

[1] Proposed at 81 Fed. Reg. 5113 and 81 Fed Reg. 45479 and approved by OMB's Office of Information and Regulatory Affairs on October 18, 2016 (ICR number 201610-3046-001).

[2] 5 CFR 3517(f).

[3] EO 13771, Section 1.

202                                                                        JA065

OMB_0000367

**Relevant Circumstances Under the PRA Have Changed**

Consistent with the PRA, "relevant circumstances"[4] changed when President Trump issued Executive Order (EO) 13771 on January 30, 2017, three months after OMB's approval of the revised EEO-1 Form on October 18, 2016.  Under EO 13771, your review "is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations."[5]

In addition to EO 13771, after OMB's approval of the revised EEO-1 Form, the Commission published the data file specifications that employers are to use if they utilize the data file option for submitting their EEO-1 Forms.  The new data file specifications look nothing like what OMB approved.[6]

Instead of two grids of 1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that the Commission expects employers to create a spreadsheet where all establishment data are included in a single row of 27,934 characters.  Employers with multiple establishments are to include each establishment as a separate row of 27,934 characters.  After creating this spreadsheet, employers are required to convert the file to a comma separated value file for upload.

Nowhere in the EEOC's *Federal Register* notices or relevant supporting materials did the Commission describe how employers are to create this spreadsheet or the burdens and costs that will be imposed.  Clearly, relevant circumstances have changed that warrant further review and provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**Revised EEO-1 Form Will Misdirect and Waste Agency and Employer Resources**

The EEOC's revised EEO-1 Form is meaningless and misleading because it's based on aggregate pay data that blurs legitimate variances and distinctions in pay.  For example, employees who work night shifts, swing shifts, and/or weekends are often paid a differential to account for less desirable work schedules.  The use of W-2 data, which includes not only base salary but also commissions, tips, overtime pay, shift differentials, and bonus payments ignores the fact that some types of pay are determined more by an employee's skill and effort than an employer's pay policies.  Further, combining employees who work part-time or partial year with full-time and full-year employees will result in very misleading results.  The pay band approach simply does not account for legitimate variables that affect employee pay (*i.e.*, differing responsibilities, education, skill level, length of service, experience, and performance).

Moreover, the EEO-1 job categories are too broad to evaluate compensation data for similarly-situated employees as they may lump aerospace engineers and lawyers with teachers and human resource specialists, and salaried employees who are exempt from the Fair Labor Standards Act with those employees who are not.

---

[4] 5 CFR 3517(f).

[5] EO 13771, Section 1.

[6] The data file specifications are available at: https://www.eeoc.gov/employers/eeo1survey/ 2017-data-file-layout.cfm.

OMB_0000368

The pay data collection in the revised EEO-1 Form is likely to generate significant numbers of "false positives" that will waste the EEOC's enforcement resources and inappropriately target non-discriminating employers, who will then need to spend significant time, money, and resources defending themselves against meritless allegations.  The revised EEO-1 Form is also likely to generate significant numbers of "false negatives" where true discriminators would be identified as non-discriminators and the EEOC and OFCCP thus would fail to target them for investigation.

Notably, in 2006 the Office of Federal Contract Compliance Programs (OFCCP) rescinded a similar reporting requirement, the Equal Opportunity Survey, that was rushed through in the final year of the Clinton Administration after an analysis of actual federal contractor data by a reputable statistical firm found the survey's usefulness "to be only slightly better than chance."[7] The study also found "of 637 establishments that would be classified by the EO Survey results as suspected of having systemic discrimination, 93% would be false positives.... Furthermore, the EO Survey model wrongly classifies a significant portion of true discriminators as non-discriminators, and thus would not target them for compliance evaluations."[8]

Like OFCCP's rescinded EO Survey, the broadly aggregated data in the revised EEO-1 Form will likely mislead and misdirect EEOC and employer resources at great cost.  There is simply no circumstance under which broad, aggregate compensation and hours data can be used to effectively target employers for review.

The Commission's revised EEO-1 Form will place an incredible economic burden on employers to produce information that will not advance EEOC's mission, and will likely waste the EEOC's limited enforcement resources.  Therefore, a new review of this extraordinarily expensive and useless requirement is consistent with the EO 13771, the PRA, and with the President's efforts to ease regulatory burdens on employers and the American public.

<div align="center">*     *     *</div>

For the reasons outlined above, the Association strongly urges OMB to review and rescind its prior approval of the EEOC's revisions to the EEO-1 Form.  If the Association can be of further assistance, please contact Mark Wilson at 202-315-5575 or mwilson@hrpolicy.org.

Sincerely,

Mark Wilson
Vice President, Health & Employment Policy
HR Policy Association

---

[7] 71 Fed. Reg. 53033.

[8] *Id.*

OMB_0000369



NATIONAL
WOMEN'S
LAW CENTER
EXPANDING THE POSSIBILITIES

April 12, 2017

John M. Mulvaney, Director
Office of Management and Budget
725 17th Street, N.W.
Washington, D.C. 20503

**Re:     Opposition to Reopening Review of the Equal Employment Opportunity
         Commission's Employment Information (EEO-1) Report (OMB Control Number
         3046-0007)**

Dear Director Mulvaney:

     The National Women's Law Center (the Center) has worked for 45 years to advance
and protect women's equality and opportunity—with a focus on women's employment,
education, income security, health, and reproductive rights—and has long sought to remove
barriers to equal treatment of women in the workplace, particularly those that suppress
women's wages.  The Center and the 82 undersigned organizations committed to workplace
equality write in strong opposition to the recent requests by the U.S. Chamber of Commerce
(Chamber) and the Equal Employment Advisory Council (EEAC) that the Office of
Management and Budget (OMB) revoke approval of the previously approved Equal
Employment Opportunity Commission (EEOC) data collection by means of the Employer
Information Report (EEO-1 Form). This collection of pay data by sex, race, and ethnicity will
be critically important in helping to identify compensation discrimination and improving
enforcement of pay discrimination laws, and will benefit businesses, individual workers, and
the economy.

     Neither the Chamber nor the EEAC provides an adequate basis for reopening review
of this data collection. Current federal rules require the collection of information by means of
the EEO-1 Form.[1] OMB previously approved the EEO-1 Form revision on September 29,
2016, for a term of three years.[2] Because the EEO-1 Form is a previously approved data
collection pursuant to federal rules, under the Paperwork Reduction Act, OMB may only
review this collection of information after consultation with the EEOC, when relevant
circumstances have changed or if the burden estimates provided by the EEOC at the time of
its initial submission to OMB were materially in error.[3] This standard has not been met. No
change in circumstances justifies reopening review of the EEO-1 Form, no material error has

---

[1] 29 C.F.R. § 1602.7.
[2] U.S. Office of Mgm't and Budget, *Notice of Office of Management and Budget Action* (Sept. 29, 2016),
*available at* https://www.reginfo.gov/public/do/DownloadNOA?requestID=275763.
[3] 5 C.F.R. § 1320.12(i). In arguing that OMB has the authority to rescind the revised EEO-1 Form under the
Paperwork Reduction Act, the Chamber cites the "broad remedial powers" under 5 C.F.R. § 1320.10(g), which
states that "[g]or good cause, after consultation with the agency, OMB may stay the effectiveness of its prior
approval of any collection of information that is not specifically required by agency rule." But the EEO-1 Form
is specifically required by agency rule, 29 C.F.R. § 1602.7, rendering § 1320.10(g) inapplicable.

*With the law on your side, great things are possible.*

11 Dupont Circle ⌗ Suite 800 ⌗ Washington, DC 20036 ⌗ 202.588.5180 ⌗ 202.588.5185 Fax ⌗ www.nwlc.org

OMB_0001041

been shown in the burden estimates previously provided by the EEOC in support of the revision, and OMB has not consulted with the EEOC about this matter.

## I.   The Pay Data Collection Pursuant to the Revised EEO-1 Revisions Addresses a Serious Pay Discrimination Problem.

Women working full time, year round are typically paid 80 cents for every dollar paid by their male counterparts, and when we compare women of color to white, non-Hispanic men, the wage gaps are even larger. African American women and Latinas typically make only 63 cents and 54 cents, respectively, and Native American women make only 58 cents for every dollar paid to white, non-Hispanic men for full-time, year-round work. While Asian American and Pacific Islander (AAPI) women are cited as making 85 cents for every dollar paid to white, non-Hispanic men, AAPI subgroups experience drastically wider pay gaps. For instance, Southeast Asian and Pacific Islander women have some of the widest wage gaps compared to other communities of color, with Bhutanese women making as little as 38 cents for every dollar paid to white, non-Hispanic men.[4]

Women are still paid less than men in nearly every occupation,[5] and studies show that even controlling for race, region, unionization status, education, experience, occupation, and industry leaves 38 percent of the pay gap unexplained.[6] Stereotypes about working women remain a driver of this unexplained gap. For example, a 2012 experiment revealed that compared to an identical female applicant, science professors offered a male applicant for a lab manager position a salary of nearly $4,000 more, as well as additional career mentoring, and judged him to be significantly more competent and hirable.[7]

Men of color experience similar dynamics compared to white, non-Hispanic men. For every dollar earned by White men, African American men earn 72 cents and Hispanic men earn 62 cents.

When employees are paid less because of their sex, race, or ethnicity, they often have no idea they are being discriminated against. Because pay often is cloaked in secrecy, when a discriminatory salary decision is made, it is seldom as obvious to an affected employee as a demotion, a termination, or a denial of a promotion.[8] Moreover, the most recent survey data

---

[4] NAT'L ASIAN PACIFIC AMERICAN WOMEN'S FORUM, FIGHTING INVISIBILITY: CLOSING THE WAGE GAP 10 (Mar. 2017), *available at* https://napawf.org/wp-content/uploads/2017/03/FIGHTING-INVISIBILITY_FINAL-3.29.17.pdf.
[5] Hegewisch, A. & Matite, M., *The Gender Wage Gap by Occupation,* INST. FOR WOMEN'S POLICY RESEARCH (2013), *available at* http://www.iwpr.org/publications/pubs/the-gender-wage-gap-by-occupation-2
[6] Blau, F. D. & Kahn, L.M, *The Gender Wage Gap: Extent, Trends and Explanations*, NAT'L BUREAU OF ECONOMIC RESEARCH (Jan. 2016), *available at* http://www.nber.org/papers/w21913.pdf.
[7] Moss-Racusin, C.A. et al., *Science faculty's subtle gender biases favor male students*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (Aug. 2012), *available at* http://www.pnas.org/content/109/41/16474.abstract#aff-1.
[8] As Justice Ginsburg has noted:

    Comparative pay information . . . is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials.

*With the law on your side, great things are possible.*

11 Dupont Circle ⌗ Suite 800 ⌗ Washington, DC 20036 ⌗ 202.588.5180 ⌗ 202.588.5185 Fax ⌗ www.nwlc.org

OMB_0001042

available indicates about 60 percent of workers in the private sector are either forbidden or strongly discouraged from discussing their pay with their colleagues.[9] As a result, employees face significant obstacles in gathering the information that would indicate they have experienced pay discrimination, which undermines their ability to challenge such discrimination. Consequently, government enforcement and employer self-evaluation and self-correction are critical to combat compensation discrimination. The EEO-1 Form revisions were properly designed to facilitate both, as set out in greater detail in the Center's previous comments to the EEOC and to OMB in support of the EEO-1 Form Revision.[10]

## II.     The EEO-1 Burden Estimates Were Based on Careful, Rigorous, and Transparent Analysis.

The EEOC calculates that to complete the revised EEO-1 Form, 60,886 firms will file 674,146 establishment reports, taking 15.2 burden hours per firm and 1.9 burden hours per establishment, for a total 1,892,979.5 hours--approximately 31 hours per firm.[11] Neither the Chamber nor the EEAC demonstrates material error in the EEOC's estimate.

The revised EEO-1 Form was adopted after an extensive and transparent process, including a public hearing, a vote by the EEOC Commissioners, and two rounds of notice and public comment ("60-Day Notice" and "30-Day Notice"). As that process made clear, in estimating burden and concluding that the revised EEO-1 Form would not unduly burden employers, the EEOC collected data from multiple sources. As set out in its 30-Day Notice,[12] the EEOC's proposal was informed by the 2012 National Academy of Sciences' study regarding the collection of compensation data (NAS Study), which concluded that use of the EEO-1 for pay data collection would be "quite manageable for both the EEOC and the respondents."[13] The EEOC then commissioned an independent Pay Pilot Study (Pilot Study) to identify the most efficient means of collecting pay data, with a specific focus on the most

---

Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves. Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, …or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory.

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (Ginsburg, J. dissenting).

[9] INST. FOR WOMEN'S POLICY RESEARCH, PAY SECRECY AND WAGE DISCRIMINATION (2014), *available at* http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file

[10] *See* Nat'l Women's Law Ctr., *Comment Re: Proposed Revision of the Employer Information Report (EEO-1), FR Docket Number 2016-01544, Docket ID EEOC-2016-0002* (Apr. 1, 2016); Nat'l Women's Law Ctr., *Comment Re: Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), OMB Control Number 3046-0007, Docket ID EEOC-2016-0002-0340* (Aug. 15, 2016).

[11] U.S. Equal Employment Opportunity Comm'n, *Agency Information Collection Activities, Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1),* 81 Fed. Reg. 45479 (July 14, 2016) ("30-Day Notice").

[12] *Id.* at 45480.

[13] NAT'L RESEARCH COUNCIL OF THE NAT'L ACADEMIES, COLLECTING COMPENSATION DATA FROM EMPLOYERS 60 (2012), *available at* http://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.

*With the law on your side, great things are possible.*

11 Dupont Circle ⌗ Suite 800 ⌗ Washington, DC 20036 ⌗ 202.588.5180 ⌗ 202.588.5185 Fax ⌗ www.nwlc.org

efficient and least costly methods for employers to transmit pay data.[14] This Pilot Study was completed in 2015 and also informed the EEOC's analysis.[15] In addition, the EEOC held a two-day meeting in March 2012 on data collection procedures with employer representatives, statisticians, human resources information systems experts, and information technology specialists, which included a discussion of pay data collection and estimated burdens; the recommendations provided in that meeting included a recommendation that reporting requirements be aligned with other agencies but concluded that the cost burden of reporting pay data to the EEOC would be minimal.[16]

The EEOC also reviewed the burden analysis the Office of Federal Contract Compliance Programs (OFCCP) of the Department of Labor had previously conducted on a compensation data collection tool focused narrowly on federal contractors in 2014, and the public comments submitted to OFCCP regarding burden estimates based on that proposal.[17] In March 2016, the EEOC held a public hearing on the proposed revisions where it heard testimony from employer representatives, among others.[18]

The EEOC also received and considered hundreds of public comments on its 60-Day Notice, including numerous comments from the employer community. Based on its consideration of these comments, the EEOC made multiple revisions to the burden analysis between the 60-Day Notice and 30-Day Notice. For example, based on comments, the EEOC lowered its estimate of the level of automation typical for employer completion of the EEO-1 Form. While the 60-Day Notice assumed that EEO-1 forms would all be submitted in one data upload filed by a firm on behalf of all of the firm's establishments, in the 30-Day Notice, the EEOC based its estimate of the number of firms who would rely on an automated data upload on the number of firms using this method in 2014[19]—a conservative estimate given that from year to year, more firms automate this process. It also increased its estimate of the number and variety of professional staff who would spend time gathering the relevant data and submitting the report at both the firm and the establishment level, based on employer input.[20]

Further, as the EEOC observed in its 30-Day Notice, the employer community offered widely discrepant estimates of the time necessary to complete the revised EEO-1 Form.[21] For example, the Society for Human Resources Management (SHRM) reported that in its survey

---

[14] SAGE COMPUTING, INC., FINAL REPORT 8, 101 (Sept. 2015), *available at* http://eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf  [PILOT STUDY].

[15] 30-Day Notice, 81 Fed. Reg. at 45480.

[16] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* https://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf.

[17] U.S. Equal Employment Opportunity Comm'n, *Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1)*, 81 Fed. Reg. 5113 (Feb.1, 2016) ("60-Day Notice").

[18] Public Hearing before the U.S. Equal Employment Opportunity Commission, Public Input into the Proposed Revisions to the EEO-1 Report, Mar. 16, 2016, *available at* https://www.eeoc.gov/eeoc/meetings/3-16-16/index.cfm.

[19] 30-Day Notice, 81 Fed. Reg. at 45493-5.

[20] *Id.* at 45493.

[21] *Id.*

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

4

of members, 80 percent estimated that the revised EEO-1 Form would require 30 hours of time or less to file.[22] This survey of the employer community actually suggests a lighter burden than does the final EEOC conclusion that on average a firm would be able to complete the revised EEO-1 Form in 31 hours. SHRM surveyed 262 of its members in reaching this conclusion.[23] By contrast, the Chamber's assertion in its February 27, 2017, letter to OMB that completing the revised EEO-1 Form will take 132 hours per firm is based on a survey of only 50 employers.  The EEOC's conclusion, consistent with SHRM estimates, was further informed by its own experience working with EEO-1 stakeholders over many years.[24]

The EEOC also undertook its own analysis regarding the burden of bridging HRIS and payroll systems for reporting pay data on the EEO-1 Form in the face of a broad variety of employer estimates of the cost and burden of providing such data. As it stated in the 30-Day notice, it determined that major HRIS vendors already allow for the collection of EEO-1 demographic data and offer the capacity to record year-to-date gross and paid earnings. The EEOC thus reasonably concluded that "creating software solutions for the EEO-1, components 1 and 2, may not be as complex or novel as some comments suggested."[25] Indeed, compensation management systems and software are specifically designed to be updated routinely to accommodate changes in federal, state or local income tax rules, new accounting rules, and employer changes in fringe benefits or compensation practices and can be expected to provide off-the-shelf solutions to allow this bridging of systems.[26]

Moreover, throughout the design and review of the revised EEO-1 Form, the EEOC has carefully analyzed and taken steps to minimize any burden imposed on employers by this data collection. For example, in initially proposing the revision to the EEO-1 Form in February 2016, the EEOC was guided by the 2011 and 2014 rounds of public comments to OFCCP on its proposed compensation data collection tool.[27] When OFCCP proposed collecting compensation data from federal contractors through a separate tool on a different reporting schedule from the EEO-1, employer representatives, including the EEAC, urged in the strongest terms that instead EEOC and OFCCP coordinate their data collection through

---

[22] Society for Human Resource Mgm't, *Comment on the Equal Employment Opportunity Commission's Proposed Revision of the Employer Information Report (EEO-1); ID: EEOC-2016-0002-0001, 81 Fed. Reg. 5113 (Feb. 1, 2016)* 22 (Apr. 1, 2016).
[23] *Id.* at 8.
[24] 30-Day Notice, 81 Fed. Reg. at 45493.
[25] *Id.* at 45487.
[26] For example, Intuit provides regular updates for subscribers to its Quick Books Payroll service. *See* http://payroll.intuit.com/support/kb/2000204.html; Sage provides similar software updates to its subscribers. *See* https://support.na.sage.com/selfservice/microsites/msbrowse.do?UMBrowseSelection=SG_SAGE50_U_S_EDIT ION_1.
[27] U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, *Non-Discrimination in Compensation; Compensation Data Collection Tool, Advanced Notice of Proposed Rulemaking*, 76 Fed. Reg. 49398 (Aug. 10, 2011); U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, *Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking*, 79 Fed. Reg. 46561 (Aug. 8, 2014). While the Chamber attempts to characterize this OFFCP proposal as a failed and abandoned effort, in fact, the comments and analysis undertaken led to the decision to broaden the reach of the pay data collection through the revised EEO-1 Form, which includes both federal contractors and other private employers with more than 100 employees.

*With the law on your side, great things are possible.*

11 Dupont Circle ⧫ Suite 800 ⧫ Washington, DC 20036 ⧫ 202.588.5180 ⧫ 202.588.5185 Fax ⧫ www.nwlc.org

OMB_0001045

use of a single, unified instrument.[28]  The EEO-1 Form revision proposed by the EEOC accomplished this goal, avoiding duplication of effort or wasted costs for either employers or enforcement agencies.

The selection of W-2 income as the proper measure of compensation was also designed to minimize employer burden, while capturing the relevant range of employee compensation.  Federal law already requires employers to maintain and generate the information in W-2 forms that will be required for the revised EEO-1.[29] HRIS experts consulted for the Pilot Study reported that most major payroll software systems are preprogrammed to compile the data for generating W-2 forms. This led the Pilot Study to conclude that employers using such software to generate W-2 forms could report the proposed data with relatively little additional burden.[30] The EEOC properly relied on this analysis in its burden estimates.

The EEOC also minimized employer burden by moving the EEO-1 Form filing deadline from September to March, to align with employers' annual W-2 calculations, eliminating the need for employers to generate a separate, non-calendar year W-2 calculation. This change, which directly responded to employers' concerns, allows the use of the same calendar year W-2 data for the purposes of both the EEO-1 Form and federal tax law. Similarly, in response to employer concerns, the EEOC moved the "workforce snapshot" period from the third quarter (July-September) to the fourth quarter (October-December).[31]

Finally, it is important to note that various elements of the description of the revised EEO-1 Form by the Chamber and the EEAC are misleading at best. For example, the EEAC emphasizes that the revisions to the EEO-1 "increase the total number of data fields for each establishment from 180 to 3,660," implying that employers' burden in completing the EEO-1 Form has increased by a similar factor. But this emphasis on number of data fields is misleading, given the automation of the process. As noted by the EEOC, the online portal for submitting the EEO-1 Form does not require that "zeros" be entered in cells for which employers do not have data: "No EEO-1 filers enter data in every cell, so basing the annual PRA burden on the total number of cells on the EEO-1 form would be inaccurate."[32]

---

[28] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf;  *see also, e.g.*, Equal Employment Advisory Council, *Comments on the Office of Federal Contract Compliance Programs' Proposed Requirement to Report Summary Data on Employee Compensation* (Jan. 5, 2015);  Society for Human Resource Management and the College and University Professional Association for Human Resources, *Comment on Advanced Notice of Proposed Rulemaking Related to Non-Discrimination in Compensation* 3-4 (Oct. 11, 2011).
[29] 26 C.F.R. § 31.6051-1.
[30] PILOT STUDY, *supra* note 14 at 8, 101. The Pilot Study acknowledged that some companies may need to make a one-time capital investment to write a software program to import data from payroll programs into the HRIS system. PILOT STUDY at 8.
[31] 30-Day Notice, 81 Fed. Reg. at 45484-5.
[32] *Id.* at 45493.

*With the law on your side, great things are possible.*

11 Dupont Circle ⌗ Suite 800 ⌗ Washington, DC 20036 ⌗ 202.588.5180 ⌗ 202.588.5185 Fax ⌗ www.nwlc.org

OMB_0001046

## III.    No Relevant Circumstances Have Changed.

In the six months since the revised EEO-1 Form was approved, no relevant circumstances have changed, and the Chamber does not attempt to argue otherwise. The EEAC, however, asserts that the data file specifications published by the EEOC this fall constitute a change in circumstances. This ignores that fact that the EEOC noted in its 30-Day Notice that it would be posting data file specifications to support employers and HRIS vendors to accommodate Component 2 of the EEO-1 Form.[33] OMB approved the data collection with the knowledge that these data file specifications would be posted thereafter. Moreover, no employer is required to utilize these data file specifications to submit the EEO-1 Form. This is one option to submit data offered for employer convenience. It provides no basis for reopening review of the data collection.

## IV.    The Revised EEO-1 Form Will Generate Substantial Benefit.

OMB may only reopen review of a previously approved collection when the burden estimates by the agency are shown to be in material error or when circumstances have changed.  The applicable standard does not permit revocation of approval based on disagreement regarding benefits generated by the information collection. Nevertheless, it is important to note that the Chamber is wrong when it states that the EEOC failed to identify any benefit from the revised EEO-1 report. In its 30-Day Notice, the EEOC describes in detail the ways in which the data will aid EEOC investigations and the ways in which the EEOC has tested the utility of its planned analyses though the use of comparable databases.[34]

The revised EEO-1 Report will provide the EEOC with a critical tool for focusing investigatory resources to identify pay discrimination. It will allow the EEOC to see which employers have racial, ethnic, or gender pay gaps that differ significantly from the pay patterns from other employers in their industry and region. By comparing wage data for firms employing workers in the same job categories, in the same industry, in the same location, in the same year, the EEOC will be able to tell which employers' pay practices depart from the norm and to investigate possible pay discrimination more efficiently. While the EEO-1 Form will never be the basis of a finding of discrimination standing alone, it provides important information to the EEOC to direct its resources. Again, this is particularly important for enforcement of pay discrimination laws, given that so many victims of pay discrimination have no idea they are being paid less than their counterparts, limiting their ability to challenge discrimination without the assistance of the EEOC.

In addition, both the process of responding to the data collection tool and the more effective enforcement that the tool permits will spur more employers to proactively review and evaluate their pay practices and to address any unjustified disparities between employees. Reporting pay data by gender and race within job categories ensures that employers are collecting and evaluating it. By incentivizing and facilitating such employer self-evaluation, the revised EEO-1 Report will increase voluntary employer compliance with discrimination

---

[33] *Id.* at 45487.
[34] *Id.* at 45490.

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

OMB_0001047

laws. Employees and employers alike will benefit from the elimination of discrimination in pay practices absent litigation or other formal enforcement mechanisms, which can be expensive and time-consuming.

The revised EEO-1 Report encourages employers to proactively implement practices to help prevent pay disparities in the first instance and to develop a diverse workforce, both of which are good for business. A diverse workforce and equitable employment practices can confer a wide array of benefits on a company beyond decreased risk of liability, including access to the best talent, increased employee satisfaction and productivity, increased innovation, an expanded consumer base, and stronger financial performance.[35] Competitive—and thus equal—pay is critical for recruiting and retaining a diverse workforce and high performers, particularly for younger women workers.[36] And when employees are confident they are being paid fairly, they are more likely to be engaged and productive.[37] Significantly, shareholders and potential investors are recognizing these benefits and increasingly are interested in companies' commitment to diversity and equal employment opportunity, and see compliance with antidiscrimination laws—particularly with regard to equal pay—as an important factor impacting risk and profitability, and therefore relevant to investment decisions.[38]

Furthermore, addressing discrimination and closing the gender wage gap would have a significant positive impact on the economy. A recent study found that if women received the same compensation as their comparable male co-workers, the poverty rate for all working women would be reduced by half, from 8.0 percent to 3.8 percent.[39] Moreover, nearly 60

---

[35] Hunt, V., Layton, D. & Prince, S., *Diversity Matters* 9-13, MCKINSEY & CO. (Feb. 2015) (finding diverse workforces correlate with better financial performance, because diversity helps to recruit the best talent, enhance the company's image, increase employee satisfaction, and improve decision making, including fostering innovation); Hewlitt, S.A., Marshall, M. & Sherbin, L., *How Diversity Can Drive Innovation,* HARVARD BUS. REV. (Dec. 2013), *available at* https://hbr.org/2013/12/how-diversity-can-drive-innovation. Conversely, companies that fail to address gender wage disparities and discriminatory employment practices could damage their reputation and brand among consumers, leading to a loss of profits and shareholder value. Lamb, N. & Klein, W., *A Proactive Approach to Wage Equality is Good for Business*, EMPLOYMENT RELATIONS TODAY (Summer 2015), *available at* http://arjuna-capital.com/news/a-proactive-approach-to-wage-equality-is-good-for-business/ [*Proactive Approach*].

[36] A recent study found that "pay and financial benefits drive Millennials' choice of organization more than anything else." THE 2016 DELOITTE MILLENNIAL SURVEY: WINNING OVER THE NEXT GENERATION OF LEADERS 19 (2016), *available at* https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/gx-millenial-survey-2016-exec-summary.pdf.  Noel, L. & Hunter Arscott, C., *Millennial Women: What Executives Need to Know About Millennial Women* 4, ICEDR (2015), *available at* http://www.icedr.org/research/documents/14_millennial_snapshot.pdf (Millennial women leave jobs primarily for more compensation).

[37] Courtney Seiter, "The Counterintuitive Science of Why Transparent Pay Works," *Fastcompany.com*, Feb. 26, 2016, *available at* http://www.fastcompany.com/3056975/the-future-of-work/the-transparent-pay-revolution-inside-the-science-and-psychology-of-open-.

[38] *Proactive Approach, supra* note 35; Natasha Lamb, "Closing the pay gap: Silicon Valley's gender problem," *Ethical Boardroom*, June 7, 2016, *available at* http://ethicalboardroom.com/leadership/diversity/close-the-pay-gap/; Trillium Asset Mgm't, *Letter to Citigroup Shareholders,* Apr. 16, 2016, *available at* https://www.sec.gov/Archives/edgar/data/831001/000121465916010905/j415160px14a6g.htm.

[39] Milli, J., et al., *The Impact of Equal Pay on Poverty and the Economy* 1, INST. FOR WOMEN'S POLICY RESEARCH (Apr. 2017), *available at* https://iwpr.org/publications/impact-equal-pay-poverty-economy/.

*With the law on your side, great things are possible.*

11 Dupont Circle ⌗ Suite 800 ⌗ Washington, DC 20036 ⌗ 202.588.5180 ⌗ 202.588.5185 Fax ⌗ www.nwlc.org

OMB_0001048

percent of women would earn more if working women were paid the same as men of the same age with similar education and hours of work.[40] Increased wages would augment these workers' consumer spending power and benefit businesses and the economy.[41] Another recent study estimates that by closing the wage gap entirely, women's labor force participation would increase and $4.3 trillion in additional gross domestic product could be added in 2025, about 19 percent more than would otherwise be generated in 2025.[42]

## V.    The EEOC Has Fully Addressed How It Will Ensure Confidentiality of Data.

The Chamber, again ignoring the standard that applies to OMB in reopening review of a data collection required by a final rule, asserts that review should be reopened because the EEOC has ignored privacy and confidentiality concerns in its revision of the EEO-1 Form. This is not only an inappropriate basis for OMB to reopen review of the data collection, it is flatly untrue.  As the EEOC stated in its 30-Day Notice, its employees are bound to keep EEO-1 Form data confidential on threat of criminal penalties.[43] Contactors, other federal agencies, and state and local agencies are provided access to this information only upon submitting to the same strict confidentiality requirements. As the EEOC also explained, in considerable detail, it maintains "a robust cyber security and privacy program, in compliance with the Federal Information Security and Modernization Act of 2014."[44] The Chamber fails to offer any support at all for its bare assertions to the contrary.

********

For all these reasons, there is no basis for OMB to reopen its review of the revised EEO-1 Form. The pay data collection is a critical equal pay initiative to address an ongoing problem of discrimination on the basis of sex, race, and ethnicity in compensation that shortchanges working people across the country. It was adopted after an open, vigorous, thoughtful process that invited and considered the participation of all stakeholders and was based on careful and thorough analysis. It aligns with this Administration's expressed commitment to ensuring equal pay for equal work. There is no basis for revisiting this important and much needed measure. Please do not hesitate to contact Emily Martin, General Counsel and Vice President for Workplace Justice at the National Women's Law Center, at (202) 588-5180, if we can be of further assistance as you consider this important matter.

Sincerely,

National Women's Law Center

---

[40] *Id.*
[41] *See id.* at 2 (finding that the U.S. economy would have produced additional income of more than $512.6 billion in 2016 if women received pay equal to their male counterparts).
[42] Ellingrud, K., *et al.*, *The power of parity: Advancing women's equality in the United States* 1-2, MCKINSEY GLOBAL INST. (Apr. 2016), *available at* http://www.mckinsey.com/global-themes/employment-and-growth/the-power-of-parity-advancing-womens-equality-in-the-united-states. The same study estimates that even if the wage gap was only partially closed, $2.1 trillion in additional GDP could be added in 2025.
[43] 30-Day Notice, 81 Fed. Reg. at 45491-92.
[44] *Id.* at 45492.

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

9

JA123

OMB_0001049

9to5, National Association of Working Women
American Association of University Women (AAUW)
     Jacksonville, FL, Branch of AAUW
American Civil Liberties Union
Americans for Democratic Action (ADA)
Atlanta Women for Equality
Bazelon Center for Mental Health Law
California Employment Lawyers Association
Cashdan & Kane PLLC
Center for Biological Diversity
Center for Law and Social Policy (CLASP)
Center for Media and Democracy
Center on Budget and Policy Priorities
Colorado Center on Law and Policy
Deeds Not Words
Economic Opportunity Institute
Economic Policy Institute
Economic Progress Institute (RI)
Equal Pay Today!
Equal Rights Advocates
Equality California
Fair Work Center
Family Equality Council
Family Values @ Work
Feminist Majority
Fiscal Policy Institute
Food & Water Watch
FORGE, Inc.
Futures Without Violence
Indiana Institute for Working Families
Institute for Science and Human Values
Interfaith Worker Justice
International Union, United Automobile, Aerospace &
Agricultural Implement Workers of America, UAW
JOBS NOW Coalition
Jobs With Justice
Keystone Research Center
Labor Council for Latin American Advancement
Labor Project for Working Families
Lambda Legal
Lawyers' Committee for Civil Rights Under Law
The Leadership Conference on Civil and Human Rights
Legal Aid at Work
Los Angeles Alliance for a New Economy
Los Angeles Black Worker Center

Make it Work
Massachusetts Law Reform Institute
NAACP
National Asian Pacific American Women's Forum
National Black Justice Coalition
National Center for Lesbian Rights
National Center for Transgender Equality
National Coalition Against Domestic Violence
National Committee on Pay Equity
National Council of Jewish Women
National Domestic Workers Alliance
National Employment Law Project
National Employment Lawyers Association
National Latina Institute for Reproductive Health
National Organization for Women
     Southwest PA National Organization for Women
National Partnership for Women & Families
Network Lobby for Catholic Social Teaching
North Carolina Justice Center
People Demanding Action
Policy Matters Ohio
PowHer New York
Progressive Democrats of America
Protect All Children's Environment
Public Citizen
Santa Clara County Wage Theft Coalition
Sargent Shriver National Center on Poverty Law
Sisters of Our Lady of Charity of the Good Shepherd
Chapters
     Mid-North America Province
     National Advocacy Center of the Sisters of the
     Good Shepherd
     New York/Toronto Province
     US Central South Province
South Florida AFL-CIO
UltraViolet
The United State of Women
Women Employed
Women's Law Project
Women's Rights and Empowerment Network (WREN)

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

OMB_0001051

## DONALD MCINTOSH

| From: | VICTORIA A. LIPNIC |
|-------|--------------------|
| Sent: | Thursday, May 25, 2017 10:43 AM |
| To: | DONALD MCINTOSH; KIMBERLY ESSARY |
| Subject: | FW: Responses to the Chamber and EEAC Critiques of the EEO-1 Pay Data Collection |
| Attachments: | Chamber v. EEOC Burden AnalysistoOCH041417.doc; Attachment Chamber Survey.pdf; EEACOMBletter toOCH041417.docx |

Donald – This is all I have. I just searched my inbox for an email from Ron or from Peggy.

**From:** PEGGY MASTROIANNI
**Sent:** Friday, April 14, 2017 4:58 PM
**To:** VICTORIA A. LIPNIC
**Cc:** JIM PARETTI ; DONALD MCINTOSH ; RONALD EDWARDS ; CAROL MIASKOFF ; BRIA GILLUM ; MUSLIMA LEWIS ; ERIN NORRIS
**Subject:** Responses to the Chamber and EEAC Critiques of the EEO-1 Pay Data Collection

Dear Madam Chair -

OLC has prepared memos that respond to the letters the U.S. Chamber of Commerce and EEAC sent to the OMB Director urging reconsideration of OMB's PRA approval of the EEO-1 pay survey.

- The first attachment is OLC's response to the Chamber's arguments regarding the burden calculations; it identifies the major reasons for the discrepancies between the Chamber's and ours.
- For your convenience, we have also attached the Chamber's survey (second attachment).
- The third attachment is OLC's response to EEAC's argument that release of the software data file specifications was a substantial change in the EEO-1.

If you have any questions, please contact Carol Miaskoff, Ron Edwards, Bria Gillum, Erin Norris, Muslima Lewis, or me.

Peggy R. Mastroianni
Legal Counsel
U.S. Equal Employment Opportunity Commission
131 M St. NE
Washington, DC 20507
202.663.4609
peggy.mastroianni@eeoc.gov

1

JA126



Office of
Legal Counsel

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C. 20507**

April 14, 2017

### MEMORANDUM

TO:        Victoria A. Lipnic
           Acting Chair

FROM:      Peggy R. Mastroianni /s/
           Legal Counsel

SUBJECT:   EEOC's Response to EEAC's Argument that Relevant Circumstances Have
           Changed After OMB's Approval of the EEO-1 Report

### I.    Introduction

On March 20, 2017, the Equal Employment Advisory Council (EEAC) sent a letter to
John M. Mulvaney, the Director of the Office of Management and Budget (OMB), urging him to
review, reconsider, and reject the September 29, 2016, approval of a revised EEO-1 report to
collect pay band and hours-worked data starting March 31, 2018. This memorandum addresses
EEAC's argument[1] that EEOC's release of "partial" data file specifications, which were
referenced in EEOC's 30-day Federal Register notice and disclosed after OMB approved the
revisions to the EEO-1 report, provides sufficient justification for OMB to reconsider its
approval of the revised form.

### II.    The EEAC Argues That "Relevant Circumstances Have Changed" Because the
           EEOC Released File Specifications for Data Upload Files That Were Not
           Submitted to OMB

OMB may *sua sponte* decide to reconsider its approval of an information collection prior
to the expiration of the current approval of that information collection under certain

---

[1]    The EEAC also argued in its letter that EEOC's burden estimates for the revised EEO-1 were in material error
and urged OMB to reconsider its prior approval of the pay data collection for that reason. The memorandum
responding to the Chamber's letter addresses burden issues in detail. The EEAC's only other burden issue was
whether burden should be calculated on a per-cell basis. In light of reliance on information technology, and the fact
that EEO-1 cells can and are left blank in the absence of data, the EEOC moved away from this methodology for
calculating burden in 2016. Finally, the EEAC recommended that OMB consider alternatives to the currently
approved collection and suggested that any new revisions to the EEO-1 be subject to a pilot study that includes a
representative sample of actual employers to test the burden and utility.

circumstances. One of those "circumstances" is that "relevant circumstances have changed" since the time of OMB's approval.[2]

### A.    The EEAC Argument

EEAC argues that the EEOC's file specifications, which were published after OMB approved the EEO-1 pay data collection on September 29, 2016, are an indication that relevant circumstances have changed and provide an independent basis for OMB to reconsider its approval of the collection. EEAC contends that the published file specifications will impose an additional burden on employers because employers will be required to create a spreadsheet that does not resemble the approved EEO-1 and that the EEOC did not provide further guidance or instructions that discuss the new file specifications.

### B.    The EEOC Response

#### 1.    Defining when "Relevant Circumstances have Changed"

The regulations implementing the Paperwork Reduction Act (PRA) of 1980 do not define what constitutes a change in relevant circumstances, and OLC's research of the law did not yield a more detailed definition. The preamble of the 1982 NPRM proposing OMB's regulations to implement the PRA, which EEAC cites in its letter, does provide some evidence of OMB's intent in creating the reconsideration process. While the EEAC cites to a paragraph from the preamble affirming OMB's authority to conduct a review, the immediately preceding paragraph makes clear that OMB should reconsider an approval of a collection of information only "when circumstances have **significantly** changed . . . . " (emphasis added).[3] This suggests that OMB did not intend to step in whenever there was a change in circumstances surrounding an approved information collection, but expected to reserve this remedy for cases in which a change had a significant impact.

#### 2.    EEOC's File Specifications

The EEOC's published file specifications are not a new requirement but rather simply a familiar tool to make it easier for employers to submit EEO-1 data to the EEOC. The EEOC provided this tool to employers for use with the 2016 EEO-1, as evident on the EEOC website, where the file specifications for the 2016 EEO-1 were published at https://www.eeoc.gov/employers/eeo1survey/eeo1_cvs_specifications.cfm. Like those later published for the EEO-1 pay data collection, the 2016 specifications were in comma-separated values format ("csv"), a format that enables employers to convert tabular data (like that in the EEO-1) for importation and exportation to a database. Employers that used data upload technology for their 2016 EEO-1 reports used these csv specifications.

---

[2]    *See* 5 C.F.R. §1320.12(h)(2)(i) (*sua sponte* reconsideration of clearance of collections of information in current rules).

[3]    Office of Management and Budget, Controlling Paperwork Burdens on the Public, Notice of Proposed Rulemaking, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).

2

Publication of the file specifications after OMB's approval of the pay data collection is not a "significant" change that warrants OMB's reconsideration. As noted above, EEOC indicated in the 30-day notice its intent to post updated specifications, and stated that it would provide support to employers and HRIS vendors as they transitioned to the new reporting requirements. EEAC had notice of these data specifications, was probably familiar with the 2016 version, and had ample opportunity to raise questions or concerns before OMB's approval of the revised EEO-1, but it did not do so.

3

10/31/2018

Case 1:17-cv-02458-TSC Document 39-2 Filed 02/05/19 Page 186 of 235
USCA Case #19-5130 Document #1802830 Filed: 08/19/2019 Page 223 of 369

 *U.S. Equal Employment Opportunity Commission*

This is the proposed EEO-1 Form to collect compensation data.

## SECTION A - TYPE OF REPORT

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

☐ Single-establishment Employer Report

Multi-establishment Employer:

☐ Consolidation Report (Required)

☐ Headquarters Unit Report (Required)

☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)

☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only):

## SECTION B - COMPANY IDENTIFICATION
*(To be answered by all employees)*

1. Parent Company:

a. Name of Parent Company that owns or controls establishment in item 2 below (omit if same name as above):

Address (Number and Street):

| City or Town: | State: | ZIP code: |
| --- | --- | --- |
| | | |

10/31/2018

Case 1:17-cv-02458-TSC   Document 39-2nd Filed 02/05/19   Page 187 of 235
USCA Case #19-5130   Document #1802830   Filed: 08/19/2019   Page 224 of 369

2. Establishment for which this report is filed (omit if same as above):

a. Name of Establishment:

Address (Number and Street):

City or Town:                County:              State:              ZIP code:

Employer identification No. (IRS 9-DIGIT TAX NUMBER):

Was an EEO-1 report filed for this establishment last year?

☐ Yes   ☐ No

## SECTION C - EMPLOYERS WHO ARE REQUIRED TO FILE

*(To be answered by all employees)*

1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?

☐ Yes   ☐ No

2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?

☐ Yes   ☐ No

3. Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5, AND either (1) is a prime government contractor or first-tier subcontractor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?

☐ Yes   ☐ No

4. If the response to the above question (C - 3) is Yes, please enter your Dun and Bradstreet identification number (if you have one):

*NOTE: If an answer to questions 1, 2 or 3 of Section C is "Yes", complete the entire form, otherwise skip to Section G.*

Save & Continue (https://web.archive.org/web/20170504053819/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey_2.cfm)

221

JA280

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195

 *U.S. Equal Employment Opportunity Commission*

This is the proposed EEO-1 Form to collect compensation data.

### SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Number of Employees (Report employees in only one category) | | | | | | | | | | | | | Total Col A-N |
| | | Race/Ethnicity | | | | | | | | | | | | | |
| | | Hispanic or Latino | | Non/Hispanic or Latino | | | | | | | | | | | |
| | | | | Male | | | | | | Female | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |

USCA Case #19-5130      Document #1802836         Filed: 06/19/2019      Page 227 of 369

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Technicians 3 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |

https://web.archive.org/web/20170506005055/https://www1.eeoc.gov//employers/eeo1survey/2016_new_survey_2.cfm?renderforprint=1

USCA Case #19-5130    Document #1802830    Filed: 06/19/2019    Page 228 of 369

| Category | Salary Range | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $163,800 - $207,999 | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | |
| Sales Workers 4 | $19,239 and under | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | |
| Adminstrative Support Workers 5 | $19,239 and under | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | |
| Craft Workers 6 | $19,239 and under | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | |

https://web.archive.org/web/20170506005055/https://www1.eeoc.gov//employers/eeo1survey/2016_new_survey_2.cfm?renderforprint=1

USCA Case #19-5130      Document #1802836      Filed: 06/19/2019      Page 229 of 369

| Job Category | Salary Range | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $62,920 - $80,079 | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | |
| Operatives 7 | $19,239 and under | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | |
| Laborers and Helpers 8 | $19,239 and under | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | |
| Service Workers 9 | $19,239 and under | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | |

https://web.archive.org/web/20170506005055/https://www1.eeoc.gov//employers/eeo1survey/2016_new_survey_2.cfm?renderforprint=1

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| $208,000 and over | | | | | | | | | | | | | | | | |
| Total 121. | | | | | | | | | | | | | | | | |
| Previous Year Total 122. | | | | | | | | | | | | | | | | |

Save & Go Back (https://web.archive.org/web/20170506005055/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm)

Save & Continue (https://web.archive.org/web/20170506005055/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey_3.cfm)

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195



U.S. Equal Employment Opportunity Commission

This is the proposed EEO-1 Form to collect compensation data.

SECTION D: EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Intervals | Race/Ethnicity | | | | | | | | | | | | | | Total Col A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hispanic or Latino | | Not-Hispanic or Latino | | | | | | | | | | | | |
| | | | | Male | | | | | | Female | | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| First/Mid-Level Officials and Managers 1.2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Technicians 3 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Sales Workers 4 | $19,239 and under | | | | | | | | | | | | | | | |

USCA Case #19-5130   Document #1802830   Filed: 08/19/2019   Page 232 of 369



Extract of payroll period used. (Omit on the Consolidated Report)

**SECTION E  ESTABLISHMENT INFORMATION**
*(Omit on the Consolidated Report)*

What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title insurance, etc. Include the specific type of product of type of service provided, as well as the principal business or industrial activity.)

**SECTION F  REMARKS**

Use this item to give any identifications as a typewriting on the last EEO-1 report which affect this year or this year which changes in composition of reporting units and other pertinent information.

**SECTION G  CERTIFICATION**

Check One:
☐ 1. All report is accurate and were prepared in accordance with the instructions. (Check on Consolidated Report Only.)
☐ 2. This report is accurate and was prepared in accordance with the instructions.

| | | |
|---|---|---|
| Name of Certifying Official | Title | Signature |
| Name of Person to contact regarding this report | Title | Address (Number and Street) |
| City and State | Zip Code | Email Address |

Back to Go Back Print to U.S. Form 1

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Committee
P.O. BOX 8125 Reston, VA 20195

USCA Case #19-5130 Document #1802830 Filed: 08/19/2019 Page 234 of 369

 *U.S. Equal Employment Opportunity Commission*

## 2017 EEO-1 Survey

### THE 2017 EEO-1 SURVEY WILL BE CHANGING

The **Employer Information Report EEO-1**, otherwise known as the EEO-1 Report, will be changing.  Details on how to file are provided below.

**Reports must be submitted and certified by:**

**March 31, 2018**

**PLEASE NOTE THAT YOUR 2016 PASSWORD WILL NOT WORK FOR THE 2017 EEO-1 SURVEY**

### Final Notice and Supporting Materials

- Final Federal Register Notice
- Revised EEO-1 Instruction Booklet
- Notice of Office of Management and Budget Action
- Order

### Data File Specifications

See below for file specifications for data upload and sample EEO-1 report (Components 1 and 2).

- Data file layout
- Sample 2017 EEO-1 form: PDF | HTML

### Additional Materials

- Small Business Fact Sheet
- Questions and Answers

### Addtional Information

- Ron Edwards
  EEO1.Suggestionbox@eeoc.gov

### Technical Assistance Opportunities

- Webinar: Revisions to the 2017 EEO-1 Survey to Collect Summary Pay Data
- The Revised EEO-1 and Summary Pay Data: Questions And Answers from the EEOC's October 2016 Employer Webinars



- 10/26/16 Webinar PowerPoint slides (PDF)

### Data Security

JA290

USCA Case #18-5130     Document #1802830       Filed: 08/19/2019     Page 235 of 369

The EEOC maintains robust cybersecurity and privacy programs, in compliance with the Federal Information Security Modernization Act and based on NIST Special Publication 800-53, *Security and Privacy Controls for Federal Information Systems and Organizations*. The implemented security and privacy controls protect organizational operations and information system assets against a diverse set of threats, including malicious attacks, natural disasters, structural failures, and human error.

The hosting service for the EEO-1 data collection system provides a defense-in-depth security program with many layers of security utilizing different physical and software components in order to provide a high level of protection. Security monitoring - both inside and outside the network, ensures the detection and rejection of unauthorized use. These security controls and measures are monitored continuously with automated vulnerability and compliance software suites.

Español | Other Languages

**U.S. Equal Employment Opportunity Commission**

| Enter search terms... | Search |

CONNECT WITH US   

Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies

Contact Us

Home > Employers > EEO-1 Survey

🖨 ✉ **+ Share**

**EEO-1 JOINT REPORTING COMMITTEE**

- Equal Employment Opportunity Commission

- Office of Federal Contract Compliance Programs

OMB No. 3046-0007
Approval Expires 9/2019

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

WASHINGTON, D.C. 20507

**EQUAL EMPLOYMENT OPPORTUNITY**
STANDARD FORM 100, REV. March 2018, EMPLOYER INFORMATION REPORT EEO-1
**INSTRUCTION BOOKLET**

The Employer Information EEO-1 report (Standard Form 100) is collected annually under the authority of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq., as amended. All employers with 15 or more employees are covered by Title VII and are required to keep employment records as specified by Commission regulations. Based on the number of employees and federal contract activities, certain employers are required to file an EEO-1 report on an annual basis by the Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor Office of Federal Contract Compliance Programs (OFCCP) regulations. The type of information that employers are required to submit on the EEO-1 will depend on the employer's size. Starting in 2017, Federal contractors with 50 to 99 employees will be required to submit data about employees' ethnicity, race, and sex, by job category (Component 1) of the EEO-1. Filers with 100 or more employees (both private industry and Federal contractor) will be required to submit Component 1 and also summary pay and hours-worked data (Component 2).

See the Appendix for the applicable provisions of Title VII, Section 709(c) of Title VII, and the applicable EEOC regulations, Sections 1602.7-1602.14, Chapter XIV, Title 29 of the Code of Federal Regulations. State and local governments, public school systems and educational institutions are covered by other employment reports and are excluded from Standard Form 100, Employer Information Report EEO-1.

In the interests of consistency, uniformity and economy, Standard Form 100 has been jointly developed by the EEOC and OFCCP, as a single form which meets the statistical needs of both programs. In addition, this form should be a valuable tool for companies to use in evaluating their own internal programs for insuring equal employment opportunity.

As stated above, the filing of Standard Form 100 is required by law; *it is not voluntary*. Under section 709(c) of Title VII, the Equal Employment Opportunity Commission may compel an employer to file this form by obtaining an order from the United States District Court.

Under Section 209(a) of Executive Order 11246, the penalties for failure by a federal contractor or subcontractor to comply may include termination of the federal government contract and debarment from future federal contracts.

**1. WHO MUST FILE**

(A) Standard Form 100 - Component 1 only. The following federal contractor employers must file only Component 1 of Standard Form 100: all federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 50 to 99 employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more or serve as depositories of Government funds in any amount, or are financial institutions which are issuing and paying agents for U.S. Savings Bonds and savings notes.

(B) Standard Form 100, Components 1 and 2. The following employers must file both Components 1 and 2 of Standard Form 100:

(i) All private employers who are (1) subject to Title VII of the Civil Rights Act of 1964, as amended, with 100 or more employees EXCLUDING State and local governments, public primary and secondary school systems, institutions of higher education, American Indian or Alaska Native tribes and tax-exempt private membership clubs other than labor organizations; OR (2) subject to Title VII who have fewer than 100 employees if the company is owned or affiliated with another company, or there is centralized ownership, control or management (such as central control of personnel policies and labor relations) so that the group legally constitutes a single enterprise, and the entire enterprise employs a total of 100 or more employees.

AND

(ii) All federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 100 or more employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more; or (b) serve as depositories of Government funds in any amount; or are financial institutions which are issuing or paying agents for U.S. Savings Bonds and or savings notes.

Establishments located in the District of Columbia and the 50 states are required to submit Standard Form 100. No reports should be filed for establishments in Puerto Rico, the Virgin Islands, or other American Protectorates.

## 2. HOW TO FILE

### (a) EEO-1 Electronic Filing Requirement:

EEO-1 reporting is an electronic, online application. The EEOC requires that EEO-1 reports be submitted via the *EEO-1 Online Filing System*, or as an electronically transmitted data file.

Any employer who claims that the electronic submission of Standard Form 100 would create undue hardship may apply to the Commission for a special reporting procedure in accordance with the instructions set forth in paragraph 5.

**(b) Single-establishment employers**, i.e., employers doing business at only one establishment in one location must complete a single EEO-1 online data record.

**(c) Multi-establishment employers**, i.e., employers doing business at more than one establishment must complete online: (1) a report covering the principal or headquarters office; (2) a separate report for each establishment employing 50 or more persons; and (3) a separate report (Type 8 record) for each establishment employing fewer than 50 employees, OR an Establishment List (Type 6 record), showing the name, address, and total employment for each establishment employing fewer than 50 persons. For the EEO-1 online portal, companies using Establishment List reports (Type 6), must enter all employment data into the Consolidated report (Type 2). For the EEO-1 online application, all keyed employment data including data from the Type 8 reports will automatically transfer to populate the overall Consolidated Report.

The total number of employees indicated on the headquarters report, **PLUS** the establishment reports, **PLUS** the list of establishments employing fewer than 50 employees, **MUST** equal the total number of employees shown on the Consolidated Report.

Employment data for multi-establishment companies, including parent corporations and their subsidiary holdings, must report all employees working at each company establishment or subsidiary establishment. For purposes of this report, the term **parent corporation** refers to any corporation which owns all or the majority stock of another corporation so that the latter relates to it as a subsidiary.

## 3. WHEN TO FILE

This annual report must be filed not later than March 31 following the reporting year. Employment figures from any pay period in October through December may be used (workforce snapshot).

## 4. CONFIDENTIALITY

All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII, and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 data. Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned. The confidentiality requirements allow the EEOC to publish only aggregated data, and only in a manner that does not reveal any particular filer's or any individual employee's personal information.

OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that are made to obtain any of the data provided on the EEO-1 report, and will protect the confidentiality of EEO-1 pay and hours-worked data to the maximum extent possible consistent with FOIA and the Trade Secrets Act. However, should OFCCP receive FOIA requests for any EEO-1 data on filers not within its jurisdiction, OFCCP will refer the requests to the EEOC for a response. The confidentiality provision of Section 709(e) of Title VII applies to all EEO-1 data submitted by filers that are not federal contractors, and the EEOC adheres to that statutory provision when reviewing all requests for EEO-1 data.

## 5. REQUESTS FOR INFORMATION AND SPECIAL PROCEDURES

Where the employer claims undue hardship due to electronic submission or otherwise, the employer must submit in writing a detailed alternative proposal for compiling, reporting, or submitting information to: EEO-1 Coordinator, EEOC Survey Division, 131 M Street, NE, Room 4SW22G, Washington, DC 20507. In cases where the Commission approves written requests to submit paper EEO-1 forms, the paper EEO-1 report must be prepared in accordance with the directions set forth in the Commission's written approval. EEOC will generate a paper EEO-1 form only in extreme cases where internet access is not available to the employer. Only those special procedures approved in writing by the Commission are authorized. Such authorizations are only in effect for one report year. Paper records may not be submitted until after March 31.

## 6. BURDEN ESTIMATE

The reporting burden for Component 1 is estimated to be eight (8) hours per filer for firm-level functions plus an additional one (1) hour per report for establishment-level functions, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information.

The reporting burden for both Component 1 and Component 2 together is estimated to be fifteen and two tenths (15.2) hours per filer for firm-level functions plus an additional one and nine tenths (1.9) hours per report for establishment-level functions, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information.

Comments regarding this collection of information, including suggestions for reducing burden, can be sent at any time to:

EEO-1 Coordinator
EEOC Survey Division -- Room 4SW22G
131 M Street, N.E.
Washington, D.C. 20507

AND

Paperwork Reduction Project (3046-0007)
Office of Management and Budget
Washington, D.C. 20503

The full text of the OMB regulations on the Paperwork Reduction Act may be found at 5 CFR Part 1320.

**EEO-1 Terms**

### Type of Report (Status Code)

Single-Establishment company
1 Single-establishment company

Multi-establishment company

2 Consolidated Report (Required)

3 Headquarters Report (Required)

4 Establishment Report (50 or more employees)

6 Establishment List (Option 1)

8 Establishment Report (less than 50 employees) (Option 2)

Special Report (See 29 CFR 1602.10)

### Company Identification

Refers to the company name and address of the headquarters office of the multi-establishment company (Report Types 2 and 3); or the establishment name and address.

### Employers Who Are Required To File

Questions 1, 2 and 3 **MUST** be answered by all employers required to file the EEO-1. If the answer to Question C-3 is Yes, please enter the company's Dun and Bradstreet identification number if the company has one. If the answer is Yes to question 1 or 2, complete Components 1 and 2. If the answer is Yes to **only** question 3, complete Component 1 only. Otherwise skip to Section G.

### Employment Data

#### *Employment Data Reported by Employers Completing Component 1*

Employment data must include **ALL** full-time and part-time employees **who were employed during the payroll period selected by the employer between October 1 and December 31 (workforce snapshot)**, except those employees specifically excluded as indicated in the Appendix. Employees must be counted by sex and race, and ethnicity, for each of the ten occupational categories. See Appendix for detailed explanation of job categories and race and ethnicity identification.

Every employee must be accounted for in only one of the categories in Columns A through N.

Occupational Data - Employment data must be reported by job category. Report each employee in only one job category. In order to simplify and standardize the method of reporting, all jobs are considered as belonging in one of the broad job categories shown in the EEO-1. To assist you in determining where to place your jobs within the job categories, a description of them is in the *EEO-1 Job Classification Guide* or you may consult the EEO-1-Census Codes Cross Walk web site (https://www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm). For further clarification, you may wish to consult the Alphabetical and Classified Indices of Industries and Occupations (2010 Census) published by the U.S. Department of Commerce, Census Bureau.

#### *Employment Data for Employers Completing Components 1 and 2*

Employment data must include **ALL** full-time and part-time employees **who were employed during the payroll period selected by the employer between October 1 and December 31 (workforce snapshot)**, except those employees specifically excluded as indicated in the Appendix. Employees must be counted by sex, race, and ethnicity, and also by pay and hours worked. See Appendix for detailed explanation of job categories, race and ethnicity identification, and pay and hours-worked terminology. Every employee must be accounted for in only one of the categories in Columns A through N.

Section D Employee Report - Report total employees in the workforce snapshot for each job category and pay band. Every employee identified in the workforce snapshot must be accounted for in one of the twelve pay bands for an EEO-1 job category.

Section D Pay Report - Report W-2 Box 1 earnings for the year for all employees identified in the workforce snapshot. If an employee is not included in the workforce snapshot, his or her W-2 Box 1 earnings are not tallied. If an employee is included in the workforce snapshot, his or her W-2 Box 1 earnings are tallied, even if he or she is no longer employed at the end of the year. Note that income earned after the conclusion of the last full pay period in December is often paid to employees in the next calendar year. For EEO-1 purposes, that income would be counted in the next year, **when it is reported on the W-2**.

Section D Hours Worked Report - Report hours worked for all employees in the snapshot in their job category and pay band. Hours worked are reported as an aggregate value for each job category and pay band, representing the total of all hours worked

that year by all employees reported in that job category and pay band. If wages are actually paid in the next calendar year for work done in the last days of the past calendar year, these hours are counted in the next year, **because that is when the pay is reported on the W-2.**

For employees who are not exempt from the minimum wage and/or overtime provisions of the Fair Labor Standards Act (FLSA), count the "hours worked" as recorded for FLSA purposes during the reporting year.

For employees who are exempt from the minimum wage and/or overtime provisions of the FLSA, either (1) report a proxy of 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO-1 reporting year; or (2) provide actual hours of work by exempt employees if the employer already maintains accurate records of this information. To the extent that the use of the proxy numbers cause some deviation from an exempt employee's actual hours worked, the certification of the report as accurate would be considered appropriate. See also "6. Description of Pay-Related Terminology" in the Appendix for related information.

To standardize reporting, all jobs are considered to belong in one of the EEO-1 job categories shown in the Section D Employment Data table. To assist in determining where to place jobs within these categories, consult the description of job categories in the *EEO-1 Job Classification Guide* or the EEO-1-Census Codes Cross Walk web site (https://www.census.gov/people/eeotabulation/documentation/jobgroups.pdf). For further clarification, consult the Alphabetical and Classified Indices of Industries and Occupations (2010 Census) published by the U.S. Department of Commerce, Census Bureau.

### Establishment Information

The major activity should be sufficiently descriptive to identify the industry and product produced or service provided. If an establishment is engaged in more than one activity, describe the activity at which the **greatest** number of employees work.

**The description of the major activity indicated on the Headquarters Report (Type 3) must reflect the dominant economic activity of the company in which the greatest numbers of employees are engaged.**

### Remarks

Include in this section any remarks, explanations, or other pertinent information regarding this report.

### Certification

If all reports have been completed at headquarters, the authorized official should check Item 1 and sign the Consolidated Report only. If the reports have been completed at the individual establishments, the authorized official should check Item 2 and sign the establishment report.

### APPENDIX

### 1. DEFINITIONS APPLICABLE TO ALL EMPLOYERS

*a.* "Commission" refers to the Equal Employment Opportunity Commission.

*b.* "OFCCP" refers to the Office of Federal Contract Compliance Programs, U.S. Department of Labor, established to implement Executive Order 11246, as amended.

*c.* "Joint Reporting Committee" is the committee representing the Commission and OFCCP for the purpose of administering this reporting system.

*d.* "Employer" under Section 701(b), Title VII of the Civil Rights Act of 1964, as amended, means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include the United States, a corporation wholly owned by the government of the United States, American Indian or Alaska Native tribes, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5 of the United States Code), or a bona fide private membership club (other than a labor organization) which is exempt from taxation under Section 501(c) of the Internal Revenue Code of 1954; OR any person or entity subject to Executive Order 11246 who is a federal government prime contractor or subcontractor at any tier (including a bank or other establishment serving as a depository of

federal government funds, or an issuing and paying agent of U.S. Savings Bonds and savings notes, or a holder of a federal government bill of lading) or a federally-assisted construction prime contractor or subcontractor at any tier.

e. "Employee" means any individual on the payroll of an employer who is an employee for purposes of the employers withholding of Social Security taxes except insurance sales agents who are considered to be employees for such purposes solely because of the provisions of 26 USC 3121 (d)(3)(B) (the Internal Revenue Code). Leased employees are included in this definition.

f. "Leased Employee", for EEO-1 reporting only, means a permanent employee provided by an employment agency for a fee to an outside company for which the employment agency handles all personnel tasks including payroll, staffing, benefit payments and compliance reporting. The employment agency shall include leased employees in its EEO-1 report. **For EEO-1 reporting purposes only**, the term "employee" shall not include persons who are hired on a casual basis for a specified time, or for the duration of a specified job (for example, a person at a construction site whose employment relationship is expected to terminate with the end of the employee's work at the site); persons temporarily employed in any industry other than construction, such as temporary office workers, mariners, stevedores, lumber yard workers, etc., who are hired through a hiring hall or other referral arrangement, through an employee contractor or agent, or by some individual hiring arrangement, or persons **(EXCEPT** leased employees) on the payroll of an employment agency who are referred by such agency for work to be performed on the premises of another employer under that employers direction and control. These definitions are only for purposes of clarifying who reports these individuals on the EEO-1 and do not have legal ramifications as to the analysis of whether a particular individual is an employee or an independent contractor. That is done under the factors enumerated by the Supreme Court in *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992).

f. "Commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

g. "Industry Affecting Commerce" means any activity, business or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry affecting commerce within the meaning of the Labor Management Reporting and Disclosure Act of 1959. Any employer of 15 or more persons is presumed to be in an industry affecting commerce.

h. "Establishment" is generally a single physical location where business is conducted or where services or industrial operations are performed (e.g., factory, mill, store, hotel, movie theater, mine, farm, airline terminal, sales office, warehouse, or central administrative office (definition adapted from the *North American Industry Classification System, 2012*).

Units at different physical locations, even though engaged in the same kind of business operation, must be reported as separate establishments. For locations involving construction, transportation, communications, electric, gas, and sanitary services, oil and gas fields, and similar types of physically dispersed industrial activities, however, it is not necessary to list separately each individual site, project, field, line, etc., unless it is treated by you as a separate legal entity. For these types of activities, list as establishments only those relatively permanent main or branch offices, terminals, stations etc., which are either: (a) directly responsible for supervising such dispersed activities (where employees work from home, they should be reported as if working at the establishment where their supervisor is reported to work); or (b) the base from which personnel and equipment operate to carry out these activities. (Where these dispersed activities cross State lines, at least one such establishment should be listed for each State involved.)

i. "Major Activity" means the major product or group of products produced or handled, or services rendered by the reporting unit (e.g., manufacturing airplane parts, retail sales of office furniture) in terms of the activity at which the greatest number of all employees work. The description includes the type of product manufactured or sold or the type of service provided. "Major Activity" is based on the industrial definitions developed by the federal government as adopted by the EEOC (For example, the *North American Industry Classification System, 2012*).

It is the opinion of the Commission that Section 702 of Title VII of the Civil Rights Act of 1964, as amended, does not authorize a complete exemption of religious organizations from the coverage of the Act or of the reporting requirements of the Commission. The exemption for religious organizations applies to their employment of individuals of a particular religion to perform work connected with the organization's activities. Therefore, since the Standard Form 100 does not provide for information as to the religion of employees, religious organizations must report all information required by this report.

238

JA297

**2. DEFINITIONS APPLICABLE ONLY TO GOVERNMENT CONTRACTORS SUBJECT TO EXECUTIVE ORDER 11246**

*a.* "Order" means Executive Order 11246, as amended.

*b.* "Contract" means any government contract or any federally-assisted construction contract.

*c.* "Prime Contractor" means any employer having a government contract or any federally-assisted construction contract, or any employer serving as a depository of federal government funds.

*d.* "Subcontractor" means any employer having a contract with a prime contractor or another subcontractor calling for supplies or services required for the performance of a government contract or federally assisted construction contract.

e. "Contracting Agency" means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which enters into contracts.

*f.* "Administering Agency" means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which administers a program involving federally-assisted construction contracts.

**3. RESPONSIBILITIES OF PRIME CONTRACTORS**

*a.* At the time of an award of a subcontract subject to these reporting requirements, the prime contractor shall inform the subcontractor of its responsibility to submit annual EEO-1 employment data in accordance with these instructions.

*b.* If prime contractors are required by their Contracting Officer or subcontractors by their prime contractors, to submit notification of filing, they shall do so by ordinary correspondence. However, such notification is not required by and should not be sent to the Joint Reporting Committee.

**4. RACE, ETHNIC, AND SEX IDENTIFICATION**

Self-identification is the preferred method of identifying the race and ethnic information necessary for the EEO-1 report. Employers are required to attempt to allow employees to use self-identification to complete the EEO-1 report. If an employee declines to self-identify his or her race and/or ethnicity, employment records or observer identification may be used.

Where records are maintained, it is recommended that they be kept separately from the employee's basic personnel file or other records available to those responsible for personnel decisions. Self-identification is the preferred method of identifying the sex information necessary for the EEO-1 report.

Race and ethnicity designations as used by the Equal Employment Opportunity Commission for the EEO-1 do not denote scientific definitions of anthropological origins. In addition, such designations do not control who is protected by Title VII's prohibitions against employment discrimination based on race or national origin.

Definitions of the EEO-1 race and ethnicity categories are as follows:

**Hispanic or Latino** - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

**White (Not Hispanic or Latino)** - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Black or African American (Not Hispanic or Latino)** - A person having origins in any of the black racial groups of Africa.

**Native Hawaiian or Pacific Islander (Not Hispanic or Latino)** - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

**Asian (Not Hispanic or Latino)** - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

**Native American or Alaska Native (Not Hispanic or Latino)** - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

**Two or More Races (Not Hispanic or Latino) -** All persons who identify with more than one of the above five races.

239

JA298

**Instructions for assigning employees into the race/ethnic categories:**

**Hispanic or Latino** - Include all employees who answer YES to the question, Are you Hispanic or Latino. Report all Hispanic males in Column A and Hispanic females in Column B.

**White (Not Hispanic or Latino)** - Include all employees who identify as White males in Column C and as White females in Column I.

**Black or African American (Not Hispanic or Latino)**- Include all employees who identify as Black males in Column D and as Black females in Column J.

**Native Hawaiian or Pacific Islander (Not Hispanic or Latino)** - Include all employees who identify as Native Hawaiian or Other Pacific Islander males in Column E and as Native Hawaiian or Other Pacific Islander females in Column K.

**Asian (Not Hispanic or Latino)** - Include all employees who identify as Asian males in Column F and as Asian females in Column L.

**Native American or Alaska Native (Not Hispanic or Latino)** - Include all employees who identify as Native American or Alaska Native males in Column G and as Native American or Alaska Native females in Column M.

**Two or More Races (Not Hispanic or Latino)** - Report all male employees who identify with more than one of the above five races in Column H and all female employees who identify with more than one of the above five races in Column N.

As to the method of collecting data, the basic principles for ethnic and racial self-identification for purposes of the EEO-1 report are:

(1) Offer employees the opportunity to self- identify

(2) Provide a statement about the voluntary nature of this inquiry for employees. For example, language such as the following may be used (employers may adapt this language):

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual."

## 5. DESCRIPTION OF JOB CATEGORIES

The major job categories are listed below, including a brief description of the skills and training required for occupations in that category and examples of the job titles that fit each category. The examples shown below are illustrative and not intended to be exhaustive of all job titles in a job category. These job categories are primarily based on the average skill level, knowledge, and responsibility involved in each occupation within the job category.

The Officials and Managers category as a whole is to be divided into the following two subcategories: Executive/Senior Level Officials and Managers and First/Mid Level Officials and Managers. These subcategories are intended to mirror the employers own well established hierarchy of management positions. Small employers who may not have two well-defined hierarchical steps of management should report their management employees in the appropriate categories.

*Executive/Senior Level Officials and Managers.* Individuals who plan, direct and formulate policies, set strategy and provide the overall direction of enterprises/organizations for the development and delivery of products or services, within the parameters approved by boards of directors or other governing bodies. Residing in the highest levels of organizations, these executives plan, direct or coordinate activities with the support of subordinate executives and staff managers. They include, in larger organizations, those individuals within two reporting levels of the CEO, whose responsibilities require frequent interaction with the CEO. Examples of these kinds of managers are: chief executive officers, chief operating officers, chief financial officers, line of business heads, presidents or executive vice presidents of functional areas or operating groups, chief information officers, chief human resources officers, chief marketing officers, chief legal officers, management directors and managing partners.

240

JA299

*First/Mid Level Officials and Managers.* Individuals who serve as managers, other than those who serve as Executive/Senior Level Officials and Managers, including those who oversee and direct the delivery of products, services or functions at group, regional or divisional levels of organizations. These managers receive directions from the Executive/Senior Level management and typically lead major business units. They implement policies, programs and directives of executive/senior management through subordinate managers and within the parameters set by Executive/Senior Level management. Examples of these kinds of managers are: vice presidents and directors, group, regional or divisional controllers; treasurers; human resources, information systems, marketing, and operations managers. The First/Mid Level Officials and Managers subcategory also includes those who report directly to middle managers. These individuals serve at functional, line of business segment or branch levels and are responsible for directing and executing the day-to-day operational objectives of enterprises/organizations, conveying the directions of higher level officials and managers to subordinate personnel and, in some instances, directly supervising the activities of exempt and non-exempt personnel. Examples of these kinds of managers are: first-line managers; team managers; unit managers; operations and production mangers; branch managers; administrative services managers; purchasing and transportation managers; storage and distribution managers; call center or customer service managers; technical support managers; and brand or product managers.

*Professionals.* Most jobs in this category require bachelor and graduate degrees, and/or professional certification. In some instances, comparable experience may establish a person's qualifications. Examples of these kinds of positions include: accountants and auditors; airplane pilots and flight engineers; architects; artists; chemists; computer programmers; designers; dieticians; editors; engineers; lawyers; librarians; mathematical scientists; natural scientists; registered nurses; physical scientists; physicians and surgeons; social scientists; teachers; and surveyors.

*Technicians.* Jobs in this category include activities that require applied scientific skills, usually obtained by post-secondary education of varying lengths, depending on the particular occupation, recognizing that in some instances additional training, certification, or comparable experience is required. Examples of these types of positions include: drafters; emergency medical technicians; chemical technicians; and broadcast and sound engineering technicians.

*Sales Workers.* These jobs include non-managerial activities that wholly and primarily involve direct sales. Examples of these types of positions include: advertising sales agents; insurance sales agents; real estate brokers and sales agents; wholesale sales representatives; securities, commodities, and financial services sales agents; telemarketers; demonstrators; retail salespersons; counter and rental clerks; and cashiers.

*Administrative Support Workers.* These jobs involve non-managerial tasks providing administrative and support assistance, primarily in office settings. Examples of these types of positions include: office and administrative support workers; bookkeeping; accounting and auditing clerks; cargo and freight agents; dispatchers; couriers; data entry keyers; computer operators; shipping, receiving and traffic clerks; word processors and typists; proofreaders; desktop publishers; and general office clerks.

*Craft Workers* (formerly Craft Workers (Skilled)). Most jobs in this category include higher skilled occupations in construction (building trades craft workers and their formal apprentices) and natural resource extraction workers. Examples of these types of positions include: boilermakers; brick and stone masons; carpenters; electricians; painters (both construction and maintenance); glaziers; pipelayers, plumbers, pipefitters and steamfitters; plasterers; roofers; elevator installers; earth drillers; derrick operators; oil and gas rotary drill operators; and blasters and explosive workers. This category also includes occupations related to the installation, maintenance and part replacement of equipment, machines and tools, such as: automotive mechanics; aircraft mechanics; and electric and electronic equipment repairers. This category also includes some production occupations that are distinguished by the high degree of skill and precision required to perform them, based on clearly defined task specifications, such as: millwrights; etchers and engravers; tool and die makers; and pattern makers.

*Operatives* (formerly Operatives (Semi-skilled)). Most jobs in this category include intermediate skilled occupations and include workers who operate machines or factory-related processing equipment. Most of these occupations do not usually require more than several months of training. Examples include: textile machine workers; laundry and dry cleaning workers; photographic process workers; weaving machine operators; electrical and electronic equipment assemblers; semiconductor processors; testers, graders and sorters; bakers; and butchers and other meat, poultry and fish processing workers. This category also includes occupations of generally intermediate skill levels that are concerned with operating and controlling equipment to facilitate the movement of people or materials, such as: bridge and lock tenders; truck, bus or taxi drivers; industrial truck and tractor (forklift) operators; parking lot attendants; sailors; conveyor operators; and hand packers and packagers.

*Laborers and Helpers* (formerly Laborers (Unskilled)). Jobs in this category include workers with more limited skills who require only brief training to perform tasks that require little or no independent judgment. Examples include: production and construction worker helpers; vehicle and equipment cleaners; laborers; freight, stock and material movers; service station attendants; construction laborers; refuse and recyclable materials collectors; septic tank servicers; and sewer pipe cleaners.

*Service Workers*. Jobs in this category include food service, cleaning service, personal service, and protective service activities. Skill may be acquired through formal training, job-related training or direct experience. Examples of food service positions include: cooks; bartenders; and other food service workers. Examples of personal service positions include: medical assistants and other healthcare support positions; hairdressers; ushers; and transportation attendants. Examples of cleaning service positions include: cleaners; janitors; and porters. Examples of protective service positions include: transit and railroad police and fire fighters; guards; private detectives and investigators.

## 6. DESCRIPTION OF PAY-RELATED TERMINOLOGY

*a.* "Hours Worked" means the annual sum of hours (1) a nonexempt employee worked within the meaning of the Fair Labor Standards Act (FLSA) during the EEO-1 reporting year; or (2) an exempt employee worked during the EEO-1 reporting year based on either (a) a proxy of 40 hours per week for a full-time exempt employee, and 20 hours per week for a part-time exempt employee, multiplied by the number of weeks the individual was employed during the EEO-1 reporting year; or (2) actual hours worked by an exempt employee if the employer already maintains accurate records of this information.

*b.* "Pay" means an employee's W2 earnings, specifically those reported in Box 1 of the W2 form-Wages, tips, other compensation. IRS directions for that entry are "Show the total taxable wages, tips, and other compensation that you paid to your employee during the year. However, do not include elective deferrals (such as employee contributions to a section 401(k) or 403(b) plan) except section 501(c)(18) contributions." Employers are expected to use payroll reports for the previous four quarters to generate the necessary data. Please refer to the IRS website for specific examples (https://www.irs.gov/instructions/iw2w3/ch01.html#d0e2347).

c. "Pay band" means a range of salaries with a minimum and maximum value into which employee pay data is organized. There are twelve pay bands shown in the table below.

| Pay Band | Pay Band Label |
| --- | --- |
| 1 | $19,239 and under. |
| 2 | $19,240 - $24,439 |
| 3 | $24,440 - $30,679 |
| 4 | $30,680 - $38,999 |
| 5 | $39,000 - $49,919 |
| 6 | $49,920 - $62,919 |
| 7 | $62,920 - $80,079 |
| 8 | $80,080 - $101,919 |

| | $101,920 - $128,959 |
|---|---|
| 10 | $128,960 - $163,799 |
| 11 | $163,800 - $207,999 |
| 12 | $208,000 and over. |

## 7. LEGAL BASIS FOR REQUIREMENTS

SECTION 709(c), TITLE VII, CIVIL RIGHTS ACT OF 1964, AS AMENDED

Execution, retention, and preservation of records; reports to Commission; training program records; appropriate relief from regulation or order for undue hardship; procedure for exemption; judicial action to compel compliance

Every employer, employment agency, and labor organization subject to this subchapter shall: (1) make and keep such records relevant to the determination of whether unlawful employment practice have been or are being committed, (2) pre erve uch records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this title or the regulations or orders thereunder. The Commission shall, by regulation, require each employer, labor organization, and joint labor-management committee subject to this subchapter which controls an apprenticeship or other training program to maintain such records as are reasonably necessary to carry out the purposes of this subchapter, including, but not limited to, a list of applicants who wish to participate in such program, including the chronological order in which applications were received, and to furnish to the Commission upon request, a detailed description of the manner in which persons are selected to participate in the apprenticeship or other training program. Any employer, employment agency, labor organization, or joint labor-management committee which believes that the application to it of any regulation or order issued under this section would result in undue hardship may apply to the Commission for an exemption from the application of such regulation or order, and, if such application for an exemption is denied, bring a civil action in the United States District Court for the district where such records are kept. If the Commission or the court, as the case may be, finds that the application of the regulation or order to the employer, employment agency, or labor organization in question would impose an undue hardship, the Commission or the court, as the case may be, may grant appropriate relief. If any person required to comply with the provisions of this subsection fails or refuses to do so, the United States District Court for the district in which such person is found, resides, or transacts business, shall, upon application of the Commission, or the Attorney General in a case involving a government, governmental agency or political subdivision, have jurisdiction to issue to such person an order requiring him to comply.

### TITLE 29, CHAPTER XIV CODE OF FEDERAL REGULATIONS

*Subpart B -- Employer Information Report*

### §1602.7 Requirement for filing of report.

On or before March 31 of each year, every employer that is subject to Title VII of the Civil Rights Act of 1964, as amended, and that has 100 or more employees, shall file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as "Employer Information Report EEO-1"), in conformity with the directions set forth in the form and accompanying instructions. Notwithstanding the provisions of §1602.14, every such employer shall retain at all times at each reporting unit, or at company or divisional headquarters, a copy of the most recent report filed for each such unit and shall make the same available if requested by an officer, agent, or employee of the Commission under the authority of section 710 of Title VII. Appropriate copies of Standard Form 100 in blank will be supplied to every employer known to the Commission to be subject to the reporting requirements, but it is the responsibility of all such employers to obtain necessary supplies of the form from the Commission or its delegate prior to the filing date.

§1602.8 Penalty for making of willfully false statements on report.

The making of willfully false statements on Report EEO-1 is a violation of the United States Code, Title 18, section 1001, and is punishable by fine or imprisonment as set forth therein.

### §1602.9 Commissions remedy for employers failure to file report.

Any employer failing or refusing to file Report EEO-1 when required to do so may be compelled to file by order of a U.S. District Court, upon application of the Commission.

### §1602.10 Employers exemption from reporting requirements.

If an employer claims that the preparation or filing of the report would create undue hardship, the employer may apply to the Commission for an exemption from the requirements set forth in this part, according to instruction 5. If an employer is engaged in activities for which the reporting unit criteria described in section 5 of the instructions is not readily adaptable, special reporting procedures may be required. If an employer seeks to change the date for filing its Standard Form 100 or seeks to change the period for which data are reported, an alternative reporting date or period may be permitted. In such instances, the employer should so advise the Commission by submitting to the Commission or its delegate a specific written proposal for an alternative reporting system prior to the date on which the report is due.

### §1602.11 Additional reporting requirements.

The Commission reserves the right to require reports, other than that designated as the Employer Information Report EEO-1, about the employment practices of individual employers or groups of employers whenever, in its judgment, special or supplemental reports are necessary to accomplish the purposes of Title VII, the ADA, or GINA. Any system for the requirement of such reports will be established in accordance with the procedures referred to in section 709(c) of Title VII, section 107 of the ADA, or section 207(a) of GINA and as otherwise prescribed by law.

Subpart C--Recordkeeping by Employers

### §1602.12 Records to be made or kept.

The Commission has not adopted any requirement, generally applicable to employers, that records be made or kept. It reserves the right to impose recordkeeping requirements upon individual employers or groups of employers subject to its jurisdiction whenever, in its judgment, such records (a) are necessary for the effective operation of the EEO-1 reporting system or of any special or supplemental reporting system as described above; or (b) are further required to accomplish the purposes of title VII, the ADA, or GINA. Such record-keeping requirements will be adopted in accordance with the procedures referred to in section 709(c) of title VII, section 107 of the ADA, or section 207(a) of GINA, and otherwise prescribed by law.

### §1602.13 Records as to racial or ethnic identity of employees.

Employers may acquire the information necessary for completion of Section D of the EEO-1 either by visual surveys of the work force, or at their option, by the maintenance of post-employment records as to the identity of employees where the same is permitted by State law. In the latter case, however, the Commission recommends the maintenance of a permanent record as to the racial or ethnic identity of an individual for purpose of completing the report form only where the employer keeps such records separately from the employees basic personnel form or other records available to those responsible for personnel decisions, e.g., as part of an automatic data processing system in the payroll department.

### §1602.14 Preservation of records made or kept.

Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, or GINA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or

244 JA303

the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

**CONNECT WITH US**

Privacy Policy | Disclaimer | USA.Gov



Español | Other Languages

## U.S. Equal Employment Opportunity Commission

Enter search terms...   [Search]

CONNECT WITH US   

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

| Contact Us |

Home > Employers > EEO-1 Survey

# 2017 EEO-1 Survey
## Data File Layout Components 1 and 2

(*Download as an Excel file*)

| FIELD | FIELD NAME | POSITIONS | LNGTH | FIELD TYPE | POSSIBLE VALUES & REMARKS |
|---|---|---|---|---|---|
| 1 | COMPANY NUMBER | 1 - 7 | 7 | AN | UNIQUE IDENTIFIER FOR ENTIRE COMPANY **(REQUIRED)** |
| 2 | STATUS CODE | 8 | 1 | N | INDICATES TYPE OF REPORT AS INDICATED IN PART A OF SF 100: |
| | | | | | 1 = SINGLE-ESTAB EMPLOYER MULTI-ESTAB COMPANIES: |
| | | | | | 2 = CONSOLIDATED REPORT |
| | | | | | 3 = HEADQUARTERS REPORT |
| | | | | | 4 = ESTABLISHMENT REPORT (50+ EMPLOYEES - NOT FIRST TIME REPORTING) |
| | | | | | 5 = SPECIAL REPORTING PROCEDURE |
| | | | | | 8 = STATUS CODE 8 REPORT (LESS THAN 50 EMPLOYEES) |
| | | | | | 9 = STATUS CODE 9 REPORT (FEWER THAN 50 EMPLOYEES - FIRST TIME REPORTING) |
| | | | | | **(REQUIRED)** |
| 3 | UNIT NUMBER | 9 - 15 | 7 | AN | REQUIRED EXCEPT FOR NEW STATUS CODE 8 AND ALL STATUS CODE 9 RECORDS |
| 4 | UNIT NAME | 16 - 50 | 35 | AN | ESTABLISHMENT NAME **(REQUIRED)** |
| 5 | UNIT ADDRESS | 51 - 84 | 34 | AN | ESTABLISHMENT ADDRESS **(REQUIRED)** |
| 6 | UNIT ADDRESS-2 | 85 - 109 | 25 | AN | EXTENDED ESTABLISHMENT ADDRESS TO INCLUDE SUITE NO., PO BOX, ETC. (OPTIONAL) |

USCA Case #19-5130    Document #1802830    Filed: 08/19/2019    Page 250 of 369

| 7 | CITY NAME | 110 - 129 | 20 | A | CITY NAME **(REQUIRED)** |
|---|---|---|---|---|---|
| 8 | STATE ABBREVIATION | 130 - 131 | 2 | A | FIPS PUB 5-2(CENSUS) **(REQUIRED)** |
| 9 | ZIP CODE | 132 - 136 | 5 | N | U.S. POSTAL SERVICE **(REQUIRED)** |
| 10 | QUESTION B.2.C | 137 | 1 | N | WAS AN EEO-1 REPORT FILED FOR THIS ESTABLISHMENT LAST YEAR? 1=YES; 2=NO **(REQUIRED)** |
| 11 | QUESTION C.1 | 138 | 1 | N | DOES THE ENTIRE COMPANY HAVE AT LEAST 100 EMPLOYEES IN THE PAYROLL PERIOD FOR WHICH YOU ARE REPORTING? 1=YES; 2=NO **(REQUIRED)** |
| 12 | QUESTION C.2 | 139 | 1 | N | IS YOUR COMPANY AFFILIATED THROUGH COMMON OWNERSHIP AND/OR CENTRALIZED MANAGEMENT WITH OTHER ENTITIES IN AN ENTERPRISE WITH A TOTAL EMPLOYMENT OF 100 OR MORE? 1=YES; 2=NO **(REQUIRED)** |
| 13 | QUESTION C.3 | 140 | 1 | N | DOES THE COMPANY OR ANY OF ITS ESTABLISHMENTS (A) HAVE 50 OR MORE EMPLOYEES AND (B) IS NOT EXEMPT AS PROVIDED BY 41 CFR 60-1.5, AND EITHER (1) IS A PRIME GOVERNMENT CONTRACTOR OR FIRST-TIER SUBCONTRACTOR, AND HAS A CONTRACT, SUBCONTRACT, OR PURCHASE ORDER AMOUNTING TO $50,000 OR MORE, OR (2) SERVES AS A DEPOSITORY OF GOVERNMENT FUNDS IN ANY AMOUNT OR IS A FINANCIAL INSTITUTION WHICH IS AN ISSUING AND PAYING AGENT FOR U.S. SAVINGS BONDS AND SAVINGS NOTES? 1=YES; 2=NO **(REQUIRED)** |
| 14 | DUN AND BRADSTREET IDENTIFICATION NUMBER | 141 - 149 | 9 | N | IF THE RESPONSE TO QUESTION C.3 IS YES, PLEASE ENTER YOUR DUN AND BRADSTREET IDENTIFICATION NUMBER (REQUIRED IF AVAILABLE) |
| 15 | COUNTY NAME | 150 - 167 | 18 | A | FIPS PUB 6-4 (CENSUS) **(REQUIRED)** |
| 16 | QUESTION D.1 | 168 - 183 | 16 | N | **YEAR USED FOR COMPENSATION AND HOURS DATA: MMDDYYYYMMDDYYYY. TIME FRAME MUST BE FOR ONE YEAR ENDING IN THE SURVEY YEAR (REQUIRED)** |
| 17 | NAICS CODE | 184 - 189 | 6 | N | USE NAICS CODES FROM www.eeoc.gov/eeo1survey **(REQUIRED)** |
| 18 | TITLE OF CERTIFYING OFFICIAL | 190 - 224 | 35 | A | **(REQUIRED)** |
| 19 | NAME OF CERTIFYING OFFICIAL | 225 - 259 | 35 | A | **(REQUIRED)** |

247

JA306

| 20 | TELEPHONE NUMBER | 260 - 269 | 10 | N | INCLUDE AREA CODE (**REQUIRED**) |
|---|---|---|---|---|---|
| 21 | EMAIL ADDRESS OF CERTIFYING OFFICIAL | 270 - 309 | 40 | AN | REQUIRED IF AVAILABLE |
| 22 | MATRIX DATA NUMBER OF EMPLOYEES | 310 - 11320 | 11011 | N | 121 LINES - 91 POSITIONS EACH |
| | JOB CATEGORY 1.1 LINES 1-12 | 310 - 1401 | 1092 | | EXECUTIVE/SENIOR LEVEL OFFICIALS AND MANAGERS (Line No. 1.1, Section D, on EEO-1 Form) |
| | JOB CATEGORY 1.1 LINE 1 | 310 - 400 | 91 | | $19,239 and under |
| | COLUMN A | 310 - 315 | 6 | | HISPANIC or LATINO MALES |
| | COLUMN B | 316 - 321 | 6 | | HISPANIC or LATINO FEMALES |
| | COLUMN C | 322 - 327 | 6 | | WHITE MALES |
| | COLUMN D | 328 - 333 | 6 | | BLACK or AFRICAN AMERICAN MALES |
| | COLUMN E | 334 - 339 | 6 | | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| | COLUMN F | 340 - 345 | 6 | | ASIAN MALES |
| | COLUMN G | 346 - 351 | 6 | | NATIVE AMERICAN or ALASKA NATIVE MALES |
| | COLUMN H | 352 - 357 | 6 | | TWO or MORE RACES MALES |
| | COLUMN I | 358 - 363 | 6 | | WHITE FEMALES |
| | COLUMN J | 364 - 369 | 6 | | BLACK or AFRICAN AMERICAN FEMALES |
| | COLUMN K | 370 - 375 | 6 | | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| | COLUMN L | 376 - 381 | 6 | | ASIAN FEMALES |
| | COLUMN M | 382 - 387 | 6 | | NATIVE AMERICAN or ALASKA NATIVE FEMALES |
| | COLUMN N | 388 - 393 | 6 | | TWO or MORE RACES FEMALES |
| | COLUMN O | 394 - 400 | 7 | | TOTAL MALE AND FEMALE |
| | JOB CATEGORY 1.1 LINE 2 | 401 - 491 | 91 | | $19,240 - $24,439 |
| | JOB CATEGORY 1.1 LINE 3 | 492 - 582 | 91 | | $24,440 - $30,679 |
| | JOB CATEGORY 1.1 LINE 4 | 583 - 673 | 91 | | $30,680 - $38,999 |

| | JOB CATEGORY 1.1 LINE 5 | 674 - 764 | 91 | $39,000 - $49,919 |
|---|---|---|---|---|
| | JOB CATEGORY 1.1 LINE 6 | 765 - 855 | 91 | $49,920 - $62,919 |
| | JOB CATEGORY 1.1 LINE 7 | 856 - 946 | 91 | $62,920 - $80,079 |
| | JOB CATEGORY 1.1 LINE 8 | 947 - 1037 | 91 | $80,080 - $101,919 |
| | JOB CATEGORY 1.1 LINE 9 | 1038 - 1128 | 91 | $101,920 - $128,959 |
| | JOB CATEGORY 1.1 LINE 10 | 1129 - 1219 | 91 | $128,960 - $163,799 |
| | JOB CATEGORY 1.1 LINE 11 | 1220 - 1310 | 91 | $163,800 - $207,999 |
| | JOB CATEGORY 1.1 LINE 12 | 1311 - 1401 | 91 | $208,000 and over |
| | JOB CATEGORY 1.2 LINES 13-24 | 1402 - 2493 | 1092 | FIRST/MID-LEVEL OFFICIALS AND MANAGERS (Line No. 1.2 , Section D, on EEO-1 Form) |
| | JOB CATEGORY 2 LINES 25-36 | 2494 - 3585 | 1092 | PROFESSIONALS |
| | JOB CATEGORY 3 LINES 37-48 | 3586 - 4677 | 1092 | TECHNICIANS |
| | JOB CATEGORY 4 LINES 49-60 | 4678 - 5769 | 1092 | SALES WORKERS |
| | JOB CATEGORY 5 LINES 61-72 | 5770 - 6861 | 1092 | ADMINISTRATIVE SUPPORT WORKERS |
| | JOB CATEGORY 6 LINES 73-84 | 6862 - 7953 | 1092 | CRAFT WORKERS |
| | JOB CATEGORY 7 LINES 85-96 | 7954 - 9045 | 1092 | OPERATIVES |
| | JOB CATEGORY 8 LINES 97-108 | 9046 - 10137 | 1092 | LABORERS AND HELPERS |
| | JOB CATEGORY 9 LINES 109-120 | 10138 - 11229 | 1092 | SERVICE WORKERS |
| | LINE 121 | 11230 - 11320 | 91 | **TOTAL EMPLOYEES FOR JOB CATEGORIES 1 THRU 10 (1.1 THRU 9 ON EEO-1 FORM)** |
| 23 | MATRIX DATA NUMBER OF HOURS | 11321 - 27925 | 16605 | N | 120 LINES - 137 POSITIONS EACH 121st LINE - 165 POSITIONS |

| JOB CATEGORY 1.1 LINES 1-12 | 11321 - 12964 | 1644 | EXECUTIVE/SENIOR LEVEL OFFICIALS AND MANAGERS (Line No. 1.1, Section D, on EEO-1 Form) |
|---|---|---|---|
| JOB CATEGORY 1.1 LINE 1 | 11321 - 11457 | 137 | $19,239 and under |
| COLUMN A | 11321 - 11329 | 9 | HISPANIC or LATINO MALES |
| COLUMN B | 11330 - 11338 | 9 | HISPANIC or LATINO FEMALES |
| COLUMN C | 11339 - 11347 | 9 | WHITE MALES |
| COLUMN D | 11348 - 11356 | 9 | BLACK or AFRICAN AMERICAN MALES |
| COLUMN E | 11357 - 11365 | 9 | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| COLUMN F | 11366 - 11374 | 9 | ASIAN MALES |
| COLUMN G | 11375 - 11383 | 9 | NATIVE AMERICAN or ALASKA NATIVE MALES |
| COLUMN H | 11384 - 11392 | 9 | TWO or MORE RACES MALES |
| COLUMN I | 11393 - 11401 | 9 | WHITE FEMALES |
| COLUMN J | 11402 - 11410 | 9 | BLACK or AFRICAN AMERICAN FEMALES |
| COLUMN K | 11411 - 11419 | 9 | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| COLUMN L | 11420 - 11428 | 9 | ASIAN FEMALES |
| COLUMN M | 11429 - 11437 | 9 | NATIVE AMERICAN or ALASKA NATIVE FEMALES |
| COLUMN N | 11438 - 11446 | 9 | TWO or MORE RACES FEMALES |
| COLUMN O | 11447 - 11457 | 11 | TOTAL MALE AND FEMALE |
| JOB CATEGORY 1.1 LINE 2 | 11458 - 11594 | 137 | $19,240 - $24,439 |
| JOB CATEGORY 1.1 LINE 3 | 11595 - 11731 | 137 | $24,440 - $30,679 |

| JOB CATEGORY 1.1 LINE 4 | 11732 - 11868 | 137 | $30,680 - $38,999 |
|---|---|---|---|
| JOB CATEGORY 1.1 LINE 5 | 11869 - 12005 | 137 | $39,000 - $49,919 |
| JOB CATEGORY 1.1 LINE 6 | 12006 - 12142 | 137 | $49,920 - $62,919 |
| JOB CATEGORY 1.1 LINE 7 | 12143 - 12279 | 137 | $62,920 - $80,079 |
| JOB CATEGORY 1.1 LINE 8 | 12280 - 12416 | 137 | $80,080 - $101,919 |
| JOB CATEGORY 1.1 LINE 9 | 12417 - 12553 | 137 | $101,920 - $128,959 |
| JOB CATEGORY 1.1 LINE 10 | 12554 - 12690 | 137 | $128,960 - $163,799 |
| JOB CATEGORY 1.1 LINE 11 | 12691 - 12827 | 137 | $163,800 - $207,999 |
| JOB CATEGORY 1.1 LINE 12 | 12828 - 12964 | 137 | $208,000 and over |
| JOB CATEGORY 1.2 LINES 13-24 | 12965 - 14608 | 1644 | FIRST/MID-LEVEL OFFICIALS AND MANAGERS (Line No. 1.2 , Section D, on EEO-1 Form) |
| JOB CATEGORY 2 LINES 25-36 | 14609 - 16252 | 1644 | PROFESSIONALS |
| JOB CATEGORY 3 LINES 37-48 | 16253 - 17896 | 1644 | TECHNICIANS |
| JOB CATEGORY 4 LINES 49-60 | 17897 - 19540 | 1644 | SALES WORKERS |
| JOB CATEGORY 5 LINES 61-72 | 19541 - 21184 | 1644 | ADMINISTRATIVE SUPPORT WORKERS |
| JOB CATEGORY 6 LINES 73-84 | 21185 - 22828 | 1644 | CRAFT WORKERS |
| JOB CATEGORY 7 LINES 85-96 | 22829 - 24472 | 1644 | OPERATIVES |
| JOB CATEGORY 8 LINES 97-108 | 24473 - 26116 | 1644 | LABORERS AND HELPERS |
| JOB CATEGORY 9 LINES 109-120 | 26117 - 27760 | 1644 | SERVICE WORKERS |
| LINE 121 | 27761 - 27925 | 165 | **TOTAL HOURS FOR JOB CATEGORIES 1 THRU 10 (1.1 THRU 9 ON EEO-1 FORM)** |

251

JA310

USCA Case #19-5130    Document #1802830    Filed: 08/19/2019    Page 255 of 369

| | COLUMN A | 27761 – 27771 | 11 | | TOTAL HISPANIC or LATINO MALES |
|---|---|---|---|---|---|
| | COLUMN B | 27772 – 27782 | 11 | | TOTAL HISPANIC or LATINO FEMALES |
| | COLUMN C | 27783 – 27793 | 11 | | TOTAL WHITE MALES |
| | COLUMN D | 27794 – 27804 | 11 | | TOTAL BLACK or AFRICAN AMERICAN MALES |
| | COLUMN E | 27805 – 27815 | 11 | | TOTAL NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| | COLUMN F | 27816 – 27826 | 11 | | TOTAL ASIAN MALES |
| | COLUMN G | 27827 – 27837 | 11 | | TOTAL AMERICAN INDIAN or ALASKAN NATIVE MALES |
| | COLUMN H | 27838 – 27848 | 11 | | TOTAL TWO or MORE RACES MALES |
| | COLUMN I | 27849 – 27859 | 11 | | TOTAL WHITE FEMALES |
| | COLUMN J | 27860 – 27870 | 11 | | TOTAL BLACK or AFRICAN AMERICAN FEMALES |
| | COLUMN K | 27871 – 27881 | 11 | | TOTAL NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| | COLUMN L | 27882 – 27892 | 11 | | TOTAL ASIAN FEMALES |
| | COLUMN M | 27893 – 27903 | 11 | | TOTAL AMERICAN INDIAN or ALASKAN NATIVE FEMALES |
| | COLUMN N | 27904 – 27914 | 11 | | TOTAL TWO or MORE RACES FEMALES |
| | COLUMN O | 27915 – 27925 | 11 | | TOTAL MALE AND FEMALE |
| 24 | EIN | 27926 – 27934 | 9 | N | YOUR FEDERAL EIN (TAX ID) 9 DIGITS |



CONNECT WITH US

Privacy Policy | Disclaimer | USA.Gov

USCA Case #19-5130    Document #1802830    Filed: 08/19/2019    Page 256 of 369

**SECTION A - TYPE OF REPORT**

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

☐ Single-establishment Employer Report

Multi-establishment Employer:

☐ Consolidated Report (Required)

☐ Headquarters Unit Report (Required)

☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)

☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only):

_____

**SECTION B - COMPANY IDENTIFICATION**

1. Name of parent company that owns or controls establishment in item 2 (omit if same as above).

a. Parent Company:

_____

Address (Number and Street):

_____

City or Town:                    State:                    ZIP code:

_____        _____        _____

2. Establishment for which this report is filed (omit if same as above)

a. Name of Establishment:

_____

Address (Number and Street):

_____

City or Town:          County:          State:          ZIP code:

_____      _____      _____      _____

SAMPLE

b. Employer identification No. (IRS 9-DIGIT TAX NUMBER):

_____

c. Was an EEO-1 report filed for this establishment last year?

☐ Yes  ☐ No

**SECTION C - EMPLOYERS WHO ARE REQUIRED TO FILE**

1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?

☐ Yes  ☐ No

2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?

☐ Yes  ☐ No

3. Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5, AND either (1) is a prime government contractor or first-tier subcontractor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?

☐ Yes  ☐ No

4. If the response to the above question (C - 3) is Yes, please enter your Dun and Bradstreet identification number (if you have one):

_____

JA312

*NOTE: If an answer to questions 1, 2 or 3 of Section C is "Yes", complete the entire form, otherwise skip to Section G.*

## SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Hispanic or Latino Male (A) | Hispanic or Latino Female (B) | Non-Hispanic Male White (C) | Non-Hispanic Male Black or African American (D) | Non-Hispanic Male Native Hawaiian or Pacific Islander (E) | Non-Hispanic Male Asian (F) | Non-Hispanic Male Native American or Alaska Native (G) | Non-Hispanic Male Two or More races (H) | Non-Hispanic Female White (I) | Non-Hispanic Female Black or African American (J) | Non-Hispanic Female Native Hawaiian or Pacific Islander (K) | Non-Hispanic Female Asian (L) | Non-Hispanic Female Native American or Alaska Native (M) | Non-Hispanic Female Two or More races (N) | Total Col A-N (O) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive/Senior Level Officials and Managers 1.1 | 1. $19,239 and under | | | | | | | | | | | | | | | |
| | 2. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 3. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 4. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 5. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 6. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 7. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 8. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 9. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 10. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 11. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 12. $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | 13. $19,239 and under | | | | | | | | | | | | | | | |
| | 14. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 15. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 16. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 17. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 18. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 19. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 20. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 21. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 22. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 23. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 24. $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | 25. $19,239 and under | | | | | | | | | | | | | | | |
| | 26. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 27. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 28. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 29. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 30. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 31. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 32. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 33. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 34. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 35. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 36. $208,000 and over | | | | | | | | | | | | | | | |

SAMPLE

| Category | Salary Range |
|---|---|
| **Technicians 3** | 37. $19,239 and under |
| | 38. $19,240 - $24,439 |
| | 39. $24,440 - $30,679 |
| | 40. $30,680 - $38,999 |
| | 41. $39,000 - $49,919 |
| | 42. $49,920 - $62,919 |
| | 43. $62,920 - $80,079 |
| | 44. $80,080 - $101,919 |
| | 45. $101,920 - $128,959 |
| | 46. $128,960 - $163,799 |
| | 47. $163,800 - $207,999 |
| | 48. $208,000 and over |
| **Sales Workers 4** | 49. $19,239 and under |
| | 50. $19,240 - $24,439 |
| | 51. $24,440 - $30,679 |
| | 52. $30,680 - $38,999 |
| | 53. $39,000 - $49,919 |
| | 54. $49,920 - $62,919 |
| | 55. $62,920 - $80,079 |
| | 56. $80,080 - $101,919 |
| | 57. $101,920 - $128,959 |
| | 58. $128,960 - $163,799 |
| | 59. $163,800 - $207,999 |
| | 60. $208,000 and over |
| **Adminstrative Support Workers 5** | 61. $19,239 and under |
| | 62. $19,240 - $24,439 |
| | 63. $24,440 - $30,679 |
| | 64. $30,680 - $38,999 |
| | 65. $39,000 - $49,919 |
| | 66. $49,920 - $62,919 |
| | 67. $62,920 - $80,079 |
| | 68. $80,080 - $101,919 |
| | 69. $101,920 - $128,959 |
| | 70. $128,960 - $163,799 |
| | 71. $163,800 - $207,999 |
| | 72. $208,000 and over |
| **Craft Workers 6** | 73. $19,239 and under |
| | 74. $19,240 - $24,439 |
| | 75. $24,440 - $30,679 |
| | 76. $30,680 - $38,999 |
| | 77. $39,000 - $49,919 |
| | 78. $49,920 - $62,919 |
| | 79. $62,920 - $80,079 |
| | 80. $80,080 - $101,919 |
| | 81. $101,920 - $128,959 |
| | 82. $128,960 - $163,799 |
| | 83. $163,800 - $207,999 |
| | 84. $208,000 and over |

SAMPLE

| Category | Income Range | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operatives 7 | 85. $19,239 and under | | | | | | | | | | | |
| | 86. $19,240 - $24,439 | | | | | | | | | | | |
| | 87. $24,440 - $30,679 | | | | | | | | | | | |
| | 88. $30,680 - $38,999 | | | | | | | | | | | |
| | 89. $39,000 - $49,919 | | | | | | | | | | | |
| | 90. $49,920 - $62,919 | | | | | | | | | | | |
| | 91. $62,920 - $80,079 | | | | | | | | | | | |
| | 92. $80,080 - $101,919 | | | | | | | | | | | |
| | 93. $101,920 - $128,959 | | | | | | | | | | | |
| | 94. $128,960 - $163,799 | | | | | | | | | | | |
| | 95. $163,800 - $207,999 | | | | | | | | | | | |
| | 96. $208,000 and over | | | | | | | | | | | |
| Laborers and Helpers 8 | 97. $19,239 and under | | | | | | | | | | | |
| | 98. $19,240 - $24,439 | | | | | | | | | | | |
| | 99. $24,440 - $30,679 | | | | | | | | | | | |
| | 100. $30,680 - $38,999 | | | | | | | | | | | |
| | 101. $39,000 - $49,919 | | | | | | | | | | | |
| | 102. $49,920 - $62,919 | | | | | | | | | | | |
| | 103. $62,920 - $80,079 | | | | | | | | | | | |
| | 104. $80,080 - $101,919 | | | | | | | | | | | |
| | 105. $101,920 - $128,959 | | | | | | | | | | | |
| | 106. $128,960 - $163,799 | | | | | | | | | | | |
| | 107. $163,800 - $207,999 | | | | | | | | | | | |
| | 108. $208,000 and over | | | | | | | | | | | |
| Service Workers 9 | 109. $19,239 and under | | | | | | | | | | | |
| | 110. $19,240 - $24,439 | | | | | | | | | | | |
| | 111. $24,440 - $30,679 | | | | | | | | | | | |
| | 112. $30,680 - $38,999 | | | | | | | | | | | |
| | 113. $39,000 - $49,919 | | | | | | | | | | | |
| | 114. $49,920 - $62,919 | | | | | | | | | | | |
| | 115. $62,920 - $80,079 | | | | | | | | | | | |
| | 116. $80,080 - $101,919 | | | | | | | | | | | |
| | 117. $101,920 - $128,959 | | | | | | | | | | | |
| | 118. $128,960 - $163,799 | | | | | | | | | | | |
| | 119. $163,800 - $207,999 | | | | | | | | | | | |
| | 120. $208,000 and over | | | | | | | | | | | |
| | Total 121. | | | | | | | | | | | |
| | Previous Year Total 122. | | | | | | | | | | | |

SAMPLE

JA315

## SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| | | For each cell provide the TOTAL Number of Hours worked in last year | | | | | | | | | | | | | |
| | | Race/Ethnicity | | | | | | | | | | | | | |
| | | Hispanic or Latino | | Non/Hispanic or Latino | | | | | | | | | | | | Total Col A-N |
| | | | | Male | | | | | | Female | | | | | | |
| Job Categories | Annual Salary in Thousands | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | 1. $19,239 and under | | | | | | | | | | | | | | | |
| | 2. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 3. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 4. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 5. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 6. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 7. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 8. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 9. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 10. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 11. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 12. $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | 13. $19,239 and under | | | | | | | | | | | | | | | |
| | 14. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 15. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 16. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 17. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 18. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 19. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 20. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 21. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 22. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 23. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 24. $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | 25. $19,239 and under | | | | | | | | | | | | | | | |
| | 26. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 27. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 28. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 29. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 30. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 31. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 32. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 33. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 34. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 35. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 36. $208,000 and over | | | | | | | | | | | | | | | |

SAMPLE

USCA Case #19-5130      Document #1802830        Filed: 08/19/2019      Page 261 of 369

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 37. $19,239 and under | | | | | | | | | | | | | | |
| | 38. $19,240 – $24,439 | | | | | | | | | | | | | | |
| | 39. $24,440 – $30,679 | | | | | | | | | | | | | | |
| | 40. $30,680 – $38,999 | | | | | | | | | | | | | | |
| | 41. $39,000 – $49,919 | | | | | | | | | | | | | | |
| Technicians 3 | 42. $49,920 – $62,919 | | | | | | | | | | | | | | |
| | 43. $62,920 – $80,079 | | | | | | | | | | | | | | |
| | 44. $80,080 – $101,919 | | | | | | | | | | | | | | |
| | 45. $101,920 – $128,959 | | | | | | | | | | | | | | |
| | 46. $128,960 – $163,799 | | | | | | | | | | | | | | |
| | 47. $163,800 – $207,999 | | | | | | | | | | | | | | |
| | 48. $208,000 and over | | | | | | | | | | | | | | |
| | 49. $19,239 and under | | | | | | | | | | | | | | |
| | 50. $19,240 – $24,439 | | | | | | | | | | | | | | |
| | 51. $24,440 – $30,679 | | | | | | | | | | | | | | |
| | 52. $30,680 – $38,999 | | | | | | | | | | | | | | |
| | 53. $39,000 – $49,919 | | | | | | | | | | | | | | |
| Sales Workers 4 | 54. $49,920 – $62,919 | | | | | | | | | | | | | | |
| | 55. $62,920 – $80,079 | | | | | | | | | | | | | | |
| | 56. $80,080 – $101,919 | | | | | | | | | | | | | | |
| | 57. $101,920 – $128,959 | | | | | | | | | | | | | | |
| | 58. $128,960 – $163,799 | | | | | | | | | | | | | | |
| | 59. $163,800 – $207,999 | | | | | | | | | | | | | | |
| | 60. $208,000 and over | | | | | | | | | | | | | | |
| | 61. $19,239 and under | | | | | | | | | | | | | | |
| | 62. $19,240 – $24,439 | | | | | | | | | | | | | | |
| | 63. $24,440 – $30,679 | | | | | | | | | | | | | | |
| | 64. $30,680 – $38,999 | | | | | | | | | | | | | | |
| | 65. $39,000 – $49,919 | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | 66. $49,920 – $62,919 | | | | | | | | | | | | | | |
| | 67. $62,920 – $80,079 | | | | | | | | | | | | | | |
| | 68. $80,080 – $101,919 | | | | | | | | | | | | | | |
| | 69. $101,920 – $128,959 | | | | | | | | | | | | | | |
| | 70. $128,960 – $163,799 | | | | | | | | | | | | | | |
| | 71. $163,800 – $207,999 | | | | | | | | | | | | | | |
| | 72. $208,000 and over | | | | | | | | | | | | | | |
| | 73. $19,239 and under | | | | | | | | | | | | | | |
| | 74. $19,240 – $24,439 | | | | | | | | | | | | | | |
| | 75. $24,440 – $30,679 | | | | | | | | | | | | | | |
| | 76. $30,680 – $38,999 | | | | | | | | | | | | | | |
| | 77. $39,000 – $49,919 | | | | | | | | | | | | | | |
| Craft Workers 6 | 78. $49,920 – $62,919 | | | | | | | | | | | | | | |
| | 79. $62,920 – $80,079 | | | | | | | | | | | | | | |
| | 80. $80,080 – $101,919 | | | | | | | | | | | | | | |
| | 81. $101,920 – $128,959 | | | | | | | | | | | | | | |
| | 82. $128,960 – $163,799 | | | | | | | | | | | | | | |
| | 83. $163,800 – $207,999 | | | | | | | | | | | | | | |
| | 84. $208,000 and over | | | | | | | | | | | | | | |

SAMPLE

JA317

| Category | Income bracket |
|---|---|
| Operatives 7 | 85. $19,239 and under |
| | 86. $19,240 – $24,439 |
| | 87. $24,440 – $30,679 |
| | 88. $30,680 – $38,999 |
| | 89. $39,000 – $49,919 |
| | 90. $49,920 – $62,919 |
| | 91. $62,920 – $80,079 |
| | 92. $80,080 – $101,919 |
| | 93. $101,920 – $128,959 |
| | 94. $128,960 – $163,799 |
| | 95. $163,800 – $207,999 |
| | 96. $208,000 and over |
| Laborers and Helpers 8 | 97. $19,239 and under |
| | 98. $19,240 – $24,439 |
| | 99. $24,440 – $30,679 |
| | 100. $30,680 – $38,999 |
| | 101. $39,000 – $49,919 |
| | 102. $49,920 – $62,919 |
| | 103. $62,920 – $80,079 |
| | 104. $80,080 – $101,919 |
| | 105. $101,920 – $128,959 |
| | 106. $128,960 – $163,799 |
| | 107. $163,800 – $207,999 |
| | 108. $208,000 and over |
| Service Workers 9 | 109. $19,239 and under |
| | 110. $19,240 – $24,439 |
| | 111. $24,440 – $30,679 |
| | 112. $30,680 – $38,999 |
| | 113. $39,000 – $49,919 |
| | 114. $49,920 – $62,919 |
| | 115. $62,920 – $80,079 |
| | 116. $80,080 – $101,919 |
| | 117. $101,920 – $128,959 |
| | 118. $128,960 – $163,799 |
| | 119. $163,800 – $207,999 |
| | 120. $208,000 and over |
| Total 121. | |
| Previous Year Total 122. | |

**SAMPLE**

USCA Case #19-5130     Document #1802830     Filed: 08/19/2019     Page 263 of 369

Date(s) of payroll period used for this Consolidated Report

## SECTION E - ESTABLISHMENT INFORMATION
*(Omit on the Consolidated Report)*

What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title insurance, etc. Include the specific type of product or type of service provided, as well as the principal business or industrial activity.)

## SECTION F - REMARKS

Use this item to give any identification data appearing on the last EE0-1 report which differs from that given above, explain major changes in composition of reporting units and other pertinent information.

## SECTION G - CERTIFICATION

Check One:

☐ 1. All reports are accurate and were prepared in accordance with the instructions. (Check on Consolidated Report Only.)

☐ 2. This report is accurate and was prepared in accordance with the instructions.

SAMPLE

| Name of Certifying Official | Title | Signature | Date |
|---|---|---|---|
|  |  |  |  |

| Name of Person to contact regarding this report | Title | Address (Number and Street) |
|---|---|---|
|  |  |  |

| City and State | Zip Code | Email Address | Telephone No. (including Area code and Extension) |
|---|---|---|---|
|  |  |  |  |

**All reports and information obtained from individual reports will be kept confidential as required by Section 709(e) of Title VII.**
**WILLFULLY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001**

JA319

Español | Other Languages

U.S. Equal Employment
Opportunity Commission

Enter search terms...    Search

CONNECT WITH US 

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

# Questions and Answers: The Revised EEO-1 and Summary Pay Data

## Background

The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) enforce federal prohibitions against employment discrimination based on race, sex, and national origin, among other bases. The EEOC enforces Title VII of the Civil Rights Act (Title VII). OFCCP enforces Executive Order 11246.

For many years, the EEOC and OFCCP have collected data from certain private employers and federal contractors and subcontractors about their employees on the "Employer Information Report" or the EEO-1. The EEO-1 collects data about the number of employees by job category and by sex and race or ethnicity. To promote efficiency, the EEOC and OFCCP coordinate their collection of this data through a "Joint Reporting Committee." The EEOC is responsible for approval of the EEO-1 every three years under the Paperwork Reduction Act.

On September 29, 2016 the EEOC announced approval of a revised EEO-1, starting with the 2017 report, to collect summary pay data from employers, including federal contractors and subcontractors, with 100 or more employees. Summary pay data for private employers subject to Title VII jurisdiction will go to the EEOC. Summary pay data only for federal contractors and subcontractors subject to Executive Order 11246 will go to OFCCP.

The EEOC and the Joint Reporting Committee are committed to working with employers to ensure a successful transition to the new report. To give employers more time to transition, and allow for alignment with the W-2 reporting cycle, the EEO-1 deadline for the 2017 report will be March 31, 2018. Employers will have a total of 18 months-from September 30, 2016 (2016 report deadline) to March 31, 2018 (2017 report deadline) to make the change. The EEOC's complete explanation of this information collection, as submitted to the Office of Management Budget, is available at https://federalregister.gov/a/2016-16692.

## The Purpose of this Information Collection

Although there has been progress in combating pay discrimination in the last 50 years, recent studies show that discrimination plays a role in explaining the pay gaps nationwide for women and, especially, for African American and Hispanic or Latina women. Such wage disparities also persist for men of color.

For example, studies find that, after controlling for factors such as education and work experience, pay declines when women enter an occupation dominated by men but that pay increases when men enter a field dominated by women.[1] Studies also demonstrate racial bias in salary negotiations even after controlling for the applicants' objective qualifications for the position.[2]

Too often, pay discrimination goes undetected because of a lack of information about what employees are paid. The EEOC and OFCCP are charged with the responsibility of enforcing federal prohibitions on pay discrimination including Title VII, the Equal Pay Act, and Executive Order 11246, but, until now, they lacked the employer-and establishment-specific data needed to assess allegations of pay discrimination. The revised EEO-1 report will help to fill this gap. In developing this proposal, the EEOC carefully considered what kind of data would be most important and considered its benefit relative to the potential burden on employers.

## Description of the Revisions to the EEO-1

### Which employers will file the revised EEO-1 report?

Starting with the 2017 report, which will be due on March 31, 2018, private employers including federal contractors and subcontractors with 100 or more employees will submit summary pay data.

Federal contractors and subcontractors with 50-99 employees will not submit summary pay data but will continue to report demographic data (sex and race or ethnicity) on the EEO-1 as they did before.

Federal contractors and subcontractors with 49 or fewer employees, and companies without federal contracts with 99 or fewer employees, will not be required to complete the EEO-1 report.

### When will employers count their employees for purposes of the revised EEO-1 report?

Employers will count their employees during the "workforce snapshot period." For reporting years 2016 and before, the "workforce snapshot period" was July 1 to September 30. Starting with the EEO-1 report of 2017 data, however, the "workforce snapshot period" will be October 1 to December 31, 2017. Each employer may choose any pay period during this three-month "workforce snapshot period" to count its full and part-time employees for the EEO-1 report.

### What is new on the revised EEO-1 report?

The revised EEO-1 report has two new elements:

- Summary pay data: Employers report the *total number* of full and part-time employees they had during that year in each of 12 pay bands listed for each EEO-1 job category; employers do not report individual pay or salaries.

- Aggregate hours worked data: Employers tally and report the number of hours worked that year by all the employees accounted for in each pay band.

### What are the EEO-1 job categories?

The 10 EEO-1 job categories have not changed with this revision. They are:

(1) Executive/Senior Level Officials and Managers;
(2) First/Mid Level Officials and Managers;
(3) Professionals;
(4) Technicians;
(5) Sales Workers;
(6) Administrative Support Workers;
(7) Craft Workers;
(8) Operatives;
(9) Laborers and Helpers; and
(10) Service Workers.

To continue to assist employers categorizing specific jobs, the EEOC provides a guide classifying hundreds of jobs into the 10 EEO-1 job categories: https://www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm.

Based on their experience completing, filing, and reviewing EEO-1 reports for many years, EEO-1 filers as well as government agencies understand which jobs are included in which job categories for particular industries and regions.

### What are the EEO-1 pay bands?

The EEO-1 pay bands track the 12 pay bands used by the Bureau of Labor Statistics for the Occupation Employment Statistics survey:

(1) $19,239 and under;
(2) $19,240 - $24,439;
(3) $24,440 - $30,679;
(4) $30,680 - $38,999;
(5) $39,000 - $49,919;

262    JA321

(6) $49,920 - $62,919;

(7) $62,920 - $80,079;

(8) $80,080 - $101,919;

(9) $101,920 - $128,959;

(10) $128,960 - $163,799;

(11) $163,800 - $207,999; and

(12) $208,000 and over.

Employers will count the number of employees they have in each pay band for each job category. If no employees are in a job category or pay band, employers will leave the cell blank.

### What is the measure of income to reference in order to select the appropriate pay band?

To identify the pay band on the revised EEO-1 in which to count an employee, employers will rely on the pay reported for income tax purposes that year in Box 1 of the W-2 form.

Note that wages earned after the conclusion of the last full pay period in December are often paid to employees in the next calendar year. For EEO-1 purposes, these wages will be reported for the same year in which they are reported for W-2 purposes.

### How will data about employees' sex and race or ethnicity be reported on the revised EEO-1?

After tallying the total number of employees in each pay band by job category, employers will enter this data in the appropriate columns of the EEO-1 report based on the sex and ethnicity or race of the employees. For example, a financial services firm may report that it has 10 Professionals in pay band 6, which is $49,920 - $62,919, who are men and black; and that it also has 35 Professionals in pay band 6 who are men and white.

### Why are hours worked being collected? What is the measure of hours worked for the revised EEO-1?

Hours worked data is being collected so that the EEOC and the OFCCP can account for part-time and partial year employment when they analyze EEO-1 pay data.

For the EEO-1, hours worked will be counted by consulting employer records already required under the Fair Labor Standards Act (FLSA):

- For *non-exempt* employees, for whom the FLSA already requires employers to keep records of hours worked, employers will consult these records to identify the number of hours worked.

- For employees who are *exempt* from the FLSA, employers have a choice. They may either:
  - Report 20 hours per week for each part-time employee and 40 hours per week for each full-time employee; or

  - Report actual number of hours worked by exempt employees, full- or part-time, if they prefer to do so.

### How will hours worked be counted on the revised EEO-1 report?

Hours worked data will be reported on the EEO-1 by tallying the total number of hours worked by all the employees counted in each pay band, for the W-2 reporting year.

## The Process of Filing the Revised EEO-1 Report

### With whom will employers file the revised EEO-1 report and data?

Employers will continue to file the EEO-1 report with the Joint Reporting Committee of the EEOC and the OFCCP.

### How will the new EEO-1 report be filed?

Consistent with current reporting practices, employers will submit EEO-1 reports securely via the EEO-1 Online Filing System on the EEOC's website or utilize this portal to electronically transmit a data file containing the EEO-1 data.

### What are the file specifications for data uploads of revised EEO-1 data?

The Joint Reporting Committee announced the file specifications for the revised EEO-1 collection on September 29, 2016. To see these file specifications, please visit: https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

263

JA322

How will the Joint Reporting Committee and the EEOC assist employers in their transition to the revised EEO-1 report?

The Joint Reporting Committee and EEOC staff are available to answer questions from all EEO-1 stakeholders, including employers, payroll, HRIS experts, and software professionals. Individuals may submit questions or request assistance by contacting the EEO-1 Coordinator at: EEOC Survey Division -- Room 4SW22G, 131 M Street, N.E. Washington, D.C. 20507, or by email at: Suggestion Box on EEO-1 Additional Documentation or eeo1.suggestionbox@eeoc.gov.

The EEOC is committed to helping all EEO-1 filers successfully file their reports. The EEOC has provided resources to address questions on our website, and it will provide ongoing technical assistance to aid employers in their compliance efforts, including free webinars offered on October 20th and 26th.

## Confidentiality, Privacy, and Data Security

### What protections are in place to protect the confidentiality of the summary pay data?

Title VII forbids all EEOC officers and employees from making public any information, including EEO-1 data, before a Title VII proceeding is begun involving the information. Any violations of this prohibition by EEOC officers or staff are subject to criminal penalties including imprisonment. The EEOC imposes these conditions on all of its contractors, as well as on other federal agencies that request the data for legitimate law enforcement purposes.

The EEOC will provide OFCCP with summary pay data (including hours worked) only for federal contractors and subcontractors subject to Executive Order 11246. The OFCCP will hold EEO-1 data for federal contractors and subcontractors confidential to the maximum extent possible under the Freedom of Information Act (FOIA) and the Trade Secrets Act. OFCCP will notify contractors of any FOIA request for their EEO-1 pay and hours worked data. If a contractor objects to disclosure, OFCCP will not disclose the data if OFCCP determines that the contractor's objection is valid. FOIA Exemptions 3 and 4 recognize the value of this data and provide, in combination with the Trade Secrets Act, the necessary tools to appropriately protect it from public disclosure.

### How does the EEOC safeguard EEO-1 data in its possession?

The EEOC maintains robust security protections for EEO-1 data and consistently reviews and updates its security protocols. The EEOC's cybersecurity and privacy programs comply with the Federal Information Security Modernization Act and are based on NIST Special Publication 800-53, Security and Privacy Controls for Federal Information Systems and Organizations. The implemented security and privacy controls protect organizational operations and information system assets against a diverse set of threats, including malicious attacks, natural disasters, structural failures, and human error.

The hosting service for the EEO-1 data collection system provides a defense-in-depth security program with many layers of security utilizing different physical and software components in order to provide a high level of protection. Security monitoring-both inside and outside the network-ensures the detection and rejection of unauthorized use. These security controls and measures are monitored continuously with automated vulnerability and compliance software suites.

The EEOC has a current privacy impact assessment for the EEO-1, which is published on the EEOC website for employers that file the EEO-1 report, at: https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm

The EEOC's information technology system will be fully compliant with recently revised Circular A-130 well before the first deadline for the new EEO-1 in March 2018. The privacy impact assessment for the EEO-1 will be updated to address these revisions.

### How does the EEOC protect privacy and confidentiality of EEO-1 data when it issues national, state, or industry-level reports based on the data?

The EEOC only publishes large-scale aggregated EEO-1 data in a way that fully protects employer confidentiality and employee privacy. At a minimum, the EEOC does not publish data if it does not include at least three firms, or if one firm represents more than 80 percent of the data. The EEOC will ensure that any published aggregate data based on the revised EEO-1 will continue to protect the privacy and confidentiality of individual employers and employees.

For purposes of self-assessment, employers can use published aggregated data to compare or benchmark their own data with data from other employers in their industry or geographical area.

[1] Asaf Levanon, Paula England, Paul Allison, Occupational Feminization and Pay: Assessing Casual Dynamics Using 1950-2000 U.S. Census Data, Social Forces 88(2) (Dec. 2009), http://statisticalhorizons.com/wp-content/uploads/2012/01/88.2.levanon.pdf.

[2] Moreal Hernandez and Derek R. Avery, Getting the Short End of the Stick: Racial Bias in Salary Negotiations, MIT Sloan Management Review (June 15, 2016), http://sloanreview.mit.edu/article/getting-the-short-end-of-the-stick-racial-bias-in-salary-negotiations.

CONNECT WITH US     

Privacy Policy | Disclaimer | USA.Gov

Español | Other Languages

**U.S. Equal Employment Opportunity Commission**

Enter search terms...   [Search]

CONNECT WITH US     

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

🖨 ✉ **+ Share**

## Small Business Fact Sheet: The Revised EEO-1 and Summary Pay Data

### Background

- The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) enforce federal prohibitions on employment discrimination based on race, sex, and national origin, among other bases. The EEOC enforces Title VII of the Civil Rights Act and the Equal Pay Act. The OFCCP enforces Executive Order 11246.

- For many years, certain employers have reported data about their number of employees by EEO-1 job category, and then by sex and ethnicity or race, on the "Employer Information Report" or EEO-1. The EEOC and the OFCCP consolidate collection of EEO-1 data with a "Joint Reporting Committee."

- Beginning with the 2017 EEO-1, private employers and federal contractors with 100 or more employees also will report summary pay data on the EEO-1. Summary pay data for private employers will go to the EEOC. Summary pay data for federal contractors and subcontractors subject to Executive Order 11246 will go to OFCCP.

### When Is the First Deadline for Submitting the New EEO-1 Report?

- The EEO-1 report will be due for the first time with pay data on March 31, 2018, and the EEO-1 will be due every March 31 after that.

- Employers will have 18 months between the 2016 and 2017 EEO-1 deadlines-from September 30, 2016, until March 31, 2018-to prepare for this change.

- The 2016 EEO-1 deadline is still September 30, 2016.

### Preparing for the New EEO-1 Report

- The EEOC is committed to working with businesses to ensure a successful transition to the new EEO-1 report.

- To initiate the transition, the EEOC published the technical file specifications for the revised EEO-1 data on the same day as it announced the new report. See https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

- The EEOC is offering free webinars and additional outreach and technical assistance to assist employers.

- Free webinars will be held on October 20, 2016 and October 26, 2016. Check www.eeoc.gov for details.

- The EEOC will send a notice to each EEO-1 employer describing the new EEO-1 filing requirements and deadlines.

- If your business needs assistance filing the EEO-1 now or in the future, please contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov. Or, you may write to the EEO-1

Coordinator at: Joint Reporting Committee, EEOC Survey Division -- Room 4SW22G, 131 M Street, NE Washington, D.C. 20507.

## Which Employers Will Report Summary Pay Data?

- Private employers with 100 or more employees will report summary pay data.

- Federal contractors and subcontractors with 50 - 99 employees will not report summary pay data, but they will tally employees by job category and then by sex and ethnicity or race, as they did before. Federal contractors and subcontractors with fewer than 50 employees will not file EEO-1 reports at all.

- Employers with 1 - 99 employees that are not federal contractors or subcontractors will not file EEO-1 reports. This is a continuation of current practice.

## What Will Federal Contractors and Subcontractors with 50-99 Employees Report on the New EEO-1?

- These contractors and subcontractors will continue to report the same information as on the most recent EEO-1. They will tally and report the number of employees by EEO-1 job category and then by sex and ethnicity or race. They will not report summary pay data.

- The 10 EEO-1 job categories will be the same as on the most recent EEO-1. They are:

  (1) Executive/Senior Level Officials and Managers;
  (2) First/Mid Level Officials and Managers;
  (3) Professionals;
  (4) Technicians;
  (5) Sales Workers;
  (6) Administrative Support Workers;
  (7) Craft Workers;
  (8) Operatives;
  (9) Laborers and Helpers; and
  (10) Service Workers.

- To continue to assist employers in categorizing specific jobs, the "EEO-1 Job Classification Guide 2010," assigns hundreds of specific occupations to EEO-1 job categories.

- The sex and ethnicity or race categories are the same as in the most recent EEO-1. For an explanation, see the EEO-1 Instruction Booklet at https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

- Employers will count their employees for the EEO-1 during the "workforce snapshot period."
  - Starting with the 2017 EEO-1, the "workforce snapshot period" for the EEO-1 will be a pay period of the employer's choice between October 1 and December 31.

## What will Private Employers and Contractors/Subcontractors with 100 or more Employees Report on the New EEO-1?

- These larger employers will start by counting and categorizing employees by EEO-1 job category and then by sex and ethnicity or race, as on the most recent EEO-1. They will count employees during the "workforce snapshot period" between October 1 and December 31.

- Then, they will count employees in one of the 12 pay bands on the new EEO-1. The pay bands are:

  (1) $19,239 and under;
  (2) $19,240 - $24,439;
  (3) $24,440 - $30,679;
  (4) $30,680 - $38,999;

(5) $39,000 - $49,919;
(6) $49,920 - $62,919;
(7) $62,920 - $80,079;
(8) $80,080 - $101,919;
(9) $101,920 - $128,959;
(10) $128,960 - $163,799;
(11) $163,800 - $207,999; and
(12) $208,000 and over.

- To choose a pay band, refer to the earnings reported in the W-2 Box 1.
  - For example, for the 2017 EEO-1, employers will refer to employees' W-2, Box 1, income for the year January 1 through December 31, 2017.

- Employers will tally the number of employees in each pay band by sex and ethnicity or race. For example, an employer might report 23 Sales Workers who are non-Hispanic white women in pay band 4 ($30,680 - $38,999).

- Finally, these employers will report the total number of hours worked that year by the employees in each pay band. For example, an employer reports the total number of hours worked by 23 Sales Workers who are non-Hispanic white women in pay band 4.
  - The new EEO-1 gives employers a choice about how to count hours worked for employees who are exempt employees under the FLSA. Employers may either use 40 hours per week for full-time employees and 20 hours per week for part-time employees or, if it chooses, report the number of hours the employees actually worked. Again, this is a choice.

## Confidentiality and Privacy of EEO-1 Data

- The EEOC has strict proceduress in place to protect the confidentiality of EEO-1 data, including summary pay data. The EEOC collects EEO-1 data under Title VII of the Civil Rights Act, as amended (Title VII).

- All information that the EEOC collects under Title VII is subject to strict confidentiality requirements.
  - Title VII prohibits any EEOC officer or employee from disclosing data collected on the EEO-1 report, unless the data is the subject of litigation.
  - Title VII imposes criminal sanctions on any EEOC officer or employee who violates this prohibition.

- The EEOC reinforces this requirement with strict security and privacy controls that protect the EEOC's and the Joint Reporting Committee's operations and information systems against a range of threats. The EEOC regularly trains its employees on Title VII confidentiality and on computer security.

- The EEOC imposes these Title VII confidentiality requirements on its own contractors as a condition of their EEOC contracts.

- The EEOC publishes reports based on large-scale EEO-1 data (for example, nationwide, statewide, metropolitan area EEO-1 data) only when the EEO-1 data is aggregated in a manner that does not disclose any individual employer or employee information.

- The OFCCP holds EEO-1 data for federal contractors and subcontractors confidential to the maximum extent possible under the Freedom of Information Act (FOIA) and the Trade Secrets Act.
  - The Joint Reporting Committee will provide the OFCCP with pay data only for federal contractors and subcontractors subject to Executive Order 11246.

## How The EEO-1 Data Will Be Used

### The EEOC

- The EEOC receives thousands of Title VII charges of employment discrimination every year alleging race, national origin, or sex discrimination, including pay discrimination. The EEOC also receives close to one thousand charges under the Equal Pay Act alleging pay discrimination based on sex every year.

9/26/2018   Case 1:17-cv-02458-TSC Document 39-2 Small Business Fact Sheet 2017 Revised EEO-1 Survey-Filed 02/05/19 Page 235 of 235

USCA Case #19-5130      Document #1802830        Filed: 08/19/2019     Page 272 of 369

- The EEOC does statistical analysis of EEO-1 data early in its investigations. This helps with a first assessment of the allegations made in a charge of discrimination and, as appropriate, with planning an investigation. The EEO-1 is not the only source of data used at this stage, but it certainly helps.

- In addition, the EEOC will periodically publish aggregated EEO-1 data and industry reports that may provide useful comparative data for private employers and federal contractors.
  - Small employers will especially benefit from the published reports because they will obtain comparative data that will assist them in conducting voluntary self-assessment of their pay practices.
  - Voluntary self-assessment will help small businesses remedy any pay disparities and comply with state and federal equal pay laws.

## OFCCP
- OFCCP will use the EEO-1 data to help identify federal contractors and subcontractors for compliance reviews under E.O. 11246.

* * * * * * * * * * * * * *

For more information, contact Ronald Edwards, Director, Program Research and Surveys Division, EEOC, 131 M Street NE, Room 4SW30F, Washington, D.C. 20507; (202) 663-4949. voice or (202) 663-7063 (TTY).

**CONNECT WITH US** 

Privacy Policy | Disclaimer | USA.Gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

National Women's Law Center, *et al.*,

    *Plaintiffs*,

vs.

    Civil Action No. 17-2458 (TSC)

Office of Management and Budget, *et al.*,

    *Defendants*.

### DECLARATION OF HECTOR E. SANCHEZ

I, Hector E. Sanchez, declare as follows:

1.    My name is Hector E. Sanchez. I am the Executive Director of the Labor Council for Latin American Advancement (LCLAA). The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my duties at LCLAA.

2.    I submit this declaration in support of Plaintiffs' Motion for Summary Judgment in *National Women's Law Center v. Office of Management and Budget*, Civil No. 17-2458 (DDC). The lawsuit challenges the Office of Management and Budget's August 29, 2017 decision to review and stay a previously approved revision by the Equal Employment Opportunity Commission to the "Employer Information Report EEO-1" (EEO-1), to collect pay data from employers in addition to the long-standing collection of data regarding sex, race, ethnicity and job category.

3.    LCLAA is a national 501(c)(3) representing the interests of approximately 2 million Latino/a trade unionists throughout the United States and Puerto Rico, as well as other

i

non-unionized Latino workers. Its headquarters is in Washington, DC, and it has 52 chapters around the country.

4.      LCLAA was founded in 1972 by local Latino trade union committees to promote participation by Hispanic trade unionists. Its mission is to assist workers to advance their rights in their workplace and convince employers to take steps to improve working conditions, both through advocacy and through training and counseling workers and union members. LCLAA's dues-paying membership includes individual workers, union members, and students. LCLAA helps its members to pursue their common goal of improving the working conditions of Latino and Latina employees, both at individual employers and throughout the economy.

5.      Closing the pay gap has been an increasing focus of LCLAA's work in recent years. The pay gap burdens Latinas especially as they experience the largest gender wage gap of any group of working women in the United States.

6.      In 2012, LCLAA created the Trabajadoras Initiative,' which specifically seeks to protect and advance the interests of Latina workers on issues that impact them, including seeking to eradicate the persistent pay gap. In 2012, LCLAA passed a resolution calling on the AFL-CIO and its affiliates to conduct advocacy and outreach aimed at eradicating pay discrimination. LCLAA has passed subsequent resolutions related to fair pay, along with reaffirming its commitment to protecting and defending the rights of Latina workers in all sectors and industries across the United States. Among other things, the most recent resolution reaffirmed this priority and LCLAA's commitment to "work in partnership with Trabajadoras to win the full range of labor rights" from employers and governments.

7.      At the national and Chapter level, LCLAA does work to educate its members about the pay gap and how to use collective action and organizing to close this pay gap. In

---

' "Trabajadoras" translates to "working women."

2

addition, it has both led and supported campaigns aimed at raising awareness about the pay gap as well as potential solutions. Among these, LCLAA launched its Trabajadoras initiative in 2012 to meet the unique needs of Latina workers, including an emphasis on obtaining equal pay for Latinas. The strategy of Trabajadoras combines grassroots mobilizing, research, and education. This initiative includes a fellowship program to empower Latina workers by providing them with the information they need to improve their working conditions and organizing Latina workers to advance their priorities, including obtaining equal pay. This one-year fellowship program provides trainings to promote gender equity, engagement in coalition building, participation and coordination of civic engagement efforts, and increased awareness about Latina worker priorities, including closing the gender wage gap. Our Trabajadoras Fellows engage with LCLAA chapters across the country and provide similar trainings for members.

8.      LCLAA has also trained its Chapter Presidents about the pay gap and the Chapter leadership has shared this information with their membership and mobilized members to act on the ground in states around the country. Beginning in 2016, and continuing to the present, LCLAA has hosted an annual National Latina Equal Pay Summit, which provides information, education and solutions to closing the pay gap. The 2018 Summit is scheduled for November 1, 2018 in Atlanta, Georgia.

9.      LCLAA periodically issues reports to educate workers, employers, and union leaders about the challenges encountered by Latinos and Latinas in the workforce. The reports discuss data compiled and published by the Government on income and employment   including EEO-1 data.[2] LCLAA uses these reports in advocating for policy change and enforcement of

---

[2] *See, e.g., Trabajadoras: Challenges and Conditions of Latina Workers in the United States*, Labor Council for Latin American Advancement (2012) at 30.

3

equal pay laws, and in educating its members on ways to negotiate with employers and encourage them to follow practices that reduce workforce discrimination.

10.     LCLAA was aware that the EEOC planned to publish aggregate pay data based on the revised EEO-1 pay data collection, as has been the EEOC's longstanding practice.

11.     Had the revised EEO-1 aggregate pay data been available, as planned, in upcoming reports, LCLAA would have presented statistics on pay equity within industries and across the nation, based on this data. This information would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAA's mission of improving the condition of Latinos and Latinas in the workforce.

12.     The stay of the revised EEO-1 makes that plan impossible, impeding LCLAA's plans. To replicate the same information LCLAA would obtain from the revised EEO-1, LCLAA would have to convince thousands of employers to voluntarily provide data and then employ statisticians to analyze the resulting raw data—efforts that would require enormous expense and *still* likely be unsuccessful, given LCLAA's inability to require employers to comply. Without the revised EEO-1 pay data collection, any attempt to compile such data would almost certainly underreport pay inequities, because employers with significant disparities would be particularly unlikely to provide data voluntarily.

13.     Because the revised EEO-1's aggregate pay data is unavailable, LCLAA is pursuing the possibility of conducting surveys of workers on Latina pay equity issues. LCLAA has obtained initial cost estimates for such a survey, which suggests that the survey will be very costly. LCLAA currently is exploring how to fund it. They stay requires that any survey include detailed questions on pay equity that would be unnecessary (or, at a minimum, significantly less urgent) if the annual EEO-1 reports included aggregate pay data in addition to its general

4

aggregate demographic information. The inclusion of such questions will increase the cost of the design, implementation, and analysis of the surveys.

14.     The stay of the revised EEO-1 forced LCLAA to redeploy its limited staff resources away from their daily operations.

15.     Initially, each of LCLAA's employees had to spend time working on responses to the stay, from discussions related to the Latino/a worker survey and contract development discussed above to explaining the implications of the change to Chapter presidents and other members. This has restricted LCLAA's ability to carry out its daily operations. For example, LCLAA recently launched a first-of-its-kind fellowship for Latina workers, the Latina Gender Equity Fellowship. The first class of Fellows began their fellowships on November 1, 2017. LCLAA was not able to spend needed time to do necessary follow up and additional project development because the personnel it had intended to deploy to work on these matters have instead needed to engage in activity related to the EEO-1 pay data collection, including the survey, contracting, and other responses discussed above.

16.     Similarly, LCLAA had planned to work on educational materials related to the NAFTA renegotiations, including its impact on women, to help its members understand its implications for Latino/a workers. This type of educational initiative is a core and common part of LCLAA's daily operations    but LCLAA was not able to engage in those tasks following the stay of the EEO-1 pay data collection because it was working on the tasks described above.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct to the best of my knowledge, information, and belief.

5

274

Executed on October 29, 2018, in Washington, D.C.

_____

Hector E. Sanchez

6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

National Women's Law Center, *et al.*,

    *Plaintiffs*,

vs.

Office of Management and Budget, *et al.*,

    *Defendants*.

Civil Action No. 17-2458 (TSC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DECLARATION OF ANDREA JOHNSON

I, ANDREA JOHNSON, declare as follows:

1.    I am Senior Counsel for State Policy at the National Women's Law Center

(NWLC) in Washington, D.C. The statements made in this declaration are based on my personal

knowledge, materials I have reviewed, and information made available to me pursuant to my

duties at NWLC.

2.    I submit this declaration in support of Plaintiffs' Motion for Summary Judgment

in *National Women's Law Center v. Office of Management and Budget*, Civil No. 17-2458

(DDC). The lawsuit challenges the Office of Management and Budget's August 29, 2017

decision to review and stay a previously approved revision by the Equal Employment

Opportunity Commission to the "Employer Information Report EEO-1" (EEO-1), to collect pay

data from employers in addition to the long-standing collection of data regarding sex, race,

ethnicity and job category.

1

3.      NWLC is a 46-year-old nonpartisan, nonprofit organization that advocates for the rights of women and girls at school, at work, at home, and in their communities. It is based in Washington, DC.

4.      One of NWLC's primary and longstanding priorities is closing the gender wage gap, and in particular the race and gender wage gaps experienced by women of color.

5.      Part of NWLC's mission is to educate employers, the public, and policymakers about race and gender wage gaps. In pursuit of this mission, NWLC has published numerous analyses and reports about workplace pay disparities. For example, NWLC has published the following reports: The Wage Gap State by State: 2012 Fact Sheets (April 2012); 50 Years & Counting: The Unfinished Business of Achieving Fair Pay (2013); Women, the Minimum Wage, and the Wage Gap, State by State (August 2015); The Wage Gap Over Time (September 2015); Equal Pay For Latinas (October 2016); Women and the Lifetime Wage Gap: How Many Woman Years Does it Take to Equal 40 Man Years? (April 2017); Asking for Salary History Perpetuates Pay Discrimination from Job to Job (July 2017); Union Membership is Critical for Equal Pay (March 2018); Women Experience a Wage Gap in Nearly Every Occupation (April 2018); Promoting Pay Transparency to Fight the Gender Wage Gap: Creative International Models (June 2018); The Wage Gap for Black Women: Working Longer and Making Less (August 2018). Many of these reports cite data on pay inequality across a number of factors and reflect time-consuming analysis of Bureau of Labor Statistics and Census data undertaken by NWLC staff.

6.      NWLC was aware that the EEOC planned to publish aggregate pay data based on the revised EEO-1 pay data collection. This aggregate data would have potentially revealed new information about the occupational categories, industries, and locations experiencing the largest

2

race and gender wage gaps. If NWLC had access to this information, it would have been able to make its reports and advocacy more robust with additional data and analysis.

7.      Access to the aggregate EEO-1 pay data would also have made it possible for NWLC to focus its resources, analysis, and advocacy on the jobs, industries, and regions where intervention is most urgent. Without this information, it is more difficult for NWLC to analyze race and gender pay gaps, educate the public, and target advocacy efforts and other interventions to the most urgent problems.

8.      The EEO-1 pay data collection also would have benefitted NWLC's pro bono representation of individual clients with workplace discrimination claims. NWLC is frequently asked to assist individuals with potential pay discrimination claims, and typically agrees to provide pro bono advice and/or representation in one or more cases each year. For example, NWLC currently represents a female machine operator who has filed an EEOC charge for pay discrimination against a large manufacturing company that employs few women in this role.

9.      Access to aggregated industry-specific data would help NWLC evaluate the strength of a pay discrimination claim and its potential for success.

10.      Moreover, employer level pay data is probative evidence that may convince the EEOC to take action or prove the claim's merit to a court or jury. Because NWLC represents its clients pro bono, it must bear the costs of amassing evidence about internal pay inequities and comparators' pay practices to obtain any redress through the EEOC or in a court. For instance, in the case described above, NWLC has expended significant effort seeking to obtain and piece together information about pay practices across the manufacturing company.

11.      The EEO-1 pay data collection would have provided information that would help NWLC represent its clients. If aggregate employee pay data were available as planned by the

3

EEOC, the availability of that data would reduce the costs to NWLC associated with representing individual clients in the EEOC charge process and beyond. In addition, because aggregate sector-wide data would be available, NWLC would have a readily available benchmark against which it could compare an employer's allegedly discriminatory practices. Because the EEOC would have employer-specific data, NWLC would be able to request that the EEOC consider an employer's pay disparities at the charge stage, opening an avenue of redress to individuals who otherwise would lack the data to show discrimination and increasing the likelihood that the charge could be resolved through the EEOC investigatory and conciliation process.

12. Following the stay of the EEO-1 pay data collection, NWLC has expended funding and staff time that would have been unnecessary absent the stay. NWLC has expended this time to engage with employers to encourage voluntary compliance with equal pay laws and changes in compensation practices and policies, including voluntary self-audits of pay practices and internal wage gaps, in order to compensate for the self-evaluation of internal wage gaps that the EEO-1 pay data collection would have required employers to undertake.

13. Further, following the stay of the EEO-1 pay data collection, in order to meet the objective of improved enforcement of pay discrimination laws and increased self-evaluation by employers of their own pay practices, NWLC has expended and will expend funding and staff time to create model state and/or local pay data collection legislation; create educational materials setting out the need for such pay data collection and the interests it serves; build coalition and grassroots support in targeted states and/or localities for these measures; and advocate at the state and local level for adoption and full implementation of such legislation. For example, NWLC organized a webinar for state legislators and advocates from across the

4

country that highlighted the importance of state and local pay data collection and reporting efforts in light of the stay of the EEO-1 pay data collection. NWLC worked closely with advocates and legislators in several states, including New Jersey, Rhode Island, and California, to educate them about the importance of pay data collection and reporting, and to draft legislation requiring employers to collect and report pay data. In addition, NWLC provided talking points and/or testimony in support of such legislation in California, New Jersey, Rhode Island, and Maryland.

14.     NWLC is compelled to take these steps in order to pursue its mission of eradicating the pay gap.

15.     As a result, NWLC staff members have diverted time away from daily operations. Several of NWLC's personnel have devoted additional time to pay data collection issues since the stay was issued, shifting them away from activity on other issues at the core of NWLC's day-to-day mission.  For example, NWLC staff's ability to engage in significant federal advocacy, and produce educational and advocacy materials in support of strengthened protections against pregnancy discrimination —important work in which NWLC has long been engaged —has been hampered by the diversion of resources to issues related to equal pay and pay data collection.

16.     In addition, NWLC staff were diverted from preparing the "know your rights" and legal education materials addressing issues of workplace discrimination that are key to the ultimate success of its Legal Network for Gender Equity because of the resources absorbed by reacting to the stay.

*** 

5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States that the foregoing declaration is true and correct to the best of my knowledge,

information, and belief.

Executed on October 31, 2018, in Washington, D.C.

ANDREA JOHNSON

6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

National Women's Law Center
11 Dupont Circle, NW, #800
Washington, DC 20036,

Labor Council for Latin American Advancement
815 16th Street, NW, 3d Floor
Washington, DC 20006,

*Plaintiffs*,

vs.                                              Case No.

Office of Management and Budget
725 17th Street, NW
Washington, DC 20503,

John Michael Mulvaney
Director, Office of Management and Budget
725 17th Street, NW
Washington, DC 20503,

Neomi Rao
Administrator, Office of Information
and Regulatory Affairs
725 17th Street, NW
Washington, DC 20503,

U.S. Equal Employment Opportunity Commission
131 M Street, NE
Washington, DC 20507,

Victoria A. Lipnic
Acting Chair
U.S. Equal Employment Opportunity Commission
131 M Street, NE
Washington, DC 20507,

*Defendants*.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs National Women's Law Center (NWLC) and the Labor Council for Latin American Advancement (LCLAA) hereby sue Defendants Office of Management and Budget (OMB), John Michael (Mick) Mulvaney, Director of OMB, and Neomi Rao, Administrator of the Office of Information and Regulatory Affairs (OIRA), in their official capacities, (collectively OMB Defendants), and, in order to properly execute any remedy, the U.S. Equal Employment Opportunity Commission (EEOC) and Victoria A. Lipnic, Acting Chair of the EEOC, in her official capacity (collectively EEOC Defendants); and allege as follows.

**<u>Introduction</u>**

1.      This case challenges OMB Defendants' interference with the EEOC's ability to enforce the nation's civil rights laws. OMB Defendants halted a years-long effort by the EEOC to collect information on employee pay, and did so without legal authority or meaningful analysis. Despite the facts that OMB had approved such a collection only one year before, and that there was no intervening change in circumstances, OMB Defendants unilaterally stayed employers' obligation to report pay data for their employees. OMB Defendants asserted that the data collection lacked utility, disregarding the EEOC's conclusion that collecting pay data is necessary to remedy persistent wage gaps correlated with sex, race, and ethnicity.

2.      Women working full time, year-round are typically paid 80 cents for every dollar paid to their male counterparts, and comparing women of color to white, non-Hispanic men, the pay gaps are generally even larger. Black women typically make only 63 cents, Native American women only 57 cents, and Latinas only 54 cents for every dollar paid to white, non-Hispanic men for full-time, year-round work.[1] The wage gap is wider still for women who are

---

[1] Nat'l Women's Law Ctr., *Workplace Justice: FAQs About the Wage Gap* (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf.

immigrants.[2] Women are paid less than men in nearly every occupation. Controlling for race, region, unionization status, education, experience, occupation, and industry still leaves 38 percent of the pay gap unexplained.[3]

3.      Men of color experience similar pay disparities compared to white, non-Hispanic men. For every dollar paid to white, non-Hispanic men, Black men are paid 72 cents and Latino men are paid 62 cents.

4.      As the U.S. Congress recently determined, "wage discrimination" is still a "reality", requiring the "robust application of the civil rights laws."[4]

5.      Yet, a dearth of comparative salary and wage information may contribute to the persistence of race and gender pay gaps, and limit attempts to remedy them.[5] Indeed the most recent survey data available indicates that about 60 percent of workers in the private sector are either prohibited or discouraged from discussing their pay with their colleagues.[6] As a result, employees face significant obstacles in gathering the information that would indicate they have experienced pay discrimination, which undermines their ability to challenge such discrimination. And given the absence of legal obligations to identify wage gaps and report employee pay data, employers lack incentives to undertake their own analysis that could proactively correct pay disparities.

---

[2] Nat'l Women's Law Ctr., Labor Council for Latin Am. Adv., *Workplace Justice: Equal Pay for Latinas* (Oct. 2016), https://nwlc.org/wp-content/uploads/2016/10/Latina-Equal-Pay-2016-English-Final.pdf.
[3] Nat'l Women's Law Ctr., *Workplace Justice: FAQs About the Wage Gap* (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf.
[4] Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5.
[5] *See Ledbetter v. Goodyear Tire & Rubber Co., Inc*., 550 U.S. 618, 649-50 (2007) (Ginsburg, J., dissenting) (explaining that in contrast to "open and definitive events" like a denied promotion or termination, compensation disparities "are often hidden from sight"), *superseded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5.
[6] Inst. For Women's Policy Research, *Pay Secrecy and Wage Discrimination* (Jan. 2014), http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file/.

6.      In 2010, the EEOC and other federal agencies began a robust administrative process to identify ways to improve enforcement of federal laws prohibiting pay discrimination. Over the next six years the EEOC commissioned a National Academy of Sciences study, performed its own pilot study, and organized a diverse work group which engaged employer representatives and human resources information system experts, among many other activities.

7.      Employers have long been required by Title VII of the Civil Rights Act of 1964 (Title VII) to make and keep records that are relevant to the determinations of whether unlawful employment practices have occurred, and to report such records to the EEOC.[7] Through the administrative process described herein, the EEOC determined that including employee pay data in this recordkeeping is necessary to fulfill its obligation to enforce Title VII and other anti-discrimination laws; and namely that the availability of such information would improve the EEOC's enforcement of federal laws prohibiting pay discrimination and would increase employers' voluntary compliance with these laws. The EEOC further concluded that, "[b]alancing utility and burden," a "pay data collection would be an effective and appropriate tool" to meet its statutory obligation to end unlawful employment discrimination.[8]

8.      Accordingly, the EEOC voted on and approved revisions to a longstanding employer survey, the "Employer Information Report EEO-1" (EEO-1), to add W-2 earnings data for employees by sex, race, ethnicity, and job category.[9] On February 1, 2016, these revisions to the EEO-1 were published in the Federal Register for a 60-day notice and comment period as required by the Paperwork Reduction Act, 44 U.S.C. §§ 3501, *et seq*. (PRA). Over the next

---

[7] 42 U.S.C. § 2000e-8(c).
[8] Agency Information Collection Activities: Notice of Submission for OMB Review, 81 Fed. Reg. 45479, 45483 (July 14, 2016).
[9] EEOC has been using iterations of the EEO-1 to collect employer-level demographic information about employment statistics since 1966.

seven months, the EEOC held a public hearing, made changes to the revised EEO-1 to reduce

employer burden in response to comments received, voted on and approved the revisions to the

EEO-1, formally submitted its revisions to the EEO-1 to OMB for approval as required by the

PRA, and sought 30 days of additional public comment. The administrative process shows that at

every step the EEOC carefully considered how to maximize the utility of this collection and

minimize its burden on employers, including through the full and effective use notice and

comment procedures.

      9.     OMB Defendants approved the revisions to the EEO-1 on or about September 29,

2016. On that same day the EEOC announced that private employers with 100 or more

employees, including federal contractors and subcontractors, would be required to submit the

revised EEO-1. As such, beginning in March 2018, they would report summary pay data, which

would be held confidentially, along with their longstanding reporting of employee demographic

information by job category, to the EEOC. The EEOC also announced the availability of

technical assistance, to include free webinars, to facilitate the transition for covered employers.[10]

      10.    On August 29, 2017, without notice, Neomi Rao, the Administrator of OIRA (a

component of OMB that reviews agency information collection requests for approval or

disapproval) issued a one-and-a-half-page memorandum that immediately stayed the

effectiveness of these revisions to the EEO-1 (the Rao Memorandum). Administrator Rao

provided virtually no explanation regarding the decision, with only seven sentences used to

justify the abrupt reversal of OMB's prior approval of the pay data collection less than one year

earlier.[11] OMB Defendants' decision was made in secret and without inviting public comment, in

---

[10] Press Release, EEOC, *EEOC to Collect Summary Pay Data* (Sept. 29, 2016), https://www.eeoc.gov/eeoc/
newsroom/release/9-29-16.cfm.
[11] Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017),
https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.

contrast to the transparent, public, multi-year process utilized by the EEOC to create a well-developed and reasoned revision of the EEO-1 to collect pay data.

11.     OMB Defendants acted unlawfully in staying the pay data collection. They do not have authority to stay a collection of data required by agency rule, like the EEO-1. Even if they had such authority, the cursory explanation provided by the Rao Memorandum does not establish a legal basis for their action. The Rao Memorandum provides virtually no analysis, and simply parrots regulatory standards, while the only specific justification provided is nonsensical in light of the underlying facts.

12.     NWLC and LCLAA now sue OMB Defendants because their actions were contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (APA), and the PRA, 44 U.S.C. §§ 3501, *et seq.*

13.     Plaintiffs also sue EEOC Defendants as necessary parties for relief in this case because the EEOC acted consistently with a directive from OMB Defendants to notify employers that they were not required to submit pay data as part of their EEO-1 submissions for the current fiscal year.[12]

## Parties

14.     **Plaintiff National Women's Law Center (NWLC)** is a 45-year-old nonpartisan, nonprofit organization that advocates for the rights of women and girls at school, at work, at home, and in their communities. It is based in Washington, DC. For decades, NWLC has worked to combat sex discrimination in the workplace, with a particular focus on achieving equal pay for women.

---

[12]Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362, 43362 (Sept. 15, 2017).

15.     Closing the gender wage gap, and in particular the race and gender wage gaps experienced by women of color, is a key priority for NWLC. NWLC publishes evidence-based reports and fact sheets used to educate employers, members of the public, and federal and state policymakers about the reality of pay inequity as well as policies that promote equal pay. It identifies, highlights, and promotes promising employer practices to close the wage gap, and works with willing employers to assist them in implementing such practices. NWLC has worked closely with policymakers at the federal and state level to strengthen equal pay laws; and built coalitions to press for public policy reform to promote equal pay. NWLC pursues robust enforcement of laws prohibiting pay discrimination and other forms of workplace discrimination and seeks redress for victims of such discrimination, representing individual employees bringing discrimination charges to the EEOC, and referring others to attorneys willing to take on these cases through its Legal Network for Gender Equity. NWLC also appears as amicus and as counsel in the courts on behalf of victims of pay discrimination.

16.     **Plaintiff Labor Council for Latin American Advancement (LCLAA)** is a national 501(c)(3) representing the interests of approximately 2 million Latino/a trade unionists throughout the United States and Puerto Rico, as well as other non-unionized Latino workers. Its headquarters is in Washington, DC, and it has 52 chapters around the country. LCLAA was founded in 1972 by local Latino trade union committees to promote participation by Hispanic trade unionists. It dedicates its efforts to assisting workers to better advance their rights in their workplace and convince employers to take steps to improve working conditions, both through advocacy and through training and counseling workers and union members. LCLAA's dues-paying membership includes individual workers, union members, and students. LCLAA helps its

7

members to pursue their common goal of improving the working conditions of Latino and Latina employees, both at individual employers and throughout the economy.

17.    Closing the pay gap has been an increasing focus of LCLAA's work in recent years. This pay gap especially plagues Latinas, who suffer from the largest gender wage gap of any group of working women in the United States. In 2012, LCLAA created the Trabajadoras Initiative,[13] which specifically seeks to protect and advance the interests of Latina workers on issues that impact them, including seeking to eradicate the persistent pay gap. In 2012, LCLAA passed a resolution specifically calling on the AFL-CIO and its affiliates to conduct advocacy and outreach aimed at eradicating pay discrimination. It passed subsequent resolutions related to fair pair, along with reaffirming its commitment to protecting and defending the rights of Latina workers in all sectors and industries across the United States. Among other things, the most recent resolution reaffirmed this priority and LCLAA's commitment to "work in partnership with Trabajadoras to win the full range of labor rights" from employers and governments.

18.    At the national and Chapter level, LCLAA has actively worked to educate its members about the pay gap and how to use collective action and organizing to close this pay gap. In addition, it has actively participated in and helped lead campaigns aimed at raising awareness about this grave problem, as well as the solutions necessary to address it. To this end, it has trained Chapter Presidents about this issue and the Chapter leadership has shared this information with their membership and mobilized members to act on the ground in states around the country. LCLAA has also hosted two summits and other events at the local and national level for its membership and the public that have been focused on providing information, education and solutions to closing the pay gap.

---

[13] "Trabajadoras" translates to "working women."

19.     **Defendant OMB** is a federal agency responsible for approving or disapproving

agencies' information collection activities pursuant to the PRA. It is a component of the

Executive Office of the President and maintains a headquarters in Washington, DC.

20.     **Defendant John Michael (Mick) Mulvaney** is the Director of OMB. He is sued

in his official capacity.

21.     **Defendant Neomi Rao** is the Administrator of OIRA, a component of OMB,

responsible for approving or disapproving agency information collection requests. She is sued in

her official capacity.

22.     **Defendant EEOC** is a federal agency responsible for enforcing federal anti-

discrimination laws.

23.     **Defendant Victoria A. Lipnic** is the Acting Chair of the EEOC. She is sued in

her official capacity.

## Jurisdiction and Venue

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because this action arises under federal law, specifically the APA, 5 U.S.C. § 701, *et seq.*,

and the PRA, 44 U.S.C. 3501, *et seq*.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because at least

one of Defendants is headquartered in Washington, D.C., and a substantial part of the events or

omissions giving rise to Plaintiffs' claims occurred here.

## Plaintiffs' Injuries

### *National Women's Law Center*

26.     NWLC brings this action on its own behalf, because the challenged conduct

deprives it of valuable information that it would otherwise use in public education and advocacy

for its clients, increases the costs it bears in its pro bono representation of individuals injured by workplace discrimination, limits the efficacy of available avenues of redress, requires resource-intensive efforts that impede its daily operations, and otherwise directly conflicts with, impairs, and frustrates NWLC's organizational mission and priorities.

27.     As part of NWLC's mission to educate employers, the public, and policymakers about race and gender wage gaps, NWLC has published numerous analyses and reports about workplace pay disparities. These reports cite data on pay inequality across a number of dimensions, and reflect time-consuming analysis of Bureau of Labor Statistics and Census data undertaken by NWLC staff.

28.     The aggregate data that the EEOC intended to make publicly available from the EEO-1 pay data collection would have made available new information about the occupational categories, industries, and locations experiencing the largest race and gender wage gaps. This new data would have allowed NWLC to strengthen its reports with additional data and analysis, and to focus its resources on the jobs, industries, and regions where intervention is most urgent. The loss of that data harms NWLC's efforts to analyze these issues, educate the public, and target advocacy efforts and other interventions to the most urgent problems.

29.     The EEO-1 pay data collection also would have significantly benefited NWLC's pro bono representation of individual clients with workplace discrimination claims. NWLC is frequently asked to assist individuals with potential pay discrimination claims, and typically agrees to provide pro bono representation in one or more cases each year.

30.     In such actions, pay data is probative evidence needed to convince the EEOC to take action or to convince a court or jury of a claim's merit. But in most cases, neither NWLC nor its clients can obtain that data directly from employers prior to filing a complaint or a

USCA Case #19-5130 Document #1802830 Filed: 08/19/2019 Page 295 of 369

lawsuit, impeding their ability to convince the EEOC to devote resources to investigating a

charge or to convince a court to allow discovery to proceed. Because NWLC represents its

clients pro bono, it must bear the costs of amassing evidence about internal pay inequities and

comparators' pay practices to obtain any redress through the EEOC or in a court.

31.    The EEO-1 pay data collection would have substantially benefited NWLC by

providing information that helps overcome these hurdles, reducing costs associated with

representing individual clients and allowing access to avenues to redress that would otherwise be

closed. Because aggregate sector-wide data would be available, NWLC would have a readily

available benchmark against which it could compare an employer's allegedly discriminatory

practices. Because the EEOC would have employer-specific data, NWLC would be able to

request that the EEOC consider an employer's pay disparities at the charge stage, opening an

avenue of redress to individuals who otherwise would lack the data to show discrimination and

increasing the likelihood that the charge could be resolved through the EEOC investigatory and

conciliation process without lengthy and expensive litigation. The stay takes away all of these

benefits.

32.    In addition, because of the unlawful review and stay of the EEO-1 pay data

collection, NWLC will expend additional funding and staff time to engage with employers to

encourage voluntary compliance with equal pay laws, including voluntary self-audits of pay

practices and internal wage gaps, in order to compensate for the self-evaluation of internal wage

gaps that the EEO-1 pay data collection would have required employers to undertake. Moreover,

because of the unlawful stay of the EEO-1 pay data collection, in order to meet the objective of

improved enforcement of pay discrimination laws and increased self-evaluation by employers of

their own pay practices, NWLC has expended and will expend funding and staff time to create

model state and/or local pay data collection legislation; create educational materials setting out the need for such pay data collection and the interests it serves; build coalition and grassroots support in targeted states and/or localities for these measures; and advocate at the state and local level for adoption and full implementation of such legislation.

33.      As a result of these additional steps that the stay has forced NWLC to take in order to advance its mission, NWLC staff members have diverted time away from daily operations. Several of NWLC's personnel have focused primarily on pay data collection issues since the stay was issued, shifting them away from activity on other issues at the core of NWLC's day-to-day mission. For example, NWLC staff's ability to produce educational materials and sample laws and policies addressing workplace sexual harassment—important work for which there is currently an urgent need—has been hampered by the diversion of resources to issues related to equal pay and pay data collection.

34.      Additionally, NWLC staff have been diverted from preparing the "know your rights" and legal education materials addressing issues of workplace discrimination and harassment that are key to the ultimate success of its recently launched Legal Network for Gender Equity because of the resources absorbed by reacting to the stay.

35.      Similarly, NWLC staff have been unable to engage in significant federal advocacy efforts in recent months in support of strengthened pregnancy discrimination protections because of limited staff resources as a result of the stay.

### *Labor Council for Latin American Advancement*

36.      LCLAA brings this action on its own behalf, because the challenged conduct directly conflicts with, impairs, and frustrates LCLAA's organizational mission and priorities. The unlawful review and stay of the revised EEO-1 has caused and will continue to cause

LCLAA to divert and redirect its limited resources, impeding LCLAA's ability to carry out its daily operations. It will also cause LCLAA to spend money on external contractors to gather information that would have been unnecessary but for the stay.

37.     LCLAA periodically issues reports to educate workers, employers, and union leaders about the challenges encountered by Latinos and Latinas in the workforce. LCLAA uses these reports in advocating for policy change and enforcement, and in educating its members on ways to negotiate with employers and encourage them to follow practices that reduce workforce discrimination. To aid those efforts, the reports discuss data compiled and published by the Government on income and employment—including EEO-1 data.[14]

38.     In upcoming reports, LCLAA would have presented statistics on pay equity within industries and across the nation, based on the new pay data required by the revised EEO-1. This would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAA's mission of improving the condition of Latinos and Latinas in the workforce.

39.     OMB Defendants' stay of the revised EEO-1 renders that plan impossible, impeding LCLAA's plans for carrying out its mission. To replicate the same information LCLAA would obtain from the revised EEO-1, LCLAA would have to convince thousands of employers to voluntarily provide data and then employ statisticians to analyze the resulting raw data—efforts that would require enormous expense and *still* likely be unsuccessful, given LCLAA's inability to require employers to comply. Indeed, without the revised EEO-1 pay data collection, any attempt to compile such data would almost certainly underreport pay inequities, because employers with significant disparities would be particularly unlikely to provide data

---

[14] *See, e.g.*, *Trabajadoras: Challenges and Conditions of Latina Workers in the United States*, Labor Council for Latin American Advancement (2012) at 30.

voluntarily. Accordingly, OMB Defendants' actions render LCLAA's plan to report authoritative statistics on pay equity entirely impossible.

40.    Because this data is unavailable, LCLAA is pursuing the possibility of conducting surveys of workers on pay equity issues. It is currently working with an external consultant to get cost estimates for multiple surveys, one for both Latino and Latina workers and one specifically directed at Latina workers. Any such survey will come at considerable expense—not only for the design, implementation, and analysis of the survey, but for any interpretation or translation costs that are required to ensure that the survey is accessible to non-English-speaking Latino and Latina workers. If the revised EEO-1 remains stayed, any survey must include detailed questions on pay equity that would be unnecessary (or, at a minimum, significantly less urgent) if the annual EEO-1 reports included aggregate pay data in addition to its general aggregate demographic information. The inclusion of such questions will increase the cost to LCLAA of the design, implementation, and analysis of the surveys.

41.    As another example, prior to OMB Defendants' stay of the revised EEO-1, LCLAA had been developing a project aimed at creating model contract terms regarding pay equity for its union members to seek in contract negotiations. In light of OMB Defendants' stay of the revised EEO-1, it will be necessary for LCLAA to add terms dealing with collection of pay equity data—terms that would have been unnecessary if the revision took effect as planned, because employers would be required by law to collect such data.

42.    Similarly, once the model contract terms are complete, LCLAA intends to train its members and share this information with union leaders on the terms and on relevant aspects of negotiations. Such training will require substantial time on the part of LCLAA's staff. By forcing LCLAA to include additional model contract terms, the stay of the revised EEO-1 increases the

amount of time that training will take, further inhibiting LCLAA's ability to carry out its daily operations in a timely fashion.

43. All of the activities necessitated by OMB Defendants' stay have forced LCLAA to redeploy its limited staff resources away from their daily operations. Each of LCLAA's employees has had to spend time working on responses to the stay, from discussions related to the Latino/a worker survey and contract development discussed above to explaining the implications of the change to Chapter presidents and other members.

44. This has restricted LCLAA's ability to carry out its daily operations. For example, LCLAA recently launched a first-of-its-kind fellowship for Latina workers, the Latina Gender Equity Fellowship. The first class of Fellows began their fellowships on November 1, 2017. LCLAA has not been able to spend needed time to do necessary follow up and additional project development because the personnel it had intended to deploy to work on these matters have instead needed to engage in activity related to the EEO-1 pay data collection, including the survey, contracting, and other responses discussed above.

45. Similarly, LCLAA had intended to work on educational materials related to the NAFTA renegotiations, including its impact on women, to help its members understand its implications for Latino/a workers. This type of educational initiative is a core and common part of LCLAA's daily operations—but LCLAA has not been able to engage in these efforts because its resources have been drained by the urgent tasks described above.

## The Paperwork Reduction Act

46. The PRA was intended to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in government and society" and to "ensure the greatest possible public benefit from and maximize the utility of information created,

collected, maintained, used, shared, and disseminated by or for the Federal Government" while

minimizing the paperwork burden imposed when the federal government collects information

from individuals; educational and nonprofit institutions; Federal contractors; and State, local and

tribal governments.[15]

47.     The PRA was not intended to increase OMB's authority over substantive agency

policies. Indeed, the PRA expressly states: "[n]othing in this chapter shall be interpreted as

increasing … the authority of [OMB] with respect to … the substantive authority of any Federal

agency to enforce the civil rights laws."[16]

48.     Through the PRA, Congress established a process by which agencies obtain

approval from OMB to collect certain types of information from the public. The agency must

first conduct its own evaluation of the plan for a proposed information collection, including the

need for the information and the burden imposed by collection.[17]

49.     With limited exceptions not relevant here, the PRA requires that an agency

publish a "60-day notice" in the Federal Register soliciting public comment on the agency's

proposed collection.[18]

50.     After the conclusion of the 60-day comment period, the agency's internal

consideration of the public's comments, and any appropriate revisions, the agency submits the

collection of information to OMB and publishes a second Federal Register notice to announce

the start of OMB review and a 30-day comment period.[19] The second notice informs the public

---

[15] 44 U.S.C. § 3501.
[16] 44 U.S.C. 3518(e).
[17] 44 U.S.C. § 3506(c)(1)(A).
[18] 44 U.S.C. § 3506(c)(2).
[19] 44 U.S.C. § 3507(a), (b).

about how to submit comments to OMB and that OMB may act on the agency's request only

after the 30-day comment period has closed.

51.     After these two public comment periods, OMB, through OIRA, may approve or

disapprove the proposed collection of information; or if OMB fails to act, approval is inferred for

up to one year.[20] An OMB approval of a collection of information may last for a three-year

period, after which the agency must seek an extension of OMB's approval if it wishes to

continue the collection of information.[21]

52.     Upon approval, OMB issues a control number, which serves to inform the

regulated public that the collection has been approved. The agency must append the control

number to any collection of information.[22]

53.     OMB does not have authority to stay an ongoing collection of information it

previously approved if the collection is contained in an agency rule.

54.     OMB's regulations permit it to review an ongoing and previously approved

collection of information contained in a current rule or an ongoing and previously approved

collection of information not contained in proposed rules or current rules, when "relevant

circumstances have changed or the burden estimates provided by the agency at the time of initial

submission were materially in error."[23] OMB's regulations also permit it to stay, but only for

good cause, "the effectiveness of a prior approval of any such collection of information that is

not specifically required by agency rule."[24]

**The EEO-1**

---

[20] 44 U.S.C. § 3507(c).
[21] 44 U.S.C. § 3507(g), (h).
[22] 44 U.S.C. § 3506(c)(1)(B).
[23] 5 C.F.R. § 1320.10(f); 5 C.F.R. § 1320.12(h)(2)(i).
[24] 5 C.F.R. § 1320.10(g).

55.     Title VII requires employers to "make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed," to preserve such records, and to produce reports as the EEOC prescribes by regulation or order.[25]

56.     Pursuant to this statutory authority, beginning in 1966, the EEOC regulations have required that employers with 100 or more employees file with the EEOC a survey known as the "Employer Information Report EEO-1" (EEO-1).[26] This requirement also applies to certain federal contractors and subcontractors with more than 50 employees, enforced by the Office of Federal Contract Compliance Programs (OFCCP) in the U.S. Department of Labor (DOL).[27]

57.     The EEO-1 has been revised from time to time by the EEOC, but prior to the revisions at issue in this matter, to add to the collection W-2 earnings data for employees by sex, race, ethnicity, and job category, the EEO-1 directed covered employers to report annually the number of individuals employed by job category and by sex, race, and ethnicity. The EEO-1 currently includes seven race and ethnicity categories and ten job categories.[28]

58.     The EEOC and OFCCP use EEO-1 data to support civil rights enforcement and to analyze and inform the public about employment patterns, such as the representation of women and minorities within companies, industries, or regions. The EEOC also uses this information to determine in which industries or companies individuals may be segregated by race or sex and

---

[25] 42 U.S.C. § 2000e-8(c).

[26] 29 C.F.R. § 1602.7. Employers who make willfully false statements in an EEO-1 may be subject to fines and imprisonment, and employers who fail or refuse to file an EEO-1 may be compelled by court order to do so. *Id.*, §§ 1602.8, 1602.9.

[27] 41 CFR §60-1.7. The OFCCP enforces the antidiscrimination and affirmative action obligations that apply to federal contractors, including those set out in Executive Order 11246, prohibiting federal contractors from discriminating on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin, and requiring them to take affirmative action to ensure employment and fair treatment without regard to these characteristics.

[28] *See* EEOC, *Equal Employment Opportunity Employer Information Report EEO-1*, https://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.

18

over-included in particular roles or company divisions and excluded from others. EEO-1 data also helps to show trends regarding hiring, promotions, and employee turnover within certain sectors.

59.    The EEOC makes aggregate EEO-1 information for major geographic areas and industry group publicly available.[29] (Individually identifiable information is kept confidential). In addition, the EEOC periodically publishes special reports based on aggregate data collected from the EEO-1, such as a recent report on Diversity in High Tech.[30]

60.    OFCCP also relies upon EEO-1 data pursuant to its mission to enforce equal employment opportunity obligations imposed on those who do business with the federal government. OFCCP has issued regulations describing the EEO-1 as a report "promulgated jointly" with the EEOC and requiring certain contractors to submit annual EEO-1s.[31]

61.    The specific information reported by a covered employer or contractor pursuant to the EEO-1 must be kept confidential unless and until the EEOC initiates a Title VII action that involves the information.[32] Private litigants may also obtain EEO-1 data via discovery as part of a Title VII proceeding in some circumstances.

### The EEOC's Determination That Collecting Pay Data Is Necessary to Enforce Employment Non-Discrimination Laws and Would Not Impose a Significant Burden

62.    In 2010, the EEOC joined other federal agencies, including DOL, as members of the President's National Equal Pay Task Force to identify ways to improve enforcement of federal laws prohibiting pay discrimination.

---

[29] EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1)*, https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/.
[30] EEOC, *Special Reports*, https://www.eeoc.gov/eeoc/statistics/reports/index.cfm.
[31] 41 C.F.R. § 60-1.7.
[32] 42 U.S.C. § 2000e-8(e).

63.     Thereafter, the EEOC commissioned a study from the National Academy of

Sciences, a Congressionally-established body that provides independent, objective advice to the

nation on science and technology matters, to assess how to collect pay data most effectively to

support its wage discrimination enforcement efforts. This study concluded that using the EEO-1

for pay data collection would be "quite manageable for both the EEOC and the respondents" and

recommended that following development of a comprehensive plan for use of earnings data, the

EEOC commission a pilot study to test data collection and the plan for its use.[33]

64.     The EEOC commissioned a pilot study, as recommended, identifying the most

efficient means to collect pay data. This study made technical recommendations about several

components of data collection, including the unit of pay to be collected, the best summary

measures of rates of pay, appropriate statistical test(s) for analyzing pay data, and the most

efficient and least costly methods for transmitting pay data from employers. It also estimated

employer burden-hour costs and the processing costs associated with data collection.[34]

65.     The EEOC's pilot study recommended that the EEOC use the IRS's W-2

definition of pay, because it offers a "comprehensive picture of earnings data and may not create

a measurable burden for most respondents."[35] Further, it recommended collecting aggregate W-2

compensation information for the ten EEO-1 occupation categories in pay bands, as well as

collecting total hours worked for each group to account for pay differences due to variations in

the number of hours worked.

---

[33] *See* Nat'l. Research Council, *Collecting Compensation Data from Employers*, 60 (2012), *https*://www.nap.edu/
catalog/13496/collecting-compensation-data-from-employers.
[34] *See* Fidan Kurulus, et al., *Final Report* (Sept. 2015), https://www.eeoc.gov/employers/eeo1survey/pay-pilot-
study.pdf.
[35] *Id*. at 108.

66. The EEOC also sought input on updating all EEO surveys, including adding pay data, in a two-day "work group" meeting in March 2012 with employer representatives, statisticians, human resources information systems experts, and information technology specialists. This work group had several recommendations regarding collection of pay data and noted the importance of confidentiality. It also concluded that for EEO-1 filers, "[t]he cost burden of reporting pay data to EEOC would be minimal."[36]

67. An April 8, 2014, Presidential Memorandum, "Advancing Pay Equality Through Compensation Data Collection," directed the Secretary of Labor to develop a compensation data collection proposal.[37] OFCCP proposed such a collection on August 8, 2014 and provided a sample Equal Pay Report unique for OFCCP. OFCCP received comment, among other things, about the need to improve interagency coordination and decrease employer burden for reporting compensation data by using the EEO-1, rather than a new OFCCP data collection. OFCCP ultimately determined, in part in response to this stakeholder input, to coordinate its data collection with the EEOC by using the EEO-1 and the EEOC benefited from the comments OFCCP had received during its rulemaking efforts.[38]

68. While developing the planned revision to the EEO-1, and considering their enforcement obligations, the EEOC and OFCCP also consulted with the Department of Justice to assess how EEO-1 pay data would be used to assess complaints of discrimination, focus

---

[36] See EEOC, *EEOC Survey System Modernization Work Group Meeting: Draft Report*, 2 (Mar. 19, 2012), https://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf.

[37] See Press Release, The White House, *Presidential Mem. – Advancing Pay Equity Through Compensation Data Collection* (Apr. 8, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/04/08/presidential-memorandum-advancing-pay-equality-through-compensation-data.

[38] Government Contractors Requirement to Report Summary Data on Employee Compensation, 79 Fed. Reg. 46562 (Aug. 8, 2014). In addition to the comments received on its August 8, 2014, proposal, OFCCP had previously received comments in response to its advanced notice of proposed rulemaking on a pay data collection tool and these comments also informed the EEOC's analysis. Non-Discrimination in Compensation: Compensation Data Collection Tool, 76 Fed. Reg. 49398 (Aug. 10, 2011).

21

investigations, and identify employers with existing pay disparities that might warrant further examination.[39]

69.      On February 1, 2016, following this robust process and after a vote to approve the proposed revisions, the EEOC published a Federal Register notice proposing a revision of the EEO-1 to include pay data and requesting public comments. This was the "60-day notice" required by the PRA.[40]

70.      In the 60-day notice, the EEOC proposed revising the EEO-1 to collect aggregate W-2 data in twelve pay bands for the ten existing EEO-1 job categories, as recommended by the pilot study. As the notice explained, "Employers will simply count and report the number of employees in each pay band. For example, a filer will report on the EEO-1 that it employs 3 African American women as professionals in the highest pay band." The notice further explained that it was using pay bands for reporting to minimize employer burden, in part because pay bands were already used in an EEOC survey that collects pay data from state and local government employers, so that software developers reasonably could be expected to be able to build upon their existing knowledge to efficiently and promptly develop human resources software to support the new data collection.[41]

71.      The 60-day notice also proposed collecting the total number of hours worked by the employees included in each EEO-1 pay band, as recommended by the EEOC's pilot study. The EEOC specifically sought employer input with respect to how to report hours for salaried employees, noting that it was "not proposing to require an employer to begin collecting

---

[39] Agency Information Collection Activities: Revision of the Employer Information Report, 81 Fed. Reg. 5113, 5115 (Feb. 1, 2016).
[40] *Id*. at 5113. *See also* 44 U.S.C. § 3506(c)(2).
[41] *Id*. at 5117.

additional data on actual hours worked for salaried workers, to the extent that the employer was not currently maintaining such information."[42]

72.      The notice included a "Paperwork Reduction Act Statement," in which the EEOC explained that it intended to submit to OMB a request for a three-year PRA approval of the revised EEO-1, which would add a component to collect data on employees' W-2 pay and hours worked. The EEOC stated that for the 2016 reporting cycle, EEO-1 filers would use the previous version of the EEO-1, and would not be required to use the proposed revised form until the 2017 reporting cycle.[43]

73.      As required by the PRA, the EEOC estimated the number of reporting hours it expected to be imposed on EEO-1 filers as part of its data collection. For the 2016 reporting year, which would use the previously existing version of the EEO-1 without the pay data requirement, it estimated that the 67,146 filers would use a total of 228,296.4 hours to report the EEO-1 information, or 3.4 hours per filer. For the 2017 and 2018 reporting years, with the pay data requirement, it estimated that the 60,886 filers that would be subject to the additional data collection requirement would use a total of 401,847.6 reporting hours, or a total of 6.6 hours per filer. In short, adding the collection of pay data was estimated to add 3.2 hours of reporting time for each filer.[44]

74.      The EEOC sought employer input on its burden calculation, and specifically sought quantitative information about the burden associated with completing the previously-approved EEO-1, as well as the estimated burden to also submit pay and hours-worked data.

---

[42] *Id.*
[43] *Id.* at 5118.
[44] *Id.* at 5119.

75.     On March 16, 2016, the EEOC held a public hearing on its proposed pay data collection, and heard testimony from witnesses who represented the views of employers, employees, and academics. NWLC joined in this hearing and provided testimony on the revised collection.

76.     The EEOC received a total of 322 timely comments in response to the 60-day notice. These were submitted by individual members of the public, employers, employer associations, Members of Congress, civil rights groups, women's organizations, labor unions, industry groups, law firms, and human resource organizations, and included a comment from NWLC.[45] 119 of these submissions compiled many individual comments in support of the proposed EEO-1 pay data collection. For example, NWLC compiled and submitted 2,393 such supportive comments by individuals.

77.     On July 14, 2016, the EEOC published a second Federal Register notice, announcing that it was submitting to OMB a request for a three-year PRA approval of the revised EEO-1, and soliciting comments both to OMB and the EEOC. This was the "30-day notice" required to obtain OMB approval of the collection of information.[46]

78.     The 30-day notice considered and responded to comments submitted in response to the 60-day notice.[47]

79.     The 30-day notice also set forth the EEOC's conclusion that revisions to the EEO-1 were necessary for the enforcement of Title VII, the Equal Pay Act, and Executive Order

---

[45] 81 Fed. Reg. at 45480.
[46] *Id*. at 45479.
[47] *See* OIRA, *Final EEO-1 Supporting Statement*, 5-7 (Sept. 28, 2016), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-3046-001(identifying seven specific actions EEOC took in response to public comments on the 60-day notice). *See also* 44 U.S.C. § 3507(a)(1)(D).

11246 (which prohibits federal contractors from discriminating on the basis of sex, race or

national origin, among other bases, in employment decisions). The EEOC explained that:

> Based on federal data and a robust body of research, the Commission concludes
> that: (1) [p]ersistent pay gaps continue to exist in the U.S. workforce correlated
> with sex, race, and ethnicity; (2) workplace discrimination is an important
> contributing factor to these pay disparities; and (3) implementing the proposed
> EEO-1 pay data collection will improve the EEOC's ability to efficiently and
> effectively structure its investigation of pay discrimination charges.[48]

80.     The 30-day notice discussed the bases for these conclusions, including a survey of

persistent pay gaps in the U.S. workforce that resulted in the following findings, as of 2014:

- For women of all races and ethnicities, the median annual pay for a woman
  who held a full-time, year-round job was $39,621, while the median annual
  pay for a man who held a full-time, year-round job was $50,383.

- Latina women were paid approximately 44% less than white, non-Hispanic
  men. The average Hispanic or Latina woman would be paid approximately
  $1,007,000 less than the average white, non-Hispanic, male over a 40-year
  period.

- African-American women were paid almost 40% less than white, non-
  Hispanic men.

- Disparities also exist for other women, and for men of color.[49]

81.     As the EEOC explained, these gaps in pay cannot be fully explained by

differences in education, experience, industry, or occupation. Discrimination may play both

direct and indirect roles in creating pay disparities. For example, one study cited by the EEOC

concluded that discrimination accounts for at least one-third of the black-white wage gap.[50]

82.     The EEOC further explained that the pay data collection would "be used to

enhance and increase the efficiency of enforcement efforts while facilitating employer self-

---

[48] 81 Fed. Reg. at 45481.
[49] *Id*. at 45482.
[50] *Id*. at 45482-83.

evaluation and voluntary compliance."[51] It also noted that while voluntary compliance was an important part of the effort to improve pay equity, it has been insufficient to remedy the pay disparities that the EEOC and OFCCP are statutorily required to address. Specifically, "[t]hey now lack the employer- and establishment-specific pay data that prior to issuing a detailed request for information or a subpoena, would be extremely useful in helping enforcement staff to investigate potential pay discrimination. Balancing utility for civil rights enforcement and burden on employers, the EEOC concluded that the proposed EEO-1 pay data collection would be an effective and appropriate tool for this purpose."[52]

83.    The EEOC concluded that it would use the collection of pay data in multiple ways, including: (1) to support its enforcement efforts, by enabling its staff to use statistical analysis to assist in an early assessment of pay discrimination charges against an employer; (2) to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area; and (3) to provide training and outreach both internally and to employers and other stakeholders.[53] Data received through the revised EEO-1 would be used by OFCCP to more effectively focus agency investigations, assess complaints, and identify existing pay disparities.[54]

84.    The 30-day notice also announced adjustments to the data collection proposal in response to public comments, specifically to reduce burden to employers. The EEOC announced it would change the EEO-1 filing deadline to March 31 of the year that follows the reporting year, moving the date from September 30. This change was in response to commenter objections to a reporting period that did not align with calendar year W-2 data.

---

[51] *Id*. at 45480.
[52] *Id*. at 45483.
[53] *Id*. at 45490-91.
[54] *Id.* at 45483.

85.     The EEOC would also change the "workforce snapshot period," which refers to the pay period when employers count the total number of employees for the year's EEO-1. The EEOC moved the workforce snapshot period to a pay period in the final quarter of the calendar year in response to comments from the employer community that criticized the workforce snapshot approach because it would not reflect same-year promotions that have the effect of moving an employee into a different job category or pay band after the "snapshot" was taken.[55]

86.     In response to public comments, the 30-day notice also adjusted the estimates of burden imposed by the revisions to the EEO-1 upward from the first notice. The EEOC estimated that completing the revised EEO-1 would take 15.2 hours per filer for functions at a whole firm level plus an additional 1.9 hours per individual report for functions at an individual establishment level. It also estimated that there would be a onetime implementation burden of approximately 8 hours per filer.[56]

87.     In the 30-day notice, the EEOC estimated that the addition of pay data would increase the filing cost for each EEO-1 filer by $416.58.[57]

88.     The 30-day notice also stated that the EEOC would later post data file specifications to support employers and Human Resources Information Systems vendors in reporting pay data via the EEO-1 through direct data upload "as soon as OMB approves the information collection."[58]

89.     The EEOC received a total of 612 comments in response to the 30-day notice, including comments from NWLC. Many of these submissions compiled numerous individual

---

[55] *Id.* at 45484-5.
[56] *Id.* at 45496-97.
[57] *Id.* at 45493-94.
[58] *Id.* at 45487.

comments in support of the proposed EEO-1 pay data collection. For example, NWLC compiled

and submitted 5,269 such supportive comments by individuals.

90.     In the EEOC's Final Supporting Statement on EEO-1, provided to OMB on

September 28, 2016, it set forth a mechanism for future review of the utility and burden of

collecting pay data as part of the EEO-1 collection:

> [T]he EEOC will continue to evaluate the revised EEO-1 report after it is in use.
> Under the standard three-year renewal process set out by the PRA for federal data
> collection, the next renewal of the EEO-1 will occur in 2019. As part of this
> process, the EEOC will consider its experience in collecting data through the
> revised EEO-1. The EEOC will monitor and evaluate the utility and effectiveness
> of the summary pay data collected and, within six months of the approval of this
> collection, the EEOC will provide OMB a monitoring and evaluation plan. The
> plan will include effectiveness measures, baseline information, procedures for
> collecting and evaluating data, and any other pertinent information. The EEOC
> will report the results of its monitoring and evaluation activities in subsequent
> information collection request packages.
>
> The EEOC will begin collecting pay data as of March 31, 2018, and will be
> positioned to utilize pay data in its investigations in 2019, after the first pay data
> collection has been thoroughly reviewed for accuracy. As these investigations
> may still be ongoing at the time the next information collection request package
> must be submitted to OMB in late 2019, there will be limited information to
> evaluate for purposes of that PRA approval process. Consistent with the PRA
> requirements and its commitment to assess this collection, however, the agency
> will consider whether changes may be warranted to increase the practical utility of
> the data collection or to decrease the burden on EEO-1 filers. For example, the
> EEOC may consider the utility and burden of retaining the existing EEO-1 job
> categories or pay bands as compared to adopting new categories or bands.[59]

91.     OMB approved the proposed collection and issued an OMB control number for

the revised EEO-1 on or about September 29, 2016.

92.     After OMB approved the collection, EEO-1 filers' obligation to submit pay data

came into effect for the 2017 reporting period, which had a filing deadline of March 31, 2018.

---

[59] OIRA, *Final EEO-1 Supporting Statement*, 8 (Sept. 28, 2016),
https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-3046-001

Thereafter, the EEOC updated a website advising employers of the format for the data file by which they could directly upload pay data as part of the EEO-1, if they chose to do so.

93.     Employers submitting the EEO-1 can do so either via (1) direct data entry or (2) direct data upload using a data file specification, based on employers' preferences.[60] Only employers using direct data upload would use the data file specifications posted by the EEOC. As of 2014, the most recent date for which data is publicly available, 98 percent of employers used direct data entry. Only two percent of employers used direct data upload.[61]

94.     The data file specification provided for the revised EEO-1 is a modified version of the data file specification for the EEO-1 that has been in place for over a decade. When the EEO-1 has previously been reviewed and approved by OMB under the PRA, the details of the associated data file specification have not been included in the package provided to OMB, nor has OMB sought this information.[62]

**OMB Defendants' Review and Stay of the EEO-1 Collection**

95.     Nearly one year after OMB approved the pay data collection, on August 29, 2017, Administrator Rao issued a memo to the Acting Chair of the EEOC stating that OMB was initiating a review and immediate stay of the revision to the EEO-1 to collect pay data (Rao

---

[60] *See, e.g.*, EEOC, *Instruction Booklet*, https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm ("EEO-1 reporting is an electronic, online application. Pursuant to the Government Paperwork Elimination Act of 1998, we **strongly** recommend that EEO-1 reports be submitted via the *EEO-1 Online Filing System*, *or* as an electronically transmitted data file. A copy of the **prescribed** EEO-1 data file format is available at the website address in the survey mailout memorandum." (second emphasis added)).

[61] 81 Fed. Reg. at 5119 n. 55, 5120 n. 62 (in 2014, 67,146 firms filed EEO-1s, of which 1,449 firms used direct data upload).

[62] *See, e.g.*, Agency Information Collection Activities: Notice of Submission for OMB Review, 71 Fed. Reg. 71294, 71301 (Nov. 28, 2005) (Noting that the EEOC had introduced online filing in 2003, but providing no information regarding data file specifications); Agency Information Collection Activities: Proposed Collection; Submission for OMB Review, 79 Fed. Reg. 72678 (Dec. 8, 2014) (submission for renewal of approval of EEO-1, providing no information regarding data file specifications).

Memorandum). This memo, just over a page in length, provided scant explanation for the

decision.

     96.     As the basis for the decision, the Rao Memorandum stated in full:

[U]nder 5 CFR 1320.10(f) and (g), OMB may review an approved collection of
information if OMB determines that the relevant circumstances related to the
collection have changed and/or that the burden estimates provided by EEOC at
the time of initial submission were materially in error. OMB has determined that
each of these conditions for review has been met. For example, since approving
the revised EEO-1 form on September 29, 2016, OMB understands that EEOC
has released data file specifications for employers to use in submitting EEO-1
data. These specifications were not contained in the Federal Register notices as
part of the public comment process nor were they outlined in the supporting
statement for the collection of information. As a result, the public did not receive
an opportunity to provide comment on the method of data submission to EEOC.
In addition, EEOC's burden estimates did not account for the use of these
particular data file specifications, which may have changed the initial burden
estimate.

OMB has also decided to stay immediately the effectiveness of the revised aspects
of the EEO-1 form for good cause, as we believe that continued collection of this
information is contrary to the standards of the PRA. Among other things, OMB is
concerned that some aspects of the revised collection of information lack practical
utility, are unnecessarily burdensome, and do not adequately address privacy and
confidentiality issues.[63]

     97.     The Rao Memorandum did not address the fact that the EEO-1 is required by

EEOC and OFCCP regulations[64], and that OMB Defendants therefore did not have legal

authority to stay it. The Rao Memorandum did not acknowledge that employers were not

required to use the data file specifications to provide EEO-1 data, nor did it acknowledge that the

data file specifications did not require the reporting of any information not made available for

public comment. The Memorandum also did not explain what aspects of the pay data collection

lacked practical utility, were unnecessarily burdensome, and failed to adequately address privacy

---

[63] Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017),
https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.
[64] 29 C.F.R. § 1602.7; 41 C.F.R. § 60-1.7.

and confidentiality issues (issues that the EEOC addressed throughout its administrative

process), nor why any purported problems with the pay data collection outweighed the benefits

identified by the EEOC and OMB in approving the revised EEO-1. The Memorandum did not set

forth any other cause to support its decision to review and stay the collection of pay data, nor did

it claim that any other circumstances related to the collection had changed or that it had

conducted any analysis showing that the burden estimate was materially in error. The

Memorandum also did not explain why the EEOC's planned mechanism for future review of the

collection was insufficient, nor did it state OMB's legal authority to review and stay only one

component of the collection of information.

98.     While the Rao Memorandum asserts that consultation with the EEOC occurred, at

least some EEOC commissioners were left "in the dark about the process."[65]

99.     Following OMB Defendants' direction, on September 15, 2017, the EEOC

published a Federal Register notice stating that EEO-1 filers should not submit pay data in their

EEO-1s due by March 31, 2018.[66]

### Count One: Violation of the APA for Agency Action
### That Exceeds OMB's Authority

100.     Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if

fully set forth herein.

101.     The EEO-1 is required by EEOC regulation. 29 C.F.R. § 1602.7. OFCCP also

requires filing of the EEO-1 by regulation. 41 C.F.R. § 60-1.7.

---

[65] Danielle Paquette, *Trump's White House froze an equal-pay rule. Women are fighting to save it.*, Wash. Post, https://www.washingtonpost.com/news/wonk/wp/2017/10/02/trumps-white-house-froze-an-equal-pay-rule-women-are-fighting-to-save-it/?utm_term=.840f229b1b31.
[66] 82 Fed. Reg. at 43362.

102.    OMB Defendants do not have authority to stay an ongoing collection of information that has already been approved and that is required by regulation.

103.    OMB Defendants do not have authority to review an ongoing collection of information in a current rule unless relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. 5 C.F.R. § 1320.12(h)(2)(i). OMB Defendants' review of the revised EEO-1 did not meet either criteria.

104.    OMB Defendants therefore acted in a manner that was in excess of legal authority in violation of the APA, 5 U.S.C. § 706(2)(C). EEOC Defendants acceded to the unlawful action.

<div align="center">

**Count Two: Violation of the APA for Agency Action
That Is Contrary to Regulation
(*in the alternative to Count One*)**

</div>

105.    Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if fully set forth herein.

106.    OMB may review previously approved collections of information not in agency rules "after consultation with the agency" and "only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submissions were materially in error." 5 C.F.R. § 1320.10(f).

107.    OMB may stay the effectiveness of an approval of a collection of information that is not specifically required by agency rule only "[f]or good cause, after consultation with the agency." 5 C.F.R. § 1320.10(g).

108.    OMB Defendants' review and stay of the revised EEO-1 did not meet the requirements of 5 C.F.R. §§ 1320.10(f) and (g), and therefore OMB Defendants' action was contrary to OMB's own regulations and in excess of OMB's legal authority.

109.    OMB Defendants therefore acted in a manner that was contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). EEOC Defendants acceded to the unlawful action.

### Count Three: Violation of the PRA and the APA for Agency Action That Is Contrary to Statute

110.    Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if fully set forth herein.

111.    The PRA states: "[n]othing in this chapter shall be interpreted as increasing … the authority of [OMB] with respect to … the substantive authority of any Federal agency to enforce the civil rights laws." 44 U.S.C. 3518(e).

112.    Section 709(c) of Title VII of the Civil Rights Act of 1964 requires employers to make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the EEOC prescribes by regulation or order. 42 U.S.C. § 2000e-8(c).

113.    The EEOC determined that collecting pay data was reasonable, necessary and appropriate to enforce Title VII and other civil rights laws. The revised EEO-1 was also expected to strengthen OFCCP's ability to select appropriate federal contractors and subcontractors for review of their compliance with equal employment opportunity mandates.

114.    OMB Defendants stayed the EEOC's ability to collect this pay data.

115.    In so doing, OMB Defendants acted in a manner that violated the PRA, 44 U.S.C. 3518(e), and was therefore contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). EEOC Defendants acceded to the unlawful action.

### Count Four: Violation of the APA for Agency Action That Is Arbitrary and Capricious

33

116.     Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if fully set forth herein.

117.     OMB Defendants did not provide a reasoned basis for the decision to review and stay the revised EEO-1. As outlined above, they failed to consider the EEOC's analysis regarding the utility and burden for the pay data revisions to the EEO-1, as well as the EEOC's plan for ongoing monitoring of this utility and burden; the decision ran counter to the evidence before OMB; OMB Defendants did not provide sufficient justification for the reversal of the prior approval of the revisions to the EEO-1; and they otherwise failed to provide a plausible justification for the action.

118.     In so doing, OMB Defendants acted in a manner that was arbitrary, capricious, and otherwise contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). EEOC Defendants acceded to the unlawful action.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

1.     Declare that OMB Defendants violated the PRA and the APA and exceeded their statutory authority in reviewing and staying the collection of pay data as part of the EEO-1 and that these actions are therefore unlawful;

2.     Declare that the stay proclaimed in the Rao Memorandum and the September 15, 2017, Federal Register notice was a nullity, and that the revised EEO-1 remains in effect;

3.     Vacate the stay, and reinstate the revised EEO-1 reporting requirements;

4.     Order EEOC Defendants to publish a Federal Register notice announcing this reinstatement or to take other equivalent action necessary to immediately reinstate the pay data collection;

5.     Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements

incurred in this action; and

6.     Grant such other relief as the Court may deem just and proper.

Dated: November 15, 2017                       Respectfully submitted,

                                        /s/ *Javier M. Guzman*
                                        Javier M. Guzman
                                        (DC Bar No. 462679)
                                        Robin F. Thurston (*pro hac vice motion to
                                        be filed*)*
                                        Jeffrey B. Dubner (DC Bar No. 1013399)
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, DC 20043
                                        (202) 448-9090
                                        jguzman@democracyforward.org
                                        rthurston@democracyforward.org
                                        jdubner@democracyforward.org

                                         *Admitted in the State of Illinois;
                                         practicing under the supervision of
                                         members of the DC Bar while DC Bar
                                         application is pending.

                                        Fatima Goss Graves (DC Bar No. 481051)
                                        Emily J. Martin (DC Bar No. 991968)
                                        Sunu Chandy (DC Bar No. 1026045)
                                        Maya Raghu (DC Bar No. 1035558)
                                        (*pro hac vice motions to be filed*)
                                        National Women's Law Center
                                        11 Dupont Circle, NW, Ste 800
                                        Washington, DC 20036
                                        (202) 588-5180
                                        fgraves@nwlc.org
                                        emartin@nwlc.org
                                        schandy@nwlc.org
                                        mraghu@nwlc.org

                                         *Attorneys for Plaintiffs*

**This case was appealed to**
D.C. Circuit: 19-5130

# US District Court Civil Docket

**U.S. District - District of Columbia**
**(Washington, DC)**

## 1:17cv2458

## National Women's Law Center et al v. Office of Management And Budget et al

**This case was retrieved from the court on Sunday, August 11, 2019**

| | |
|---|---|
| **Date Filed:** 11/15/2017 | **Class Code:** **OPEN** |
| **Assigned To:** **Judge Tanya S. Chutkan** | **Closed:** |
| **Referred To:** | **Statute:** **05:551** |
| **Nature of suit:** **Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)** | **Jury Demand:** **None** |
| **Cause:** **Administrative Procedure Act** | **Demand Amount:** **$0** |
| **Lead Docket:** **None** | **NOS Description:** **Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision** |
| **Other Docket:** **19-05130** | |
| **Jurisdiction:** **U.S. Government Defendant** | |

| Litigants | Attorneys |
|---|---|
| National Women's Law Center<br>Plaintiff | Javier M. Guzman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington , DC  20043<br>USA<br>(202) 448-9090<br>Email:Jguzman@democracyforward.Org<br><br>Jeffrey B. Dubner<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>1333 H Street Nw<br>Washington , DC  20005<br>USA<br>(202) 448-9090<br>Email:Jdubner@democracyforward.Org |

Emily J. Martin
ATTORNEY TO BE NOTICED
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle
#800
Washington , DC  20036
USA
202-588-5180
Email:Emartin@nwlc.Org

Maya Raghu
ATTORNEY TO BE NOTICED
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Nw Suite 800
Washington , DC  20036
USA
(202) 588-5180
Fax: (202) 588-5185
Email:Mraghu@nwlc.Org

Robin Frances Thurston
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington , DC  20043
USA
(202) 448-9090
Email:Rthurston@democracyforward.Org

Sunu P. Chandy
ATTORNEY TO BE NOTICED
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle Suite 800
Washington , DC  20036
USA
202-588-5180
Email:Schandy@nwlc.Org

Labor Council For Latin American Advancement
Plaintiff

Javier M. Guzman
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington , DC  20043
USA
(202) 448-9090
Email:Jguzman@democracyforward.Org

Jeffrey B. Dubner
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
1333 H Street Nw
Washington , DC  20005
USA
(202) 448-9090
Email:Jdubner@democracyforward.Org

Emily J. Martin
ATTORNEY TO BE NOTICED
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle
#800

Washington , DC  20036
USA
202-588-5180
Email:Emartin@nwlc.Org

Maya Raghu
ATTORNEY TO BE NOTICED
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Nw Suite 800
Washington , DC  20036
USA
(202) 588-5180
Fax: (202) 588-5185
Email:Mraghu@nwlc.Org

Robin Frances Thurston
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington , DC  20043
USA
(202) 448-9090
Email:Rthurston@democracyforward.Org

Sunu P. Chandy
ATTORNEY TO BE NOTICED
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle Suite 800
Washington , DC  20036
USA
202-588-5180
Email:Schandy@nwlc.Org

Office of Management And Budget
Defendant

Rachael Lynn Westmoreland
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington , DC  20044
USA
(202) 514-1280
Fax: (202) 616-8460
Email:Rachael.Westmoreland@usdoj.Gov

Tamra Tyree Moore
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L
Street, Nw
Washington , DC  20005
USA
(202) 305-8628
Fax: (202) 616-8460
Email:Tamra.Moore@usdoj.Gov

John Michael Mulvaney
Director, Office of Management and Budget
Defendant

Rachael Lynn Westmoreland
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883

Washington , DC  20044
USA
(202) 514-1280
Fax: (202) 616-8460
Email:Rachael.Westmoreland@usdoj.Gov

Tamra Tyree Moore
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L
Street, Nw
Washington , DC  20005
USA
(202) 305-8628
Fax: (202) 616-8460
Email:Tamra.Moore@usdoj.Gov

Neomi Rao
Administrator, Office of Information and Regulatory
Affairs
Defendant

Rachael Lynn Westmoreland
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington , DC  20044
USA
(202) 514-1280
Fax: (202) 616-8460
Email:Rachael.Westmoreland@usdoj.Gov

Tamra Tyree Moore
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L
Street, Nw
Washington , DC  20005
USA
(202) 305-8628
Fax: (202) 616-8460
Email:Tamra.Moore@usdoj.Gov

U.S. Equal Employment Opportunity Commission
Defendant

Rachael Lynn Westmoreland
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington , DC  20044
USA
(202) 514-1280
Fax: (202) 616-8460
Email:Rachael.Westmoreland@usdoj.Gov

Tamra Tyree Moore
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L
Street, Nw
Washington , DC  20005
USA
(202) 305-8628
Fax: (202) 616-8460

Email:Tamra.Moore@usdoj.Gov

Victoria A. Lipnic
Acting Chair, U.S. Equal Employment Opportunity
Commission
Defendant

Rachael Lynn Westmoreland
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington , DC  20044
USA
(202) 514-1280
Fax: (202) 616-8460
Email:Rachael.Westmoreland@usdoj.Gov

Tamra Tyree Moore
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L
Street, Nw
Washington , DC  20005
USA
(202) 305-8628
Fax: (202) 616-8460
Email:Tamra.Moore@usdoj.Gov

Directemployers Association, Inc.
Movant

Edward Lee Isler
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ISLER DARE, P.C.
1945 Old Gallows Road Suite 650
Vienna , VA  22182
USA
(703) 748-2690
Fax: (703) 748-2695
Email:Eisler@islerdare.Com

Madalyn K. Doucet
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, Nw
Washington , DC  20037
USA
(202) 955-1577
Email:Mdoucet@hunton.Com

Jay J. Wang
PRO HAC VICE;ATTORNEY TO BE NOTICED
FOX, WANG & MORGAN, P.C.
315 University Avenue
Los Gatos , CA  95030
USA
408-844-2350
Fax: 408-844-2351

John C. Fox
PRO HAC VICE;ATTORNEY TO BE NOTICED
FOX, WANG & MORGAN, P.C.
315 University Avenue
Los Gatos , CA  95030
USA
408-844-2350
Fax: 408-844-2351

321

Micah Ephram Ticatch
ATTORNEY TO BE NOTICED
ISLER DARE, P.C.
1945 Old Gallows Road Suite 650
Vienna , VA  22182
USA
(703) 748-2690
Fax: (703) 748-2695
Email:Mticatch@islerdare.Com

American Society of Employers
Movant

Edward Lee Isler
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ISLER DARE, P.C.
1945 Old Gallows Road Suite 650
Vienna , VA  22182
USA
(703) 748-2690
Fax: (703) 748-2695
Email:Eisler@islerdare.Com

Jay J. Wang
PRO HAC VICE;ATTORNEY TO BE NOTICED
FOX, WANG & MORGAN, P.C.
315 University Avenue
Los Gatos , CA  95030
USA
408-844-2350
Fax: 408-844-2351

John C. Fox
PRO HAC VICE;ATTORNEY TO BE NOTICED
FOX, WANG & MORGAN, P.C.
315 University Avenue
Los Gatos , CA  95030
USA
408-844-2350
Fax: 408-844-2351

Micah Ephram Ticatch
ATTORNEY TO BE NOTICED
ISLER DARE, P.C.
1945 Old Gallows Road Suite 650
Vienna , VA  22182
USA
(703) 748-2690
Fax: (703) 748-2695
Email:Mticatch@islerdare.Com

Chamber of Commerce of The United States of
America
1616 H Street NW
Washington, DC 20062
202-463-5337
Chamber of Commerce of the United States of
America, et al.
Movant

Lawrence Z. Lorber
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Seyfarth Shaw LLP
975 F Street, N.W.
Washington , DC  20004
USA
(202) 463-2400
Fax: (202) 828-5393
Email:Llorber@seyfarth.Com

Annette Tyman

PRO HAC VICE;ATTORNEY TO BE NOTICED
SEYFARTH SHAW, LLP
233 S. Wacker Drive Suite 8000
Chicago , IL  60606
USA
(312) 460-5943
Fax: 312-460-7000
Email:Atyman@seyfarth.Com

Camille A. Olson
PRO HAC VICE;ATTORNEY TO BE NOTICED
SEYFARTH SHAW, LLP
233 S. Wacker Drive Suite 8000
Chicago , IL  60606
USA
(312) 460-5831
Fax: 312-460-7000
Email:Colson@seyfarth.Com

Richard B. Lapp
PRO HAC VICE;ATTORNEY TO BE NOTICED
SEYFARTH SHAW, LLP
233 S. Wacker Drive Suite 8000
Chicago , IL  60606
USA
(312) 460-5000
Fax: (312) 460-7000
Email:Rlapp@seyfarth.Com

Hr Policy Association
Movant

Lawrence Z. Lorber
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Seyfarth Shaw LLP
975 F Street, N.W.
Washington , DC  20004
USA
(202) 463-2400
Fax: (202) 828-5393
Email:Llorber@seyfarth.Com

Associated Builders And Contractors
Movant

Lawrence Z. Lorber
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Seyfarth Shaw LLP
975 F Street, N.W.
Washington , DC  20004
USA
(202) 463-2400
Fax: (202) 828-5393
Email:Llorber@seyfarth.Com

Associated General Contractors of America
Movant

Lawrence Z. Lorber
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Seyfarth Shaw LLP
975 F Street, N.W.
Washington , DC  20004
USA
(202) 463-2400
Fax: (202) 828-5393
Email:Llorber@seyfarth.Com

| | |
|---|---|
| Center For Workplace Compliance<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |
| Institute For Workplace Equality<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |
| National Association of Manufacturers<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |
| National Federation of Independent Business<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |
| National Retail Federation<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |
| Restaurant Law Center<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393 |

Email:Llorber@seyfarth.Com

| | |
|---|---|
| Retail Litigation Center, Inc.,<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |
| Society For Human Resource Management<br>Movant | Lawrence Z. Lorber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Seyfarth Shaw LLP<br>975 F Street, N.W.<br>Washington , DC  20004<br>USA<br>(202) 463-2400<br>Fax: (202) 828-5393<br>Email:Llorber@seyfarth.Com |

| Date | # | Proceeding Text | Source |
|---|---|---|---|
| 11/15/2017 | 1 | COMPLAINT against ALL DEFENDANTS ( Filing fee $ 400 receipt number 0090-5206576) filed by NATIONAL WOMEN'S LAW CENTER, LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(Guzman, Javier) (Entered: 11/15/2017) | |
| 11/15/2017 | | Case Assigned to Judge Tanya S. Chutkan. (md) (Entered: 11/19/2017) | |
| 11/19/2017 | 2 | SUMMONS (7) Issued Electronically as to VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice of Consent) (md) (Entered: 11/19/2017) | |
| 11/27/2017 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Robin F. Thurston, :Firm- Democracy Forward Foundation, :Address- P.O. Box 34553, Washington, DC 20043. Phone No. - (202) 448-9090. Filing fee $ 100, receipt number 0090-5221881. Fee Status: Fee Paid. by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Declaration, # 2 Text of Proposed Order) (Guzman, Javier) (Entered: 11/27/2017) | |
| 11/28/2017 | 4 | CERTIFICATE OF SERVICE by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER . (Attachments: # 1 Declaration)(Guzman, Javier) (Entered: 11/28/2017) | |
| 11/29/2017 | | NOTICE OF ERROR re 4 Certificate of Service; emailed to jguzman@democracyforward.org, cc'd 1 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect event used, 2. Please refile document, 3. Incorrect event used; Refile using appropriate events on the Service of Process menu as to the U.S. Attorney, U.S. Attorney General, and Federal Defendants. (znmw, ) (Entered: 11/29/2017) | |
| 11/29/2017 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 11/27/2017. Answer due for ALL FEDERAL DEFENDANTS by | |

1/26/2018. (Attachments: # 1 Declaration)(Guzman, Javier) (Entered: 11/29/2017)

| 11/29/2017 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 11/27/2017., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. VICTORIA A. LIPNIC served on 11/24/2017; JOHN MICHAEL MULVANEY served on 11/27/2017; OFFICE OF MANAGEMENT AND BUDGET served on 11/27/2017; NEOMI RAO served on 11/27/2017; U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION served on 11/24/2017. (See Docket Entry 5 to view document). (znmw) (Entered: 11/30/2017) |
| --- | --- | --- |
| 12/04/2017 | | MINUTE ORDER: Granting 3 Motion for Leave to Appear Pro Hac Vice. Attorney Robin F. Thurston is hereby admitted pro hac vice to appear in this matter on behalf of Plaintiffs. Signed by Judge Tanya S. Chutkan on 12/4/17. (DJS) (Entered: 12/04/2017) |
| 01/05/2018 | 7 | NOTICE of Appearance by Jeffery B. Dubner on behalf of LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Guzman, Javier) Modified attorney on 1/8/2018 (znmw). (Entered: 01/05/2018) |
| 01/08/2018 | | NOTICE OF ERROR re 7 Notice of Appearance; emailed to jguzman@democracyforward.org, cc'd 4 associated attorneys -- The PDF file you docketed contained errors: 1. In the future, appearing attorney shall file own appearance using his assigned ECF login; Do not refile. (znmw, ) (Entered: 01/08/2018) |
| 01/25/2018 | 8 | MOTION for Extension of Time to Respond to Complaint by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Text of Proposed Order)(Moore, Tamra) (Entered: 01/25/2018) |
| 01/29/2018 | 9 | RESPONSE re 8 MOTION for Extension of Time to Respond to Complaint filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Thurston, Robin) (Entered: 01/29/2018) |
| 01/30/2018 | 10 | REPLY to opposition to motion re 8 MOTION for Extension of Time to Respond to Complaint filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 01/30/2018) |
| 01/30/2018 | | MINUTE ORDER: Granting in part and denying in part 8 Motion for Extension of Time to File Answer. Defendant shall answer or otherwise respond to the complaint by 2/13/18. Signed by Judge Tanya S. Chutkan on 1/30/18. (DJS) (Entered: 01/30/2018) |
| 01/31/2018 | | Set/Reset Deadlines: Defendant shall answer or otherwise respond to the complaint by 2/13/18. (jth) (Entered: 01/31/2018) |
| 02/13/2018 | 11 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss for Failure to State a Claim by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint, # 2 Exhibit A, # 3 Text of Proposed Order)(Moore, Tamra) (Entered: 02/13/2018) |
| 02/21/2018 | 12 | NOTICE of Appearance by Maya Raghu on behalf of LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Raghu, Maya) (Entered: 02/21/2018) |
| 02/21/2018 | 13 | |

NOTICE of Appearance by Emily J. Martin on behalf of LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Martin, Emily) (Entered: 02/21/2018)

02/22/2018    14    NOTICE of Appearance by Rachael Lynn Westmoreland on behalf of All Defendants (Westmoreland, Rachael) (Entered: 02/22/2018)

02/22/2018    15    NOTICE of Appearance by Sunu P. Chandy on behalf of LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Chandy, Sunu) (Entered: 02/22/2018)

02/27/2018    16    Memorandum in opposition to re 11 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Attachments: # 1 Text of Proposed Order)(Thurston, Robin) (Entered: 02/27/2018)

03/02/2018    17    Consent MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Text of Proposed Order)(Moore, Tamra) (Entered: 03/02/2018)

03/06/2018    MINUTE ORDER: Granting 17 Consent Motion for Extension of Time to File Response/Reply. Defendant's reply due March 9, 2018. Signed by Judge Tanya S. Chutkan on 3/6/18. (DJS) (Entered: 03/06/2018)

03/07/2018    Set/Reset Deadlines: Defendant reply due by 3/9/2018. (tb) (Entered: 03/07/2018)

03/09/2018    18    REPLY to opposition to motion re 11 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 03/09/2018)

04/19/2018    19    MOTION to Compel Compliance with Local Civil Rule 7(n) by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Text of Proposed Order)(Thurston, Robin) (Entered: 04/19/2018)

05/03/2018    20    Memorandum in opposition to re 19 MOTION to Compel Compliance with Local Civil Rule 7(n) filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 05/03/2018)

05/10/2018    21    REPLY to opposition to motion re 19 MOTION to Compel Compliance with Local Civil Rule 7(n) filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Dubner, Jeffrey) (Entered: 05/10/2018)

09/13/2018    MINUTE ORDER: Denying without prejudice 19 Motion to Compel compliance with Local Rule 7(n). Given that there is a pending Motion to Dismiss, this case is not yet in a posture where compliance with Rule 7(n) is necessary. Signed by Judge Tanya S. Chutkan on 9/13/18. (DJS) (Entered: 09/13/2018)

10/31/2018    22    MOTION for Summary Judgment by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Memorandum in Support, # 2 Affidavit Link Decl., # 3 Affidavit Johnson Decl., # 4 Affidavit Sanchez Decl., # 5 Text of Proposed Order)(Thurston, Robin) (Entered: 10/31/2018)

11/14/2018    23    MOTION to Stay re 22 MOTION for Summary Judgment by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY

| | | |
|---|---|---|
| | | COMMISSION (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Westmoreland, Rachael) (Entered: 11/14/2018) |
| 11/15/2018 | | MINUTE ORDER: The Government's 23 Motion to Stay is GRANTED in part and DENIED in part. The Government shall compile the Administrative Record and respond to Plaintiffs' 22 Motion for Summary Judgment by December 6, 2018. Signed by Judge Tanya S. Chutkan on 11/15/2018. (lctsc3) (Entered: 11/15/2018) |
| 11/20/2018 | | Set/Reset Deadlines: Response due by 12/6/2018. (tb) (Entered: 11/20/2018) |
| 12/04/2018 | 24 | Consent MOTION for Extension of Time to File Response/Reply as to 22 MOTION for Summary Judgment by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Text of Proposed Order)(Moore, Tamra) (Entered: 12/04/2018) |
| 12/04/2018 | | MINUTE ORDER: Defendants' 24 Consent Motion for Extension of Time to Respond to Plaintiffs' Motion for Summary Judgment is GRANTED. Defendants shall file their Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment by December 20, 2018. Plaintiffs shall file their Reply in Support of Plaintiffs' Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment by January 14, 2019. Defendants shall file their Reply in Support of Defendants' Cross-Motion for Summary Judgment by January 22, 2019. Signed by Judge Tanya S. Chutkan on 12/4/2018. (lctsc3) (Entered: 12/04/2018) |
| 12/06/2018 | 25 | ADMINISTRATIVE RECORD List of Certified Contents by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Attachments: # 1 Exhibit A)(Westmoreland, Rachael) (Entered: 12/06/2018) |
| 12/07/2018 | | Set/Reset Deadlines: Cross Motion due by 12/20/2018. Response to Cross Motion due by 1/14/2019. Reply to Cross Motion due by 1/22/2019. Response to Motion for Summary Judgment due by 12/20/2018. Reply to Motion for Summary Judgment due by 1/14/2019. (tb) (Entered: 12/07/2018) |
| 12/20/2018 | 26 | Consent MOTION for Extension of Time to File Response/Reply as to 22 MOTION for Summary Judgment by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Text of Proposed Order)(Westmoreland, Rachael) (Entered: 12/20/2018) |
| 12/20/2018 | | MINUTE ORDER: Granting Consent Motion 26 to Extend Deadlines. Defendants' Opposition to Plaintiffs' Summary Judgment Motion and Cross-Motion for Summary Judgment due December 21, 2018. Plaintiffs' Reply in Support of their Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment due January 15, 2019. Defendants' Reply in Support of their Cross-Motion for Summary Judgment due January 22, 2019. Signed by Judge Tanya S. Chutkan on 12/20/18. (DJS) (Entered: 12/20/2018) |
| 12/21/2018 | | Set/Reset Deadlines: Cross Motion due by 12/21/2018. Response to Cross Motion due by 1/15/2019. Reply to Cross Motion due by 1/22/2019. Response to Motion for Summary Judgment due by 12/21/2018. Reply to Motion for Summary Judgment due by 1/15/2019. (tb) (Entered: 12/21/2018) |
| 12/21/2018 | 27 | MOTION for Summary Judgment by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Moore, Tamra) Modified event title on 12/28/2018 (znmw). (Entered: 12/21/2018) |

| 12/22/2018 | 28 | Memorandum in opposition to re 22 MOTION for Summary Judgment filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Moore, Tamra) (Entered: 12/22/2018) |
|---|---|---|
| 01/10/2019 | 29 | MOTION to Stay Defendants' Reply Briefing Deadline in Light of Lapse in Appropriations by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Westmoreland, Rachael) (Entered: 01/10/2019) |
| 01/15/2019 | 30 | RESPONSE re 29 MOTION to Stay Defendants' Reply Briefing Deadline in Light of Lapse in Appropriations filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Attachments: # 1 Exhibit A (Order Denying Stay Motion), # 2 Exhibit B (Order Denying Stay Motion))(Thurston, Robin) (Entered: 01/15/2019) |
| 01/15/2019 | 31 | REPLY to opposition to motion re 22 MOTION for Summary Judgment and Opposition to Cross-Motion for Summary Judgment filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Thurston, Robin) (Entered: 01/15/2019) |
| 01/15/2019 | 32 | RESPONSE re 27 MOTION for Summary Judgment and Reply in Support of Motion for Summary Judgment (also filed at Dkt. 31) filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Thurston, Robin) (Entered: 01/15/2019) |
| 01/15/2019 | 33 | MOTION to Compel Completion of the Administrative Record by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Affidavit Declaration of Lenora M. Lapidus, # 2 Text of Proposed Order)(Thurston, Robin) (Entered: 01/15/2019) |
| 01/16/2019 | 34 | REPLY to opposition to motion re 29 MOTION to Stay Defendants' Reply Briefing Deadline in Light of Lapse in Appropriations filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Westmoreland, Rachael) (Entered: 01/16/2019) |
| 01/17/2019 | | MINUTE ORDER: In as much as Defendants feel compelled to submit a Reply in Support of their Cross-Motion for Summary Judgment to address arguments not made in their Motion for Summary Judgment 27 / Opposition to Plaintiffs' Motion for Summary Judgment 28 , it is ORDERED that the Motion to Stay Defendants' Reply Briefing in Light of Lapse in Appropriations 29 is DENIED. It is further ORDERED that Plaintiffs shall file supplemental briefing by January 18, 2019 addressing the following questions: 1) If the court grants Plaintiffs' Motion to Compel Completion of the Administrative Record 33 , how would such a ruling impact the briefing already completed on the cross-motions for summary judgment?; and 2) If the court grants Plaintiffs' Motion to Compel Completion of the Administrative Record 33 , would Defendants be permitted to comply with the Proposed Order [33-2] considering the lapse in appropriations and representations made by Defendants' counsel? Signed by Judge Tanya S. Chutkan on 01/17/2019. (lctsc3) (Entered: 01/17/2019) |
| 01/18/2019 | 35 | RESPONSE TO ORDER OF THE COURT Filing Plaintiffs' Supplemental Brief Responding to Questions Posed by the Court's Janaury 17, 2019 Minute Order by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Exhibit A)(Thurston, Robin) Modified event title on 1/25/2019 (znmw). (Entered: 01/18/2019) |
| 01/22/2019 | 36 | REPLY re 27 MOTION for Summary Judgment filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 01/22/2019) |

01/29/2019  37  RESPONSE re 33 MOTION to Compel Completion of the Administrative Record filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 01/29/2019)

02/05/2019  38  REPLY to opposition to motion re 33 MOTION to Compel Completion of the Administrative Record filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Thurston, Robin) (Entered: 02/05/2019)

02/05/2019  39  JOINT APPENDIX by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Attachments: # 1 Appendix, # 2 Appendix)(Thurston, Robin) (Entered: 02/05/2019)

02/07/2019  40  ORDER: Plaintiffs' Motion to Compel Completion of the Administrative Record 33 is GRANTED in part. By 8:00 p.m. on February 8, 2019 the parties shall file supplemental briefing stating their positions on the court's conducting an in camera review of the disputed e-mails referenced in the Mancini and Lipnic declarations. These pleadings shall be no longer than five pages. See Order for more details. Signed by Judge Tanya S. Chutkan on 2/7/19. (lctsc3) Modified on 2/8/2019 (tb). (Entered: 02/07/2019)

02/08/2019      Set/Reset Deadlines: Supplemental Briefing due by 8:00 pm. on 2/8/2019. (tb) (Entered: 02/08/2019)

02/08/2019  41  RESPONSE TO ORDER OF THE COURT re 40 Order on Motion to Compel, filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Thurston, Robin) (Entered: 02/08/2019)

02/08/2019  42  RESPONSE TO ORDER OF THE COURT re 40 Order on Motion to Compel, filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 02/08/2019)

02/11/2019      MINUTE ORDER: By 3:00 p.m. on February 13, 2019, Defendants shall submit the following documents for an in camera inspection: (1) an April 14, 2017 e-mail between Deputy Administrator Mancini and Acting Chair Lipnic; (2) an April 19, 2017 e-mail between Deputy Administrator Mancini and Acting Chair Lipnic; (3) a July 14, 2017 e-mail between Deputy Administrator Mancini and EEOC Chief of Staff Paretti; and (4) an August 28, 2017 e-mail between Deputy Administrator Mancini and EEOC Chief of Staff Paretti. These documents shall be delivered to the Clerk of the Court in a sealed envelope and labeled "For In Camera Inspection." Signed by Judge Tanya S. Chutkan on 2/11/2019. (lctsc1) (Entered: 02/11/2019)

02/15/2019  43  ORDER: The April 14, 2017 e-mails and the July 14, 2017 e-mails shall be added to the administrative record. Defendants shall turn over these e-mails to Plaintiffs by 5:00 p.m. today, February 15, 2019. See Order for more details. Signed by Judge Tanya S. Chutkan on 2/15/2019. (lctsc3) (Entered: 02/15/2019)

02/15/2019      Set/Reset Deadlines: Defendants to turn over e-mails to plaintiffs by 5:00 p.m. on 2/15/2019. (tb) (Entered: 02/15/2019)

02/21/2019      MINUTE ORDER: By February 25, 2019 the parties shall meet and confer and file an updated Joint Appendix. The e-mails now in the administrative record, ECF No. 43, shall be added as the last entries to the current Joint Appendix, ECF No. 39. Signed by Judge Tanya S. Chutkan on 2/21/2019. (lctsc3). (Entered: 02/21/2019)

02/22/2019      Set/Reset Deadlines: Attorney Meet and Confer Conference and file update Joint Appendix due by 2/25/2019. (tb) (Entered: 02/22/2019)

02/25/2019  44  JOINT APPENDIX by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Attachments: # 1 Appendix, # 2 Appendix)(Dubner, Jeffrey) Modified on 2/27/2019 (ztd). Modified on 3/14/2019 (znmw). (Entered: 02/25/2019)

| | | |
|---|---|---|
| 02/26/2019 | | ENTERED IN ERROR.....NOTICE OF ERROR re 44 Joint Appendix; emailed to jdubner@democracyforward.org, cc'd 9 associated attorneys -- The PDF file you docketed contained errors: 1. Please refile document, 2. The document is electronically filed by Jeffrey Dubner and signed by Tamra Moore. The signatures should match. (ztd, ) Modified to enter in error on 3/14/2019; disregard error notice. (znmw). (Entered: 02/26/2019) |
| 03/04/2019 | 45 | MEMORANDUM OPINION: Regarding Defendants' Motion to Dismiss 11, Plaintiffs' Motion for Summary Judgment 22, and Defendants' Motion for Summary Judgment 27. Signed by Judge Tanya S. Chutkan on 3/4/2019. (lctsc3) (Entered: 03/04/2019) |
| 03/04/2019 | 46 | ORDER denying Defendants' Motion to Dismiss 11 , granting Plaintiffs' Motion for Summary Judgment 22 , and denying Defendants' Motion for Summary Judgment 27 . Signed by Judge Tanya S. Chutkan on 3/4/2018. (lctsc3) (Entered: 03/04/2019) |
| 03/18/2019 | 47 | MOTION for Hearing Request for Status Conference by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Thurston, Robin) Modified event title on 3/19/2019 (znmw). (Entered: 03/18/2019) |
| 03/18/2019 | | MINUTE ORDER: The court will hold a status conference on March 19, 2019 at 11:30 a.m. Signed by Judge Tanya S. Chutkan on 3/18/2019. (lctsc3) (Entered: 03/18/2019) |
| 03/18/2019 | | Set/Reset Hearings: Status Conference set for 3/19/2019, at 11:30 AM, in Courtroom 9, before Judge Tanya S. Chutkan. (kt) (Entered: 03/18/2019) |
| 03/19/2019 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Status Conference held on 3/19/2019. Defendants' submissions due by 4/3/2019; Plaintiffs' Response due by 4/8/2019. (Court Reporter: Elizabeth Saint Loth.) (kt) Modified on 3/19/2019 to correct apostrophe typo (kt). (Entered: 03/19/2019) |
| 04/01/2019 | 48 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- John C. Fox, :Firm- Fox, Wang &amp; Morgan P.C., :Address- 315 University Avenue, Los Gatos, CA 95030,. Phone No. - 408-844-2350. Fax No. - 408-844-2351 Filing fee $ 100, receipt number 0090-6031985. Fee Status: Fee Paid. by DirectEmployers Association, Inc. (Attachments: # 1 Declaration Declaration of John C. Fox In Support Of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order Proposed Order Granting Motion for Admission of Attorney Pro Hac Vice)(Doucet, Madalyn) Modified to add address on 4/1/2019 (ztd). (Entered: 04/01/2019) |
| 04/01/2019 | 49 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jay J. Wang, :Firm- Fox, Wang &amp; Morgan P.C., :Address- 315 University Ave., Los Gatos, CA 95030. Phone No. - 408-844-2350. Fax No. - 408-844-2351 Filing fee $ 100, receipt number 0090-6032199. Fee Status: Fee Paid. by DirectEmployers Association, Inc. (Attachments: # 1 Declaration of Jay J. Wang In Support Of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order Granting Motion for Admission of Attorney Pro Hac Vice) (Doucet, Madalyn) . (Entered: 04/01/2019) |
| 04/01/2019 | 50 | MOTION for Leave to File Amici Curiae Brief by DirectEmployers Association, Inc., AMERICAN SOCIETY OF EMPLOYERS (Attachments: # 1 Exhibit Amici Brief, # 2 Exhibit Corporate Disclosure Statement for DirectEmployers Association, Inc., # 3 Exhibit Corporate Disclosure for American Society fo Employers)(Isler, Edward) (Entered: 04/01/2019) |
| 04/01/2019 | 51 | NOTICE of Appearance by Edward Lee Isler on behalf of AMERICAN SOCIETY OF EMPLOYERS, DirectEmployers Association, Inc. (Isler, Edward) (Entered: 04/01/2019) |
| 04/01/2019 | 52 | NOTICE of Appearance by Micah Ephram Ticatch on behalf of AMERICAN SOCIETY OF EMPLOYERS, DirectEmployers Association, Inc. (Ticatch, Micah) (Entered: 04/01/2019) |

04/01/2019  53    NOTICE of Proposed Order by AMERICAN SOCIETY OF EMPLOYERS, DirectEmployers Association, Inc. re 50 MOTION for Leave to File Amici Curiae Brief (Isler, Edward) (Entered: 04/01/2019)

04/03/2019  54    NOTICE of Defendants' Submission in Response to the Court's Questions Raised During the March 19, 2019 Status Conference by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION re Status Conference,, Set Deadlines, (Attachments: # 1 Declaration)(Moore, Tamra) (Entered: 04/03/2019)

04/03/2019  55    MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Camille Olson, :Firm- Seyfarth Shaw LLP, :Address- 233 S. Wacker Drive. Phone No. - 312-460-5000. Fax No. - 312-460-7000 Filing fee $ 100, receipt number 0090-6039997. Fee Status: Fee Paid. by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Lorber, Lawrence) (Entered: 04/03/2019)

04/03/2019  56    NOTICE of Appearance by Lawrence Z. Lorber on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Lorber, Lawrence) (Entered: 04/03/2019)

04/04/2019  57    MOTION for Leave to File Amici Curiae Brief by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit Amici Brief, # 2 Exhibit Corp Disc Stmt Chamber, # 3 Exhibit Corp Disc Stmt HR Policy, # 4 Exhibit Corp Disc Stmt ABC, # 5 Exhibit Corp Disc Stmt AGC, # 6 Exhibit Corp Disc Stmt CWC, # 7 Exhibit Corp Disc Stmt IWE, # 8 Exhibit Corp Disc Stmt NAM, # 9 Exhibit Corp Disc Stmt NFIB, # 10 Exhibit Corp Disc Stmt NRF, # 11 Exhibit Corp Disc Stmt RLC, # 12 Exhibit Corp Disc Stmt Retail Litigation, # 13 Exhibit Corp Disc Stmt SHRM, # 14 Exhibit Corp Disc Stmt Proposed Order)(Lorber, Lawrence) (Entered: 04/04/2019)

04/04/2019  58    MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Annette Tyman, :Firm- Seyfarth Shaw LLP, :Address- 233 S. Wacker Drive. Phone No. - 312-460-5000. Fax No. - 312-460-7000 Filing fee $ 100, receipt number 0090-6040013. Fee Status: Fee Paid. by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Lorber, Lawrence) (Entered: 04/04/2019)

04/04/2019  59    MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Richard Lapp, :Firm- Seyfarth Shaw LLP, :Address- 233 S. Wacker Drive. Phone No. - 312-460-5000. Fax No. - 312-460-7000 Filing fee $ 100, receipt number 0090-6040014. Fee Status: Fee Paid. by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Lorber, Lawrence) (Entered: 04/04/2019)

04/05/2019  60    RESPONSE re 50 MOTION for Leave to File Amici Curiae Brief, 57 MOTION for Leave to File Amici Curiae Brief filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Attachments: # 1 Exhibit A)(Thurston, Robin) (Entered: 04/05/2019)

04/08/2019  61    REPLY to opposition to motion re 50 MOTION for Leave to File Amici Curiae Brief filed by AMERICAN SOCIETY OF EMPLOYERS, DIRECTEMPLOYERS ASSOCIATION, INC.. (Isler, Edward) (Entered: 04/08/2019)

04/08/2019  62    RESPONSE re 54 Notice (Other), filed by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER. (Dubner, Jeffrey) (Entered: 04/08/2019)

04/09/2019  63    REPLY re 54 Notice (Other), filed by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. (Moore, Tamra) (Entered: 04/09/2019)

04/11/2019  64    ORDER granting 50 and 57 . The court will hold a Hearing on the parties' Submissions, 54 , 62 and 63 , on April 16, 2019 at 2:00 p.m. See Order

for further details and instructions. Signed by Judge Tanya S. Chutkan on 4/11/2019. (lctsc3) (Entered: 04/11/2019)

04/12/2019    Set/Reset Hearings: Hearing on submissions ECF Nos. 54, 62 and 63 now set for 4/16/2019 at 02:00 PM in Courtroom 9 before Judge Tanya S. Chutkan. (tb) (Entered: 04/12/2019)

04/12/2019    MINUTE ORDER: Granting 55 58 59 Motions for Leave to Appear Pro Hac Vice. Camille A. Olson, Annette Tyman, and Richard B. Lapp are hereby admitted pro hac vice to appear in this matter on behalf of amici Chamber of Commerce of the United States of America, the HR Policy Association, Associated Builders and Contractors, Associated General Contractors of America, the Center for Workplace Compliance, Institute for Workplace Equality, National Association of Manufacturers, National Federation of Independent Business, National Retail Federation, Restaurant Law Center, Retail Litigation Center, Inc., and Society for Human Resources Management. Signed by Judge Tanya S. Chutkan on 4/12/19. (DJS) (Entered: 04/12/2019)

04/12/2019    MINUTE ORDER: Granting 49 Motion for Leave to Appear Pro Hac Vice Jay J. Wang is hereby admitted pro hac vice to appear in this matter on behalf of amici DirectEmployers Association, Inc. and the American Society of Employers. Signed by Judge Tanya S. Chutkan on 4/12/19. (DJS) (Entered: 04/12/2019)

04/15/2019    65    RESPONSE by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION re 64 Order on Motion for Leave to File,,, (Moore, Tamra) Modified text on 4/16/2019 (ztd). (Entered: 04/15/2019)

04/16/2019    MINUTE ORDER: By 5:00 p.m. on April 22, 2019, the parties may file written summations on the April 16, 2019 Hearing. If a party chooses to file a summation, it shall include a proposed Order and case law supporting its position. Signed by Judge Tanya S. Chutkan on 4/16/2019. (lctsc3) (Entered: 04/16/2019)

04/16/2019    Minute Entry Evidentiary Hearing on the parties' Submissions, 54, 62 and 63 held on 4/16/2019 before Judge Tanya S. Chutkan: Defendant's witness: Samuel Haffer. Arguments heard and taken under advisement. Order to be issued. (Court Reporter Lisa Moreira) (tb) (Entered: 04/17/2019)

04/17/2019    66    TRANSCRIPT OF HEARING ON SUBMISSIONS before Judge Tanya S. Chutkan held on April 16, 2019; Page Numbers: 1-103. Date of Issuance:April 17, 2019. Court Reporter/Transcriber Lisa A. Moreira RDR, CRR, Telephone number (202) 354-3187, Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from t he court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 5/8/2019. Redacted Transcript Deadline set for 5/18/2019. Release of Transcript Restriction set for 7/16/2019.(Moreira, Lisa) (Entered: 04/17/2019)

04/22/2019    67    MOTION for Leave to File Instanter A Summation of the April 16, 2019 Hearing by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Exhibit Amici Brief, # 2 Text of Proposed Order Proposed Order)(Olson, Camille) (Entered: 04/22/2019)

04/22/2019    68

|  |  | NOTICE of Post-Hearing Summation by LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATIONAL WOMEN'S LAW CENTER (Attachments: # 1 Text of Proposed Order)(Thurston, Robin) (Entered: 04/22/2019) |
|---|---|---|
| 04/22/2019 | 69 | NOTICE of Defendants' Written Summation by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION re Evidentiary Hearing, (Attachments: # 1 Text of Proposed Order, # 2 Text of Alternative Proposed Order, # 3 Declaration, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Moore, Tamra) (Entered: 04/22/2019) |
| 04/24/2019 |  | MINUTE ORDER: The Motion for Leave to File of Amici The Chamber of Commerce of the United States of America, et al., 67 is granted to the extent that it summarizes testimony. Signed by Judge Tanya S. Chutkan on 4/24/2019.(lctsc3) (Entered: 04/24/2019) |
| 04/24/2019 |  | MINUTE ORDER: The court will issue its decision orally on April 25, 2019 at 11:00 a.m. Signed by Judge Tanya S. Chutkan on 4/24/2019. (lctsc3) (Entered: 04/24/2019) |
| 04/24/2019 |  | Set/Reset Hearings: Oral ruling set for 4/25/2019 at 11:00 AM in Courtroom 9 before Judge Tanya S. Chutkan. (tb) (Entered: 04/24/2019) |
| 04/25/2019 |  | Minute Entry: Status Conference ( Oral ruling from the bench) held on 4/25/2019 before Judge Tanya S. Chutkan regarding submissions, 54, 62 and 63: Written order forthcoming. (Court Reporter Bryan Wayne) (tb) (Entered: 04/25/2019) |
| 04/25/2019 | 70 | TRANSCRIPT OF 4/25/19 ORAL RULING before Judge Tanya S. Chutkan held on April 25, 2019 Page Numbers: 1-24. Date of Issuance: 4/25/19. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting Transcript Order Form at www.dcd.uscourt.gov. For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (PDF, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 5/16/2019. Redacted Transcript Deadline set for 5/26/2019. Release of Transcript Restriction set for 7/24/2019.(Wayne, Bryan) (Entered: 04/25/2019) |
| 04/25/2019 | 71 | ORDER following decision announced in court on April 25, 2019. Signed by Judge Tanya S. Chutkan on 4/25/2019. (lctsc3) (Entered: 04/25/2019) |
| 04/26/2019 |  | Set/Reset Deadlines: Status Report due by 5/3/2019 and continuing every 21 days thereafter. (tb) (Entered: 04/26/2019) |
| 05/03/2019 | 72 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 45 Memorandum &amp; Opinion, 46 Order on Motion for Summary Judgment,, Order on Motion to Dismiss/Lack of Jurisdiction, 71 Order by VICTORIA A. LIPNIC, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, JOHN MICHAEL MULVANEY, NEOMI RAO. Fee Status: No Fee Paid. Parties have been notified. (Ricketts, Jennifer) (Entered: 05/03/2019) |
| 05/03/2019 | 73 | NOTICE of Filing of EEOC Report by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Exhibit (EEOC Status Report))(Ricketts, Jennifer) (Entered: 05/03/2019) |
| 05/06/2019 | 74 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals |

|  |  | docketing fee was not paid because the appeal was filed by the government re 72 Notice of Appeal to DC Circuit Court,. (ztd) (Entered: 05/06/2019) |
|---|---|---|
| 05/08/2019 |  | USCA Case Number 19-5130 for 72 Notice of Appeal to DC Circuit Court, filed by JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, NEOMI RAO, VICTORIA A. LIPNIC. (ztd) (Entered: 05/08/2019) |
| 05/08/2019 | 75 | NOTICE by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Ricketts, Jennifer) (Entered: 05/08/2019) |
| 05/14/2019 | 76 | NOTICE by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Wells, Carlotta) (Entered: 05/14/2019) |
| 05/21/2019 |  | MINUTE ORDER: Granting 48 Motion for Leave to Appear Pro Hac Vice. John C. Fox is hereby admitted pro hac vice to appear in this matter on behalf of amici DirectEmployers Association, Inc. and the American Society of Employers. Signed by Judge Tanya S. Chutkan on 5/21/19. (DJS) (Entered: 05/21/2019) |
| 05/24/2019 | 77 | NOTICE by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Exhibit EEOC Report) (Wells, Carlotta) (Entered: 05/24/2019) |
| 06/14/2019 | 78 | NOTICE by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION re 71 Order (Attachments: # 1 Report of Defendant EEOC)(Moore, Tamra) (Entered: 06/14/2019) |
| 06/14/2019 | 79 | Consent MOTION to Modify Report Schedule by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Text of Proposed Order)(Moore, Tamra) (Entered: 06/14/2019) |
| 06/14/2019 |  | MINUTE ORDER: Defendants' 79 Consent Motion to Modify Report Schedule is granted. Defendants may file the next reports by July 12, 2019, and July 26, 2019, respectively. Signed by Judge Tanya S. Chutkan on 6/14/2019. (lctsc3) (Entered: 06/14/2019) |
| 06/18/2019 |  | Set/Reset Deadlines: Reports due by 7/12/2019 and 07/26/19. (tb) (Entered: 06/18/2019) |
| 07/12/2019 | 80 | NOTICE of Report of Defendant EEOC by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION re 71 Order (Attachments: # 1 Report of Defendant EEOC)(Moore, Tamra) (Entered: 07/12/2019) |
| 07/26/2019 | 81 | NOTICE of Filing of EEOC Status Report by VICTORIA A. LIPNIC, JOHN MICHAEL MULVANEY, OFFICE OF MANAGEMENT AND BUDGET, NEOMI RAO, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (Attachments: # 1 Exhibit EEOC Report)(Wells, Carlotta) (Entered: 07/26/2019) |

Copyright © 2019 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

more of the following areas of human health risk assessment: (1) An understanding of thyroid function (preferably in the sensitive life stages of interest), (2) the importance of maternal thyroid hormone homeostasis in each stage of gestation, (3) hypothyroxinemia, (4) neurodevelopmental assessment indices for young children including the Bayley's Scale, (5) the toxicity of perchlorate, (6) epidemiological assessment techniques, and (7) statistics.

Versar, Inc., considered the nominated peer review candidates and also conducted an independent search for scientific experts to augment the list of publically-nominated candidates.

*Selection Process:* Versar, Inc., considered and screened all candidates against the selection criteria described in the March 1, 2016, and June 3, 2016, **Federal Register** notices (81 FR 10617 and 81 FR 35760, respectively), which included the candidates being free of any conflict of interest and being available to participate in-person in a two-day, public, peer review meeting in the Washington, DC, area. Versar, Inc., narrowed the list of potential reviewers for the second panel to 12 candidates. EPA is now soliciting comments on the interim list of 12 candidates.

EPA requests that the public provide relevant information or documentation on the experts that the contractor should consider in evaluating these candidates. Once the public comments on the interim list of candidates have been reviewed and considered, the contractor will select the final list of peer reviewers.

*Responsibilities of Peer Reviewers:* Peer reviewers will be charged with evaluating and preparing written comments on EPA's draft MCLG Approaches Report. Versar, Inc., will provide reviewers with a summary and compilation of public comments on the draft MCLG Approaches Report submitted to EPA's docket (ID number EPA–HQ–OW–2016–0438) during the 45-day public comment period, for their consideration. Reviewers will participate in a two-day meeting expected to be held in the Washington, DC, metro area, projected to occur in late fall of 2017 (exact date to be determined), to discuss the scientific basis supporting these materials. Following the meeting, Versar, Inc., will provide a report to EPA, summarizing the peer reviewers' evaluation of the scientific and technical merit of the draft MCLG Approaches Report and the peer reviewers' full responses to the charge questions. EPA will make the final peer review report available to the public (exact date to be determined). In

preparing the final MCLG Approaches Report, EPA will consider the peer review report as well as the written public comments submitted to the docket.

## II. Interim List of Peer Reviewers

Versar, Inc., is considering the following candidates for the peer review panel. Biosketches are available through the EPA docket at *http://www.regulations.gov* (Docket ID No. EPA–HQ–OW–2016–0439). After review and consideration of public comments and consultation with EPA's Scientific Integrity Official, Versar, Inc., will select from this list, the final list of peer reviewers, who will, collectively, best provide expertise spanning the previously mentioned areas of knowledge and experience and, to the extent feasible, best provide a balance of perspectives. EPA will announce the peer review panel meeting date, location and registration details, along with the final list of peer reviewers selected by Versar, Inc., at least 30 days prior to the meeting.

*Name of Nominee, Degree, Place of Employment*

1. Hugh A. Barton, Ph.D., Pfizer, Inc.
2. Nancy Carrasco, M.D., Yale School of Medicine
3. Jonathan Chevrier, Ph.D., McGill University Faculty of Medicine
4. Claude Emond, Ph.D., University of Montreal
5. Dale Hattis, Ph.D., George Perkins Marsh Institute, Clark University
6. Judy S. LaKind, Ph.D., LaKind Associates, LLC
7. Angela M. Leung, M.D., M.Sc., UCLA David Geffen School of Medicine
8. Paul H. Lipkin, M.D., Johns Hopkins University School of Medicine
9. Elizabeth N. Pearce, M.D., M.Sc., Boston Medical Center/Boston University School of Medicine
10. Stephen M. Roberts, Ph.D., University of Florida
11. Joanne F. Rovet, Ph.D., The Hospital for Sick Children (Toronto)
12. Craig Steinmaus, M.D., M.P.H., University of California, Berkeley

## III. Draft Peer Review Charge Questions

The draft peer review charge questions are available through the EPA docket at *http://www.regulations.gov* (Docket ID No. EPA–HQ–OW–2016–0439).

Dated: September 6, 2017.

**Michael H. Shapiro,**

*Acting Assistant Administrator, Office of Water.*

[FR Doc. 2017–19702 Filed 9–14–17; 8:45 am]

**BILLING CODE 6560–50–P**

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

[3046–0007]

## Stay the Effectiveness of the EEO–1 Pay Data Collection

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Notice.

**SUMMARY:** The U.S. Equal Employment Opportunity Commission (EEOC) announces that, until further notice, filers subject to the EEO–1 reporting requirement should not submit aggregate data about W–2 (Box 1) income and hours worked, which is the information required by ''Component 2'' of the EEO–1 report as approved on September 29, 2016. However, filers should continue to submit data on the ethnicity, race, and sex of workers by job category (''Component 1'' of the EEO–1 report). This is the same type of EEO–1 data that filers have submitted in the past.

**DATES:** All EEO–1 filers should submit and certify their 2017 EEO–1 reports (Component 1 data only) by March 31, 2018. They should count employees for purposes of this EEO–1 report during a ''workforce snapshot period'' between October 1 and December 31, 2017.

**FOR FURTHER INFORMATION CONTACT:** Ronald Edwards, Director, Program Research and Surveys Division, Equal Employment Opportunity Commission, 131 M Street NE., Room 4SW30F, Washington, DC 20507 (202) 663–4949 (voice) or (202) 663–7063 (TTY). Requests for this notice in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663–4191 (voice) or (202) 663–4494 (TTY).

**SUPPLEMENTARY INFORMATION:** On August 29, 2017, the Office of Management and Budget (OMB) issued a memorandum [1] informing the EEOC that OMB was initiating a review and immediate stay of the effectiveness of a portion of the EEO–1 report that was initially approved on September 29, 2016.[2] Specifically, OMB initiated a review and immediate stay of the portion of the EEO–1 report that required the reporting of aggregate W–2 (Box 1) income and hours-worked data by employers (including federal contractors) with 100 or more employees. (This is called EEO–

---

[1] OMB's memorandum is available at *https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.*

[2] The September 29, 2016 Notice of OMB Action was reissued on October 18, 2016. *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201610-3046-001#*

1 "Component 2.") OMB did not stay the portion of the EEO–1 report that requires filers to submit data on the race, ethnicity, and sex of their workers, by job category. (EEO–1 "Component 1") The EEOC will continue to collect EEO–1 Component 1 data from all filers during OMB's review and stay.

Thus, pursuant to 5 CFR 1320.10(g), the EEOC hereby announces that, until further notice, filers subject to the EEO–1 reporting requirement should not submit aggregate W–2 income and hours worked data under Component 2 of the EEO–1, but that they should submit data about race, ethnicity, and sex, by job category, as required by Component 1 of the EEO–1. Filers should follow the EEO–1's new reporting schedule. The 2017 EEO–1 report should be submitted and certified by March 31, 2018. Filers should use a "workforce snapshot period" between October 1 and December 31, 2017.

Dated: August 31, 2017.

For the Commission.

**Victoria A. Lipnic,**
*Acting Chair.*

[FR Doc. 2017–19489 Filed 9–14–17; 8:45 am]

**BILLING CODE 6570–01–P**

---

## FARM CREDIT SYSTEM INSURANCE CORPORATION

### Regular Meeting; Farm Credit System Insurance Corporation Board

**AGENCY:** Farm Credit System Insurance Corporation.

**ACTION:** Notice, regular meeting.

**SUMMARY:** Notice is hereby given of the regular meeting of the Farm Credit System Insurance Corporation Board (Board).

**DATES:** The meeting of the Board will be held at the offices of the Farm Credit Administration in McLean, Virginia, on September 21, 2017, from 2:00 p.m. until such time as the Board concludes its business.

**FOR FURTHER INFORMATION CONTACT:** Dale L. Aultman, Secretary to the Farm Credit System Insurance Corporation Board, (703) 883–4009, TTY (703) 883–4056.

**ADDRESSES:** Farm Credit System Insurance Corporation, 1501 Farm Credit Drive, McLean, Virginia 22102. Submit attendance requests via email to *VisitorRequest@FCA.gov.* See **SUPPLEMENTARY INFORMATION** for further information about attendance requests.

**FOR FURTHER INFORMATION CONTACT:** Dale L. Aultman, Secretary to the Farm Credit Administration Board, (703) 883–4009, TTY (703) 883–4056.

**SUPPLEMENTARY INFORMATION:** Parts of this meeting of the Board will be open to the public (limited space available), and parts will be closed to the public. Please send an email to *VisitorRequest@FCA.gov* at least 24 hours before the meeting. In your email include: Name, postal address, entity you are representing (if applicable), and telephone number. You will receive an email confirmation from us. Please be prepared to show a photo identification when you arrive. If you need assistance for accessibility reasons, or if you have any questions, contact Dale L. Aultman, Secretary to the Farm Credit System Insurance Corporation Board, at (703) 883–4009. The matters to be considered at the meeting are:

**Closed Session**

• Confidential Report on System Performance

**Open Session**

A. *Approval of Minutes*
 • June 8, 2017
B. *Business Reports*
 • Quarterly Financial Reports
 • Report on Insured and Other Obligations
 • Quarterly Report on Annual Performance Plan
C. *New Business*
 • Annual Performance Plan FY 2018–2019
 • Proposed 2018 and 2019 Budgets
 • Insurance Fund Progress Review and Setting of Premium Range Guidance for 2018

Dated: September 12, 2017.

**Dale L. Aultman,**
*Secretary, Farm Credit System Insurance Corporation Board.*

[FR Doc. 2017–19622 Filed 9–14–17; 8:45 am]

**BILLING CODE 6710–01–P**

---

## FEDERAL COMMUNICATIONS COMMISSION

**[OMB 3060–0573]**

### Information Collection Being Reviewed by the Federal Communications Commission

**AGENCY:** Federal Communications Commission.

**ACTION:** Notice and request for comments.

**SUMMARY:** As part of its continuing effort to reduce paperwork burdens, and as required by the Paperwork Reduction Act (PRA), the Federal Communications Commission (FCC or Commission) invites the general public and other Federal agencies to take this opportunity to comment on the following information collections. Comments are requested concerning: Whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; the accuracy of the Commission's burden estimate; ways to enhance the quality, utility, and clarity of the information collected; ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology; and ways to further reduce the information collection burden on small business concerns with fewer than 25 employees.

The FCC may not conduct or sponsor a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number. No person shall be subject to any penalty for failing to comply with a collection of information subject to the PRA that does not display a valid OMB control number.

**DATES:** Written comments should be submitted on or before November 14, 2017. If you anticipate that you will be submitting comments, but find it difficult to do so within the period of time allowed by this notice, you should advise the contacts below as soon as possible.

**ADDRESSES:** Direct all PRA comments to Cathy Williams, FCC, via email *PRA@fcc.gov* and to *Cathy.Williams@fcc.gov.*

**FOR FURTHER INFORMATION CONTACT:** For additional information about the information collection, contact Cathy Williams at (202) 418–2918.

**SUPPLEMENTARY INFORMATION:** As part of its continuing effort to reduce paperwork burdens, and as required by the PRA of 1995 (44 U.S.C. 3501–3520), the FCC invites the general public and other Federal agencies to take this opportunity to comment on the following information collections. Comments are requested concerning: Whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; the accuracy of the Commission's burden estimate; ways to enhance the quality, utility, and clarity of the information collected; ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology; and ways to further reduce the information

supported by the rationales included in those documents.

Following public comment, the Agency will issue interim or final registration review decisions for the pesticides listed in the tables in Unit II.

The registration review program is being conducted under congressionally mandated time frames, and EPA recognizes the need both to make timely decisions and to involve the public. Section 3(g) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. 136a(g)) required EPA to establish by regulation procedures for reviewing pesticide registrations, originally with a goal of reviewing each pesticide's registration every 15 years to ensure that a pesticide continues to meet the FIFRA standard for registration. The Agency's final rule to implement this program was issued in August 2006 and became effective in October 2006, and appears at 40 CFR part 155, subpart C. The Pesticide Registration Improvement Act of 2003 (PRIA) was amended and extended in September 2007. FIFRA, as amended by PRIA in 2007, requires EPA to complete registration review decisions by October 1, 2022, for all pesticides registered as of October 1, 2007.

The registration review final rule at 40 CFR 155.58(a) provides for a minimum 60-day public comment period on all proposed interim registration review decisions. This comment period is intended to provide an opportunity for public input and a mechanism for initiating any necessary amendments to the proposed interim decision. All comments should be submitted using the methods in **ADDRESSES**, and must be received by EPA on or before the closing date. These comments will become part of the docket for the pesticides included in the tables in Unit II. Comments received after the close of the comment period will be marked ''late.'' EPA is not required to consider these late comments.

The Agency will carefully consider all comments received by the closing date and may provide a ''Response to Comments Memorandum'' in the docket. The interim registration review decision will explain the effect that any comments had on the interim decision and provide the Agency's response to significant comments.

Background on the registration review program is provided at: *http:// www2.epa.gov/pesticide-reevaluation.*

**Authority:** 7 U.S.C. 136 *et seq.*

Dated: July 6, 2016.
**Michael Goodis,**
*Acting Director, Pesticide Re-Evaluation Division, Office of Pesticide Programs.*
[FR Doc. 2016–16709 Filed 7–13–16; 8:45 am]
**BILLING CODE 6560–50–P**

---

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**[3046–007]**

**Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO–1)**

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), the Equal Employment Opportunity Commission (EEOC or Commission) announces that it is submitting to the Office of Management and Budget (OMB) a request for a three-year PRA approval of a revised Employer Information Report (EEO–1) data collection. Employers have submitted the EEO–1 report for over fifty years. The Commission is responsible for PRA compliance for the EEO–1, although it is a joint data collection to meet the statistical needs of both the EEOC and the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). This PRA submission has two components. Component 1 describes the data now collected by the currently approved EEO–1, which is data about employees' ethnicity, race, and sex by job category (demographic data). Component 2 describes the W–2 (Box 1) and hours-worked data that will be added to the EEO–1 with OMB's approval under this PRA request (pay data). EEO–1 respondents must comply with the 2016 filing requirement for the currently approved EEO–1.

**DATES:** Submit comments on or before August 15, 2016.

**ADDRESSES:** Comments on this notice must be submitted to Joseph B. Nye, Policy Analyst, Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th Street NW., Washington, DC 20503, email *oira_submission@omb.eop.gov.* Commenters are also encouraged to send comments to the EEOC online at *http://www.regulations.gov,* which is the Federal eRulemaking Portal. Follow the instructions on the Web site for submitting comments. In addition, the

EEOC's Executive Secretariat will accept comments in hard copy by delivery by COB on August 15, 2016. Hard copy comments should be sent to Bernadette Wilson, Acting Executive Officer, EEOC, 131 M Street NE., Washington, DC 20507. Finally, the Executive Secretariat will accept comments totaling six or fewer pages by facsimile (''fax'') machine before the same deadline at (202) 663–4114. (This is not a toll-free number.) Receipt of fax transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at (202) 663–4070 (voice) or (202) 663–4074 (TTY). (These are not toll-free telephone numbers.) The EEOC will post online at *http:// www.regulations.gov* all comments submitted via this Web site, in hard copy, or by fax to the Executive Secretariat. These comments will be posted without change, including any personal information you provide. However, the EEOC reserves the right to refrain from posting libelous or otherwise inappropriate comments including those that contain obscene, indecent, or profane language; that contain threats or defamatory statements; that contain hate speech directed at race, color, sex, national origin, age, religion, disability, or genetic information; or that promote or endorse services or products. All comments received, including any personal information provided, also will be available for public inspection during normal business hours by appointment only at the EEOC Headquarters' Library, 131 M Street NE., Washington, DC 20507. Upon request, individuals who require assistance viewing comments will be provided appropriate aids such as readers or print magnifiers. To schedule an appointment, contact EEOC Library staff at (202) 663–4630 (voice) or (202) 663–4641 (TTY). (These are not toll-free numbers.)

**FOR FURTHER INFORMATION CONTACT:** Ronald Edwards, Director, Program Research and Surveys Division, Equal Employment Opportunity Commission, 131 M Street NE., Room 4SW30F, Washington, DC 20507; (202) 663–4949 (voice) or (202) 663–7063 (TTY). Requests for this notice in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663–4191 (voice) or (202) 663–4494 (TTY).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
II. The EEOC's Legal Authority To Propose This EEO–1 Report
   A. Title VII of the Civil Rights Act of 1964

B. The Paperwork Reduction Act of 1995
III. Revisions to the EEO–1 Report Are Necessary for the Enforcement of Title VII, the EPA, and Executive Order 11246
IV. Who Will Report Pay Data on the Revised EEO–1
    A. Employers That Currently File the EEO–1
    B. 60-Day Notice: Which Employers Would File Pay Data
    C. Public Comments
    D. 30-Day Notice: Employers With 100 or More Employees Will File Components 1 & 2
V. When To File: Filing Deadline and Workforce Snapshot Period
    A. 60-Day Notice
    B. Public Comments
    C. 30-Day Notice
    1. Deadline for Filing the EEO–1
    2. "Workforce Snapshot" Period
VI. What Pay Data To Report: Measure of Pay for the EEO–1
    A. 60-Day Notice: Options for Measuring Pay
    B. Public Comments
    1. Supporting the Use of W–2 Income
    2. Opposing the Use of W–2 Income
    C. 30-Day Notice: W–2 (Box 1) Income Is the Measure of Pay
    1. W–2 Income and Employee Choice
    2. Supplemental Income Is Important and May Be Linked to Discrimination
    3. Bridging HRIS and Payroll
VII. What Data To Report: Hours Worked
    A. 60-Day Notice
    B. Public Comments
    C. 30-Day Notice
    1. The Importance of Collecting Hours Worked
    2. Defining "Hours Worked"
    3. Reporting Hours Worked for Nonexempt Employees
    4. Reporting Hours Worked for Exempt Employees
VIII. How To Report Data in Component 2: Pay Bands and Job Categories
    A. 60-Day Notice
    B. Public Comments
    C. 30-Day Notice
IX. How the EEOC Will Use W–2 and Hours-Worked Data
    A. 60-Day Notice
    B. Public Comments
    C. 30-Day Notice
    1. Early Assessment of Charges of Discrimination
    2. EEOC Publications Analyzing Aggregate EEO–1 Data
    3. EEOC Training on the Pay Data Collection
X. Confidentiality of EEO–1 Data
    A. 60-Day Notice
    B. Public Comments
    C. 30-Day Notice
    1. Legal Confidentiality
    a. EEOC
    b. OFCCP
    2. Data Protection and Security
XI. Paperwork Reduction Act Burden Estimates
    A. Background
    B. 60-Day Notice
    C. 30-Day Notice
    1. Annual Burden Hours
    2. Hourly Wage Rates

XII. Formal Paperwork Reduction Act Statement
    A. Overview of Information Collection
    1. 2016 Overview of Information Collection—Component 1
    2. 2017 and 2018 Overview of Information Collection—Components 1 and 2
    a. Component 1 (Demographic and Job Category Data)
    b. Components 1 and 2 (Demographic and Job Category Data Plus W–2 and Hours Worked Data)
    B. 30-Day Notice PRA Burden Statement

## I. Background

This final proposal to supplement the longstanding EEO–1 employer information report (currently approved by OMB under Control Number 3046–0007) is intended to support the EEOC's pay discrimination investigations by collecting employer- and gender-, race-, and ethnicity-specific pay data to identify pay disparities that may result from discriminatory practices or policies. This Notice provides stakeholders with their second opportunity to comment on this proposal.

The EEOC published the first notice of this proposed revision in the **Federal Register** on February 1, 2016, for a 60-day comment period (the "60-Day Notice").[1] It announced which employers would be required to file pay data, what data would be collected, when the due date would be, how the data would be analyzed, and how the proposed collection and analysis would protect confidentiality and privacy. As required, the 60-Day Notice estimated the cost to employers of completing the current EEO–1 (Component 1) and the proposed revision of the EEO–1 (Components 1 and 2).

The EEOC received 322 timely public comments in response to the 60-Day Notice. The comments were submitted by individual members of the public, employers, employer associations, Members of Congress, civil rights groups, women's organizations, labor unions, industry groups, law firms, and human resources organizations. Over 120 of the 322 comments were part of mass mail campaigns mostly supporting the proposal, although one mass mail campaign opposed the proposal. The mass mail campaigns included submissions from organizations that collected up to thousands of signatures from their members or supporters.

The Commission also held a public hearing on March 16, 2016, and heard from 15 witnesses representing a range of stakeholders including employers, employees, and academics. The Commission reviewed their detailed written submissions, heard them discuss their different perspectives on the proposal, and asked them questions.[2]

Pursuant to the required procedures under the PRA, the Commission now publishes its final proposal to supplement the EEO–1 for a second round of public comments, to last 30 days (hence the "30-Day Notice"). The EEOC also is formally submitting the proposed EEO–1 revisions to OMB for consideration and decision.

This 30-Day Notice summarizes the 60-Day Notice, describes the public comments, and explains the Commission's decisions. In making these decisions, the Commission took into account all of the hearing testimony and public comments. The Commission also assessed government data regarding components of compensation in United States workplaces, relevant academic literature on compensation practices and on discrimination, and the conclusions of two studies commissioned by the EEOC to examine how and whether to implement a pay data collection.[3] This 30-Day Notice sets forth the EEOC's conclusions about the ways the proposed pay data collection will be used to enhance and increase the efficiency of enforcement efforts while facilitating employer self-evaluation and voluntary compliance.

## II. The EEOC's Legal Authority To Propose This EEO–1 Report

In written comments in response to the 60-Day Notice, several interested parties questioned whether the EEOC has legal authority to collect pay data and whether the agency should have conducted a formal rulemaking to impose a pay data reporting requirement. As explained in more

---

[1] 81 FR 5113 (Feb. 1, 2016).

[2] The press release on the hearing is available at EEOC, *EEOC Hears Wide Range of Views at Public Hearing on Proposed Changes to EEO–1 Form* (Mar. 16, 2016), *https://www.eeoc.gov/eeoc/newsroom/release/3-16-16.cfm*. The statements and biographies of the witnesses are available at EEOC, *Hearing of March 16, 2016—Public Input into the Proposed Revisions to the EEO–1 Report*, *http://www.eeoc.gov/eeoc/meetings/3-16-16/*.

[3] The first EEOC-commissioned study, resulting in a 2012 report from the National Research Council, National Academy of Sciences (NAS Report), outlined the potential value for EEOC enforcement of collecting pay data from employers by sex, race, and national origin through a report such as the EEO–1. National Research Council, 2012. *Collecting Compensation Data from Employers*. Washington, DC: National Academies Press, *http://www.nap.edu/read/13496/chapter/1#ii*. The second study, reported by an EEOC contractor in 2015, provided detailed analysis of different approaches to implementing the report and included assessments of different statistical analyses for employer data. Sage Computing, *EEOC Pay Pilot Study* (September, 2015), *http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf*.

detail below, the EEOC has the legal authority to collect pay data under Title VII of the Civil Rights Act of 1964, as amended (Title VII),[4] without conducting a formal rulemaking because the EEOC is responsible for enforcing federal laws that prohibit wage discrimination on the basis of sex, race and national origin, and Title VII grants the EEOC broad authority to collect data from employers regarding compliance with federal anti-discrimination laws. The EEOC has exercised this statutory authority by implementing a regulation to establish the EEO–1 reporting requirement, and now administers the EEO–1 report pursuant to the PRA.

### A. Title VII of the Civil Rights Act of 1964

The EEOC is responsible for enforcing Title VII, which prohibits all employment discrimination, including pay discrimination, based on race, color, religion, national origin, or sex.[5] The EEOC also enforces other federal laws prohibiting employment discrimination, including the Equal Pay Act of 1963 (EPA), which prohibits certain gender-based pay discrimination.[6]

The EEOC's authority to promulgate the EEO–1 report is found in section 709(c) of Title VII, which requires employers covered by Title VII to make and keep records relevant to whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the Commission prescribes by regulation or order, after public hearing, "as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations . . . thereunder." [7] The Commission prescribes the EEO–1 report by regulation at 29 CFR part 1602, subpart B, which requires private employers with 100 or more employees to "file [annually] with the Commission or its delegate executed copies of [the] . . . EEO–1 [report] in conformity with the directions set forth in the form and accompanying instructions." The EEOC administers the EEO–1 jointly with OFCCP, which enforces the employment discrimination prohibitions of Executive Order 11246, as amended, for federal contractors and subcontractors (contractors), including specific provisions regarding pay discrimination and transparency.[8] OFCCP's regulations

require contractors to submit "complete and accurate reports on Standard Form 100 (EEO–1) . . . or such form as may hereafter be promulgated in its place." [9] The Joint Reporting Committee, composed of the EEOC and OFCCP and located at the EEOC, administers the EEO–1 as a single data collection to meet the statistical needs of both agencies while avoiding duplication.

### B. The Paperwork Reduction Act of 1995

Since 1995, the EEO–1 report also has been governed by the Paperwork Reduction Act of 1995 (PRA), which provides standards for federal data collections and requires periodic Office of Management and Budget (OMB) review and renewal.[10] The EEOC is responsible for maintaining PRA approval of the EEO–1.

The EEOC, like other federal agencies subject to the PRA, generally follows a multi-step process for maintaining OMB approval of an information collection, which culminates in OMB deciding if the proposed collection "strikes a balance between collecting information necessary to fulfill [the agency's] statutory mission[ ] and guarding against unnecessary or duplicative information that imposes unjustified costs on the American public." [11] The first step is for the agency to publish a proposed information collection for a 60-day public comment period, which ran from February 1 to April 1, 2016 for this EEO–1 revision.[12] Then, in light of the public comments and its statutory mission, the agency formulates a final

data collection, which it publishes in the **Federal Register** and submits to OMB for approval, subject to a 30-day public comment period.[13] The current document, which has been approved by a majority of the Commission, is the EEOC's 30-Day Notice for the revised EEO–1.

The EEOC has consistently used the PRA renewal process to change the EEO–1. Most recently, in 2006, the PRA process was used to significantly revise the EEO–1 by adding a new race category, requiring employers to ask employees to self-identify by race and ethnicity, and requiring employers to ask about ethnicity (Hispanic or Latino) in a separate question.[14] The 2006 EEO–1 revision also added a new job category.[15]

### III. Revisions to the EEO–1 Report Are Necessary for the Enforcement of Title VII, the EPA, and Executive Order 11246

Some public comments opposing the EEOC's proposal in the 60-Day Notice questioned whether there are still pay disparities that are caused by discrimination linked to gender, race, or ethnicity and, accordingly, whether there is actually a need for more effective enforcement of the prohibitions on pay discrimination in Title VII, the EPA, and E.O. 11246.

Based on federal data and a robust body of research, the Commission concludes that: (1) Persistent pay gaps continue to exist in the U.S. workforce correlated with sex, race, and ethnicity; (2) workplace discrimination is an important contributing factor to these pay disparities; and (3) implementing the proposed EEO–1 pay data collection will improve the EEOC's ability to efficiently and effectively structure its investigation of pay discrimination charges.

First, persistent pay gaps exist in the U.S. workforce correlated with sex, race, and ethnicity. As of 2014, for women of all races and ethnicities, the median annual pay for a woman who held a full-time, year-round job was $39,621, while the median annual pay for a man who held a full-time, year-round job was $50,383.[16]

---

[4] 42 U.S.C. 2000e, *et seq.*

[5] *Id.*

[6] 29 U.S.C. 206(d).

[7] 42 U.S.C. 2000e–8(c).

[8] E.O. 11246, as amended, 30 FR 12319, 41 CFR 60–1.7(a). Executive Order 13665 amends E.O. 11246 to promote pay transparency for federal contractors, protect employees and job applicants,

and make it possible for employees and job applicants to share information about their pay without fear of discrimination. E.O. 13665, 79 FR 20749, available at: *https://www.gpo.gov/fdsys/pkg/ DCPD-201400250/pdf/DCPD-201400250.pdf*. OFCCP's recently adopted final rule on sex discrimination (OFCCP Rule on Discrimination on the Basis of Sex) addresses a number of sex-based barriers to equal employment and fair pay. The rule requires contractors to provide equal opportunities "without regard to sex." 41 CFR part 60–20. *See also* 81 FR 39108, 39125–39129 (June 15, 2016).

[9] 41 CFR 60–1.7(a).

[10] According to the OMB, "collection of information" may include: (1) Requests for information to be sent to the government, such as forms (*e.g.*, the IRS 1040), written reports (*e.g.*, grantee performance reports), and surveys (*e.g.*, the Census); (2) recordkeeping requirements (*e.g.*, OSHA requirements that employers maintain records of workplace accidents); and third-party or public disclosures (*e.g.*, nutrition labeling requirements for food).

Office of Information and Regulatory Affairs, OMB, Memorandum for the Heads of Executive Departments and Agencies and Independent Regulatory Agencies, *Information Collection under the Paperwork Reduction Act* (Apr. 7, 2010), *https://www.whitehouse.gov/sites/default/files/ omb/assets/inforeg/PRAPrimer_04072010.pdf; See also* 5 CFR 1320.3(c).

[11] *Id.*

[12] 81 FR 5113 (Feb. 1, 2016).

[13] 44 U.S.C. 3507(a)(1).

[14] EEOC, *EEOC Implements Finals Revisions to EEO–1 Report* (Jan. 27, 2006), *https://www.eeoc.gov/ eeoc/newsroom/release/archive/1-27-06.html; See also* 70 FR 71294 (Nov. 28, 2005); OMB approved these changes on January 25, 2006, Office of Information and Regulatory Affairs, *http:// www.reginfo.gov/public/do/PRAViewICR?ref_ nbr=200511-3046-001#.*

[15] *Id.*

[16] Carmen DeNavas-Walt and Bernadette Proctor, U.S. Census Bureau, *Income and Poverty in the*
Continued

African American and Hispanic or Latina women nationwide now experience the largest pay disparities. As of 2014, African American women were paid almost 40% less than white, non-Hispanic, men and approximately 20% less than white, non-Hispanic women.[17] At a national level, African American women were paid 18% less than African American men.[18]

Similarly, Latina women were paid approximately 44% less than white, non-Hispanic men, and 27% less than white, non-Hispanic, women in 2014.[19] The result of the wage gap is that the average Hispanic or Latina woman would be paid approximately $1,007,000 less than the average white, non-Hispanic, male over a 40-year period.[20]

A similar pattern exists for Native Hawaiian and Pacific Islander women and Native American women who were paid approximately 38% and 41% less than white, non-Hispanic men, respectively.[21] Asian American women were paid 10% less than white, non-Hispanic men.[22]

Wage disparities also exist for men of color. In 2014, African American men who worked full time in wage and salary jobs had median weekly earnings of $680, which represented approximately 76% of white men's median weekly earnings ($897).[23]

Hispanic men earned $616, or approximately 69%, of white men's median weekly earnings.[24]

Employment discrimination may play both direct and indirect roles in creating these pay disparities. Economists Francine Blau and Lawrence Khan found that 64.6% of the wage gap between men and women can be explained by three factors: Experience (14.1%), industry (17.6%), and occupation (32.9%).[25] Men are more likely to work in blue collar jobs that are higher paying, including construction, production, or transportation occupations, whereas women are more concentrated in lower paying professions, such as office and administrative support positions.[26] Most of the remaining 35.4% of the gender gap cannot be explained by differences in education, experience, industry, or occupation.[27] Blau and Khan argue that discrimination— intentional or unintentional, systematic or at the individual level—plays a role in explaining the gap.[28]

Gender bias may become more obvious when occupations have a greater proportion of women. One study found that, in an occupation dominated by men, pay declines when women enter that occupation in large numbers, even after controlling for factors such as education and work experience.[29] The

opposite effect occurred when a larger proportion of men entered a profession previously dominated by women, i.e., pay increased.[30]

One way that gender discrimination may influence pay is through implicit or unconscious bias during hiring, promotion decisions, or job assignments.[31] A study by McKinsey & Company found that women are almost three times more likely than men to have missed out on an assignment, promotion, or increase in wages because of their gender.[32] Another study shows that women who engage in pay negotiations are more likely than men to face backlash due to gender stereotypes.[33]

Similar to gender discrimination, racial discrimination may influence pay through implicit or unconscious bias. A series of studies by MIT Sloan found racial bias in salary negotiations even after controlling for the applicants' objective qualifications.[34] Research by

*United States: 2014*, Current Population, 6 (2015), Table 1: Income and Earnings Summary Measures by Selected Characteristics: 2013 and 2014, *https://www.census.gov/content/dam/Census/library/publications/2015/demo/p60-252.pdf*.

[17] Joan Farrelly-Harrigan, U.S. Dep't. of Labor, Women's Bureau, *Black Women in the Labor Force* (Feb. 2016), *https://www.dol.gov/wb/media/Black_Women_in_the_Labor_Force.pdf* (reporting that African American women's median annual earnings in 2014 was $33,533, $41,822 for white, non-Hispanic women, and $55,470 for white, non-Hispanic men).

[18] *Id.*

[19] Michelle Vaca, U.S. Dep't. of Labor Blog, *Celebrating Hispanic Women in the Labor Force* (Oct. 6, 2015). *http://blog.dol.gov/2015/10/06/celebrating-hispanic-women-in-the-labor-force/* (reporting that the 2013 median annual earnings for Latinas was $30,209).

[20] Joint Economic Committee, United States Congress, *Gender Pay Inequality*, 3 (April 2016) *http://www.jec.senate.gov/public/_cache/files/0779dc2f-4a4e-4386-b847-9ae919735acc/gender-pay-inequality----us-congress-joint-economic-committee.pdf.*

[21] American Association of University Women, *The Simple Truth About the Gender Pay Gap*, 10 (Spring 2016), *http://www.aauw.org/files/2016/02/SimpleTruth_Spring2016.pdf* (reporting that the median annual earnings for Native Hawaiian and Pacific Islander women was $32,893 and $31,191 for Native American women).

[22] *Id.* (reporting that Asian American women's median earnings in 2014 was $47,776).

[23] U.S. Dept. of Labor, Bureau of Labor Statistics, *Women in the labor force; a databook*, BLS Reports, 60–61 (Dec. 2015), Table 16: Median usual weekly earnings of full-time wage and salary workers, in current dollars, by race, Hispanic, or Latino

ethnicity, and gender, 1979–2014 annual averages, *http://www.bls.gov/opub/reports/womens-databook/archive/women-in-the-labor-force-a-databook-2015.pdf.*

[24] *Id.*

[25] Francine Blau and Lawrence Kahn, *The Gender Wage Gap: Extent, Trends, and Explanations*, Institute for the Study of Labor, 73 (Jan. 2016), Table 4: Decomposition of Gender Wage Gap, 1980 and 2010 (PSID), *http://ftp iza.org/dp9656.pdf* (the authors reported that the gender wage gap for purposes of the study was approximately 79 cents on the dollar in 2010).

[26] DeNavas-Walt and Proctor, *supra* note 16 at 5; *see also* PayScale, *Inside the Gender Pay Gap*, (2016), *http://www.payscale.com/data-packages/gender-pay-gap* (reporting that across the United States women are more likely to be overrepresented in lower paying jobs (jobs that pay less than $60,000 per year) and underrepresented in higher paying jobs compared to men. In addition, female pay levels off at $49,000 between the ages of 35–40 whereas men's pay levels off at $75,000 for the ages of 50–55).

[27] Blau & Kahn, *supra* note 25 at 73, Table 4.

[28] *Id.* A smaller portion of the gap (approximately 5%) can be attributed to geographic region (0.3%) and race (4.3%). The authors do not provide an explanation about why only 4% of the pay gap is attributed to race despite federal data suggesting that the wage gap between and within minorities is much larger. However, women's gains in education helped to narrow the gender wage gap by almost 6% as women now exceed men in educational attainment.

[29] Asaf Levanon, Paula England, Paul Allison, *Occupational Feminization and Pay: Assessing Casual Dynamics Using 1950–2000 U.S. Census Data*, Social Forces 88(2) (Dec. 2009), *http://statisticalhorizons.com/wp-content/uploads/2012/01/88.2.levanon.pdf.*

[30] Claire Cain Miller, *As Women Take Over a Male Dominated Field, the Pay Drops*, NY Times (Mar. 18, 2016), *http://www.nytimes.com/2016/03/20/upshot/as-women-take-over-a-male-dominated-field-the-pay-drops.html?_r=0* (reporting that when more women became designers, for example, wages fell by 34 percentage points. When male computer programmers outnumbered women computer programmers, the job began to pay more and earned more prestige).

[31] Nancy Lockwood, *The Glass Ceiling: Domestic and International Perspectives*, 3 Society for Human Resource Management Quarterly 2004, *https://www.shrm.org/Research/Articles/Articles/Documents/040329Quarterly.pdf* (reporting that signs of the glass ceiling in the workplace can be based on gender-based barriers that may be invisible, covert, and overt).

[32] Lean In & McKinsey & Company, *Women in the Workplace 2015*, 13 (2015), *http://womenintheworkplace.com/ui/pdfs/Women_in_the_Workplace_2015.pdf?v=5.*

[33] Hannah Riley Bowles & Linda Babcock, *How Can Women Escape the Compensation Negotiation Dilemma? Relational Accounts Are One Answer*, Psychology of Women Quarterly, 37.1, 81 (2013), *http://pwq.sagepub.com/content/37/1/80.full.pdf+html* (finding that ''[n]egotiating for higher compensation is socially costly for women because it violates prescriptive gender stereotypes derived from the gendered division of labor . . ., and its resulting social hierarchy of men in charge and women in caregiving and support roles'').

[34] Moreal Hernandez and Derek R. Avery, *Getting the Short End of the Stick: Racial Bias in Salary Negotiations*, MIT Sloan Management Review (June 15, 2016), *http://sloanreview.mit.edu/article/getting-the-short-end-of-the-stick-racial-bias-in-salary-negotiations/* (MIT conducted three studies focused on racial bias in salary negotiations. In the first study, evaluators reviewed resumes from white and black job applicants. The evaluators were asked to evaluate each job applicant and rate the likelihood that the job applicant would negotiate their salary if offered the job. After controlling for each job applicant's objective qualifications, the evaluators identified the black job applicants as less likely to negotiate compared to the white job applicants. The second study tested whether the evaluators had a racially-biased mindset, which was defined as a person who believes one or a few races were superior to others. The study found that the evaluators had different role expectations of the

Roland Fryer, Devah Pager, and Jörg L. Spenkuch found that discrimination accounts for at least one-third of the black-white wage gap.[35] The authors concluded that, compared to whites with comparable resumes, black job seekers were offered lower compensation by potential new employees and were more likely to accept the lower compensation. The researchers found that, although the wage gaps narrow over time as black workers stay at the same job, an unexplained gap nonetheless persists.[36]

Voluntary compliance is an important part of the effort to prevent discrimination and improve pay equity, and many employers are taking steps to ensure equal pay for equal work. For example, more than 25 companies have signed a White House Equal Pay Pledge to take action to reduce wage disparities in the workplace.[37] These employers committed to conducting an annual company-wide gender pay analysis across occupations, reviewing hiring and promotion processes and procedures to reduce unconscious bias and structural barriers, and embedding equal pay efforts into broader enterprise-wide equity initiatives.[38]

There is also evidence that pay equity is good for business. For example, a McKinsey & Company study found that gender parity in the United States could lead to $4.3 trillion of additional GDP by 2025, which is 19% higher than if current trends in pay inequity continue.[39] Another recent study found

that, on average, companies with greater gender diversity outperformed their peers with less diversity over the previous five years, and had a higher return on equity.[40] The study measured gender diversity according to the following factors: (1) Equality in pay; (2) empowerment (defined as number of women at the highest levels of the corporation and on key committees); (3) representation of women at different levels (including as members of the board of directors, senior executives, and regular employees); (4) work life balance programs; and (5) diversity policies. Pay parity and empowerment were weighted more than the other factors.[41]

Despite voluntary compliance and the strong business case for fair pay, pay discrimination persists as a serious problem that EEOC and OFCCP are statutorily required to address. The EEOC's mission is to stop and remedy unlawful employment discrimination. The OFCCP's purpose is to enforce, for the benefit of job seekers and wage earners, the contractual promise of affirmative action and equal employment opportunity required of those who do business with the federal government. To fulfill these goals, the EEOC and OFCCP need to be as effective and efficient as possible in their investigations of alleged discrimination. They now lack the employer- and establishment-specific pay data that, prior to issuing a detailed request for information or a subpoena, would be extremely useful in helping enforcement staff to investigate potential pay discrimination. Balancing utility and burden, the EEOC has concluded that the proposed EEO–1 pay data collection would be an effective and appropriate tool for this purpose, for all of the reasons explained below.[42]

## IV. Who Will Report Pay Data on the Revised EEO–1

### A. Employers That Currently File the EEO–1

All private employers that are covered by Title VII and have 100 or more employees now file an EEO–1 report about the sex, race, and ethnicity of their employees, which is designated here as Component 1 (demographic data).[43] Federal contractors with 50 or more employees also file the EEO–1 if they are not exempt as provided for by 41 CFR 60–1.5. Single establishment employers file one EEO–1, and multi-establishment employers file EEO–1 reports or data for each establishment.[44] Federal contractors with 1 to 49 employees and other private employers with 1 to 99 employees do not file EEO–1 reports.

### B. 60-Day Notice: Which Employers Would File Pay Data

In the 60-Day Notice, the EEOC proposed that EEO–1 private employers and federal contractors with 100 or more employees would submit the EEO–1 with pay and hours-worked data (Component 2) in addition to Component 1 data. The 60-Day Notice also stated that federal contractors with between 50 and 99 employees would continue to submit Component 1 data but would not submit Component 2 data.

### C. Public Comments

The EEOC received comments urging it to remove employers with fewer than

---

[black applicants compared to the black applicants and they also identified the black job applicants as less likely to negotiate. For the third study, the evaluators and job applicants were required to simulate a job negotiation. Although the black job applicants reported that they negotiated comparably (in terms of the number of offers and counteroffers made) to their white counterparts, their evaluators reported that the black job applicants had negotiated more than the white job applicants. The MIT professors concluded that because the evaluators expected the black job applicants to negotiate less, they had an exaggerated view of their behavior during the job negotiation. In addition, the professors found that the black job applicants received lower starting salaries based on the evaluators perception that the black job applicants were more aggressive.]

[35] Roland Fryer, Devah Pager, and Jörg L. Spenkuch, *Racial Disparities in Job Findings and Offered Wages,* Journal of Law and Economics, University of Chicago Press, vol. 56(3), 22–23, (Sept. 2011), *http://scholar.harvard.edu/files/fryer/files/racial_disparities_in_job_finding_and_offered_wages.pdf.*

[36] *Id.*

[37] The White House, *White House Equal Pay Pledge, https://www.whitehouse.gov/webform/white-house-equal-pay-pledge. See also,* Natalia Merluzzi, *These Businesses are Taking the Equal Pay Pledge,* White House Blog (June 14, 2016), *https://www.whitehouse.gov/blog/2016/06/14/businesses-taking-equal-pay-pledge.*

[38] *Id.*

[39] McKinsey & Company, *The Power of Parity: Advancing Women's Equality in the United States,*

(April 2016) *http://www.mckinsey.com/global-themes/employment-and-growth/the-power-of-parity-advancing-womens-equality-in-the-united-states.*

[40] Morgan Stanley, *Gender Diversity is a Competitive Advantage* (May 12, 2016), *http://www.morganstanley.com/blog/women/gender-diversity-work; See also* Morgan Stanley, *Why it Pays to Invest in Gender Diversity* (May 11, 2016), *http://www.morganstanley.com/ideas/gender-diversity-investment-framework.html.*

[41] *Id.*

[42] States also are addressing gender pay inequities, including proposing to establish pay transparency, prohibit retaliation against workers who discuss their wages, and request state agencies to examine their pay practices and develop best practices. For a summary of state equal pay laws, see National Conference of State Legislatures, *State Equal Pay Laws—July 2015, http://www.ncsl.org/research/labor-and-employment/equal-pay-laws.aspx.* For a summary of state equal pay legislation, see Kate Nielsen, American Association of University Women, *2015 State Equal Pay Legislation by the Numbers* (August 20, 2015),

*http://www.aauw.org/2015/08/20/equal-pay-by-state/.*

[43] Private employers also must file the EEO–1 if they have fewer than 100 employees *but* are owned or affiliated with another company or have centralized ownership, control or management so that the group legally constitutes a single enterprise and the entire enterprise employs a total of 100 or more employees. EEOC, *EEO–1: Who Must File, https://www.eeoc.gov/employers/eeo1survey/whomustfile.cfm.*

[44] Employers and contractors file different types of EEO–1 reports depending on whether they are single-establishment or multi-establishment filers. Single-establishment filers only file one report, the Type 1 report. Multi-establishment filers submit several reports. These are: The Type 2—Consolidated Report, which must include data on all employees of the company; the Type 3—Headquarters Report, which must include the employees working at the main office site of the company and those who work from home and report to the corporate office; the Type 4—Establishment Report, for each physical location with *50 or more* employees, which provides full employment data categorized by race, gender and job category. For sites with fewer than 50 employees, filers submit either: Type 6—Establishment List, which provides only the establishment name, complete address and total number of employees; or Type 8—Establishment Report, which is a full report for each establishment employing *fewer than 50 employees.*

200, or fewer than 500, employees from the requirement to report pay and hours-worked data on the EEO–1 (Component 2), in order to avoid imposing a burden on them. Some comments also encouraged the EEOC to eliminate the requirement to provide establishment-level pay data for establishments with fewer than 50 or 100 employees. These comments also expressed concern that reporting pay data for small employers, or small employer establishments, could reveal employee-level pay information. Conversely, other comments urged the EEOC to collect data from smaller employers by lowering the reporting threshold for pay data to 50 or more employees for federal contractors.

*D. 30-Day Notice: Employers With 100 or More Employees Will File Components 1 and 2*

The Commission has considered the arguments for increasing the size of those employers subject to Components 1 and 2 and has decided to retain the same employee thresholds as in the 60-Day Notice. Exempting employers with fewer than 500 employees, or even fewer than 250, from Component 2 would result in losing data for a large number of employers who employ millions of workers, and thus would significantly reduce the utility of the pay data collection. In addition, the EEOC and OFCCP have decided not to exempt federal contractors with 50–99 employees from filing Component 1 of the EEO–1. The Commission's proposal reduces employer burden by changing other aspects of the EEO–1, such as the reporting deadline. *See* section V.

In sum, all employers with 100 or more employees will be subject to Components 1 and 2 of the EEO–1 starting with reporting year 2017. Federal contractors with 50–99 employees will not experience a change in their EEO–1 reporting requirements as a result of this proposal; they will not file Component 2 and will continue to file only Component 1. Consistent with current practice, federal contractors with 1 to 49 employees and other private employers with 1 to 99 employees will be exempt from filing the EEO–1; they will file neither Component 1 nor Component 2.

## V. When To File: Filing Deadline and Workforce Snapshot Period

This 30-Day Notice proposes to change the EEO–1 filing deadline to March 31st· of the year that follows the reporting year. This Notice also proposes to change the "workforce snapshot" to a pay period between October 1st and December 31st of the reporting year, starting with the EEO–1 report for 2017.

Note that the reporting schedule for 2016 data remains unchanged; EEO–1 respondents must comply with the September 30, 2016, filing requirement for the currently-approved EEO–1, and must continue to use the July 1st through September 30th workforce snapshot period for that report. Under the proposed changes to the reporting schedule, EEO–1 reports for 2017 data would be due on March 31, 2018.

*A. 60-Day Notice*

In the 60-Day Notice, the EEOC proposed to retain the current September 30th EEO–1 filing deadline. The EEOC explained that, starting in 2017, employers with 100 or more employees would document their employees' W–2 earnings for a 12-month period starting October 1st and ending the next September 30th. The 60-Day Notice reasoned that W–2 earnings are generally recorded in 3-month periods (calendar year quarters) and that, because the third quarter ends on September 30th, employers could calculate the 12-month W–2 wages without significant difficulty.[45] The 60-Day Notice also retained the current "workforce snapshot" approach of allowing each employer to choose a pay period between July 1st and September 30th during which it would count its employees to be reported on the EEO–1.[46] The employees counted during this pay period would be the ones reported on the EEO–1.

*B. Public Comments*

Employers and other groups objected vigorously to the burden of reporting non-calendar year W–2 data (*i.e.,* October 1st to September 30th). These parties argued that the EEOC, by choosing to impose this unique 12-month reporting period, would significantly increase their costs by compelling them to recalculate W–2 earnings for the sole purpose of completing the EEO–1.

On a related point, employers reliant on human resource information systems (HRIS)[47] and payroll software said that they would have insufficient time to budget, develop, and implement new reporting systems if the 2017 EEO–1 report were to be due on September 30, 2017. Employers lacking HRIS and payroll software said they would have a variety of implementation challenges, depending on how they organized their records.

Many commenters suggested changing the 12-month EEO–1 reporting period to be the same as the W–2 reporting period (a calendar year) and moving the EEO–1 filing deadline into the subsequent year, preferably after W–2s are due. A few stakeholders suggested that the EEOC conduct the pay data collection every two years.

*C. 30-Day Notice*

1. Deadline for Filing the EEO–1

For the upcoming 2016 EEO–1 report, the filing deadline will remain September 30, 2016. However, beginning with the 2017 report, the reporting deadline for all EEO–1 filers will be March 31st of the year following the EEO–1 report year. Thus, the 2017 EEO–1 report will be due on March 31, 2018. Changing the filing deadline will give employers subject to Component 2 six more months to prepare their recordkeeping systems for the 2017 report, and it will give them 1.5 years without filing an EEO–1 report (September 30, 2016 to March 31, 2018). At the same time, this change will align the EEO–1 with federal obligations to calculate and report W–2 earnings as of December 31st; the EEOC will not require a special W–2 calculation for the EEO–1.[48] These changes will reduce the burden on employers of gathering Component 2 data.

The Commission declines to adopt an alternate-year schedule for filing the EEO–1 report. If collected only in alternate years, the utility of EEO–1 data would be diminished because it would become stale before the new data became available.

2. "Workforce Snapshot" Period

The "workforce snapshot" period refers to the pay period when employers count the total number of employees for that year's EEO–1 report. The EEO–1 has always used this "workforce snapshot" approach, which gives employers a choice but freezes EEO–1 employment numbers as of the chosen pay period. Some employers criticized the "workforce snapshot" approach because it would not reflect same-year promotions that have the effect of moving the employee into a different EEO–1 job category or pay band after the "snapshot" was taken. The Commission

---

[45] 81 FR 5113 (Feb. 1, 2016).

[46] EEOC, *EEO–1: When to File, https:// www.eeoc.gov/employers/eeo1survey/ whentofile.cfm.*

[47] These systems are also sometimes called "human resource management systems" or HRMS.

[48] Employers must send the W–2 to the Social Security Administration by the last day of February, although special due dates apply if the employer terminated its business or is filing electronically. Employers must furnish the W–2 to employees by February 1. IRS, *Topic 752—Filing Forms W–2 and W–3* (Dec. 30, 2015), *https://www.irs.gov/taxtopics/ tc752 html.*

addresses this concern in part by moving the ''workforce snapshot'' period to the fourth quarter, October 1st to December 31st, so that there are fewer opportunities for unreported changes after the ''snapshot.'' This will preserve employer choice as to the ''workforce snapshot,'' while at the same time accommodating the established federal schedule for preparing W–2's. In sum, while employers will count their employees during a pay period between October 1st and December 31st, they will report W–2 income and hours-worked data *for these employees* for the *entire year* ending December 31st.[49]

This change will not affect the 2016 EEO–1, for which the July 1st to September 30th ''workforce snapshot'' period remains effective.

## VI. What Pay Data To Report: Measure of Pay for the EEO–1

This 30-Day Notice proposes that employers use Box 1 of Form W–2 (hereafter ''W–2 income'') as the measure of pay for Component 2 of the EEO–1.[50] By definition, W–2, Box 1

includes income that is received between January 1st and December 31st of the relevant calendar year. In reaching this decision, the Commission considered government studies that analyze compensation in U.S. workplaces, relevant academic literature on compensation practices, the public comments and public testimony, and the analyses reflected in the EEOC's NAS study[51] and its own Pilot Study.[52]

### A. 60-Day Notice: Options for Measuring Pay

The EEOC's 60-Day Notice described five different measures of individual compensation that are used by the federal government.[53] After narrowing

its consideration to two of these—the Bureau of Labor Statistics' Occupational Employment Statistics (OES) measure of pay[54] and the Internal Revenue Service's W–2 definition[55] —the EEOC proposed to use W–2 income because it is already calculated by employers, therefore limiting burden, and because it is a comprehensive measure of pay that would be more likely to capture the effect of employment discrimination on different kinds of compensation.[56] In the 60-Day Notice, the EEOC did not specify which box on the W–2 it would use, but the Commission now specifies that employers will report on income provided in Box 1 of the W–2 form.

### B. Public Comments

#### 1. Supporting the Use of W–2 Income

Comments in support of using W–2 income emphasized that it is a comprehensive measure of pay that encompasses overtime, shift differentials, and production and non-production bonuses, which are increasingly important elements of pay. These parties stated that employment discrimination can be manifested when employers decide which employees get opportunities to earn shift differentials or overtime pay, or get large bonuses or awards. Using a measure of pay that excludes so much pay that could be influenced by discrimination would radically reduce the utility of this data collection for the EEOC and OFCCP.

#### 2. Opposing the Use of W–2 Income

Comments in opposition to using W–2 income fell into three categories.

---

[49] By changing the EEO–1 ''workforce snapshot'' to the last quarter of each calendar year, EEO–1 contractor filers that also file annual employee reports under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA), 38 U.S.C. 4212(d), will be in a position to align their VEVRAA data collections with the new EEO–1. Under regulations implementing VEVRAA, certain federal contractors must report annually on form VETS–4212 the number of employees and new hires protected under VEVRAA. 41 CFR 61–300.10(d)(1). Form VETS–4212 collects information for veterans protected by VEVRAA using the EEO–1's 10 job categories. For each reporting year, the federal contractor must report covered employees for the 12-month period preceding a date it selects between July 1st and August 31st that falls at the end of a payroll period. Significantly, the regulations allow contractors to select December 31st as the basis for reporting the number of employees and as the ending date of the twelve-month covered period, if the federal contractor has ''previous written approval from the Equal Employment Opportunity Commission to do so for purposes of submitting the Employer Information Report EEO–1, Standard Form 100 (EEO–1 Report).'' 41 CFR 61–300.10(d)(2). The implementation notice for the revised EEO–1 will serve as ''previous written approval'' from the EEOC pursuant to this Department of Labor VEVRAA rule.

[50] The IRS instructions for Form W–2 list the following categories of Box 1 taxable income: ''(1) Total wages, bonuses (including signing bonuses), prizes, and awards paid to employees during the year; (2) Total noncash payments, including certain fringe benefits; (3) Total tips reported by the employee to the employer; (4) Certain employee business expense reimbursements; (5) The cost of accident and health insurance premiums for 2%-or-more shareholder-employees paid by an S corporation: (6) Taxable benefits from a section 125 (cafeteria) plan if the employee chooses cash; (7) Employee contributions to an Archer MSA (medical savings account); (8) Employer contributions to an Archer MSA if includible in the income of the employee; (9) Employer contributions for qualified long-term care services to the extent that such coverage is provided through a flexible spending or

similar arrangement; (10) Taxable cost of group-term life insurance in excess of $50,000; (11) Unless excludable under Educational assistance programs, payments for non-job-related education expenses or for payments under a nonaccountable plan; (12) The amount includible as wages because you paid your employee's share of social security and Medicare taxes for railroad retirement taxes, if applicable). If employer also paid the employee's income tax withholding, the employer treats the grossed-up amount of that withholding as supplemental wages and reports those wages in boxes 1, 3, 5, and 7. (Employer uses box 14 if railroad retirement taxes apply.) No exceptions to this treatment apply to household or agricultural wages; (13) Designated Roth contributions made under a section 401(k) plan, a section 403(b) salary reduction agreement, or a governmental section 457(b) plan; (14) Distributions to an employee or former employee from an NQDC plan (including a rabbi trust) or a nongovernmental section 457(b) plan; (15) Amounts includible in income under section 457(f) because the amounts are no longer subject to a substantial risk of forfeiture; (16) Payments to statutory employees who are subject to social security and Medicare taxes but not subject to federal income tax withholding must be shown in box 1 as other compensation; (17) Cost of current insurance protection under a compensatory split-dollar life insurance arrangement; (18) Employee contributions to a health savings account (HSA); (19) Employer contributions to an HSA if includible in the income of the employee; (20) Amounts includible in income under an NQDC plan because of section 409A; (21) Payments made to former employees while they are on active duty in the Armed Forces or other uniformed services; and (22) All other compensation, including certain scholarship and fellowship grants.'' IRS, *2016 General Instructions for Forms W–2 and W–3*, (Jan. 5, 2016), *http://www.irs.gov/pub/irs-pdf/iw2w3.pdf.*

[51] NAS Report, *supra* note 3.

[52] Sage Computing, *supra* note 3. This EEOC Pilot Study compared the OES definition of compensation to the W–2 and concluded that ''[t]he W–2 definition of income . . . offers a more comprehensive picture of earnings data and therefore is more appropriate for identifying discriminatory practices.'' In contrast to the OES definition of pay, the W–2 definition includes all the elements of compensation that are captured by the OES definition, but also includes forms of compensation such as overtime wages, shift differentials, fees, commissions, fringe benefits, and bonuses. Box 1 on the W–2 excludes certain elective deferrals or pre-tax deductions such as employer-sponsored retirement plan (401(k) or 403(b)) contributions, flexible spending account contributions for health and dependent care, and medical contributions.

[53] NAS Report, *supra* notes 3 and 51 at 32–34, 41–45, *http://www.nap.edu/read/13496/chapter/4#32.*

[54] The Occupation Employment Statistics (OES) survey defines earnings to include base rate pay, cost-of-living allowances, guaranteed pay, hazardous-duty pay, incentive pay such as commissions and production bonuses, tips, and on-call pay. The OES measure *excludes* back pay, jury duty pay, overtime pay, severance pay, shift differentials, nonproduction bonuses, employer costs for supplementary benefits, and tuition reimbursements. U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupation Employment Statistics*, *http://www.bls.gov/oes/current/oes_tec.htm.* OES survey uses twelve wage intervals. U.S. Dept. of Labor, Bureau of Labor Statistics, *Survey Methods and Reliability Statement for the 2015 Occupational Employment Statistics Survey*, 4, *http://www.bls.gov/oes/current/methods_statement.pdf,*

[55] 81 FR 5113, 5116 (Feb. 1, 2016). The EEOC initially considered five measures of pay. Three of those measures are used by the U.S. Bureau of Labor and Statistics (BLS) when it reports national employment data: the Occupation Employment Statistics (OES); the National Compensation Survey (NCS); and the Current Employment Statistics (CES) survey programs. One measure was from the Social Security Administration (SSA) and the final measure was from the Internal Revenue Service (IRS) (W–2).

[56] Sage Computing, *supra* notes 3 and 52.

**45486**    **Federal Register** / Vol. 81, No. 135 / Thursday, July 14, 2016 / Notices

**Objection 1: W–2 Income Reflects Employee Choice and Is Not a Reliable Measure of Employer Discrimination**

The most widely articulated objection to using W–2 income was that it was not indicative of discrimination because it may reflect employee choice more than employer discretion and that the EEOC cannot differentiate the two in an aggregate pay data collection. Commenters making this argument identified elective participation in overtime, working shifts that provide pay differentials, and working faster or better than another employee (*e.g.*, payments for piecework, commissions, or production), as governed by employee choice. Some of these comments argued that using W–2 income will in fact cause the EEOC to find "false-positives" indicating discrimination because the agency will assume that pay disparities are caused by discrimination rather than employee choice.

Some of these parties urged the EEOC to use "base pay" rather than W–2 income because "base pay" is controlled entirely by employers and therefore is better suited to documenting potential discrimination. Another advantage to using "base pay," they maintained, is that it would be significantly less expensive and easier for them to report on the EEO–1 because their HRIS now include records of base pay but not W–2 income. These stakeholders did not define "base pay," apart from noting that it does not include supplemental pay such as overtime, shift differentials, and bonuses, and that it can be stated as an hourly rate or as an annual salary.

**Objection 2: Collection of W–2 Data Burdens Employers by Requiring the Integration of HRIS and Payroll Systems**

Employers argued that reporting W–2 income would impose an inordinate burden and expense because they store W–2 income data in computerized payroll systems that are entirely separate from the HRIS where they maintain EEO–1 demographic data. They asserted that procuring or developing new software to bridge these two systems would be time-consuming and extremely costly.

**Objection 3: Collection of W–2 Income Data for October 1st to September 30th Is Burdensome**

Finally, employers argued that reporting W–2 income for October 1st to September 30th of every year would be burdensome because employers' payroll systems collect and report W–2 income on a calendar-year basis for tax purposes. By proposing to change the

filing date for the revised EEO–1 from September 30th to March 31st, the EEOC has addressed this objection.

*C. 30-Day Notice: W–2 (Box 1) Income Is the Measure of Pay*

1. W–2 Income and Employee Choice

The Commission is not persuaded by the argument that W–2 income is an unsuitable measure for a pay data collection by an agency that enforces anti-discrimination laws because it may reflect employee choice as well as employer policy or decisions. As the White House Council of Economic Advisers notes, "In many situations, the delineations between discrimination and preferences are ambiguous." [57] For example, higher commission income may, as some public comments noted, reflect an employee's higher performance, but it may also reflect an employer's discriminatory assignment of more lucrative sales opportunities to employees based on race, ethnicity, and/or sex. As another example, a statistically significant difference in overtime pay between men and women in the same job may result from an employer's gender-biased assumptions that lead to more overtime opportunities being offered to men than to women, whom they may assume have competing family responsibilities. Pay discrimination is complex, and it would be an oversimplification to conclude that only those measures of pay that are shown to be exclusively dependent on an employer's decision or policy can be relevant to assessing allegations of pay discrimination.

2. Supplemental Income Is Important and May Be Linked to Discrimination

Based on its consideration of public comments and government and private sector research, the Commission concludes that supplemental pay is a critical component of compensation and it can be influenced by discrimination, so any measure of income for purposes of enforcing the pay discrimination laws should include supplemental pay. W–2 income incorporates different kinds of supplemental pay that would not be available for analysis if the EEOC were to collect only "base pay" or another basic measure of pay that ignored major sources of compensation.[58] For

employers, W–2 income is a well-defined, familiar, and universally-available measure of pay; for the EEOC and OFCCP, it is useful data for exploring potential pay discrimination.

Supplemental pay is becoming more and more prevalent in the United States. As noted by the Bureau of Labor Statistics, Department of Labor (BLS), "For many occupations in the U.S. labor market supplemental pay—including overtime, bonuses, and shift differentials—is an important component of overall cash compensation. Overtime pay is especially important in production occupations and other blue-collar jobs; bonus pay is mostly a feature of high-wage managerial and sales occupations; and shift differentials play a prominent role in . . . healthcare [] and technical occupations." [59] This pattern also is apparent in some of America's highest paying professions. In the legal profession, for example, bonuses at law firms can account for a significant portion of an associate's total compensation, beyond base salary.[60]

The human resources consulting firm Aon Hewitt's 2014 U.S. Salary Increase Survey of 1,064 organizations found that variable pay (such as performance-based bonuses) for exempt employees comprised 12.7% of payroll that year.[61] This represented the highest ratio companies have paid out of their budgets toward bonuses since the consulting firm started keeping records 35 years ago and is an increase from 2008 when 10.8% of their total compensation budgets were devoted to variable pay for exempt employees.[62] Ken Abosch, leader of Aon Hewitt's compensation practice, stated that companies prefer to give performance-based pay because this practice "keeps employees focused on good performance rather than just showing up, and it allows companies to reward and retain their really valuable employees." [63] In addition, Abosch

---

[57] Council of Economic Advisers Issue Brief, *The Gender Pay Gap on the Anniversary of the Lilly Ledbetter Fair Pay Act* (Jan. 2016), *https://www.whitehouse.gov/sites/default/files/page/files/20160128_cea_gender_pay_gap_issue_brief.pdf*.

[58] For example, although the FLSA requires employers to maintain pay rates, those pay rates do not include important sources of supplemental income that the EEOC has determined is important

to collect in order to identify potential sources of pay discrimination.

[59] John L. Bishow, U.S. Dept. of Labor, Bureau of Labor Statistics, *A Look at Supplemental Pay: Overtime Pay, Bonuses, and Shift Differentials* (March 25, 2009), *http://www.bls.gov/opub/mlr/cwc/a-look-at-supplemental-pay-overtime-pay-bonuses-and-shift-differentials.pdf*.

[60] National Association of Law Placement (NALP), *2014 Associate Salary Survey*, NALP, 67–77 (September, 2014), Associate Bonuses.

[61] Aon Hewitt, *New Aon Hewitt Survey Shows 2014 Variable Pay Spending Spikes to Record-High Level* (Aug. 27, 2014), *http://aon.mediaroom.com/New-Aon-Hewitt-Survey-Shows-2014-Variable-Pay-Spending-Spikes-to-Record-High-Level*.

[62] *Id.*

[63] Jenna McGregor, *Bonuses are making up a bigger and bigger percentage of companies' payrolls*, Washington Post, (Aug. 27, 2014), *https://*

noted that performance-based pay allows companies to keep their base salaries lower and that companies will only allocate bonuses ''if [the company] has good or great results.''[64]

In some industries, shift differentials[65] and overtime pay[66] are important aspects of income. Eighty-three percent of manufacturing and production companies, 59% of customer service and support entities, and 51% of transportation and distribution companies surveyed in 2010 offered shift differentials.[67] Hospitals and health care service organizations also pay shift differentials for holiday and weekend shifts more than other industries.[68] Overtime is particularly important in production, transportation, and material moving industries, with workers earning 2% of their income in overtime pay in December 2015.[69] Employers can control who gets the opportunity for assignments to lucrative shifts that pay premium wages or overtime pay, and withholding such assignments because of a protected basis such as race, ethnicity, or sex would violate Title VII.

Incentive pay for top executives also may be subject to discrimination. For example, at the five highest executive level positions (chief executive officer, vice chair, president, chief financial officer, and chief operating officer), research based on data from 1992–2005 shows that women received a lower share of incentive pay (including bonuses and stock option grants) than their male counterparts, accounting for 93% of the gender pay gap at that level.[70] This difference remained even after taking into account differences of age, tenure, and titles.[71]

## 3. Bridging HRIS and Payroll

In light of employers' argument that bridging employers' HRIS and payroll software for the new EEO–1 will be so burdensome that it outweighs the utility of W–2 income, the EEOC examined three of the HRIS tools that it sees most often in systemic investigations: ADP Enterprise, PeopleSoft, and UltiPro. All three HRIS allow for the collection of EEO–1 demographic data, and all three offer the capacity to record year-to-date gross and paid earnings.[72] The EEOC recognizes that many employers may not choose to use this capacity, but its existence suggests that creating software solutions for the EEO–1, Components 1 and 2, may not be as complex or novel as some comments suggested.

The EEOC intends to support employers and HRIS vendors as appropriate to accommodate Component 2 of the proposed EEO–1. For example, the EEO–1 Joint Reporting Committee plans to post online its new Data File Specifications for Components 1 and 2 of the modified EEO–1 as soon as OMB approves the information collection. The EEO–1 data file specifications will be for data uploads (submitting EEO–1 data in one digital file), but they also will describe the formatting of data for direct data entry onto the firm's secure EEO–1 account with the Joint Reporting Committee. For reference, the current EEO–1 data file specifications can be found at *https://www.eeoc.gov/employers/eeo1survey/ee1_datafile_2013.cfm*.

## VII. What Data To Report: Hours Worked

### A. 60-Day Notice

The Commission proposed collecting the number of ''hours worked'' for non-exempt employees by job category, subdivided into pay band cells, to account for periods when employees were not employed or were engaged in part-time work. With regard to exempt employees, the EEOC suggested that ''[o]ne approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers. The EEOC [was] not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers, to the extent that the employer does not currently maintain such information.''[73]

### B. Public Comments

Public comments from many employers objected to collecting hours worked data due to the cost of creating new systems to collate and report data about hours worked with W–2 income, and EEO–1 Component 1 data. Some employers inquired how the EEOC would define ''hours worked,'' so they would know what to report. These employers focused on two alternatives: (1) The FLSA definition of hours worked; and (2) the Affordable Care Act (ACA) approach.

The question of how to count hours worked for employees exempt from overtime received a lot of attention, especially the EEOC's proposal to count 40 hours per week for full time, exempt workers. Supporters of the revised EEO–1 said it was reasonable to use a proxy of 40 hours per week for full-time exempt employees. Those who objected to using the 40-hours per week proxy observed that it simply would not reflect the reality of the hours worked by many full-time exempt employees, who may work substantially more than 40 hours in any given week and may work less than 40 hours in another week. Some comments argued that, since the 40-hour estimate would be incorrect in many instances, reporting 40 hours per week would require them to submit and certify inaccurate information to the federal government.

### C. 30-Day Notice

#### 1. The Importance of Collecting Hours Worked

Collecting hours worked is of central importance because this data will enable the EEOC and OFCCP to account for part-time and partial-year work and to assess potential pay disparities in the

---

*www.washingtonpost.com/news/on-leadership/wp/2014/08/27/bonuses-are-making-up-a-bigger-and-bigger-percentage-of-companies-payrolls/*.

[64] *Id.*

[65] Shift differentials are paid to compensate employees for working shifts other than regular weekday hours.

[66] Employees who are nonexempt under the Fair Labor Standards Act are entitled to receive overtime pay for hours worked over 40 in a workweek. 29 CFR 778.10. The overtime rate is not less than time and one-half their regular pay rate. U.S. Dept. of Labor, Wage and Hour Division, *Overtime Pay*, *https://www.dol.gov/whd/overtime_pay.htm. See also* U.S. Dept. of Labor, Wage and Hour Division, *Final Rule: Overtime, https://www.dol.gov/whd/overtime/final2016/*, and, U.S. Dept. of Labor, Wage and Hour Division, *Fact Sheet: Final Rule to Update the Regulations Defining and Delimiting the Exemption for Executive, Administrative, and Professional Employees* (May 2016), *https://www.dol.gov/whd/overtime/final2016/overtime-factsheet.htm*.

[67] SHRM, *Shift Differentials: Compensation for Working Undesirable Hours* (Dec. 3, 2010), *https://www.shrm.org/hrdisciplines/compensation/articles/pages/shiftdifferentials.aspx*.

[68] *Id.*

[69] U.S. Dept. of Labor, Bureau of Labor Statistics, *News Release-Employer Costs for Employee Compensation* (June 9, 2016), *http://www.bls.gov/news.release/pdf/ecec.pdf*.

[70] Stefania Albanesi, Claudia Olivetti, Maria José Prados, *Liberty Street Economics: Incentive Pay and Gender Compensation Gaps for Top Executives*, Federal Reserve Bank of New York, (Aug. 25, 2015), *http://libertystreeteconomics.newyorkfed.org/2015/08/incentive-pay-and-gender-compensation-gaps-for-top-executives html#.VzovwP5JlR0*.

[71] Stefania Albanesi, *How performance pay schemes make the gender gap worse*, World Economic Forum, (Dec.23, 2015), *https://www.weforum.org/agenda/2015/12/how-performance-pay-schemes-make-the-gender-gap-worse/*.

[72] The ADP HRIS software allows for the collection of year-to-date gross pay and pay earnings. It includes paycheck year-to-date totals and provides fields for year-to-date tax amount, overtime hourly earnings, overtime hours, total overtime earnings, and total overtime hours. Further, it appears to provide fields for year-to-date taxable income, taxable gross income year-to-date, and year-to-date taxable amounts. Ultipro allows collection of weekly pay rate, hourly pay rate, and year-to-date taxable gross income, in addition to other measure of pay, hours, and bonus. Finally, PeopleSoft allows collection of hourly rate, minimum hourly rate, maximum hourly rate, and Last 26 Pay Period gross income.

[73] 81 FR 5113, 5117 (Feb. 1, 2016).

context of this information. The importance of "hours worked" data can be illustrated by example. If two men and two women in the same job category are paid comparable wage rates, but the men are employed full-time and the women are employed part-time, it would initially appear on Component 2 of the EEO–1—without any data on their hours worked—that the employer was paying the women significantly less than the men (the women would be counted in a lower pay band). On the other hand, if it was known that the men worked 40 hours per week and the women worked 20 hours per week, then their different hours worked provide a potential explanation of what initially appears to be a gender-based pay disparity. Of course, explaining a pay disparity in this way would not rule out the possibility that it was also caused by a discriminatory practice or policy that may be identified through further investigation.

In addition to helping to assess pay disparities, hours-worked data may be useful in its own right. The EEOC receives charges of discrimination alleging that an employer gave the charging party fewer hours than other employees, or denied overtime or premium pay hours based on race, ethnicity, sex, or another statutorily-protected basis. Collecting "hours worked" data on the EEO–1 would be useful in the initial stages of such an investigation, as the EEOC seeks to assess how the employer assigns work hours.

### 2. Defining "Hours Worked"

The Commission adopts the FLSA definition for "hours worked" because it is familiar to employers, designed in conjunction with pay, and applies to all employers subject to the EEO–1.[74] By contrast, the ACA approach to "service hours" gives employers a range of choices about how to count hours,

which would not provide clarity for the EEO–1.[75]

Under the FLSA, the term "hours worked" includes "all time an employee must be on duty, or on the employer's premises or at any other prescribed place of work, from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday."[76] Numerous court decisions have also helped shape this definition. The FLSA and its regulations require employers to maintain certain records for nonexempt employees, including hours the employee worked each day and the total hours the employee worked each workweek,[77] Payroll records are to be preserved for at least three years and records upon which wage computations were made (e.g., time cards) should be maintained for at least two years.[78]

Federal contractors that file the EEO–1 also are subject to the 2014 Fair Pay and Safe Workplaces Executive Order, which, once implemented by regulation, will require them to supply employees with a document each pay period showing the employee's hours worked, overtime hours, pay, and any additions made to, or deductions made from, pay as recorded for purposes of the FLSA.[79]

Adopting the FLSA definition of "hours worked" for the EEO–1 promotes consistency for contractors subject to both requirements.

### 3. Reporting Hours Worked for Nonexempt Employees

The Commission will require private employers and contractors to report the "hours worked" as recorded for FLSA purposes for nonexempt employees in Component 2 of the proposed EEO–1. "Hours worked" will be reported for the total number of employees in each pay band by ethnicity, race, and gender, for the entire calendar year. For example, assume an employer reports on the EEO–1 that it employs four African American women as administrative support workers in the sixth pay band. The employer would report their total "hours worked" for the entire year in the appropriate pay band cell under "Hours Worked" (for example, 8,160 hours). If one of the workers resigned after the employer took its "workforce snapshot" but before December 31st, the employer would report only the total number of hours she actually worked that year prior to her resignation, which would account for her partial-year employment (for example, rather than 2,040 hours, it might report 1,900 hours).

### 4. Reporting Hours Worked for Exempt Employees

Although the Commission seeks to minimize employer burden, the importance of hours-worked data necessitates its collection on the EEO–1. The EEO–1 Instructions will give employers the option to: (1) Report a proxy of 40 hours per week for full-time exempt employees, and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO–1 reporting year; or (2) provide actual hours of work by exempt employees during the EEO–1 reporting year if the employer already maintains accurate records of this information.

---

[74] Under the Fair Labor Standards Act, employers must keep certain records for employees who are subject to the minimum wage provisions alone, or to both the minimum wage and overtime provisions, including records of hours worked each workday and total hours worked each workweek. 29 CFR 516.2(a)(7). Employers are not required to maintain hours worked records for employees who are exempt from minimum wage or minimum wage and overtime requirements. 29 CFR 516.3. "Hours worked" under the FLSA includes "(a) [a]ll time during which an employee is required to be on duty or on the employer's premises or at a prescribed workplace and (b) all time during which an employee is suffered or permitted to work whether or not he is required to do so." 29 CFR 778.223. Unlike the ACA definition, it does not include paid days off.

[75] Under the Affordable Care Act (ACA), all employers with 50 or more full-time employees or equivalents are considered applicable large employers (ALEs) subject to ACA's shared responsibility provisions for providing health insurance. For this purpose, a full-time employee is, for a calendar month, an employee employed on average at least 30 hours of service per week, or 130 hours of service per month. The ACA provides employers the flexibility to use different measurements of hours worked, or "service hours," for different categories of exempt employees, provided the measures are reasonable and consistently applied. 26 CFR 54.4980H–3(b)(3)(i).

[76] U.S. Dept. of Labor, Wage and Hour Division, Handy Reference Guide to the Fair Labor Standards Act (November, 2014), https://www.dol.gov/whd/regs/compliance/hrg.htm.

[77] Additional FLSA recordkeeping requirements include (1) the employee's sex and occupation, (2) time and day of the week when employer's workweek begins, (3) basis on which employee's wages are paid, (4) employee's regular hourly rate, (5) employee's total daily or weekly straight-time earnings, (6) employee's total overtime earnings for the workweek, (7) employee's total wages each pay period, (8) date of payment to employee and pay period covered by payment, and much more. 29 CFR 516. See also United States Department of Labor, Wage and Hour Division, Fact Sheet #21: Recordkeeping Requirements under the Fair Labor Standards Act (FLSA) (July, 2008), https://www.dol.gov/whd/regs/compliance/whdfs21.htm.

[78] Id.

[79] E.O. 13673, section 5, 79 FR 45309 (Aug. 5, 2014). The Paycheck Transparency provision of the Executive Order on Fair Pay Safe Workplaces provides: "(a) Agencies shall ensure that, for contracts subject to section 2 of this order, provisions in solicitations and clauses in contracts shall provide that, in each pay period, contractors provide all individuals performing work under the contract for whom they are required to maintain wage records under the Fair Labor Standards Act;

40 U.S.C. chapter 31, subchapter IV (also known as the Davis-Bacon Act); 41 U.S.C. chapter 67 (also known as the Service Contract Act); or equivalent State laws, with a document with information concerning that individual's hours worked, overtime hours, pay, and any additions made to or deductions made from pay. Agencies shall also require that contractors incorporate this same requirement into subcontracts covered by section 2 of this order. The document provided to individuals exempt from the overtime compensation requirements of the Fair Labor Standards Act need not include a record of hours worked if the contractor informs the individuals of their overtime exempt status. These requirements shall be deemed to be fulfilled if the contractor is complying with State or local requirements that the Secretary of Labor has determined are substantially similar to those required by this subsection."

With this approach, the company official who certifies the firm's EEO–1 report would certify that the reports are "accurate and . . . . prepared in accordance with the instructions." Since the new EEO–1 instructions will give employers the option to record 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, or to report actual hours-worked data for exempt employees, employers using the proxies can certify with confidence that they completed their EEO–1 reports accurately and in accordance with the instructions.

### VIII. How To Report Data in Component 2: Pay Bands and Job Categories

This 30-Day Notice does not change the proposal to collect W–2 income and hours-worked data in the twelve pay bands used by the Department of Labor's Bureau of Labor Statistics (BLS) Occupational Employment Statistics (OES),[80] for each of the 10 EEO–1 job categories. Such data will support the EEOC's ability to discern significant pay disparities in the early stages of its investigations and, in conjunction with other information, to make more efficient decisions about how to plan the investigations going forward.

#### A. 60-Day Notice

The 60-Day Notice proposed that Component 2 of the EEO–1 report would collect W–2 income and hours-worked data within twelve distinct pay bands for each job category. These pay bands were based on the twelve wage intervals used by the BLS for the OES survey, which is a semi-annual survey designed to measure employment and wage estimates [81] for over 800 occupations.[82] These OES pay bands are different from the pay bands used on the

EEO–4 report now completed by state and local government employers.

TABLE 1—EEO–4 PAY BANDS

| Pay bands | Pay bands label |
|---|---|
| 1 ................. | $100–$15,999. |
| 2 ................. | $16,000–$19,999. |
| 3 ................. | $20,000–$24,999. |
| 4 ................. | $25,000–$32,999. |
| 5 ................. | $33,000–$42,999. |
| 6 ................. | $43,000–$54,999. |
| 7 ................. | $55,000–$69,999. |
| 8 ................. | $70,000 and over. |

TABLE 2—PROPOSED EEO–1 PAY BANDS

| Pay bands | Pay bands label |
|---|---|
| 1 ................. | $19,239 and under. |
| 2 ................. | $19,240–$24,439. |
| 3 ................. | $24,440–$30,679. |
| 4 ................. | $30,680–$38,999. |
| 5 ................. | $39,000–$49,919. |
| 6 ................. | $49,920–$62,919. |
| 7 ................. | $62,920–$80,079. |
| 8 ................. | $80,080–$101,919. |
| 9 ................. | $101,920–$128,959. |
| 10 ............... | $128,960–$163,799. |
| 11 ............... | $163,800–$207,999. |
| 12 ............... | $208,000 and over. |

#### B. Public Comments

Many stakeholders argued that the twelve OES pay bands are overly broad, particularly for the highest pay band ($208,000 and over) and also for the lower or middle income pay bands ($30,000 to $80,000). Opponents of the proposal argued that broad pay bands would not produce reliable data because the employees within each pay band may have different levels of experience or hold different jobs within an organization. Some comments advocated for additional and narrower pay bands to better capture pay disparities.

#### C. 30-Day Notice

Collecting W–2 income and hours-worked data in the twelve OES pay bands will enable the EEOC to gather pay data about most employees and EEO–1 filers, as the majority of wages in the United States are well below the highest OES pay band ($208,000 and over), even after including some types of supplemental income. According to the U.S. Census Bureau, the estimated median earnings for full-time, year round civilian workers 16 years of age and over were $43,545 in 2014. For management occupations, the median earnings were $71,112.[83]

In Component 2 of the EEO–1, employers will report the number of employees whose annual W–2 income falls in each of the job category's twelve pay bands. For example, an employer may report that it has twelve employees in pay band 3 for Professionals, and that four are white men, four are Asian men, and four are white women.

The EEOC is not convinced that using twelve pay bands in conjunction with the EEO–1 job categories will undermine the utility of W–2 income and hours-worked data. The EEOC does not intend or expect that this data will identify specific, similarly situated comparators or that it will establish pay discrimination as a legal matter. Therefore, it is not critical that each EEO–1 pay band include only the same or similar occupations. The data will be useful for identifying patterns or correlations that can inform the early stages of the investigative process, as explained in more detail in section IX.

In addition, many EEO–1 firms and establishments do not report widely divergent occupations in each EEO–1 job category. It also is likely that similar firms and establishments in the same geographic area will have similar distributions of occupations within the job groups and pay bands, thus making statistical comparisons between EEO–1 reports a reasonable approach to using this data.

### IX. How the EEOC Will Use W–2 and Hours-Worked Data

#### A. 60-Day Notice

As explained in the 60-Day Notice, Component 2 data would support EEOC data analysis at the early stages of an investigation, using statistical tests to identify significant disparities in reported pay. EEOC enforcement staff who conduct these analyses would use them, in the larger context of other available economic data and information, to evaluate whether and how to investigate the allegations of discrimination in more depth. Moreover, the 60-Day Notice also explained how employers would be able to use the summary pay data that the EEOC intends to publish to generally assess their own pay practices.

#### B. Public Comments

Employers opposing the proposal expressed concern that the EEOC would make unfounded inferences of discrimination based on its statistical analysis of the EEO–1 Component 2 pay data which, in turn, would result in

---

[80] U.S. Dept. of Labor, Bureau of Labor Statistics, *Survey Methods and Reliability Statement for the May 2015 Occupational Employment Statistics Survey, supra* note 54 at 3, (stating that "employment refers to the number of workers who can be classified as full-or-part-time employees, including workers on paid vacations or other types of paid leave; exempt officers, executives, and staff members of incorporated firms; employees temporarily assigned to other units; and noncontract employees for whom the reporting unit is their permanent duty station regardless of whether that unit prepares their paychecks.")

[81] U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Employment Statistics Frequently Asked Questions, http://www.bls.gov/oes/oes_ques.htm.*

[82] *Id.* The OES survey produces estimates of wages or salary paid to employees in non-farm occupations in the United States, in a particular State, or in a particular industry. The occupational wage estimates can be estimates of mean wages or percentiles, such as the median wage.

[83] U.S. Census Bureau, *Table Packages,* Full-Time, Year-Round Workers and Median Earnings in the Past 12 Months by Sex and Detailed Occupation: 2014, *http://www.census.gov/people/io/publications/table_packages html.*

unwarranted and burdensome EEOC investigations. Some interested parties criticized the particular statistical analyses that the EEOC described in the 60-Day Notice, arguing that these tests would not yield meaningful results when applied to data reported in pay bands and broad EEO–1 job categories. These commenters also raised concerns about the dangers of Type I or Type II errors in analyzing Component 2 data: In statistics, "Type I" errors are referred to as "false positives" and "Type II" errors are "false negatives." [84]

Finally, employers expressed skepticism that the EEOC's reports based on aggregated EEO–1 pay data would be useful for evaluating their own pay practices and promoting voluntary compliance. Several employers explained that they do not use W–2 data to analyze their own compensation practices, but rather rely on more complete compensation data that they have at their disposal.

*C. 30-Day Notice*

This 30-Day Notice expands on the discussion in the 60-Day Notice and explains in more detail how the data collected with this information collection will support enforcement of, and compliance with, Title VII, the EPA, and E.O. 11246.

1. Early Assessment of Charges of Discrimination

Currently, the EEOC enforcement staff can retrieve a respondent's EEO–1 report using existing EEO–1 analytics software to assess the distribution of different demographics (sex, race, and ethnicity) in an employer's job groups. When W–2 income and hours-worked data is added to the EEO–1 report, the EEOC's EEO–1 analytic software tool will be expanded to allow for the examination of pay disparities based on job category, pay bands, and gender, ethnicity, or race. For example, if a charging party alleges that she was paid less than her male colleagues in a similar job, the EEOC's enforcement staff might use the expanded EEO–1 analytics tool to generate a report comparing the distribution of the pay of women to that of men in the same EEO–

1 job category.[85] They also might use statistical tools to determine generally whether there are significant disparities in reported pay in job groups based on race, gender, or ethnicity.

EEOC enforcement staff could then examine how the employer compares to similar employers in its labor market[86] by using a statistical test to compare the distribution of women's pay in the respondent's EEO–1 report to the distribution of women's pay among the respondent's competitors in the same labor market. With the proposed addition of hours-worked data to the EEO–1, statistical tests could be used to determine whether pay disparities remain among relevant groups such as men and women, controlling for hours worked. More specifically, statistical tests could determine whether factors such as race, ethnicity, gender, and hours worked impact the distribution of individuals in pay bands. The EEOC envisions that any statistical test would be accompanied by an indication of the practical significance of pay differences.

After considering the results of several statistical analyses in conjunction with allegations in the charge, and sometimes also assessing how the EEO–1 pay data compares to statistics for comparable workers using Census data, EEOC enforcement staff would decide how to focus the investigation and what information to request from the employer. When EEOC enforcement staff requests information from an employer, the employer has the opportunity to explain its practices, provide additional data, and explain the non-discriminatory reasons for its pay practices and decisions. Only after considering all of this information, and possibly additional information, would the EEOC reach a conclusion about whether discrimination was the likely cause of the pay disparities.

The EEOC has tested whether statistical tests, and the EEO–1 pay data, would be useful tools in the

investigation of charges of discrimination and has found them to be effective.[87] The EEOC used two databases to test the utility of the planned analyses. The first was the EEO–4 database that the EEOC currently uses to collect and analyze pay data from state and local governments. Since the EEO–4 has fewer and different pay bands than the EEOC proposes for the EEO–1 pay data collection, the EEOC also used a synthetic database. The term "synthetic" does not mean that the data was not real. Rather, the EEOC created a large confidential database from HRIS data obtained in actual EEOC investigations that contained certain variables of interest, in particular pay rate history and job titles for all employees, and the statistical tests referenced above were run. Other important variables such as "race," "gender," and "EEO–1" job codes were randomly generated for databases that lacked this information. The results supported the EEOC's conclusion that these statistical tests provide insights that are useful in developing a request for information or deciding whether an investigation of a charge should have a more limited scope.[88]

As noted above, some critics disputed the EEOC's choice of statistical tests, arguing that they would not be useful for data reported in broad pay bands and job categories. The EEOC's Pilot Study reported on a 2007 study finding that, even if collecting income data in bands results in a loss of information, that loss would likely be small and of little concern to many researchers, and would be balanced by reduced cost and burden.[89] Other researchers have identified the value of banded pay data even to the point of being useful in estimating mean incomes within an accuracy of 1–3 percent.[90] This research suggests that critics who argue that one cannot detect mean differences that are smaller than the pay bands, or bins, are incorrect.[91]

In addition, the EEOC is confident that the risk of Type I (false positive) or Type II (false negative) errors will not undermine its statistical analyses of Component 2 data. The chances of incurring Type I errors (false positives) are related to the probability level used

---

[84] Type I errors represent the possibility of rejecting a null hypothesis when it is correct. For example, a null hypothesis might be that the earnings of African Americans and whites are the same and a Type I error would be rejecting it as false when it is true. Type II errors represent the opposite: The possibility of accepting the null hypothesis (for example, that the earnings of African Americans and whites are the same) as true when in fact it is false. Type I errors in this context could suggest a need for an investigation where it may not be needed; Type II errors in this context could result in victims of pay discrimination not receiving relief for discrimination.

[85] Enforcement staff could choose to compare men and women in one particular EEO–1 job category, for multiple job categories, or even all job categories.

[86] EEO–1 reports are identified by location and by each establishment's 5-digit NAICS industry codes. The U.S. Census Bureau maintains only one NAICS code for each establishment based on its primary business activity. The Census Bureau states: "[i]deally, the primary business activity of an establishment is determined by relative share of production costs and/or capital investment. In practice, other variables, such as revenue, value of shipments, or employment, are used as proxies. The Census Bureau generally uses revenue or value of shipments to determine an establishment's primary business activity." U.S. Census Bureau, *"North American Industry Classification System— Frequently Asked Questions," https:// www.census.gov/eos/www/naics/faqs/faqs.html.*

[87] Sage Computing, *supra* notes 3, 52, and 56.

[88] *Id.*

[89] *Id.* citing Micklewright, John and Schnepf, Sylke V., *How Reliable are Income Data Collected with a Single Question?* (Nov., 2007), *http:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=1047981.*

[90] Paul T. von Hippel, Samuel V. Scarpino and Igor Holas, *Robust estimation of inequality from binned incomes,* Sociological Methodology (Jun. 6, 2016), *http://arxiv.org/abs/1402.4061.*

[91] *Id.*

in the statistical significance test. The EEOC follows judicially recognized statistical standards for identifying meaningful discrepancies,[92] and therefore is confident that the probability level it uses is effective at minimizing the risk of Type I (false positive) errors. By contrast, the risk of Type II (false negative) error is inversely related to the sample size: The smaller the sample size, the more likely a Type II error. If a sample size is so small that the EEOC enforcement staff is concerned about Type II errors, it will consider analyzing a differently configured, larger sample. Even if it forgoes such analysis due to an elevated risk of Type II errors, enforcement staff will study the EEO–1 for other relevant information and analyze additional data from other sources. In fact, EEOC enforcement staff expects to analyze data from other sources regardless of the risk of error.

2. EEOC Publications Analyzing Aggregate EEO–1 Data

Using aggregated EEO–1 data, Census data, and potentially other data sources, the EEOC expects to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area (MSA). Particularly after a few years of data collection, these reports will provide useful comparative data. For smaller employers and others that do not hire consultants to analyze their compensation structures, these reports will be especially informative in light of the business case for equal pay and the need to comply with state equal pay laws.

The EEOC's publication of aggregated pay data, in conjunction with the employer's preparation of the EEO–1 report itself, may be useful tools for employers to engage in voluntary self-assessment of pay practices. For contractors, such self-assessment is encouraged by the OFCCP Rule on Discrimination on the Basis of Sex.[93] OFCCP states that ''[e]ach contractor may continue to choose the assessment method that best fits with its workforce

and compensation practices.'' [94] Although the OFCCP rule does not create new obligations with respect to a covered contractor's self-assessment of its compensation practices, it does provide additional guidance about the kinds of compensation practices the contractors should evaluate to ensure their compliance with E.O. 11246.

3. EEOC Training on the Pay Data Collection

The EEOC will ensure its internal capacity to use the EEO–1 pay data effectively by supplementing existing training for EEOC statisticians, investigators, and attorneys about how EEO–1 pay data and the updated EEO–1 analytics tool can be used to improve the agency's enforcement work. EEOC enforcement staff will receive periodic training on how to use the expanded EEO–1 analytics software tool to examine pay data and identify any disparities. EEOC personnel who conduct intake also would receive periodic training to help them ''issue spot'' potential pay discrimination and ask appropriate questions to collect relevant anecdotal evidence of possible discrimination and information about employer policies and practices. Further, the agency would provide specialized training to its lead systemic investigators. Finally, as discussed more fully below, the EEOC would continue to ensure that staff is trained with regard to confidentiality obligations with respect to pay data.

The EEOC also would provide enhanced technical assistance and support to employers with seminars or webinars, training, and outreach and education materials. Such materials may include best practice guides and self-assessment tools to promote voluntary compliance and assist employers in identifying and correcting discriminatory pay policies and practices. They may also identify practices that could lead to pay discrimination, such as subjective pay decision-making practices, establishing salary by relying heavily on prior salary, and setting salary based in large part on negotiations.

Finally, the EEOC would conduct outreach to other stakeholders, including employees and their advocates, and academic researchers. Outreach to employees and their advocates would focus on ''know your rights'' trainings with respect to equal pay for equal work and also include training about how to use the EEOC's planned aggregated pay data reports for research and informational purposes.

## X. Confidentiality of EEO–1 Data

This 30-Day Notice expands on the discussion in the 60-Day Notice regarding the privacy and confidentiality protections for Component 2 data. The EEOC has successfully protected the confidentiality of EEO–1 data for over 50 years, since this data was first collected. Recognizing that employers are concerned both about the confidentiality of their business data and the privacy of employees' pay information, the EEOC and OFCCP have committed to vigorously guarding its privacy and confidentiality, as explained below.

### A. 60-Day Notice

The 60-Day Notice emphasized that Title VII subjects the EEOC to strict confidentiality requirements, subject to criminal penalties; that OFCCP defers to the EEOC on disclosure of all non-contractor data; and that the OFCCP ensures the confidentiality of contractor data to the maximum extent permissible by law. In the 60-Day Notice, the EEOC explained that EEO–1 Component 2 would not include any employee personally identifiable information and, since EEO–1 pay and hours-worked data would be anonymous and aggregated, personally identifying information would not be readily apparent.

### B. Public Comments

Employers expressed concern that the addition of sensitive pay data to the EEO–1 would make it more valuable to their competitors and that any breach in confidentiality would be significantly more costly than with the current EEO–1. They also expressed concern about the privacy of the data, because an individual's pay could be disclosed if, for example, the employee was one of only a few employees matching a particular race/ethnicity background and gender in a cell on the EEO–1 and the EEO–1 report were disclosed. Some employers expressed concern that federal and state agencies may not be bound by Title VII's confidentiality requirements, and some employers urged the EEOC to prevail on Congress to amend Title VII to expressly extend the statute's confidentiality provisions to other federal and state agencies that might get EEO–1 data.

### C. 30-Day Notice

1. Legal Confidentiality

a. EEOC

As recognized by employers and explained in the 60-Day Notice, Title VII forbids the EEOC or any EEOC officer or employee from making public any

---

[92] *Hazelwood Sch. Dist.* v. *United States,* 433 U.S. 299, 311 n.17 (1977) (explaining that ''a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to [a protected trait]''); *Wright* v. *Stern,* 450 F.Supp.2d 335, 363 (S.D.N.Y. 2006) (denying motion for summary judgment in case alleging discrimination against African-American and Hispanic employees in promotions and compensation, the court noted that, ''[t]hough not dispositive, statistics demonstrating a disparity of two standard deviations outside of the norm are generally considered statistically significant.'').

[93] 41 CFR 60–20. *See also* 81 FR 39109 (June 15, 2016).

[94] *Id.*

information, including EEO–1 data, before a Title VII proceeding is instituted that involves that information.[95] EEOC staff who violate this prohibition are guilty of a criminal misdemeanor and can be imprisoned.

The EEOC directly imposes this Title VII confidentiality requirement on all of its contractors, including contract workers and contractor companies, as a condition of their contracts. With respect to other federal agencies with a legitimate law enforcement purpose, the EEOC gives access to information collected under Title VII *only* if the agencies agree, by letter or memorandum of understanding, to comply with the confidentiality provisions of Title VII.

Finally, the text of Title VII itself states that the EEOC may only give state and local fair employment practices agencies (FEPAs) information (including EEO–1 data) about employers in their jurisdiction on the condition that they *not* make it public.[96]

For the EEOC, its agents and contractors, and the FEPAs, Title VII only permits disclosure of information after suit is filed on the issues that were investigated at the administrative level.

b. OFCCP

Even though OFCCP obtains EEO–1 reports for federal contractors and subcontractors (contractors) through the Joint Reporting Committee with the EEOC, OFCCP obtains this information pursuant to its own legal authority under E.O. 11246 and its implementing regulations.[97]

OFCCP will notify contractors of any FOIA request for their EEO–1 pay and hours-worked data. If a contractor objects to disclosure, OFCCP will not disclose the data if OFCCP determines that the contractor's objection is valid. FOIA Exemptions 3 and 4 recognize the value of this data and provide, in combination with the Trade Secrets Act, the necessary tools to appropriately protect it from public disclosure. OFCCP will protect the confidentiality of EEO–1 pay and hours-worked data to the maximum extent possible consistent with FOIA.

With respect to companies that are not federal contractors or subcontractors under OFCCP's jurisdiction, the confidentiality provision of Section 709(e) applies. OFCCP will refer all such FOIA requests for EEO–1 data to the EEOC for a response. The EEOC, in

turn, is subject to Title VII confidentiality and cannot disclose any of its EEO–1 data to the public, except in an aggregated format that protects the confidentiality of each employer's information. Any FOIA request by a member of the public for such disaggregated EEO–1 data will be denied by the EEOC under Exemption 3 of the FOIA.

2. Data Protection and Security

The EEOC takes extensive measures to protect the confidentiality and integrity of EEO–1 data in its possession. First, all EEOC and FEPA staff[98] receive annual training in data protection and security. The EEOC maintains a robust cyber security and privacy program, in compliance with the Federal Information Security Modernization Act of 2014.[99]

The EEOC also complies with a comprehensive set of security and privacy controls to protect organizational operations and information system assets against a diverse set of threats, including hostile cyber-attacks, natural disasters, structural failures, and human errors. The EEOC's systems are monitored on an ongoing basis to assure compliance with an extensive set of security and privacy requirements derived from legislation, Executive Orders, policies, directives, and standards.[100] Agency information technology systems are subjected to weekly security scans by the Department of Homeland Security, annual internal audits performed by the EEOC's Office of Inspector General, and expert third-party audits for best practices and compliance with cybersecurity standards. Current protections include regular internal and external vulnerability scanning and penetration testing, comprehensive real-time anti-virus scanning and protection on all desktops and servers, Internet and email filtering for malware and spam, strong firewall protections and intrusion

detection systems, compliance with security benchmark configuration settings, deep discovery advanced network security analysis and monitoring, secure domain name server configurations, automatic server/firewall monitoring and logging, security awareness training, and comprehensive disaster recovery planning and testing.

The online EEO–1 portal of the Joint Reporting Committee allows firms that currently upload EEO–1 data files to encrypt their data or even create a file transfer site for EEOC to download the data. After collecting and reconciling EEO–1 data through a process that may involve input from the employer or contractor, the Joint Reporting Committee at the EEOC provides the database to OFCCP on an encrypted storage device.

## XI. Paperwork Reduction Act Burden Estimates

### A. Background

The revised EEO–1 data collection has two components. The first component (Component 1) will collect information identical to that collected by the currently approved EEO–1, through which employers report data on employees' ethnicity, race, and sex by job category. The second component (Component 2) will collect data on employees' W–2 (Box 1) income and hours worked. Because of the complexity of this PRA burden calculation, the EEOC is providing the following background information to explain the rationale behind its methodologies for calculating the annual and one-time burden of filing EEO–1 reports.

The OMB's PRA guidance prescribes the factors for agencies to consider in calculating annual reporting and one-time implementation costs. The prescribed PRA calculation is focused on the time it takes filers to complete the tasks required for the proposed information collection and the hourly rates of the employees who spend that time. For this reason, the following discussion of the costs of transitioning and annually filing Components 1 and 2 of the EEO–1 must be formulated through the PRA analysis of hours spent and hourly rates.

OMB's PRA regulations also require consideration of how to reduce the burden of a data collection through the use of technology and automation.[101]

---

[95] 42 U.S.C. 2000e–8(e).

[96] 42 U.S.C. 2000e–8(d). *See also* EEOC, *EEO–1 Survey System Privacy Impact Assessment, https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm.*

[97] 41 CFR 60–1.7(a)(1).

[98] As noted in text above, all FEPAs sign a contractual agreement with the EEOC that requires them to follow the confidentiality provisions set forth in Title VII.

[99] 44 U.S.C. 3551; *see also* relevant provision 44 U.S.C. 3554 discussing federal agency responsibilities for protecting federal information and information systems.

[100] 40 U.S.C. 1401 *et seq.,* Information Technology Management Reform Act, identifying standards and guidelines developed by the National Institute of Standards and Technology (NIST) for federal computing systems. NIST, NIST Special Publication 800–53, Rev 4, *Security and Privacy Controls for Federal Information Systems and Organizations* (April 2013), *http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf* (explaining specific security controls required by the Federal Information Security Management Act of 2002 and thereafter the Federal Information Security Modernization Act of 2014).

[101] Agencies must "evaluat[e] . . . whether (and if so, to what extent) the burden on respondents can be reduced by use of automated, electronic, mechanical, or other technological collection techniques or other forms of information

This consideration is particularly relevant to EEO–1 reporting. In the years since the EEOC first estimated the PRA burden of the EEO–1 based only on the time to fill in the cells on a paper EEO–1 report, there have been major advances in technology both for employers and the Joint Reporting Committee. Many employers now rely on HRIS and automated payroll systems.[102] The Joint Reporting Committee now utilizes an online EEO–1 portal for the confidential filing of EEO–1 reports, either by digital upload or by data entry onto a password-protected, partially pre-populated digital EEO–1.

Throughout the Joint Reporting Committee's transition to this new system, the EEOC continued to calculate the PRA burden based on its original method of counting all the cells on a paper report and calculating the time needed to enter data into each of them. However, with the 60-Day Notice, the EEOC concluded that both digital recordkeeping and digital filing were sufficiently well-established to transition to a new PRA methodology more suited to the new technology and the time-savings it generated.[103] The EEOC's new PRA methodology—necessarily expressed in the PRA's terms of hours and hourly labor rates—focuses on the time needed by the employer's staff to complete tasks such as reading the EEO–1 instructions, collecting, verifying, validating, certifying, and submitting the report. Therefore, in the 60-Day Notice, the EEOC considered for the first time the time savings generated by this task-based approach stemming from technology.[104] This is the reason that the burden of filing the EEO–1 actually declined with the PRA calculations in 60-Day Notice, relative to the paper-based calculation method previously used.

In the 60-Day Notice, the EEOC concluded that most employers would be filing the EEO–1 with a digital file upload by the time they file their EEO–1 reports for 2017 and 2018. Therefore, in the 60-Day Notice, the EEOC reasoned that "each additional report filed [would have] just a marginal additional cost." [105] Accordingly, the burden calculation in the 60-Day Notice was based on the number of *firms* filing one or more EEO–1 reports, not on the number of reports submitted or the number of separate establishments submitting reports. The EEOC's PRA burden calculations also assumed that all employees working on the EEO–1 would be administrative staff paid an hourly rate of $24.23 per hour.

The EEOC's intent in calculating respondent burden for the 60-Day Notice was to recognize the cost and time savings associated with the accelerating trend toward greater automation. However, employers' public comments indicated that the EEOC's estimates reflected a level of automation that was unlikely to be attained imminently. Some of these comments included estimates about the annual time and costs of completing the EEO–1. While some firms stated that they spent *less* time each year on the EEO–1 than the EEOC estimated in the 60-Day Notice, many firms reported that they spent *more* time and used more varied professional staff. These same commenters observed that they used data uploads less frequently than the EEOC had projected.

The EEOC carefully considered employers' input, yet, their comments as a whole reflected widely discrepant estimates of the time needed, jobs involved, and HRIS and software costs associated with digital EEO–1 reporting. Although the EEOC recognizes that the EEO–1 may involve more time than it estimated in the 60-Day Notice, the EEOC also concludes that the amount of time a filer spends each year completing this report varies, because each employer is different in terms of number of establishments, number of employees involved in producing the report, time spent by those employees and their rates of pay, and sophistication of HRIS. Due to the wide range of estimates provided about annual reporting costs, the EEOC also relied on its own experience collecting the EEO–1 reports and working with EEO–1 stakeholders over the years.

In conclusion, the EEOC adjusted its methodology for calculating PRA annual burden in this 30-Day Notice. First, the EEOC took into account the time and pay rates for a range of employees at both the firm- and establishment- levels who are responsible for preparing and filing the EEO–1. The EEOC now accounts for time to be spent annually on EEO–1 reporting by everyone from the executive who certifies it, to the lawyer who reviews it and the human resource professionals who prepare it with the support of information technology professionals and clericals.

Second, the EEOC no longer assumes that all the EEO–1 reports for 2017 and 2018 will be submitted by one data upload filed by the firm on behalf of all the establishments. While still reflecting that the bulk of the tasks performed in completing the EEO–1 report will be completed at the firm level due to the centrality of automation, the EEOC's 30-Day Notice recognizes that there are certain tasks that will be performed at the establishment level for employers who enter their EEO–1 data directly onto the Joint Reporting Committee's secure portal. Therefore, the 30-Day Notice burden calculations are based on the number of hours needed to complete the tasks at the firm level and also at the establishment level for the proportion of EEO–1 filers who do *not* now use centralized, secure data uploads. To make these calculations, the EEOC distinguished the time spent at the firm and establishment levels on the different types of EEO–1 reports, such as single-establishment Type 1 reports, Type 2 consolidated reports for employers with multiple establishments, and Type 6 or 8 reports for small establishments (under 50 employees).

For those employers who have staff enter EEO–1 data online, which is closest digital equivalent to completing a paper form by hand, the Joint Reporting Committee's password-protected, individualized portal prompts the employer with pre-populated EEO–1 forms that already include identifying information and the prior year totals. Moreover, the Joint Reporting Committee's online portal does not compel these employers to enter "zeros" in the cells for which they do not submit data. No EEO–1 filers enter data in every cell, so basing the annual PRA burden on the total number of cells on the EEO–1 form would be inaccurate.

Therefore, as explained in detail below, the total estimated *annual* burden hour cost in 2017 and 2018 for those contractors that will complete and submit only Component 1 (contractors with 50–99 employees) will be $1,872,792.41. The total estimated *annual* burden hour cost in 2017 and 2018 for employers and contractors that will complete both Components 1 and 2 will be $53,546,359.08.

The EEOC estimates that for these filers submitting both Component 1 and 2 data in 2017 and 2018, the *addition* of pay data will increase the estimated annual burden hour costs by a total of $25,364,064.80 or an average of $416.58 per EEO–1 filer each year, using the 30-Day PRA analysis. This is an average

---

technology, *e.g.*, permitting electronic submission of responses." 5 CFR 1320.8(a)(5).

[102] International Public Management Association for Human Resources, *Public Personnel Management*, Volume 39, No. 3, Fall 2010, *http://ipma-hr.org/files/pdf/ppm/ppmfall2010.pdf* (reporting that 90% of human resources departments used some form of HRIS).

[103] 81 FR 5113, 5120 (Feb. 1, 2016).

[104] *Id.*

[105] *Id.*

estimate per filer, and actual costs will vary, as explained in this Notice.

*B. 60-Day Notice*

In the 60-Day Notice, the EEOC estimated burden based on centralized electronic, rather than paper, filing of the EEO–1. Costs were calculated assuming that all tasks were performed at the firm level.

*Burden Statement—2016:* For reporting year 2016, when all filers will continue to submit only Component 1 demographic data, the EEOC estimated the total annual burden hours required to complete the EEO–1 as 228,296.4 hours, with an associated total annual burden hour cost of $5,531,621.77.

*Burden Statement—Component 1 Only:* The 60-Day Notice stated that starting in 2017, the estimated number of annual respondents (contractor filers) who will submit Component 1 only would be 6,260.[106] The 60-Day Notice estimated the burden in 2017 on contractor filers with 50 to 99 employees as follows:

• *Annual Burden Calculation:* The total annual burden hours required to complete Component 1 of the EEO–1 data collection in 2017 and 2018 was estimated to be 21,284 hours each year, with an associated total annual burden hour cost of $515,711.32. This figure used an average wage rate of $24.23 for employees working on the EEO–1, based on the conclusion that administrative support staff would perform the work in completing an EEO–1 report.

*Burden Statement—Components 1 and 2:* The 60-Day Notice estimated the number of annual respondents that would submit both Components 1 and 2 starting with the 2017 reporting cycle at 60,886 private industry and contractor filers. Filers required to complete both Components 1 and 2 were estimated to incur 401,847.6 burden hours annually or 6.6 hours per filer.

• *Annual Burden Calculation:* The estimated total annual burden hours needed for filers to report demographic and W–2 income and hours-worked data via Components 1 and 2 of the revised EEO–1 was estimated at 401,847.6, with an associated total annual burden hour cost of $9,736,767.35. This burden estimate includes reading instructions and collecting, merging, validating, and reporting the data electronically.[107]

• *One-Time Implementation Burden:* The estimated one-time implementation burden hour cost for submitting the information required by Component 2 of the revised EEO–1 Report was estimated at $23,000,295.[108] This calculation was based on the one-time cost for developing queries related to Component 2 in an existing human resources information system, which was estimated to take 8 hours per filer at a wage rate of $47.22 per hour.

The 60-Day Notice also estimated that the addition of W–2 income data to the EEO–1 would result in the EEOC incurring $318,000 in one-time costs and would raise the EEOC's recurring internal staffing cost by $290,478 due to the increased staff time needed to process the additional data.

*C. 30-Day Notice*

In response to concerns raised in the public comments to the 60-Day Notice, this 30-Day Notice reflects an increased burden estimate by: (1) Reflecting varying labor costs for the different types of staff involved with preparing the EEO–1, (2) adding labor costs for report-level functions, and (3) increasing the total number of burden hours a firm would need to read the EEO–1 instructions and to collect, verify, and enter EEO–1 data on the EEO–1 online portal. This methodology increases the total number of hours spent annually, even though the 30-Day Notice reduced overall burden by no longer requiring employers to make special W–2 income calculations for the EEO–1. This reflects employers' feedback about the annual EEO–1 reporting burden.

1. Annual Burden Hours

The 30-Day Notice revises the annual burden hour estimates to add the estimated time spent on firm-level functions by several different types of employees. These estimates on the 60-Day Notice, based on the EEOC's experiences in providing technical assistance to employers, and within the range of time suggested by public comments.

To submit a report containing EEO–1 Component 1 data, the EEOC now

assumes that, at the firm level, computer specialists would need to spend 4 hours, senior human resource managers, corporate legal counsel, and chief executive officers would each spend 1 hour, and data entry clerks and clerical staff would each spend 0.5 hours, for a total of 8 hours to complete firm-level functions.

Based on information received during the comment period, the addition of Component 2 data would increase the total time spent by each of these employees by a factor of 1.9. Therefore, the EEOC estimates that beginning with the 2017 EEO–1, each firm reporting both Component 1 and Component 2 data would require 7.6 hours by computer specialists, 1.9 hours each by senior human resource managers, corporate legal counsel, and chief executive officers, and 0.95 hours each by data entry clerks and clerical staff, for a total of 15.2 hours per firm for firm-level functions.

In order to analyze annual reporting burden as accurately as possible, the EEOC now also considers the time and effort associated with completing the different types of EEO–1 reports. There are six types of EEO–1 reports, as detailed in the footnote.[109] All reports except the Type 6 report include the requested EEO–1 workforce data; the Type 6 report includes only the employer's name, address, and the number of employees in each establishment with fewer than 50 employees. An employer having establishments with fewer than 50 employees chooses between filing one Type 6 report or multiple Type 8 reports (a full EEO–1 report for the establishment). If it chooses to file separate Type 8 reports for each establishment with fewer than 50 employees, the Joint Reporting Committee does not require it to complete a consolidated EEO–1 for the entire firm; rather, the Joint Reporting Committee's software generates a Type 2 report for the employer. However, if the employer chooses to submit a Type 6 report, it must also complete a full consolidated report. Accordingly, firms that have establishments with fewer than 50 employees either submit Type 8 reports (one for each establishment) or a Type 6 report (a list covering all establishments) plus a Type 2 report.

Finally, based on the EEOC's experience, most firms complete all the

---

[106] 81 FR 5113 (Feb. 1, 2016). Of the 67,146 firms that filed EEO–1 reports in 2014, 6,260 were federal contractor filers with fewer than 100 employees.

[107] 81 FR 5113 (Feb. 1, 2016). This estimate was calculated as follows: 6.6 hours per respondent × 60,886 respondents = 401,847.6 hours × $24.23 per hour = $9,736,767.35. *See also* U.S. Dept. of Labor Bureau of Labor Statistics, *Employer Costs for*

*Employee Compensation—December 2013* (March 2014), *http://www.bls.gov/news.release/archives/ ecec_03122014.htm* (listing total compensation for administrative support as $24.23 per hour).

[108] 81 FR 5113 (Feb. 1, 2016). This estimate was calculated as follows: 8 hours per respondent × 60,886 employers = 487,088 × $47.22 per hour = $23,000,295. *See also* U.S. Dept. of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation—December 2013, supra* note 108 (listing total compensation for a professional at $47.22 per hour).

[109] Type 1 (single establishment firm); Type 2 (consolidated report for headquarters and multi-establishment firm); Type 3 (headquarters report); Type 4 (report for establishments with over 50 employees); Type 6 (list of establishments with under 50 employees); and Type 8 (detailed report for establishments with under 50 employees).

tasks associated with filing EEO–1 Type 1, 2, and 6 reports at the firm level. By contrast, for Type 3, 4 and 8 reports, some of the tasks are performed at the firm level, but others are performed at the establishment level. The EEOC's 30-Day Notice annual burden estimates therefore reflect time spent on establishment-level tasks associated with Type 3, 4, and 8 reports, while time spent on tasks associated with Type 1, 2, and 6 reports (and the firm-level functions associated with Types 3, 4, and 8) are included in the firm-level estimates.[110]

The EEOC assumes that human resource specialists and data entry clerks will perform all establishment-level functions. For firms filing only Component 1 of the EEO–1, the EEOC estimates that for each establishment report submitted, a human resource specialist and a data entry clerk would

each spend 0.5 hours on establishment-level functions, for a total of 1 hour per report. Beginning in 2017, firms filing both Component 1 and Component 2 of the EEO–1 would require 0.95 hours each from the human resource specialist and the data entry clerk on establishment-level functions, for a total of 1.9 hours per report.

In 2014, 1,449 firms submitted their EEO–1 reports via data upload, but they submitted 329,944 Type 3, 4, and 8 reports.[111] The EEOC estimates that firms using data upload will need to spend less time at the establishment level than firms submitting their reports by data entry. For firms using data upload, the EEOC estimates that data entry clerks will not need to perform any establishment-level tasks.

### 2. Hourly Wage Rates

Using figures reflecting median pay obtained from the Bureau of Labor Statistics,[112] the EEOC's 30-Day Notice uses hourly wage rates as follows: Computer specialist $24.75, senior human resource manager $50.21, corporate legal counsel $55.69, chief executive officer $49.37, data entry clerk $13.69, clerical staff $15.41, and human resource specialist $28.06. See Table 3 for an illustration of the jobs, hours, and wage rates described in this Notice. Based on the EEOC's experience, the bulk of the work is now performed by computer specialists and senior human resource managers. At the establishment level, the EEOC concluded that EEO–1 reporting work is more likely to be performed by data entry clerks and human resource specialists, resulting in a lower average wage rate for establishment-level functions.

### Table 3—EEO–1 Jobs, Hours, and Wages

| Job title | Hours spent on EEO–1 Component 1 only | Hours spent on EEO–1 Components 1 & 2 | Hourly wage rates |
|---|---|---|---|
| **Firm-Level Functions** | | | |
| Computer Specialist | 4 | 7.6 | $24.75 |
| Senior Human Resource Manager | 1 | 1.9 | 50.21 |
| Corporate Legal Counsel | 1 | 1.9 | 55.69 |
| Chief Executive Officer | 1 | 1.9 | 49.37 |
| Data Entry Clerk | 0.5 | 0.95 | 13.69 |
| Clerical Staff | 0.5 | 0.95 | 15.41 |
| **Report-Level Functions** | | | |
| Human Resource Specialist | 0.5 | 0.95 | 28.06 |
| Data Entry Clerk | 0.5 | 0.95 | 13.69 |

## XII. Formal Paperwork Reduction Act Statement

### A. Overview of Information Collection

The EEOC has submitted to OMB a request for a three-year PRA approval of a revised EEO–1. The revised EEO–1 data collection has two components. The first component (Component 1) will collect information identical to that collected by the currently approved EEO–1. The second component (Component 2) will collect data on employees' W–2 pay and hours worked. Component 1 can be found at *http://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.* An illustration of the data to be collected by both Components 1 and 2 can be found at

*http://10.5.0.211/employers/eeo1survey/2016_new_survey.cfm.*

For the 2016 reporting cycle, there will be no change to the EEO–1 reporting requirement. All EEO–1 filers will continue to submit the data on race, ethnicity, sex, and job category that is currently collected by the EEO–1 report. The EEOC refers to this demographic and job category data as Component 1 data. Beginning with the 2017 reporting cycle, the EEOC proposes to require EEO–1 filers with 100 or more employees to submit data on pay and hours worked (Component 2 data) in addition to Component 1 data. However, federal contractor filers with 50 to 99 employees will only submit Component 1 data.

### 1. 2016 Overview of Information Collection—Component 1

*Collection Title:* Employer Information Report (EEO–1).
*OMB Control Number:* 3046–0007.
*Frequency of Report:* Annual.
*Description of Affected Public:* Private industry filers with 100 or more employees and federal government contractor filers with 50 or more employees.
*Number of Respondents:* 67,146 firms filing 683,275 establishment reports.
*Reporting Hours:* 1,055,471.
*Respondent Burden Hour Cost:* $30,055,086.62.
*Federal Cost:* $1,330,821.
*Number of Forms:* 1.
*Form Number:* EEOC Form 100.

---

[110] Because of this, the EEOC's burden estimates for firm-level tasks are inflated for those firms electing to file Type 8 reports, because the firm-level estimates include time spent completing a Type 2 and a Type 6 report, even though firms that

opt to complete Type 8 reports do not also submit a Type 2 or Type 6 report.

[111] In 2014, contractor filers with 50–99 employees submitted 86 Type 3, 4, and 8 reports via data upload.

[112] U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Outlook Handbook, http://www.bls.gov/ooh/.*

2. 2017 and 2018 Overview of Information Collection—Components 1 and 2

*Collection Title:* Employer Information Report (EEO–1).
*OMB Control Number:* 3046–0007.
*Frequency of Report:* Annual.
*Number of Forms:* 1.
*Form Number:* EEOC Form 100.
*Federal Cost:* $318,000 for one-time costs and $1,621,300 [113] for recurring staffing costs.

a. Component 1 (Demographic and Job Category Data)

*Description of Affected Public:* In 2017 and 2018, contractor filers with 50 to 99 employees will submit only the demographic and job category data collected by Component 1.
*Number of Respondents:* 6,260 firms filing 9,129 establishment reports.
*Reporting Hours:* 59,166.
*Respondent Burden Hour Cost:* $1,872,792.41.

b. Components 1 and 2 (Demographic and Job Category Data Plus W–2 and Hours Worked Data)

*Description of Affected Public:* In 2017 and 2018, EEO–1 filers with 100 or more employees will submit pay and hours worked data under Component 2 in addition to demographic and job category data under Component 1.
*Number of Respondents:* 60,886 firms filing 674,146 establishment reports.
*Reporting Hours:* 1,892,979.5.
*Respondent Burden Hour Cost:* $53,546,359.08.

*B. 30-Day Notice PRA Burden Statement*

2016: Component 1

*Burden Statement:* In 2016, all EEO–1 filers will submit Component 1, which only includes the data collected by the currently approved EEO–1. No filer will be required to submit the Component 2 data during the 2016 reporting cycle. The estimated number of respondents required to submit the annual EEO–1 report is 67,146.[114] This data collection is estimated to impose 1,055,471 burden

hours in 2016 or 8 hours per filer for firm-level functions plus an additional one hour per report for establishment-level functions.[115] The associated burden hour cost for the 2016 reporting cycle is $30,055,086.62.[116] This estimate assumes electronic filing through the EEO–1 online portal either by data entry or data upload, and accounts for time and cost savings now associated with submission of the EEO–1 via data upload.

2017 and 2018: Components 1 and 2

With respect to the EEO–1 reporting cycles for 2017 and 2018, this Notice will discuss the burden estimates associated with two distinct groups of filers. The first group consists of contractor filers with 50 to 99 employees. This group of filers will continue to submit only the Component 1 data, just as they have done in previous years. The second group of filers includes all EEO–1 filers with 100 or more employees, whether private industry or contractor filers. This larger group will continue to submit Component 1 data as they have always done, but will also submit the newly-added W–2 and hours-worked data of Component 2.

*Burden Statement—Component 1 Only:* Starting in 2017, the estimated number of annual respondents who are contractor filers with 50 to 99 employees is 6,260.[117] Again, this calculation assumes 8 hours per filer for firm-level functions plus an additional one hour per individual report for report-level functions. The burden on

these contractor filers is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours required to complete Component 1 of the EEO–1 data collection in 2017 and 2018 is 59,166,[118] with an associated total annual burden hour cost of $1,872,792.41.[119]

*Burden Statement—Components 1 and 2:* Starting in 2017, the estimated number of annual respondents that will submit Components 1 and 2 is 60,886 private industry and contractor filers. Filers required to complete both Components 1 and 2 are estimated annually to incur a total of 15.2 hours per filer for firm-level functions plus an additional 1.9 hours per individual report for establishment-level functions. The estimated burden is based on electronic filing.

The burden imposed on all private industry employer filers and contractor filers with 100 or more employees as a result of the proposed collection of Component 1 and 2 data is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours needed for all filers required to report Components 1 and 2 data is 1,892,979.5 hours,[120] with an associated total annual burden hour cost of $53,546,359.08.[121] The EEOC estimates

---

[113] The addition of W–2 pay data to the EEOC's internal staffing costs by approximately $290,478. The annual federal cost figure of $1,621,300 includes both the increase in contract costs resulting from the addition of the pay data collection and the estimated internal staffing costs. It reflects an increase of more than $290,478 compared to the estimated federal costs provided in previously published **Federal Register** notices seeking PRA approval of this information collection because past estimates reflected the cost of the contract with the vendor whose services the EEOC procures to assist with administration and processing of the EEO–1 but did not include EEOC's internal staffing costs associated with processing the EEO–1.

[114] In 2014, 67,146 firms filed EEO–1 reports.

[115] This estimate calculates total time spent by firms assuming no data upload, then subtracts the estimated time saved by firms using data upload, as follows: 8 hours per firm for firm-level functions × 67,146 firms = 537,168 hours; 1 hour per report for establishment-level functions × 683,275 reports = 683,275 hours; 537,168 + 683,275 = 1,220,443 total hours; 0.5 hours per report of data entry clerk time saved by data upload × 329,944 reports filed by data upload = 164,972; 1,220,443 − 164,972 = 1,055,471.

[116] To reach this estimate, the EEOC multiplied the hourly wage rates for each job by the estimated hours spent by each job in completing the EEO–1 to arrive at a per-firm cost for firm-level functions of $268.82 and a per-report cost for establishment-level functions of approximately $20.88 (rounded). The total burden hour cost for firm-level functions is $18,050,187.7 and the total burden hour cost for establishment-level functions is $14,263,365.6. Firms using data upload are estimated to save $2,258,466.68 (data entry clerk hourly wage rate of $13.69 × 0.5 hours × 329,944 reports filed by data upload). Total firm-level burden hour cost of $18,050,187.7 + total establishment-level burden hour cost of $14,263,365.6 − cost savings from data upload of $2,258,466.68 = a total annual burden hour cost of $30,055,086.62.

[117] Of the 67,146 firms that filed EEO–1 reports in 2014, 6,260 were federal contractor filers with fewer than 100 employees.

[118] This estimate calculates total time spent by firms assuming no data upload, then subtracts the estimated time saved by firms using data upload, as follows: 8 hours per firm for firm-level functions × 6,260 firms = 50,080 hours; 1 hour per report for establishment-level functions × 9,129 reports = 9,129 hours; 50,080 + 9,129 = 59,209 total hours; 0.5 hours per report of data entry clerk time saved by data upload × 86 reports filed by data upload = 43; 59,209 − 43 = 59,166.

[119] To reach this estimate, the EEOC multiplied the adjusted hourly rates for each job by the estimated hours spent by each job in completing the report to arrive at a per-firm cost for firm-level functions of $268.82 and a per-report cost for establishment-level functions of approximately $20.88 (rounded). The burden hour cost for firm-level functions is $1,682,813.2 and the burden hour cost for establishment-level functions is $190,567.875. Firms using data upload are estimated to save $588.67 (data entry clerk hourly wage rate of $13.69 × 0.5 hours × 86 reports filed by data upload). Total firm-level burden hour cost of $1,682,813.2 + total establishment-level burden hour cost of $190,567.875 − cost savings from data upload of $588.67 = a total annual burden hour cost of $1,872,792.41.

[120] This estimate calculates total time spent by firms assuming no data upload, then subtracts the estimated time saved by firms using data upload, as follows: 15.2 hours per firm for firm-level functions × 60,886 firms = 925,467.2 hours; 1.9 hours per report for establishment-level functions × 674,146 reports = 1,280,877.4 hours; 925,467.2 + 1,280,877.4 = 2,206,344.6 total hours; 0.95 hours per report of data entry clerk time saved by data upload × 329,858 reports filed by data upload = 313,365.1; 2,206,344.6 − 313,365.1 = 1,892,979.5.

[121] To reach this estimate, the EEOC multiplied the adjusted hourly rates for each job by the

that for these filers submitting both Component 1 and 2 data in 2017 and 2018, the *addition* of pay data will increase the estimated annual burden hour costs by a total of $25,364,064.80 or an average of $416.58 per EEO–1 filer each year. This burden estimate includes reading instructions and collecting, merging, validating, and reporting the data electronically.

• *One-Time Implementation Burden:* The 60-Day Notice estimated the one-time implementation burden hour cost associated with submitting the information required by Component 2 of the revised EEO–1 Report to be $23,000,295. This was based on the one-time cost for developing queries related to Component 2 in an existing HRIS, which was estimated to take 8 hours per filer at a wage rate of $47.22 per hour.

Employers filing public comments stated that bridging pay and HRIS systems, or purchasing software updates from vendors, would be extremely expensive. Some of these employers estimated the one-time implementation cost of bridging HRIS and payroll records to report Component 2 data estimated costs could range from $5,000 per firm to $20,000, $30,000, or $40,000 per firm. Although the estimates did not provide details explaining how *they* were calculated, the EEOC has considered this feedback and increased the one-time implementation burden. It has done so by reflecting that specialized computer software experts with a higher wage rate will be required to do the work necessary to implement the one-time changes required for this proposal.

Using an hourly wage rate for a computer programmer of $55.81, the EEOC now estimates one-time burden hour cost of $27,184,381.28.[122]

Dated: July 11, 2016.

For the Commission.

**Jenny R. Yang,**

*Chair.*

[FR Doc. 2016–16692 Filed 7–13–16; 8:45 am]

**BILLING CODE P**

---

**FEDERAL COMMUNICATIONS COMMISSION**

**Open Commission Meeting, Thursday, July 14, 2016**

July 7, 2016.

The Federal Communications Commission will hold an Open Meeting on the subjects listed below on Thursday, July 14, 2016 which is scheduled to commence at 10:30 a.m. in Room TW–C305, at 445 12th Street SW., Washington, DC.

| Item No. | Bureau | Subject |
|---|---|---|
| 1 ..................... | Wireless Tele-Commucations, International And Office Of Engineering & Technology. | Title: Use of Spectrum Bands Above 24 GHz For Mobile Radio Services (GN Docket No. 14–177); Establishing a More Flexible Framework to Facilitate Satellite Operations in the 27.5–28.35 GHz and 37.5–40 GHz Bands (IB Docket No. 15–256); Petition document of the Fixed Wireless Communications Coalition to Create Service Rules for the 42–43.5 GHz Band (RM–11664); Amendment of Parts 1, 22, 24, 27, 74, 80, 90, 95, and 101 To Establish Uniform License Renewal, Discontinuance of Operation, and Geographic Partitioning and Spectrum Disaggregation Rules and Policies for Certain Wireless Radio Services (WT Docket No. 10–112); Allocation and Designation of Spectrum for Fixed-Satellite Services in the 37.5–38.5 GHz, 40.5–41.5 GHz and 48.2–50.2 GHz Frequency Bands; Allocation of Spectrum to Upgrade Fixed and Mobile Allocations in the 40.5–42.5 GHz Frequency Band; Allocation of Spectrum in the 46.9–47.0 GHz Frequency Band for Wireless Services; and Allocation of Spectrum in the 37.0–38.0 GHz and 40.0–40.5 GHz for Government Operations (IB Docket No. 97–95). |
| | | Summary: The Commission will consider a document that would make spectrum in bands above 24 GHz available for flexible use wireless services, including for next-generation, or 5G, networks and technologies. |
| 2 ..................... | Wireline Competition ................................ | Title: Technology Transitions (GN Docket No. 13–5); USTelecom Petition for Declaratory Ruling that Incumbent Local Exchange Carriers Are Non-Dominant in the Provision of Switched Access Services (WC Docket No. 13–3); Policies and Rules Governing Retirement of Copper Loops by Incumbent Local Exchange Carriers (RM–11358). |
| | | Summary: The Commission will consider a document that adopts a framework to guide transitions to next-generation communications technologies while protecting the interests of consumers and competition. |

---

estimated hours spent by each job in completing the report to arrive at a per-firm cost for firm-level functions of approximately $510.76 and a per-report cost for establishment-level functions of approximately $39.66 (these figures are rounded). The burden hour cost for firm-level functions is $31,098,011.6 and the burden hour cost for establishment-level functions is $26,738,315.7. Firms using data upload are estimated to save $4,289,968.22 (data entry clerk hourly wage rate of $13.69 × 0.95 hours × 329,858 reports filed by data upload). Total firm-level burden hour cost of $31,098,011.6 + total establishment-level burden hour cost of $26,738,315.7 cost savings from data upload of $4,289,968.22 = a total annual burden hour cost of $53,546,359.08.

[122] This estimate is calculated as follows: 8 hours per respondent × 60,886 employers = 487,088 × $55.81 per hour = $27,184,381.28. The higher one-time implementation burden estimate in this Notice as compared to the one-time implementation burden estimate in the 60-Day Notice is due to the higher wage rate for the computer programmer, multiplied by 1.46, which is the employer

contribution for "management, professional, related." U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Outlook Handbook: Computer Programmers, http://www.bls.gov/ooh/computer-and-information-technology/computer-programmers.htm; see also* U.S. Dept. of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation—Dec. 2015* (Mar. 2016), *http://www.bls.gov/news.release/archives/ecec_03102016.htm* (computing the rate of employer contribution by dividing total compensation by total salary).

can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

Dated: January 26, 2016.

**Lynn B. Mahaffie,**

*Deputy Assistant Secretary for Policy, Planning, and Innovation Delegated the Duties of the Assistant Secretary for Postsecondary Education.*

[FR Doc. 2016–01746 Filed 1–29–16; 8:45 am]

**BILLING CODE 4000–01–P**

---

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

[3046–0007]

## Agency Information Collection Activities: Revision of the Employer Information Report (EEO–1) and Comment Request

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Proposed revision of the employer information report (EEO–1) and comment request.

**SUMMARY:** In accordance with the Paperwork Reduction Act (PRA), the Equal Employment Opportunity Commission (EEOC or Commission) announces that it intends to submit to the Office of Management and Budget (OMB) a request for a three-year PRA approval of a revised Employer Information Report (EEO–1) data collection. This revised data collection has two components. Component 1 collects the same data that is gathered by the currently approved EEO–1: Specifically, data about employees' ethnicity, race, and sex, by job category. Component 2 collects data on employees' W–2 earnings and hours worked, which EEO–1 filers already maintain in the ordinary course of business. For the 2016 reporting cycle, all EEO–1 filers would submit the data under Component 1. Starting in 2017, filers with 100 or more employees (both private industry and Federal contractor) would submit data in response to both Components 1 and 2. Contractors with 50 to 99 employees would only submit data for Component 1. In this notice, the EEOC solicits public comment on the utility and burden of collecting pay and hours-worked data through the EEO–1 data collection process.

**DATES:** Written comments on this notice must be submitted on or before April 1, 2016.

Pursuant to 42 U.S.C. 2000e–8(c), a public hearing concerning the proposed changes to the EEO–1 will be held at a place and time to be announced. To request an opportunity to present your views orally at the hearing, please submit a written request to the EEOC's Executive Secretariat (street address below) no later than February 22, 2016 to be assured of consideration. Please include your contact information.

**ADDRESSES:** Comments on this notice may be submitted to the EEOC in three ways; please use only one.

Comments and attachments may be submitted online at *http:// www.regulations.gov,* which is the Federal eRulemaking Portal. Follow the instructions on the Web site for submitting comments. Comments received here will be posted publicly on the same portal without change, including any personal information you provide. However, the EEOC reserves the right to refrain from posting comments, including those that contain obscene, indecent, or profane language; that contain threats or defamatory statements; that contain hate speech directed at race, color, sex, sexual orientation, national origin, ethnicity, age, religion, or disability; or that promote or endorse services or products.

Hard copy comments and all requests to participate in the hearing may be submitted to Bernadette Wilson, Acting Executive Officer, Executive Secretariat, Equal Employment Opportunity Commission, 131 M Street NE., Washington, DC 20507.

The Executive Secretariat also will accept documents totaling six or fewer pages by facsimile ("fax") machine. This limitation is necessary to assure access to the equipment. The telephone number of the fax receiver is (202) 663–4114. (This is not a toll-free number.) Receipt of fax transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at (202) 663–4070 (voice) or (202) 663–4074 (TTY). (These are not toll-free telephone numbers.)

Subject to the conditions noted above, the EEOC will post online at *http:// www.regulations.gov* all comments submitted in hard copy or by fax with the Executive Secretariat. The EEOC Headquarters' library also will make available hard copies of all comments, by advance appointment only, between the hours of 9 a.m. and 5 p.m. Eastern Time. To schedule an appointment to inspect the comments at the EEOC's library, contact the library staff at (202) 663–4630 (voice) or (202) 663–4641 (TTY). (These are not toll-free numbers.)

For reference when commenting on this notice, the current EEO–1 (and proposed Component 2) can be found at *http://www.eeoc.gov/employers/ eeo1survey/upload/eeo1-2.pdf.* An illustration of the data to be collected by both Components 1 and 2 can be found at *http://www.eeoc.gov/employers/ eeo1survey/2016_new_survey.cfm.*

**FOR FURTHER INFORMATION CONTACT:** Ronald Edwards, Director, Program Research and Surveys Division, Equal Employment Opportunity Commission, 131 M Street NE., Room 4SW30F, Washington, DC 20507; (202) 663–4949 (voice) or (202) 663–7063 (TTY). Requests for this notice in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663–4191 (voice) or (202) 663–4494 (TTY).

**SUPPLEMENTARY INFORMATION:**

## The EEO–1 Survey and Its Legal Authority

Section 709(c) of Title VII of the Civil Rights Act of 1964 (Title VII) requires employers to make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the Commission prescribes by regulation or order.[1] Pursuant to this statutory authority, the EEOC in 1966 issued a regulation requiring certain employers to file executed copies of the EEO–1 survey in conformity with the directions and instructions on the form, which called for reporting employee data by job category, ethnicity, race, and sex.[2] Pursuant to Executive Order 11246,[3] the Office of Federal Contract Compliance Programs (OFCCP), U.S. Department of Labor (DOL), in 1978 issued its regulation describing the EEO–1 as a report "promulgated jointly with the Equal Employment Opportunity Commission" and requiring certain contractors to submit "complete and accurate reports" annually.[4] Through the EEO–1 Joint Reporting Committee housed at the

---

[1] 42 U.S.C. 2000e–8(c).

[2] The EEOC's EEO–1 regulation is at 29 part 1602 Subpart B. The EEOC is responsible for obtaining OMB's PRA approval for the EEO–1 report.

[3] Exec. Order No. 11,246, 30 FR 12,319 (Sept. 24, 1965).

[4] 41 CFR 60–1.7(a).

EEOC, the EEO–1 is administered as a single data collection to meet the statistical needs of both agencies.[5] Currently, the EEO–1 directs certain covered employers with more than 50 employees (contractors) or 100 employees (private industry)[6] to report annually the number of individuals they employ by job category and by race, ethnicity, and sex.[7] The data include seven race and ethnicity categories[8] and ten job categories,[9] by sex. A sample copy of the currently approved EEO–1 can be found at *http://www.eeoc.gov/ employers/eeo1survey/upload/eeo1-2.pdf.*

---

[5] The EEOC shares EEO–1 data with state and local Fair Employment Practices Agencies under the authority of section 709(d) of Title VII. Subject to their agreement to comply with the confidentiality provisions of 42 U.S.C. 2000e–8(e), the EEOC shares EEO–1 reports with the Department of Justice (DOJ), the Federal Deposit Insurance Corporation (FDIC), and the National Credit Union Administration (NCUA). The FDIC and the NCUA use EEO–1 data pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 to help analyze diversity in management, employment, and business activities. DOJ uses the EEO–1 data when it defends OFCCP in litigation, in the event a federal contractor sues OFCCP to prevent debarment.

[6] Unless otherwise noted, the term "contractor" refers to federal contractors and first-tier subcontractors that satisfy the employee and contract size coverage criteria that subject them to the EEO–1 reporting obligations. The term "private industry" refers to all other entities required to file the EEO–1 that are not included in the "contractor" designation. The term "employer" or "filer" refers collectively to all entities that file EEO–1 data.

[7] The EEO–1 uses federal race and ethnic categories, which were adopted by the Commission in 2005 and implemented in 2007, pursuant to the PRA.

[8] *Hispanic or Latino*—A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

*White (Not Hispanic or Latino)*—A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

*Black or African American (Not Hispanic or Latino)*—A person having origins in any of the black racial groups of Africa.

*Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)*—A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

*Asian (Not Hispanic or Latino)*—A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

*American Indian or Alaska Native (Not Hispanic or Latino)*—A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

*Two or More Races (Not Hispanic or Latino)*—All persons who identify with more than one of the above five races.

[9] The ten job groups are: Executive/Senior Level Officials and Managers; First/Mid Level Officials and Managers; Professionals; Technicians; Sales Workers; Administrative Support Workers; Craft Workers; Operatives; Laborers and Helpers; Service Workers.

## Adding Pay Data to the EEO–1

In 1964, Congress enacted Title VII of the Civil Rights Act, as amended, 42 U.S.C. 2000e, *et seq.,* (Title VII), which makes unlawful a wide range of discriminatory employment practices, including pay discrimination, because of race, color, religion, national origin, or sex. The EEOC is responsible for enforcing Title VII and other federal laws prohibiting employment discrimination, including the Equal Pay Act of 1963.[10] The Equal Pay Act prohibits sex-based wage discrimination between men and women if they work in the same establishment and perform jobs that require substantially equal skill, effort, and responsibility under similar working conditions.[11] OFCCP enforces Executive Order 11246, as amended, which prohibits discrimination, including compensation discrimination, based on race, color, religion, sex, sexual orientation, gender identity, or religion.[12]

In 2010, the EEOC joined other federal agencies, including the DOL, as members of the President's National Equal Pay Task Force to identify ways to improve enforcement of federal laws prohibiting pay discrimination. The Task Force recommended, among other things, that the EEOC engage the National Academy of Sciences (NAS) to conduct a study assessing how to most effectively collect pay data to support its wage discrimination law enforcement efforts. The EEOC accordingly commissioned a study, and the NAS convened a Panel on *Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin.* This Panel's August 15, 2012, report (NAS Report)[13] recognized the potential value for enforcement of collecting pay data from employers by sex, race, and national origin through a survey such as the EEO–1, and emphasized the importance of a definitive plan for how the data would be used in coordination with other equal employment opportunity (EEO) enforcement agencies. The NAS Report also recommended that the EEOC conduct a pilot to inform the parameters for any pay data collection.[14]

---

[10] 29 U.S.C. 206(d).

[11] *Id.* Enforcement of the Equal Pay Act was transferred from the DOL to the EEOC in 1978. 5 USCA APP. 1 REORG. PLAN 1 1978.

[12] *See* Department of Labor, Office of Federal Contractor Compliance Programs, Exec. Order 11246 as amended, *http://www.dol.gov/ofccp/regs/ statutes/eo11246.htm.*

[13] National Research Council. 2012. *Collecting Compensation Data From Employers.* Washington, DC: National Academies Press, 8. Available at *http://www.nap.edu/openbook.php?record_ id=13496.*

[14] *Id.* at 87–88.

Following the NAS Report recommendation, the EEOC commissioned an independent Pilot Study to identify the most efficient means to collect pay data. The Pilot Study, completed in September 2015, assisted the EEOC in formulating this proposal and will guide the development of analytic techniques to make full use of the data to be collected.[15] The Pilot Study considered a variety of statistical approaches that could be used to detect pay differences between groups and then tested these approaches by applying them to synthetic pay data[16] in order to identify their strengths and weaknesses.[17] Ultimately, the Pilot Study made technical recommendations about several central components of a data collection, including: The unit of pay to be collected; the best summary measures of central tendency and dispersion for rates of pay; appropriate statistical test(s) for analyzing pay data; and the most efficient and least costly methods for transmitting pay data from employers. The Pilot Study also estimated employer burden-hour costs and the processing costs associated with the recommended method of collection.

Separately, the EEOC sought input about updating all the EEO surveys, including adding pay data, when its staff held a two-day meeting in March 2012 with employer representatives, statisticians, human resources information systems (HRIS) experts, and information technology specialists

---

[15] "EEOC Pay Pilot Study," September, 2015, Sage Computing. Available at: *http://www.eeoc.gov/ employers/eeo1survey/pay-pilot-study.pdf.*

[16] Two "synthetic" data bases were used. The first synthetic data base used data from the auto parts manufacturing industry and the Occupation Employment Statistics (OES) as well as EEO–1 data to construct a hypothetical firm in the auto parts manufacturing industry. To do so, the number of employees by EEO–1 job groups in an average sized firm was estimated. EEO–1 job groups were then mapped to the Standard Occupational Classification (SOC) categories in the OES data. Using OES statistics on the distribution of annual wages within SOC categories, the likely wages for EEO–1 job groups in an average firm were generated. These samples represent typical or representative wages, not actual wages, for auto parts employees. See Pilot Study, page 79. The second data base used data extracts from Current Population Survey (CPS) data (downloaded from *http://cps.ipums.org.* March CPS Annual Social and Economic Supplement). The data were downloaded from the International Public Use Microdata Series Web site for the 2010 to 2014 period. (King, M., S. Ruggles, J.T. Alexander, S. Flood, K. Genadek, M.B. Schroeder, B. Trampe, and R. Vick. 2010. Integrated Public Use Microdata Series, Current Population Survey: Version 3.0. [Machine-readable database]. Minneapolis: University of Minnesota.) See Pilot Study, page 56.

[17] Synthetic pay data was used because conducting a test survey of nine or more companies would require PRA approval. 44 U.S.C. 3502(3)(A)(i).

(work group). The work group reviewed the current data collection procedures, provided feedback on future modernization of the EEO surveys, and engaged in brainstorming that led to ideas submitted individually by group participants on a number of topics, including collecting pay data as well as multiple-race category data on the EEO–1. Employer stakeholders expressed concern about the importance of maintaining the confidentiality of any individual filer's pay data even if pay data were only published in aggregated form.[18] The work group report [19] reflects feedback from participants that the burden of reporting pay data would be minimal for EEO–1 filers.

On April 8, 2014, the Presidential Memorandum, "Advancing Pay Equality Through Compensation Data Collection" was issued. It directed the Secretary of Labor to develop a compensation data collection proposal.[20] OFCCP issued a Notice of Proposed Rulemaking (NPRM) on August 8, 2014, proposing to amend one of its implementing regulations for Executive Order 11246 to add a requirement that certain federal contractors submit compensation data reports to OFCCP.[21] Under the NPRM, OFCCP also proposed a sample of an Equal Pay Report for collecting this data.[22]

Public comments submitted to OFCCP about the proposed Equal Pay Report

and rule argued for, among other things, the need to improve interagency coordination and decrease employer burden for reporting compensation data by using the EEO–1, rather than a new OFCCP data collection, as well as the need to protect privacy and data confidentiality. The instant proposal responds to these concerns.[23] Similarly, the NAS Report recommended that the federal EEO enforcement agencies develop a coordinated plan for using compensation data. In the course of developing this EEO–1 proposal, the EEOC and OFCCP together consulted with the Department of Justice, focusing on how EEO–1 pay data would be used to assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities that might warrant further examination. The EEOC and OFCCP plan to develop statistical tools that would be available to staff on their computers, to utilize the EEO–1 pay data for these purposes. They also anticipate developing software tools and guidance for stakeholders to support analysis of aggregated EEO–1 data. Finally, the EEOC and OFCCP anticipate that the process of reporting pay data may encourage employers to self-monitor and comply voluntarily if they uncover pay inequities.

The following discussion explains the justification for each component of the proposed EEO–1 pay data collection. As stated above, this proposal does not compel employers to collect new data but rather requires the reporting of pay data that employers maintain in the normal course of business. This notice proposes a collection that will maximize the utility of the pay data while balancing respondent concerns about confidentiality and the burden of the collection.

*Proposal To Add Pay Data to the EEO–1*

Who Will Report Pay Data and When This Reporting Requirement Will Start

For the 2016 EEO–1 reporting cycle, to ease the transition, all employers will submit information that is identical to the information collected by the currently approved EEO–1 (Component 1). Starting in 2017, employers that are subject to the EEO–1 reporting requirement *and that have 100 or more employees* will submit the EEO–1 with pay and related information (Components 1 and 2). By contrast,

contractors that are subject to the EEO–1 reporting requirement *and that have between 50 and 99 employees* will continue to submit the same information that is collected by the current EEO–1 report (Component 1). They will not be required to submit pay and hours-worked data. A sample copy of the currently approved EEO–1 report provides an illustration of the data to be collected by Component 1. It can be found at *http://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.* An illustration of the data to be collected by both Components 1 and 2 can be found at *http://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm.*

When Annual EEO–1 Reports Will Be Due and How Employers Will Submit Data

Currently, employers must collect EEO–1 data from any pay period occurring in the months of July through September of the current survey year. The EEO–1 must be filed by September 30th of the same year. These deadlines would continue after the addition of pay data, to minimize employers' burden by folding the new collection into long-established deadlines. As explained below regarding the utility and burden of using W–2 data to describe pay, requiring filers to report W–2 data as of a pay period occurring in the months of July through September should not be burdensome given the capabilities of HRIS software.

Beginning in 2017, all filers will be required to submit the proposed EEO–1 report electronically. Automated electronic data collection promotes the utility of the EEO–1 survey by reducing the number of inadvertent human errors in the data. Electronic data collection also is less burdensome for employers than assigning staff to complete the survey. As of 2014, all but three of the 67,146 EEO–1 filers already used electronic data submission.[24] Any EEO–1 filer seeking an exemption from this electronic requirement may use the existing EEO–1 process for seeking special reporting procedures.[25]

[18] For example, reporting the average pay for Hispanic or Latino women who are Executive/Senior Level Officials and Managers, if there are few Hispanic or Latino women in that job group, may effectively reveal the pay of individual employees. To allay these concerns, the EEOC intends to re-examine the rules for testing statistical confidentiality for publishing aggregate data to make certain that tables with small cell-counts are not made public.

[19] "EEOC Survey System Modernization Work Group Meeting, Draft Report," March 19, 2012, Sage Computing. Available at: *http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf.*

[20] Presidential Documents, Memorandum of April 8, 2014, "Advancing Pay Equality Through Compensation Data Collection," Memorandum for the Secretary of Labor, April 11, 2014 (79 FR 20751).

[21] Government Contractors, Requirement to Report Summary Data on Employee Compensation, 79 FR 46563 (August 8, 2014). This NPRM provided detailed explanations for the design of the Equal Pay Survey, which utilized W–2 information as a measure of wages and reported cumulative wages. It did not use pay bands like Component 2 of the currently proposed EEO–1. In 2011, OFCCP had issued an Advance Notice of Proposed Rulemaking (ANPRM). Nondiscrimination in Compensation: Compensation Data Collection Tool, 79 FR 49398 (August 10, 2011), in response to which stakeholders provided extensive input and information.

[22] Office of Information and Regulatory Affairs and Office of Management and Budget, Equal Pay Report, *http://www.reginfo.gov/public/do/PRAViewIC?ref_nbr=201407-1250-0018icID=212555.*

[23] OFCCP plans to utilize EEO–1 pay data for federal contractors with 100 or more employees instead of implementing a separate compensation data survey as outlined in its August 8, 2014, NPRM.

[24] The remaining three filers submitted hard copy reports.

[25] The EEO–1 instructions provide that "[a]n employer who claims that preparation or the filing of Standard Form 100 would create undue hardship may apply to the Commission for a special reporting procedure. In such cases, the employer must submit in writing a detailed alternative proposal for compiling and reporting information to: The EEO–1 Coordinator, EEOC-Survey Division, 131 M Street NE., Washington, DC 20507. Only those special procedures approved in writing by the Commission are authorized. Such authorizations remain in effect until notification of cancellation is given. All requests for information should be sent

Continued

Component 2 of the revised EEO–1 includes a request for data on the amount of employer staff time used to collect and report pay data on the EEO–1. This will better enable the EEOC to quantify the burden of this aspect of the survey.

What Pay Data Will Be Collected

Measure: Total W–2 Earnings

In selecting total W–2 earnings as the measure of pay, the focus was on maximizing utility of the EEO–1 pay data while minimizing the burden on employers to collect and report it. With respect to maximizing utility, the goal was to identify a measure of compensation that encompasses as much employer-paid income earned by individuals as possible. With respect to minimizing burden, the focus was on finding a measure that is well-defined and compatible with the data elements in employers' existing human resources and pay systems. Consideration also was given to the sample Equal Pay Report proposed in OFCCP's 2014 Notice of Proposed Rulemaking, which used W–2 earnings.[26]

Five different measures of earnings now used by federal data collection systems were considered. The first three were from the U.S. Bureau of Labor Statistics (BLS): The Occupation Employment Statistics (OES);[27] the National Compensation Survey (NCS);[28]

and the Current Employment Statistics (CES) survey program.[29] The remaining options were from the Social Security Administration (SSA)[30] and the Internal Revenue Service (IRS).[31]

Of these five options, the focus was on the relative strengths and weaknesses of the OES and the W–2 definitions because they are best known to employers. The NAS Study recommended the use of OES' wage definition because it is based on widespread surveys,[32] but the EEOC ultimately decided not to use the OES definition because it excludes widely-used elements of compensation such as overtime pay, severance pay, shift differentials, nonproduction bonuses, year-end bonuses, holiday bonuses, and tuition reimbursement.[33] These elements of pay, however, are

increasingly important. According to a 2014 survey of 1,064 U.S. companies, "91 percent of organizations offer a variable pay program and expect to spend 12.7 percent of payroll on variable pay for salaried exempt employees in 2015."[34] Another recent survey of companies' bonus practices found that 74 percent of respondents used a sign-on bonus program and 61 percent used a retention bonus program in 2014.[35]

By contrast, the W–2 definition provides a more comprehensive report of earnings at the employee level than the OES definition. W–2 gross income includes wages, salaries, fees, commissions, tips, taxable fringe benefits, and elective deferrals. Amounts withheld for taxes, including but not limited to income tax, Social Security, and Medicare taxes, are considered "received" and are included as gross income of the given year they are withheld.[36] The W–2 encompasses all earned income, including supplemental pay components such as overtime pay, shift differentials, and nonproduction bonuses (*e.g.*, year-end bonuses, hiring and referral bonuses, and profit-sharing cash bonuses).[37] Nonproduction bonuses account for over 11 percent of cash compensation for management, business, and financial operations occupations, while shift differentials are a significant component of compensation for healthcare workers.[38] A panel of HRIS experts convened for the Pilot Study agreed that the trend is toward paying higher-level executives in bonuses, which are

---

to the address above." *See http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm.* Any requests would be considered by the EEO–1 Coordinator, who is also responsible for issuing any written approvals.

[26] In the NPRM, OFCCP stated that it choose the W–2 definition of compensation because it accounts for a broad range of pay elements and because collection of W–2 data would result in minimal burden on contractors. 79 FR 46562 at 46576 (August 8, 2014). Public comments on the NPRM were split on using the W–2, but EEOC and OFCCP conclude that it remains the best option for the reasons stated in this section.

[27] The *Occupation Employment Statistics* (OES) survey defines earnings to include base rate pay, cost-of-living allowances, guaranteed pay, hazardous-duty pay, incentive pay such as commissions and production bonuses, tips, and on-call pay. The OES measure *excludes* back pay, jury duty pay, overtime pay, severance pay, shift differentials, nonproduction bonuses, employer costs for supplementary benefits, and tuition reimbursements. *See U.S. Bureau of Labor Statistics, Occupation Employment Statistics. http://www.bls.gov/oes/current/oes_tec.htm.* See page 4 of *http://www.bls.gov/oes/current/methods_statement.pdf* for the 12 wage intervals.

[28] The *National Compensation Survey* (NCS) is a BLS establishment survey of employee salaries, wages, and benefits. In this survey, "[e]arnings are defined as regular payments from employers to their employees as compensation for straight-time (not overtime) hourly wages or for any salaried work performed." The NCS does not include premium pay for overtime, holidays, and weekends; shift differentials such as night work; nonproduction bonuses; tips; and uniform and tool allowances. *See U.S. Bureau of Labor Statistics,*

*Overview on BLS Statistics on Pay and Benefits, http://www.bls.gov/bls/wages.htm http://www.bls.gov/ncs/ncswage2010.pdf,* at pp 8–9. However, this definition does include incentive pay such as commissions, piece-rate payments, production bonuses, cost-of- living adjustments, hazard pay, payments for income deferred due to participation in a salary reduction plan, and deadhead pay (which is paid to a driver who is driving an empty vehicle, typically when the driver is traveling to pick up a delivery or after completion of a delivery).

[29] The *Current Employment Statistics* (CES) survey program is a BLS and state cooperative program that produces data on earnings but not wages. Average hourly earnings exclude items such as employee benefits, irregular bonuses and commissions, retroactive payments, and the employers' share of payroll taxes and therefore, do not represent employers' total compensation costs (as calculated by the National Compensation Survey). *See National Research Council. Collecting Compensation Data from Employers. National Academic Press 2013. http://www.nap.edu/openbook php?record_id=13496,* at p. 8.

[30] The *Social Security Administration* defines income as any payment received during a calendar month that can be used to meet needs for food or shelter. It may be in cash or in kind (*i.e.,* payment in the form of the use of a good or service, such as free rent). It includes earned income and unearned income. Examples of unearned income include social security, interest and dividends, retirement income, unemployment benefits, alimony, child support, and pay received for work while an inmate in a penal institution. *See http://www.ssa.gov/OP_Home/ssact/title16b/1612.htm.*

[31] The *Internal Revenue Service's* W–2 definition of gross income includes wages, salaries, fees, commissions, tips, taxable fringe benefits, and elective deferrals. Amounts withheld for taxes, including but not limited to income tax, Social Security, and Medicare taxes, are considered "received" and must be included in gross income of the given year they are withheld. *See http://www.irs.gov/publications/p17/ch05.html;* see also *http://www.irs.gov/Individuals/What-is-Earned-Income%3F.*

[32] National Research Council, 2012, *Collecting Compensation Data From Employers.* Washington, DC: National Academies Press, 8. Available at *http://www.nap.edu/openbook.php?record_id=13496,* at p.58.

[33] United States Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics-Frequently Asked Questions, *http://www.bls.gov/oes/oes_ques.htm*

[34] *See Press Release,* Aon Hewitt, 2014 U.S. Salary Increase Survey, (Aug. 27, 2014), *http://aon.mediaroom.com/New-Aon-Hewitt-Survey-Shows-2014-Variable-Pay-Spending-Spikes-to-Record-High-Level.*

[35] WorldatWork. "Bonus Programs and Practices." Available at *http://www.worldatwork.org/adimLink?id=75444,* at p.10.

[36] Internal Revenue Service. 2014. "Wages, Salaries, and Other Earnings." In: Internal Revenue Service. Your Federal Income Tax (Individuals). Available at *http://www.irs.gov/publications/p17/ch05.html;* and Internal Revenue Service. 2015. "What Is Earned Income?" Available at *http://www.irs.gov/Individuals/What-is-Earned-Income%3F.*

[37] U.S. Dept. of Labor, Bureau of Labor Statistics. "Fact Sheet for the June 2000 Employment Cost Index Release." Available at *http://www.bls.gov/ncs/ect/sp/ecrp0003.pdf.*

[38] John L. Bishow, U.S. Dept. of Labor, Bureau of Labor Statistics. "A Look at Supplemental Pay: Overtime Pay, Bonuses, and Shift Differentials." Available at *http://www.bls.gov/opub/mlr/cwc/a-look-at-supplemental-pay-overtime-pay-bonuses-and-shift-differentials.pdf* at pp 5–7. "Analysis is limited to jobs that receive positive payments—that is, those jobs that actually receive supplemental pay, as opposed to the average for all jobs—the percentage for each type of supplemental pay is higher."

counted as W–2 income but are not included in the OES definition.[39]

Using the W–2 definition is less likely to be burdensome for most respondents than using the OES wage definition. Federal law requires all employers to generate W–2s for each of their employees. Although W–2 data may not be routinely compiled until the end of the calendar year, and EEO–1 reports are due on September 30th, several approaches are possible. First, because payroll records are cumulative, generating reports at any given point in time should not be complicated for employers with automated payroll systems. The W–2 data can be imported into a HRIS, and a data field can be established to accumulate W–2 data for the EEO–1. Alternatively, employers could obtain this pay information by utilizing quarterly payroll reports for the previous four quarters. Employers that do their payroll in-house will be able to report this data utilizing most major payroll software systems or by using off-the-shelf payroll software that is preprogrammed to compile data for generating W–2s. For employers that outsource their payroll, there would be a one-time burden of writing custom programs to import the data from their payroll companies into their HRIS systems.

Organizing and Reporting W–2 Data

In determining how employers would be required to organize and report their employees' W–2 data, the focus was on collectability, burden, confidentiality, and data utility.[40] The NAS Report and the Pilot Study reviewed various alternative approaches for reporting compensation, which ranged from highly detailed to general. Of these alternatives, the most comprehensive collection proposals required collecting data at the individual employee level and would have included human capital qualifications data as well as pay data. Although these options would reduce ambiguity and help assess the existence of potential discrimination, they also raise significant confidentiality and burden concerns.[41]

Options for collecting aggregate pay data include using pay rates (calculated by employer), range of pay with a maximum and minimum provided by employer, total pay, and average or median pay. There are disadvantages to each of these approaches. Total pay

could be impractical and would be dependent on the number of employees. Average pay by occupation would provide limited information about variation. Collecting the range of pay or average pay could produce biased estimates as pay is often distributed in a manner where a few individuals are paid much more than others. This might create misleading data when ranges or means are used as a measure. Simply gathering rates of pay, without standard deviation measures, would not assist in parity/disparity analysis, and asking employers to calculate standard deviations would not only be burdensome but also would risk a higher rate of inaccuracy.

Using pay bands appears to be more likely to generate reliable data while being less burdensome for employers than other reporting alternatives. Therefore, Component 2 of the revised EEO–1 will collect aggregate W–2 data in 12 pay bands for the 10 EEO–1 job categories. Employers will simply count and report the number of employees in each pay band. For example, a filer will report on the EEO–1 that it employs 3 African American women as professionals in the highest pay band. As to data utility, pay bands will allow the EEOC to compute within-job-category variation, across-job-category variation, and overall variation, which would support the EEOC's ability to discern potential discrimination while preserving confidentiality.[42] At the same time, pay bands would not require the computation of mean earnings or a measure of variance as alternative approaches might, thus avoiding a source of employer burden. Finally, as distinguished from mean earnings, pay bands can effectively use statistical tests that do not rely on an assumption that pay is normally distributed.

By choosing to use pay bands, the EEOC also is adopting a methodology that will limit employer burden. HRIS software developers already are familiar with using pay bands on the EEO–4 survey, which collects pay data from state and local government employers.[43] By choosing to use pay bands for the EEO–1, the EEOC and OFCCP will allow HRIS software developers to build on their existing experience with the EEO–4. Consistent with the recommendations of the Pilot Study, however, the EEO–1 pay bands (Table 2) will track the 12

"wage intervals" used by the Bureau of Labor Statistics in the OES survey.[44]

TABLE 1—EEO–4 PAY BANDS

| Pay bands | Pay bands label |
|---|---|
| 1 | $100–$15,999. |
| 2 | $16,000–$19,999. |
| 3 | $20,000–$24,999. |
| 4 | $25,000–$32,999. |
| 5 | $33,000–$42,999. |
| 6 | $43,000–$54,999. |
| 7 | $55,000–$69,999. |
| 8 | $70,000 and over. |

TABLE 2—PROPOSED EEO—1 PAY BANDS

| Pay bands | Pay bands label |
|---|---|
| 1 | $19,239 and under. |
| 2 | $19,240–$24,439. |
| 3 | $24,440–$30,679. |
| 4 | $30,680–$38,999. |
| 5 | $39,000–$49,919. |
| 6 | $49,920–$62,919. |
| 7 | $62,920–$80,079. |
| 8 | $80,080–$101,919. |
| 9 | $101,920–$128,959. |
| 10 | $128,960–$163,799. |
| 11 | $163,800–$207,999. |
| 12 | $208,000 and over. |

Hours Worked

Consistent with the recommendations of the Pilot Study, Component 2 of the revised EEO–1 will collect the total number of hours worked by the employees included in each EEO–1 pay band cell. This data will allow analysis of pay differences while considering aggregate variations in hours. The total hours worked also will permit an analysis that accounts for periods when the employees were not employed, thus reflecting part-time work.[45]

The EEOC seeks employer input with respect to how to report hours worked for salaried employees. One approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers. The EEOC is not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers, to the extent that the employer does not currently maintain such

---

[39] The panel included individuals with expertise in HRIS and SAP, and in compensation, payroll, and benefits.

[40] Collecting Compensation Data from Employers, National Academies of Science *http://de.nlx.org/pdfs/20140825_nrc-report-august2012.pdf.*

[41] *See supra* note 19, at 2.

[42] *See also* Micklewright, John and Schnepf, Sylke V., How Reliable are Income Data Collected with a Single Question? (November 2007). *See also* IZA Discussion Paper No. 3177, *http://ftp.iza.org/dp3177.pdf.*

[43] *See* U.S. Equal Employment Opportunity Commission, EEO–4 Survey, *https://egov.eeoc.gov/eeo4/.*

[44] *See* Survey Methods and Reliability Statement for the May 2014 Occupational Employment Statistics Survey. *http://www.bls.gov/oes/current/methods_statement.pdf.*

[45] Collection of the hours-worked data will account for the fact that some individuals are employed for less than the entire reporting year, and therefore, may work fewer hours. For example, if a large number of women are hired part way into a reporting year, their W–2 compensation will be lower than the compensation of men who worked for the entire reporting year.

information. Employers are encouraged to comment on this issue.[46]

Generally, however, the initial conclusion is that requiring employers to provide the total number of hours worked would impose a minimal burden. Employers will report only data that they already maintain. The panel of HRIS experts convened for the Pilot Study reported that "total hours worked" data is maintained by almost all payroll systems. The information is available for the previous quarter, the previous four quarters, and the calendar year. For employers that outsource payroll, this variable could be added to the one-time reporting query that is written to download income data.

Analysis of W–2 Pay Data

Statistical tests will be used as an initial check of the W–2 data to be collected on the EEO–1, specifically, statistical significance tests that do not rely on an assumption of a normal distribution. The Pilot Study recommended several statistical techniques to test within-job categories and then suggested further examining companies and establishments with low probabilities that the differences between examined groups, such as men and women, occurred by chance.[47] The Pilot Study also noted that the issue of calibrating error rates (power vs. significance level) needed to be addressed to detect discrimination without suffering too many false positives. This process would include recognition of how sample sizes may influence results and also of judicial precedents regarding definitions of statistical probabilities.[48]

The EEOC and OFCCP plan to develop a software tool that will allow their investigators to conduct an initial analysis by looking at W–2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data.[49] This application would highlight statistics of interest.

Confidentiality

The EEOC and OFCCP jointly collect the data on the EEO–1 report through their Joint Reporting Committee, which has represented the two agencies for the purpose of administering the EEO–1 since the reporting requirement began. All data is initially submitted to the Joint Reporting Committee housed at the EEOC and then provided to OFCCP. EEOC is required to hold its EEO–1 data confidential under Section 709(e) of Title VII, which forbids "any [EEOC] officer or employee" from making "public in any manner whatever any information obtained by the Commission . . . prior to the institution of any [Title VII] proceeding . . . involving such information." 42 U.S.C. 2000e–8(e). Any EEOC officer or employee who violates this prohibition is guilty of a misdemeanor. *Id.*

The EEOC publishes aggregate EEO–1 data in a manner that does not reveal any particular employer's data, consistent with Section 709(e). For example, the EEOC has published aggregate EEO–1 data at the national, regional, and industry levels.[50] The EEOC also publishes reports analyzing aggregate EEO–1 data based on industry (*e.g.*, finance, media, and law firms) or

particular groups of people (*e.g.*, women of color).[51]

After collecting and reconciling EEO–1 data, the Joint Reporting Committee at the EEOC provides a database to OFCCP. OFCCP holds confidential the data for contractor filers to the maximum extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act.[52] With respect to EEO–1 data for companies that are not under OFCCP's jurisdiction, the confidentiality provisions of Section 709(e) apply.[53] Accordingly, OFCCP refers all requests for such data to the EEOC for a response.

*Paperwork Reduction Act Statement*

The EEOC intends to submit to OMB a request for a three-year PRA approval of a revised EEO–1. The revised EEO–1 data collection has two components. The first component (Component 1) will collect information identical to that collected by the currently approved EEO–1. The second component (Component 2) will collect data on employees' W–2 pay and hours worked. Component 1 can be found at *http://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.* An illustration of the data to be collected by both Components 1 and 2 can be found at *http://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm.*

For the 2016 reporting cycle, EEO–1 filers would only submit the Component 1 data. Beginning with the 2017 reporting cycle, the EEOC proposes to

---

[46] Some commentators on OFCCP's proposed data collection suggested that hours-worked data should not be collected based, in part, on their concerns that the collection would be burdensome and that some employers do not collect this data for exempt employees. For this reason, the EEOC encourages employers to provide specific, detailed input on this aspect of its proposed data collection.

[47] For example, the Pilot Study recommends using the Mann-Whitney test for grouped data and comparison of two groups (for example, gender (men versus women) or race (African Americans versus Whites)), and the Kruskal-Wallis test for comparison of more than two groups (*e.g.*, race). These tests are the most appropriate for an initial review of establishments as a whole. Analyses can be conducted by computing the statistical tests within job categories and then proceeding to more closely investigate companies and establishments with low *p*-values. Interval regressions can be used to examine the impact of hours worked, race and gender on distributions within pay bands. It may also be appropriate to compare a particular firm's regression coefficients for the hours worked, race and gender variables to those derived from an analysis of the relevant labor market as a whole.

[48] The EEOC's statistical analysis techniques are consistent with judicially recognized statistical standards for identifying meaningful discrepancies. *Hazelwood Sch. Dist.* v. *United States,* 433 U.S. 299,

311 n.17 (1977) ("a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to [a protected trait]);" *see also, Wright* v. *Stern,* 450 F.Supp.2d 335, 363 (S.D.N.Y. 2006) (court denied employer's motion for summary judgment, concluding that the plaintiffs presented sufficient statistical and other evidence for a jury to conclude that the employer engaged in widespread discrimination against African-American and Hispanic employees, in terms of promotions and compensation. The court noted that, "[t]hough not dispositive, statistics demonstrating a disparity of two standard deviations outside of the norm are generally considered statistically significant.")

[49] Operationally, this application, or dashboard, could relate the nominal results of statistical tests (that is, test statistics or their *p*-values) to those encountered in the location and the labor market based on the relevant industry and geography. On such a dashboard, the EEOC investigator would see technical information such as the values of the main statistics used to describe the establishment, and its relation to the same statistic encountered in other comparable establishments.

[50] *See* U.S. Equal Employment Opportunity Commission, "Job Patterns for Minorities and Women in Private Industry (EEO–1), *http://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm.*

[51] *See* U.S. Equal Employment Opportunity Commission, Special Reports, *http://www.eeoc.gov/eeoc/statistics/reports/index.cfm.*

[52] *See* 5 U.S.C. 552 (b)(4). FOIA does not apply to "'trade secrets and commercial or financial information obtained from a person and privileged or confidential"; 18 U.S.C. 1905. Under the Trade Secrets Act, criminal penalties may apply to an officer or employee of the United States who "publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law . . . confidential statistical data. . . ." See also 79 FR 46562 at 46583 (August 8, 2014).

[53] *See* relevant Paperwork Reduction Act provision, 44 U.S.C. 3510. "(a) The Director may direct an agency to make available to another agency, or an agency may make available to another agency, information obtained by a collection of information if the disclosure is not inconsistent with applicable law. (b)(1) If information obtained by an agency is released by that agency to another agency, all the provisions of law (including penalties) that relate to the unlawful disclosure of information apply to the officers and employees of the agency to which information is released to the same extent and in the same manner as the provisions apply to the officers and employees of the agency which originally obtained the information. (2) The officers and employees of the agency to which the information is released, in addition, shall be subject to the same provisions of law, including penalties, relating to the unlawful disclosure of information as if the information had been collected directly by that agency."

require EEO–1 filers with 100 or more employees to submit Component 2 data in addition to Component 1 data. However, contractor filers with 50 to 99 employees will only submit Component 1 data.

*2016 Overview of Information Collection—Component 1*

*Collection Title:* Employer Information Report (EEO–1).

*OMB Control Number:* 3046–0007.

*Frequency of Report:* Annual.

*Description of Affected Public:* Private industry filers with 100 or more employees and federal government contractor filers with 50 or more employees.

*Number of Respondents:* 67,146.

*Reporting Hours:* 228,296.4.

*Respondent Burden Hour Cost:* $5,531,621.77.

*Federal Cost:* $1,330,821.

*Number of Forms:* 1.

*Form Number:* EEOC Form 100.

*2017 and 2018 Overview of Information Collection—Components 1 and 2*

*Collection Title:* Employer Information Report (EEO–1).

*OMB Control Number:* 3046–0007.

*Frequency of Report:* Annual.

*Number of Forms:* 1.

*Form Number:* EEOC Form 100.

*Federal Cost:* $318,000 for one-time costs and $1,621,300 [54] for recurring staffing costs.

Component 1 (Demographic and Job Category Data)

*Description of Affected Public:* In 2017 and 2018, contractor filers with 50 to 99 employees will submit only the demographic and job category data collected by Component 1.

*Number of Respondents:* 6,260.

*Reporting Hours:* 21,284.

*Respondent Burden Hour Cost:* $515,711.32.

Components 1 and 2 (Demographic and Job Category Data Plus Pay and Hours-Worked Data)

*Description of Affected Public:* In 2017 and 2018, EEO–1 filers with 100 or more employees will submit pay and hours-worked data under Component 2 in addition to the demographic and job category data under Component 1.

*Number of Respondents:* 60,886.

*Reporting Hours:* 401,847.6.

*Respondent Burden Hour Cost:* $9,736,767.35.

*PRA Burden Statement*

2016: Component 1

*Burden Statement:* In 2016, all EEO–1 filers will submit only Component 1, which includes the data collected by the currently approved EEO–1. The estimated number of respondents required to submit the annual EEO–1 survey is 67,146.[55] This data collection is estimated to impose 228,296.4 burden hours in 2016 or 3.4 hours per filer.[56] See Table 3. The estimated burden is based on electronic, rather than paper filing, which significantly reduces the survey burden.

## TABLE 3—ANNUAL BURDEN—2016 (COMPONENT 1)

[All EEO–1 filers: Private industry employers with 100 or more employees and Federal Government contractors and first-tier subcontractors with 50 or more employees]

| | Annual burden hours | Filers | Total annual burden hours | Wage rate | Total burden hour cost |
|---|---|---|---|---|---|
| Reading instructions ......................................... | 0.5 | 67,146 | 33,573 | $24.23 | $813,473.79 |
| Collecting, verifying, validating and reporting data ........... | 2.9 | 67,146 | 194,723.4 | 24.23 | 4,718,147.98 |
| Total ......................................................... | 3.4 | 67,146 | 228,296.4 | ........................ | 5,531,621.77 |

2017 and 2018: Components 1 and 2

*Burden Statement—Component 1 Only:* Starting in 2017, the estimated number of annual respondents who are contractor filers with 50 to 99 employees is 6,260.[57]

The burden on these contractor filers is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours required to complete Component 1 of the EEO–1 data collection in 2017 and 2018 is 21,284, with an associated total annual burden hour cost of $515,711.32.[58] See Table 4.

*Burden Statement—Components 1 and 2:* Starting in 2017, the estimated number of annual respondents that will submit Components 1 and 2 is 60,886 private industry and contractor filers. Filers required to complete both Components 1 and 2 are estimated to incur 401,847.6 burden hours annually or 6.6 hours per filer. The estimated burden is based on electronic, rather than paper, filing, which significantly reduces the survey burden.

The burden imposed on all private industry employer filers and contractor filers with 100 or more employees as a result of the proposed collection of W–2 pay data is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours needed for filers to report demographic and W–2 pay data via Components 1 and 2 of the revised EEO–1 Report is 401,847.6, with an associated total annual burden hour cost of $9,736,767.35. This burden estimate includes reading instructions and collecting, merging, validating, and reporting the data electronically.[59] See Table 4.

---

[54] The addition of W–2 pay data to the EEO–1 is expected to increase EEOC's internal staffing costs by approximately $290,478. The annual federal cost figure of $1,621,300 includes both the increase in contract costs resulting from the addition of the pay data collection and the estimated internal staffing costs. It reflects an increase of more than $290,478 compared to the estimated federal costs provided in previously published **Federal Register** notices seeking PRA approval of this information collection because past estimates reflected the cost of the contract with the vendor whose services the EEOC

procures to assist with administration and processing of the EEO–1 but did not include EEOC's internal staffing costs associated with processing the EEO–1.

[55] In 2014, 67,146 firms filed EEO–1 reports.

[56] In 2014, all but three reporting firms submitted electronic, rather than paper survey responses. These burden estimates assume that virtually all respondents will continue to file electronically.

[57] Of the 67,146 firms that filed EEO–1 reports in 2014, 6,260 were federal contractor filers with fewer than 100 employees.

[58] This estimate is calculated as follows: 3.4 hours per respondent × 6,260 respondents = 21,284 hours × $24.23 per hour = $515,711.32. See Bureau of Labor Statistics in the publication "Employer Costs for Employee Compensation" (December 2013), which lists total compensation for administrative support as $24.23 per hour, *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (last accessed September 23, 2014).

[59] This estimate is calculated as follows: 6.6 hours per respondent × 60,886 respondents = 401,847.6 hours × $24.23 per hour = $9,736,767.35. See

Continued

• *One-Time Implementation Burden:* The estimated one-time implementation burden hour cost for submitting the information required by Component 2 of the revised EEO–1 Report is $23,000,295.[60] This calculation is based

on the one-time cost for developing queries related to Component 2 in an existing human resources information system, which is estimated to take 8 hours per filer at a wage rate of $47.22 per hour.

Further, the EEOC estimates that the addition of W–2 pay data to the EEO–1 will raise its internal staffing cost by $290,478 due to the increased staff time needed to process the additional data.

TABLE 4—ANNUAL BURDENS—2017 AND 2018

[Revised EEO–1 Data Collection—Components 1 and 2]

| Annual burden | Annual burden hours | Filers | Total annual burden hours | Wage rate | Total annual burden hour cost |
|---|---|---|---|---|---|
| **Component 1 Only** Contractor filers with 50 to 99 employees | | | | | |
| Reading instructions ................................. | 0.5 | 6,260 | 3130 | $24.23 | $75,839.90 |
| Collecting, verifying, validating and reporting data ........ | 2.9 | 6,260 | 18,154 | 24.23 | 439,871.42 |
| Total Annual Burden for Filers Submitting Component 1 ................................................ | 3.4 | 6,260 | 21,284 | ....................... | 515,711.32 |
| **Components 1 and 2** All private industry employer filers, as well as contractor filers with 100 or more employees | | | | | |
| Reading instructions ................................. | 1 | 60,886 | 60,886 | 24.23 | 1,475,268 |
| Collecting, verifying, validating and reporting data ........ | 5.6 | 60,886 | 340,961.6 | 24.23 | 8,261,499.35 |
| Total Annual Burden for Filers Submitting Components 1 and 2 ................................................ | 6.6 | 60,886 | 401,847.6 | ....................... | 9,736,767.35 |
| **Total Annual Burden—All Filers** | | | | | |
| Total for Revised EEO–1 ................................. | ....................... | 67,146 | 423,131.6 | ....................... | 10,252,478.67 |

The reporting hour burden calculations in this notice reflect a departure from the manner in which the EEOC traditionally has estimated reporting burden. In the past, the EEOC estimated the reporting hour burden based on the number of total cells in the report(s) that a firm had to complete. This approach viewed each report filed by a firm as a separate reporting requirement, analogous to a paper report. In reporting year 2014, however, the number of paper reports declined to just three. In addition, employers now rely extensively on automated HRIS to generate the information they submit on the EEO–1 report.[61] As a result, each additional report filed has just a marginal additional cost.[62] To accurately reflect the manner in which employers now collect and submit the data for filing, the estimated reporting burden set forth in this notice is calculated per firm, rather than per

report. This burden calculation is based on the time spent on the tasks involved in filing the survey, rather than on "key strokes" or data entry. As such, it more accurately reflects how virtually all employers actually complete the EEO–1 and the EEOC's practice of providing filers alternative methods for filing their reports such as data uploads using various formats and online filing.

The EEOC seeks employer input on this burden calculation. The EEOC reviewed OFCCP's ANPRM and NPRM and the public comments relating to the burden calculation for OFCCP's proposal to collect pay data and consulted with OFCCP about burden estimates.[63] The Pilot Study approached some private employers to seek data about the possible cost of collecting pay information but few employers responded, and the employers that did respond did not provide quantitative feedback. The EEOC encourages

employers, in their comments responding to paragraph 2 in the "Solicitation of Public Comment" section below, to provide: (1) Quantitative information about the burden associated with completing the currently approved EEO–1, as well as the anticipated estimated burden to also submit pay and hours-worked data, and (2) data regarding the estimated time that staff will spend to report the employer's pay and hours-worked data and the corresponding wage rates for that staff.

Solicitation of Public Comment: Pursuant to the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35, and OMB regulation 5 CFR 1320.8(d)(1), the Commission solicits public comment to enable it to:

1. Evaluate whether the proposed collection of information is necessary for the proper performance of the Commission's functions, including

Bureau of Labor Statistics in the publication "Employer Costs for Employee Compensation" (December 2013), which lists total compensation for administrative support as $24.23 per hour, *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (last accessed September 23, 2014).

[60] This is estimate is calculated as follows: 8 hours per respondent × 60,886 employers = 487,088 × $47.22 per hour = $23,000,295. See Bureau of Labor Statistics in the publication "Employer Costs

for Employee Compensation" (December 2013), which lists total compensation for a professional as $47.22 per hour, *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (last accessed September 23, 2014).

[61] Surveys have shown that more than 90 percent of human resource departments operate with some form of computerized HRIS. *See Public Personnel Management,* Volume 39, No. 3, Fall 2010.

[62] In fact, a number of firms file by uploading a data file so that the information goes nearly directly

from an electronic file generated by the HRIS to the survey data base. In 2014, 1,449 firms filed EEO–1 reports by uploading a data file, accounting for 704,654 of the EEO–1 reports filed in that year.

[63] OFCCP plans to utilize EEO–1 pay data for federal contractors with 100 or more employees instead of implementing a separate compensation data survey as outlined in its August 8, 2014, NPRM.

whether the information will have practical utility;

2. Improve the accuracy of the Commission's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are required to respond, including the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

## Conclusion

This notice summarizes the EEOC's proposal to submit a revised EEO–1 to OMB for 3-year PRA approval to require private employer filers, as well as most federal government contractor filers, to submit data on employee pay starting with the 2017 reporting cycle. This data collection would meet the statistical needs of both the EEOC and OFCCP. It would also enable employers to self-assess their pay practices and policies and thereby support voluntary compliance. In developing this PRA proposal, the EEOC has balanced enforcement objectives with the burden and confidentiality concerns of respondents.

Dated: January 21, 2016.

For the Commission.

**Jenny R. Yang,**

*Chair.*

[FR Doc. 2016–01544 Filed 1–29–16; 8:45 am]

**BILLING CODE 6570–01–P**

---

# FEDERAL COMMUNICATIONS COMMISSION

## Sunshine Act Meeting

January 21, 2016.

The Federal Communications Commission will hold an Open Meeting on the subjects listed below on Thursday, January 28, 2016, which is scheduled to commence at 10:30 a.m. in Room TW–C305, at 445 12th Street SW., Washington, DC.

| Item No. | Bureau | Subject |
|---|---|---|
| 1 .................. | MEDIA ...................................................... | TITLE: Expansion of Online Public File Obligations to Cable and Satellite TV Operators and Broadcast and Satellite Radio Licensees (MB Docket No. 14–127). SUMMARY: The Commission will consider a Report and Order which modernizes the public inspection file rules by requiring cable and satellite TV operators and broadcast and satellite radio companies to post public inspection files on the FCC's online database. |
| 2 .................. | PUBLIC SAFETY & HOMELAND SECURITY. | TITLE: Amendment of Commission's Rules Regarding the Emergency Alert System (PS Docket No. 15–94) and Wireless Emergency Alerts (PS Docket No. 15–91). SUMMARY: The Commission plans to discuss strengthening the Emergency Alert System (EAS) by promoting participation on the state and local levels, supporting greater testing and awareness of EAS, leveraging technological advances, and bolstering EAS security. |
| 3 .................. | WIRELINE COMPETITION AND WIRELESS TELE-COMMUNICATIONS. | TITLE: Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act (GN Docket No. 15–191). SUMMARY: The Commission will consider the 2016 Broadband Progress Report examining whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion, pursuant to Section 706 of the Telecommunications Act of 1996. |

\*    \*    \*    \*    \*

**Consent Agenda**

The Commission will consider the following subjects listed below as a consent agenda and these items will not be presented individually:

| | | |
|---|---|---|
| 1 .................. | GENERAL COUNSEL .............................. | TITLE: Mitchell F. Brecher Request for Inspection of Records (FOIA Control No. 2014–338). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by Mitchell F. Brecher regarding the denial of his request for inspection of records under the Freedom of Information Act. |
| 2 .................. | GENERAL COUNSEL .............................. | TITLE: SMS/800 Inc. Request for Inspection of Records (FOIA Control No. 2015–044). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by SMS/800 Inc. regarding the release of records pertaining to SMS/800 Inc. in response to a request for inspection of records under the Freedom of Information Act filed by Mark Lewyn. |
| 3 .................. | GENERAL COUNSEL .............................. | TITLE: Rachel A. Avan Request for Inspection of Records (FOIA Control No. 2014–572). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by Rachel A. Avan regarding the denial of her request for inspection of records under the Freedom of Information Act. |
| 4 .................. | GENERAL COUNSEL .............................. | TITLE: Russell Carollo Request for Inspection of Records (FOIA Control No. 2015–553). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by Russell Carollo regarding the partial denial of his request for inspection of records under the Freedom of Information Act. |

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, I electronically filed the foregoing

Joint Appendix with the Clerk of the Court for the United States Court of Appeals for

the District of Columbia Circuit by using the appellate CM/ECF system. Participants

in the case are registered CM/ECF users, and service will be accomplished by the

appellate CM/ECF system.


*/s/ Lindsey Powell*
LINDSEY POWELL