[ORAL ARGUMENT NOT SCHEDULED]
No. 19-5130

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL WOMEN'S LAW CENTER, ET AL.,

*Plaintiffs-Appellees,*

v.

OFFICE OF MANAGEMENT AND BUDGET, ET AL.,

*Defendants-Appellants.*

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, HR POLICY ASSOCIATION, THE NATIONAL ASSOCIATION OF MANUFACTURERS, AMERICAN BANKERS ASSOCIATION, AMERICAN SOCIETY OF EMPLOYERS, ASSOCIATED BUILDERS AND CONTRACTORS, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, CENTER FOR WORKPLACE COMPLIANCE, INSTITUTE FOR WORKPLACE EQUALITY, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, NATIONAL RETAIL FEDERATION, RESTAURANT LAW CENTER, RETAIL LITIGATION CENTER, INC., AND SOCIETY FOR HUMAN RESOURCE MANAGEMENT AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS SUPPORTING REVERSAL**

On Appeal from the U.S. District Court for the District of Columbia
Case No. 1:17-cv-02458-TSC, Hon. Tanya S. Chutkan

Daryl Joseffer
Jonathan Urick
**U.S. CHAMBER LITIGATION CENTER**
1615 H STREET, NW
WASHINGTON, DC 20062
(202) 463-5337
DJoseffer@USChamber.com

**CO-COUNSEL, THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**

Camille A. Olson
Richard B. Lapp
Annette Tyman
Andrew Cockroft
**SEYFARTH SHAW LLP**
233 S. WACKER DR., SUITE 8000
CHICAGO, IL 60606
(312) 460-5000
colson@seyfarth.com
Lawrence Z. Lorber
975 F. STREET, NW
WASHINGTON D.C.  20004
(202)463-2400
llorber@seyfarth.com
**COUNSEL FOR ALL *AMICI***

## ADDITIONAL CO-COUNSEL

G. Roger King
McGuinness, Yager & Bartl LLP
1100 13th Street, NW, Suite 850
Washington, DC 20005
(202) 375-5004
rking@hrpolicy.org
*Co-Counsel, HR Policy Association*

Peter C. Tolsdorf
Leland P. Frost
Manufacturers' Center for Legal Action
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000
ptolsdorf@nam.org
lfrost@nam.org
*Co-Counsel, The National Association of Manufacturers*

Thomas Pinder
American Bankers Association
1120 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 663-5028
tpinder@aba.com
*Co-Counsel, American Bankers Association*

Rae R. Vann
Michael J. Eastman
NT LAKIS, LLP
1501 M Street, N.W.
Suite 1000
Washington, DC 20005
(202) 629-5600
rvann@ntlakis.com
meastman@ntlakis.com
*Co-Counsel, Center for Workplace Compliance*

David S. Fortney
Fortney & Scott
1750 K St., NW, Suite 325
Washington, DC 20006
(202) 689-1200
dfortney@fortneyscott.com
*Co-Counsel, The Institute for Workplace Equality*

Elizabeth Milito
National Federation of Independent Business
53 Century Blvd., Suite 250
Nashville, TN 37214
(800) 634-2669
Elizabeth.Milito@NFIB.ORG
*Co-Counsel, National Federation of Independent Business*

Stephanie Martz
National Retail Federation
1101 New York Avenue NW
Suite 1200
Washington, DC 20005
(202) 783-7971
martzs@nrf.com
*Co-Counsel, National Retail Federation*

Angelo I. Amador
Restaurant Law Center
2055 L Street, NW
Seventh Floor
Washington, DC 20036
(202) 331-5913
AAmador@restaurant.org
*Co-Counsel, Restaurant Law Center*

Deborah White
Retail Litigation Center, Inc.
1700 N. Moore Street, Suite 2250
Arlington, VA 22209
(703) 600-2067
Deborah.White@rila.org
*Co-Counsel, Retail Litigation Center, Inc.*

James Banks, Jr.
Society for Human Resource Management
1800 Duke Street
Alexandra, VA 22314
(800) 283-7476
James.BanksJr@shrm.org
*Co-Counsel, Society for Human Resource
Management*

# CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

A.  <u>Parties and *Amici*</u>.  All parties appearing in this Court are listed in the Brief for Appellants.  All *Amici* participating in the district court are listed in the Brief for Appellants.  All *Amici* participating as *Amici Curiae* in support of Appellants in this Court are listed in the caption of this brief and in the Corporate Disclosure Statement.

B.  <u>Rulings Under Review</u>.  An accurate reference to the rulings at issue appears in the Brief for Appellants.

C.  <u>Related Cases</u>.  An accurate statement regarding related cases appears in the Brief for Appellants.

Respectfully submitted,

DATED: August 26, 2019          SEYFARTH SHAW LLP


<u>By  /s/  Camille A. Olson</u>
        CAMILLE A. OLSON

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *Amici* submit the following corporate disclosure statement.

The Chamber of Commerce of the United States of America ("Chamber") has no parent corporation or publicly held company that owns 10% or more of its stock.

HR Policy Association ("HRPA") has no parent corporation or publicly held company that owns 10% or more of its stock.

The National Association of Manufacturers ("The NAM") has no parent corporation or publicly held company that owns 10% or more of its stock.

American Bankers Association ("ABA") has no parent corporation or publicly held company that owns 10% or more of its stock.

American Society of Employers ("ASE") has no parent corporation or publicly held company that owns 10% or more of its stock.

Associated Builders and Contractors ("ABC") has no parent corporation or publicly held company that owns 10% or more of its stock.

Associated General Contractors of America ("AGC") has no parent corporation or publicly held company that owns 10% or more of its stock.

Center For Workplace Compliance (formerly the Equal Employment Advisory Council ("EEAC")) ("CWC") has no parent corporation or publicly held company that owns 10% or more of its stock.

The Institute For Workplace Equality (formerly The OFCCP Institute) ("the Institute") has no parent corporation or publicly held company that owns 10% or more of its stock.

National Federation of Independent Business ("NFIB") has no parent corporation or publicly held company that owns 10% or more of its stock.

National Retail Federation ("NRF") has no parent corporation or publicly held company that owns 10% or more of its stock.

The Restaurant Law Center ("RLC") has no parent corporation or publicly held company that owns 10% or more of its stock.

The Retail Litigation Center, Inc. ("The RLC") has no parent corporation or publicly held company that owns 10% or more of its stock.

Society For Human Resource Management ("SHRM") has no parent corporation or publicly held company that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE PURSUANT TO FED. R. APP. P. 29(A)(4)(D) ................. 1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ......... 5

SUMMARY OF ARGUMENT ................................................................. 6

ARGUMENT ...................................................................................... 9

I.    The District Court Should Have Remanded To OMB Rather Than Crafting Its Own Remedy Because OMB's Substantial Administrative Record Identified Significant PRA Deficiencies With EEOC's Proposed Revisions To the EEO-1 Report ........................................................... 9

    A.    The Record Before OMB Showed EEOC's Burden Estimates Vastly Understated The True Costs of Compliance ................................ 11

        1.    The Record Before OMB Demonstrated EEOC's One-Time Burden Estimate Was Unrealistic ........................................ 12

        2.    The Record Before OMB Demonstrated EEOC's Annual Burden Estimate Was Similarly Unrealistic ................................... 15

    B.    The Record Before OMB Showed Questionable To No Public Benefit of The Revised EEO-1 ................................................... 17

        1.    OMB's Record Included Evidence That EEO-1 Pay Data Would Not Assist in Early Assessment of Discrimination Charges ........................................................................... 18

        2.    OMB's Record Included Evidence that EEOC's Stated Plan To  Publish Aggregate EEO-1 Data Provides No Utility ............................................................................. 20

    C.    The Record Before OMB Showed That EEOC Failed To Demonstrate That It Had Put In Place Appropriate Safeguards To Protect Confidentiality .......................................................... 21

II.   The District Court's Order Compounds The Problems With Burden, Utility, and Confidentiality On An Ongoing Basis .............................. 23

    A.    Retroactive Data Collection Raises Serious Reliability Concerns ........... 24

    B.    The District Court Heightened The Costs and Burdens of Component 2 Beyond What EEOC Presented to OMB ........................ 26

    C.    Not Following Industry Standards For Data Collection Aggravates Confidentiality Concerns ........................................................ 28

CONCLUSION ................................................................................................. 29

CERTIFICATE OF COMPLIANCE ................................................................. 33

CERTIFICATE OF SERVICE ........................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Food Marketing Institute v. Argus Leader Media*,
___ U.S. ___, 139 S. Ct. 2356 (2019) ........................................................ 23

*Holbrook v. Reno,*
196 F.3d 255, 261 (D.C. Cir. 1999) ......................................................... 19

*Spencer v. Virginia State University*,
919 F.3d 199 (4th Cir. 2019) ..................................................................... 19

## Statutes

Paperwork Reduction Act:
44 U.S.C. § 3500, *et. seq*.......................................................... 6, 9, 18, 24, 27
44 U.S.C. § 3504(c) ................................................................................. 10

## Other Authorities

EEO-4, EEOC, *available at* https://egov.eeoc.gov/eeo4/ (last visited
Aug. 21, 2019) ........................................................................................... 20

Fed. R. App. P. 29(a)(2) ................................................................................ 1

Fed. R. App. P. 29(a)(4)(D) .......................................................................... 1

Fed. R. App. P. 29(a)(4)(E)........................................................................... 4

U.S. Equal Emp't Comm'n, Component 2 EEO-1 Online Filing System,
https://eeoccomp2.nor.org/Index (last visited Aug. 23, 2019) ............... 23

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLS | Bureau of Labor Statistics |
| DOJ | Department of Justice |
| EEO-1 | EEO-1 Report |
| EEOC | Equal Employment Opportunity Commission |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| NAS | National Academy of Sciences |
| Consortium | National Payroll Reporting Consortium, Inc. |
| OFCCP | Office of Federal Contract Compliance Programs |
| OMB | Office of Management and Budget |
| PRA | Paperwork Reduction Act |
| SJA | Supplemental Joint Appendix |

### *Amici Curiae*

| | |
|---|---|
| ABA | American Bankers Association |
| ABC | Associated Builders and Contractors |
| AGC | Associated General Contractors of America |
| ASE | American Society of Employers |

| | |
|---|---|
| Chamber | The Chamber of Commerce of the United States of America |
| CWC | Center for Workplace Compliance |
| HRPA | HR Policy Association |
| The Institute | The Institute for Workplace Equality |
| NAM | The National Association of Manufacturers |
| NFIB | National Federal of Independent Business |
| NRF | National Retail Federation |
| RLC | The Restaurant Law Center |
| The RLC | The Retail Litigation Center, Inc. |
| SHRM | Society For Human Resource Management |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Appellants.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE PURSUANT TO FED. R. APP. P. 29(a)(4)(D)

*Amici* are authorized to file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) because all parties consent to its filing. *Amici* have a strong interest that differs from the parties'. The district court ordered the Equal Employment Opportunity Commission ("EEOC") to conduct a highly burdensome collection of information from employers, even though the collection will have little if any practical utility and will raise serious confidentiality concerns. The costs of gathering and reporting the required information, as well as the risk of improper public disclosure of this sensitive, confidential business information, fall largely on employers, not on the government. Employers represented by *Amici* thus have a distinct and important interest in this case.

The Chamber is the world's largest business federation, representing 300,000 direct members and indirectly representing the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.

HRPA represents the chief human resource officers of more than 375 of the largest corporations doing business in the United States and globally. Since its founding, one of HRPA's principle missions has been to ensure that laws and policies affecting human resources are sound, practical, and responsive to labor and employment issues arising in the workplace.

The NAM is the largest manufacturing association in the United States. It represents small and large manufacturers in every industrial sector. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

ABA is the principal trade association of the banking industry. It represents banks and holding companies of all sizes, as well as savings associations, trust companies, and savings banks.

ASE supports Michigan's business community through the information and programming it provides to its 760 employer members to assist them in meeting their compliance obligations and to be employers of choice.

ABC represents more than 21,000 members, including all specialties within the U.S. construction industry, and is comprised primarily of firms that perform work in the industrial and commercial sectors, as well as government contractors.

AGC is a nationwide trade association of construction companies, with more than 26,000 members. Its members construct public and private buildings as well as other structures.

CWC is the nation's leading association of employers dedicated exclusively to helping its members develop practical and effective programs for ensuring compliance with fair employment and other workplace requirements. Its membership includes more than 200 major U.S. corporations, collectively providing employment to millions

of workers. CWC's directors and officers include many of the industry's leading experts in the field of equal employment opportunity and workplace compliance.

The Institute is a national organization that trains and educates federal contractors and subcontractors in understanding and complying with their affirmative action and equal employment obligations. The Institute's members are representative of nine diverse industries, with over 498,000 employees, and a total of 8,965 separate establishments.

NFIB represents small businesses in Washington, D.C., and all 50 state capitals. NFIB's mission is to promote and protect the right of its members to own, operate and grow their businesses.

NRF is the world's largest retail trade association; it represents all aspects of the retail industry. NRF's membership includes discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers.

RLC is a public policy organization affiliated with the National Restaurant Association, the largest non-profit, tax exempt trade association representing the restaurant and foodservice industry. RLC was created in 2015 to provide courts with the industry's perspective on legal issues significantly impacting the industry.

The RLC's members include many of the nation's largest and most innovative retailers. Those retailers employ millions of workers throughout the United States.

The RLC is the only trade association dedicated to representing the retail industry in the judiciary.

SHRM works to create better workplaces where employers and employees thrive together.  As the voice of all things work, workers and the workplace, SHRM is the foremost expert, convener and thought leader on issues impacting today's evolving workplaces.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for a party authored this brief in whole or in part, and no person other than *Amici*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

*Amici* fully agree with the government's arguments and will not belabor them. In our view, the administrative record amply supports OMB's stay decision under the Paperwork Reduction Act ("PRA") by showing that the proposed Component 2 data collection imposes high burdens, with little if any utility, and raises serious unresolved confidentiality concerns. However, even if plaintiffs had standing and the district court properly vacated the stay (points with which we do not agree), the court still had no authority to order EEOC to collect Component 2 data, much less to do so on the timetable and in the manner prescribed by that court.

This brief focuses on the practical significance of that remedial error. In short, the court required EEOC to collect this information without any meaningful consideration of the extensive administrative record and other evidence showing that the information collection was not compliant with the PRA and unwarranted.

If the district court had simply vacated OMB's stay and remanded to that agency, OMB and EEOC each could have considered whether EEOC should proceed with a Component 2 information collection and, if so, how. OMB could have reviewed and reconsidered the administrative record in conducting a final review under the PRA of EEOC's proposed information collection. Then OMB could have made a final decision with a reasoned explanation, ultimately concluding the review it began in August 2017.

6

Even apart from OMB's decision, EEOC could have considered, in light of changed circumstances and newly available information, whether it still wanted to collect the Component 2 data, and, if so, in what way. For example, EEOC could have considered when it would be reasonable to require employers to submit information, and for what time period.

But the district court's remedial orders took those decisions away from the agencies Congress charged to make them. The court's failure to follow basic rules of administrative procedure -- by requiring and managing an information collection by EEOC instead of just remanding to OMB -- thus had far more than procedural consequences. It forced an outcome with no regard whatsoever for the consequences imposed on the regulated parties – here, employers – that the PRA is designed to protect. This brief details those consequences, which thus far have received scant consideration in this litigation, even though they were set forth in detail in the record before OMB as well as in the *Amici* briefs submitted to the district court. That record fully supports OMB's conclusion that the revised EEO-1 imposes unwarranted burdens, lacks utility, and raises significant confidentiality concerns.

***First***, when EEOC initially proposed the Component 2 data collection, it vastly underestimated the burden on employers. OMB's record includes a detailed economic survey demonstrating that employers would annually spend over $400 million in pure labor costs alone, carrying a total annual burden of $1.3 billion in

overhead costs, and an estimated $178 million in one-time costs for the design, testing, and implementation of information systems.

**Second,** OMB's record shows that the Component 2 data collection will have little to no practical utility and certainly not sufficient utility to justify the burden on employers. Before OMB, EEOC conceded that it "does not intend or expect that this data will identify specific, similarly situated comparators or that it will establish pay discrimination as a legal matter." JA 348.

**Third**, OMB's record supports its conclusion that the Component 2 collection jeopardizes the confidentiality of employer data. For example, the National Academy of Sciences ("NAS") prepared a report finding that "[e]mployee compensation data are generally considered to be highly sensitive," but "EEOC provides [this] data to agencies that do not have the same level of confidentiality protections" and ineffective protection of this information "could lead to serious consequences and result in substantial harm." SJA 183, 262-263.

**Finally,** the district court made all of those matters worse by fashioning a remedy itself that required the government to proceed with a hasty collection of data without regard to employer burdens, industry standards for reliable collection of data, or confidentiality issues. EEOC Chief Data Officer Dr. Samuel Haffer testified that the July 15-September 30 deadline for compliance "did not" account for the "employer burden concerns" or the time it would reasonably take employers to comply. JA 96.

Dr. Haffer further testified that this sensitive and confidential data will *not* be collected pursuant to applicable industry standards because a collection under those standards could not occur until 2021. The upshot is a "high cost" to employers with "ramifications for the quality of information that EEOC collects." Brief of Appellant at 30.

To be clear, this Court need not itself decide questions like burden, utility, and confidentiality in the first instance. But it should understand their weighty nature and the importance of allowing the administrative agencies to consider them and exercise their own judgment.

## ARGUMENT

I.    **The District Court Should Have Remanded To OMB Rather Than Crafting Its Own Remedy Because OMB's Substantial Administrative Record Identified Significant PRA Deficiencies With EEOC's Proposed Revisions To the EEO-1 Report**

After the district court granted plaintiffs' motion for summary judgment and vacated OMB's stay of the Revised EEO-1, the court stated that "it must fashion an appropriate remedy." JA 172. The court refused to remand for further consideration by OMB of its stay decision, finding it is "unlikely that the government could justify its decision on remand….The government's deficiency is not that it failed to explain OMB's 'reasoning' but that OMB's reasoning lacked support in the record." JA 173. That was wrong because, as detailed below, OMB's record contained significant support for its reasoning, support the district court all but ignored.

9

The district court further erred by taking another, extraordinary step: requiring EEOC to collect Component 2 data and micromanaging important aspects of that collection.  Even if the record before OMB had not been sufficient to justify a stay, the court had authority only to make that determination and vacate the stay.  *See* Br. for Appellant 26-34.  OMB could have then completed its final review of the Component 2 collection under the PRA, and EEOC also could have reconsidered whether it still wanted to proceed with a Component 2 collection (which is not mandated by statute) and, if so, how and when to do so.  By ordering a hasty Component 2 collection, the district court precluded both of those agencies from exercising their administrative discretion over the Component 2 collection.  On the record here, that produced an untenable and unfair result.

*Amici* had twice provided information to OMB demonstrating that EEOC's proposed Component 2 data collection did not satisfy the PRA's requirements to: minimize the burden of the proposed data collection; show that the data collection would enhance the mission of the agency; or adequately and effectively address confidentiality concerns. *See* JA 202; 44 U.S.C. § 3504(c).

Significantly, the second of those submissions, which came in early 2017 as OMB was reconsidering its initial approval, relied on the actual experience of employers in attempting to comply with the Component 2 obligations.  That experience revealed, among other things, substantial labor costs as well as system upgrades and overhead costs required for designing, testing, and implementing the

information systems necessary to comply.  These actual costs far exceeded the estimates EEOC had provided to OMB.

Key here is the magnitude of Component 2, which EEOC minimized. Component 2 vastly expands the data fields employers must complete.  Component 1 contains only 180 data fields per employer location.  JA 187.  Component 2 replaces Component 1 for all private employers with more than 100 employees, and contains 3,660 data fields *for each* employer location. For the first time, the form requires wage information and hours worked data for each employee subgroup.  *Id.*

As described below, the record before OMB establishes that EEOC's planned collection did not satisfy the requirements of the PRA, because it substantially underestimated the burden on employers, showed little to no public benefit, and lacked appropriate safeguards to ensure confidentiality.  The district court erred by precluding OMB and EEOC from considering these facts on remand, and exercising their judgment and discretion, before any Component 2 collection.

## A.  The Record Before OMB Showed EEOC's Burden Estimates Vastly Understated The True Costs of Compliance

In the PRA process, EEOC created two grossly understated burden estimates. Neither estimate was supported by any analysis.  *See* Notice of Submission for OMB Review, Final Comment Request: Revision of the EEO-1 ("Final Proposed Revisions"), JA 338.  Before OMB, EEOC's final revised estimates included an annual compliance cost of $53.5 million for 60,866 respondent companies to file an

estimated 674,146 reports (based on 1,892,980 hours annually). JA 343.  Additionally,

EEOC estimated a $27.2 million one-time burden associated with the new

requirement (based on eight hours of work by information systems specialists for each

of the 60,866 affected employers). *Id.*

EEOC's revised estimates were unsupported.  In contrast, *Amici's* submissions

to OMB included a detailed economic survey of over 50 companies showing that

employers would annually spend in excess of $400 million in pure labor costs alone,

carrying a total annual burden of $1.3 billion in overhead costs, as well as an estimated

$178 million one-time cost for the design, testing, and implementation of information

systems needed to provide Component 2 data. JA 196-199.

## 1.    *The Record Before OMB Demonstrated EEOC's One-Time Burden Estimate Was Unrealistic*

Before OMB, EEOC mistakenly assumed that employers would be able to

generate W-2 and hours data after a human resource information system professional

spent just eight hours "developing queries . . . in an existing human resources

information system." JA 343.  First, EEOC's underlying assumption – that a single

system houses all the data necessary to generate the W-2 and hours data – was

incorrect.  OMB received information from *Amici* that most employers maintain

gender, race, and ethnicity data in a system that is different from the one that houses

payroll information, including W-2 wage information.  SJA 17.  *Amici* also informed

OMB that, in practice, hours worked data was likewise captured outside of the human

resources information system; and hours data for exempt employees (those who are salaried and not entitled to overtime under the Fair Labor Standards Act) simply did not exist for most employers. SJA 18-20. OMB's record, moreover, contains evidence that even human resources information systems that maintain a standardized or default value for "work hours" for salaried exempt employees (such as 40 hours per week) do not reflect an employee's actual hours worked. SJA 55-56. Determining how to combine gender, race, and ethnicity data housed in a human resources information system with W-2 wage and hours data housed in a payroll system, often by a third party, would exceed eight hours.

Second, EEOC's estimate to OMB of the one-time burden was also inaccurate because the hourly rate on which it was based – $47.22 for a "Professional" – failed to account for the fact that senior information technology personnel, legal personnel, and others would be involved in developing the processes necessary to generate the required data. JA 353. The identified hourly rate was far lower than the actual rates of pay for such individuals. SJA 18.

Third, EEOC's OMB submission assumed that filing on-line through web-based fillable forms would alleviate the burden of manual data entry. However, OMB's record included information that fillable forms still require manual data entry for each establishment. SJA 75. With the addition of W-2 data and hours data, reported in twelve different pay bands within each EEO-1 category, each EEO-1 responder would be required to populate as many as 3,660 separate cells of data. *Id.*

Finally, EEOC's OMB estimate ignored the burden associated with requiring employers to develop processes to report an "hours worked" number, particularly for partial year employees. Numerous *Amici* presented OMB with information that such costs are massive, particularly for large employers. *See e.g.*, SJA 20.

The National Payroll Reporting Consortium, Inc. ("Consortium"), a trade association whose member organizations provide payroll processing to nearly two million U.S. employers, recently explained these points in a letter to EEOC, OMB, and DOJ. SJA 83.

System design and development, testing, release and related training and communications necessary to comply with the Revised EEO-1 require substantial lead time in order to produce competent results.[1] As Consortium explained:

> Systems development is also not a straightforward task of merely formatting data (assuming such data is available) into an EEOC-defined file specification. Such projects require specific procedural or systemic handling of complex fact patterns, which may require rulemaking or other guidance from EEOC. A few examples include handling of:
>
> 1. Employees with job classification code changes during the snapshot period, or the full year
>
> 2. Reclassification of a job category during the year

---

[1] Systems development requires procedural or systemic handling of complex fact patterns to allow data to be accurately formatted into an EEOC-defined file specification. SJA 85.

3.      Employees that appeared in the snapshot period but were terminated, deceased or retired by the end of the snapshot period

4.      Employee changes of status (e.g., temporary to regular; part-time to full-time; non-exempt to exempt) during the snapshot period or year

5.      Changes in work location/establishment, or work location/establishment, that become inactive during the period

6.      Employees with more than one job classification concurrently or during the snapshot period.  SJA 85.

## 2. *The Record Before OMB Demonstrated EEOC's Annual Burden Estimate Was Similarly Unrealistic*

The record before OMB demonstrated that EEOC also significantly underestimated the annual cost to employers of collecting, verifying, validating and reporting on data that must be pulled from various systems and sources.

As noted above, employers do not house the required data in a single information system.  Even after the data is compiled and generated, a combination of human resource information system professionals and human resources professionals would have to expend time verifying and validating it.  Legal professionals would also be involved in the verification process, given that EEOC's stated purpose for the collection is to target government enforcement efforts, and given the requirement that a company official certify the filing, subject to penalties.  SJA 18.

Second, EEOC based its revised burden estimate for the generation and reporting of W-2 data and hours data on the wage rate of $24.23, the BLS wage rate

for Administrative Support personnel.  SJA 10.  Again, before OMB demonstrated that employees other than Administrative Support personnel would be engaged to collect, verify, validate, and report the W-2 and hours data. SJA 19.

Third, compounding EEOC's underestimate of the hourly rate of personnel compiling the necessary data, EEOC's estimate to OMB failed to include new overhead costs. SJA 244.  By failing to account for employer overhead costs, EEOC underestimated the financial burden on employers by hundreds of millions of dollars. JA 193-199.

Fourth, EEOC did not provide any estimate of the costs associated with implementing the tools necessary to upload a data file to the EEO-1 survey site in compliance with EEOC's precise data specifications. SJA 75.  As noted above, EEOC assumed that filing on-line through fillable forms would alleviate the burden of manual data entry.  Yet, OMB's record contained information that fillable forms would still require manual data entry for each establishment.  *Id.*  Though employers could avoid such manual data entry by uploading a data file to complete the EEO-1 Survey (an option that only became available on August 15, 2019), that itself imposes a significant cost according to record evidence before OMB.  JA 182; SJA 12. And, EEOC acknowledged that only 2% of all employers had availed themselves of the tools necessary to use this format (1,449/60,886) for completing the EEO-1 Survey before the addition of Component 2.  JA 364.  The 2016 record before EEOC and OMB indicated that the development of an exemplar tool for the EEO-1 data file

"upload" – before Component 2 – required a one-time expenditure of over 110 data analyst hours. *Id.*; SJA 75. EEOC's failure to extrapolate this data to accurately cost out compliance with the expanded EEO-1 Component 2 requirements severely underestimated these costs to employers.

Finally, OMB's record includes reference to EEOC's failure to account for the costs employers would incur responding to the inevitable investigations and enforcement actions that will be prompted by "false positives" that flow from comparing employees within the grossly overbroad EEO-1 categories. JA 197, 202, 204; SJA 19. Because EEOC and the Office of Federal Contract Compliance Programs ("OFCCP") intend to use the Component 2 results to target their enforcement efforts, and because those analyses will be fundamentally flawed, as discussed below, OMB received information from employers who would be forced to expend resources producing additional data to EEOC and/or OFCCP, retaining labor economists to run their own analyses of pay, and engaging legal counsel. *Id.*

## B. The Record Before OMB Showed Questionable To No Public Benefit of The Revised EEO-1

OMB's record contained ample evidence that the Revised EEO-1 lacked benefit, including references by *Amici* to the Sage Report. The Sage Report, which EEOC used to formulate the proposal and guide the development of analytical techniques to make full use of the data to be collected, recognized that summary data at the organization level will likely be of very limited use in EEOC practice. JA 103.

Despite this, EEOC identified three ways in which it might use the proposed W-2 and hours-worked data: (1) early assessment of charges of discrimination; (2) publication of aggregate EEO-1 data; and (3) EEOC training. JA 348. None of these articulated bases is sufficient to meet the PRA requirement that a collection provide "utility" to the public or Federal Government, particularly when compared against the burden of collecting sensitive compensation data from every employer in the country with more than 100 employees. EEOC's own PRA submission admitted that "the EEOC does not intend or expect that this data will identify specific, similarly situated comparators or that it will establish pay discrimination as a legal matter." *Id.*

### 1.    *OMB's Record Included Evidence That EEO-1 Pay Data Would Not Assist in Early Assessment of Discrimination Charges*

The names of the EEO-1 job categories themselves make clear that comparisons among them are inappropriate as a matter of law.[2] For example, OMB received information that there was no legal support for comparing Sales Workers to Laborers and Helpers, Executive/Senior level Officials and Managers, Operatives, or

---

[2] In claims of pay discrimination, relevant comparators must be similarly situated or perform substantially similar work under equal working conditions, respectively. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (under Title VII, plaintiff must demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the similarly-situated employee.) (internal quotations omitted); *Spencer v. Virginia State University*, 919 F.3d 199 (4th Cir. 2019) (rejecting broad notions of comparability under Equal Pay Act).

18

Professionals.  JA 197; SJA 24-25. Employers have an inherent right to value jobs differently for reasons other than gender, race, or ethnicity.

EEOC effectively ignored the numerous factors that could influence pay when claiming that its statistical tests "could determine whether factors such as race, ethnicity, gender and hours worked impact the distribution of individuals in pay bands."  JA 349.  Notwithstanding the inaccurate analyses, EEOC stated that an employer would have the "opportunity to explain its practices, provide additional data, and explain the non-discriminatory reasons for its pay practices and decisions." *Id.*  In other words, EEOC asserted that a simplistic analysis of data submitted under Component 2 would create a presumption of discriminatory compensation practices. In addition to being inaccurate, such a presumption would subject wholly innocent employers to sprawling EEOC investigations or massive and costly class action litigation in order to overcome the presumption of discriminatory compensation practices.

In evaluating a charge of discrimination, EEOC already has the authority to collect detailed compensation information from employers based on the specific allegations in a charge under investigation.  Thus, employers will still be subject to requests for information in connection with specific charge filings; but in addition, they will now be forced to explain the erroneous assumptions EEOC and others may make based on flawed compensation data analyses from Component 2 data.

19

Significantly, EEOC admitted to the district court that collecting data in pay bands "is not a valid way of collecting pay data for purposes of enforcing discrimination laws." JA 75. EEOC stated that the pay band data that the agency currently collects via an analogous survey of state and local governments[3] "have not been useful, and, in fact…those data aren't used at all." JA 104. The collection and dissemination of this new data can only create unfair litigation risk for employers based on faulty data and assumptions.

### 2. *OMB's Record Included Evidence that EEOC's Stated Plan To Publish Aggregate EEO-1 Data Provides No Utility*

EEOC also contended that "EEOC enforcement staff could examine how the employer compares to similar employers in the labor market by using a statistical test to compare the distribution of women's pay in the respondent's EEO-1 report to the distribution of women's pay among competitors in the same labor market." JA 349. Here, too, *Amici* demonstrated there is no basis in law for such comparisons in evaluating compensation discrimination. *See e.g.*, JA 197-198. Because it is not discriminatory for an employer to pay lower wages for certain positions than its competitors, the mere fact that a particular employer's aggregate compensation data is

---

[3] Each State and political subdivision with 100 or more employees must file a EEO-4 form with EEOC under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, which "require[s] [them] to keep records and to make such reports to the Equal Employment Opportunity Commission as are specified in the regulations of the Commission." *See* EEO-4, EEOC, *available at* https://egov.eeoc.gov/eeo4/ (last visited Aug. 21, 2019).

below the pay of the industry is irrelevant to an investigation of whether an employer's pay practices are discriminatory.

Nor, according to OMB record evidence, would such comparisons have any value given that the data contained in the Component 2 filings would be flawed and would not provide an "apples to apples" basis of comparison to other market-based data sets. JA 129. Finally, without complete descriptions of all factors contributing to compensation decisions, which are not included in Component 2, no useful analysis regarding gender pay practices can be conducted.

### C.   The Record Before OMB Showed That EEOC Failed To Demonstrate That It Had Put In Place Appropriate Safeguards To Protect Confidentiality

Before issuing the proposed rule, EEOC engaged the National Academy of Sciences ("NAS") to conduct a study, which, *inter alia*, looked at confidentiality concerns raised by EEOC's collection of employee pay data in EEO-1 reports and its subsequent disclosure of this data in aggregate and original form. The NAS report recognized that "[e]mployee compensation data are generally considered to be highly sensitive; they are even considered proprietary information by many private-sector employees." SJA 43, 104. Despite the confidential nature of this data, the NAS's report noted that the "EEOC provides [this] data to agencies that do not have the same level of confidentiality protections." SJA 183. Ineffective protection of this information could lead to serious consequences and result in substantial harm to individuals and to the federal government. In the hands of the wrong people, the

21

original pay data from the EEO-1 report could cause significant harm to EEO-1 responders and subject employees to potential violation of their privacy.

In addition to the NAS report, *Amici* made additional showings to OMB that EEOC had failed to address the significant privacy and confidentiality concerns related to the collection of highly confidential Component 2 pay data.  JA 179-180; 193-199; SJA 1-7, 251, 258-263.

EEOC did not demonstrate to OMB that it would require those to whom it provides the EEO-1 reports to (1) retain them in confidence; (2) demonstrate that their information security programs are sufficient to protect this data from malicious attacks targeted at such data; or (3) provide notification to EEOC in the event their data security is compromised or the entity or individual experiences a data breach. Since the district court's order, EEOC's public website warns employers that the required transmission of Component 2 data to EEOC may expose the data to "tampering from an outside source."[4]  Moreover, EEOC's PRA submission was silent as to how the data would be transferred from EEOC to the various federal or state agencies or individuals.  SJA 57-58.

Concerns over confidentiality are heightened when considering that EEOC routinely shares EEO-1 reports with other federal agencies.  Thus, such reports are not only routinely the subject of discovery requests in litigation, but also of FOIA

---

[4] U.S. Equal Emp't Comm'n, Component 2 EEO-1 Online Filing System, https://eeoccomp2.nor.org/Index (last visited Aug. 23, 2019).

requests to other federal agencies.  JA 300.  Even with the Supreme Court's recent decision in *Food Marketing Institute v. Argus Leader Media*, ___ U.S. ___, 139 S. Ct. 2356 (2019), which clarified the scope of FOIA's exception for confidential business information, employers are rightly concerned that EEO-1 compensation and other data are potentially vulnerable to widespread dissemination.  These concerns are contained in OMB's record.  JA 179, 188-189, 198; SJA 40-42.  Employers' concerns are compounded considering the revised EEO-1 data is potentially highly misleading with regard to pay comparisons due to the broad pay bands it uses, thus drastically raising the likelihood of unnecessary litigation.

At the district court, Dr. Haffer conceded that EEOC does not have the internal resources to "make the necessary updates, enhancements, security testing, load and performance testing, data validations and verifications, and application testing to *securely collect and store this significantly increased volume of highly sensitive Component 2 data*" under its current systems. JA 126-127 (emphasis added).  As a result, EEOC did not adequately address Components 2's confidentiality risks as required by the PRA before OMB.

## II.     The District Court's Order Compounds The Problems With Burden, Utility, and Confidentiality On An Ongoing Basis

The problems inherent in Component 2 were exacerbated by the district court's remedial orders, which required the government to proceed with a hasty collection of data ignoring employer burdens, industry standards for reliable collection

of data, and confidentiality issues.  As the government recognizes, this will come at a "high cost" to employers and "may have ramifications for the quality of information that EEOC collects." Appellant Br. at 30.  Some of these costs and quality ramifications will extend well past the September 30, 2019 due date for the first collection.  For example, absent agency intervention, a second data collection for 2019 data would take place in early 2020, and a third for 2020 data in 2021, under the district court's order tolling the termination date of OMB's initial PRA clearance.  JA 3.  And all of these cost and quality ramifications demonstrate the practical problems that can result when a court exceeds its remedial authority by, for example, ordering and micromanaging an information collection without regard to the impact on the regulated parties.

### A.    Retroactive Data Collection Raises Serious Reliability Concerns

In a written declaration, Dr. Haffer presented testimony describing significant concerns with the validity and reliability of the Component 2 data collection:

> Given the absence of a true pilot study leading up to the 2016 authorization of Components 1 and 2 of the EEO-1, and given the abbreviated period available in which to develop and implement quality assurance processes and procedures . . . (i.e., data training, instructions, directions, and technical assistance for employers), it is likely that undertaking and closing the collection of Component 2 data by September 30, 2019 would raise major data validity and reliability issues.  Under the circumstances, *I perceive a significant risk that employers would not be reporting comparable data that can be used by the government or others in meaningful comparisons or analyses.*

JA 131 (emphasis added).  Dr. Haffer's concerns were based on the likely increase in the "errors in the entire data collection process" if employers were required to report, retroactively, on 2017 Component 2 data at the same time as 2018 data.  JA 127.  In its 2016 OMB submission, EEOC contemplated collecting one year of data at a time, and allowing employers an 18-month lead time for the first year of data collection to allow time to design and implement systems and collect data contemporaneously, without having to construct reports retroactively in systems that were not designed for that purpose.  JA 320.

Dr. Haffer testified that while EEOC could possibly collect the data by retaining a third-party consultant, he was dubious that EEOC could conduct meaningful "data comparisons" or conduct "other analyses" with the pay and hours data because of the "limited quality control and quality assurance measures that would be implemented due to this expedited timeline."  JA 128.  Because there was no pilot program, there has been no opportunity to determine the utility and value of the data being collected.  Problems related to the initial collection will persist into future collections.  The concerns described by EEOC's Chief Data Officer thus have far-reaching and ongoing implications with regard to the validity of any analyses or publishing of aggregated data based on information collected through the Revised EEO-1 Report.

**B.     The District Court Heightened The Costs and Burdens of Component 2 Beyond What EEOC Presented to OMB**

As detailed above, EEOC's estimates of cost and burden presented to OMB were wholly inadequate, both for employers initializing the process and for ongoing annual compliance efforts.  The expedited reporting and collection period mandated by the district court further magnified the errors within the original burden estimates.  Dr. Haffer testified that the selection of a collection period of July 15 - September 30, 2019 "did not" include consideration of the "employer burden concerns" or the time it would reasonably take employers to comply with the Component 2 EEO-1 data collection requirements.  JA 97.[5]  Instead, Dr. Haffer testified that the September 30, 2019 date was picked because he understood it was the PRA expiration date on the EEO-1 form.

The Consortium had noted, before the district court's remedial orders in this case, that the cost for employers would only increase if they were required to gather data retroactively.  As the Consortium explained, "a substantial added complication [is] that the Component 2 pay data report would require retroactive gathering of input.  Because of OMB's stay, employers and service providers generally did not

---

[5] Dr. Haffer's Declaration, which was accepted as direct testimony at the April 16, 2019 hearing, was not challenged or questioned insofar as Dr. Haffer testified he understood that employers believe that they are likely to experience significant issues regarding the immediate reporting of Component 2 data.  *See* JA 127.

develop the data collection mechanisms and did not collect and store the necessary data to comply with such a report for 2018" (much less 2017). SJA 84.

Dr. Haffer further testified that before the district court's March 2019 order, EEOC was in the process of upgrading its EEO Surveys under an initiative titled EEOC Data and Analytics Modernization Program, which was designed to provide a "comprehensive evaluation of the collection, analysis, and dissemination of EEOC data." JA 124. Following the court's decision, and because of the expedited and retroactive nature of the collection directed by the court, EEOC retained a contractor to undertake and close the collection by September 30, 2019 (at a cost to the government of over three million additional dollars). JA 127. However, the process that the contractor and EEOC implemented for the expedited 2019 Revised EEO-1 collection is separate from EEOC's overall Data and Analytics Modernization Program.

Dr. Haffer testified that this is just a one-time solution: "This system would be utilized one time for the collection of calendar year 2018 Component 2 data only. It would not be utilized after the EEOC makes its transition to the modernized data collection process." *Id.* Thus, the one-time implementation costs and other costs associated with the 2018 filings (and, under the court's order, 2017) will need to be re-done and repeated in the future. According to Dr. Haffer's testimony, employers will need to reconfigure all of their systems, reporting and other process changes they undertook to comply with the expedited 2019 data collection in order to comply with

any new systems EEOC chooses to implement after its transition to the "modernized data collection process" described in Dr. Haffer's declaration for subsequent years.

### C.    Not Following Industry Standards For Data Collection Aggravates Confidentiality Concerns

Finally, the compressed timeline imposed by the district court for collection of 2017 and 2018 data by September 30, 2019, as well as the next data collection that would occur under the court's order by March 30, 2020, ensures that EEOC's collection of sensitive and confidential information will not follow industry standards. JA 58-59, 73-74. Dr. Haffer testified that to comply with acceptable industry standards for data collection, the timetable for collection by EEOC (with its contractor's full participation) could not occur until 2021. *Id.* Dr. Haffer was not questioned as to what sacrifices in confidentiality were made in the contractor's proposal for Component 2 data collection by September 30, 2019 (a full 15 months earlier than its earlier quoted January 2021 timetable for data collection pursuant to industry standards). JA 73-74. Similarly, there is no record evidence that addresses these confidentiality concerns with respect to the next potential data collection, in early 2020, of 2019 Component 2 data.

\*     \*     \*

The serious concerns discussed above regarding the failures of EEOC to satisfy the requirements of the PRA have, thus far, received scant consideration in this litigation. And under the district court's remedial orders, they simply vanish. This

Court should vacate the district court's order of remedial relief and direct the court to remand the matter in order to allow OMB and EEOC to discharge their responsibilities by, among other things, considering the evidence and concerns discussed above before deciding whether to proceed with a Component 2 collection and, if so, how and when to conduct it.

## CONCLUSION

For the foregoing reasons and those set forth in the Government's brief, the judgment of the district court should be reversed.

Respectfully submitted,

DATED: August 26, 2019      SEYFARTH SHAW LLP

By   /s/ *Camille A. Olson*

CAMILLE A. OLSON
Richard B. Lapp
Annette Tyman
Andrew Cockroft
**SEYFARTH SHAW LLP**
233 S. WACKER DR., SUITE 8000
CHICAGO, IL 60606
(312) 460-5000
colson@seyfarth.com
Lawrence Z. Lorber
975 F. STREET, NW
WASHINGTON, DC, 20004
(202) 463-2400
llorber@seyfarth.com
COUNSEL FOR ALL *AMICI*

29

Daryl Joseffer
Jonathan Urick
U.S. Chamber Litigation Center
1616 H Street, NW
Washington, DC 20062
(202) 463-5337
DJoseffer@USChamber.com
*Co-Counsel, The Chamber of Commerce of the United States of America*

G. Roger King
McGuinness, Yager & Bartl LLP
1100 13th Street, NW, Suite 850
Washington, DC 20005
(202) 375-5004
rking@hrpolicy.org
*Co-Counsel, HR Policy Association*

Peter C. Tolsdorf
Leland P. Frost
Manufacturers' Center for Legal Action
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000
ptolsdorf@nam.org
lfrost@nam.org
*Co-Counsel, The National Association of Manufacturers*

Thomas Pinder
American Bankers Association
1120 Connecticut Avenue, N.W.
Washington, DC 20036
(202)663-5028
tpinder@aba.com
*Co-Counsel, American Bankers Association*

Rae R. Vann
Michael J. Eastman
NT LAKIS, LLP
1501 M Street, N.W.
Suite 1000
Washington, DC 20005
(202) 629-5600
rvann@ntlakis.com
meastman@ntlakis.com
*Co-Counsel, Center for Workplace Compliance*

David S. Fortney
Fortney & Scott
1750 K St., NW, Suite 325
Washington, DC 20006
(202) 689-1200
dfortney@fortneyscott.com
*Co-Counsel, The Institute for Workplace Equality*

Elizabeth Milito
National Federation of Independent Business
53 Century Blvd., Suite 250
Nashville, TN 37214
(800) 634-2669
Elizabeth.Milito@NFIB.ORG
*Co-Counsel, National Federation of Independent Business*

Stephanie Martz
National Retail Federation
1101 New York Avenue NW
Suite 1200
Washington, DC 20005
(202) 783-7971
martzs@nrf.com
*Co-Counsel, National Retail Federation*

Angelo I. Amador
Restaurant Law Center
2055 L Street, NW
Seventh Floor
Washington, DC 20036
(202) 331-5913
AAmador@restaurant.org
*Co-Counsel, Restaurant Law Center*

Deborah White
Retail Litigation Center, Inc.
1700 N. Moore Street, Suite 2250
Arlington, VA 22209
(703) 600-2067
Deborah.White@rila.org
*Co-Counsel, Retail Litigation Center, Inc.*

James Banks, Jr.
Society for Human Resource Management
1800 Duke Street
Alexandra, VA 22314
(800) 283-7476
James.BanksJr@shrm.org
*Co-Counsel, Society for Human Resource Management*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6,400 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Garamond font using Microsoft Word.

DATED: August 26, 2019                SEYFARTH SHAW LLP


                                      By  */s/*  Camille A. Olson
                                      CAMILLE A. OLSON
                                      COUNSEL FOR ALL *AMICI*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2019, I electronically filed the foregoing

Amicus Brief with the Clerk of the Court for the United States Court

of Appeals for the District of Columbia Circuit by using the appellate CM/ECF

system. Participants in the case are registered CM/ECF users, and service will be

accomplished by the appellate CM/ECF system.


DATED: August 26, 2019          SEYFARTH SHAW LLP


                                By  /s/  Camille A. Olson
                                CAMILLE A. OLSON
                                COUNSEL FOR ALL *AMICI*