# [ORAL ARGUMENT NOT SCHEDULED]

## No. 19-5130

---

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————◆———————————

NATIONAL WOMEN'S LAW CENTER, ET AL.,

*Plaintiffs-Appellees,*

v.

OFFICE OF MANAGEMENT AND BUDGET, ET AL.,

*Defendants-Appellants.*

———————————◆———————————

**SUPPLEMENTAL JOINT APPENDIX OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, HR POLICY ASSOCIATION, THE NATIONAL ASSOCIATION OF MANUFACTURERS, AMERICAN BANKERS ASSOCIATION, AMERICAN SOCIETY OF EMPLOYERS, ASSOCIATED BUILDERS AND CONTRACTORS, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, CENTER FOR WORKPLACE COMPLIANCE, INSTITUTE FOR WORKPLACE EQUALITY, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, NATIONAL RETAIL FEDERATION, RESTAURANT LAW CENTER, RETAIL LITIGATION CENTER, INC., AND SOCIETY FOR HUMAN RESOURCE MANAGEMENT AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS SUPPORTING REVERSAL**

———————————◆———————————

On Appeal from the U.S. District Court
for the District of Columbia, Case No. 1:17-cv-02458-TSC
Hon. Tanya S. Chutkan

———————————◆———————————

Daryl Joseffer
Jonathan Urick
**U.S. CHAMBER LITIGATION CENTER**
1615 H STREET, NW
WASHINGTON, DC 20062
(202) 463-5337
DJoseffer@USChamber.com


**CO-COUNSEL, THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**

Camille A. Olson
Richard B. Lapp
Annette Tyman
Andrew Cockroft
**SEYFARTH SHAW LLP**
233 S. WACKER DR., SUITE 8000
CHICAGO, IL 60606
(312) 460-5000
colson@seyfarth.com
Lawrence Z. Lorber
975 F. STREET, NW
WASHINGTON D.C. 20004
(202)463-2400
llorber@seyfarth.com
**COUNSEL FOR ALL *AMICI***

## ADDITIONAL CO-COUNSEL

G. Roger King
McGuinness, Yager & Bartl LLP
1100 13th Street, NW, Suite 850
Washington, DC 20005
(202) 375-5004
rking@hrpolicy.org
*Co-Counsel, HR Policy Association*

Peter C. Tolsdorf
Leland P. Frost
Manufacturers' Center for Legal Action
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000
ptolsdorf@nam.org
lfrost@nam.org
*Co-Counsel, The National Association of Manufacturers*

Thomas Pinder
American Bankers Association
1120 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 663-5028
tpinder@aba.com
*Co-Counsel, American Bankers Association*

Rae R. Vann
Michael J. Eastman
NT LAKIS, LLP
1501 M Street, N.W.
Suite 1000
Washington, DC 20005
(202) 629-5600
rvann@ntlakis.com
meastman@ntlakis.com
*Co-Counsel, Center for Workplace Compliance*

David S. Fortney
Fortney & Scott
1750 K St., NW, Suite 325
Washington, DC 20006
(202) 689-1200
dfortney@fortneyscott.com
*Co-Counsel, The Institute for Workplace Equality*

Elizabeth Milito
National Federation of Independent Business
53 Century Blvd., Suite 250
Nashville, TN 37214
(800) 634-2669
Elizabeth.Milito@NFIB.ORG
*Co-Counsel, National Federation of Independent Business*

Stephanie Martz
National Retail Federation
1101 New York Avenue NW
Suite 1200
Washington, DC 20005
(202) 783-7971
martzs@nrf.com
*Co-Counsel, National Retail Federation*

Angelo I. Amador
Restaurant Law Center
2055 L Street, NW
Seventh Floor
Washington, DC 20036
(202) 331-5913
AAmador@restaurant.org
*Co-Counsel, Restaurant Law Center*

Deborah White
Retail Litigation Center, Inc.
1700 N. Moore Street, Suite 2250
Arlington, VA 22209
(703) 600-2067
Deborah.White@rila.org
*Co-Counsel, Retail Litigation Center, Inc.*

James Banks, Jr.
Society for Human Resource Management
1800 Duke Street
Alexandra, VA 22314
(800) 283-7476
James.BanksJr@shrm.org
*Co-Counsel, Society for Human Resource Management*

# TABLE OF CONTENTS

Letter from Chamber of Commerce of the U.S. to Bernadette Wilson, Acting Executive Officer, Executive Secretariat, EEOC (District Court JA153) ..................... 1

Written Testimony of Camille Olson Seyfarth Shaw LLP on behalf of U.S. Chamber of Commerce ..................................................................................................... 46

Letter from  National Payroll Reporting Consortium to Victoria A. Lipnic, Acting Chair, EEOC ........................................................................................................ 83

National Research Council, Collecting Compensation Data From Employers .......... 87

Estimating Paperwork Burden, OMB ........................................................................ 242

Letter from Equal Employment Advisory Council to Joseph Nye, Policy Analyst, ORIA, OMB ................................................................................................... 246

# CHAMBER OF COMMERCE
### OF THE
# UNITED STATES OF AMERICA
1615 H STREET, N.W.
WASHINGTON, D.C. 20062
202/463-5522

**RANDEL K. JOHNSON**
SENIOR VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

**JAMES PLUNKETT**
DIRECTOR
LABOR LAW POLICY

April 1, 2016

Bernadette Wilson, Acting
Executive Officer, Executive Secretariat
Equal Employment Opportunity Commission
131 M Street NE.
Washington, DC 20507

**Re:** **Equal Employment Opportunity Commission's (EEOC's or Commission's) Proposed Revisions to the Employer Information Report.**

Dear Ms. Wilson:

The U.S. Chamber of Commerce ("Chamber") submits these comments responding to the Equal Employment Opportunity Commission's ("EEOC's" or "Commission's") Proposed Revisions to the Employer Information Report (EEO-1) ("Proposed Revisions"). The Chamber is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region, with substantial membership in all 50 states. The Chamber's mission is to advance human progress through an economic, political, and social system based on individual freedom, incentive, initiative, opportunity, and responsibility.

The Chamber is a long-standing supporter of reasonable and necessary steps designed to achieve the goal of equal employment opportunity for all -- including equal pay for equal work and non-discriminatory compensation practices.[1] It was in large part through the efforts of the Chamber and other employer organizations that the 2008 Americans with Disabilities Amendments Act was enacted with bi-partisan support, and with the active involvement of all stakeholders. That is why the Chamber is so concerned with the current attempt to revise the EEO-1 form without prior input from the employer community regarding its real costs and lack of benefit, and in a process so violative of the Paperwork Reduction Act ("PRA").

The Proposed Revisions fail to further the purposes of Title VII and the EPA, and fails to meet the PRA's requirements. The Proposed Revisions are not reasonable, necessary, or appropriate as required by Title VII. The PRA imposes certain mandatory requirements on the

---

[1] The Chamber and its member-employers have always been supportive of non-discrimination laws including the Equal Pay Act ("EPA"), Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), and the Americans with Disabilities Act ("ADA"). The Chamber has held many seminars and meetings in which the requirements of the laws have been explained and which afford members the latest information regarding compliance.

EEOC.  The PRA requires the EEOC to:  minimize the burden on those required to comply with government requests, maximize the utility of the information being required, and ensure information provided is subject to appropriate confidentiality and privacy protections.  The EEOC's Proposed Revisions fail to meet the statutory requirements of the PRA:

- First, the Proposed Revisions do not minimize the employer's burden.  Rather, they impose substantial additional compliance burdens on employers. And the Proposed Revisions improperly suggest that the vast increase in data collection will be accomplished with a significant *decrease* in cost and burden compared to prior years.

- Second, the Proposed Revisions do not maximize the utility of collected data. Rather, they aggregate the compensation of employees performing vastly dissimilar work, leading to both false negatives and false positives for discrimination, and not otherwise yielding any information to permit the EEOC or OFCCP to undertake an investigation.  This wastes valuable time and resources for both employers *and* EEOC.

- Third, the Proposed Revisions fail to propose a mechanism to adequately protect the confidentiality of sensitive employee compensation information.

The burden of the Proposed Revision would be substantial; both in the millions of hours that private employers would be required to spend completing the proposed EEO-1 Report and in the false results that are likely to be generated. For example, based on the 307,103 total reports filed in the most recent year (according to the EEOC), Economist Ronald Bird estimates that the actual national annual cost burden of the *current* format EEO-1 form is $427.3 million, which is about 21 times greater than the $19.8 million annual total that the EEOC estimated in its 2015 information clearance request supporting statement for the current format EEO-1 form (see Exhibit 2, p. 2, Declaration of Ronald Bird) and $421.8 million more than its current estimate of $5.5 million.  This is before factoring in the burden associated with the Proposed Revisions.

The Proposed Revisions, allegedly borne out of a laudable desire to ensure that employees are paid fairly, will not accomplish this goal. Instead, in practice, it would impose enormous burdens and risks on employers who base complex compensation decisions on various factors other than membership in a particular EEO-1 category (factors which the EEOC does not contemplate considering under the Proposed Rule's suggested use of the collected data).

As Economists DuMond and Speakman detail in their attached Declarations, based on actual results generated from tabulations run in mock tests of the Proposed Revisions to the EEO-1 Form, any resulting analyses from the data collected by the Proposed Revisions will be of *no value* in ascertaining whether there are disparities in pay between individuals performing the

2

same or substantially similar work. See Declaration of Dr. J. Michael DuMond and Dr. Robert Speakman, Exhibits 1 and 4. According to Dr. Speakman, "…analyses using the EEOC's proposed pay data and suggested tests will result in a high error rate – firms that pay fairly will be investigated too often and firms that underpay women or minorities will often go undetected. <u>Simply put, the recommended tests and data will lead to many false-positive and false-negative conclusions, negating any utility from this proposal. In fact, it appears that at best the targeting mechanisms suggested by the EEOC will do only negligibly better than selecting firms at random.</u>"[2]

For all the reasons set forth below and in the attached supporting Declaration of Economist Ronald Bird (Exhibit 2), Declaration of Economist J. Michael DuMond (Exhibit 1), Declaration of Economist Robert Speakman (Exhibit 4) and Declaration of Attorney Annette Tyman (Exhibit 3), as well as the Chamber's prior testimony submitted March 9, 2016 to the EEOC, and the oral testimony and responses provided by Camille Olson on behalf of the Chamber at the EEOC Hearing on the Proposed Revision on March 16, 2016, the Chamber asks that the EEOC withdraw the Proposed Revisions to revise the EEO-1 Employer Information Report.

## **Summary of Comments**

On February 1, 2016, without any prior notice to the regulated community, the EEOC published a proposed revision to the EEO-1, Employer Information Report. This data request, to which every employer with 100 or more employees and every government contractor with 50 or more employees must respond annually, has been in existence for 50 years. The authorization for the EEOC to require this report is found in Title VII at 42 USC § 2000e-8(c)(3) where such reports are authorized only if they are " reasonable, necessary, or appropriate…" However, for the first time, the EEOC is proposing that all employers with more than 100 employees submit data showing the W-2 wages and hours worked of all of their employees grouped by broad job categories and subdivided into 12 arbitrary pay bands, in addition to the demographic makeup of their employment rosters. The magnitude of the proposed revision cannot be overstated. The existing EEO-1 report requires 140 data points. Pursuant to the changes proposed by the EEOC, covered employers will have to submit forms for each establishment, and each establishment report would consist of 3,660 data points.

Ironically, EEOC advances this brand new and burdensome data request pursuant to, of all laws, the Paperwork Reduction Act.[3] As previously noted, the PRA requires that any request for data by a government agency meet three basic criteria: (1) the request minimizes the burden

---

[2] Ex. 4, Dr. Robert Speakman Declaration at p. 3.
[3] For underlying authority to require employers to submit the EEO-1 form, EEOC relies on the recordkeeping provisions of 42 U.S.C. § 2000-e8(c) and 29 CFR 1602.7. *See* 81 Fed. Reg. 5113. Nothing in the authorizing statute exempts the EEOC from complying with the PRA.

3

on responders to reply; (2) the request results in data which is meaningful to the government for policy and enforcement purposes; and (3) the data request is designed to ensure that the data is securely and confidentially obtained and retained. The OMB is charged with reviewing the data request to ensure that the requesting agency complies with the PRA and by approving the request the OMB must certify that the agency has met its requirements under the PRA and OMB directives. And of course the EEOC must also assure that the reports it is requiring a significant number of employers to collect and submit to the agency meets the standards set by Title VII.

Although the EEOC notes that it began working on this project at least four years ago, it permitted employers only five weeks to prepare comments for submission at a public hearing in which selected employer representatives were permitted five minutes each to "testify" about the proposal, and only 60 days to submit these written comments. The Chamber nevertheless retained noted labor economists identified above to review the EEOC's Proposed Revisions and two law firms, Seyfarth Shaw LLP and Crowell & Moring LLP, to further analyze the legal compliance of the EEOC with the PRA and the new requirements it is proposing to impose on employers. The conclusions of these reviewing economic experts and law firms is stunning:

***The EEOC has cavalierly refused to comply with its obligations under Title VII and the Paperwork Reduction Act in the following ways:***

*<u>The EEOC has produced an "analysis" of the burden its proposal will impose which is completely lacking in any substance, has no basis in fact, and is contrary to the attached economic analyses of three economists and the results of the Chamber's survey of a significant sampling of its members.</u>*

- The EEOC suggests that a "revised form" with almost 26 times the number of data points to complete will impose *no* additional burden and cost 50% *less* than the previous form which was approved in 2015.

- The EEOC and its consultant admit that there was no testing of the form or the time that would take to complete it, but rather that it used "synthetic data" compiled from fictitious companies to produce an estimate of the time required to complete the new forms. While the EEOC admits it did nothing to quantify the burdens attendant to its new data requests, and certainly did nothing to minimize the burden, the Chamber, in the eight short weeks allotted to responding entities to comment on the EEOC's Proposed Revisions, conducted a survey of 35 of its members, received in excess of twenty replies to its questionnaire and in fact determined that the burdens imposed by the new requirement were excessive, costly and, in some instances, not feasible.

4

- The EEOC, apparently in an effort to show a non-existent burden reduction, arbitrarily eliminated from its analysis the burden of time and effort required to submit data relating to more than 250,000 employer establishments. Under the EEOC's proposal, employers will still be required to submit data for the 250,000 establishments that have been omitted from the Commission's burden analysis. The EEOC simply ignores this fact. The PRA did not intend that its requirement to reduce reporting burdens be addressed by an agency simply ignoring or air-brushing reporting requirements to make its burden numbers look better.[4] This failure alone requires that the agency rescind its proposal and undertake the necessary burden analysis the statute commands and meet the Title VII command that the required report be reasonable, necessary and appropriate.

- The EEOC also attempts to sustain its estimate of burden by referring to proposals by other agencies which have never been completed and which have never been published.

- As shown in the analysis of the Chamber Survey performed by Dr. Bird (Exhibit 2), employers who employ almost 4.5% of the employees who would be included in the revised EEO-1 report will experience a vast increase in the cost of implementing and completing the revised form and will encounter severe operational difficulties in even formulating their HR systems to meet the new obligations.

*The EEOC offers no rationale to support its claim that the mass collection of data will be useful for any law enforcement or policy enhancement.*

- The laws that the EEOC enforces do not permit aggregating dissimilar jobs into artificial groupings for purpose of analyzing pay. There can be no legal or enforcement-related use for this data. Indeed, the EEOC's own compliance manual and its consultant recognize that these broad aggregations of data are essentially useless. Myriad federal courts have reached the same conclusion.

- The EEOC is requiring the combining of completely dissimilar jobs into arbitrary pay bands to determine if there is pay discrimination. For instance, the proposed revised forms will require a reporting hospital to combine lawyers, doctors, nurses and dieticians - all grouped as "professionals" - to somehow determine whether

---

[4] The PRA does not recognize the concept of *Ipse Dixit.* In *National Tire Dealers & Retreaders Association, Inc. v. Brinegar*, 491 F.2d 31, 40 (D.C. Cir. 1974), Circuit Judge Wilkey considered that the Secretary of Transportation's "statement of the reasons for his conclusion that the requirements are practicable is not so inherently plausible that the court can accept it on the agency's mere ipse dixit."

5

there are pay disparities based on gender, race or ethnicity. No law permits comparisons of such diverse workers to prove discrimination or even to provide enough evidence to commence an investigation.

- In order to meet its own bureaucratic timetable, the EEOC will require employers to combine two distinct years of W-2 data to create a fictitious W-2 amount for employees. This combined W-2 amount over a two year period will yield completely useless information. <u>It does not take into account job changes, promotions, annual pay adjustments, different working conditions or locations or the many other factors that go into compensation</u>. And the components of W-2 income are so diverse that there can be no viable analysis of the reported W-2 income to ascertain disparities of treatment.

- The EEOC will also require employers to collect and report the hours worked for all employees. While the EEOC suggests that it will not require collection of new information from employers, it has not addressed the critical fact that employers do not currently collect hours information for exempt employees. The EEOC suggests that employers may use a "default" number of 40 hours for each exempt employee. In the private sector, exempt employees regularly work more than 40 hours; thus, the hours information would be inaccurate and, therefore, of limited use. A legitimate study before this proposal was published would have revealed that fact, but no such study was done.

- The EEOC's Proposed Revisions therefore again fails the Title VII requirement that it be "reasonable, necessary or appropriate" and the PRA requirement that it maximize the practical utility from the information collected.

*<u>The EEOC offers absolutely no discussion of the threats to confidentiality or privacy of the information it is requiring employers to submit.</u>*

- The PRA requires that the requesting agency and the OMB ensure that data collected will be treated with complete confidentiality. The EEOC did not even attempt to take this responsibility seriously. When the Office of Personnel Management (OPM) cannot even protect the personnel data of 21 million federal employees or applicants, the EEOC should at least be cognizant that confidentiality of the pay data of more than 70,000 employers – encompassing millions of employees – deserves significant consideration. It offers none.

- These data, once shared with the Department of Labor, are subject to demand for production under the Freedom of Information Act. The EEOC states that the data will be protected to the extent permitted by law. Of course, employers will have to

6

expend significant resources to assert their right under law to protect this data. And for some of the smaller employers, the identity and the compensation of individual employees will be easily ascertained; the same is true for larger employers with small establishments. The EEOC devotes only two paragraphs to discuss these privacy and confidentiality issues.

In short, the EEOC has sprung upon employers a proposal that would (1) impose significant new, costly administrative burdens; (2) yield data of no utility; and (3) fail to protect confidential information. The EEOC has proposed these revolutionary revisions without meeting any of its obligations under the PRA.  For these reasons, the Chamber submits that EEOC should withdraw this proposed data collection and, if it refuses to do so, the OMB should exercise its authority and refuse to approve the revised form.

## Comments

### I.  PAPERWORK REDUCTION ACT

As previously noted, the EEO-1 Revision process is being conducted pursuant to the PRA. The PRA, which was reauthorized in 1995, was promulgated in order to bring a degree of coherence and prudence to the Government's rather voracious quest to collect data from responding employers (and other responders). *See Dole v. United Steelworkers of America*, 494 U.S. 26 (1990) (recognizing that the PRA was enacted in response to the federal government's "insatiable appetite for data."). The purposes of the PRA set forth in direct terms what the Act was designed to accomplish:

The purposes of this chapter are to--

(1) minimize the paperwork burdens for individuals, small businesses…Federal contractors…and other persons resulting from the collection of information by or for the Federal Government;

(2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government.

(4) improve the quality and use of Federal information to strengthen decisionmaking, accountability and openness in Government and society;

8) ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to--(A) privacy and confidentiality, including section 552a of title 5;

7

The PRA established within the Office of Management and Budget ("OMB") the Office of Information and Regulatory Affairs ("OIRA") whose Director is charged with the administration of the PRA. *Livestock Marketing Ass'n v. U.S. Dept. of Agr.*, 132 F. Supp. 2d 817, 830 (D.S.D. 2001) ("Among other things, the Act establishes the Office of Information and Regulatory Affairs within the Office of Management and Budget, with authority to" facilitate and manage the PRA). OIRA has a substantial role in the federal regulatory process. No data collection instrument which is directed to more than nine responders can be issued without first receiving the approval of OMB and OIRA. *CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (2008) ("The need for OMB approval of information collections derives from the Paperwork Reduction Act"); *Gossner Foods, Inc. v. E.P.A.*, 918 F. Supp 359, 361-62 (D. Utah 1996) ("The Act institutes a second layer of review by the OMB for new paperwork requirements.") (quoting *Dole*, 494 U.S. at 32-33). In addition to the actual review of agency data requests, the Director is charged with the responsibility to oversee the use and collection of information.  In fulfilling this oversight responsibility, OMB issued Circular A-130 which directs federal agencies to establish mechanisms and procedures to meet the PRA's mandate to reduce the collection burden and insure that the information being collected has significant public utility.  The EEOC does not have the discretion to ignore the PRA or Circular A-130.  Nevertheless it has done so.

The Director, in turn, is mandated to review data collection requests in accordance with the direction of the PRA to (1) minimize the burden on those individuals and entities most adversely affected and (2) maximize the practical utility of and public benefit from information collected by or for the Federal Government and establish standards for the agencies to estimate the burden of data collection. *See Dole*, 494 U.S. at 32 (explaining that the PRA charges the OMB with responsibility for minimizing the burden on individuals and establishing standards to reduce federal collection of information). *See also Tozzi v. U.S. E.P.A.*, No. Civ. 98 - 0169 (TFH), 1998 WL 1661504, *1 (D.D.C. April 21, 1998).  The Director is also charged with developing and promulgating standards to insure the privacy, confidentiality and security of information collected or maintained by agencies. *In re French*, 401. B.R. 295 (E.D. Tenn. 2009) (noting that, amongst other things, the PRA's purpose is to ensure that information is collected consistent with privacy and security laws) (quoting 44 U.S.C. § 3501).

It is under this specific statutory framework that the proposal to revise the EEO-1 form and collection procedures must be reviewed. There is no exemption from the mandates of the PRA and neither the agency head nor the Director of OIRA may exempt data collection efforts from the constraints and mandates of the PRA. Simply put, data collection efforts of the size and scope of the proposed EEO-1 revision must be reviewed independently to insure that the burdens placed upon responders is minimized, the information collected has the maximum utility, and that the security and confidentiality of the information is assured. *See Dole*, 494 U.S. at 32-33 (explaining that all federal agency regulations that require the collection of paperwork must be reviewed by the OMB in accordance with the goals and purpose of the PRA).

8

These are simple precepts and should be reviewed independently. In other words, the burden placed upon responders must be determined only with respect to the efforts necessary to collect and report the data. The obligation to minimize the burden should be reviewed in relevance to the purposes and utility of the data to be collected. The PRA requires each standard to be reviewed on its own terms. Similarly, the benefit to be derived from the data collection requirement is not dependent upon the degree of burden the effort creates, but rather the utility of the data collected. The government is not permitted to require the collection of data with no utility regardless of the extent of the burden imposed to collect the data. Nor is the government permitted to require an excessively burdensome collection effort in the face of a complete lack of utility of the data collected. In short, there is no license for the Government to simply collect data without a clearly articulated purpose and legitimate use. Finally, in conjunction with the type and sensitivity of the data being collected, OIRA and the requesting agency must insure that the requested data be collected and retained in a manner to insure its confidentiality and privacy.

These requirements are neither difficult nor complex. Indeed, they establish a commonsense framework by which the requesting agency in the first instance and Director of OIRA must review requests for authorization to collect data. As will be shown in this submission, the EEOC has not met any of the statutory requirements. Rather, it has proposed a data collection protocol which will place a significant burden upon responding employers and which the EEOC has remarkably understated or ignored. Indeed, the EEOC has ignored its obligation to analyze and minimize the burden its new proposal will create.   The EEOC is proposing to collect extensive data heretofore never collected by the federal government without any developed framework to review the data, or use the data for any legally authorized or recognized purpose. In addition, the EEOC has totally ignored the obvious security and confidentiality issues which it is directed to consider.

## II.     THE EEOC'S PRA BURDEN ESTIMATE IS INSUFFICIENT AND UNSUPPORTED

The EEOC should rescind its Proposed Revisions because its PRA burden estimate is wholly deficient in three critical ways: (1) it underestimates the employer burden associated with generating the EEO-1 Report *in its current form* and is inconsistent with prior EEOC estimates of the burden associated with generating the EEO-1 Report; (2) it underestimates the employer burden associated with compiling, analyzing, and reporting the W-2 information the Proposed Revisions would require; and (3) it vastly underestimates the burden associated with compiling, analyzing and reporting the hours information that would be required, particularly as to exempt employees.

9

**A.     The EEOC's Estimate of the Burden Associated with
       Completing the _Current_ EEO-1 Report is Inconsistent with its
       Prior Burden Analyses and Otherwise Lacks Factual Support**

1.      The EEOC's PRA Assumptions

The EEOC makes the following claims and assumptions in connection with its estimate
of the burden associated with generating the EEO-1 Report in its current form:

- There are 67,146 employers who file EEO-1 Reports ("EEO-1 Filers"), based
  on 2014 filing figures.[5]

- Each EEO-1 Filer spends just 3.4 hours generating its EEO-1 Reports each
  year, across all establishments, with 30 minutes dedicated to reading the
  instructions and 2.9 hours dedicated to generating the data required to be
  reported and populating the cells in the Form itself.  Thus, total hourly burden
  incurred by employers filing the EEO-1 Report is 228,296.4 hours.

- All work done to complete the EEO-1 Report is performed by "Administrative
  Support" personnel who are paid, according to the Bureau of Labor Statistics
  ("BLS") publication "Employer Costs for Employee Compensation," on
  average, $24.23 per hour.

Based on these assumptions, the EEOC estimates that the total annual cost burden incurred by
employers filing the current EEO-1 Report is just over _$5.5 million_.  This figure represents the
number of EEO-1 Filers (67,146) multiplied by 3.4, then multiplied by $24.23.

2.      The EEOC's Unexplained Decision to Abandon  Its
        Prior "Response-Based" Approach is Fatal to the
        Agency's PRA Analysis

The EEOC's approach for assessing the actual _current_ burden imposed on EEO-1
Filers is deficient for several reasons.

First, and perhaps most importantly, the "EEO-1 Filer"-based approach adopted by the
EEOC in its Comment Request is contrary to the approach the EEOC has used to quantify the
burden associated with EEO-1 filings since at least 2009.  From at least 2009 through 2015, the
EEOC, when estimating the burden associated with filing EEO-1 Reports, based its assessment
on the number of _responses_ filed by the employer community, _not_ on the number of EEO-1

---

[5] This figure underestimates by 40% the number of private employers with 100 or more employees.  Ex. 2, Ronald
Bird Decl., Appendix A, p. 18.

Filers.  *See* Exhibits 5 -8 (EEOC OIRA filings).  The EEOC's approach over at least the last six years appropriately accounted for the fact that many EEO-1 Filers are required to generate multiple "responses" or reports: one for each physical establishment with 50 or more employees and one consolidated report.  As a result, the EEOC burden estimates for the years 2009 through 2015 are significantly higher than the burden estimate identified in the Proposed Revisions.  *See* Exhibits 5 - 8 (EEOC OIRA filings).  For instance, in 2015, the EEOC estimated the annual employer burden associated with the EEO-1 filings as follows:

- 307,103 EEO-1 reports filed, based on actual 2013 filings.

- 3.4 hours per report, which yields 1,044,150 total burden hours.

- Average cost per hour estimated to be $19.00 per hour, based on the hourly rate paid to "Human Resources Assistants" according to the BLS publication "Occupational Employment Statistics, Occupational Employment and Wages, May 2010" – $18.22 – "rounded to $19.00 to account for instances where higher paid staff perform this work."

Based on those assumptions, the EEOC estimated in 2015 – less than one year ago – that EEO-1 Filers would incur costs of *$19.8 million* annually to generate the EEO-1 filings.  That cost figure is *350% higher than the EEOC's new estimate* of what the current burden is *without* any of the proposed changes.[6]

Attempting to explain this *$14.3 million reduction* in the estimated burden, and perhaps anticipating criticism of this change, the EEOC includes only the following statement in its Proposed Revisions:

> The reporting hour burden calculations in this notice reflect a departure from the manner in which EEOC traditionally estimated reporting burden.  In the past, the EEOC estimated the reporting hour burden based on the number of total cells in the report(s) that a firm had to complete.  This approach viewed each report filed by a firm as a separate reporting requirement, *analogous to a paper report*.  In reporting year 2014, however, the number of paper reports declined to just three.  In addition, employers now rely extensively on automated HRIS to generate the information they submit on the EEO-1 report.  As a result, each additional report

---

[6] In 2009, the EEOC used this approach and estimated 599,000 burden hours.  Ex. 5.  That figure rose to 987,394 burden hours in both 2011 and 2014.  Exs. 6 and 7.  Using the $19.00 per hour rate used by the EEOC in 2015, those estimates would have identified annual burdens of $11.3 million in 2009 and $18.8 million in both 2011 and 2014.

filed has just a marginal additional cost. To accurately reflect the
manner in which employers now collect and submit the data for
filing, the estimated reporting burden set forth in this notice is
calculated per firm, rather than per report. This burden calculation
is based on the time spent on the tasks involved in filing the
survey, rather than on 'key strokes' or data entry."

81 Fed. Reg. 5120 (February 1, 2016) (emphasis added).

      The EEOC's explanation rings hollow, as it is contradicted by its 2015 OIRA filing and is
wholly inconsistent with the experience of EEO-1 Filers. The burden estimate reached by the
EEOC in 2015 expressly noted that "98%" of the 70,070 respondents in 2013 "file [their EEO-1
Reports] on-line." Ex. 8 at Paragraph 3. Thus, the claim that the shift from a *response-based
approach* that takes into account the number of establishments on which reports are filed to an
*EEO-1 Filer-based approach* was prompted by a sudden shift from paper filings to online filings
is not supported by the EEOC's own submissions. <u>The PRA requires that the imposed burden be
accurately computed. It does not countenance fictitious assertions of burden bereft of factual
support or historical experience.</u>

      Second, the assumption that "each additional report" for those employers with multiple
establishments "has just a marginal cost" is based on no analysis whatsoever. The EEOC seems
to assume that the electronically fillable PDF format relieves employers of the necessity of
manually entering data when filing their EEO-1 Reports. That assumption is contrary to fact.[7]
Even when using the EEOC's on-line system, EEO-1 Filers must manually enter the data for
each cell and for each establishment.[8] Notably, the EEOC's Proposed Revisions acknowledge
that only 2% of EEO-1 Filers (1,449 of 67,146) submitted their data by uploading a data file in
2014 rather than manually completing the online submission. Thus, the process remains a
manual one for most employers, even if the EEO-1 Report is submitted electronically, and the
actual burden remains unchanged from recent years.[9]

          3.      The EEOC's PRA Analysis of the Current
                  Reporting Burden is Fundamentally Flawed in
                  <u>Other Respects</u>

      There are two other glaring flaws to the EEOC's PRA analysis. First, the EEOC nowhere
explains its estimate that EEO-1 Filers spend a total of just 2.9 hours collecting, verifying,

---

[7] Ex. 3, Annette Tyman, Decl., generally describing the EEO-1 submission process.
[8] Ex. 3, Annette Tyman Decl. ¶7.a.
[9] The EEOC's suggestion that uploading a data file means that "the information goes nearly directly from an
electronic file generated by the HRIS to the survey data base" is a gross misunderstanding of the process required
for gathering and validating data for submission to the EEO-1 survey. Ex. 3, Annette Tyman Decl. ¶11.

validating, and reporting" their current EEO-1 data.  As part of its burden under the PRA, the EEOC should identify its current basis for this estimate. [10]

Second, the EEOC bases its cost estimate on an improper assumption that EEO-1 data and the ultimate reports are developed by "Administrative Support" personnel alone, at a cost of $24.23 per hour, without any internal or external assistance, and without any consideration of overhead costs associated with those personnel.  The EEOC's assumption is flatly contradicted by employer experience.  In fact, personnel ranging from HRIS and information technology personnel to senior human resources officials and legal professionals often assist in the development of the data, the compilation of the EEO-1 Report, review of the Report, and the submission of the Report.  Because the EEO-1 Report requires certification by a company official, subject to penalties for false reporting, the EEOC's assumption that the entire EEO-1 filing process is left to clerical personnel is simply false.  Because the EEOC has not included the wage rates of senior human resources, HRIS and information technology personnel, or legal professionals in the development, compilation, review, certification, and submission of the report, the assumption that the wage rate of an Administrative Support personnel alone, is flawed.  The EEOC's additional failure to consider overhead costs only undermines further its PRA analysis.

      4.      The Chamber's Survey of Member Companies
                   Contradicts the EEOC's Estimate of the Burden
                   Associated with the Current EEO-1 Report

The Chamber developed[11] and issued a survey instrument ("Survey") to 35 of its members during the 60-day comment period.  Ex. 2 (Appendix B to Bird Declaration).  While the cribbed comment period and the Commission's rejection of the Chamber's request for an extension of time to file comments impacted the Chamber's ability to gather as much survey data as it would have liked, a total of 22 companies responded to the Survey by March 25, 2016.  Information gleaned from those 22 respondents is set forth below.[12]

Responses were received from employers with as few as approximately 400 employees, 90% of whom are housed in a single establishment, and from an employer with more than 200,000 employees housed in more than 2,000 EEO-1 reportable establishments.  Ex. 2, p. 2.  Respondents to the Survey filed a total of 12,982 EEO-1 reports in 2015, comprising

---

[10]  Ex. 2, Ronald Bird Decl. p. 4.
[11]  Nine experienced Human Resources professionals participated in the development of the Survey.  Ex. 2, p. 2 (Bird Declaration).
[12]  Since March 25, 2016, the Chamber has received additional responses from the original group of 35 member employers and we anticipate all 35 recipients will respond in the coming weeks.  The Chamber is also distributing the Survey to additional employers and anticipates having a larger sample of results in time for comments to OIRA.

approximately 4.2% of the total number of reports filed annually, according to the EEOC's most recent tabulation. *Id.*

The Survey responses reveal the following deficiencies in the EEOC's estimate of the burden associated with filing the current EEO-1 Reports:

- The total costs of compiling and submitting EEO-1 data was significantly dependent upon the number of establishments covered by the report and by the number of reports filed. This finding undermines the EEOC's decision to abandon the "Response-Based" approach and invalidates the "EEO-1 Filer-Based Approach."

- The internal resource time reported to complete an EEO-1 Report for a single establishment ranged from 2.6 hours per report to 42.5 hours per report, and the average *was 8.1 hours per report*, or 2.4 times greater than the EEOC's estimate.

- Multiplying the 8.1 hours per report by the EEOC's most recent tabulation of 307,103 reports filed by 67,146 distinct companies yields a total burden of *2,479,156* hours, or 36.9 hours per employer, to complete the EEO-1 form in its current form. This figure is more than ten times greater than the 3.4 hours the EEOC identifies as the baseline estimate for its current proposal.

- Of the 22 respondents, 20 provided their estimate of the hourly rate paid to the internal employees who would gather the information, prepare and submit the EEO-1 Reports. The average hourly rate reported from these 20 respondents was *$45.00*.

- The Chamber's expert, Dr. Bird, identified a multiplier of 3.25 for the overhead cost of internal labor used, a figure that was drawn from an examination of the fully loaded labor cost reimbursement rates paid by government agencies for administrative, professional, technical and managerial services under the GSA government-wide services contracts. Applying this overhead plus profit factor to the $45 per hour average hourly rate yields an opportunity cost value of $146 per hour. Applying this fully loaded labor cost to the average hours required per report (8.1) yields a cost per report for internal labor of *$1,175*.

- Respondents were also asked to address the extent to which they retained outside consultants and service providers to complete their EEO-1 filings. Fourteen of the 22 respondents reported they did not use such consultants or

14

service providers. Across all 22 respondents (including $0 for the 14 who reported that all work is done internally), the average external cost was *$8,307 per respondent and $215 per report.*

- Adding the per report cost for internal labor ($1,175) to the per report cost for outside services ($215) yields a total current annual cost for completing each report of $1,391. Based on the 307,103 total reports filed in the most recent year, the total annual cost burden of the EEO-1 Report, in its current format, is *$427.3 million*, a figure that is $421.8 million higher than the EEOC's estimate.

Exh. 2, pp.3-5 (Bird Declaration).

As these figures demonstrate, the EEOC's estimate that EEO-1 Filers will incur costs of just $5.5 million in 2016 to complete the EEO-1 Report as currently configured – representing a 350% reduction in the EEOC's *own* estimated total costs of $19.8 million incurred in 2015 – is absurd. The actual burden, based on the Chamber's Survey, is more than $425 million. Because the EEOC's erroneous estimate impacts the Agency's estimate of the anticipated costs of completing the proposed revised EEO-1 Report in 2017 and 2018, the EEOC's entire burden estimate associated with the Proposed Revisions is inaccurate, misleading, and inadequate under the PRA.

**B.     The EEOC's Analysis of the Burden Associated with Completing the Proposed Revised EEO-1 Report Lacks Factual Support**

1.     The EEOC's PRA Analysis

The EEOC's Comment Request includes the PRA-required estimate of both the one-time burden of complying with the proposed revisions and the annual burden of complying with those revisions. As for the "One-Time Implementation Burden," the EEOC's analysis consists of three sentences, one of which is contained in a footnote. The EEOC estimates a one-time burden of *$23,000,295*, which is based on the following assumptions:

- Eight (8) hours of time "per filer" to "develop[ ] queries . . . in an existing human resources information system."

- An hourly wage rate of $47.22, which is the average compensation for a Professional as identified in the BLS publication "Employer Costs for Employee Compensation," issued in 2013.

15

The EEOC's total estimate for the one-time burden is calculated by multiplying the number of EEO-1 Filers that would be required to submit W-2 and hours information (60,886) by eight hours, and multiplying that total by $47.22.

As for the recurring, annual burden employers will incur completing the proposed revised EEO-1 Report, the EEOC restates its current burden analysis for the estimated 6,260 EEO-1 Filers that have 50-99 employees. For that group of employers, the EEOC maintains its estimate that each filer will spend just 3.4 hours completing its EEO-1 Report, that those 3.4 hours will be spent by Administrative Support personnel at a cost of $24.23 per hour, and that the total cost burden to the 6,260 EEO-1 Filers who need not submit W-2 wage and hours data will be $515,711. That estimate is flawed, for the reasons identified above.

For employers with 100 or more employees, the EEOC estimates that each EEO-1 Filer will spend 30 additional minutes reviewing the instructions and *just 2.7 additional hours per year* "collecting, verifying, validating, and reporting" the W-2 wage data and the hours data for its employees. The EEOC continues to assume that all of these tasks will be performed by Administrative Support personnel, again at a cost of $24.23 per hour. In total, the EEOC's annual burden estimate for employers with 100 or more employees is as follows:

- 6.6 hours per EEO-1 Filer to collect, verify, validate, and report both the representational data currently reported and the W-2 wage data and hours data that would be required beginning in 2017.

- An hourly rate of $24.23.

Based on these assumptions, the EEOC estimates that the total annual cost burden on EEO-1 Filers with 100 or more employees will be $9,736,767, which is the number of such filers (60,886) multiplied by 6.6, then multiplied by $24.23. When coupled with the estimated cost burden for EEO-1 Filers with 50-99 employees, the total annual estimated cost identified by the EEOC for all EEO-1 Filers in 2017 is *$10,252,478*.

2.      The EEOC's PRA Analysis Lacks Credibility

The EEOC's estimates of the burdens – one-time and recurring – associated with the proposed revised EEO-1 Reports are wholly unrealistic. As detailed below, absent from the EEOC's analysis of the burden associated with the Proposed Revisions is any explanation of the basis for its estimate of the hours that would be incurred by EEO-1 Filers. [13] As an initial matter, while the EEOC claims it reviewed "the public comments relating to the burden calculation for OFCCP's proposal to collect pay data and consulted with OFCCP about burden estimates," the

---

[13] Ex. 2, Ronald Bird Decl. pp. 5-6.

16

EEOC fails to state how it reconciled the information supplied to the OFCCP with the EEOC's current estimates. More importantly, the EEOC failed to identify any other basis for its hours estimates, noting that its Pilot Study sought data from private employers "about the possible cost of collecting pay information but few employers responded, and the employers that did respond did not provide quantitative feedback." 81 Fed. Reg. 5120. Without more, one can only conclude that the EEOC's estimate of the hours employers will spend "collecting, verifying, validating, and reporting" W-2 wage data was "pulled out of thin air."

To make matters worse, the EEOC provides no explanation for its estimate of the hours burden associated with supplying hours-worked data. The EEOC does not even address this issue in its Proposed Revisions, stating simply that it is seeking input from employers as to "the anticipated estimated burden to also submit . . . hours-worked data." As detailed below, this omission should sound the death knell for the EEOC's Proposed Revisions, given that the collection of hours-worked data for exempt employees who do not currently capture their hours worked would be staggering.

>        a.        The EEOC's Estimate of the <u>One-Time</u> Burden Bears No Relationship to Reality

The EEOC's estimate of the one-time burden associated with the Proposed Revisions cannot withstand scrutiny. First, its assumption that employers will be able to generate W-2 and hours data after an HRIS professional spends just eight hours "developing queries . . . in an existing human resources information system" underscores how distant the EEOC's experience with employer HRIS systems is from reality.

The EEOC's underlying assumption – that a single HRIS houses all the data necessary to generate the W-2 and hours data – is plainly false. Most employers maintain gender, race, and ethnicity data in an HRIS that is different from the system that houses payroll information, including W-2 wage information. Hours data for non-exempt employees are likewise captured outside of the HRIS and hours data for exempt employees simply do not exist for most employers. In practice, once each reporting employer gathers the necessary earnings information, that data must be merged with each employee's EEO-1 occupational classification, gender, and race/ethnicity to complete the information needed for the proposed report. The number of employees in each unique combination of EEO-1 classification, gender, race/ethnicity, and membership in one of the twelve pay bands then would have to be computed and separately reported for each of the employer's establishments. Therefore, determining how to marry gender, race, and ethnicity data housed in an HRIS with W-2 wage data housed in a payroll system, often by a third party, in and of itself, will take more than eight hours.

17

Second, the EEOC's estimate is off-base because it ignores the fact that the W-2 data to be submitted is different from the W-2 data generated annually by employers for income tax reporting purposes. Because the 12-month reporting period proposed by the EEOC crosses tax years, employers cannot simply rely on the data they generate for the IRS each year. Instead, employers will be required to generate data spanning two different tax reporting years and will be required to make one-time changes to their systems in 2016 to permit such reporting.

Third, the EEOC's estimate of the one-time burden is inaccurate because the hourly rate on which it is based – $47.22 for a "Professional" – fails to account for the fact that senior information technology personnel, legal personnel, and others will be involved in any effort to develop the processes necessary to generate the required data. The identified hourly rate is not commensurate with the rates of pay provided to such individuals. [14]

Fourth, as detailed in Section II.B.3, below, the EEOC estimate fails to account for the one-time burden associated with requiring employers to develop, for the first time, a system that captures the hours worked by exempt employees and to train all exempt employees on any new system.[15] Those costs would be massive, and should be quantified by the EEOC before the Proposed Revisions are considered.

> b.  The EEOC's Estimate of the Annual
>     Burden of Compliance with the
>     Proposed Revisions is Likewise
>     Unrealistic

The Commission's prediction that the Proposed Revisions will require only 3.2 hours of additional work per EEO-1 Filer – 30 additional minutes to read the instructions and just 2.7 hours to "collect, verify, validate, and report" all of the required W-2 and hours data for every establishment – is ludicrous.

First, the EEOC dramatically underestimates the time it will take each EEO-1 Filer to collect, verify, validate and report on data that must be pulled from various systems and sources. As noted above, often the required data is not housed in a single HRIS and cannot be generated with the push of a button. Once generated, a combination of HRIS professionals and HR professionals will have to expend time verifying and validating the data. Legal professionals will likewise be involved in the verification process, given that the EEOC's stated purpose for the collection is to target its, and the OFCCP's, enforcement efforts, and given the requirement that a company official certify the filing, subject to penalties.

---

[14] Ex. 2, Ronald Bird Decl. pp.17-18.
[15] As noted in Section III.C.2, any approach that assumes each exempt employee works 40 hours per week is not realistic and would only further undermine the efficacy of the data collected.

Second, the EEOC bases its burden estimate for the generation and reporting of W-2 data and hours data on the wage rate of $24.23, which is – again – the BLS wage for Administrative Support personnel. As detailed above, employees other than Administrative Support personnel would be engaged in the effort to collect, verify, validate, and report the W-2 and hours data – legal professionals and others are, and will continue to be, involved in the EEO-1 filing process.[16]

Third, the EEOC's annual burden estimate for filing the Revised Reports is improperly based on the number of EEO-1 Filers, rather than the number of EEO-1 Reports filed. The "per EEO-1 Filer" approach is inappropriate, for the reasons identified above, and the approach the EEOC used between 2009 and 2015 – in which the burden estimate takes into account the fact that many EEO-1 Filers must file reports on all of their establishments individually – remains the appropriate approach. If the per response approach were applied here, the EEOC's total cost estimate would jump from *$10,252,478 to $49,111,297*, and that calculation assumes that the EEOC's hours estimates of 6.6 hours and cost estimate of $24.23 per hour are correct, which they clearly are not.

Fourth, the EEOC's assumption that filing on-line, through fillable PDFs, alleviates the burden of manual data entry is a false assumption. As detailed above, fillable PDFs still require the employer to manually enter the relevant data. With the addition of W-2 data and hours data, reported in twelve different pay bands within each EEO-1 category, each EEO-1 Filer will now be required to populate as many as 3,360 separate cells of data. The EEOC's burden estimate fails to account for this reality in any way.

Fifth, the EEOC does not account, in any way, for the costs employers will incur responding to investigations and enforcement actions that are prompted by "false positives" that flow from comparing employees within broad EEO-1 categories.[17] Because the EEOC and OFCCP intend to use the results of analyses of W-2 wages by EEO-1 categories to target their enforcement efforts and because those analyses will be fundamentally flawed, the substantial cost to employers who must respond to such investigations is not theoretical. Employers will be forced to expend resources producing additional data to the EEOC and/or OFCCP, retaining labor economists to run their own analyses of pay, and engaging legal counsel to correct the Agencies' presumption of discrimination.

---

[16] Ex. 2, Ronald Bird Decl. pp. 17-18.
[17] *See* Section III (describing lack of efficacy of any analysis that compares employee pay within broad EEO-1 categories); Ex. 1, Declaration of Dr. Michael DuMond (same).

19

        *c.*       *The EEOC Ignores the Substantial*
                  *<u>Burden Associated with Collecting</u>*
                  *<u>Hours Data</u> for Exempt Employees*

The EEOC proposes to collect "the total number of hours worked by employees" included in each of 12 pay bands within each EEO-1 category, to "allow analysis of pay differences while considering aggregate variations in hours." With respect to exempt personnel, the Commission "seeks employer input with respect to how to report hours worked for salaried employees" and states that "[o]ne approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers." The Commission further states that it is "not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers," and the EEOC's "initial conclusion is that requiring employers to provide the total number of hours worked would impose a minimal burden."

As detailed in Section III<u>.C.2</u>, below, assuming that all full-time exempt employees work 40 hours per week is neither an accurate nor a fair assumption. Thus, to the extent the EEOC intends to consider "aggregate variations in hours," the <u>only way</u> for the EEOC to accurately capture hours for exempt employees would be to require employers to track hours of exempt employees. That option would be incredibly burdensome.

First, employers would be required to implement a time system to track all hours worked by exempt employees. Because there is no continuous workflow for exempt employees, and because they often work outside of normal business hours, any such system would be much more complex than the standard time-clock, punch-clock, or timesheet system currently used by employers for their non-exempt employees. The cost of developing such a system would be immense.

Second, the hours burden associated with exempt employees recording time would be substantial. Unlike non-exempt employees who may use a punch clock system or work regular hours, each exempt employee would be required to capture the "starts" and "stops" of his or her work. Even if that effort required just 15 minutes of time each day for each exempt employee, the result would be significant new burden for employers.

<u>Finally, the EEOC has failed to abide by its obligation under the PRA, which is to propose a methodology for, and also assess the burden of, collecting hours for exempt employees.</u> Because the EEOC has failed to do so, commenters – including the Chamber – are unable to examine the utility and burden of producing the hours report for exempt employees.

3.      The EEOC's One-Time and Recurring Burden Estimates
        Relating to the Collection and Submission of W-2 and
        Hours Data is Wholly Contradicted by the Chamber's
        Survey

The Survey conducted by the Chamber sheds further light on the fundamental shortcomings of the EEOC's burden analysis under the PRA, both as to the one-time costs associated with collecting and reporting aggregate W-2 and hours data and as to the recurring costs associated with such efforts.

The Survey reveals the following with regard to the one-time costs that will be incurred by the 60,886 employers (estimated by the EEOC) who will be required to furnish aggregate W-2 and hours data:

- Ninety-five percent (21 of 22) of the respondents stated that they expected to incur one-time cost burdens associated with the proposed W-2 and hours reporting requirement.

- One respondent estimated its one-time cost of complying with the W-2 earnings requirement would range from $1,000 to $5,000. The remaining  respondents estimated those costs to range from $50,799 to $58,254, which equates to $253 to $406 per report filed by each respondent.

- Estimates of the one-time costs associated with complying with the hours reporting requirement (including developing an hours tracking system) ranged from $37,535 to $57,563 per employer respondent, which equates to $174 to $242 per report filed by each respondent.

- Adding together the one-time costs associated with both new reporting requirements yields a total that ranges from $88,334 to $115,817 per respondent, or $427 to $648 per report.

- Applying the per report one-time cost ranges ($427 to $648) to the 307,103 reports that were filed most recently yields a lower bound

21

for the one-time cost estimate that ranges from *$118.9 million to $180.4 million*.[18]

Exh. 2, p. 5-6 (Bird Declaration).

The Survey reveals the following with regard to the <u>recurring costs</u> that will be incurred by the 60,886 employers who will be required to furnish aggregate W-2 data[19]:

- Seventy-three percent (16 of 22) of the respondents stated that they expected to incur additional, ongoing, annual costs to implement the proposed expanded data collection.

- In response to the Survey request that respondents characterize their expectations for the ongoing, recurring costs of generating and submitting the W-2 wage data as a multiple of the current hours required and current outside services costs required, the average multiple reported was *1.9*.

- Mutliplying the average cost per report for the current EEO-1 Report (*see* Section II.A.4, above) by 1.9 yields cost per report that ranges from $2,488 to $2,619. Multiplying those figures by the 307,000 annual reports filed yields a recurring annual total cost for the proposed expanded EEO-1 report that ranges from *$692.9 million to $729.4 milion.*

Exh. 2, p. 6-8 (Bird Declaration). As noted in footnote 18, this recurring cost figure of $692.9 million to $729.4 million does <u>not</u> including the recurring costs employers will incur tabulating hours worked by their employees. As a result, even these extraordinary cost figures are simply the lower bound of the costs to be expected.

---

[18] The Chamber will continue to assess this figure as additional Survey responses are received. The upper bound, which one could calculate using the high end of the cost per company range ($115,817) and the total number of filers (60,886), is as high as $7 billion. Exh. 2, p. 5 (Bird Declaration).

[19] The EEOC should note that respondents were unable to provide an estimate of the recurring costs associated with tabulating hours worked data, as would be required under the EEOC's proposal.

22

## III. THE PROPOSAL WILL NOT PROVIDE A PUBLIC BENEFIT OR MAXIMIZE THE UTILITY OF THE REQUESTED DATA AS REQUIRED BY THE PAPERWORK REDUCTION ACT.

Despite the significant burden that employers with more than 100 employees will face as a result of the requirements in the Proposed Revisions, the EEOC has failed to articulate any rationale or evidence whatsoever to justify the need for the proposed EEO-1 Revisions. Nor has the agency identified the specific benefit that the collection of aggregated wage and hours data would provide to the Commission. The EEOC's wholesale failure to articulate the proposed benefit is significant given that one of the purposes of the PRA is to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government."

The Sage Report, which the EEOC used to "formulat[e] the proposal and guide the development of analytical techniques to make full use of the data to be collected," recognized the inherent limited use of the requested data. Specifically, the Sage Report recognized that "[s]**ummary data at the organization level will likely be of very limited use in EEOC practice**."[20] The reasons for this observation are numerous, as articulated below.

To evaluate the utility of the proposed EEO-1 Revision, one must consider the legal framework that governs compensation discrimination. Since 1963, the EPA has required employers to pay men and women at the same establishment equal pay for equal work. In addition to the protections against wage discrimination based on sex afforded by the EPA, Title VII prohibits pay discrimination on the basis of race, color, national origin as well as other protected factors.[21] Employees who work for Federal contractors and subcontractors share

---

[20]" Sage Computing Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 57 (Sept. 2015).

[21] Against this backdrop, it is important to note that Congress and courts have explicitly rejected the notion of pay equity based on "comparable worth" theories under which employers would be required to set wages to reflect differences in the "worth" of different jobs. (In the 1960s, the Kennedy Administration proposed a ban on sex discrimination in wages "for work of comparable character on jobs the performance of which requires comparable skills," with the assumption that job evaluation systems were available to evaluate the comparative worth of different jobs. Equal Pay Act of 1963: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 88th Cong., 1st Sess. 2 (1963) (quoting S. 882, 88th Cong., 1st Sess., 109 CONG. REC. 2770 (1963) and S. 910. 88th Cong., 1st Sess., 109 CONG. REC. 2886 (1963)). Congress resisted the proposal for the simple reason that it did not want the government or judges to invade the workplace and tell employers what to pay their employees.) Under federal law, the value of the relative worth of one job as compared to another job is a matter to be decided within the province of the employer offering the employment opportunities to workers. For instance, the Sixth Circuit rejected the comparable worth theory stating, "Title VII is not a substitute for the free market, which historically determines labor rates." *Int'l Union v. Michigan*, 886 F.2d 766, 769 (6th Cir. 1989). Likewise, the Ninth Circuit rejected the theory on the grounds that it found "nothing in the language of Title VII or

23

similar protections under Executive Order 11246. Since 1978, the EEOC is the administrative agency with enforcement authority of the EPA and Title VII, while the OFCCP enforces EO 11246.

Notwithstanding these protections, both the EPA and Title VII recognize that there are legitimate reasons for differences in compensation. In this regard, the EEOC has recognized that differences in education, experience, training, shift differentials, job classification systems, temporary assignments, "red circling," revenue production, and market factors, to name a few, can legitimately explain compensation differences.[22] Thus, mere differences in pay even as between comparable employees are insufficient to infer unlawful discrimination.

### A. The EEOC's Proposed Tool Will Not Advance Investigations Under the EPA

As noted above, the EPA prohibits sex-based compensation discrimination for employees working at the same establishment if they perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[23] In other words, the relevant comparators are only those employees who perform "equal work" in the "same establishment." The EEOC itself describes the *prima facie* elements of an EPA claim as follows:

- Prima Facie Case: (1) the complainant receives a lower wage than paid to an employee of the opposite sex in the same establishment; and (2) the employees perform substantially equal work (in terms of skill, effort, and responsibilities) under similar working conditions.[24]

Despite the requirement that pay comparisons can only be made between employees who perform "equal work," the proposed EEO-1 Revision would require that employers provide W-2 wage data by EEO-1 job category. Because there are only ten EEO-1 job categories or groupings of jobs,[25] employers would be forced to categorize employees who perform wildly different work into these groupings. The job groupings are exceedingly broad, and will necessarily capture a wide range of positions that are not capable of meaningful compensation comparisons.

---

its legislative history to indicate Congress intended to abrogate fundamental economic principles such the laws of supply and demand or to prevent employers from competing in the labor market." *AFSCME v. Washington*, 770 F.2d 1401, 1407 (9th Cir. 1985).
[22] EEOC Compl. Man. Ch. 10.
[23] 29 U.S.C. § 206(d).
[24] EEOC Comp. Man. Ch. 10, at p. 20, available at www.eeoc.gov/policy/docs/compensation.html
[25] The ten EEO-1 Job groups include: Executive/Senior Level Officials and Managers; First/Mid-Level Officials and Managers; Professionals; Technicians; Sales Workers; Administrative Support Workers; Craft Workers; Operatives; Laborers and Helpers; and Service Workers.

For instance, as Economist Dr. J. Michael DuMond observed, one of the most serious deficiencies with the proposed EEO-1 Revisions are the "very broad occupational group[ings]" that would "result in comparisons of employees who work in very different jobs and who may perform different work." Dr. DuMond uses the following example:

> [O]ne of the 10 EEO-1 job categories is "Professionals", which encompasses a wide range of occupations such as lawyers and registered nurses. Hospitals that employ both nurses and lawyers would nevertheless be required to include both of these occupations together in the proposed EEO-1 survey. This grouping of nurses with lawyers ignores the fact that a nursing degree does not require a post-graduate college degree whereas a lawyer will almost surely have post-graduate education. Moreover, the knowledge, skills and abilities required of a nurse differ greatly from those factors that required of a lawyer. In fact, there is actually very little in common between nurses and lawyers beyond the sharing of a common EEO-1 category. While it is undeniable that nurses and lawyers are tied to very different labor markets, the EEOC's proposal ignores this reality and assumes pay should be similar for these types of occupations simply because they are both "Professionals."[26]

Dr. DuMond is not alone in his concerns; Economist Dr. Speakman expressed similar apprehensions, stating "it is my experience [employers] don't use the EEO-1 job classification for any type of review or planning or comparison purposes, much less for compensation-related determinations, outside the scope of providing data to the government. It's an artificial and meaningless conglomeration of dissimilar workers used only for EEO-1 reports. . . It's unclear why anyone or any agency would consider it an appropriate grouping for a meaningful analysis of employees' pay."[27]

The EEOC's instruction booklet outlines other "Professional" positions that similarly cannot form a proper comparison for compensation purposes under the EPA. For instance, using the Professionals job category for positions typically found within a hospital, we would also find accountants, computer programmers, dieticians, physicians and surgeons.[28] But these jobs are simply not comparable under the EPA.

---

[26] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 9.
[27] Ex. 4, Dr. Robert Speakman Declaration at p. 11.
[28] *See* EEO-1 instruction booklet, available at http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm. Notably, the examples provided omit the myriad other jobs that would also fall within the Professionals EEO-1 job group.

25

The EEOC itself must recognize the inappropriateness of such groupings under the EPA. Indeed, in investigating and analyzing the "equal work" requirement, the EEOC advises as follows:

> [A]n inquiry should first be made as to whether the jobs have the same common core of tasks, i.e., whether a significant portion of the tasks performed is the same. *If the common core of tasks is not substantially the same, no further examination is needed and no cause can be found on the EPA violation.*[29]

Common sense tells us that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons do not share the same common core of tasks. But to be more specific, the Department of Labor, Bureau of Labor Statistics makes those distinctions clear in the descriptions it assigns to these workers: [30]

> Accountants & Auditors: Examine, analyze, and interpret accounting records to prepare financial statements, give advice, or audit and evaluate statements prepared by others. Install or advise on systems of recording costs or other financial and budgetary data.

> Computer Programmers: Create, modify, and test the code, forms, and script that allow computer applications to run. Work from specifications drawn up by software developers or other individuals. May assist software developers by analyzing user needs and designing software solutions. May develop and write computer programs to store, locate, and retrieve specific documents, data, and information.

---

[29] EEOC Comp. Man. Ch. 10, at p. 22, available at www.eeoc.gov/policy/docs/compensation.html, (emphasis added) citing *Stanley v. University of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir.) (EPA requires two-step analysis: first, the jobs must have a common core of tasks; second, court must determine whether any additional tasks incumbent on one of the jobs make the two jobs substantially different), cert. denied, 120 S. Ct. 533 (1999); *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998) (critical issue in determining whether two jobs are equal under the EPA is whether the two jobs involve a "common core of tasks" or whether "a significant portion of the two jobs is identical"); *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (same).

[30] Standard Occupational Classification system overview, March 5, 2016, http://www.bls.gov/soc/home.htm, "The 2010 Standard Occupational Classification (SOC) system is used by Federal statistical agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 840 detailed occupations according to their occupational definition. To facilitate classification, detailed occupations are combined to form 461 broad occupations, 97 minor groups, and 23 major groups. Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together."

26

Dieticians: Plan and conduct food service or nutritional programs to assist in the promotion of health and control of disease. May supervise activities of a department providing quantity food services, counsel individuals, or conduct nutritional research.

Registered Nurses: Assess patient health problems and needs, develop and implement nursing care plans, and maintain medical records. Administer nursing care to ill, injured, convalescent, or disabled patients. May advise patients on health maintenance and disease prevention or provide case management. Licensing or registration required. Includes Clinical Nurse Specialists. Excludes "Nurse Anesthetists" (29-1151), "Nurse Midwives" (29-1161), and "Nurse Practitioners" (29-1171).

Lawyers: Represent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions. May specialize in a single area or may practice broadly in many areas of law.

Physicians:[31] Physicians who diagnose and provide non-surgical treatment of diseases and injuries of internal organ systems. Provide care mainly for adults who have a wide range of problems associated with the internal organs. Subspecialists, such as cardiologists and gastroenterologists, are included in "Physicians and Surgeons, All Other" (29-1069).

Surgeons: Physicians who treat diseases, injuries, and deformities by invasive, minimally-invasive, or non-invasive surgical methods, such as using instruments, appliances, or by manual manipulation. Excludes "Oral and Maxillofacial Surgeons" (29-1022).

And of course, the BLS job descriptions do not take into account the many specific job descriptions and duties employers are likely to have in their own workforces.

Aside from the "same common core of tasks" analysis, assessing whether required "skills" of comparator jobs are substantially equal further demonstrates that comparisons of pay by EEO-1 job groupings can serve little utility. As the EEOC's Compliance Manual provides:

---

[31] See Internists, SOC 29-1063 given the multiple listings categories of "Physicians and Surgeons."

> Two jobs require equal skill for purposes of the EPA if the experience, ability, education and training required are substantially the same for each job.

Again, one need only look at the instructions the EEOC has provided to employers to see that the EEO-1 job groupings take into account a wide range of experience and educational requirements within the same job group. For instance, employers are advised that most jobs in the "Professionals" job group "require bachelor and graduate degrees, and/or professional certification." The EEOC further provides that "[i]n some instances, comparable experience may establish a person's qualifications." Thus, the explicit directions make clear that jobs that do not require the same education, experience and training will be grouped together. On its face, the EEO-1 job groupings are not capable of any meaningful analysis under the EPA. As Dr. Speakman indicated "…analyses using the EEOC's proposed pay data and suggested tests will result in a high error rate – firms that pay fairly will be investigated too often and firms that underpay women or minorities will often go undetected. Simply put, the recommended tests and data will lead to many false-positive and false-negative conclusions, negating any utility from this proposal. In fact, it appears that at best the targeting mechanisms suggested by the EEOC will do only negligibly better than selecting firms at random."[32]

### B. The EEOC's Proposed Tool Will Not Advance Investigations Under Title VII

The proposed EEO-1 Revisions are also inconsistent with Title VII and, therefore, cannot support any meaningful analysis probative of further investigation. Specifically, providing W-2 data by EEO-1 job categories is not consistent with the requirement that compensation differences only matter if the comparators are "similarly situated." As articulated by the EEOC in its compliance manual, "similarly situated employees are those who would be expected to receive the same compensation because of the similarity of their jobs and other objective factors."[33] And when reviewing similarity of jobs, EEOC investigators are instructed that the "actual content of the jobs must be similar enough that one would expect those who hold the jobs to be paid at the same rate or level."[34]

For the reasons set forth in Section III.A above, the EEO-1 job groups are exceedingly broad and will necessarily include a wide range of positions that are not capable of meaningful compensation comparisons under Title VII. Using the same example described above, it is simply implausible to expect that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons are "paid at the same level or rate."

---

[32] Ex. 4, Dr. Robert Speakman Declaration, at p. 3.
[33] EEOC Comp. Man. Ch. 10, at p. 6, available at www.eeoc.gov/policy/docs/compensation.html.
[34] *Id*. at 7.

Moreover, courts across this country have held that although similarly situated employees need not be "identical," they must be "directly comparable to the plaintiff in all material respects...."[35] Under these legal standards, any compensation analysis based upon EEO-1 job groupings would be meaningless.

We see a similar result in the EEO-1 "Sales Workers" job grouping. In that group we find advertising sales agents, insurance sales agents, real estate brokers and sales agents, securities, commodities, financial services sales agents, and telemarketers. Many of these positions could reasonably be found within a financial services organization. Yet one would not expect that these jobs would be similar enough to suggest that those who hold the positions would be paid at the same rate or level. Indeed, sales workers are often compensated based on varying levels of base salary and commission plans. Thus, unless they were truly in similar jobs, it would be impossible to conduct pay comparisons based on an overall broad-based job grouping that would include, for example, telemarketers and securities and commodities brokers.

And aside from the overly broad EEO-1 job groupings themselves, the EEOC has acknowledged that "differences in job titles, departments, or other organizational units may reflect meaningful differences in job content or other factors that *preclude direct pay comparisons* between employees."[36] But neither these factors nor the legitimate factors that explain compensation discrimination as described in Section II.C.1 below, are captured under the proposed EEO-1 Revisions.

### C. There are Fatal Limitations with the Information Sought and the Statistical Tool Proposed to be Utilized by the EEOC to Analyze this Information

For reasons addressed in detail below, there is simply no circumstance under which broad-brush, aggregate compensation and hours data can be used effectively on a grand scale to target employers for review.[37] Every employer's compensation system is unique and numerous

---

[35] *Eskridge v. Chicago Bd. of Educ.*, 47 F. Supp. 3d 781, 790-91 (N.D. Ill. 2014). Although a similarly situated employee need not be "identical," *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 592 (7th Cir.2008), he must be "directly comparable to the plaintiff in all material respects...." citing *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010); *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856-57 (S.D.Tex. 2010) ("'Similarly situated' employees are employees who are treated more favorably in 'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly. Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protective class. Where different decision makers or supervisors are involved, their decisions are rarely 'similarly situated' in relevant ways for establishing a prima facie case."); *Alexander v. Ohio State University College of Social Work*, 697 F.Supp.2d 831, 846-47 (S.D. Ohio 2012) (To be similarly situated, a plaintiff's purported comparators must have the same responsibilities and occupy the same level position.)
[36] EEOC Comp. Man. Ch. 10, at p. 8, available at www.eeoc.gov/policy/docs/compensation.html.
[37] *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (noting that "some [are] regressions so incomplete as to be inadmissible as irrelevant . . . .''); *Sheehan v. Purolator*, 839 F.2d 99, 103 (2d Cir. 1988) (affirming the district

factors impact compensation decisions and results. The authors of the Sage Report, commissioned by the EEOC, detailed a theoretical framework for identifying pay disparities that is consistent with standard labor economic theory.[38] More specifically, the authors demonstrated that an employee's pay is estimated as a function that includes "control variables that can have a justifiable impact on difference in pay (such as education, certification, and work experience)." The inclusion of the control variables is critical in explaining why some employees are paid more than others. As the authors correctly note: "market forces determine one's level of pay, and *variation in pay is both necessary and inevitable*."[39]

Nonetheless, the two tests that the EEOC specifically references in the Proposed Revisions are simply distributional tests that do not control for any legitimate factors that explain pay such as those identified in the Pilot Study. Besides pay band, the only other factor that a covered employer will be providing to the EEOC is the aggregate number of work hours associated with employees in each pay band and demographic group. However, the Sage Report's authors noted that simply adjusting for the number of work hours, as recommended by the EEOC, could generate misleading results:

> [W]e have to recognize the varying patterns of compensation for employees who work different hours. As a result, pooling together into a single cell the employees who may have received the same compensation from working different hours and *analyzing them with a single offset as the format of the proposed EEOC form suggests, may lead to biases that are difficult to quantify…*"[40]

As the EEOC has found with similar efforts to collect compensation data on a broad scale, compensation cannot be subjected to a normalized, one-size-fits-all method of

---

court's denial of class certification because the regression analysis relied upon was deemed to be "flawed" for failing to take into account non-discriminatory factors, such as "education and prior work experience."); *Griffin v. Board of Regents*, 795 F.2d 1281, 1292 (7th Cir. 1986) (holding that "the explanatory power of a model is a factor that may legitimately be considered by the district court in deciding whether the model may be relied upon."); EEOC Compliance Manual, Section 10: Compensation Discrimination ("[Employers often] assert[] that pay disparities are caused by nondiscriminatory factors. Such factors could include the employees' education, work experience with previous employers, seniority in the job, time in a particular salary grade, performance ratings, and others. The Commission will need accurate information about all the variables on which the employer relies, for each employee similarly situated to the charging party. The employer should be asked to provide and explain all of its reasons for a compensation differential to reduce the need for burdensome repetitive requests.")

[38] Sage Computing "Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 16 (Sept. 2015).

[39] *Id.*, at 16, emphasis added.

[40] *Id.*, at 61, emphasis added.

interpretation. As a result, the proposed data collection will have no "meaningful value" and certainly no benefit that rises to the level required by the PRA. <u>Simply put, the EEOC cannot achieve the objectives identified in the proposal through any mechanism, and certainly not through the mechanism it has identified</u>.

1.    The Pay Proposal Ignores Legitimate Reasons for
        Differences in Compensation

Employers have an inherent right to value jobs differently based on non-gender or race/ethnicity based standards.[41]  The EEOC's proposal does not account for the explicitly-permitted differentiation in compensation based on factors like experience, performance, work productivity, skills, scope of responsibility, market, and education – to name just a few. This is particularly troublesome because differences in sex and race/ethnicity correlate with some of these factors. For example, the Bureau of Labor Statistics indicates that the average amounts of company-specific tenure differ between men and women and among different race/ethnic groups.[42]  Notwithstanding, the statistical tests proposed by the EEOC do not account for these permitted differences.

Moreover, the EEOC's proposal ignores the role of working conditions and how that affects an employee's compensation. For example, employees who work night shifts, swing shifts and/or weekends are often paid a differential to account for less desirable work schedules.[43]  For the same reason, jobs that require employees to work outside or exert atypical physical effort may also command a wage premium.[44]  Nevertheless, the statistical tests proposed by the EEOC using the collected data will not and cannot account for differences in working conditions.

The concerns with the EEOC's failure to account for differences in working conditions is compounded because the Commission is proposing that employers use W-2 data, which includes not only base salary but also commissions, tips, overtime pay, shift differentials and bonus payments in the aggregate. In doing so, the EEOC is ignoring that some types of pay, specifically commissions and tips, are determined more by an employee's skill and effort than an employer's pay policies.[45]  For example, Dr. DuMond notes that differences in W-2 earnings among servers at a restaurant will be based on their ability to provide quality service and earning the associated tips/gratuities, and is largely undetermined by the employer.[46]

---

[41] 29 U.S.C. 206(d) and 42 CFR 2000e-2(h).
[42] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 10.
[43] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.
[44] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.
[45] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.
[46] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.

31

    2.    The Use of W-2 Earnings Further Obscures the Relevance
          of the Data Collection

The EEOC's proposal does not specify how employers are to report W-2 earnings and does not indicate whether employers should report the W-2 federal income taxable earnings (box 1) or Medicare taxable earnings (box 5) or report in some other manner. It is possible--and indeed likely--that a difference in tax-deferred retirement contributions and savings propensities could drive a pay difference between groups of employees, creating false positives and false negatives.[47] As Dr. Speakman noted, pay differences "generated by employees' decisions" will undermine the EEOC's efforts to correctly identify firms that discriminate in pay.[48]

    3.    The EEOC's Approach to Reporting of Hours for Salaried,
          Part-Time and Terminated Employees Further Denigrates
          the Efficacy of the Data

The proposal would require employers to report hours worked as well as W-2 earnings data that span a two-year income tax period. The Commission stated that this will allow the EEOC and OFCCP to "meaningfully analyze"[49] pay differences because "collection of hours-worked data will account for the fact that some individuals are employed for less than the entire reporting year, and therefore, may work fewer hours."[50] The proposed approach to reporting data for employees exempt from the overtime provisions of the FLSA, part-time employees, and employees who are hired or terminated mid-year, however, is fundamentally flawed.

First, as the EEOC admits in the proposal, it is unsure how to count hours worked for full-time, salaried exempt employees, noting that the Agency "*seeks employer input*" on how to report hours worked for these exempt employees.[51] The EEOC indicated that it is "not proposing" that employers begin collecting additional data on actual hours worked for salaried workers "to the extent that the employer does not currently maintain such data," but rather is considering a standard such as estimating 40 hours per week for all full-time salaried workers in all industries. In our experience and in the experience of Dr. DuMond and Dr. Speakman, very few employers track the number of actual hours worked for their salaried workers and even HRIS systems that maintain a standardized or default value for "work hours" for salaried exempt

---

[47] Employee Benefits Security Administration Publications, *Women And Retirement Savings*, available at http://www.dol.gov/ebsa/publications/women.html ("Women are more likely to work in part-time jobs that don't qualify for a retirement plan. And working women are more likely than men to interrupt their careers to take care of family members. Therefore, they work fewer years and contribute less toward their retirement, resulting in lower lifetime savings.")
[48] Ex. 4, Dr. Robert Speakman Declaration at p. 10.
[49] EEOC's Notice of Proposed Changes to the EEO-1 to Collect Pay Data from Certain Employers, available at http://www.eeoc.gov/employers/eeo1survey/2016_eeo-1_proposed_changes_qa.cfm.
[50] 81 Fed. Reg. 5117, fn. 45 (February 1, 2016).
[51] 81 Fed. Reg. 5117-5118 (February 1, 2016) (emphasis added).

employees (such as 40 hours per week) does not reflect an employee's actual hours worked.[52] As such, the Agency will be forced to apply an across-the-board rule that does further harm to the efficacy of the data and that would be uninformative and unreliable for purposes of identifying pay disparities.[53] The impact of this data limitation is serious: according to data from the Bureau of Labor Statistics, 59% of the US workforce is paid by the hour, meaning that 41% of the US workforce is paid on a basis for which no accurate work hours may be available and for which the EEOC does not have a recommended method for measuring.[54]

Further, combining employees who work part-time or partial year with full-time and full-year employees will result in very misleading results. The variation is explained by Dr. DuMond in his example of an employee who has an annual salary of $120,000 per year but was recently hired and only worked 1 of 12 months, he or she will be placed in the lowest pay band since he/she only earned $10,000. Under the EEOC's proposal, this employee could be grouped with lower wage workers at the same company, even though the hourly rate for this employee would be much higher than the other employees in the same pay band.[55] Similarly, an employee who works a part-time schedule of 20 hours per week will be grouped and counted with full-time employees who earn half of that hourly rate but work 40 hours per week.[56] Likewise, Dr. Speakman raised similar concerns with comparing employees who worked part-time or part-year or who took leaves of absence with other employees who worked full-time, full-year without any breaks.[57]

Simply collecting the aggregate number of hours worked does not fix the bigger underlying problem with the EEOC's proposal: employees are being counted in the "wrong" pay band. However, the EEOC might again infer discrimination from differences in the imputed hourly rates for employees in the same pay band, not recognizing that those differences can just as easily arise from part time and partial year employees, and the Commission will not be able to make that distinction with the aggregated data. Additionally, the proposal does not suggest a methodology by which the EEOC will distinguish between intermixed part-time, partial year or full-time employees in the aggregate W-2 data. Moreover, since the total number of hours worked by employees in a pay band does not incorporate any of the factors known to affect pay, the data collected under this proposal will not provide any useful insight into the actual nature of employers' pay practices.

---

[52] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 13; Ex 4, Dr. Robert Speakman Declaration at p 9-10.
[53] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraphs 13-15.
[54] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 14.
[55] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.
[56] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.
[57] Ex. 4, Dr. Robert Speakman Declaration at p. 10.

33

4.      The EEOC's Proposed Statistical Approaches Will Not be
        Useful in Identifying Pay Differences

The EEOC's proposal suggests that they will primarily use two statistical tests to analyze the collected data: the Mann-Whitney and the Kruskal-Wallis tests.[58] The EEOC indicates that it can "compute the statistical tests within job categories and then proceeding [sic?] to more closely investigate companies and establishments with low p-values" and may also "compare a particular firm's regression coefficients for the hours worked, race and gender variables to those derived from an analysis of the relevant labor market as a whole."[59]  The use of these measures could easily lead to both "false positives" (i.e., flagging a company for further review even when all employees working in the same job are paid exactly the same) and also "false negatives" (i.e., concluding that pay disparities do not exist at a company even in the presence of unambiguous pay discrimination).[60]

The reason that the two statistical tests proposed by the EEOC are likely to lead to both false positives and false negatives is that the aggregated data collected by the EEOC will not include the most important factors that drive compensation. For example, the report will not account for one of the most critical factors that determine pay, specifically the job level/job grade of an employee.[61]  According to Dr. DuMond, it is commonly understood that all employees, regardless of their race, ethnicity or gender, will experience increases in pay as they move "up" or "higher" in an organization.[62]  He provides the example that Pharmaceutical Sales Representatives are paid less than their District Sales Managers who are paid less than their Regional Sales Directors.[63] While it would not be reasonable to assume that an inexperienced Pharmaceutical Sales Representative would be paid similarly to an experienced Regional Sales Director simply because they are in the same EEO-1 job category (Sales), the statistical measure the EEOC proposes utilizing could lead to this conclusion because the EEOC's proposal will not include any information or breakdown relating to an employee's job level/job grade. Despite this lack of consideration for an employee's job level/grade, the two statistical tests will nevertheless ascertain whether gender and racial groups are equally distributed across all the pay levels of a company without any consideration of the employee's job level/grade.

---

[58] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).
[59] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).
[60] Ex. 4, Dr. Robert Speakman Declaration, at p. 13 ("Of secondary concern is that the EEOC's proposed data collection removes within pay band earnings variation. This variation may add information and it may add uncertainty. Suppose, for example, that men are paid at the top of every pay band and women are paid at the bottom. Given the proposed data collection, they will all appear to all earn the same amount. That men earn more is masked by the pay band data, which limits the EEOC's ability to detect a pay difference.")
[61] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.
[62] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.
[63] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.

34

The Pilot Study commissioned by the EEOC is very clear as to what these two statistical tests assume: "Although the (Mann-Whitney) test is sensitive to pure shifts, it has the more general interpretation of a test of the differences between two or more distributions."[64] Thus, because the Mann-Whitney and Kruskal-Wallis tests are determining whether men and women, for example, are distributed similarly across all pay bands (and hence all levels of an organization), these tests do not determine whether there are improper disparities within a pay band.[65] Instead, it is a test of whether racial and gender groups of employees are similarly distributed across all pay bands, even when the employees in these groups may have very different levels of experience, may hold very different jobs (e.g., nurses and lawyers) and may be at very differently job and pay levels within an organization.[66] If the EEOC proceeds with its stated proposal to use these tests on the collected data to "detect discrimination," then the likelihood that they would lead to false positives and false negatives is greatly increased.

Dr. Speakman also had serious concerns with the use of these statistical measures. Dr. Speakman stated:

> In my twenty-four years of experience working as an expert in the areas of economics and statistics, I've only seen the Mann-Whitney test run once and I've never seen the Kruskal-Wallis test run. In the one instance that I saw the Mann-Whitney test run, the opposing expert was inexperienced and there were many other errors made in the analysis that using the wrong test was only one of many concerns.

> The reason these tests are never used is that the comparisons made cannot be used to assess Title VII or EPA claims as they cannot be used to make comparisons among similarly situated workers. The exception would be if the population of employees was defined so that they are similarly situated in all relevant, potentially confounding factors. This would almost always lead to comparisons among very small groups of employees and the tests would not have the ability to statistically detect pay differences even if they existed.[67]

These concerns are all too real. Dr. DuMond conducted the Mann-Whitney test on two sets of simulated employment data to illustrate the problems with the use of these measures.

---

[64] EEOC pilot study on collecting pay data, available at: http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf, at p. 27.
[65] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19; Ex. 4, Dr. Robert Speakman Declaration at Page 12.
[66] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19; Dr. Robert Speakman Declaration at Page 12.
[67] Ex. 4. Dr. Robert Speakman Declaration, at pp. 12-13.

In the first simulation, an employee's pay is completely determined by two factors: his or her job grade/level and the number of years he or she has worked at that level.[68] For example, an employee entering the first job grade receives a starting annual salary of $30,000 and is awarded a raise of $1,000 each year he or she remains in that position. Similarly, an employee hired into the next grade level receives a starting salary of $40,000 and receives a raise of $2,000 each year he/she or she remains in their job. A similar method of pay determination exists for the next three job grades at this fictitious company, though the starting pay and annual pay adjustments are naturally greater in the higher-level grades. In this simulation, it is clearly impossible for a pay disparity to exist between women and men in the same job grade, after taking into account any differences in job tenure. A standard multiple regression analysis of this simulated data confirmed this obvious conclusion. Using the Mann-Whitney test on these simulated data, however, yielded a statistically significant result, which the EEOC may incorrectly interpret as an indication of pay disparities that are adverse to women.[69] That is, even in a simulation in which an employee's pay is 100% determined by a formula that allows no room for discrimination, the test that the EEOC is proposing to use still yielded a statistically significant difference. Put simply, the EEOC's proposal won't be able to test whether or not similarly situated men and women are paid equally.

This point is further illustrated in the second simulation. At this second fictitious company, there is an explicit, racially discriminatory policy that all African-American employees in grade level 1 receive a starting salary of $30,000 and all white employees in grade level 1 receive a higher starting salary of $30,500. Both employees receive a pay adjustment of $1,000 for each year worked. This blatantly discriminatory policy is found at all other job grades as well: white employees in grade level 2 receive a starting pay of $40,500 compared to $40,000 for African-Americans. At the highest job grade in this hypothetical company, the starting pay gap is even more pronounced: African-Americans have a starting salary of $100,000 compared to $105,000 for white employees.[70] As would be expected, the existence of such an overt policy of pay discrimination was readily detectible through a standard multivariate regression analysis, which indicated that African-American employees were paid statistically significantly less than their white counterparts. On the other hand, applying the EEOC's proposed Mann-Whitney test to these same data did not reveal any statistically significant differences between white and African-American employees.

Dr. Speakman conducted a different simulation using the 2013 and 2014 earner study population of the Current Population Survey (CPS) and reached the exact same conclusion.[71] Dr. Speakman produced simulated employer data in thirteen industry and EEO-1 job category

---

[68] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 20.
[69] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 20.
[70] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 23.
[71] Ex. 4, Dr. Robert Speakman Declaration, at p. 18.

36

pairings.[72]  Using the CPS data, Dr. Speakman constructed an annual wage and salary measure[73] and annual hours.[74]  From there, Dr. Speakman selected 10 "workers" at random and matched them to a random pay rate.  Dr. Speakman performed this matching 10,000 times. In theory, the "workers" are matched randomly with predicted pay and the *expectation* is that there will not be a gender difference in the new pay amounts. Dr. Speakman indicated that labor economists would expect 5% of the trials to have statistically significant pay disparities even when controlling for hours worked, age, and census occupation code (the three pay determinants). About half of these significant outcomes will favor men (2.5%) and half will favor women (2.5%).  However, the findings using the Mann-Whitney test did not show this. They found far more significant results than would be expected. For example, for Sales Workers in the Grocery Stores industry, when it is assumed that there is no underlying gender pay disparity (0%), for employers with 10 employees in this job classification, Dr. Speakman found that 8.0% of the trials produced a statistically significant pay disparity adverse to women.  These are false positives, instances of when a firm pays employees equitably, but the statistical test is significant anyway.  The findings in Dr. Speakman's simulation were damning:

> [T]here is a high rate of false positives and the ability to detect actual pay differences is weak.  The false positive rate will be higher when workers are more dissimilar and the (omitted) factors impacting pay are correlated with gender.  Increased population size exacerbates the problem.  As population size and the underlying gender pay difference increase, the test will be better able to identify firms that actually underpay women, but at the cost of an increase in targeting firms that pay fairly.   The statistical tests and targeting mechanism suggested by the EEOC will perform poorly.[75]

<u>These simulations call into question the usefulness of the data that would be collected under the EEOC's proposal</u>. These examples illustrate that the proposed statistical tests may not identify actual pay differences that are consistent with discrimination when it truly exists, and

---

[72] Ex. 4, Dr. Robert Speakman Declaration, at p. 18. Dr. Speakman indicated that these will likely be the largest industry and job classifications, which means that the EEOC's targeting mechanism should be more successful here than in smaller industries and job classifications. Dr. Speakman indicated that if the targeting mechanism is not successful with these larger populations, the chance of being successful elsewhere is even smaller.

[73] Ex. 4, Dr. Robert Speakman Declaration at p. 19.  This measure does not include overtime, commissions, bonuses, tips, etc., which Dr. Speakman indicated makes the simulation more likely (not less likely) to be able to identify pay discrimination, noting "it does not have the shortcomings introduced by examining W-2 earnings."  *Id.*

[74] The CPS data includes the information necessary to derive weekly earnings for all workers, but it does not include weeks worked except for those paid an annual salary.  As such, Dr. Speakman assumed that all workers work fifty-two weeks per year.  As Dr. Speakman noted: "If there is a difference between men and women in weeks worked, the test performed here will perform better than those that would be performed by the EEOC."

[75] Ex. 4, Dr. Robert Speakman Declaration, at pp. 22-23.

may incorrectly conclude that there is evidence consistent with discrimination when employees are actually paid equivalently. But perhaps more importantly, the first simulation shows that a company with a disproportionately greater number of female or minorities at the lower grade levels is likely to "fail" the Mann-Whitney test. In fact, failing the Mann-Whitney test could occur while companies are making good-faith efforts to increase their minority and female representation. That is, many firms have worked diligently to increase the participation of workers from historically disadvantaged groups by hiring these workers as they became available. The result of this effort is that higher percentages of female, African American, and Hispanic workers are found in some of the lower job levels as they gain additional experience to be eligible for promotion.

The EEOC has also suggested it may also use interval regression to perform analyses that attempt to correct for potential differences in annual hours worked between men and women and between members of different race groups. The EEOC indicated that the use of interval regression is to remove the effect of differences in hours worked. However, based on the analysis by Dr. Speakman, it appears the EEOC's proposed approach results in the same false positives and false negatives outlined with the Mann-Whitney and Kruskal-Wallace tests.[76] To illustrate the fatal limitations of interval regression, Dr. Speakman provided two hypotheticals:

- In Hypothetical 1, Dr. Speakman assumed that there are five women and five men who work 1,560 hours per year and five women and five men who work 2,080 hours per year. Dr. Speakman set the hourly pay rate for women at $20 per hour and set the hourly pay rate for men at <u>twice the rate</u> as women ($40/hour). In Hypothetical 1 men and women work the <u>same</u> number of average hours per year (1,820) but men are paid <u>twice the rate of women</u>. However, the interval regression would not produce <u>any</u> estimates of a gender pay difference even though men are clearly paid twice as much as women.

- In Hypothetical 2, Dr. Speakman produced a dataset with 24 men and 24 women, who on average earned the same hourly rate ($27.43) but who worked different number of hours. All workers worked either 1,040 hours per year or 2,080 hours per year, but men were more likely to work full-time and women more likely to work part-time. Interval regression produced a statistically significant gender pay result favoring men, even though <u>the hourly pay rates were exactly the same</u>.[77]

In sum, the statistical tests that the EEOC suggests they will use will undercut the EEOC's ability to correctly identify firms that discriminate in pay. They will not allow them to make comparisons among similarly situated workers. It appears that they will not even allow

---

[76] Ex. 4, Dr. Robert Speakman Declaration at p. 13.
[77] Ex. 4, Dr. Robert Speakman Declaration at p. 14.

38

them to account for differences in the number of hours worked by gender or race.[78] <u>Accordingly, the EEOC's proposed statistical methodology provides no benefit and does not meet the standards of the PRA.</u>

### D. The EEOC's Proposal to Compare the Pay of a Firm or Establishment to Industry or Metropolitan-Area Data Serves No Purpose Under Title VII or the EPA.

The EEO-1 Revisions state that EEOC and OFCCP will develop a software tool that will allow its investigators to analyze "W-2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data" which would "highlight statistics of interest."

However, neither Title VII, the EPA nor EO 11246 requires employers to pay its employees according to industry or geographical standards. Certainly, employers cannot use as a defense to claims of inequitable pay practices that others in its industry are also paying women or minorities in a particular EEO-1 category less than white men. Conversely, it is not discriminatory for an employer to decide to pay lower wages for certain positions than its competitors may choose to pay for the same positions. As such, the mere fact that a particular employer's aggregate compensation data is below the pay of the industry or metropolitan area is irrelevant to an investigation of whether an employer's pay practices are discriminatory.

Employers already have many different, much more finely-tuned, methods by which they can benchmark their compensation against others for particular jobs. Many companies, large and small alike, look to market data that is specific to the jobs in their workforce to assess their position vis-a-vis their competitors. The data that could be assembled through the proposed EEO-1 Revisions will lack the reliability of such targeted market data — data that employers can and do already access. We would note as well that the EEOC proposal dos not permit area differentials to be factored into the reported compensation data. Insofar as the federal government itself has area pay differentials for civil service pay grades, it makes absolutely no sense that the EEOC will require EEO-1 reports, either on the establishment or consolidated basis and not permit the employer to apply geographic differentials.

Moreover, the EEO-1 Revisions' suggestion that reporting pay data may "encourage self-monitoring" and "voluntary" compliance by employees if they uncover pay disparities misses the mark. As an initial matter, federal contractors and subcontractors are already required to monitor their pay practices as part of their compliance obligations.[79] And any

---

[78] Ex. 4, Dr. Robert Speakman Declaration at Page 14.

[79] 41 CFR 60-2.17 (b) "Identification of problem areas. The contractor must perform in-depth analyses of its total employment process to determine whether and where impediments to equal employment opportunity exist. At a minimum the contractor must evaluate … (3) Compensation system(s) to determine whether there are gender-, race-, or ethnicity-based disparities."

39

contractor subject to an OFCCP compliance evaluation is required to submit employee-level detailed compensation data for the establishment under review. Thus, there would be no added utility to federal contractors and subcontractors who already self-monitor pay within their organizations.

And, generally speaking, the EEO-1 Revisions would not otherwise encourage self-monitoring efforts because, for the reasons explained above: (1) EEOC cannot effectively target its enforcement efforts based on the data; and (2) the data is too broad and generalized to be of any practical use to those employers who endeavor to establish equitable pay practices.

## IV.    CONFIDENTIALITY & PRIVACY

### A.    EEOC Should Take All Possible Actions to Protect the Confidentiality and Security of the Highly Confidential, Proprietary Data Being Requested

EEOC gives short shrift to the privacy and confidentiality issues raised by the Proposed Revisions notwithstanding the mandate of the PRA. The notice published in the Federal Register merely reiterated that Section 709(e) of Title VII, 42 USC § 2000e-8(e) prohibits disclosure of any information contained in the EEO-1 report "prior to the institution of any [Title VII] proceeding." The proposal notes that while the OFCCP is not subject to the restrictions of section 709(e), it nevertheless will hold the information contained in the EEO-1 confidential "to the extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act." While these assertions state the law as codified and practiced, they understate the significant privacy and confidentiality concerns raised by the proposal.

We only have to refer to the draft report of the EEOC Survey System Modernization Work Group (Working Group) Meeting conducted on March 8-9, 2012, which was published with the Proposed Revisions to confirm these concerns. While this Working Group performed its work nearly four years prior to the publication of the Proposed Revisions and while the draft report was deficient in many respects, the sparsely published report highlighted issues raised which were not addressed in the Proposed Revisions. The Working Group noted that "the Privacy Act is a concern."[80] The report stated that: "Statistical Controls would be required to ensure the confidentiality of data to companies with smaller job categories."[81] The proposal is devoid of any discussion of data confidentiality. The draft report notes as well that if the "cell" size was lower than 5, we do not publish data for that cell."[82] There is no discussion of the implication of small cells, particularly in the upper pay bands.

---

[80] Draft Report pg 10, Question 6. Group 1
[81] Draft Report page 11 group 1
[82] Draft Report page 11, group 2.

40

In fact, there is no discussion at all of confidentiality issues in the proposal. In addition, the general reference to the Exemption 4 exclusion from the OFCCP releasing this information does not reference a crucial point. Unlike the section 709(e) restriction on EEOC disclosure, the OFCCP procedure requires contractors to follow the regulatory constraints found in the OFCCP and Department of Labor FOIA regulations. The Department of Labor FOIA Regulations, 29 CFR Part 70, create a complex process for employers to request that business confidential information not be disclosed. Rather than a simple prohibition of disclosure, the regulations state:

> (b) Designation of business information. A submitter of business information will use good-faith efforts to designate, by appropriate markings, either at the time of submission or at a reasonable time thereafter, any portions of its submission that it considers to be protected from disclosure under Exemption 4. These designations will expire ten years after the date of the submission unless the submitter requests, and provides justification for, a longer designation period.

> (c) Notice to submitters. A component will provide a submitter with prompt written notice of a FOIA request that seeks its business information whenever required under paragraph (d) of this section, except as provided in paragraph (g) of this section, in order to give the submitter an opportunity to object in writing to disclosure of any specified portion of that information under paragraph (e) of this section. The notice will either describe the business information requested or include copies of the requested records or record portions containing the information. When notification to a voluminous number of submitters is required, notification may be made by posting or publishing notice reasonably likely to accomplish such notification.

> (e) Opportunity to object to disclosure. A component will allow a submitter a reasonable time to respond to the notice described in paragraph (c) of this section. If a submitter has any objection to disclosure, it is required to submit a detailed written statement. The statement must show why the information is a trade secret or commercial or financial information that is privileged or confidential. In the event that a submitter fails to respond to the notice within the time specified, the submitter will be considered to have no objection to disclosure of the information. Information

41

provided by a submitter under this paragraph may itself be subject
to disclosure under the FOIA.

Thus, in every instance where the Department of Labor receives a FOIA request for the extended EEO-1 information, it must timely notify the employer submitter which in turn must submit a detailed written statement explaining why some or all of the EEO-1 information is a trade secret or commercial or financial information. The regulations then provide a process whereby the requester and the employer have to undertake a lengthy appeal process where each presents its arguments. Final determinations are subject to judicial review. Further, even if the Department of Labor applies Exemption 4, that exemption from disclosure expires 10 years after it is granted. As noted in the draft Working Group report, information contained in small cells or smaller job categories may well disclose individual pay or other personal information. Thus, the submission to the OFCCP is not resolved by the glib assertion in the proposal that the OFCCP holds this information confidential "to the extent permitted by law." In fact, there is a significant burden placed on contractors to protect the confidentiality of the new EEO-1 information.

To the extent that the OFCCP shares the EEO-1 information, disclosure concerns would be alleviated to some extent if the EEOC requests that the Director of OIRA treats all information submitted to the EEOC as covered by Section 3510 of the Paperwork Reduction Act[83] and directs the EEOC that the statutory restrictions on disclosure of EEO-1 data will apply to the OFCCP.[84] In this regard, the direct prohibition on disclosure will not be subject to regulatory considerations and determination of trade secrets or commercial or financial information by OFCCP personnel not trained in these issues or a laborious and expensive regulatory and judicial review process.

### B.      Potential Data Breaches

As noted above, the proposal to collect employee pay data through the EEO-1 reports presents significant confidentiality issues related to the potential disclosure of this data. The EEOC publishes aggregate data collected from the EEO-1 reports and also shares original EEO-1 data with other federal and state agencies and individual researchers. With regard to the aggregate data, there are concerns that those who receive it will be able to reverse-engineer the aggregate data. With regard to original data, there are concerns that those who receive it might not take appropriate steps or have appropriate procedures in place to maintain its confidentiality. Furthermore, the EEOC must be transparent about the steps that it will take as an agency to insure that its information security program is now, and will be in the future, able to protect this sensitive data from access or acquisition by unauthorized individuals.

---

[83] 44 U.S.C. 3510
[84] 44 U.S.C. 3510 (b)(1)(2)

Prior to issuing the proposed rule, the EEOC engaged the National Academy of Sciences (NAS) to conduct a study, which, *inter alia*, looked at confidentiality concerns raised by the EEOC's collection of employee pay data in EEO-1 reports and its subsequent disclosure of this data in aggregate and original form. As a threshold matter, the report issued by the NAS (NAS Report) recognized -- and we wish to underscore -- that "[e]mployee compensation data are generally considered to be highly sensitive; they are even considered proprietary information by many private-sector employees."[85]

The NAS Report underscored that "there will be a great demand on the part of other federal agencies, researchers, analysts, compensation-setting bodies and others for access to these powerful new data . . . and the EEOC would be well advised to start taking steps now to develop policies to provide access in a protected environment."[86] The NAS Report went on to note that, despite the sensitive nature of employee pay data, the "EEOC provides [this] data to agencies that do not have the same level of confidentiality protections."[87] With regard to both its routine disclosure of data from the EEO-1 reports to other federal and state agencies, as well as researchers, the NAS Report recommended that the EEOC:

> (1) consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications; and

> (2) seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to non-agency employees.[88]

EEOC's proposal does not address these recommendations in any way.

Moreover, these is no indication in the proposal that the EEOC requires those to whom it provides the EEO-1 reports to (1) maintain the same level of confidentiality that the EEOC does with respect to this information (other than the Department of Justice) (2) demonstrate that their information security programs are sufficient to protect this data from malicious attacks targeted at such data or (3) provide notification to the EEOC in the event their data security is compromised or the entity or individual experiences a data breach. Moreover, the proposal is

---

[85] National Research Council, 2012, *Collecting Compensation Data from* Employers, Washington D.C., National Academies Press, p. 84, available at http://www.nap.edu/catalog/13496.
[86] *Id*. at 90.
[87] *Id*.
[88] *Id.* at 91.

43

silent as to how the data will be transferred from the EEOC to the various federal or state agencies or individuals.

Although the NAS Report did not make any specific recommendations about a review of, or improvements to, the EEOC's information security protocols in connection with requiring employers to provide pay data in the EEO-1 forms, the NAS Report did emphasize that "the consequences of a breach in the protection of data provided in confidence are, as other federal agencies have discovered, painful and of lasting consequence."[89] This has most recently been seen with the data breach experienced last year by the Office of Personnel Management. This massive data breach was one of the largest in recent memory and was specifically targeted at employee, applicant and former employee information. OPM has now had to make major changes to its personnel and its policies and procedures in an attempt to earn the trust of the American public when it comes to the information entrusted to this agency. A major source of criticism of OPM has been its decision to transfer the personally identifiable information entrusted to it to a third party vendor. The class action complaints filed against OPM and the vendor allege that OPM did not do enough to vet the security measures employed by the vendor or require the vendor to provide ongoing updates to OPM regarding its security program and any breaches.

The OPM breach holds lessons for all federal agencies and should inform how the EEOC handles the disclosure and transfer of employee pay data to third parties. The EEOC needs to assure employers that it has reviewed its information security protocols and that they can and will safeguard the pay data employers are providing. In the hands of the wrong people, the original pay data from the EEO-1 report regarding pay could cause significant harm to a company and as previously noted subject employees to potential violation of their privacy. Indeed, while the Working Group noted potential Privacy Act concerns, the EEOC apparently gave absolutely no consideration to this potential problem. And even though no information in the EEO-1 report is tied to the name of any one individual, it is not hard to imagine a scenario in which individual employees within a small group listed on the EEO-1 report could be identified. Indeed, this is why the EEOC has suppression protocols in place for aggregate data where a group has three or less employers' information in it or any one employer accounts for 80% of the group data being aggregated.

Finally, we would observe that the EEOC is apparently providing establishment EEO-1 data to researchers whom it engages under some form or another of consultancy agreement to enable the researchers to publish findings in learned journals or to enhance their academic credentials. There is absolutely no indication as to what, if any, confidentiality restrictions are imposed on these shared reports, nor is there any agency enforcement purpose from these arrangements, the sole Title VII justification for requiring these reports. And of course the PRA

---

[89] *Id.*

does not create an exemption from its requirements to permit agencies to share privileged data with academic researchers which has been submitted as a result of massive cost and operational burdens on employers.

## **Conclusion**

In conclusion, the Chamber has serious concerns with the proposed EEO-1 Revisions. In view of the multitude of deficiencies which we have illuminated in these comments and which will be further highlighted in our formal comments, we request that the EEOC withdraw the proposed revisions and commence a cooperative effort with all stakeholders to deal with the issues.

Sincerely,

Randel K. Johnson
Senior Vice President
Labor, Immigration and
Employee Benefits

James Plunkett
Director
Labor Law Policy

Of Counsel:

/s/ Kris D. Meade
Kris D. Meade
Rebecca L. Springer
Crowell & Moring LLP

/s/ Larry Lorber
Larry Lorber
Camille Olson
Annette Tyman
Seyfarth Shaw, LLP

45



**U.S. Equal Employment Opportunity Commission**

Hearing of March 16, 2016 - Public Input into the Proposed Revisions to the EEO-1 Report

# Written Testimony of Camille Olson
# Seyfarth Shaw LLP on behalf of U.S. Chamber of Commerce

Good morning Madam Chair, Commissioners, and General Counsel. Thank you for the opportunity to participate in today's hearing. On behalf of the U.S. Chamber of Commerce, I am pleased to testify on the Equal Employment Opportunity Commission's (EEOC's or Commission's) Proposed Revisions to the Employer Information Report (EEO-1) (Proposed Revisions).[1] I am Chair of the Chamber's equal employment opportunity policy subcommittee.[2] The Chamber is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region, with substantial membership in all 50 states. The Chamber's mission is to advance human progress through an economic, political, and social system based on individual freedom, incentive, initiative, opportunity, and responsibility.

In today's testimony, I discuss the impact of the EEOC's Proposed Revisions to the EEO-1 Report, specifically with respect to the proposed "Component 2" requirements. According to the EEOC's proposed changes, beginning in 2017, employers with 100 or more employees would be required, for the first time, to compute, record, aggregate and submit data regarding employees' W-2 earnings and hours worked for each of its establishments. For each of the 10 EEO-1 job categories, by location, employers would be required to report the number of employees by ethnicity, race, and sex that fall within twelve pay bands. Employers would be required to provide W-2 earnings data from any pay period between July 1st and September 30th.

According to the EEOC, both the Commission and the Office of Federal Contract Compliance Programs (OFCCP) will use this data "to more effectively focus agency investigations, assess complaints of discrimination, and identify existing pay disparities that may warrant further examination." The EEOC has also stated that in conjunction with the OFCCP, it will develop statistical software to analyze the EEO-1 data, as well as guidance to be used by their staff when reviewing such data.

The impact of the new EEO-1 report would be substantial, both in the millions of hours that private employers would be required to spend completing the new report and in the false results that may be generated. This report, allegedly borne out of a laudable desire to ensure that employees are paid fairly, will do no such thing. Instead, in practice, it would impose enormous burdens and risks on employers who base complex compensation decisions on factors other than membership in a particular EEO-1 category. However, at the outset I must highlight that the U.S. Chamber of Commerce and its member employers have always been supportive of the non-discrimination laws including the Equal Pay Act (EPA), Title VII and the Americans with Disabilities Act (ADA). We have held many seminars and meetings in which the requirements of the laws have been explained and which afford our members the latest information regarding compliance. And indeed it was in large part through the efforts of the U.S. Chamber and our other employer organizations that the 2008 Americans with Disabilities Amendments Act was enacted with bi-partisan support and with the active involvement of all stakeholders. That is why we are so concerned with the current attempt to revise the EEO-1 form without any input from the employer community and in a process so violative of the Paperwork Reduction Act.

## Summary of Submission

On February 1, 2016, without any prior notice to the regulated community, the EEOC published a proposed revision to the EEO-1, Employer Information Report. This data request, to which every employer with 100 or more employees and every government contractor with 50 or more employees must respond annually, has been in existence for 50 years. However, for the first time, the EEOC is proposing that employers submit data showing the W-2 wages and hours worked of all of their employees divided into 12 arbitrary pay bands, in addition to the demographic makeup of their employment rosters. To get a sense of the magnitude of the proposed revision, the existing EEO-1 report requires 128 data points. Pursuant to the changes proposed by the EEOC, covered employers will have to submit forms for each establishment, and each establishment report would consist of 3,360 data points.

Ironically, EEOC advances this brand new and burdensome data request pursuant to, of all laws, the Paperwork Reduction Act (PRA or Act).[3] The PRA requires that any request for data by a government agency meet three basic criteria: (1) the request minimizes the burden on responders to reply; (2) the request results in data which is meaningful to the government for policy and enforcement purposes; and (3) the data request is designed to ensure that the data is securely and confidentially obtained and retained. The OMB is charged with reviewing the data request to ensure that the requesting agency complies with the PRA.

Although the EEOC admits that it began working on this project four years ago (and perhaps even longer ago), it permitted employers only five weeks to prepare these comments for submission at a public "hearing" in which selected employer

representatives are permitted five minutes each to "testify" about the proposal. The Chamber's request for an extension of the comment period due date was summarily denied. The Chamber nevertheless retained noted labor economists and statisticians to review the EEOC's proposal and two law firms to further analyze the legal compliance of the EEOC with the PRA and the new requirements it is proposing to impose on employers. The conclusions of these reviewing experts and law firms is stunning:

### *The EEOC has cavalierly refused to comply with its responsibilities under the Paperwork Reduction Act in the following ways:*

*The EEOC has produced an "analysis" of the burden its proposal will impose which is completely lacking in any substance and has no basis in fact.*

- The EEOC suggests that a "revised form" with almost 26 times the number of data points to complete will impose *no* additional burden and cost 50% *less* than the previous form which was approved in 2015.
- The EEOC and its consultant admit that there was no testing of the form or the time that would take to complete it, but rather that it used "synthetic data" compiled from fictitious companies to produce an estimate of the time required to complete the new forms.
- The EEOC refers to proposals by other agencies which have never been completed and which have never been published to sustain its estimate of burden.
- The EEOC, through sleight of hand, arbitrarily eliminated from its analysis of the burden the time and effort required to submit data relating to more than 250,000 employer establishments. Under the EEOC's proposal, employers will still be required to submit data for the 250,000 establishments that have been omitted from the Agency's burden analysis. The EEOC simply ignores this fact.

*The EEOC offers no argument that the mass of data to be submitted will be useful for any law enforcement or policy enhancement.*

- The laws that the EEOC enforces do not permit the consideration of broad aggregates of data from dissimilar jobs combined into artificial groupings. There can be no legal or enforcement use of this data. Indeed, the EEOC's own compliance manual and its consultant recognize that these broad aggregations of data are essentially useless. Myriad federal courts have reached the same conclusion.
- The EEOC is requiring the combining of completely dissimilar jobs to determine if there is pay discrimination. For instance, the proposed revised forms will require a reporting hospital to combine lawyers, doctors, nurses and dieticians - all grouped as "professionals" - to somehow determine whether there are pay disparities based on gender, race or ethnicity. No law permits comparisons of such diverse workers to prove discrimination.
- In order to meet its own bureaucratic timetable, the EEOC will require employers to combine two distinct years of W-2 data to create a fictitious W-2 amount for employees. This combination of W-2 data over a two year period will yield completely useless information. It does not take into account job changes, promotions, annual pay adjustments, different working conditions or locations or the many other factors that go into compensation.
- The EEOC will require employers to collect and report the hours worked for all employees. While the EEOC suggests that it will not require collection of new information from employers, they have not addressed the critical fact that employers do not currently collect hours information for exempt employees. The EEOC suggests that employers may use a "default" number of 40 hours for each exempt employee. In the private sector, exempt employees regularly work more than 40 hours, thus the hours information would be inaccurate, and therefore, of limited use. A legitimate study before this proposal was published would have revealed that fact.

*The EEOC offers absolutely no discussion of the threats to confidentiality or privacy of the information it is requiring employers to submit.*

- The PRA requires that the requesting agency and the OMB ensure that data collected will be treated with complete confidentiality. The EEOC did not even attempt to take this responsibility seriously. When the OPM cannot even protect the personnel data of 21 million federal employees or applicants, the EEOC should at least be cognizant that confidentiality of the pay data of more than 70,000 employers--encompassing millions of employees--deserves some consideration. It offers none.
- This data, which is shared with the Department of Labor, is subject to demand for production under the Freedom of Information Act. The EEOC states that the data will be protected to the extent permitted by law. Of course, employers will have to expend significant resources to assert their right under law to protect this data. And for some of the smaller employers, the identity and the compensation of employees will be easily ascertained; the same is true for larger employers with small establishments. The EEOC devotes only two paragraphs to discuss these privacy and confidentiality issues.

In short, the EEOC has sprung upon employers a proposal that would (1) impose significant new, costly administrative burdens; (2) yield data of no utility; and (3) fail to protect confidential information. For these reasons, the Chamber submits that EEOC should withdraw this proposed data collection and, if it refuses to do so, the OMB should exercise its authority and refuse to approve the revised form.

## I. Paperwork Reduction Act

As previously noted, the EEO-1 Revision process is being conducted pursuant to the PRA. The PRA, which was reauthorized in 1995, was promulgated in order to bring a degree of coherence and prudence to the Government's rather voracious quest to collect data from responding employers (and other responders). *See Dole v. United Steelworkers of*

*America*, 494 U.S. 26 (1990) (recognizing that the PRA was enacted in response to the federal government's "insatiable appetite for data."). The purposes of the PRA set forth in direct terms what the Act was designed to accomplish:

> The purposes of this chapter are to--
>
> (1) minimize the paperwork burdens for individuals, small businesses…Federal contractors…and other persons resulting from the collection of information by or for the Federal Government;
>
> (2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government.
>
> (4) improve the quality and use of Federal information to strengthen decisionmaking, accountability and openness in Government and society…

The PRA established within the Office of Management and Budget ("OMB") the Office of Information and Regulatory Affairs ("OIRA") whose Director is charged with the administration of the PRA. *Livestock Marketing Ass'n v. U.S. Dept. of Agr.*, 132 F. Supp. 2d 817, 830 (D.S.D. 2001) ("Among other things, the Act establishes the Office of Information and Regulatory Affairs within the Office of Management and Budget, with authority to" facilitate and manage the PRA). OIRA has a substantial role in the federal regulatory process. No data collection instrument which is directed to more than nine responders can be issued without first receiving the approval of OMB and OIRA. *CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (2008) ("The need for OMB approval of information collections derives from the Paperwork Reduction Act"); *Gossner Foods, Inc. v. E.P.A.*, 918 F. Supp 359, 361-62 (D. Utah 1996) ("The Act institutes a second layer of review by the OMB for new paperwork requirements.") (quoting *Dole*, 494 U.S. at 32-33).

The Director, in turn, is mandated to review data collection requests in accordance with the direction of the PRA to (1) minimize the burden on those individuals and entities most adversely affected and (2) maximize the practical utility of and public benefit from information collected by or for the Federal Government and establish standards for the agencies to estimate the burden of data collection. *See Dole*, 494 U.S. at 32 (explaining that the PRA charges the OMB with responsibility for minimizing the burden on individuals and establishing standards to reduce federal collection of information). *See also Tozzi v. U.S. E.P.A.*, No. Civ. 98 - 0169 (TFH), 1998 WL 1661504, *1 (D.D.C. April 21, 1998). The Director is also charged with developing and promulgating standards to insure the privacy, confidentiality and security of information collected or maintained by agencies. *In re French*, 401. B.R. 295 (E.D. Tenn. 2009) (noting that, amongst other things, the PRA's purpose is to ensure that information is collected consistent with privacy and security laws) (quoting 44 U.S.C. § 3501).

It is under this specific statutory framework that the proposal to revise EEO-1 form and collection procedures must be reviewed. There is no exemption from the mandates of the PRA and neither the agency head nor the Director of OIRA may exempt data collection efforts from the constraints and mandates of the PRA. Simply put, data collection efforts of the size and scope of the proposed EEO-1 revision must be reviewed independently to insure that the burdens placed upon responders is minimized, the information collected has the maximum utility, and that the security and confidentiality of the information is assured. *See Dole*, 494 U.S. at 32-33 (explaining that all federal agency regulations that require the collection of paperwork must be reviewed by the OMB in accordance with the goals and purpose of the PRA).

These are simple precepts and should be reviewed independently. In other words, the burden placed upon responders must be determined only with respect to the efforts necessary to collect and report the data. The obligation to minimize the burden should not be reviewed in relevance to the purposes of the data. The PRA does not create a burden/benefit analysis but rather requires each standard to be reviewed on its own terms. Similarly, the benefit to be derived from the data collection requirement is not dependent upon the degree of burden the effort creates, but rather the utility of the data collected. The government is not permitted to require the collection of data with no utility regardless of the extent of the burden imposed to collect the data. In short, there is no license for the Government to simply collect data without a clearly articulated purpose and legitimate use. Finally, in conjunction with the type and sensitivity of the data being collected, OIRA and the requesting agency must insure that the requested data be collected and retained in a manner to insure its confidentiality and privacy.

These requirements are neither difficult nor complex. Indeed, they establish a commonsense framework by which the requesting agency in the first instance and Director of OIRA must review requests for authorization to collect data. As will be shown in this submission and in our formal comments filed by April 1, 2016, the EEOC has not met any of the statutory requirements. Rather, it has proposed a data collection protocol which will place a significant burden upon responding employers and which the EEOC has remarkably understated or ignored. The EEOC is proposing to collect extensive data heretofore never collected by the federal government without any developed framework to review the data, or use the data for any legally authorized or recognized purpose. In addition, the EEOC has totally ignored the obvious security and confidentiality issues which it is directed to consider.

## II. The EEOC's PRA Burden Estimate is Insufficient and Unsupported

The EEOC should rescind its Proposed Revisions because its PRA burden estimate is wholly deficient in three critical ways: (1) it underestimates the employer burden associated with generating the EEO-1 Report *in its current form* and is inconsistent with prior EEOC estimates of the burden associated with generating the EEO-1 Report; (2) it underestimates the employer burden associated with compiling, analyzing, and reporting the W-2 information the Proposed Revisions would require; and (3) it vastly underestimates the burden associated with compiling, analyzing and reporting the hours information that would be required, particularly as to exempt employees.

A. The EEOC's Estimate of the Burden Associated with Completing the _Current_ EEO-1 Report is Inconsistent with its Prior Burden Analyses and Otherwise Lacks Factual Support

The EEOC makes the following claims and assumptions in connection with its estimate of the burden associated with generating the EEO-1 Report in its current form:

- There are 67,146 employers who file EEO-1 Reports ("EEO-1 Filers"), based on 2014 filing figures. [4]
- Each EEO-1 Filer spends just 3.4 hours generating its EEO-1 Reports each year, across all establishments, with 30 minutes dedicated to reading the instructions and 2.9 hours dedicated to generating the data required to be reported and populating the cells in the Form itself. Thus total hourly burden incurred by employers filing the EEO-1 Report is 228,296.4 hours.
- All work done to complete the EEO-1 Report is performed by "Administrative Support" personnel who are paid, according to the Bureau of Labor Statistics ("BLS") publication "Employer Costs for Employee Compensation," on average, $24.23 per hour.

Based on these assumptions, the EEOC estimates that the total annual cost burden incurred by employers filing the current EEO-1 Report is just over _$5.5 million_. This figure represents the number of EEO-1 Filers (67,146) multiplied by 3.4, then multiplied by $24.23.

The EEOC's approach for assessing the actual _current_ burden imposed on EEO-1 Filers is deficient for several reasons.

First, and perhaps most importantly, the "EEO-1 Filer"-based approach adopted by the EEOC in its Comment Request is at odds with the approach the EEOC has used to quantify the burden associated with EEO-1 filings since at least 2009. From at least 2009 through 2015, the EEOC, when estimating the burden associated with filing EEO-1 Reports, based its assessment on the number of _responses_ filed by the employer community, _not_ on the number of EEO-1 Filers. _See_ Exhibits 4 -7 (EEOC OIRA filings). The EEOC's approach over at least the last six years appropriately accounted for the fact that many EEO-1 Filers are required to generate multiple "responses" or reports: one for each physical establishment with 50 or more employees and one consolidated report. As a result, the EEOC burden estimates for the years 2009 through 2015 are significantly higher than the burden estimate identified in the Comment Request. _See_ Exhibits 4 - 7 (EEOC OIRA filings). For instance, in 2015, the EEOC estimated the annual employer burden associated with the EEO-1 filings as follows:

- 307,103 EEO-1 reports filed, based on actual 2013 filings.
- 4 hours per report, which yields 1,044,150 total burden hours.
- Average cost per hour estimated to be $19.00 per hour, based on the hourly rate paid to "Human Resources Assistants" according to the BLS publication "Occupational Employment Statistics, Occupational Employment and Wages, May 2010" - $18.22 - "rounded to $19.00 to account for instances where higher paid staff perform this work."

Based on those assumptions, the EEOC estimated in 2015 - less than one year ago - that EEO-1 Filers would incur costs of _$19.8 million_ annually to generate the EEO-1 filings. That cost figure is _350% higher than the EEOC's new estimate_ of what the current burden is _without_ any of the proposed changes.[5]

Attempting to explain this _$14.3 million_ reduction in the estimated burden, and perhaps anticipating criticism of this change, the EEOC includes only the following statement in its Proposed Revisions:

> The reporting hour burden calculations in this notice reflect a departure from the manner in which EEOC traditionally estimated reporting burden. In the past, the EEOC estimated the reporting hour burden based on the number of total cells in the report(s) that a firm had to complete. This approach viewed each report filed by a firm as a separate reporting requirement, _analogous to a paper report_. In reporting year 2014, however, the number of paper reports declined to just three. In addition, employers now rely extensively on automated HRIS to generate the information they submit on the EEO-1 report. As a result, each additional report filed has just a marginal additional cost. To accurately reflect the manner in which employers now collect and submit the data for filing, the estimated reporting burden set forth in this notice is calculated per firm, rather than per report. This burden calculation is based on the time spent on the tasks involved in filing the survey, rather than on 'key strokes' or data entry."

81 Fed. Reg. 5120 (February 1, 2016) (emphasis added).

The EEOC's explanation rings hollow, as it is contradicted by its 2015 OIRA filing and is wholly inconsistent with the experience of EEO-1 Filers. The burden estimate reached by the EEOC in 2015 expressly noted that "98%" of the 70,070 respondents in 2013 "file [their EEO-1 Reports] on-line." Ex. 7 at Paragraph 3. Thus, the claim that the shift from a _response-based approach_ that takes into account the number of establishments on which reports are filed to an _EEO-1 Filer-based approach_ was prompted by a sudden shift from paper filings to online filings is not supported by the EEOC's own submissions. The PRA requires that the imposed burden be accurately computed. It does not countenance fictitious assertions of burden bereft of factual support or historical experience.

Second, the assumption that "each additional report" for those employers with multiple establishments "has just a marginal cost" is based on no analysis whatsoever. The EEOC seems to assume that the electronically fillable PDF format relieves employers of the necessity of manually entering data when filing their EEO-1 Reports. That assumption is contrary to fact. [6] Even when using the EEOC's on-line system, EEO-1 Filers must manually enter the data for each cell and for each establishment.[7] Notably, the EEOC's Proposed Revisions acknowledge that only 2% of EEO-1 Filers (1,449 of 67,146) submitted their data by uploading a data file in 2014 rather than manually completing the online submission. Thus, the

SJA049

process remains a manual one for most employers, even if the EEO-1 Report is submitted electronically, and the actual burden remains unchanged from recent years.[8]

Third, the EEOC nowhere explains its estimate that EEO-1 Filers spend a total of just 2.9 hours collecting, verifying, validating, and reporting" their current EEO-1 data. As part of its burden under the PRA, the EEOC should identify its current basis for this estimate. [9]

Fourth, the EEOC bases its cost estimate on an improper assumption that EEO-1 data and the ultimate reports are developed by "Administrative Support" personnel alone, at a cost of $24.23 per hour, without any internal or external assistance. The EEOC's assumption is flatly contradicted by employer experience. In fact, personnel ranging from HRIS and information technology personnel to senior human resources officials and legal professionals often assist in the development of the data, the compilation of the EEO-1 Report, review of the Report, and the submission of the Report. Because the EEO-1 Report requires certification by a company official, subject to penalties for false reporting, the EEOC's assumption that the entire EEO-1 filing process is left to clerical personnel is simply false. Because the EEOC has not included the wage rates of senior human resources, HRIS and information technology personnel, or legal professionals in the development, compilation, review, certification, and submission of the report, the assumption that the wage rate of an Administrative Support personnel alone, is flawed.

In short, the EEOC's estimate that EEO-1 Filers will incur costs of just $5.5 million in 2016 to complete the EEO-1 Report as currently configured - representing a 350% reduction in the EEOC's *own* estimated total costs of $19.8 million incurred in 2015 - is fatally flawed. Because that erroneous estimate impacts the Agency's estimate of the anticipated costs of completing the proposed revised EEO-1 Report in 2017 and 2018, the EEOC's entire burden estimate associated with the Proposed Revisions is completely inaccurate and misleading.

## B. The EEOC's Analysis of the Burden Associated with Completing the Proposed Revised EEO-1 Report Lacks Factual Support

The EEOC's Comment Request includes the PRA-required estimate of both the one-time burden of complying with the proposed revisions and the annual burden of complying with those revisions. As for the "One-Time Implementation Burden," the EEOC's analysis consists of three sentences, one of which is contained in a footnote. The EEOC estimates a one-time burden of *$23,000,295*, which is based on the following assumptions:

- Eight (8) hours of time "per filer" to "develop[ ] queries . . . in an existing human resources information system."
- An hourly wage rate of $47.22, which is the average compensation for a Professional as identified in the BLS publication "Employer Costs for Employee Compensation," issued in 2013.

The EEOC's total estimate for the one-time burden is calculated by multiplying the number of EEO-1 Filers that would be required to submit W-2 and hours information (60,886) by eight hours, and multiplying that total by $47.22.

As for the recurring, annual burden employers will incur completing the proposed revised EEO-1 Report, the EEOC restates its current burden analysis for the estimated 6,260 EEO-1 Filers that have 50-99 employees. For that group of employers, the EEOC maintains its estimate that each filer will spend just 3.4 hours completing and submitting its EEO-1 Report, that those 3.4 hours will be spent by Administrative Support personnel at a cost of $24.23 per hour, and that the total cost burden to the 6,260 EEO-1 Filers who need not submit W-2 wage and hours data will be $515,711. That estimate is flawed, for the reasons identified above.

For employers with 100 or more employees, the EEOC estimates that each EEO-1 Filer will spend 30 additional minutes reviewing the instructions and *just 2.7 additional hours per year* "collecting, verifying, validating, and reporting" the W-2 wage data and the hours data for its employees. The EEOC continues to assume that all of these tasks will be performed by Administrative Support personnel, again at a cost of $24.23 per hour. In total, the EEOC's annual burden estimate for employers with 100 or more employees is as follows:

- 6 hours per EEO-1 Filer to collect, verify, validate, and report both the representational data currently reported and the W-2 wage data and hours data that would be required beginning in 2017.
- An hourly rate of $24.23.

Based on these assumptions, the EEOC estimates that the total annual cost burden on EEO-1 Filers with 100 or more employees will be $9,736,767, which is the number of such filers (60,886) multiplied by 6.6, then multiplied by $24.23. When coupled with the estimated cost burden for EEO-1 Filers with 50-99 employees, the total annual estimated cost identified by the EEOC for all EEO-1 Filers in 2017 is *$10,252,478*.

The EEOC's estimates are wholly unrealistic. As detailed below, absent from the EEOC's analysis of the burden associated with the Proposed Revisions is any explanation of the basis for its estimate of the hours that would be incurred by EEO-1 Filers. [10] As an initial matter, while the EEOC claims it reviewed "the public comments relating to the burden calculation for OFCCP's proposal to collect pay data and consulted with OFCCP about burden estimates," the EEOC fails to state how it reconciled the information supplied to the OFCCP with the EEOC's current estimates.[11] More importantly, the EEOC failed to identify any other basis for its hours estimates, noting that its Pilot Study sought data from private employers "about the possible cost of collecting pay data information but few employers responded, and the employers that did respond did not provide quantitative feedback." 81 Fed. Reg. 5120 (February 1, 2016). Without more, one can only conclude that the EEOC's estimate of the hours employers will spend "collecting, verifying, validating, and reporting" W-2 wage data was "pulled out of thin air."

To make matters worse, the EEOC provides no explanation for its estimate of the hours burden associated with supplying hours-worked data. The EEOC does not even address this issue in its Comment Request, stating simply that it is seeking input from employers as to "the anticipated estimated burden to also submit . . . hours-worked data." As detailed below, this omission should sound the death knell for the EEOC's Proposed Revisions, given that the collection of hours-worked data for exempt employees who do not currently capture their hours worked would be staggering.

*1. The EEOC's Estimate of the One-Time Burden Bears No Relationship to Reality*

The EEOC's estimate of the one-time burden associated with the Proposed Revisions cannot withstand scrutiny. First, its assumption that employers will be able to generate W-2 and hours data after an HRIS professional spends just eight hours "developing queries . . . in an existing human resources information system" underscores how distant the EEOC's experience with employer HRIS systems is from reality. The EEOC's underlying assumption - that a single HRIS houses all the data necessary to generate the W-2 and hours data - is plainly false. Most employers maintain gender, race, and ethnicity data in an HRIS that is different from the system that houses payroll information, including W-2 wage information. Hours data for non-exempt employees are likewise captured outside of the HRIS and hours data for exempt employees simply do not exist for most employers. Determining how to marry gender, race, and ethnicity data housed in an HRIS with W-2 wage data housed in a payroll system, often by a third party, in and of itself, will take more than eight hours.

Second, the EEOC's estimate is off-base because it ignores the fact that the W-2 data to be submitted is different from the W-2 data generated annually by employers for income tax reporting purposes. Because the 12-month reporting period proposed by the EEOC crosses tax years, employers cannot simply rely on the data they generate for the IRS each year. Instead, employers will be required to generate data spanning two different tax reporting years and will be required to make one-time changes to their systems in 2016 to permit such reporting.

Third, the EEOC's estimate of the one-time burden is inaccurate because the hourly rate on which it is based - $47.22 for a "Professional" - fails to account for the fact that senior information technology personnel, legal personnel, and others will be involved in any effort to develop the processes necessary to generate the required data. The identified hourly rate is not commensurate with the rates of pay provided to such individuals. [12]

Fourth, as detailed in Section II.B.3, below, the EEOC estimate fails to account for the one-time burden associated with requiring employers to develop, for the first time, a system that captures the hours worked by exempt employees and to train all exempt employees on any new system.[13] Those costs would be massive, and should be quantified by the EEOC before the Proposed Revisions are considered.

The Chamber is in the process of surveying its members to obtain information regarding the one-time hour and cost burden associated with the Proposed Revisions. The Chamber's written comments to the Comment Request will include information from that survey.

*2. The EEOC's Estimate of the Annual Burden of Compliance with the Proposed Revisions is Likewise Unrealistic*

The Agency's prediction that the Proposed Revisions will require only 3.2 hours of additional work per EEO-1 Filer - 30 additional minutes to read the instructions and just 2.7 hours to "collect, verify, validate, and report" all of the required W-2 and hours data - is ludicrous.

First, the EEOC dramatically underestimates the time it will take each EEO-1 Filer to collect, verify, validate and report on data that must be pulled from various systems and sources. As noted above, often the required data is not housed in a single HRIS and cannot be generated with the push of a button. Once generated, a combination of HRIS professionals and HR professionals will have to expend time verifying and validating the data. Legal professionals will likewise be involved in the verification process, given that the EEOC's stated purpose for the collection is to target its, and the OFCCP's, enforcement efforts, and given the requirement that a company official certify the filing, subject to penalties.

Second, the EEOC bases its burden estimate for the generation and reporting of W-2 data and hours data on the wage rate of $24.23, which is - again - the BLS wage for Administrative Support personnel. As detailed above, employees other than Administrative Support personnel would be engaged in the effort to collect, verify, validate, and report the W-2 and hours data - legal professionals and others are, and will continue to be, involved in the EEO-1 filing process.[14]

Third, the EEOC's annual burden estimate for filing the Revised Reports is improperly based on the number of EEO-1 Filers, rather than the number of EEO-1 Reports filed. The "per EEO-1 Filer" approach is inappropriate, for the reasons identified above, and the approach the EEOC used between 2009 and 2015 - in which the burden estimate takes into account the fact that many EEO-1 Filers must file reports on all of their establishments individually - remains the appropriate approach. If the per response approach were applied here, the EEOC's total cost estimate would jump from *$10,252,478* to *$49,111,297*, and that calculation assumes that the EEOC's hours estimates of 6.6 hours and cost estimate of $24.23 per hour are correct, which they clearly are not.

Fourth, the EEOC's assumption that filing on-line, through fillable PDFs, alleviates the burden of manual data entry is a false assumption. As detailed above, fillable PDFs still require the employer to manually enter the relevant data. With the addition of W-2 data and hours data, reported in twelve different pay bands within each EEO-1 category, each EEO-1 Filer will now be required to populate as many as 3,360 separate cells of data. The EEOC's burden estimate fails to account for this reality in any way.

SJA051

Fifth, the EEOC does not account, in any way, for the costs employers will incur responding to investigations and enforcement actions that are prompted by "false positives" that flow from comparing employees within broad EEO-1 categories.[15] Because the EEOC and OFCCP intend to use the results of analyses of W-2 wages by EEO-1 categories to target their enforcement efforts and because those analyses will be fundamentally flawed, the substantial cost to employers who must respond to such investigations is not theoretical. Employers will be forced to expend resources producing additional data to the EEOC and/or OFCCP, retaining labor economists to run their own analyses of pay, and engaging legal counsel to correct the Agencys' presumption of discrimination.

*3. The EEOC Ignores the Substantial <u>Burden Associated with Collecting Hours Data</u> for Exempt Employees*

The EEOC proposes to collect "the total number of hours worked by employees" included in each of 12 pay bands within each EEO-1 category, to "allow analysis of pay differences while considering aggregate variations in hours." With respect to exempt personnel, the Commission "seeks employer input with respect to how to report hours worked for salaried employees" and states that "[o]ne approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers." The Commission further states that it is "not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers," and the EEOC's "initial conclusion is that requiring employers to provide the total number of hours worked would impose a minimal burden."

As detailed in Section III.C.2, below, assuming that all full-time exempt employees work 40 hours per week is neither an accurate nor a fair assumption. Thus, to the extent the EEOC intends to consider "aggregate variations in hours," the <u>only way</u> for the EEOC to accurately capture hours for exempt employees would be to require employers to track hours of exempt employees. That option would be incredibly burdensome.

First, employers would be required to implement a time system to track all hours worked by exempt employees. Because there is no continuous workflow for exempt employees, and because they often work outside of normal business hours, any such system would be much more complex than the standard time-clock, punch-clock, or timesheet system currently used by employers for their non-exempt employees. The cost of developing such a system would be immense.

Second, the hours burden associated with exempt employees recording time would be substantial. Unlike non-exempt employees who may use a punch clock system or work regular hours, each exempt employee would be required to capture the "starts" and "stops" of his or her work. Even if that effort required just 15 minutes of time each day for each exempt employee, the result would be significant new burden for employers. The Chamber is seeking additional data from its members to quantify this potential burden.

<u>Finally, the EEOC has failed to abide by its obligation under the PRA, which is to propose a methodology for, and also assess the burden of, collecting hours for exempt employees.</u> Because the EEOC has failed to do so, commenters - including the Chamber - are unable to examine the utility and burden of producing the hours report for exempt employees.

## III. The Proposal will Not provide a public benefit or maximize the utility of the requested data as Required by The Paperwork Reduction Act.

Despite the significant burden that employers with more than 100 employees will face as a result of the requirements in the Proposed Revisions, the EEOC has failed to articulate any rationale or evidence whatsoever to justify the need for the proposed EEO-1 Revisions. Nor has the agency identified the specific benefit that the collection of aggregated wage and hours data would provide to the agency. The EEOC's wholesale failure to articulate the proposed benefit is significant given that one of the purposes of the PRA is to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government."

The Sage Report, which the EEOC used to "formulat[e] the proposal and guide the development of analytical techniques to make full use of the data to be collected," recognized the inherent limited use of the requested data. Specifically, the Sage Report recognized that "**[s]ummary data at the organization level will likely be of very limited use in EEOC practice.**" [16] The reasons for this observation are numerous, as articulated below.

To evaluate the utility of the proposed EEO-1 Revision, one must consider the legal framework that governs compensation discrimination. Since 1963, the EPA has required employers to pay men and women at the same establishment equal pay for equal work. In addition to the protections against wage discrimination based on sex afforded by the EPA, Title VII prohibits pay discrimination on the basis of race, color, national origin as well as other protected factors.[17] Employees who work for Federal contractors and subcontractors share similar protections under Executive Order 11246. Since 1978, the EEOC is the administrative agency with enforcement authority of the EPA and Title VII, while the OFCCP enforces EO 11246.

Notwithstanding these protections, both the EPA and Title VII recognize that there are legitimate reasons for differences in compensation. In this regard, the EEOC has recognized that differences in education, experience, training, shift differentials, job classification systems, temporary assignments, "red circling," revenue production, and market factors, to name a few, can legitimately explain compensation differences.[18] <u>Thus, mere differences in pay even as between comparable employees are insufficient to infer unlawful discrimination.</u>

## A. The EEOC's Proposed Tool Will Not Advance Investigations Under the EPA

SJA052

*1. The EEOC's Proposed Broad Comparison Groups is Inconsistent with Equal Pay For Equal or "Substantially Similar Work"*

As noted above, the EPA prohibits sex-based compensation discrimination for employees working at the same establishment if they perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[19]  In other words, the relevant comparators are only those employees who perform "equal work" in the "same establishment." The EEOC itself describes the *prima facie* elements of an EPA claim as follows:

- Prima Facie Case: (1) the complainant receives a lower wage than paid to an employee of the opposite sex in the same establishment; and (2) the employees perform substantially equal work (in terms of skill, effort, and responsibilities) under similar working conditions.[20]

Despite the requirement that pay comparisons can only be made between employees who perform "equal work," the proposed EEO-1 Revision would require that employers provide W-2 wage data by EEO-1 job category.  Because there are only ten EEO-1 job categories or groupings of jobs,[21] employers would be forced to categorize employees who perform wildly different work into these groupings.  The job groupings are exceedingly broad, and will necessarily capture a wide range of positions that are not capable of meaningful compensation comparisons.

For instance, as Economist Dr. J. Michael DuMond observed, one of the most serious deficiencies with the proposed EEO-1 Revisions are the "very broad occupational group[ings]" that would "result in comparisons of employees who work in very different jobs and who may perform different work."  Dr. DuMond uses the following example:

> [O]ne of the 10 EEO-1 job categories is "Professionals", which encompasses a wide range of occupations such as lawyers and registered nurses.  Hospitals that employ both nurses and lawyers would nevertheless be required to include both of these occupations together in the proposed EEO-1 survey.  This grouping of nurses with lawyers ignores the fact that a nursing degree does not require a post-graduate college degree whereas a lawyer will almost surely have post-graduate education.  Moreover, the knowledge, skills and abilities required of a nurse differ greatly from those factors that required of a lawyer.  In fact, there is actually very little in common between nurses and lawyers beyond the sharing of a common EEO-1 category.  While it is undeniable that nurses and lawyers are tied to very different labor markets, the EEOC's proposal ignores this reality and assumes pay should be similar for these types of occupations simply because they are both "Professionals."[22]

The EEOC's instruction booklet outlines other "Professional" positions that similarly cannot form a proper comparison for compensation purposes under the EPA.  For instance, using the Professionals job category for positions typically found within a hospital, we would also find accountants, computer programmers, dieticians, physicians and surgeons.[23]  But these jobs are simply not comparable under the EPA.

The EEOC itself must recognize the inappropriateness of such groupings under the EPA. Indeed, in investigating and analyzing the "equal work" requirement, the EEOC advises as follows:

> [A]n inquiry should first be made as to whether the jobs have the same common core of tasks, i.e., whether a significant portion of the tasks performed is the same.  *If the common core of tasks is not substantially the same, no further examination is needed and no cause can be found on the EPA violation.*[24]

Common sense tells us that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons do not share the same common core of tasks.  But to be more specific, the Department of Labor, Bureau of Labor Statistics makes those distinctions clear in the descriptions it assigns to these workers: [25]

Accountants & Auditors: Examine, analyze, and interpret accounting records to prepare financial statements, give advice, or audit and evaluate statements prepared by others. Install or advise on systems of recording costs or other financial and budgetary data.

Computer Programmers: Create, modify, and test the code, forms, and script that allow computer applications to run. Work from specifications drawn up by software developers or other individuals. May assist software developers by analyzing user needs and designing software solutions. May develop and write computer programs to store, locate, and retrieve specific documents, data, and information.

Dieticians: Plan and conduct food service or nutritional programs to assist in the promotion of health and control of disease. May supervise activities of a department providing quantity food services, counsel individuals, or conduct nutritional research.

Registered Nurses: Assess patient health problems and needs, develop and implement nursing care plans, and maintain medical records. Administer nursing care to ill, injured, convalescent, or disabled patients. May advise patients on health maintenance and disease prevention or provide case management. Licensing or registration required. Includes Clinical Nurse Specialists. Excludes "Nurse Anesthetists" (29-1151), "Nurse Midwives" (29-1161), and "Nurse Practitioners" (29-1171).

Lawyers: Represent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions. May specialize in a single area or may practice broadly in many areas of law.

Physicians:[26] Physicians who diagnose and provide non-surgical treatment of diseases and injuries of internal organ systems. Provide care mainly for adults who have a wide range of problems associated with the internal organs. Subspecialists, such as cardiologists and gastroenterologists, are included in "Physicians and Surgeons, All Other" (29-1069).

Surgeons: Physicians who treat diseases, injuries, and deformities by invasive, minimally-invasive, or non-invasive surgical methods, such as using instruments, appliances, or by manual manipulation. Excludes "Oral and Maxillofacial Surgeons" (29-1022).

And of course, the BLS job descriptions do not take into account the many specific job descriptions and duties employers are likely to have in their own workforces.

Aside from the "same common core of tasks" analysis, assessing whether required "skills" of comparator jobs are substantially equal further demonstrates that comparisons of pay by EEO-1 job groupings can serve little utility. As the EEOC's Compliance Manual provides:

Two jobs require equal skill for purposes of the EPA if the experience, ability, education and training required are substantially the same for each job.

Again, one need only look at the instructions the EEOC has provided to employers to see that the EEO-1 job groupings take into account a wide range of experience and educational requirements within the same job group. For instance, employers are advised that most jobs in the "Professionals" job group "require bachelor and graduate degrees, and/or professional certification." The EEOC further provides that "[i]n some instances, comparable experience may establish a person's qualifications." Thus, the explicit directions make clear that jobs that do not require the same education, experience and training will be grouped together. On its face, the EEO-1 job groupings are not capable of any meaningful analysis under the EPA.

## B. The EEOC's Proposed Tool Will Not Advance Investigations Under Title VII

The proposed EEO-1 Revisions are also inconsistent with Title VII and, therefore, cannot support any meaningful analysis probative of further investigation. Specifically, providing W-2 data by EEO-1 job categories is not consistent with the requirement that compensation differences only matter if the comparators are "similarly situated." As articulated by the EEOC in its compliance manual, "similarly situated employees are those who would be expected to receive the same compensation because of the similarity of their jobs and other objective factors."[27] And when reviewing similarity of jobs, EEOC investigators are instructed that the "actual content of the jobs must be similar enough that one would expect those who hold the jobs to be paid at the same rate or level."[28]

For the reasons set forth in Section III.A.1 above, the EEO-1 job groups are exceedingly broad and will necessarily include a wide range of positions that are not capable of meaningful compensation comparisons under Title VII. Using the same example described above, it is simply implausible to expect that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons are "paid at the same level or rate."

Moreover, courts across this country have held that although similarly situated employees need not be "identical", they must be "directly comparable to the plaintiff in all material respects...."[29] Under these legal standards, any compensation analysis based upon EEO-1 job groupings would be meaningless.

We see a similar result in the EEO-1 "Sales Workers" job grouping. In that group we find advertising sales agents, insurance sales agents, real estate brokers and sales agents, securities, commodities, financial services sales agents, and telemarketers. Many of these positions could reasonably be found within a financial services organization. Yet one would not expect that these jobs would be similar enough to suggest that those who hold the positions would be paid at the same rate or level. Indeed, sales workers are often compensated based on varying levels of base salary and commission plans. Thus, unless they were truly in similar jobs, it would be impossible to conduct pay comparisons based on an overall broad-based job grouping that would include, for example, telemarketers and securities and commodities brokers.

And aside from the overly broad EEO-1 job groupings themselves, the EEOC has acknowledged that "differences in job titles, departments, or other organizational units may reflect meaningful differences in job content or other factors that *preclude direct pay comparisons* between employees."[30] But neither these factors nor the legitimate factors that explain compensation discrimination as described in Section III.C.1 below, are captured under the proposed EEO-1 Revisions.

## C. There are Fatal Limitations with the Information Sought and the Statistical Tool Proposed to be Utilized by the EEOC to Analyze this Information

For reasons addressed in more detail below, there is simply no circumstance under which broad-brush, aggregate compensation and hours data can be used effectively on a grand scale to target employers for review.[31] Every employer's compensation system is unique and numerous factors impact compensation decisions and results. The authors of the Sage Report, commissioned by the EEOC, detailed a theoretical framework for identifying pay disparities that is consistent with standard labor economic theory.[32] More specifically, the authors demonstrated that an employee's pay is estimated as a function that includes "control variables that can have a justifiable impact on difference in pay (such as education, certification, and work experience)." The inclusion of the control variables is critical in explaining why some

employees are paid more than others. As the authors correctly note: "market forces determine one's level of pay, and *variation in pay is both necessary and inevitable.*"[33]

Nonetheless, the two tests that the EEOC specifically references in the Proposed Revisions are simply distributional tests that do not control for any legitimate factors that explain pay such as those identified in the pilot study. Besides pay band, the only other factor that a covered employer will be providing to the EEOC is the aggregate number of work hours associated with employees in each pay band and demographic group. However, the pilot study's authors noted that simply adjusting for the number of work hours, as recommended by the EEOC, could generate misleading results:

> [W]e have to recognize the varying patterns of compensation for employees who work different hours. As a result, pooling together into a single cell the employees who may have received the same compensation from working different hours and *analyzing them with a single offset as the format of the proposed EEOC form suggests, may lead to biases that are difficult to quantify…*"[34]

As the EEOC has found with similar efforts to collect compensation data on a broad scale, compensation cannot be subjected to a normalized, one-size-fits-all method of interpretation. As a result, the proposed data collection will have no "meaningful value" and certainly no benefit that rises to the level required by the PRA. Simply put, the EEOC cannot achieve the objectives identified in the proposal through any mechanism, and certainly not through the mechanism it has identified.

*1. The Pay Proposal Ignores Legitimate Reasons for Differences in Compensation*

Employers have an inherent right to value jobs differently based on non-gender or race/ethnicity based standards.[35] The EEOC's proposal does not account for the explicitly-permitted differentiation in compensation based on factors like experience, performance, work productivity, skills, scope of responsibility, market, and education - to name just a few. This is particularly troublesome because differences in sex and race/ethnicity correlate with some of these factors. For example, the Bureau of Labor Statistics indicates that the average amounts of company-specific tenure differ between men and women and among different race/ethnic groups.[36] Notwithstanding, the statistical tests proposed by the EEOC do not account for these permitted differences.

Moreover, the EEOC's proposal ignores the role of working conditions and how that affects an employee's compensation. For example, employees who work night shifts, swing shifts and/or weekends are often paid a differential to account for less desirable work schedules.[37] For the same reason, jobs that require employees to work outside or exert atypical physical effort may also command a wage premium.[38] Nevertheless, the statistical tests proposed by the EEOC using the collected data will not and cannot account for differences in working conditions.

The concerns with the EEOC's failure to account for differences in working conditions is compounded because the Commission is proposing that employers use W-2 data, which includes not only base salary but also commissions, tips, overtime pay, shift differentials and bonus payments in the aggregate. In doing so, the EEOC is ignoring that some types of pay, specifically commissions and tips, are determined more by an employee's skill and effort than an employer's pay policies.[39] For example, Economist Dr. J. Michael DuMond notes that differences in W-2 earnings among servers at a restaurant will be based on their ability to provide quality service and earning the associated tips/gratuities, and is largely undetermined by the employer.[40]

*2. The EEOC's Approach to Reporting of Hours for Salaried, Part-Time and Terminated Employees Further Denigrates the Efficacy of the Data*

The proposal would require employers to report hours worked as well as data about W-2 earnings. The Commission stated that this will allow the EEOC and OFCCP to "meaningfully analyze"[41] pay differences because "collection of hours-worked data will account for the fact that some individuals are employed for less than the entire reporting year, and therefore, may work fewer hours."[42] The proposed approach to reporting data for employees exempt from the overtime provisions of the FLSA, part-time employees, and employees who are hired or terminated mid-year, however, is fundamentally flawed.

First, as the EEOC admits in the proposal, it is unsure how to count hours worked for full-time, salaried exempt employees, noting that the Agency "*seeks employer input*" on how to report hours worked for these exempt employees.[43] The EEOC indicated that it is "not proposing" that employers begin collecting additional data on actual hours worked for salaried workers "to the extent that the employer does not currently maintain such data," but rather is considering a standard such as estimating 40 hours per week for all full-time salaried workers in all industries. In our experience and in the experience of Dr. DuMond, very few employers track the number of actual hours worked for their salaried workers and even HRIS systems that maintain a standardized or default value for "work hours" for salaried exempt employees (such as 40 hours per week) does not reflect an employee's actual hours worked.[44] As such, the Agency will be forced to apply an across-the-board rule that does further harm to the efficacy of the data and that would be uninformative and unreliable for purposes of identifying pay disparities.[45] The impact of this data limitation is serious: according to data from the Bureau of Labor Statistics, 59% of the US workforce is paid by the hour, meaning that 41% of the US workforce is paid on a basis for which no accurate work hours may be available and for which the EEOC does not have a recommended method for measuring.[46]

Further, combining employees who work part-time or partial year with full-time and full-year employees will result in very misleading results. The variation is explained by Dr. DuMond in his example of an employee who has an annual salary of

SJA055

$120,000 per year but was recently hired and only worked 1 of 12 months, he or she will be placed in the lowest pay band since he/she only earned $10,000. Under the EEOC's proposal, this employee could be grouped with lower wage workers at the same company, even though the hourly rate for this employee would be much higher than the other employees in the same pay band. [47] Similarly, an employee who works a part-time schedule of 20 hours per week will be grouped and counted with FT employees who earn half of that hourly rate but work 40 hours per week.[48]

Simply collecting the aggregate number of hours worked does not fix the bigger underlying problem with the EEOC's proposal: employees are being counted in the "wrong" pay band. However, the EEOC might again infer discrimination from differences in the imputed hourly rates for employees in the same pay band, not recognizing that these differences can just as easily arise from part time and partial year employees, and the agency will not be able to make that distinction with the aggregated data. Additionally, the proposal does not suggest a methodology by which the EEOC will distinguish between intermixed part-time, partial year or full-time employees in the aggregate W-2 data. Moreover, since the total number of hours worked by employees in a pay band does not incorporate any of the factors known to affect pay, the data collected under this proposal will not provide any useful insight into the actual nature of employers' pay practices.

### 3. The EEOC's Proposed Statistical Approach Will Not be Useful in Identifying Pay Differences

The EEOC Proposes using two statistical tests to analyze the collected data: the Mann-Whitney and the Kruskal-Wallis tests.[49] The EEOC indicates that it can "compute the statistical tests within job categories and then proceeding [sic?] to more closely investigate companies and establishments with low p-values" and may also "compare a particular firm's regression coefficients for the hours worked, race and gender variables to those derived from an analysis of the relevant labor market as a whole."[50] The use of these measures could easily lead to both "false positives" (i.e., flagging a company for further review even when all employees working in the same job are paid exactly the same) and also "false negatives" (i.e., concluding that pay disparities do not exist at a company even in the presence of unambiguous pay discrimination).

The reason that the two statistical tests proposed by the EEOC are likely to lead to both false positives and false negatives is that the aggregated data collected by the EEOC will not include one of the most critical factors that determine pay, specifically the job level/job grade of an employee.[51] According to Dr. DuMond, it is commonly understood that all employees, regardless of their race, ethnicity or gender, will experience increases in pay as they move "up" or "higher" in an organization.[52] He provides the example that Pharmaceutical Sales Representatives are paid less than their District Sales Managers who are paid less than their Regional Sales Directors. [53] While it would not be reasonable to assume that an inexperienced Pharmaceutical Sales Representative would be paid similarly to an experienced Regional Sales Director simply because they are in the same EEO-1 job category (Sales), the statistical measure the EEOC proposes utilizing could lead to this conclusion because the EEOC's proposal will not include any information or breakdown relating to an employee's job level/job grade. Despite this lack of consideration for an employee's job level/grade, the two statistical tests will nevertheless ascertain whether gender and racial groups are equally distributed across all the pay levels of a company without any consideration of the employee's job level/grade.

The Pilot Study commissioned by the EEOC is very clear as to what these two statistical tests assume: "Although the (Mann-Whitney) test is sensitive to pure shifts, it has the more general interpretation of a test of the differences between two or more distributions."[54] Thus, because the Mann-Whitney and Kruskal-Wallis tests are determining whether men and women, for example, are distributed similarly across all pay bands (and hence all levels of an organization), these tests do not determine whether there are improper disparities within a pay band.[55] Instead, it is a test of whether racial and gender groups of employees are similarly distributed across all pay bands, even when the employees in these groups may have very different levels of experience, may hold very different jobs (e.g., nurses and lawyers) and may be at very differently job and pay levels within an organization.[56] If the EEOC proceeds with its stated proposal to use these tests on the collected data to "detect discrimination," then the likelihood that they would lead to false positives and false negatives is greatly increased.

Economist J. Michael DuMond conducted the Mann-Whitney test on two sets of simulated employment data.

In the first simulation, an employee's pay is completely determined by two factors: his or her job grade/level and the number of years he or she has worked at that level.[57] For example, an employee entering the first job grade receives a starting annual salary of $30,000 and is awarded a raise of $1,000 each year he or she remains in that position. Similarly, an employee hired into the next grade level receives a starting salary of $40,000 and receives a raise of $2,000 each year he/she or she remains in their job. A similar method of pay determination exists for the next three job grades at this fictitious company, though the starting pay and annual pay adjustments are naturally greater in the higher-level grades. In this simulation, it is clearly impossible for a pay disparity to exist between women and men in the same job grade, after taking into account any differences in job tenure. A standard multiple regression analysis of this simulated data confirmed this obvious conclusion. Using the Mann-Whitney test on these simulated data, however, yielded a statistically significant result, which the EEOC may incorrectly interpret as an indication of pay disparities that are adverse to women.[58] That is, even in a simulation in which an employee's pay is 100% determined by a formula that allows no room for discrimination, the test that the EEOC is proposing to use still yielded a statistically significant difference. Put simply, the EEOC's proposal won't be able to test whether or not similarly situated men and women are paid equally.

This point is further illustrated in the second simulation. At this second fictitious company, there is an explicit, racially discriminatory policy that all African-American employees in grade level 1 receive a starting salary of $30,000 and all white employees in grade level 1 receive a higher starting salary of $30,500. Both employees receive a pay adjustment of $1,000 for each year worked. This blatantly discriminatory policy is found at all other job grades as well: white employees in grade

SJA056

level 2 receive a starting pay of $40,500 compared to $40,000 for African-Americans. At the highest job grade in this hypothetical company, the starting pay gap is even more pronounced: African-Americans have a starting salary of $100,000 compared to $105,000 for white employees.[59] As would be expected, the existence of such an overt policy of pay discrimination was readily detectible through a standard multivariate regression analysis, which indicated that African-American employees were paid statistically significantly less than their white counterparts. On the other hand, applying the EEOC's proposed Mann-Whitney test to these same data did not reveal any statistically significant differences between white and African-American employees.

These two simulations call into question the usefulness of the data that would be collected under the EEOC's proposal. These examples illustrate that the proposed statistical tests may not identify actual pay differences that are consistent with discrimination when it truly exists, and may incorrectly conclude that there is evidence consistent with discrimination when employees are actually paid equivalently. But perhaps more importantly, the first simulation shows that a company with a disproportionately greater number of female or minorities at the lower grade levels is likely to "fail" the Mann-Whitney test. In fact, failing the Mann-Whitney test could occur while companies are making good-faith efforts to increase their minority and female representation. That is, many firms have worked diligently to increase the participation of workers from historically disadvantaged groups by hiring these workers as they became available. The result of this effort is that higher percentages of female, African American, and Hispanic workers are found in some of the lower job levels as they gain additional experience to be eligible for promotion.

Accordingly, the EEOC's proposed statistical methodology provides no benefit and does not meet the standards of the PRA.

D. The EEOC's Proposal to Compare the Pay of a Firm or Establishment to Industry or Metropolitan-Area Data Serves No Purpose Under Title VII or the EPA.

The EEO-1 Revisions state that it will develop a software tool that will allow its investigators to analyze "W-2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data" which would "highlight statistics of interest."

However, neither Title VII, the EPA nor EO 11246 requires employers to pay its employees according to industry or geographical standards. Certainly, employers cannot use as a defense to claims of inequitable pay practices that others in its industry are also paying women or minorities in a particular EEO-1 category less than white men. Conversely, it is not discriminatory for an employer to decide to pay lower wages for certain positions than its competitors may choose to pay for the same positions. As such, the mere fact that a particular employer's aggregate compensation data is below the pay of the industry or metropolitan area is irrelevant to an investigation of whether an employer's pay practices are discriminatory.

Employers already have many different, much more finely-tuned, methods by which they can benchmark their compensation against others for particular jobs. Many companies, large and small alike, look to market data that is specific to the jobs in their workforce to assess their position vis-a-vis their competitors. The data that could be assembled through the proposed EEO-1 revisions will lack the reliability of such targeted market data - data that employers can and do already access.

Moreover, the EEO-1 Revisions suggestion that reporting pay data may "encourage self-monitoring" and "voluntary" compliance by employees if they uncover pay disparities misses the mark. As an initial matter, federal contractors and subcontractors are already required to monitor their pay practices as part of their compliance obligations.[60] And any contractor subject to an OFCCP compliance evaluation is required to submit employee-level detailed compensation data for the establishment under review. Thus, there would be no added utility to federal contractors and subcontractors who already self-monitor pay within their organizations.

And, generally speaking, the EEO-1 Revisions would not otherwise encourage self-monitoring efforts because, for the reasons explained above: (1) EEOC cannot effectively target its enforcement efforts based on the data; and (2) the data is too broad and generalized to be of any practical use to those employers who endeavor to establish equitable pay practices.

## IV. Confidentiality & Privacy

A. EEOC Should Take All Possible Actions to Protect the Confidentiality and Security of the Highly Confidential, Proprietary Data Being Requested

EEOC gives rather short shrift to the privacy and confidentiality issues raised by the Proposed Revisions. The notice published in the Federal Register merely reiterated that Section 709(e) of Title VII, 42 USC § 2000e-8(e) prohibits disclosure of any information contained in the EEO-1 report "prior to the institution of any [Title VII] proceeding." The proposal notes that while the OFCCP is not subject to the restrictions of section 709(e), it nevertheless will hold the information contained in the EEO-1 confidential "to the extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act." While these assertions state the law as codified and practiced, they understate the significant privacy and confidentiality concerns raised by the proposal.

We only have to refer to the draft report of the EEOC Survey System Modernization Work Group (Working Group) Meeting conducted on March 8-9, 2012, which was published with the Proposed Revisions to confirm these concerns. While this Working Group performed its work nearly four years prior to the publication of the Proposed Revisions and while the draft report was deficient in many respects, the sparse published report highlighted issues raised which were not addressed in the Proposed Revisions. The Working Group noted that "the Privacy Act is a concern."[61] The report stated that:

SJA057

"Statistical Controls would be required to ensure the confidentiality of data to companies with smaller job categories."[62] The proposal is devoid of any discussion of data confidentiality. The draft report notes as well that if the "cell" size was lower than 5, we do not publish data for that cell."[63] There is no discussion of the implication of small cells, particularly in the upper pay bands.

In fact, there is no discussion at all of confidentiality issues in the proposal. In addition, the general reference to the Exemption 4 exclusion from the OFCCP releasing this information does not reference a crucial point. Unlike the section 709(e) restriction on EEOC disclosure, the OFCCP procedure requires contractors to follow the regulatory constraints found in the OFCCP and Department of Labor FOIA regulations. The Department of Labor FOIA Regulations, 29 CFR Part 70, create a complex process for submitters to request that business confidential information not be disclosed. Rather than a simple prohibition of disclosure, the regulations state:

> (b) Designation of business information. A submitter of business information will use good-faith efforts to designate, by appropriate markings, either at the time of submission or at a reasonable time thereafter, any portions of its submission that it considers to be protected from disclosure under Exemption 4. These designations will expire ten years after the date of the submission unless the submitter requests, and provides justification for, a longer designation period.

> (c) Notice to submitters. A component will provide a submitter with prompt written notice of a FOIA request that seeks its business information whenever required under paragraph (d) of this section, except as provided in paragraph (g) of this section, in order to give the submitter an opportunity to object in writing to disclosure of any specified portion of that information under paragraph (e) of this section. The notice will either describe the business information requested or include copies of the requested records or record portions containing the information. When notification to a voluminous number of submitters is required, notification may be made by posting or publishing notice reasonably likely to accomplish such notification.

> (e) Opportunity to object to disclosure. A component will allow a submitter a reasonable time to respond to the notice described in paragraph (c) of this section. If a submitter has any objection to disclosure, it is required to submit a detailed written statement. The statement must show why the information is a trade secret or commercial or financial information that is privileged or confidential. In the event that a submitter fails to respond to the notice within the time specified, the submitter will be considered to have no objection to disclosure of the information. Information provided by a submitter under this paragraph may itself be subject to disclosure under the FOIA.

Thus, in every instance where the Department of Labor receives a FOIA request for the extended EEO-1 information, it must timely notify the employer submitter which in turn must submit a detailed written statement explaining why some or all of the EEO-1 information is a trade secret or commercial or financial information. The regulations then provide a process whereby the requester or the submitter have to undertake a lengthy appeal process where each presents its arguments. Final determinations are subject to judicial review. Further, even if the Department of Labor applies Exemption 4, that exemption from disclosure expires 10 years after it is granted. As noted in the draft Working Group report, information contained in small cells or smaller job categories may well disclose individual pay or other personal information. Thus, the submission to the OFCCP is not resolved by the glib assertion in the proposal that the OFCCP holds this information confidential "to the extent permitted by law." In fact, there is a significant burden placed on contractors to protect the confidentiality of the new EEO-1 information.

To the extent that the OFCCP shares the EEO-1 information, disclosure concerns would be alleviated to some extent if the EEOC requests that the Director of OIRA treats all information submitted to the EEOC as covered by Section 3510 of the Paperwork Reduction Act[64] and directs the EEOC that the statutory restrictions on disclosure of EEO-1 data will apply to the OFCCP.[65] In this regard, the direct prohibition on disclosure will not be subject to regulatory considerations and determination of trade secrets or commercial or financial information by OFCCP personnel not trained in these issues or a laborious and expensive regulatory and judicial review process.

## B. Potential Data Breaches

As noted above, the proposal to collect employee pay data through the EEO-1 reports presents significant confidentiality issues related to the potential disclosure of this data. The EEOC publishes aggregate data collected from the EEO-1 reports and also shares original EEO-1 data with other federal and state agencies and individual researchers. With regard to the aggregate data, there are concerns that those who receive it will be able to reverse-engineer the aggregate data. With regard to original data, there are concerns that those who receive it might not take appropriate steps or have appropriate procedures in place to maintain its confidentiality. Furthermore, the EEOC must be transparent about the steps that it will take as an agency to insure that its information security program is now, and will be in the future, able to protect this sensitive data from access or acquisition by unauthorized individuals.

Prior to issuing the proposed rule, the EEOC engaged the National Academy of Sciences (NAS) to conduct a study, which, *inter alia*, looked at confidentiality concerns raised by the EEOC's collection of employee pay data in EEO-1 reports and its subsequent disclosure of this data in aggregate and original form. As a threshold matter, the report issued by the NAS (NAS Report) recognized -- and we wish to underscore -- that "[e]mployee compensation data are generally considered to be highly sensitive; they are even considered proprietary information by many private-sector employees."[66]

The NAS Report underscored that "there will be a great demand on the part of other federal agencies, researchers, analysts, compensation-setting bodies and others for access to these powerful new data . . . and the EEOC would be well

advised to start taking steps now to develop policies to provide access in a protected environment."[67]  The NAS Report went on to note that, despite the sensitive nature of employee pay data, the "EEOC provides [this] data to agencies that do not have the same level of confidentiality protections."[68]  With regard to both its routine disclosure of data from the EEO-1 reports to other federal and state agencies, as well as researchers, the NAS Report recommended that the EEOC:

> (1) consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications;  and

> (2) seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to nonagency employees.[69]

EEOC's proposal does not address these recommendations in any way.

Moreover, these is no indication in the proposal that the EEOC requires those to whom it provides the EEO-1 reports to (1) to maintain the same level of confidentiality that the EEOC does with respect to this information (other than the Department of Justice) (2) demonstrate that their information security programs are sufficient to protect this data from malicious attacks targeted at such data or (3) provide notification to the EEOC in the event their data security is compromised or the entity or individual experiences as a data breach.  Moreover, the proposal is silent as to how the data will be transferred from the EEOC to the various federal or state agencies or individuals.

Although the NAS Report did not make any specific recommendations about a review of, or improvements to, the EEOC's information security protocols in connection with requiring employers to provide pay data in the EEO-1 forms, the NAS Report did emphasize that "the consequences of a breach in the protection of data provided in confidence are, as other federal agencies have discovered, painful and of lasting consequence."[70] This has most recently been seen with the data breach experienced last year by the Office of Personnel Management.  This massive data breach was one of the largest in recent memory and was specifically targeted at employee, applicant and former employee information.  OPM has now had to make major changes to its personnel and its policies and procedures in an attempt to earn the trust of the American public when it comes to the information entrusted to this agency.  A major source of criticism of OPM has been its decision to transfer the personally identifiable information entrusted to it to a third party vendor.  The class action complaints filed against OPM and the vendor allege that OPM did not do enough to vet the security measures employed by the vendor or require the vendor to provide ongoing updates to OPM regarding its security program and any breaches.

The OPM breach holds lessons for all federal agencies and should inform how the EEOC handles the disclosure and transfer of employee pay data to third parties.  The EEOC needs to assure employers that it has reviewed its information security protocols and that they can and will safeguard the pay data employers are providing.  In the hands of the wrong people, the original pay data from the EEO-1 report regarding pay could cause significant harm to a company and as previously noted subject employees to potential violation of their privacy.  Indeed, while the Working Group noted potential Privacy Act concerns, the EEOC apparently gave absolutely no consideration to this potential problem.  And even though no information in the EEO-1 report is tied to the name of any one individual, it is not hard to imagine a scenario in which individual employees within a small group listed on the EEO-1 report could be identified.  Indeed, this is why the EEOC has suppression protocols in place for aggregate data where a group has three or less employers' information in it or any one employer accounts for 80% of the group data being aggregated.

## V. CONCLUSION

In conclusion, the Chamber has serious concerns with the proposed EEO-1 Revisions. In view of the multitude of deficiencies which we have illuminated in this testimony and which will be further highlighted in our formal comments, we request that the EEOC withdraw the proposed revisions and commence a cooperative effort with all stakeholders to deal with the issues.  Madam Chair, Commissioners, and General Counsel, we thank you for the opportunity to share some of those concerns with you today.  Please do not hesitate to contact me or the Chamber of Commerce, if we can be of further assistance in this matter.

---

## Exhibit 1

## DECLARATION OF J. MICHAEL DUMOND, PH.D.

I, J. Michael DuMond, do hereby declare as follows:

1. I am over the age of 18. I have personal knowledge of the facts contained in this declaration and if called as a witness I would testify truthfully to the matters stated herein.
2. My name is Jon Michael DuMond. I hold a Ph.D., M.S. and B.S. in economics, all from Florida State University.  I am currently a Vice President at Economists Incorporated, a position I have held since 2014.  Economists Incorporated ("EI") is an economic consulting firm that offers consulting services to a wide variety of clients, including law firms, businesses, trade associations, government agencies and multilateral organizations.  From 2009 to 2014, I worked as a Principal within the labor and employment practice of Charles River Associates ("CRA").  Prior to CRA, I worked as an economist with ERS Group from 2001 to 2008, an economic consulting firm which specializes in the economic analysis of labor and employment issues.

SJA059

3. Since 2002, I have also been an adjunct professor with the Department of Economics at Florida State University. Beginning in 2006, my teaching has consisted solely of graduate-level courses, including computer programming, applied research methods and the econometric analysis of data. My academic research has focused on employee compensation and selection procedures and has appeared in peer-reviewed professional economic journals such as *Economic Inquiry, Industrial Labor Relations Review, Managerial and Decision Economics, and the Journal of Sports Economics.*

4. During my tenure with EI, CRA and ERS Group, I have regularly been engaged to analyze employee compensation for potential disparities in pay related to gender or race/ethnicity. These engagements have encompassed a wide variety of industries and occupations, and have included both private-sector and public-sector employees. I have been retained on behalf of both plaintiffs and defendants. A copy of my curriculum vitae is attached to this declaration as Exhibit A.

5. I was retained by the United States Chamber of Commerce in connection with the Equal Employment Opportunity Commission's proposed changes to the EEO-1 survey, which would affect federal contractors and private employers with at least 100 employees. More specifically, I was asked to evaluate whether the data that would be collected by the Equal Employment Opportunity Commission (EEOC) would be useful and informative with respect to identifying pay discrimination.[71]

6. If adopted, the new reporting requirements would require covered employers to "collect aggregate W-2 data in 12 pay bands for the 10 EEO-1 job categories. Employers will simply count and report the number of employees in each pay band.[72]" Separate counts would be made in order to show the number of male and female employees in each of the pay bands as well as the number of employees in seven race/ethnic groups.[73] In addition to the number of employees in each pay band, covered employers would also report the total number of hours worked by those same employees in the prior 12 months.

7. The EEOC and Office of Federal Contract Compliance Programs (OFCCP) have stated they intend to rely on these data to guide their investigations, "identify employers with existing pay disparities" and "detect discrimination.[74]" The proposal does not define "discrimination".

8. In my opinion, the collection of such limited and aggregated data is highly unlikely to provide meaningful information for detecting discriminatory pay disparities and even less useful in determining whether a contractor or covered employer is providing "equal pay for equal work." The reasons that these data would be uninformative in identifying potential pay discrimination are numerous, and I have detailed six of the most serious deficiencies in the following paragraphs.

9. First, the aggregated reporting structure proposed by the EEOC only distinguishes employees based on very broad occupational groups. That is, these groupings result in comparisons of employees who work in very different jobs and who may perform different work. As a result, these groupings will necessarily result in comparisons of employees with large differences in skills, training, education and other qualifications. For example, one of the 10 EEO-1 job categories is "Professionals", which encompasses a wide range of occupations such as lawyers and registered nurses. Hospitals that employ both nurses and lawyers would nevertheless be required to include both of these occupations together in the proposed EEO-1 survey. This grouping of nurses with lawyers ignores the fact that a nursing degree does not require a post-graduate college degree whereas a lawyer will almost surely have post-graduate education. Moreover, the knowledge, skills and abilities required of a nurse differ greatly from those factors that required of a lawyer. In fact, there is actually very little in common between nurses and lawyers beyond the sharing of a common EEO-1 category. While it is undeniable that nurses and lawyers are tied to very different labor markets, the EEOC's proposal ignores this reality and assumes pay should be similar for these types of occupations simply because they are both "Professionals."

10. Second, the EEOC's proposal does not recognize that pay is highly correlated with job experience. For example, some employers have an explicit seniority-based pay system. Also, pay generally increases the longer an employee has been with a company. Recent data from the Bureau of Labor Statistics indicates that the average amounts of company-specific tenure differ between men and women and among different race/ethnic groups.[75] Notwithstanding, the statistical tests proposed by the EEOC do not account for differences between employees based on length of service.

11. Third, The EEOC's proposal ignores the role of working conditions and how that affects an employee's compensation. For example, employees who work night shifts, swing shifts and/or weekends are often paid a wage differential to account for less desirable work schedules. For the same reason, jobs that require employees to work outside or exert atypical physical effort may also command a wage premium. Nevertheless, the statistical tests proposed by the EEOC using the collected data will not and cannot account for differences in working conditions.

12. Fourth, the EEOC is proposing that employers use W-2 data rather than an employee's "base" pay as the former includes commissions, tips, overtime pay, shift differentials and bonus payments. However, the EEOC is not proposing that employers report each of these compensation types separately, but instead is requiring that employers use the total of all these earnings when assigning an employee to one of the 12 proposed pay bands. In doing so, the EEOC is ignoring that some types of pay, specifically commissions and tips, are determined more by an employee's skill and efforts rather than an employer's pay policies. For example, differences in W-2 earnings among servers at a restaurant will be based on their ability to provide quality service and earning the associated tips/gratuities, and is largely undetermined by the employer. Unfortunately, the data that the EEOC is proposing to gather will not account for such differences.

13. The fifth reason that the data collected through the EEOC's proposal would be uninformative and unreliable for purposes of identifying pay disparities arises from the inherent problem in determining the number of work hours for salaried employees. As previously noted, covered employers would be required to also determine the total number of annual work hours for employees in each of the 12 pay bands. While such data is obviously available for employees paid by the hour, there are relatively very few employers that track the number of actual work hours for their salaried workers. In reviewing data from numerous HRIS data systems over the course of my professional career, I have learned that even though these systems often maintain a standardized or default value for "work hours" for salaried exempt employees (such as 40 hours per week) this default value frequently does not reflect an employee's actual work hours. For most employers, there is no need to track actual hours worked for salaried exempt employees, as they are not

SJA060

eligible for overtime pay.  Put another way, accurate data on work hours for salaried or commissioned employees are typically not maintained in the normal course of business.

14. This limitation on accurate data for non-hourly employees is openly acknowledged within the EEOC's own proposal, as they invite "specific, detailed input on this aspect of its proposed data collection.[76]" The impact of this data limitation is serious:  according to data from the Bureau of Labor Statistics, 59% of the US workforce is paid by the hour, meaning that 41% of the US workforce is paid on a basis for which no accurate work hours may be available and for which the EEOC does not have a recommended method for measuring.[77]

15. The proposal is also unclear as to how the EEOC will use or analyze the data relating to work hours. I assume that this information will be used to undertake a rough conversion of the pay range counts into hourly rates for workers in each of the pay bands, most likely using the midpoint of each of the proposed pay bands divided by the number of hours per employee.  This approach, however, could be very misleading.  For example, an employee that has an annual salary of $120,000 per year but was recently hired and only worked 1 of 12 months will be placed in the lowest pay band since he/she only earned $10,000.  Under the EEOC's proposal, this employee would be grouped with minimum wage workers at the same company, even though the hourly rate for this employee would be much higher than the other employees in the same pay band.  Similarly, an employee who works a part time schedule of 20 hours per week will be grouped and counted with FT employees who earn half of that hourly rate but work 40 hours per week.  Simply collecting the aggregate number of hours worked doesn't fix the bigger underlying problem with the EEOC's proposal: employees are being counted in the "wrong" pay band.  However, the EEOC and OFCCP might again infer discrimination from differences in the imputed hourly rates for employees in the same pay band, not recognizing that those differences can just as easily arise from part time and partial year employees, and the agencies will not be able to make that distinction with the aggregated data.  Additionally, the proposal does not suggest a methodology by which the EEOC and the OFCCP will distinguish between intermixed part time, partial year or fulltime employees in the aggregate W-2 data.  Moreover, since the total number of hours worked by employees in a pay band does not incorporate any of the factors known to affect pay, the data collected under this proposal will not provide any useful insight into the actual nature of employers' pay practices.

16. The sixth reason that the data that would be collected by the EEOC would not be useful in identifying pay disparities is that the two statistical tests that the EEOC suggests they would use in analyzing the collected data (i.e., the Mann-Whitney tests and the Kruskal-Wallis test) could easily lead to both "false positives" and "false negatives." In this context, an example of a "false positive" would be an inference that a company has gender pay disparities although women and men working in the same job are paid exactly the same (i.e., "equal pay for equal work.")  On the other hand, an example of a "false negative" is a conclusion that pay disparities do not exist at a company even in the presence of unambiguous pay discrimination.

17. The reason that the two statistical tests proposed by the EEOC are likely to lead to both false negatives and false positives is that the aggregated data collected by the EEOC will not include one of the most critical factors that determine pay, specifically the job level/job grade of an employee. It is commonly understood that all employees, regardless of their race, ethnicity or gender, will experience increases in pay as they move "up" or "higher" in an organization.  In my experience, most every company defines salary ranges for positions based on the level of the job within the organization.  For example, Pharmaceutical Sales Representatives are paid less than their District Sales Managers who are paid less than their Regional Sales Directors.  It would not be reasonable to assume that an inexperienced Pharmaceutical Sales Representative would be paid similarly to an experienced Regional Sales Director simply because they are in the same EEO-1 job category (Sales).  But since the data that the EEOC is proposing to collect will not include any information or breakdown relating to an employee's job level/job grade, these relevant data will be ignored.

18. Despite a lack of consideration for an employee's job level/grade, the two statistical tests will nevertheless ascertain whether gender and racial groups are equally distributed across all the pay levels of a company without any consideration of the employee's job level/grade. The Pilot Study commissioned by the EEOC is very clear as to what these two statistical tests assume:

> Although the (Mann-Whitney) test is sensitive to pure shifts, it has the more general interpretation of a test of the differences between two or more *distributions*.[78]

19. Because the Mann-Whitney and Kruskal-Wallis tests are determining whether men and women, for example, are distributed similarly across all pay bands (and hence all levels of an organization), these tests do not determine whether there are improper disparities within a pay band. Instead, it is a test of whether racial and gender groups of employees are similarly distributed across all pay bands, even when the employees in these groups may have very different levels of experience, may hold very different jobs (e.g., nurses and lawyers) and may be at very differently job levels of an organization. If the EEOC proceeds with their stated proposal to use these tests on the collected data to "detect discrimination," then the likelihood that they would lead to false positives and false negatives is greatly increased.

20. I conducted the Mann-Whitney test on two sets of simulated employment data[79] that the EEOC is proposing to collect in order to illustrate the inherent flaws in the analytical framework in the EEOC's proposal. In the first simulation, an employee's pay is completely determined by two factors:  their job grade/level and the number of years they have worked at that level.  For example, an employee entering the first job grade receives a starting annual salary of $30,000 and is awarded a raise of $1,000 each year he or she remains in that position.  Similarly, an employee hired into the next grade level would receive a starting salary of $40,000 and receives a raise of $2,000 each year he/she or she remains in their job.  A similar method of pay determination exists for the next three job grades at this fictitious company, though the starting pay and annual pay adjustments are naturally greater in the higher level grades.  In this simulation, it is clearly impossible for a pay disparity to exist between women and men in the same job grade, after taking into account any differences in job tenure.  A standard multiple regression analysis of this simulated data confirmed this obvious conclusion.

SJA061

21. Using the Mann-Whitney test on these simulated data, however, yielded a statistically significant result, which the EEOC may incorrectly interpret as an indication of pay disparities that are adverse to women. That is, even in a simulation in which an employee's pay is 100% determined by a formula that allows no room for discrimination, the test that the EEOC is proposing to use still found a statistically significant difference.

22. This seemingly contradictory result occurs because in this simulation there are (by design) proportionately more female employees than male employees in the lower job grades, and therefore also in the lower pay bands. This demonstrates an important issue about the EEO-1 Pay Reporting Proposal: Since employees' compensation (and therefore their pay band) is highly correlated with their job grade, the statistical significance of both the Mann-Whitney and Kruskal-Wallis tests are going to depend on whether men and women are similarly distributed across all levels of a company's job grades/levels. This of course, is a very different type of question than whether pay disparities exist among employees in jobs requiring substantially equal skill, effort, and responsibility. Put simply, the EEOC's proposal won't be able to test whether or not similarly situated men and women are paid equally.

23. This point is further illustrated in the next simulation. At this second fictitious company, an African-American employee in grade level 1 receives a starting salary of $30,000. In contrast, a white employee in grade level 1 receives a higher starting salary of $30,500. Both employees receive a pay adjustment of $1,000 for each year worked. This blatant policy of pay discrimination is found at all other job grades as well: white employees in grade level 2 receive a starting pay of $40,500 compared to $40,000 for African-Americans. At the highest job grade in this hypothetical company, the starting pay gap is even more pronounced: African-Americans have a starting salary of $100,000 compared to $105,000 for white employees.

24. As would be expected, the existence of such an overt policy of pay discrimination was readily detectible through a standard multivariate regression analysis, which indicated that African-American employees were paid statistically significantly less than their white counterparts. On the other hand, applying the EEOC's proposed Mann-Whitney test to these same data did _not_ show any statistically significant differences between white and African-American employees.

25. As before, this contradiction occurs because the Mann-Whitney test does not measure actual pay differences between groups of employees, but instead it tests if groups of employees are found in relatively similar proportions across all pay levels of that company. To illustrate this point, the second simulation included a similar percentage of African-Americans and white employees in each of the EEO-1 pay bands, even though the actual pay of African-Americans was always less than white employees in the same job grade.

26. These two simulations call into question the usefulness of the data that would be collected under the EEOC's proposal. These examples illustrate that the proposed statistical tests may not identify actual pay differences that are consistent with discrimination when they truly exist, and may incorrectly conclude that there is evidence consistent with discrimination when employees are actually paid equivalently.

27. But perhaps more importantly, the first simulation shows that a company with a disproportionate greater number of female or minorities at the lower grade levels is likely to "fail" the Mann-Whitney test. In fact, failing the Mann-Whitney test could occur while companies are making good-faith efforts to increase their minority and female representation. That is, many firms have worked diligently to increase the participation of workers from historically disadvantaged groups by hiring these workers as they became available. The result of this effort is that higher percentages of female, African American, and Hispanic workers are found in some of the lower job levels as they gain additional experience to be eligible for promotion. Accordingly, such companies would "fail" the Mann-Whitney or Kruskal-Wallis tests. The EEOC's proposal is likely to have the unintended and ironic effect of harming employers seeking to increase the participation of historically disadvantaged workers at all levels of their organization.

28. In summary, the aggregated data that the EEOC is proposing to collect and the analyses using the Mann-Whitney and Kruskal-Wallis tests are extremely unlikely to be useful or informative in addressing the laudable and important goal of eliminating gender and race-related pay disparities. The EEOC's proposal, as currently designed, will result in misleading comparisons, will not take into account known and accepted factors that influence pay, and will not lead to any useful determination as to whether employees are truly being paid the same for equal work or are otherwise being subjected to pay practices which violate Title VII.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed at Tallahassee, Florida on March 4, 2016.

_____/s/_____
J. Michael DuMond

Exhibit A to the Declaration of J. Michael DuMond, Ph.D.

**J. Michael DuMond**
*1276 Metropolitan Blvd. Suite 303 · Tallahassee, Florida 32312 · (850) 558-6036*
*dumond.m@ei.com*

## Professional Experience

### Economists Incorporated
Vice President (2014 - Present)

Apply economic, econometric and statistical analysis to pay equity, employment litigation, EEOC investigations, OFCCP audits and pro-active self-monitoring studies. Consult with corporations, government contractors and law firms on employment discrimination matters to monitor and assess the risk of litigation or government investigation for various occupations and industries. Work closely with clients to design statistical models consistent with the employer's hiring, promotion, performance evaluation, compensation, termination and reduction-in-force decisions. Assist clients in identifying the data required to conduct thorough analyses of their workforce and excels at preparing and analyzing extremely large and complex human resources data.

Conduct quantitative data analysis designed to help attorneys assess the value and merits of Fair Labor Standards Act (FLSA) and state wage and hour claims including misclassification, missed meal/rest periods, donning/doffing, off-the-clock work, unpaid overtime and regular rate calculations. Assist companies with extracting, compiling and summarizing archived data from payroll and timekeeping systems, as well as unconventional systems such as computer logs, to evaluate wage and hour claims. Compute waiting time penalties and other PAGA penalties in California wage claims.

Prepare written reports and declarations relating to economic analyses, data production and/or the calculation of economic exposure; provide support of these analyses in the form of sworn testimony.

### Charles River Associates
Principal (2009 - 2014)

Manage and design economic analyses relating to labor and employment issues, including matters in preparation for litigation, audits, mediation, monitoring, and settlement. Supervise the activities and analyses of a team of Ph.D. economists and other junior staff. Direct the construction of computerized databases for use in analyses. Extensive experience in matters relating to Fair Labor Standards Act compliance (as well as state-specific wage and hour laws), including calculation of economic exposure relating to allegations of unpaid overtime and the miscalculation of the regular rate of pay.

### Economic Research Services (ERS) Group, Inc.
Client Relationship Manager (2008 - 2009)
Research Economist (2001 - 2008)

Worked as a client relationship manager at an economic consulting firm that specializes in labor and employment issues. Casework included matters in preparation for litigation, arbitration, monitoring and settlement. Conducted economic and statistical analyses involving allegations of gender, race, and age discrimination in a variety of employment practices, including selection, termination, and compensation as well as Fair Labor Standards Act compliance.

Case management experience included the supervision of economists and analysts, data receipt and preparation, database construction and analysis, summarization of relevant economic literature and direct contact with clients. Past clients represent a wide variety of employers, including state and local governments, multi-facility retailers, production facilities, and educational institutions.

### Florida State University
Adjunct Professor (2002 - Present)

Courses taught include Labor Economics, Economic Analysis of Data, SAS Programming, and MS Project. Since 2006, all courses have been taught at the post-graduate level. MS Project is the capstone course that simulates a consulting project, including the preparation of written and oral presentations.

### Blockbuster, Inc.
Director of Franchise Finance (1999 - 2001)
Manager/Director of Modeling and Research (1997 - 1999)
Senior Demographic Research Analyst (1996 - 1997)

Responsible for all budgeting, forecasting and financial analysis of the 800+ store franchise division. Designed and implemented projects to improve profitability of both franchisees and franchisor, such as optimal labor allocation methods and alternative methods of acquiring rental product. These programs and models helped franchisees lower their labor and product costs without sacrificing top-line revenue.

SJA063

Developed and supervised the implementation of predictive models for use by the real-estate, product and special format divisions. Oversaw the worldwide rollout of site-selection and cannibalization modeling applications and assisted in the valuation and pricing of company stores for sale to franchise units. The site-selection models were used extensively during the years in which Blockbuster opened 500 stores annually, resulting in first-year store revenues that exceeded the projected rate of return. Expanded the scope of the department by introducing econometric models into business segments that had not previously relied on statistical tools. Subsequently, took on the additional responsibility of designing a product allocation system that simultaneously determines the optimal aggregate purchase amount for the entire company. Managed a staff of analysts, including Ph.D economists. Prepared written reports and presented results to executive management.

## Education

Ph.D., Labor Economics, Florida State University (1997)

M.S., Economics, Florida State University (1994)

B.S., Florida State University (1991) - Summa Cum Laude

## Publications and Research Papers

"Stockwell v. City & County of San Francisco: What it Doesn't Say about Statistics in Age Discrimination Cases," (with Kenneth W. Gage), Daily Labor Report, Bloomberg BNA, July 2, 2014.

"Evidence of Bias in NCAA Tournament Selection and Seeding," (with Jay B. Coleman and Allen K. Lynch), Managerial and Decision Economics, Vol. 31, March 2010.

"An Examination of NBA MVP Voting Behavior: Does Race Matter?" (with Jay B. Coleman and Allen K. Lynch), Journal of Sports Economics, Vol. 9, No. 6, December 2008.

"An Economic Model of the College Football Recruiting Process," (with Allen K. Lynch and Jennifer Platania), Journal of Sports Economics, Vol. 9, No. 1, February 2008.

"Estimating Wage Differentials: When Does Cost-of-Living Matter?" (with Barry Hirsch and David Macpherson), Economic Inquiry, Vol. 37, No. 4, October 1999.

"Two Essays on Wage Differentials," Ph.D. Dissertation, Department of Economics, Florida State University, April 1997."

"Workers Compensation Recipiency in Union and Nonunion Workplaces," (with Barry Hirsch and David Macpherson), Industrial and Labor Relations Review, Vol. 50, No. 2, January 1997.

## Presentations/Professional Meetings

"Navigating the New Frontier of Steering Claims," National Industry Liaison Group 2015 Annual Conference, July 2015, New York, NY. (Panel Discussant).

"Early Mediation of Wage and Hour Claims," American Conference Institute's 20th National Forum on Wage and Hour Claims and Class Actions, January 2014, Miami, FL. (Panel Discussant).

"Prob(it)ing the NCAA: Three Empirical Models on Collegiate Athletics," (with Allen K. Lynch and Jay B. Coleman), 2005, presented at the SAS M2005 Data Mining Conference. Invited Presentation, Mid-day Keynote Address.

"An Economic Model of the College Football Recruiting Process," paper presented at the Eastern Economic Association meetings, 2005.

"Customer Discrimination in Major League Baseball," (with Allen K. Lynch) paper presented at the Southern Economic Association meetings, 1999.

## Expert Reports & Testimony

*Johnny Reynolds v. State of Alabama*. This case involved the termination of a consent decree between the State of Alabama and the U.S. Department of Justice relating to the hiring and promotions of African-American employees. Submitted report and provided testimony at judicial hearing.

*Simmons, et al. v. Comerica Bank*. This matter involved allegations of additional overdraft fees resulting from changes in debit posting procedures during nightly settlement. Submitted a written report that examined plaintiff's expert's statistical approach and its applicability for purposes of class certification and provided deposition testimony.

*Coordinated Proceedings Special Title, Sutter Health Wage and Hours Cases and Coordinated Actions.* These matters involved allegations of missed meal and rest periods for nurses and surgical care technicians at approximately 20 affiliates within the Sutter Health system. Submitted a declaration in relation to the motion for class certification.

*Tammy Garcia v. MAKO Surgical Corporation.* This case involved allegations of an unlawful termination due to plaintiff's gender. Submitted a written report that provides estimates of economic loss, arising from differences in base salary, incentive compensation, and stock options.

*Angel Corona v. Time Warner Cable.* This matter involved calculation of unpaid overtime due to an alleged improper calculation of the regular rate of pay. Written report submitted.

*Selene Prado v. Warehouse Demo Services, et al.* This report detailed the necessary calculations relating to the determination of rest period violations on a class-wide basis and damages relating to the miscalculation of the regular rate of pay for overtime purposes. Submitted a written report in relation to the motion for class certification.

*Victor Guerrero v. California Department of Corrections and Rehabilitation.* Plaintiff alleges that he was disqualified from consideration of a Correctional Officer position due to his past usage of a false Social Security number, a pre-employment criteria that allegedly had a disparate impact on Latino applicants. Submitted written reports and provided testimony at deposition and trial.

*Daisy Vazquez and Bryan Joseph, et al.v. TWC Administration, LLC.* Plaintiff alleges that putative class members were not properly paid overtime due to the inclusion of non-working hours in the calculation of the regular rate of pay and an improper allocation of commissions to the time periods in which they were earned. Submitted a written report in relation to the motion for class certification.

*Fernando Vega v. Hydraulics International, Inc.* Submitted a written report in regards to allegations that non-exempt employees were not paid for all hours they were logged into the timekeeping and project management system.

## Representative Engagements as a Consulting Expert - Wage and Hour

### Regular Rate Miscalculation

Inside sales employees at a multi-site retailer alleged that their overtime true-ups were based only on weekly overtime hours without consideration of additional daily overtime hours. Prepared estimates of economic exposure, including the valuation of potential offsets from factors that were included in the regular rate calculation beyond what was legally required.

Customer Service Representatives at multiple facilities filed collective actions involving failure to properly calculate the regular rate relating to overtime pay. Prepared economic loss estimates for use in mediation and settlement. Prepared measures of overpayments that were used as financial offsets to the estimated liability.

First line supervisors at a national landscaping company had overtime pay calculated using the fluctuating work week (FWW) methodology, in violation of wage and hour laws in some states, and the paid overtime did not properly include shift differential payments. Calculated economic exposure relating to these claims using the proper regular rate of pay.

### Misclassification of Exempt Status

Inside sales representatives for an online retailer alleged they were misclassified as salaried exempt. Analyzed millions of records of time-stamped activity in order to ascertain estimates of alleged overtime hours. Calculated potential economic losses under alternate scenarios for use at mediation.

Store managers at a nationwide multi-site retailer claimed misclassification as salaried exempt. Prepared economic loss estimates of alleged unpaid overtime for use in mediation. (Multiple similar engagements)

Outside engineers at a national telecommunications company alleged that they were misclassified as exempt. Prepared an analysis of alleged overtime work and the related economic exposure for mediation and eventual settlement.

First-line construction and maintenance supervisors challenged their exempt status; prepared estimates of potential liability exhibits for trial.

### Missed Meal/Rest Periods

Delivery drivers of a nationwide medical supply distributor alleged that their schedule necessitated that they work through their unpaid meal periods. Combined multiple data sources, including GPS data to assess the validity of these claims.

Major financial institution with multiple collective actions involving pay stub violations, deductions, wait-time penalties, overtime, and meal and rest periods. Prepared economic loss estimates for use in mediation and settlement.

Assistant store managers at a nationwide multi-site retailer alleged they were working without compensation during meal periods. Prepared an analysis to assess liability by integrating time-clock data with time-stamped cash register activity records.

Employees of on-campus restaurants at a state university alleged they were denied meal and rest breaks in violation of state law. Analyzed time-punch records to assess violation incidence and prepared estimates of economic exposure that were relied upon during mediation to reach settlement.

### *Off-the-clock/Time-Rounding allegations*

Call center operators at several facilities filed collective actions involving failure to pay overtime as required under the Fair Labor Standards Act (FLSA). Prepared estimates of the amount of alleged "off-the-clock" work and the associated economic loss estimates; identified and corrected numerous errors made by plaintiff's expert. (Multiple similar engagements)

Customer Service Representatives at multiple facilities filed collective actions alleging a failure to pay for pre-shift activities. Integrated employees' computer time-stamp records with their time-clock data in order to determine the potential range of pre-shift work. Prepared estimates of potential exposure for use at mediation.

Non-exempt employees alleged that their Employees of a restaurant chain alleged that paid hours were systematically lower than their actual work hours due to the employer's time-rounding policies. Analyzed and compared actual work activity with payroll data to assess validity of these claims. (Multiple similar engagements)

## Representative Engagements as a Consulting Expert - Equal Employment Opportunity

A major computer manufacturer was faced with allegations of Title VII violations, specifically involving discriminatory compensation and promotions. Assisted client with data production and responses to discovery requests. Conducted statistical analyses of compensation, promotions and estimates of potential economic exposure. Developed methodologies and analytical tools used to assess differences in performance ratings, annual bonuses, and merit pay adjustments on an on-going basis. (Multiple similar engagements)

Prepared analyses relating to a comprehensive audit of the major employment decisions at a global healthcare company, including promotions, terminations, performance evaluations, compensation, and disciplinary actions. Provided remediation recommendations for sub-groups of employees based on results of the audit.

Servers at a nationwide chain of restaurants alleged disparate treatment with respect to work assignments. Prepared a statistical analysis of allegations that resulted in a favorable settlement for client.

Store managers at a nationwide multi-site retailer alleged compensation differences under the Equal Pay Act. Prepared analytical databases and prepared estimates of potential economic exposure.

Multiple engagements involving analyses of potential adverse impact by race and gender relating to the conversion of salary grades to salary bands and the associated reclassification of employees.

Reviewed and identified errors made by opposing counsel's expert relating to the valuation of stock-options in a case involving a termination allegedly based on the plaintiff's age.

Multiple retentions for a variety of clients relating to potential adverse impact by race and gender of employees' annual performance rating assignments and the associated merit increases/bonus payments.

Prepared analyses of compensation for a large technology company. Investigated whether the observed pay differentials were the result of initial (starting) pay or whether they developed during the course of their employment tenure with the company. Calculated remediation amounts and devised a procedure in which the pay adjustments were incorporated into the annual merit pay adjustment cycle.

## Data Sampling and Production

Processed millions of data records and prepared numerous databases for opposing counsel for a class of over 600 opt-ins in a wage and hour matter after limiting the data to relevant work dates and employment spells. (Multiple similar engagements)

Prepared a stratified sampling plan of stores for a nationwide, multi-site retailer who was alleged to have improperly classified assistant managers as salaried exempt. The sample was used for purposes of challenging conditional certification.

## Exhibit B to the Declaration of J. Michael DuMond, Ph.D.

The EEOC's pay reporting proposal ("Proposal") recommends the use of the Mann-Whitney or Kruskal-Wallis test to evaluate the pay band data that will be submitted by companies. The Proposal does concede that the accuracy of these tests "needed to be addressed" as there is a concern that using them may yield "false positives."[80] Put another way, a statistically significant result from these tests may give rise to an inference of discrimination, even when no such

discrimination exists. This is not a trivial concern. As will be shown in the following two examples, the Mann-Whitney test can be shown to find "discrimination" against women even when a company has a gender-neutral and formulaic pay policy. The second example shows just the opposite: the Mann-Whitney test fails to identify evidence consistent with discrimination against African-Americans even when a company chooses to pay them less than white employees in every job.

*Example 1 - "False Positive"*

Company XYZ sets their employee's salary based on two factors. The first factor is the employee's job grade. Like most companies, jobs at the higher grade levels pay more than jobs at the lower grade levels in accordance with the greater responsibilities, supervisory authority and requisite skills and experience that the higher grade jobs require. Second, company XYZ increases an employee's salary for each additional year of experience in their job grade. The salary structure of Company XYZ is shown in the following table.

| Job Grade Level | Starting Salary | Additional Salary per (Full) Year in Job |
|---|---|---|
| 1 | $30,000 | $1,000 |
| 2 | $40,000 | $2,000 |
| 3 | $70,000 | $3,000 |
| 4 | $90,000 | $4,000 |
| 5 | $100,000 | $5,000 |

As would be expected, a standard regression analysis of employee compensation that controls for job grade and the number of years an employee has worked in their current grade would reveal that there is not a gender pay difference. That is, the average female employee at Company XYZ is paid almost identically to the average male employee, after considering the effect of job grade and the number of years worked, and the measured gender pay difference is not statistically significant.

| Total Number of Employees | Number of Female Employees | Estimated Pay Difference for Female Employees | Number of Standard Deviations |
|---|---|---|---|
| 777 | 399 | -$44.54 | -0.19 |

Despite a pay policy that is, by construction, completely gender-neutral, the Mann-Whitney test of the EEO-1 pay bands would show a statistically significant result in favor of male employees, as depicted in the following chart.

SJA067



This seemingly contradictory result stems only from the fact that there are proportionately more female employees than male employees in the lower grades, and therefore also in the lower pay bands. For example, the percent of women in Pay Band 4 ($30,680 - $38,999) is noticeably higher than the percent of men, while the opposite is true in Pay Bands 7 and above. This raises an important issue about the EEO-1 Pay Reporting Proposal: Since employees' compensation (and therefore their pay band) is heavily correlated with their job grade, the statistical significance of both the Mann-Whitney and Kruskal-Wallis tests are going to depend on whether men and women are similarly distributed across all levels of a company's pay grades.

Put simply, the Proposal doesn't test whether or not similarly situated men and women are paid equally, but rather, whether women are hired, promoted or otherwise placed into levels within the company at rates similar to men. This point is further illustrated in the second example.

*Example 2 - "False Negative"*

Like the first example, Company ABC uses only three factors to determine an employee's pay: job grade, the number of years of worked in the job and the race of an employee.[81] The salary structure for Company ABC is as follows:

| Grade Level | Starting Pay Whites | Starting Pay African-Americans | Additional Salary per Year in Job |
|---|---|---|---|
| 1 | $30,500 | $30,000 | $1,000 |
| 2 | $40,500 | $40,000 | $2,000 |
| 3 | $71,000 | $70,000 | $3,000 |
| 4 | $95,000 | $90,000 | $4,000 |
| 5 | $105,000 | $100,000 | $5,000 |

SJA068

Naturally, a regression analysis that controls for job grade and the number of years an employee has worked in their current job would identify the existence of a pay disparity. More specifically, African-Americans are paid, on average, $923 less than otherwise similar white employees, a difference that is statistically significant.

| Total Number of Employees | Number of Female Employees | Estimated Pay Difference for Female Employees | Number of Standard Deviations |
|---|---|---|---|
| 777 | 79 | -$923 | -2.34 |

In spite of this pay policy, the Mann-Whitney test does not reveal a statistically significant difference in the pay bands between whites and African-American employees, even in a situation in which the company is blatantly discriminating against African-Americans.



These examples call into question the usefulness of the data that would be collected under the EEOC's Pay Data Reporting proposal. First and foremost, these examples illustrate that the proposed statistical tests may not identify differences that are consistent with discrimination when those differences exist, and may incorrectly conclude that there is evidence consistent with discrimination when the evidence definitively is not. Secondly, while it is often the case that female and minority employees are paid less than male and white employees on average, the aggregated data that would be collected ignores any of the possible and often legitimate reasons for pay differences between gender or race/ethnicity groups. It only depicts the pay difference in a different manner.

Exhibit 2

## Declaration of Ronald Bird, Ph.D.
## Regarding the Equal Employment Opportunity Commission
## Proposal to Revise the Annual Employer Report EEO-1 Survey
## To Add Earnings and Hours Data

March 8, 2016

### Statement of Qualification:

I, Ronald Edward Bird, was awarded the degree of Doctor of Philosophy (Ph.D.) in economics by The University of North Carolina at Chapel Hill on May 9, 1974.  Subsequently I served as a faculty member teaching economic theory, economic benefit/cost analysis, economic statistics, labor economics and financial economics at North Carolina State University, The University of Alabama, Meredith College, and Wesleyan College.

Subsequently I served as Chief Economist for DynCorp Government Services conducting research regarding the costs and benefits of existing and proposed regulations and Paperwork Reduction Act information collection requests as a contractor to various Federal agencies, including the U.S. Departments of Labor, Energy, Treasury, and Defense and the U.S. Environmental Protection Agency.

From 1999 to 2005, I served as Chief Economist for the Employment Policy Foundation, a non-profit, non-partisan educational foundation that conducted research, inter alia, regarding the compliance costs to employers of Federal regulations and information collection mandates.

From 2005 to 2009, I served as Chief Economist of the U.S. Department of Labor, in which capacity I directly advised the Secretary of Labor regarding various economic policy and statistical issues, including

- the compliance costs and benefits of existing and proposed regulations;
- methods of estimating the compliance costs of Federal information collection requirements;
- the economic theories of employment and wage determination; and
- the statistical/econometric analysis of earnings differentials in relation to occupations, industries, education, experience, hours of work, race, ethnicity, gender and other factors.

As Chief Economist of the U.S. Department of Labor, I also served as liaison for the Department to the Executive Office of the President , the President's Council of Economic Advisers, and the Office of Management and Budget's Office of Information  and Regulatory Affairs regarding various economic policy and analysis topics, including the conformity of the Department's regulatory economic analyses with the requirements of Executive Order 12866 regarding analysis of the economic costs and benefits of regulations, the requirements of The Paperwork Reduction Act, regarding the time and monetary cost burdens of Federal information collection activities, and the Regulatory Flexibility Act, regarding the economic impact of regulation compliance costs and of Federal information collection costs on small businesses and organizations.

Currently, I serve as Senior Regulatory Economist for the United States Chamber of Commerce.  I conduct economic research and analysis regarding the costs and benefits of Federal regulatory and information collection activities as they affect employers.  This work includes detailed review, evaluation and analysis of the benefits and costs of existing and proposed regulations and information collection activities of various Federal agencies and programs, including the Department of Labor's Office of Federal Contract Compliance Programs and the Equal Employment Opportunity Commission.

### Summary of EEOC Information Collection Burden Estimate:

The Equal Employment Opportunity Commission has proposed (81 FR 20, p. 5113) to revise the existing annual "Employer Information Report" (Form EEO-1), by adding to the existing form requirements that employers of 100 or more total employees (1) report the number of employees in each of the 140 standard EEOC occupation/gender/race/ethnicity categories with a further cross-tabulation of each of these categorical employee counts by 12 annual earnings categories based on employer tax form W-2 data for the 12 months preceding the reference date of the report, and (2) report the total hours worked of employees counted in each of the resulting 1,680 categories for the 12 months prior to the reference date of the report.  These requirements (which EEOC identifies as "Component 2") are in addition to the continuing requirement to file the currently specified tabulation of total employees in each of 10 EEOC occupations and 14 gender/race/ethnicity categories (140 categorical cell counts) , which EEOC identifies as "Component 1" of the proposed report.

The proposed revised EEO-1 form, including both components 1 and 2, would be required of all private industry employers of 100 or more total employees across all of the employer's establishments and wholly owned subsidiaries. The proposed revision would become effective for the annual employer information reports due September 30, 2017.

EEOC claims that the proposed combination of components 1 and 2 (see Table 4, 81 FR 20, p. 5120) of the proposed information collection will impose an average annual burden of 6.6 hours on each covered employer, including 5.6 hours per employer for collecting, verifying, validating and reporting data and 1 hour for "reading instructions."  This amounts to 3.2 hours of additional labor effort per employer, 0.5 hours for additional instruction reading and 2.7 additional hours for collecting, verifying, validating and reporting data.  The EEOC asserts that the total average per hour labor cost will be

$24.23, which implies a total cost per employer of $159.92 per employer for components 1 and 2 combined. The additional cost, according to EEOC calculations, for the increment of the earnings and hours data required in proposed component 2 is $77.54. EEOC also asserts that the number of employers (filers) affected by the proposed new requirements (component 2) is 60,886, resulting in a national aggregate on-going annual burden subject to the Paperwork Reduction Act of 401,847.6 hours or $9,736,767.35.

EEOC recognizes in its proposal notice at 81 FR 20, p. 5120, a one-time implementation burden for developing new or revised database queries to existing human resources management information systems. EEOC asserts that an employer (filer) affected by the proposed requirements will "take 8 hours per filer at a wage rate of $47.22 per hour." This cost element amounts to $377.76 per employer who would be required to file the proposed EEO-1 reports. Based on EEOC's assertion that 60,886 employer filers would be affected, the calculated national one-time additional cost burden is $23,000,295.

EEOC also estimates the additional cost on itself to process the expanded data that would be submitted as $290,478, as the cost of needed internal staffing needs and costs.

In addition to reviewing the referenced Federal Register notice, I have reviewed the following documents that EEOC references in support of its calculation of time and cost burdens of its proposed information collection request under the requirements of the Paperwork Reduction Act.

1. National Research Council, "Collecting Compensation Data from Employers," report of the Committee on National Statistics, Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race and National Origin. Washington: National Academies Press, 2012.
2. Equal Employment Opportunity Commission, "EEOC Survey System Modernization Work Group Meeting, March 8-9, 2012, Draft Report," prepared by Sage Computing, Inc., March 19, 2012.
3. Sage Computing, "Final Report [of task order] To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected From Employers on EEOC's survey Collection Systems and Development of Burden Cost Estimates for Bothe EEOC and Respondents for Each of EEOCC Surveys (EEO-1, EEO-4, and EEO-5).

I have also reviewed the burden estimation supporting statements and other documents submitted by EEOC to OMB/OIRA in connection with the information collection clearance requests for the currently approved version of the EEO-1 form and for previous requests going back to 2009.

Findings and Opinion:

Based on my review of the burden calculations and supporting materials and justifications presented by EEOC in its Federal Register notice and my review of the supporting documents cited by EEOC, based on my knowledge and experience regarding the requirements of the Paperwork Reduction Act, OMB guidance documents and requirements for submission of information collection requests and regulatory impact analyses, and based on my knowledge and experience of the generally accepted standards of research in the economics profession, it is my finding and opinion, to a reasonable degree of economic certainty, that the cost burden estimate presented by EEOC in support of its proposal to add earnings and hours worked data requirements to the current EEO-1 report grossly and significantly under-estimates the likely cost burden that the proposal will impose on affected employers. Both elements of the cost burden, (1) the one-time cost of modifying information systems and administrative procedures and (2) the on-going annual costs of collecting, compiling, tabulating, verifying, validating, and submitting the data have been inaccurately calculated and grossly and significantly underestimated by EEOC.

The errors and under-estimation of the reporting burden arise from at least six fundamental deficiencies in EEOC's economic analysis:

1. EEOC has not conducted any credible empirical study to validate the accuracy of its estimate of the compliance time burden of the current EEO-1 reporting requirement. Because the cost burden of the proposed new reporting elements (Component 2), is presented by EEOC as an addition of about 96% (near doubling) to the 3.4 hour reporting burden ascribed to the existing report (Component 1), the accuracy of the underlying current report burden is of critical importance to the final cost result. To establish, to a reasonable degree of economic certainty, the time and cost of the current reporting format, the Commission could have either conducted a survey of current filers or an experiment using itself and other government agencies as proxy filers. No evidence of either sort has been presented. EEOC, in its Federal Register notice states that its "pilot study" contractor, Sage, "approached some private employers to seek data" about the additional cost of the proposed new elements, but received too few responses. My experience in research to obtain similar data for information collection burden and regulatory impact analysis purposes has been that surveys, field audits and experiments to collect such compliance time and cost information are feasible and relatively economical to conduct. EEOC's claim of non-response to its request may be mostly a reflection of the ineffectiveness of its initial effort, and it is no excuse for putting forward a baseline burden estimate that is without empirical or reasonable foundation.
2. EEOC has also not conducted any credible empirical study to validate its estimate of the additional time burden of the proposed new earnings and hours report elements. The claim that the additional burden would be 3.2 hours on top of the current format report (Component 1) is not based on any evidence cited explicitly in the Commission's notice. One possible conclusion is that EEOC invented the number arbitrarily and capriciously from its imagination. The Commission's consultant, Sage, clearly states on page 109 of its report that its failed survey attempt yielded no results and that "it is not possible to provide estimates of the burden." It seems that EEOC has chosen to attempt to do

the impossible by presenting a rather precise seeming burden estimate (3.2 hours for Component 2) that its own consultant declared to be impossible to do.[82]

3. EEOC has not provided any credible empirical evidence as a basis for its estimate that the one-time cost burden of the proposal is represented by 8 hours of total labor time. Again, EEOC could have conducted surveys or experiments to obtain empirical estimates of the time and resources needed to adjust information systems and administrative procedures to facilitate the proposed earnings and hours reporting. Again, EEOC has presented a number arbitrarily and capriciously produced from nothing. EEOC's analysis on this and other points fails to meet the most fundamental standard of economic research - that the methods by which data is obtained be transparent to and reproducible by independent observers. EEOC's analysis is not transparent.

4. EEOC uses two wage data parameters in its burden cost calculations: $24.23 per hour for labor employed to collect, compile, tabulate, validate, verify, and submit required data, and $47.22 per hour for the labor to make one-time modifications to information systems to facilitate the new reporting elements. In the first case the amount is the average hourly compensation reported by the Bureau of Labor Statistics from its Employer Cost of Employee Compensation Survey of December 2013 for an "administrative support" employee. In the second case the amount is the BLS compensation survey amount for a professional employee. EEOC has failed to account for the fact that the labor involved in both the annual report preparation and submission activity and in the one-time adjustment of systems to facilitate new requirements is not restricted to a single occupational category. A correct analysis of the information cost burden would recognize that the activity involves the blended effort of workers across an array of occupations, levels of responsibility, training, experience and compensation. An average hourly compensation rate used in any information collection burden calculation is meaningless unless it is constructed as a weighted average of the time and cost associated with each member of the overall task team. In particular, EEOC should have considered that an official report to the government by an employer from which potential legal charges and liabilities could emanate will require some review and approval at the highest levels of corporate responsibility. It is plainly absurd for EEOC to assume, without any empirical basis reflecting the practice of actual filers, that the annual reporting responsibility is fully represented by the hourly pay rate of the lowest rank of administrative support worker. A further error in the analysis is EEOC's assumption that employee compensation is the full measure of the compliance burden on the employer of allocating labor time to the task. In addition to direct labor compensation, EEOC should add allowance for physical and indirect labor overhead as parts of an estimate of the full economic opportunity cost of a regulatory or paperwork compliance mandate.

5. EEOC's calculation of the aggregate national time and cost burden of the proposed information collection is based on an assumption that 60,886 filers will be subject to the revised reporting requirement. The proposed requirement applies to all private sector employers of 100 or more workers. According to authoritative data published by the Office of Advocacy of the U.S. Small Business Administration, the number of private employers in 2012 (the latest year available) with 100 or more employees totaled 101,642 and these firms operated a total of 1,559,581 separate establishments (39 establishments per employer firm). To the extent that the EEOC's burden calculation identifies the number of employers subject to the current EEO-1 filing requirement, that number is, 101,642. The Paperwork Reduction Act does not contain any provision allowing an agency to "discount" its estimate of information collection burden imposed on the public because of public non-response or because of the agency's own ineffectiveness in collecting the subject data. The EEOC is asking for data from all firms with 100 or more employees. That number of firms being asked for data is the number that EEOC is required to use to calculate its information collection burden estimate. That number is 101,642 according to the most recent available authoritative data. This means that regardless of other issues discussed herein, EEOC's burden estimate is in error by about 40 percent. Furthermore, to the extent that individual filers must submit multiple reports, the number of responses and attendant burden is greater.

6. EEOC's analysis assumes, contrary to its own reporting instructions, that every covered employer will file only a single report. EEOC's current and proposed instructions clearly require that each employer of 100 or more total workers, company-wide, submit a separate report form for each separate establishment employing 50 or more employees, and that each multi-establishment employer submit an additional composite report for aggregating the data across all establishments. Furthermore, covered employers are required to prepare and submit for establishments with less than 50 employees either a small establishments consolidated report or individual establishment reports. EEOC's own data indicates that the average filer in 2013 submitted 4.5 distinct reports, including all separate establishment reports. My experience in analysis of hundreds of information collection and regulatory recordkeeping burdens is that the number of separate establishments within a company is a significant parameter affecting the total compliance cost burden, and it has remained so despite reporting efficiency improvements associated with newer information technology and systems. Total employment is a similarly important parameter. EEOC has presented no meaningful empirical evidence to support its contention that the time and cost burdens of the existing and proposed EEO-1 reporting requirements will be invariant with respect to a filer's number of establishments or number of employees.

In all prior calculations of the reporting burden for the EEO-1 form, the Commission recognized the principle that number of establishments for which data must be compiled, tabulated and reported is a significant factor affecting the total time and cost burden for a filing entity. In fact, the commission previously used the exact number of 3.4 hours per report filed in all previous burden calculations, beginning with the earliest on record in 2009. Now EEOC proposes to shift that number and apply it to the burden per filer (i.e., per employer firm) instead of per report. EEOC claims that its shift from the per report basis to the per filer basis is a reflection of its consideration of the effect of increasing automation of human resource information systems, but EEOC does not present any quantitative empirical data regarding the supposed change in circumstances.

It is notable that the exact same 3.4 hour number, which previously was used as a per report burden and multiplied by the 307,103 reports filed in 2013 in EEOC's supporting statement for its information collection clearance filed in 2015, is now being used by EEOC as a per filer hour burden and multiplied against the 67,146 filers of Component 1 of the proposed information collection. Not only does the Commission lack real data to support its putative estimate of a per

SJA072

filer burden, it appears that the Commission lacks the imagination to invent a number that is different from the one it used previously for the per report calculation. The numbers and calculations presented by the Commission give the appearance of an effort to manipulate the results to make it appear that the burden is low. The error is compounded by the fact that EEOC has no credible evidence to support the contention that 3.4 hours is the correct burden even on a per report basis. There is reason to suspect that for many filers the burden per report is significantly greater than 3.4 hours per report, and for filers of multiple reports, the total cost per filer would likely be even greater.

I also find that EEOC has not presented credible evidence that the proposed revision will yield any meaningful or measurable welfare benefit. Indeed, the study by Sage Computing, cited above, which EEOC commissioned to inform and advise its decision to put forth the proposed EEO-1 revision, points toward the conclusion that the proposal will likely reduce benefit in comparison to the current reporting format. On page 61 of their report to EEOC, Sage states

> …we have to recognize the varying patterns of compensation for employees who work different hours. As a result, pooling together into a single cell the employees who may have received the same compensation from working different hours, and analyzing them with a single offset as the format of the proposed EEOC form suggests, may lead to biases that are difficult to quantify because of the model misspecification with respect to the time commitments required by the different positions.

This flaw in the design of the proposed new reporting requirement, which EEOC's own contract consultant identified, could significantly impact the rate of false-positive results obtained. Increased false positives from using the proposed form to inform investigations will divert EEOC's scarce investigative resources in fruitless directions, with the possible result that the Commission's effectiveness to identify and eliminate discrimination may be reduced by adoption of the proposed revision. Reduction in the Commission's effectiveness because it allows its scarce resources to be wasted by investigations based on a report format that generates excessive numbers of false positives would mean that the welfare benefit of the proposed revision is negative compared to the status quo reporting requirement.

EEOC is required to seek public input regarding its information collection and regulatory proposals, and the requirement is that EEOC provide the public with at least 60 days to comment before it sends its proposal to OMB/OIRA. EEOC is not prevented from providing a longer public comment period, and the size and complexity of the proposal to add earnings and hours worked data to the EEO-1 reporting form is such that meaningful public comment is curtailed by the 60 day limit. The 60 day limit has been further truncated by EEOC's decision to hold hearings on the proposal at an earlier date and to require submission of testimony and supporting documents (such as this declaration) a further week in advance of the hearing. EEOC rejected requests for an extension of the comment deadline, and EEOC has presented no reasoned basis for its rush to proceed with the proposed revision.

Because EEOC has arbitrarily limited the time available for public response and comment, the analysis presented here is limited. In particular, it would have been useful to provide empirical data from surveys of employers, which are currently underway and being tabulated. Preliminary results confirm the findings presented here based on limited time and information: EEOC's estimates of the information collection burden are inaccurate and grossly under-estimate the likely compliance cost burden. This analysis will be revised and resubmitted as additional information becomes available from on-going private surveys and as further research into existing sources reveals additional empirical evidence.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 9th day of March, 2016, at Washington, D.C..

                                         _____ /s/ _____
                                                                 Ronald Bird

---

# Exhibit 3

## DECLARATION OF ANNETTE TYMAN

I, Annette Tyman, do hereby declare as follows:

### Qualifications

1. I am over the age of 18. I declare that the statements in this declaration are correct of my own personal knowledge and I am competent to testify concerning them.
2. My name is Annette Tyman. I am an attorney and Partner at Seyfarth Shaw LLP. I also serve as Co-Chair of the Firm's OFCCP Compliance, Affirmative Action & Diversity Consulting Practice Group. In that role, I oversee a team of Advisors and Analysts who prepare Affirmative Action Plans and EEO-1 Reports on behalf of companies across the United States.

## Overview of the EEO-1 Filing Process

3. A general overview of the EEO-1 filing submission process is summarized as follows.
4. Typically, the process to prepare and submit EEO-1 Reports begins with employers who provide employee information, including employee name or employee identification number, location, race, gender, EEO-1 job category (if tracked by the employer), and job title.
5. At that point, one must analyze and prepare the data. This step includes validating, coding and creating summary tables in order to input or submit the EEO-1 required data to the EEO-1 Survey site. The quality and consistency of the data set necessarily impacts the time it takes to prepare the data for submission to the EEO-1 Survey site.
6. Pursuant to the EEO-1 instructions, multi-establishment employers are required to submit (1) a report covering the principal or Headquarters office ("Headquarters Report"); (2) a separate report for each establishment employing 50 or more persons ("Type 4" report); (3) a separate report ("Type 8" report - which provides similar information to the Type 4 report) for each establishment employing fewer than 50 employees, *or* an Establishment List (Type 6 report), showing the name, address, and total employment for each establishment employing fewer than 50 persons; and (4) a Consolidated Report which summarizes the employers workforce.

## Submission of EEO-1 Data - Two Formats

7. The EEOC allows employers to submit data using two electronic formats methods.
   a. The first format, which is most commonly used by employers, is most easily described as a "fillable pdf." The data requires manual entry of employee summary counts by race/ethnicity and gender, using the EEO-1 job groups. Pursuant to Footnote 62 of the EEOC's Proposed Revision of the Employer Information Report (EEO-1) and Comment Request ("proposed EEO-1 Revision"), 98% of all employers use this format ((60,886 - 1449)/60,886) for completing the EEO-1 Survey.
   b. The second format involves the submission of an electronic data file. The EEOC's parameters are specific and technical and include a few data file formats. While the proposed EEO-1 Revision refers to this methodology as a data file "upload," the data file is actually emailed to upload@EEOC.gov.

## Submission by "PDF Fillable Format"

8. If employers use the EEO-1 electronic "fillable pdf" format for submitting to the EEO-1 Survey, which is described in 7.a. above, the steps identified below are generally followed.
   a. After analyzing the data and preparing summary totals for input into the EEO-1 Survey, employers log into the EEO-1 Survey site using employer specific login information. Once employers log in, they see a listing of the EEO-1 reports that were filed for each establishment in the location that was filed in the previous year. The company will be required to "select" each location and either complete a new form or delete the form. EEO-1 forms for establishments may be deleted for various reasons, including, for example, if the location closed during the last reporting period.
   b. The employers then answer or verify the response to the three EEO-1 Survey questions found in Section C of the EEO-1 Survey regarding "Employers Who Are Required to File" and verify NAICS codes.
   c. In our experience, most employers do not track EEO-1 survey "unit numbers" which identify the establishment for previously submitted reports. Instead, this information is obtained by downloading prior year EEO-1 reports before submission.
   d. For previously existing establishments, employers review and revise, if necessary, the address information of the location and complete the ethnicity/race and gender totals by location and EEO-1 Category. If the location total has changed by more than 20%, a prompt will appear to verify the entries are correct.
   e. If there are new locations, employers are required to complete a new EEO-1 establishment form for those locations.
      i. For locations with more than 50 employees, the company is required to complete Type 4 establishment reports. For locations with less than 50 employees, the company has the option to complete a Type 8 report, which is the similar to the Type 4 establishment report (but is coded as a Type 8 report to signify it is being submitted for a location with less than 50 employees), or a Type 6 establishment list. A Type 6 establishment list includes a listing of the address and total employee count for each location with less than 50 employees.
      ii. A key difference between Type 6 establishment *list* and Type 8 establishment *report* (both of which relate only to establishments with less than 50 employees) is found when preparing the employer's Consolidated Report. The Consolidated Report automatically populates if employers submit Type 8 establishment *reports*. In other words, if employers choose to provide the more detailed information that includes race/ethnicity and gender, even for its locations with less than 50 employees, the Consolidated report is automatically populates the detailed counts provided for each establishment and the headquarters location. If the employer instead completes Type 6 Establishment *lists* for locations with less than 50 employees (which includes only address location and total employee count at that location), then it must manually complete the Consolidated Report, to ensure the total counts, including race/ethnicity and gender by location and EEO-1 Category for both locations with more than 50

employees and locations with less than 50 locations are included in the Consolidated Summary. This manual process must be carefully reviewed because the employer must ensure that the totals for each location and establishment match the data entered into the Consolidated Report submission.

9. Once the data has been entered and the employer receives confirmation from the EEO-1 Survey site that the forms are complete (as noted by a change in status from "Red" to "Green"), the data is ready to be "certified." At that point, the authorized official for the employer certifies the submission of the report.

Submission by Data File "Upload" and One-Time Implementation Cost

10. As previously noted in 7.b. above, once the data has been collected, validated and coded, employers also have the option to "upload" a data file to the EEO-1 Survey tool. All data files must comply with the precise data specifications prescribed by the EEOC.

11. Because Seyfarth Shaw provides specialized consulting services to a multitude of employers, it has developed an analytical tool to facilitate the uploading of data files needed to complete the current EEO-1 Survey submission. The development of the tool for the current EEO-1 data file "upload" required a one-time expenditure of over 110 hours data analyst hours to implement the data requirements of the current EEO-1 report. To facilitate the data file upload for employers, Seyfarth utilizes this data tool to submit multi-establishment EEO-1 reports. Pursuant to Footnote 62 of the proposed EEO-1 Revision, the EEOC recognizes that only 2% of all employers have availed themselves of the tools necessary to use this format (1,449/60,886) for completing the EEO-1 Survey. In our experience, information does not go "nearly directly from an electronic file generated by the HRIS to the survey data base" as set forth in Footnote 62 of the proposed EEO-1 Revision.

12. Before data submission using an "upload" file, employers must first test the data file to ensure it complies with the EEO-1 Survey data upload specifications. During the testing phase, employers receive a summary report detailing the specific issues, if any, with the upload file. After correcting any identified issues, the file is e-mailed to upload@EEOC.gov for upload to the Survey site. Once confirmation is received from the EO Survey team that the data file has been "uploaded" to the EEO-1 Survey site, the process continues on as if the Company had manually keyed in the data using the "electronic fillable pdf." Specifically, the company will receive a notification that the forms are ready for certification. The company representative must then review all the reports that are flagged on the EO Survey site (identified as red). The flagged reports are typically those for new establishments, closed establishments, or locations establishments with workforce counts that have changed by more than 20%. Once all the reports that were flagged have been reviewed and finalized, the Company will then need to certify their reports to successfully file them.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 8th day of March, 2016, at Chicago, Illinois.

   /s/ Annette Tyman
Annette Tyman

---

Exhibit 4

Attachment

---

Exhibit 5

Attachment

---

Exhibit 6

SJA075

**Attachment**

---

## Exhibit 7

Supporting Statement
Recordkeeping and Reporting Requirements for
Employer Information Report (EEO-1)

A. Justification

1. The legal basis for the Employer Information Report (EEO-1) form and recordkeeping requirements is Section 709(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-8(c), which imposes the requirement that "[e]very employer, employment agency, and labor organization subject to this subchapter shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports there from as the Commission shall prescribe by regulation or order. . ." Accordingly, the EEOC issued a regulation, **29 C.F.R. §1602.7,** which sets forth the reporting and related recordkeeping requirements for private industry employers with 100 or more employees. The U.S. Department of Labor's Office of Federal Contract Compliance Programs has imposed the same reporting requirement on certain Federal Government contractors and first-tier subcontractors with 50 or more employees. The individual reports are confidential and may not be made public by the Commission prior to the institution of a lawsuit under Title VII in which the individual reports are involved.
2. EEO-1 data are used by EEOC to investigate charges of employment discrimination against employers in private industry and to provide information about the employment status of minorities and women. The data are used to evaluate and prioritize charges under the Commission's charge processing system and to determine the appropriate investigative approaches. The data can be analyzed to develop statistical evidence as the investigation proceeds. EEOC uses the data to develop studies of private sector work forces (see www.eeoc.gov/statistics for some examples), and to assist researchers requesting data for academic studies.

   The data are shared with the Office of Federal Contract Compliance Programs (OFCCP), U.S. Department of Labor, and several other Federal agencies.  Pursuant to §709(d) of Title VII of the Civil Rights Act of 1964, as amended, EEO-1 data are also shared with ninety- four State and local Fair Employment Practices Agencies (FEPAs) for their enforcement efforts.
3. The EEO-1 report is collected through a web based on-line filing system. There are 70,070 respondents reporting annually[83] and 98% of these respondents file on-line. The on-line filing system has reduced the burden hours.
4. We are not aware of any duplicative or related data collection efforts.
5. The EEO-1 report is collected from all private employers with 100 or more employees and certain government contractors with 50 or more employees, so there is no burden on small business.
6. Because the data are an integral part of the Title VII enforcement process, failure to collect the data would reduce our ability to enforce Title VII. The data has been integrated into the enforcement process and computer applications for retrieving EEO-1 reports and conducting statistical comparisons of such reports to the external labor market are available to the enforcement staff at their desktops. Collecting the data less often would impair enforcement decisions by reducing the reliability of the data, as there will be a lag between the employment statistics provided by employers when reporting and the time when the data is used. This problem is likely to be most pronounced among industries and employers with fluctuations in employment.  It is important to make certain that employment decisions are consistent with law when increases or decreases in employment occur. A gap of more than a year between data collections would also impose some processing costs on EEOC because more work would be needed to update mailing lists. The data is only collected annually.
7. None of the above special circumstances will be used to collect the EEO-1 Report.
8. See attached Federal Register Notice dated June 30, 2014 (79 FR 36802). Only one comment was received from the public, and it supports the continued use of the EEO-1 without change to the form. However, the commenter suggests making a change to the reporting procedures that currently prevent parent companies from electronically submitting EEO-1 reports for different subsidiary companies operating at the same physical location within the same industry classification. EEOC has made contact with this organization to begin implementation of this recommendation for the EEO-1 report. Finally, EEOC is planning to make this change by 2015 reporting cycle.
9. EEOC's employees are prohibited by law from providing any payment or gifts to respondents, other than remuneration of contractors or grantees.
10. All reports and information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII, and may not be made public by EEOC prior to the institution of any proceeding under Title VII. However, aggregate

data may be made public in a manner so as not to reveal any particular employer's statistics. All state and local FEPAs with whom we share the data must agree to maintain the confidentiality of the data.

11. The EEO-1 Report does not solicit any information of a sensitive nature from    respondents.

| ANNUAL RESPONDENT BURDEN HOURS | 1,044,150 |
|---|---|

| ANNUAL EMPLOYER COSTS | $19.83  million |
|---|---|

| REPORTS FILED 2013 | ESTIMATED BURDEN HOURS PER REPORT | ESTIMATED TOTAL BURDEN HOURS | COSTS PER HOUR | ESTIMATED TOTAL ANNUAL EMPLOYER COSTS |
|---|---|---|---|---|
| 307,103 | 3.40 | 1,044,150 | 19.00 | 19,838,850 |

Burden hours are assumed to be 3.4 hours per report at a cost of $19.00 per hour. [84]

13. There are no cost changes. Private employers have been completing this form for a number of years.

14. Estimated cost to the federal government will be: $650,000.00 dollars contract cost (based on a competitive bid process from prior years.) The government cost has decreased because the government has used base year contract plus two option years.

15. There are no program changes. However it should be noted that the burden hours estimated in question 12 above have been revised since the approval of the report for the 2011 reporting period.  The total burden hour estimate represents an update from the 2011 estimates when total burden hours were estimated at 987,394.  This increase in total burden is due to the creation of new firms filing EEO-1 reports that are subject to the reporting requirement, leading to an increase in reports filed with the agency.

16. The time schedule for information collection and publication is as follows:

| Filing deadline | September 30 |
|---|---|

| First Follow-up | October 15 |
|---|---|

| Second Follow-up | November 15 |
|---|---|

| Preliminary Data | Periodic data audits |
|---|---|

| Final Data | June 30 |
|---|---|

In each survey year a publication, *Job Patterns for Minorities and Women in Private Industry* is posted on our web site.  This consists primarily of non-confidential aggregations of the data based on various geographic and industrial criteria.  So for example, a table combining all EEO-1 reports for all food and beverage stores in the New York metropolitan area is provided (http://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm). Similar data sets are available on data.gov.  Some of the primary users of this data are employers (for self assessment and affirmative action purposes) and researchers.

17. EEOC is not seeking approval of this nature.

18. No exceptions are requested.

# Camille A. Olson

**SEYFARTH SHAW LLP**
**2029 Century Park East**
**Los Angeles, CA 90067**
**310-277-7200**

**131 S. Dearborn Street**
**Chicago IL  60603**
**312-460-5831**
**colson@seyfarth.com**

Camille A. Olson is a partner of Seyfarth Shaw LLP, Co-Chair of its National Complex Litigation Practice Group, and National Chairperson of its Complex Discrimination Litigation Practice Group. She serves on the firm's National Labor and Employment Law Steering Committee and is the past National Chairperson of the Labor and Employment Practice Department. In November 2013, Ms. Olson was appointed Chairperson of the United States Chamber of Commerce's Equal Employment Opportunity ("EEO") Subcommittee. For nearly 30 years, she has represented companies nationwide in all areas of litigation, with emphasis on employment discrimination and harassment, wage and hour matters, and independent contractor status. Her trial experience includes lead defense trial counsel in "bet the company" harassment, discrimination, independent contractor, and wage and hour cases. In addition, Ms. Olson represents employers in designing, reviewing, and evaluating their pay practices to ensure compliance with federal and local equal employment opportunity laws.  Ms. Olson also works closely with Seyfarth Shaw's OFCCP & Affirmative Action Compliance team, which has defended clients in every OFCCP region and virtually all district offices with clients ranging from *Fortune* 100 companies to small employers in all industries. She has served as outside counsel and independent counsel to Boards of Directors and Executive Team Members in connection with internal investigations and highly sensitive litigation matters. Ms. Olson is on the Board of Directors of Inland Press Association, and Co-Chair of Inland's Human Resource Committee.

Ms. Olson is the recipient of numerous accolades. Ms. Olson was named one of 2016's Top Attorneys in Illinois as well as one of the Top 50 Women Attorneys in Illinois by *Chicago Magazine.*  She was named one of the top 10 employment litigators in the country by *Legal 500*, which praised her 'superb representation' and named her 'one of the best employment litigators in the country.' Law360 has named Ms. Olson one of seven Employment Litigator MVPs for her exemplary work on critical litigation. She has been named as one of the Nation's Most Powerful Employment Attorneys by *Human Resource Executive* and *LawDragon*, and is a Fellow of the American Bar Foundation. *Chambers USA* consistently rates her at the highest level, recently noting: "Specializing in complex discrimination litigation, Camille Olson is 'just terrific.' Everything you hear about her is excellent and she handles the really cutting-edge stuff." Also in 2013, Inland Press Association named Ms. Olson the recipient of its Ray Carlsen Distinguished Award; one of the Association's highest honors, the award recognizes "members who have distinguished themselves in service to the association and its affiliated foundation, who have been exemplary in service to their communities and their companies, and who deserve the recognition of their peers and colleagues."  In 2014 the Columbus Dispatch inaugurated the Camille A. Olson Award of Excellence, to be awarded annually to one of their managers in recognition of Ms. Olson's commitment to excellence in managing independent contractor relationships.

---

ENDNOTES

[1] The Testimony was prepared on behalf of the U.S. Chamber of Commerce by Seyfarth Shaw LLP attorneys Lawrence Lorber, Annette Tyman, Richard Lapp, Christine Hendrickson, Karla Grossenbacher, Sam Sverdlov, and Arielle Eisenberg with assistance from case assistant Kali Froh as well as attorneys Kris D. Meade and Rebecca Springer of Crowell & Moring.  In addition, the Testimony is based on the Declarations of Economist Dr. J. Michael DuMond (see Attachment Exhibit 1), Economist Dr. Ronald Edward Bird (see Attachment Exhibit 2) and Annette Tyman, J.D.  (see Attachment Exhibit 3).

[2] I am also a partner with the law firm of Seyfarth Shaw LLP, where I chair the Labor and Employment Department's Complex Discrimination Litigation Practice Group. Seyfarth Shaw LLP is a global law firm of over 800 attorneys specializing in providing strategic, practical legal counsel to companies of all sizes.  In addition to my litigation practice, which has specialized in representing local and national companies in federal court litigation involving claims of employment discrimination, I also represent employers in designing, reviewing, and evaluating their pay practices to ensure compliance with federal and local equal employment opportunity laws.  Nationwide, over 350 Seyfarth attorneys provide advice, counsel, and representation to employers in pay equity matters.

[3] For underlying authority to require employers to submit the EEO-1 form, EEOC relies on the recordkeeping provisions of 42 U.S.C. § 2000-e8(c) and 29 CFR 1602.7.  *See* 81 Fed. Reg. 5113. Nothing in the authorizing statute exempts the EEOC from complying with the PRA.

[4] This figure underestimates by 40% the number of private employers with 100 or more employees.  Ex. 2, Ronald Bird Decl. p. 6.

SJA078

[5] In 2009, the EEOC used this approach and estimated 599,000 burden hours. Ex. 4. That figure rose to 987,394 burden hours in both 2011 and 2014. Exs. 5 and 6. Using the $19.00 per hour rate used by the EEOC in 2015, those estimates would have identified annual burdens of $11.3 million in 2009 and $18.8 million in both 2011 and 2014.

[6] Ex. 3, Annette Tyman, Decl., generally describing the EEO-1 submission process.

[7] Ex. 3, Annette Tyman Decl. ¶7.a.

[8] The EEOC's suggestion that uploading a data file means that "the information goes nearly directly from an electronic file generated by the HRIS to the survey data base" is a gross misunderstanding of the process required for gathering and validating data for submission to the EEO-1 survey. Ex. 3, Annette Tyman Decl. ¶11

[9] Ex. 2, Ronald Bird Decl. p. 4.

[10] Ex. 2, Ronald Bird Decl. pp. 4-5.

[11] Insofar as the OFCCP has apparently abandoned its review of the submitted comments, there is no agency representation as to the input it received regarding the time and burden attendant to its proposal. Thus, the EEOC is citing to non-existent or non-published data to support its burden estimates.

[12] Ex. 2, Ronald Bird Decl. pp.5-6.

[13] As noted in Section III.C.2, any approach that assumes each exempt employee works 40 hours per week is not realistic and would only further undermine the efficacy of the data collected.

[14] Ex. 2, Ronald Bird Decl. pp. 5-6.

[15] See Section III (describing lack of efficacy of any analysis that compares employee pay within broad EEO-1 categories); Ex. 1, Declaration of Dr. Michael DuMond (same).

[16] " Sage Computing Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 57 (Sept. 2015).

[17] Against this backdrop, it is important to note that Congress and courts have explicitly rejected the notion of pay equity based on "comparable worth" theories under which employers would be required to set wages to reflect differences in the "worth" of different jobs. (In the 1960s, the Kennedy Administration proposed a ban on sex discrimination in wages "for work of comparable character on jobs the performance of which requires comparable skills," with the assumption that job evaluation systems were available to evaluate the comparative worth of different jobs. Equal Pay Act of 1963: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 88th Cong., 1st Sess. 2 (1963) (quoting S. 882, 88th Cong., 1st Sess., 109 CONG. REC. 2770 (1963) and S. 910. 88th Cong., 1st Sess., 109 CONG. REC. 2886 (1963)). Congress resisted the proposal for the simple reason that it did not want the government or judges to invade the workplace and tell employers what to pay their employees.) Under federal law, the value of the relative worth of one job as compared to another job is a matter to be decided within the province of the employer offering the employment opportunities to workers. For instance, the Sixth Circuit rejected the comparable worth theory stating, "Title VII is not a substitute for the free market, which historically determines labor rates." Int'l Union v. Michigan, 886 F.2d 766, 769 (6th Cir. 1989). Likewise, the Ninth Circuit rejected the theory on the grounds that it found "nothing in the language of Title VII or its legislative history to indicate Congress intended to abrogate fundamental economic principles such the laws of supply and demand or to prevent employers from competing in the labor market." AFSCME v. Washington, 770 F.2d 1401, 1407 (9th Cir. 1985).

[18] EEOC Compl. Man. Ch. 10.

[19] 29 U.S.C. § 206(d).

[20] EEOC Comp. Man. Ch. 10, at p. 20, available at www.eeoc.gov/policy/docs/compensation.html

[21] The ten EEO-1 Job groups include: Executive/Senior Level Officials and Managers; First/Mid-Level Officials and Managers; Professionals; Technicians; Sales Workers; Administrative Support Workers; Craft Workers; Operatives; Laborers and Helpers; and Service Workers.

[22] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 9.

[23] See EEO-1 instruction booklet, available at http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm. Notably, the examples provided omit the myriad other jobs that would also fall within the Professionals EEO-1 job group.

[24] EEOC Comp. Man. Ch. 10, at p. 22, available at www.eeoc.gov/policy/docs/compensation.html, (emphasis added) citing Stanley v. University of S. Cal., 178 F.3d 1069, 1074 (9th Cir.) (EPA requires two-step analysis: first, the jobs must have a common core of tasks; second, court must determine whether any additional tasks incumbent on one of the jobs make the two jobs substantially different), cert. denied, 120 S. Ct. 533 (1999); Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1998) (critical issue in determining whether two jobs are equal under the EPA is whether the two jobs involve a "common core of tasks" or whether "a significant portion of the two jobs is identical"); Brewster v. Barnes, 788 F.2d 985, 991 (4th Cir. 1986) (same).

[25] Standard Occupational Classification system overview, March 5, 2016, http://www.bls.gov/soc/home.htm, "The 2010 Standard Occupational Classification (SOC) system is used by Federal statistical agencies to classify workers into

occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 840 detailed occupations according to their occupational definition. To facilitate classification, detailed occupations are combined to form 461 broad occupations, 97 minor groups, and 23 major groups. Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together."

[26] See Internists, SOC 29-1063 given the multiple listings categories of "Physicians and Surgeons."

[27] EEOC Comp. Man. Ch. 10, at p. 6, available at www.eeoc.gov/policy/docs/compensation.html.

[28] *Id.* at 7.

[29] *Eskridge v. Chicago Bd. of Educ.*, 47 F. Supp. 3d 781, 790-91 (N.D. Ill. 2014). Although a similarly situated employee need not be "identical," *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir.2008), he must be "directly comparable to the plaintiff in all material respects...." citing *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir.2010); *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 856-57 (S.D.Tex. 2010) ("'Similarly situated' employees are employees who are treated more favorably in 'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly. Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protective class. Where different decision makers or supervisors are involved, their decisions are rarely 'similarly situated' in relevant ways for establishing a prima facie case."); *Alexander v. Ohio State University College of Social Work*, 697 F.Supp.2d 831, 846-47 (S.D. Ohio 2012) (To be similarly situated, a plaintiff's purported comparators must have the same responsibilities and occupy the same level position.)

[30] EEOC Comp. Man. Ch. 10, at p. 8, available at www.eeoc.gov/policy/docs/compensation.html.

[31] *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (noting that "some [are] regressions so incomplete as to be inadmissible as irrelevant . . . ."); *Sheehan v. Purolator*, 839 F.2d 99, 103 (2d Cir. 1988) (affirming the district court's denial of class certification because the regression analysis relied upon was deemed to be "flawed" for failing to take into account non-discriminatory factors, such as "education and prior work experience."); *Griffin v. Board of Regents*, 795 F.2d 1281, 1292 (7th Cir. 1986) (holding that "the explanatory power of a model is a factor that may legitimately be considered by the district court in deciding whether the model may be relied upon."); EEOC Compliance Manual, Section 10: Compensation Discrimination ("[Employers often] assert[] that pay disparities are caused by nondiscriminatory factors. Such factors could include the employees' education, work experience with previous employers, seniority in the job, time in a particular salary grade, performance ratings, and others. The Commission will need accurate information about all the variables on which the employer relies, for each employee similarly situated to the charging party. The employer should be asked to provide and explain all of its reasons for a compensation differential to reduce the need for burdensome repetitive requests.")

[32] Sage Computing "Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 16 (Sept. 2015).

[33] *Id.*, at 16, emphasis added.

[34] *Id.*, at 61, emphasis added.

[35] 29 U.S.C. 206(d) and 42 CFR 2000e-2(h).

[36] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 10.

[37] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.

[38] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.

[39] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.

[40] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.

[41] EEOC's Notice of Proposed Changes to the EEO-1 to Collect Pay Data from Certain Employers, available at http://www.eeoc.gov/employers/eeo1survey/2016_eeo-1_proposed_changes_qa.cfm.

[42] 81 Fed. Reg. 5117, fn. 45 (February 1, 2016).

[43] 81 Fed. Reg. 5117-5118 (February 1, 2016) (emphasis added).

[44] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 13.

[45] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraphs 13-15.

[46] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 14.

[47] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.

[48] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.

[49] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).

[50] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).

SJA080

[51] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.

[52] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.

[53] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.

[54] EEOC pilot study on collecting pay data, available at: http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf, at p. 27.

[55] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19.

[56] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19.

[57] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 20.

[58] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 20.

[59] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 23.

[60] 41 CFR 60-2.17 (b) "Identification of problem areas. The contractor must perform in-depth analyses of its total employment process to determine whether and where impediments to equal employment opportunity exist. At a minimum the contractor must evaluate … (3) Compensation system(s) to determine whether there are gender-, race-, or ethnicity-based disparities."

[61] Draft Report pg 10, Question 6. Group 1

[62] Draft Report page 11 group 1

[63] Draft Report page 11, group 2.

[64] 44 U.S.C. 3510

[65] 44 U.S.C. 3510 (b)(1)(2)

[66] National Research Council, 2012, *Collecting Compensation Data from* Employers, Washington D.C., National Academies Press, p. 84, available at http://www.nap.edu/catalog/13496.

[67] *Id*. at 90.

[68] *Id*.

[69] *Id*. at 91.

[70] *Id*.

[71] The details of the EEOC's proposal are presented in the Federal Register, Vol. 81, No. 20, pp. 5113 - 5121.

[72] Federal Register, Vol. 81, No. 20, page 5117.

[73] These seven groups are:  1) Hispanic/Latino, 2) White (not Hispanic/Latino), 3) African-American (not Hispanic/Latino), 4) Native Hawaiian or Other Pacific Islander (not Hispanic/Latino), 5) Asian (not Hispanic/Latino), 6) American Indian or Alaskan Native (not Hispanic/Latino) and 7) Two or More Races (not Hispanic/Latino).

[74] Federal Register, Vol. 81, No. 20, pages 5115, and 5118.

[75] See "Employee Tenure in 2014"; News Release; Bureau of Labor Statistics, US Department of Labor; http://www.bls.gov/news.release/pdf/tenure.pdf

[76][76] Federal Register, Vol. 81, No. 20, page 5118, footnote 46.

[77] http://www.bls.gov/opub/reports/cps/characteristics-of-minimum-wage-workers-2014.pdf

[78] Sage Computing Pilot Study, September 2015, page 27.  Emphasis added.

[79] A summary of these two simulations is provided within this declaration.  The details of these simulations are included as Exhibit B.

[80] Federal Register, Vol. 81, No. 20, page 5118. The Proposal also suggests that the statistical tests would be used to "detect discrimination," implying that a statistically significant result from either a Mann-Whitney or Kruskal-Wallis would be sufficient evidence thereof.  However, statistical evidence cannot be used to find discrimination-it can only identify outcomes that are consistent or inconsistent with discrimination.

[81] For this simulation, an employee's race was randomly assigned such that 12.5% of the employees were designated as African-American.  The random nature of this assignment results in a similar job grade distribution of "white" and "African-American" employees.

[82] Although EEOC does not cite any source for its 3.2 hour burden increment, careful examination of the Sage (2015) report provides a clue.  Sage reports on page 104 of its report that a 2012 EEOC working group forum on surveys modernization included some representatives of EEO-1 filers and that these filers on average opined that the addition of

compensation data to the report would increase their reporting burden by "approximately 96 per cent. It is an interesting coincidence that 3.2 hours, EEOC's estimate of the incremental burden for component 1, is 96 percent of the 3.4 hours listed for the Component 1 (existing form) burden in EEOC's notice Table 4 on p.5120. A problem for EEOC, however, is that this 96% burden increase estimate is relative to the respondents' own current burden, not the EEOC estimate of 3.4 hours as contained in the ICR supporting documents that EEOC has filed with OIRA since 2009. Another important fact that is not presented is how many forum attendees were responsible for the 96 percent burden estimate and how statistically representative they were of the total filer universe. These are questions that should be important to an agency whose mission is closely linked with the importance of statistical data and analysis.

[83] These respondents often file multiple reports.

[84] Estimated burden hours were calculated by multiplying the number of reports expected to be filed annually (307,103 in 2013) by the estimated average time to complete and submit each report (3.4 hours), for a total of 1,044,150 hours. Relying on an estimate of $19 per hour results in a total cost of $19.83 million (1,044,150 burden hours multiplied by 19.00 per hour). The rate of $19 per hour is based on the hourly pay rate of human resources assistants of $18.22 (*Occupational Employment Statistics, Occupational Employment and Wages, May 2010, 43-4161 Human Resources Assistants, Except Payroll and Timekeeping*, http://data.bls.gov/cgi-bin/print.pl/oes/current/oes434161.htm 6/30/2011, Last Modified Date: May 17, 2011, U.S. Bureau of Labor Statistics, Division of Occupational Employment Statistics). $18.22 was rounded to $19 to account for instances where higher paid staff perform this work.



March 29, 2019

Ms. Victoria A. Lipnic
Acting Chair
Equal Employment Opportunity Commission
131 M Street NE
Washington, DC 20507

Mr. Jody H. Hunt
Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Paul J. Ray
Acting Administrator
The Office of Management and Budget
Office of Information and Regulatory Affairs
725 17th Street, NW
Washington, DC 20503

Re: Potential Collection of Component 2 EEO-1 pay data for 2018

Dear Madam Chair Lipnic, Assistant Attorney General Hunt, and Acting Administrator Ray:

We understand that the EEOC is considering options in light of the recent court order removing the stay with respect to the 2016 Proposed Revised EEO-1 Form, and specifically collection of Component 2 EEO-1 pay data.

The National Payroll Reporting Consortium (NPRC) provided input in 2016 on the proposed rulemaking concerning revisions to the Employer Information Report (EEO-1) to add component 2 pay data; generally hours worked and W-2 earnings. NPRC is a non-profit trade association whose member organizations provide payroll processing and related services to nearly two million U.S. employers, representing over 36% of the private sector workforce. Payroll service providers have long served an important role in our nation as a conduit between employers and government authorities. Payroll service providers improve the efficiency of government reporting through electronic filing, and improve employer compliance.

As noted in our comment letters, NPRC is strictly neutral as to the appropriateness or need for proposed changes to the EEO-1 annual report. However, we serve in part to offer constructive technical assistance to government policymakers concerning proposals that affect employment-related reporting. Employers would likely rely heavily on external service providers, including members of the NPRC, to assist them in complying with any new or revised EEO-1 reporting

*ADP ★ Asure Software ★ BenefitMall/CompuPay*
*Ceridian ★ Gusto ★ Intuit ★ iSolved HCM ★ Paychex ★ Paycom*
*Paycor ★ Paylocity ★ PPI Business Services ★ PrimePay ★ Ultimate Software*

SJA083



obligations. As such, our members have performed critical analysis as to the feasibility of complying with the Component 2 EEO-1 pay data report, as we understand it, for 2018.

As you might imagine, there is substantial concern, in particular because of the possibility that such reports may be due by the end of May 2019. Normally changes of this magnitude require a minimum of six months to a year for design, development, testing, release and related training and communications. Aside from the critical issue of appropriate time allowed for systems development to enable formatting and submission in electronic form, there would be technical challenges in retroactive gathering of input, and related data analysis and processing tasks.

***Retroactive Collection of Data May Not Be Possible***

There is a substantial added complication because the Component 2 pay data report would require retroactive gathering of input. Because of the OMB stay on the revision, employers and service providers generally did not develop the data collection mechanisms and did not collect and store the necessary data, as explained in more detail below, to comply with such a report for 2018.

Although the revised EEO–1 W–2 earnings data for 2018 should generally be available, hours worked data is a concern. Obviously, hours worked are generally collected and stored with respect to FLSA non-exempt (i.e., hourly) employees, assuming the EEOC adopts FLSA definitions. However, such hours data do not exist for most exempt (i.e., salaried) employees, and employers will have significant difficulties at this point in re-creating hours of service records for 2018.

We recognize that EEOC's revised EEO-1 report permits the use of a proxy 20 hours or 40 hours for exempt employees, which is very helpful, but employers would still need to do a significant amount of retroactive data-gathering to establish the dates of active employment, translate them into the number of weeks worked and translate that information into hours. For instance, FLSA hours worked is a defined term that does not include all hours that were "paid" to an employee and excludes time for leave of absence(s), vacation, jury duty and other hours that were paid but not worked. Beyond salaried workers, there are also many other forms of employment and industries in which workers are paid on some basis other than hours worked. Given the stay issued by OMB, member organizations discontinued their implementation efforts pending further direction. As a result, the new data file specifications that are needed to prepare the revised report are not finalized.

Although not directly relevant to the proposed EEO-1 report, our recent experience with Affordable Care Act (ACA) employer reporting of health coverage is conceptually similar, and may offer insights as to the time required to modify software. The ACA was enacted in 2010, and included new employer reporting of health coverage beginning in 2014, which was based in part on employee hours of service. As the EEOC has done, Treasury and the IRS determined that it would be helpful to use existing definitions of hours of service with which employers were already familiar. Employers were provided with proposed regulations in mid-2012 (IRS Notice 2012-58). In February 2014, final regulations were published that were generally based on the

SJA084



definition of hours of service[1] related to qualified retirement plans (29 CFR 2530.200b-2(a)). Even with the conceptually simple adoption of an existing hours of service definition, the related systems development was extremely complex and ultimately the filing requirement for 2014 was suspended.[2] Thus, despite use of a well-established definition of hours and thorough advance rulemaking, the complexity of the underlying data made it very difficult to complete the necessary programming, which required more than two full years.

The present question is even further complicated by the potential need to obtain data from <u>past</u> periods; i.e., 2018. In fact, it may be extraordinarily difficult for many employers to capture or re-create such data even retroactive to January <u>2019</u>, for any 2019 reports due in 2020.

**Formatting and Submission in Electronic Form**

EEOC electronic filing specifications for Component 2, which are the new data elements related to hours and W-2 earnings, have not been finalized. Employers and software developers generally need a minimum of six months to one year to develop, program and test significant changes, beginning with the date that final specifications are published. Consequently, it is unlikely that many employers would be able to comply with the electronic filing requirement for the EEO-1 report, and is unclear whether the EEOC would have the technical ability to accept electronic filings even if an employer was prepared to do so in 2019.

This raises the question of whether the EEOC might permit paper submissions for 2018, and whether there would be any practical value in doing so. A paper submission would not substantially reduce the burden on employers to collect and summarize hours and wage data, and would make it effectively impossible for the EEOC to capture, analyze and use the reported information.

Systems development is also not a straightforward task of merely formatting data (assuming such data is available) into an EEOC-defined file specification. Such projects require specific procedural or systemic handling of complex fact patterns, which may require rulemaking or other guidance from EEOC. A few examples include handling of:

1. Employees with job classification code changes during the snapshot period, or the full year
2. Reclassification of a job category during the year
3. Employees that appeared in the snapshot period but were terminated, deceased or retired by the end of the snapshot period
4. Employee changes of status (e.g., temporary to regular; part-time to full-time; non-exempt to exempt) during the snapshot period or year
5. Changes in work location/establishment, or work location/establishment, that become inactive during the period
6. Employees with more than one job classification concurrently or during the snapshot period

---

[1] Treasury Final regulation TD 9655, Shared Responsibility for Employers Regarding Health Coverage, 8544 Federal Register Vol. 79, No. 29, February 12, 2014

[2] IRS Notice 2013-45: Transition Relief for 2014 Under §§ 6055 (§ 6055 Information Reporting), 6056 (§ 6056 Information Reporting) and 4980H (Employer Shared Responsibility Provisions) NOT-129718-13

SJA085



To ensure data accuracy of the reports, it will be important to understand the EEOC's position on these and other issues. Generally, any new employer reporting is more effectively addressed prospectively, after all specifications and related guidance are released; in this case so that employers can record actual hours for salaried employees in accordance with such rules.

As a result, we believe that any requirement that employers comply with Component 2 EEO-1 pay data reporting for 2018 would be prohibitively costly and difficult to execute for both employers and the EEOC. The revisions embodied in Component 2 reporting are very substantial and will require an appropriate amount of time for orderly systems development and testing.

We urge the EEOC to consider the significant implications to the employer community in establishing the timelines of reporting of Component 2 EEO-1 pay data elements to begin no sooner than 2020 (i.e., reports due in 2021 for 2020). We would recommend and propose a meeting with the Commission and other stakeholders on this important question within the next few weeks, in order to thoroughly assess the readiness of both employers and the EEOC to execute the Component 2 reporting.

Sincerely,

Pete Isberg
National Payroll Reporting Consortium, Inc.
909 971-7670
Pete_Isberg@nprc-inc.org

SHARE   



## Collecting Compensation Data from Employers (2012)

### DETAILS

154 pages | 6 x 9 | HARDBACK
ISBN 978-0-309-38755-2 | DOI 10.17226/13496

### CONTRIBUTORS

Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin; Committee on National Statistics; Division of Behavioral and Social Sciences and Education; National Research Council

### SUGGESTED CITATION

National Research Council 2012. *Collecting Compensation Data from Employers*. Washington, DC: The National Academies Press. https://doi.org/10.17226/13496.

GET THIS BOOK

FIND RELATED TITLES

Visit the National Academies Press at NAP.edu and login or register to get:

– Access to free PDF downloads of thousands of scientific reports
– 10% off the price of print titles
– Email or social media notifications of new titles related to your interests
– Special offers and discounts



Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. (Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

SJA087

# COLLECTING COMPENSATION DATA FROM EMPLOYERS

Panel on Measuring and Collecting Pay Information from
U.S. Employers by Gender, Race, and National Origin

Committee on National Statistics

Division of Behavioral and Social Sciences and Education

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

SJA088

Copyright National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS**     500 Fifth Street, NW     Washington, DC 20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by the U.S. Equal Employment Opportunity Commission and the National Science Foundation under a grant to the National Academy of Sciences. Support of the work of the Committee on National Statistics is provided by a consortium of federal agencies through a grant from the National Science Foundation (award number SES-1024012). Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

International Standard Book Number-13:   978-0-309-26408-2
International Standard Book Number-10:   0-309-26408-1

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313; http://www.nap.edu.

Copyright 2012 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Suggested citation: National Research Council. (2012). *Collecting Compensation Data from Employers*. Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin. Committee on National Statistics, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright National Academy of Sciences. All rights reserved.

SJA091
Copyright National Academy of Sciences. All rights reserved.

## PANEL ON MEASURING AND COLLECTING
## PAY INFORMATION FROM U.S. EMPLOYERS BY
## GENDER, RACE, AND NATIONAL ORIGIN

**John M. Abowd** (*Chair*), School of Industrial and Labor Relations, Cornell University

**H. Juanita (Nita) Beecher**, Employment Law & Litigation Group, Mercer LLC

**Marc Bendick, Jr.**, Bendick and Egan Economic Consultants, Inc., Washington, DC

**Charles C. Brown**, Department of Economics, University of Michigan

**Elizabeth Hirsh**, Department of Sociology, University of British Columbia

**Mark R. Killingsworth**, Department of Economics, Rutgers University

**Jonathan S. Leonard**, Haas School of Business, University of California, Berkeley

**Janice F. Madden**, Wharton School, University of Pennsylvania

**Aleksandra (Sesa) Slavkovic**, Department of Statistics, Pennsylvania State University

**Finis R. Welch**, Welch Consulting, Bryan, TX

**Valerie Rawlston Wilson**, National Urban League Policy Institute, Washington, DC

**Thomas J. Plewes**, *Study Director*
**Michael J. Siri**, *Program Associate*

*v*

Copyright National Academy of Sciences. All rights reserved.

## COMMITTEE ON NATIONAL STATISTICS
### 2011-2012

**Lawrence Brown** (*Chair*), Department of Statistics, Wharton School, University of Pennsylvania

**John M. Abowd**, School of Industrial and Labor Relations, Cornell University

**Alicia Carriquiry**, Department of Statistics, Iowa State University

**William DuMouchel**, Oracle Health Sciences, Waltham, MA

**V. Joseph Hotz**, Department of Economics, Duke University

**Michael Hout**, Survey Research Center, University of California, Berkeley

**Karen Kafadar**, Department of Statistics, Indiana University

**Sallie Keller**, University of Waterloo, Ontario, Canada

**Lisa Lynch**, Heller School for Social Policy and Management, Brandeis University

**Sally Morton**, Graduate School of Public Health, University of Pittsburgh

**Joseph Newhouse**, Division of Health Policy Research and Education, Harvard University

**Ruth Peterson**, Criminal Justice Research Center, The Ohio State University

**Hal Stern**, Department of Statistics, University of California, Irvine

**John H. Thompson**, NORC at the University of Chicago

**Roger Tourangeau**, Statistical Group, Westat, Rockville, MD

**Alan Zaslavsky**, Department of Health Care Policy, Harvard Medical School

**Constance F. Citro**, *Director*

SJA093
Copyright National Academy of Sciences. All rights reserved.

# Contents

Preface ix

Summary 1

1 Background 7
   Legislation, Authorities, and Responsibilities, 8
   EEOC Data Collection and Reports, 11
   White House Task Force Report and Panel Charge, 14
   Pay Rate Information, 16
   Earnings Information, 16

2 Alternative Sources of Wage Data 26
   Data from EEO-4 Reports, 27
   Administrative Data, 28
   Equal Opportunity Survey Pilot, 34
   U.S. State and Canadian Provincial Surveys, 37
   Survey-Based Wage Information, 41
   Summary, 45

3 Pay Concepts and Definitions 46
   Role of Compensation, 47
   Earnings Data Available in Firms, 48
   Feasible Definitions of Earnings, 50
   Conclusion, 58

*vii*

SJA094
Copyright National Academy of Sciences. All rights reserved.

4   Survey Design and Statistical Methodology                                        59
       Options for Data Collection, 60
       Fitness for Use, 61
       Minimization of Reporting Burden, 71
       Human Resource and Payroll Systems, 74

5   Confidentiality, Disclosure, and Data Access                                     77
       Statistical Protection of Tabular Data and Microdata, 78
       Protecting Original Data, 80
       Further Protection of Shared EEO Data, 84

6   Conclusions and Recommendations                                                  86
       Purpose of a New Data Collection, 86
       Pilot Study, 87
       Agency Capacity and Burden, 89
       Measures for Collection of Pay Information, 89
       Access to Pay Information in a Protected Environment, 90

References                                                                                          93

Appendixes

A   EEO Report Forms                                                                               99
B   Study of Employment Earnings for the Equal Employment              111
       Opportunity Program: A Possible Role for Administrative
       Data from Three Tax Systems
           *Nicholas Greenia*
C   Proposed Pilot Tests of Compensation Data Collection                     131
D   Biographical Sketches of Panel Members and Staff                         135

SJA095
Copyright National Academy of Sciences. All rights reserved.

# Preface

The U.S. Equal Employment Opportunity Commission (EEOC) collects detailed information on employment by gender and race/ethnicity by job groupings from all employers, except small employers. The agency does not collect earnings data from private employers. The only earnings data collected by EEOC are collected for employees of state and local governments, excluding school systems and educational institutions, and these earnings data are limited to major gender and race/ethnic groups for eight salary ranges. As a byproduct of the agency's enforcement programs, EEOC collects pay information during investigations of complaints and litigation, but it does not use the information collected in this manner to monitor pay trends in any structured way.

The Paycheck Fairness Act of 2009 (H.R. 12), which did not pass during the 111th Congress,[1] would have required EEOC to issue regulations to mandate data from employers to EEOC on pay by the race, gender, and national origin of employees. If the legislation had become law, EEOC would have confronted issues regarding currently available and potential data sources, methodological requirements, and appropriate statistical techniques for the measurement and collection of employer pay data.

At the suggestion of a White House Task Force, the EEOC asked the National Research Council, through its Committee on National Statistics (CNSTAT), to convene this panel to review methods for measuring and

---

[1]The legislation was reintroduced in both chambers in the 112th Congress. At this writing, the House version remains in committee while the Senate version failed to clear a procedural vote (to bring it up for floor consideration) on June 5, 2012.

SJA096
Copyright National Academy of Sciences. All rights reserved.

collecting pay information by gender, race, and national origin from U.S. employers for the purpose of administering Section 709 of the Civil Rights Act of 1964, as amended. The panel was asked to consider suitable data collection instruments, procedures for reducing reporting burdens on employers, and confidentiality, disclosure, and data access issues.

In conducting this review, the panel held two workshops to gather information from data users and experts in survey methodology, wage and compensation concepts, and other methods for measuring and collecting pay information by gender, race, and national origin from U.S. employers. We particularly benefitted from papers and presentations provided by leadership and staff of EEOC, the Office of Federal Contract Compliance Programs (OFCCP) of the U.S. Department of Labor, and the U.S. Department of Justice. A paper on administrative sources of pay data was commissioned and is an appendix to this report.

The panel is grateful for the active participation of Sharon Alexander, Office of the Chair, EEOC, and Ronald Edwards, director, Program Research and Surveys Division, Office of Research, Information and Planning, EEOC, for their unhesitant cooperation with the panel during its work. Special thanks go also to Bliss Cartwright and Lucius Brown, who assisted in developing this study and in overseeing its progress on behalf of EEOC.

A large group of experts from government agencies, academia, and representing various other user organizations freely gave of their time to prepare presentations for the workshops and enter into a dialogue with the panel as it gathered information for this report.

The first workshop opened with statements by Stuart Ishimaru, commissioner, EEOC; Jocelyn Samuels, senior counselor to the assistant attorney general for civil rights, U.S. Department of Justice (DOJ); and Claudia Gordon, special assistant to the director of the OFCCP. Ron Edwards of EEOC and Pamela Coukos, senior program advisor, OFCCP, brought the panel up to date on currently available sources of equal employment opportunity and wage data. State and provincial programs that now collect earnings data by gender, race, and national origin were described by Martha Burk, formerly the senior adviser for women's issues to the governor of New Mexico, Faith Zwemke, director of the Pay Equity Office of Minnesota; and, in the second workshop, Stephanie McCleave, director of the Ontario, Canada Pay Equity Office. The general counsel of the EEOC, P. David Lopez, and three EEOC field office officials—Anna Park, regional attorney, and Rosa Viramontes, deputy regional attorney, of the Los Angeles District Office, along with Marla Stern-Knowlton, director of the San Diego Local Office—summarized the current enforcement and litigation uses of the EEO-1 data currently gathered by the agency. Bliss Cartwright of the EEOC Program Research and Surveys Division gave a presentation on national office uses of the EEO-1 data. Overviews of compensation concepts and

Copyright National Academy of Sciences. All rights reserved.

definitions were provided by Kevin Hallock, Cornell University, and Philip Doyle, assistant commissioner for compensation levels and trends, Bureau of Labor Statistics, Department of Labor.

In the second workshop, the panel heard from representatives of vendors who provided payroll and software products. Karen Minicozzi discussed the enterprise software offerings of Workday, Inc., Liz Balconi, consultant, and Michele Whitehead, manager of human resource services, Berkshire Associates, discussed the software that this firm uses to assist companies with understanding their equal opportunity profiles. A consultant to the panel, Nicholas Greenia, formerly of the Internal Revenue Service, gave a presentation on the availability of administrative data to yield earnings data useful for antidiscrimination purposes. A panel consisting of Ronald Edwards, EEOC; Gilberto Garcia, chief, Branch of Enforcement and Appeals, OFCCP; and Sharyn Tejani, special litigation counsel, DOJ, discussed issues of data confidentiality and data sharing.

The panel is grateful for the excellent work of the staff of CNSTAT for their support in developing and organizing the workshops and preparing this report. Tom Plewes, study director for the panel, ably supported the work of the panel. Michael Siri provided administrative support to the panel. We are especially thankful for the personal participation of Constance F. Citro, CNSTAT director, in the conduct of the workshops and in the preparation of this report.

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the Report Review Committee of the National Research Council. The purpose of this independent review is to provide candid and critical comments that assist the institution in making its reports as sound as possible, and to ensure that the reports meet institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process.

The panel thanks the following individuals for their review of the report: Frank Dobbin, Department of Sociology, Harvard University; Jon A. Geier, Employment Law Department, Paul Hastings, LLC; Kevin F. Hallock, Institute for Compensation Studies, Cornell University; Alan F. Karr, Director's Office, National Institute of Statistical Sciences; Barbara F. Reskin, Department of Sociology, University of Washington; and John H. Thompson, NORC at the University of Chicago.

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of the report was overseen by Robert Michael, professor, Harris School, University of Chicago, and Michael Goodchild,

Copyright National Academy of Sciences. All rights reserved.

Collecting Compensation Data from Employers

professor emeritus, University of California, Santa Barbara. Appointed by the National Research Council, they were responsible for making certain that the independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of the report rests entirely with the authoring panel and the National Research Council.

John M. Abowd, *Chair*
Panel on Measuring and Collecting Pay
Information from U.S. Employers by Gender,
Race, and National Origin

SJA099
Copyright National Academy of Sciences. All rights reserved.

# Summary

For identifying the possibility of discriminatory practices, the U.S. agencies with responsibilities for enforcing equal employment opportunity (EEO) laws have long relied, along with other sources, on detailed information that is obtained from employers on employment in job groups by gender and race/ethnicity. The U.S. Equal Employment Opportunity Commission (EEOC), the Office of Federal Contract Compliance Programs (OFCCP) of the U.S. Department of Labor, and the Civil Rights Division of the U.S. Department of Justice (DOJ) have developed processes that use these employment data as well as other sources of information to target employers for further investigation and to perform statistical analysis that is used in enforcing the antidiscrimination laws. The limited data from employers do not include (with a few exceptions) ongoing measurement of possible discrimination in compensation.

The proposed Paycheck Fairness Act of 2009 (H.R. 12) would have required EEOC to issue regulations mandating that employers provide the EEOC with information on pay by the race, gender, and national origin of employees. The legislation was not enacted. If the legislation had become law, the EEOC would have been required to confront issues regarding currently available and potential data sources, methodological requirements, and appropriate statistical techniques for the measurement and collection of employer pay data.

At the suggestion of a White House Task Force, EEOC asked the National Research Council through its Committee on National Statistics to convene a panel to review methods for measuring and collecting pay information by gender, race, and national origin from U.S. employers. The

SJA100
Copyright National Academy of Sciences. All rights reserved.

Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race and National Origin considered suitable data collection instruments, procedures for reducing reporting burdens on employers, and issues of confidentiality protection and data access.

The panel concludes that the collection of earnings data would be a significant undertaking for the EEOC and that there might well be an increased reporting burden on some employers. The panel also concludes that there is, at present, no clearly articulated vision of how the data on wages could be used in the conduct of the enforcement responsibilities of the relevant agencies. The main purpose for which the wage data would be collected, as articulated to the panel by EEOC and OFCCP representatives, is for targeting employers for investigation regarding their compliance with antidiscrimination laws But beyond this general statement of purpose, the specific mechanisms by which the data would be assembled, assessed, compared, and used in a targeting operation are not well developed by either agency. An Advance Notice of Proposed Rulemaking (ANPRM), issued in August 2011 by OFCCP, posed relevant questions in seeking public comment on the development and implementation of a new compensation data collection tool. The ANPRM contained a set of 15 questions encompassing all aspects of the new tool. Questions put forth included which type of wage data to collect, appropriate job categories, the possibility of submitting data on an establishment basis, electronic data submission, etc.[1]

Nonetheless, the panel found no evidence of a clearly articulated plan for using the earnings data if they are collected. The fundamental question that would need to be answered is how the earnings data should be integrated into the compliance programs, for which the triggers for the EEOC and DOJ have primarily been a complaint process that has generated relatively few complaints about pay matters.

Furthermore, the panel concludes that existing studies of the cost-effectiveness of an instrument for collecting wage data and the resulting burden are inadequate to assess any new program. Unless the agencies have a comprehensive plan that includes the form of the data collection, it will not be possible to determine, with precision, the actual burden on employers and the probable costs and benefits of the collection. Therefore, the first recommendation is to develop such a plan.

> **Recommendation 1: In conjunction with the Office of Federal Contract Compliance Programs of the U.S. Department of Labor and the Civil Rights Division of the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission should prepare a comprehensive plan for use of earnings data before initiating any data collection.**

---

[1]For the full set of questions in the ANPRM, see 76 FR 49398–49401.

Copyright National Academy of Sciences. All rights reserved.

The second recommendation stems from the panel's conclusion that existing evidence does not provide an adequate basis for determining the costs and benefits of the collection of wage data. Based on the data use plan, the panel recommends that a pilot study be conducted by an independent organization to provide much more reliable information about the costs and benefits of the proposed collection.

> **Recommendation 2: After the U.S. Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, and the U.S. Department of Justice complete the comprehensive plan for use of earnings data, the agencies should initiate a pilot study to test the collection instrument and the plan for the use of the data. The pilot study should be conducted by an independent contractor charged with measuring the resulting data quality, fitness for use in the comprehensive plan, cost, and respondent burden.**

The panel offers two approaches to the recommended pilot study. The first pilot test—a microdata pilot approach—proposes collecting a number of core demographic variables (using the categories on the EEO-1 form) and adding an annual wage measure in order to test targeting firms for enforcement purposes. In addition, the pilot would test the collection of additional variables that are relevant to a firm's practices. For example, age and years-on-the-job variables could assist in controlling for the legitimate effect of these characteristics on wages.

The second approach—a simplified aggregated-data pilot—would develop and test an enhanced EEO-1 report that would include all the summary data required for the computation of test statistics comparing wage data within existing EEO-1 occupations. This pilot would use grouped data techniques that would produce standardized wage rates and other measures of interest. The end product would be a prototyped method for providing screening information about pay that is based on standardized information and audited test statistic formulas.

Both approaches to the pilot studies could also test various earnings definitions, such as those used in the Bureau of Labor Statistics' Occupational Employment Survey. The tests would assess the possibility of reducing employer response burden by using commercial electronic record-keeping systems in use in the larger companies. The quality of the data collected in the pilots would be independently verified by record checks or by comparison of aggregated results with administrative databases.

More needs to be done administratively to prepare the ground prior to commencing any data collection. EEOC has a small and lightly resourced data collection and analytical program that has traditionally been focused nearly exclusively on collecting employment data, developing summary

Copyright National Academy of Sciences. All rights reserved.

statistics, and assessing individual employer compliance through the means of rather straightforward statistical tests. If data on compensation are added to an existing form, or collected in a new instrument, it is likely that the resources for both collection and analysis in the agency would be severely strained. Thus, it is important that EEOC (and its partner antidiscrimination agencies) assess their capacity to undertake any new data collection and, when necessary, enhance their capacities to take full advantage of new opportunities for analytics and compliance, using the more sophisticated measures that will be possible.

> **Recommendation 3: The U.S. Equal Employment Opportunity Commission should enhance its capacity to summarize, analyze, and protect earnings data.**

There are several possible means of collecting earnings information, ranging from pay bands (the clustering of pay levels method now used in the EEO-4 reports) to rates of pay. Pay band data are attractive in that they align with the way that human resource managers tend to look at compensation, but the best data are collected from payroll records, and those are most likely to be rates of pay or average earnings as computed with information on total wages and hours. Data on rates of pay have the advantage of being more likely to provide valid measures of central tendency and dispersion, thereby affording an important quality check and analytical capability. Rates of pay collection would add rigor to the collection process.

> **Recommendation 4: The U.S. Equal Employment Opportunity Commission should collect data on rates of pay, not actual earnings or pay bands, in a manner that permits the calculation of measures of both central tendency and dispersion.**

It is important to use a definition of compensation that is measurable, collectable, and, in the end, meaningful. There are a number of definitions that are currently in use, ranging from comprehensive measures of total compensation to simple straight-time hourly pay. The panel concludes that a measure such as that used in the Occupational Employment Survey would best illuminate earnings levels. This measure has the added benefit of being generally available because earnings data by occupation are now collected with use of this definition from more than 1.2 million establishments.

Most of the firms that fall within the scope of the EEO statutes and are now required to complete an annual EEO-1 report have the ability to provide these data from their existing payroll and human resource systems. The growing penetration of highly sophisticated software-as-a-service applications into the marketplace will further enhance the ability of establishments

Copyright National Academy of Sciences. All rights reserved.

to provide earnings data by job group and gender, race, and national origin in the future.

Finally, the sensitivity of the data that employers provide to EEOC will be heightened if earnings data are added to EEO data records, since employee compensation data are generally considered to be highly sensitive, even proprietary information, by most employers. Therefore, it will be important for EEOC to develop more sophisticated techniques for protecting data that are provided in tabular and microdata form to the public.

> **Recommendation 5: In anticipation of increased user demand for microdata on pay information by demographic detail for research and analytical purposes if such data are collected by the U.S. Equal Employment Opportunity Commission, the agency should consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications.**

In order to assure reporting employers that their data are indeed protected from disclosure, it will be important to establish clear and legally enforceable protections for sharing the data that employers provide in confidence. The agencies should consider whether the protections, now insured through the mechanism of interagency memoranda-of-understanding, should be incorporated in legislation.

> **Recommendation 6: The U.S. Equal Employment Opportunity Commission should seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to nonagency employees.**

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# 1

# Background

The U.S. Equal Employment Opportunity Commission (EEOC) has a significant and active data collection program, which primarily collects information about employment status. While EEOC currently collects some pay data in its periodic reports from state and local government agencies for antidiscrimination enforcement, the agency has not collected pay data from private-sector employers, except on a case-by-case basis as necessary to support specific investigations. With that exception, the agency has no experience in collecting pay information from the private sector.[1] In its annual collection of data from private employers (EEO-1), the EEOC collects only employment classified by job category, gender, race, and national origin.

In this chapter, we briefly summarize relevant employment discrimination laws and describe the data that are currently collected in support of EEOC's enforcement program. We also describe the current roles and responsibilities of the key federal agencies that enforce those laws and that now use the EEOC data.

---

[1] The terms *pay*, *wages,* and *earnings* are used interchangeably in this report, depending on the context. They are taken to mean remuneration for labor or services to a worker on an hourly, daily, weekly, or annual basis or by the piece. The terms *salary* and *compensation* are also used in this report: *salary* is a fixed form of pay, wages, or earnings; compensation is the total amount of the monetary and nonmonetary pay provided to an employee by an employer in return for work performed, including money, benefits, services, and in-kind payments.

SJA106
Copyright National Academy of Sciences. All rights reserved.

## LEGISLATION, AUTHORITIES, AND RESPONSIBILITIES

Discrimination in pay on the basis of sex has been outlawed by the federal government for almost 50 years, since the Equal Pay Act of 1963. Enacted as an amendment to the Fair Labor Standards Act, the Equal Pay Act's coverage is very broad. It applies to any employer "engaging in commerce or in the production of goods for commerce" with an annual gross income of $500,000 or more (29 U.S.C. § 203(s)). Government entities and health and educational institutions are covered irrespective of size. There are narrow exceptions to coverage under the statute for certain kinds of employees (see 29 U.S.C. § 213(a)).

The Equal Pay Act requires that men and women in the same workplace be given equal pay for jobs "the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" (29 U.S.C. § 206(d)(1)). Unequal pay between men and women for jobs that are substantially equal violates the act unless the employer can show that the difference in pay is attributable to a bona fide seniority, merit, or incentive system or another factor other than sex. Although the U.S. Department of Labor (DOL) was initially given authority to enforce the act, that authority was transferred to the EEOC in 1978.

Originally enacted one year after the Equal Pay Act in 1964, Title VII of the Civil Rights Act (hereafter, Title VII) prohibits a wide range of discriminatory employment practices, including discriminatory pay practices, and addresses discrimination based on sex, as well as race, color, religion, and national origin. Title VII covers private-sector employers with 15 or more employees and state and local government employers.

Under Title VII, an employee challenging pay discrimination must show that he or she is paid less than another similarly situated employee because of race, color, religion, sex, or national origin. If he or she does so, then the employer must explain the reason for the disparity. The employer may assert any of the defenses in the Equal Pay Act or a different, nondiscriminatory reason for the pay disparity. If the employer is unable to provide a satisfactory explanation for the disparity, the employer will be liable for penalties for pay discrimination. If the employer does provide a satisfactory reason for the disparity, the employee would have to show that the employer's stated reason is a pretext in order to succeed in proving pay discrimination.

Even where an employer does not intend to discriminate, a practice that is, on its face, neutral but that has the *effect* of disproportionately excluding or adversely impacting members of a protected group can violate Title VII. In such "disparate impact" cases, the individual alleging discrimination must prove—usually through statistical evidence—that the challenged practice has a substantial and significant adverse effect on a protected group.

Copyright National Academy of Sciences. All rights reserved.

If the individual proves this, the employer will be liable for discrimination unless it can show that the practice in question is job related and consistent with business necessity. If an employer can demonstrate that a practice is indeed justified, the individual will be given an opportunity to prove that there are other practices that would also serve the employer's purposes, but with less impact on the protected group.

Title VII's prohibitions on compensation discrimination are broader than those contained in the Equal Pay Act. For example, under Title VII, an employee can challenge not only unequal pay between men and women performing substantially equal work, but also discriminatory practices that lead to unequal compensation, such as steering women to lower paid jobs than men or maintaining "glass ceilings," artificial barriers to the advancement of women.

Title VII empowers the EEOC to accept and investigate charges of discrimination from persons who believe they have been subjected to employment discrimination and from those acting on their behalf. Title VII also allows for members of the commission itself to file charges of unlawful employment practices against employers. The EEOC is also empowered to open "directed investigations" under the Equal Pay Act, thereby allowing the EEOC to investigate the possibility of a violation of the act without having received a charge of discrimination from an aggrieved person.

Individuals must exhaust their administrative remedies through the EEOC prior to filing a lawsuit under Title VII. But under the Equal Pay Act, while aggrieved persons may file charges of discrimination with the EEOC, they are not required to do so in order to file a lawsuit under the act. Moreover, filing a charge under the act with the EEOC does not suspend the statute of limitations under the Equal Pay Act, as it does under Title VII. For this reason, and in light of the significant time it can take to exhaust administrative remedies through the EEOC, some aggrieved individuals find it preferable to file a lawsuit under the Equal Pay Act without filing a charge with the EEOC.

Under both Title VII and the Equal Pay Act, the EEOC investigates charges of discrimination and seeks to resolve them without litigation. However, the EEOC litigates a number of charges in which conciliation has failed each year. Under Title VII, the EEOC can litigate cases against private employers; charges against state and local governmental entities have to be referred to the U.S. Department of Justice (DOJ) for litigation. Under the Equal Pay Act, the EEOC may litigate against any covered employer, private or public.

In fiscal 2010, a total of 99,922 charges were filed, many for multiple allegations of discrimination (U.S. Equal Opportunity Commission, 2010). Relatively few of those multiple allegation charges included wage discrimination; far fewer were for wage discrimination only: see Table 1-1. The

SJA108
Copyright National Academy of Sciences. All rights reserved.

**TABLE 1-1** Charges Filed with U.S. Equal Employment Opportunity Commission, by Issue: October 1, 2009, to September 30, 2010

| Issue | Total Charges | Basis for Charge | |
| | | Race/National Origin | Gender |
| --- | --- | --- | --- |
| Total charges in which wage discrimination was an issue | 4,478 | 2,314 | 2,164 |
| Charges alleging only wage discrimination | 638 | 282 | 356 |
| Percent of wage discrimination charges in which wage discrimination was the only allegation | 14.3% | 12.2% | 16.5% |

SOURCE: Data from U.S. Equal Opportunity Commission.

majority of wage charges also involved other issues, most commonly terms and conditions of employment, termination, promotions, or discharges.

The Employment Litigation Section of the DOJ's Civil Rights Division is also charged with the enforcement of Title VII of the Civil Rights Act. Specifically, DOJ has jurisdiction to enforce Title VII against state and local government employers nationwide. DOJ can initiate litigation under Title VII in two ways: (1) DOJ has independent authority to bring suit against a state or local government employer when there is reason to believe that a "pattern or practice" of discrimination exists; or (2) DOJ may investigate and file suit against a state or local government employer based on an individual charge of discrimination referred by the EEOC. DOJ can initiate such a suit if the EEOC has found reasonable cause to believe that discrimination occurred, the EEOC's efforts to obtain voluntary compliance have been unsuccessful, and EEOC has referred the charge to DOJ.

The Office of Federal Contract Compliance Programs (OFCCP) in DOL is responsible for making certain federal contractors follow requirements in the Executive Order 11246 (issued in 1965) to practice equal opportunity and take affirmative action on issues of race and gender.[2] In addition, OFCCP is responsible for enforcing Section 503 of the Rehabilitation Act of 1973, covering persons with disabilities, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), covering veterans and disabled veterans. Under these laws, federal contractors must provide equal employment opportunities and take affirmative action to

[2]In addition to race and sex, Executive Order 11246 (originally implemented in 1965) addresses equal opportunity on the basis of religion, color, and national origin.

Copyright National Academy of Sciences. All rights reserved.

employ and advance applicants and employees; provide reasonable accommodations to disabled employees and applicants; prepare Affirmative Action Plans (AAPs); permit OFCCP access during compliance reviews; and file an annual report with the EEOC.[3]

OFCCP regulations require contractors to maintain records on employee compensation and provide them on request (41 C.F.R. § 60-1.12(a), covering records on "rates of pay or other terms of compensation"). The regulations also require contractors to "regularly" monitor their compensation systems for potential pay disparities based on race and gender, develop and implement appropriate corrections to any problem areas they identify, and report the results of their internal monitoring to management (41 C.F.R. § 60-2.17). This language apparently requires federal contractors to maintain data on earnings by demographic characteristics.

### EEOC DATA COLLECTION AND REPORTS

The various laws and regulations to enforce antidiscrimination laws are accompanied by laws and regulations for the federal government to collect data that can be used in their enforcement. The EEOC uses its authority under Section 2000e-8(c) of Title VII to collect workforce data from employers. The statute requires employers to preserve "records relevant to the determinations of whether unlawful employment practices have been or are being committed," and to "make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of [Title VII] or the regulations or orders thereunder."

The EEOC currently collects workforce data from private-sector employers with more than 100 employees, from federal contractors with 50 or more employees, and from all state and local government employers. Employers that meet the reporting thresholds have a legal obligation to provide the data; it is not voluntary. The data are collected through several equal employment opportunity (EEO) reports.

There are four versions of the required EEO reports, each addressed to different employer groups. Each of the versions collects employment data about gender and race/ethnicity by some type of job grouping; each provides, in essence, a snapshot of the demographics of the workplace by job category. Copies of these report forms are provided in Appendix A.

---

[3]The application of each of these requirements may vary on the basis of contract size and number of employees.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 1-2** EEO-1 Reports by Number of Employees Covered and Percentage Female and Minority, 2010

| Size of Firm | Number of Firms | Number of Employees | Percentage Female | Percentage Minority |
|---|---|---|---|---|
| TOTAL | 67,422 | 59,128,582 | | |
| 5th percentile: 1–67 employees[a] | 3,443 | 191,965 | 38.6 | 26.8 |
| 5th–25th percentile: 68–120 employees | 13,511 | 1,312,297 | 41.7 | 29.6 |
| 25th–50th percentile: 121–194 employees | 16,875 | 2,587,008 | 45.6 | 31.1 |
| 50th–75th percentile: 195–407 employees | 16,767 | 4,615,048 | 46.6 | 32.6 |
| 75th–90th percentile: 408–1,118 employees | 10,090 | 6,541,695 | 47.4 | 33.6 |
| 90th percentile and higher: more than 1,118 employees | 6,736 | 43,880,569 | 50.0 | 34.8 |

[a]Includes only firms with at least 50 employees.
SOURCE: Data from U.S. Equal Employment Opportunity Commission (2010 EEO-1 Aggregate Report of U.S.).

## EEO-1 Report

The EEO-1 report is required from private employers with: 100 or more employees or 50 or more employees and a federal contract. Firms must file a separate report for each facility with 50 or more employees. Approximately 67,000 firms filed more than 1.3 million EEO-1 reports (Standard Form 100) in 2009 and 2010. For 2010, the reports covered 59 million employees, which is almost one-half of the 108 million employees for all firms in the private sector. The largest 10 percent of covered firms represented about 75 percent of covered employment, and covered firms with 120 employees or less represented only about 2.5 percent of covered employment: see Table 1-2.

Employers are required to file the EEO-1 report annually to the EEO-1 Joint Reporting Committee (joint between EEOC and OFCCP) (due on September 30). The data elements that are collected include 7 race/ethnicity categories and 10 job groups, by gender.[4] Employers may use employment

---

[4]The race/ethnicity categories are Hispanic or Latino, and—under not Hispanic or Latino— white, black or African American, Native Hawaiian or Other Pacific Islander, Asian, American Indian or Alaska Native, and two or more races. The 10 job groups are executive/senior level officials and managers; first- or mid-level officials and managers; professionals; technicians; sales workers; administrative support workers (formerly, office and clerical workers);

Copyright National Academy of Sciences. All rights reserved.

figures from any pay period in July through September. Employers may submit their EEO-1 reports on paper forms, as data files[5] by electronic transfer, or by keying the data online through the EEO-1 online filing system. About 99 percent of the reports are received electronically.

There are different types of reports for single establishment employers and multiple establishment employers. Multiple establishment reports must include a consolidated form that includes all employment for the company, one for headquarters locations, and one for each location with 50 or more employees. Locations with fewer than 50 employees are required to report only the address and total number of employees at that establishment, rather than a complete matrix.

## EEO-3 Report

The EEO-3 report form is used for referral unions, which are generally unions with exclusive hiring arrangements with an employer. The report is required in even-numbered years with a due date of December 31. The EEO-3 form collects data on membership and referrals by race/ethnicity and gender. In 2010, there were about 1,200 reporting unions. The reports are used for enforcement and provide basic membership and referral data for investigators. They also allow statistical analyses to examine equity in membership and referrals.

## EEO-4 Report

The EEO-4 report form is used for state and local governments. It is required in odd-numbered years and is due on September 30. Approximately 6,000 jurisdictions filed EEO-4 reports in 2009. The reports that year covered 5,980,305 employees.

This is the only EEO report that now collects employment data by job group and salary ranges for race/ethnicity and gender, with separate reports by function. Data are also collected separately for part-time employees and new hires. (See Chapter 3 for discussion of the wage data that are collected in this survey.)

---

craft workers (formerly, craft workers, skilled); operatives (formerly, operatives, semiskilled); laborers and helpers (formerly, laborers, unskilled); and service workers.

[5]The files are sent as ASCII/text files, a simple data transfer that does not use developing techniques such as XML.

Copyright National Academy of Sciences. All rights reserved.

### EEO-5 Report

The EEO-5 report form is used for primary and secondary public school districts. It is required in even-numbered years with a due date of November 30. For 2010, the EEOC received more than 5,800 of these reports. The data are collected from each school district with 100 or more employees by race/ethnicity and gender for relatively detailed job groups.[6] EEO-5 data are also collected for part-time employees and for new hires.[7]

## WHITE HOUSE TASK FORCE REPORT AND PANEL CHARGE

Following President Obama's pledge in the 2010 State of the Union address to increase enforcement of equal pay laws, the administration established the National Equal Pay Enforcement Task Force in 2010, bringing together EEOC, DOJ, DOL, and the Office of Personnel Management (OPM). The task force identified several challenges to successful enforcement of compensation discrimination laws and made recommendations to address each challenge. Three of the five challenges identified by the task force have implications for this report:

- Three different federal agencies have distinct responsibilities to enforce the laws prohibiting pay discrimination, and the agencies do not consistently coordinate these responsibilities.
- The government's ability to understand the full scope of the wage gap and to identify and combat wage discrimination is limited by the data that are currently available. As the task force report says, "this lack of data makes identifying wage discrimination difficult and undercuts enforcement efforts. We must identify ways to collect wage data from employers that are useful to enforcement agencies but do not create unnecessary burdens on employers" (National Equal Pay Task Force, 2010, p. 5).
- Existing laws do not always provide federal officials with adequate tools to fight wage discrimination. The task force report noted the administration's strong support for the Paycheck Fairness Act, which would have required EEOC to use its data collection

---

[6]The job groups are officials, administrators, and managers; principals; teaching assistant principals; nonteaching assistant principals; elementary classroom teachers; secondary classroom teachers; other classroom teachers; guidance staff; psychological staff; librarians and audiovisual staff; consultants and supervisors of instruction; other professional staff; teacher aides; technicians; clerical and secretarial staff; service workers; skilled crafts; and unskilled laborers.

[7]Part-time employees are grouped by professional, instructional, and all other; new hires are grouped by officials, administrators, managers, principals and assistant principals, classroom teachers, other professional staff, and nonprofessional staff.

Copyright National Academy of Sciences. All rights reserved.

---

**BOX 1-1**
**Statement of Task**

The National Research Council through its Committee on National Statistics (CNSTAT) will convene a panel of experts to review methods for measuring and collecting pay information from U.S. employers for the purpose of administering Section 709 of the Civil Rights Act of 1964, as amended. The panel will evaluate currently available and potential data sources, methodological requirements, and appropriate statistical techniques for the measurement and collection of employer pay data. The panel will consider suitable data collection instruments, procedures for reducing reporting burdens on employers, and confidentiality, disclosure, and data access issues. It will issue a report with findings and recommendations on what data the EEOC should collect to enhance wage discrimination law enforcement efforts, which will assist the Equal Employment Opportunity Commission (EEOC) in formulating regulations at the conclusion of an 18-month study.

---

authority to implement a pay data collection program within 18 months of its enactment. Specifically, the bill text would require EEOC to "consider factors including the imposition of burdens on employers, the frequency of required data collection reports (including which employers should be required to prepare reports), appropriate protections for maintaining data confidentiality, and the most effective format for the data collection reports."[8] The Paycheck Fairness Act would also have amended the Equal Pay Act to prohibit employers from retaliating against employees for discussing their pay.[9]

The EEOC charge to the panel stressed that it is important for the panel to bear in mind the key considerations about the balance between enforcement utility and burdens on employers. Regardless of the fate of the Paycheck Fairness Act, the EEOC wants to ensure that any effort to collect wages takes into full account the considerations expressed in the Act regarding burden on employers, confidentiality, and appropriate format for collection. The complete statement of task is in Box 1-1.

---

[8]This text is from the 112th Congress version of the bill, S. 3220.

[9]The legislation passed the House of Representatives in 2009 but then failed in a cloture vote in the Senate in 2010. It has since been reintroduced in both chambers in the 112th Congress, with the Senate version (S. 3220) failing a cloture vote in June 2012.

Copyright National Academy of Sciences. All rights reserved.

## PAY RATE INFORMATION

The employment data collected by EEOC are currently used for a variety of purposes, including enforcement, self-assessment by employers, and research. The EEOC's current collection of employment data contributes significantly to the efficiency of EEOC investigations and particularly to the development of systemic investigations. However, in a statement submitted to the panel, EEOC chair Jacqueline A. Berrien stated that the agency sees the absence of "employer-specific pay data broken down by demographic category" as a "significant barrier" to the agency's work to eradicate pay discrimination. Berrien contrasted pay discrimination, a form of discrimination she described as "largely invisible," with other forms of discrimination that are easier to detect and that EEOC can more easily confirm or refute through the use of its current data collections.

Many workplaces explicitly prohibit employees from discussing pay, and even in the absence of an explicit prohibition, employees in the United States rarely discuss their pay with one another. Because very few people know what their coworkers are paid, few people file complaints with the EEOC alleging that they are being paid in a discriminatory manner. In his testimony to the panel, EEOC commissioner Stuart Ishimaru pointed out that sex-based wage charges have made up a surprisingly small portion of the charges EEOC has received—about 2.5 percent.

Berrien contended that, in addition to strengthening the EEOC enforcement program under Title VII and the Equal Pay Act, better pay data collection would also assist employers in monitoring their compliance with federal, state, and local laws prohibiting wage discrimination. By maintaining accurate pay data, Berrien said, employers will be able "to compare and identify pay differentials that deserve closer scrutiny and to detect other patterns that may suggest departures from the standard of equal pay for equal work."

## EARNINGS INFORMATION

### Use by OFCCP[10]

OFCCP officials similarly argued for the collection of earnings information in a presentation to the panel. Under the authorities discussed above, federal contractors must provide equal employment opportunities, take affirmative action to employ and advance their employees, and make reasonable accommodations to employees and applicants.

---

[10]This section summarizes a presentation to the panel by Pamela Coukos, senior program advisor, OFCCP.

Copyright National Academy of Sciences. All rights reserved.

A major requirement imposed on certain covered federal contractors is to develop an AAP. To meet this requirement, contractors must maintain appropriate records by establishment or function. The AAP data requirements cover the following topics: an organizational profile; a job group analysis; and information on placement of incumbents, determining availability, and comparing incumbency to availability. The AAP should spell out placement goals and designate an individual responsible for implementation. Problem areas need to be identified and action-oriented programs specified, and the plans need to be audited periodically.

The AAP instructions call on employers to group jobs by similar pay and work content and to classify them into an appropriate EEO category based on similar duties and responsibilities, as well as similar opportunities for training, transfer, pay, and promotion, and similar jobs in lines of progression. An example of an AAP workforce analysis is shown in Table 1-3.

The OFCCP has minimum employee and contract size requirements for federal contractors[11] and different rules for construction contractors. For example, construction contractors with federal contracts or subcontracts valued at more than $10,000 in any 12-month period are covered by Executive Order 11246 at all construction worksites in the United States (Office of Federal Contract Compliance Programs, 2009).

The enforcement activities of OFCCP primarily involve full compliance reviews. These reviews begin with desk audits of information submitted by a contractor in response to a scheduling letter, and they may also include an onsite review. Contractors are identified as being subject to enforcement activities based, in part, on a system called the Federal Contractor Selection System (FCSS). This system draws information from the universe of EEO-1 reports and federal contractor databases. Using these data sources, OFCCP selects contractors based on threshold requirements, sampling procedures, and mathematical modeling.

An OFCCP compensation analysis consists of an initial review of average pay differences for job categories. The agency then performs a statistical or individual analysis as appropriate (depending on sample size and available data) and further review and analysis based on contractor pay practices and data. These data are used to assess the company's practices. The investigation is designed to answer some basic questions: Are there pay differences between employees in a protected class and otherwise similar

---

[11]Basically, all federal contracts and subcontracts are covered under Executive Order 11246 unless specifically exempted. Contracts and subcontracts of less than $10,000 generally are exempt, though some contracts under that amount are covered (e.g., bills of lading). Also exempt is work performed outside the United States; certain contracts with state or local governments; contracts with religious corporations, associations, and educational institutions; and contracts involving work on or near an Indian reservation. See 41 C.F.R. § 60-1.5.

SJA116
Copyright National Academy of Sciences. All rights reserved.

TABLE 1-3 Example of an Employer's Workforce Analysis for an Affirmative Action Plan

***Workforce Analysis***

**DEPARTMENT/WORK UNIT: Administration**

| Job Title | Wage Rate | EEO-1 Category (EEO-1 Form or OFCCP regulations) | Job Group | Total Employees | MALES Total | White | Black/African American | Asian/Pacific Islander | American Indian/Alaskan Native | Hispanic | FEMALES Total | White | Black/African American | Asian/Pacific Islander | American Indian/Alaskan Native | Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General Manager | S-A | 1 | 1 | 1 | 1 | 1 | | | | | | | | | | |
| Personnel Manager | S-D | 1 | 1 | 1 | 1 | 1 | | | | | | | | | | |
| Executive Assistant | S-J | 5 | 5 | 1 | | | | | | | 1 | 1 | | | | |
| Administrative Assistant | H-8 | 5 | 5 | 1 | | | | | | | 1 | | 1 | | | |
| File Clerk | H-11 | 5 | 5 | 2 | 1 | | | | | 1 | 1 | | | | 1 | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| DEPARTMENT TOTAL | | | | 6 | 3 | 2 | | | | 1 | 3 | 1 | 1 | | 1 | |

SOURCE: U.S. Department of Labor, available: http://www.dol.gov/ofccp/regs/compliance/pdf/sampleaap.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

employees? Are there differences in salary/hourly rate, promotions, job assignment, and access to earning opportunities? Are there legitimate explanations for any differences?

At the time this report was being prepared, OFCCP was considering a new compensation reporting tool that would proactively allow the agency to more effectively identify potential violations of Executive Order 11246. The agency has requested public input on the kind of instrument that could be used for this purpose. This initiative is discussed in Chapter 2.

### Use by DOJ[12]

According to Jocelyn Samuels, senior counselor to the assistant attorney general for civil rights of DOJ, the department uses data, including pay data, gleaned from the EEO-4 reports to fulfill its responsibilities under antidiscrimination statutes. The "pattern or practice" cases initiated based on the department's independent authority under Title VII, Samuels told the panel, "are factually and legally complex cases that seek systemic injunctive relief to alter unlawful employment practices—such as discriminatory recruitment, hiring, assignment or promotion policies—which have the purpose or the unjustified effect of denying employment or promotional opportunities to a class of individuals." DOJ may also investigate and file suit against a state or local government employer based on an individual charge of discrimination referred by the EEOC, as described above.

The department routinely consults and relies on the information included in the EEO-4 reports regarding workforce composition and new hires, in combination with other information, to determine whether or not to use its enforcement jurisdiction to investigate a specific state or local government employer. Specifically, the department relies on EEO-4 reports for data on the demographics of different job categories in an employer's workforce to assist in deciding whether to pursue investigations of allegations that may constitute a "pattern or practice" of discrimination. The EEO-4 information enables comparisons of an employer's workforce in a particular job category to an applicable benchmark—such as civilian labor force data in the relevant geographic area taken from census and survey sources—to determine whether a particular group appears to be underrepresented in that job category or in the employer's workforce as a whole. The comparison provides a basis to estimate whether there is a disparity in representation in the workforce and to make an initial assessment of the significance of the disparity, which is one factor that informs the department's

---

[12]Statement of Jocelyn Samuels to the Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin Workshop, May 24, 2011.

Copyright National Academy of Sciences. All rights reserved.

evaluation of whether to open an investigation in order to gather more detailed information from an employer.

In her presentation to the panel, Samuels stated that the demographic data collected on the EEO-4 reports are invaluable for enforcement purposes, but the wage data on the form are currently less useful. The job categories and the wage bands reported on the EEO-4 form are too broad, and the current EEO-4 form does not include any other information, such as longevity (years of service), which can be a key determinant of salary in the public sector.

In order to allow meaningful analysis, the department needs salary information in narrower job classes and information about years of service in the job class. In addition, according to Samuels, salary information should be collected in narrower bands, and should, to the extent possible, reflect the entire amount earned, not solely base pay. State reports suggest that these data are readily available in many states.[13]

In addition, DOJ has recently executed a memorandum of understanding with the EEOC in order to obtain access to EEO-1 data for private employers. DOJ anticipates that it will use these data in enforcement efforts for comparison purposes in job categories that exist in both the public and private workforce.

### Use for Analysis and Research

In their presentations to the panel, the representatives of the EEOC, OFCCP, and DOJ emphasized the enforcement purposes behind the collection of data from employers and unions. However, by virtue of their depth and coverage, these data also have statistical, analytical, and research uses.

EEOC publishes annual statistical summaries of employment data from the EEO-1 and EEO-4 reports, as well as information received from federal government departments and agencies, on its website in three series: *Job Patterns for Minorities and Women in Private Industry* (EEO-1); *Job Patterns for Minorities and Women in State and Local Government* (EEO-4); and *Federal Sector Reports*. The employment data by race/ethnicity and sex are published by industry, geographic area (state and local areas), and job category.

As part of an emphasis on proactive prevention, EEOC's Office of Research, Information, and Planning has produced a series of reports based on EEO-1 data. The reports over the past decade have focused on industries and sectors (the finance industry, retail distribution centers, the media, high-end department stores, investment banking, broadcasting, and law firms)

---

[13]For example, see information from the Florida Bureau of State Payrolls, available at: http://www.archive.org/details/StateOfFloridaPayrollDatabase2008 [July 2012].

Copyright National Academy of Sciences. All rights reserved.

as well as on particular labor market topics, including *How New Business Processes Impact Minority Labor Markets*; *Women of Color: Their Employment in the Private Sector*; *Glass Ceilings: The Status of Women as Officials and Managers in the Private Sector*; and *Characteristics of Private Sector Employment Report.*

A major use of the employment data is in the context of charge-based investigations, in which the data are used to assist EEOC in identifying employers that warrant statistical comparisons, which could, in turn, trigger further investigation of their EEO practices. For example, using the EEO-1 reports of the numbers of employees in the establishment(s) in a certain job group and gender, race, and ethnic category, EEOC staff calculate a number of indicators that are designed to assess the EEO status of the firm. Those indicators include

- *Actual number*: The reported number of employees in a particular job group and gender, race, and ethnic category.
- *Expected number*: The number of employees that would be expected to exist in that certain job group and gender, race, and ethnic category according to the percentage employed by comparison establishments that have been selected based on specified geographic and industrial scope.
- *Difference*: The difference between the actual number and expected number of employees in a certain job group and gender, race, and ethnic category. If the difference is positive, the establishment is over the expected number; if it is negative, the number of employees in that category is below the expected number—a difference that is often referred to as a "shortfall."
- *Actual percent*: The percentage of employees in a certain job group and gender, race, and ethnic category.
- *Expected percent*: The percentage of employees that would be expected in that certain occupational and gender, race, and ethnic category based on that percentage in comparison establishments.
- *Two-tail probability*: A binomial statistical significance test, which is used to determine if the differences between the actual and expected numbers are statistically significant.

Administratively, EEOC primarily uses the EEO-1 data to identify potential discriminatory practices in the context of an investigation of a charge and to otherwise support investigations. The EEO-1 data are used in different ways at different stages of the investigation, and the analysis becomes more refined as the investigation progresses.

In a presentation to the panel, Bliss Cartwright of the EEOC Office of Research, Information, and Planning discussed these uses, selecting as a

Copyright National Academy of Sciences. All rights reserved.

hypothetical example a comparison of gender employment in one firm to employment in similar firms in the labor market. In his example, the firm had 180 female professionals of 624 total professionals, about 29 percent: in contrast, the proportion of female professionals in the labor market was 40 percent. He assumed that the labor market percentage was estimated by aggregate EEO-1 data on other firms in similar industries and locations, and he applied a one-sample binomial test of statistical significance. The main characteristics of this hypothetical example can be summarized as follows:

- Total Professionals: 624
- Female Professionals: 180
- Observed Proportion: 0.2885
- Labor Market Proportion: 0.4067
- Null Hypothesis: No Difference
- Two-Tailed Probability: <0.0000 (less than one chance out of 10,000)
- Conclusion: Substantial Evidence Against Null Hypothesis of No Difference in Proportions

Other situations may require more refined analyses. For example, sometimes a national firm has many facilities, hiring workers for the same job in different local labor markets. Alternatively, a single firm may recruit executives from a national market, midlevel managers from a regional market, and operatives from a local market. The issue is that there are multiple units of analysis, each with different employee counts and labor market estimates. In these situations, other statistical methods might be more appropriate. For example, Cartwright illustrated one approach commonly known as a pooled binomial (Gastwirth and Greenhouse, 1987), which provides an estimate of the overall shortfalls giving a single probability value. It also allows examination of homogeneity, the extent to which the units of analysis differ from each other.

The next step in an analysis is to seek additional information from an employer through a request for information (RFI) that is tailored to the potential infraction alleged in the charge. For hiring issues, for example, EEOC typically requests files with demographic information, applicant flow data, and job history records. The requested data may be extensive. The job history information typically contains the effective date of the hire or the action that distinguishes initial hires from rehires or returns by use of employee identification numbers. The requested records also include specific job titles, divisions, and salary grades. At this stage, a wide variety of statistical methods would be considered—including linear regression,

Copyright National Academy of Sciences. All rights reserved.

survival analysis, and stratified contingency tables—depending on the facts and issues in a particular case.

## Understanding the Labor Market

Since collection of information about employment by gender, race, national origin, and job category was initiated on a regular basis in the 1970s, there has been intense interest by the academic community in using the data to understand labor markets, especially the effect of governmental programs and corporate human resource practices on employment discrimination. EEO-1 reports and enforcement data from the OFCCP have been used to examine the effect of affirmative action and other factors on the employment of minorities and women across different sectors of the economy.

Selden (2006) assessed a variety of studies that transcended disciplines,[14] pointing out that most use the EEO-1 survey data to examine the impact of affirmative action on minority and female employment shares among firms with or without federal contracts in the private sector. Selden summarized work by Leonard (1990) that concluded that affirmative action led to employment gains among women and minorities for the period 1974–1980 and rose more significantly for federal contractors than for noncontractors. Selden (2006, p. 915) concluded that "overall, studies using EEO-1 data have shown that affirmative action has significantly and positively influenced the minority employment share in the private sector, particularly in unskilled positions."

Although there have been difficulties in obtaining access to EEOC's survey data, the agency has made significant efforts to increase the access that researchers have to these data. Since 1996 the EEOC has entered into agreements with more than 35 researchers to allow access to these confidential databases. Much of this work has been published in peer-reviewed articles and books, which in many cases have raised new questions and topics for academic research. In economics, for example, Donohoe and Levitt (2001), McCrary (2007), and Miller and Segal (2011) examined the relationship between diversity and crime rates using EEO-4 data. In sociology, Dobbin, Kalev, and Kelly (2006) examined how personnel practices impact a firm's work force diversity, particularly in management. These researchers also examined the impact of OFCCP compliance reviews and Title VII lawsuits on employment profiles (Dobbin, Kalev, and Kelly, 2007; Kalev and Dobbin,

---

[14]Selden's assessment covered Ashenfelter and Heckman (1976); Chay (1998); Goldstein and Smith (1976); Holzer and Neumark (2000a, 2000b); Kellough (1990a, 1990b); Leonard (1984a, 1984b, 1990); Naff (2001); Naylor and Rosenbloom (2004); Rodgers and Spriggs (1996); Stephanopoulos and Edley (1995); and U.S. General Accounting Office (1991).

Copyright National Academy of Sciences. All rights reserved.

2009), and Kalev (2009) examined how work restructuring impacts occupational segregation based on race and gender.

A wide range of other work has also been done. Several researchers compared firm-level and sector-level changes in segregation by race, ethnicity, and sex (Stainback and Tomaskovic-Devey, 2009; Stainback, Robinson, and Tomaskovic-Devey, 2005). Huffman, Cohen, and Pearlman (2010) studied the impact of women managers on firm gender integration for the period 1975–1990. Skaggs (2008) studied how government action, including court decisions, affected female employment in food stores. Several other researchers explored the impact of various factors, including EEOC charge processing, on the employment of women and nonwhites (Hirsh, 2008, 2009; Hirsh and Kmec, 2009; Hirsh and Kornrich, 2008). Yet another group of researchers used EEO-4 data for a series of articles examining diversity in state and local governments including an examination of glass ceilings among those employers (Kerr, Reid, and Miller, 1999, 2000a, 2000b, 2002, 2003, 2004). All of this research has been done even with the difficulties of obtaining access to the data, which are discussed in Chapter 5, and in the absence of compensation data.

In the absence of employer-based earnings data by job category and demographics, however, the research community largely turned to household data to support analysis of the extent and effect of compensation discrimination in the labor market. The Current Population Survey and, more recently, the American Community Survey have emerged as powerful sources of data on earnings, industry groups, occupations, and demographics. However, these sources are limited because they do not associate the indicators of discrimination with actual employer situations and practices, nor can they be directly linked to measures of enforcement.

There is clearly a strong research and analytical interest in having an earnings dimension to establishment, occupation, and demographic data (see, e.g., Consad Research Corporation, 2009, p. 2). It is expected that there would be significant pressure on agencies that held data enriched with earnings information to make them available for analytical uses by private sector researchers. Such data could quickly become a primary source for new analytic work on equal employment and compensation issues.

### Auditing the Effectiveness and Efficiency of Antidiscrimination Programs

Over the years, Congress and a number of government agencies have used data collected on EEO-1 forms to assess the effectiveness of government antidiscrimination programs. Just as the research community would benefit from the availability of earnings data, these agencies would be expected to take advantage of earnings information to sharpen their auditing reports.

SJA123
Copyright National Academy of Sciences. All rights reserved.

The U.S. Government Accountability Office (GAO), in particular, has been at the forefront in terms of using employment data by job category and demographics. In the past two decades, GAO has published seven major studies that have been based in part on the EEOC employment data:

- *Sharing Promising Practices and Fully Implementing Strategic Human Capital Planning Can Improve Management of Growing Workload* (2008);
- *Financial Services Industry: Overall Trends in Management-Level Diversity and Diversity Initiatives* (2006);
- *Equal Employment Opportunity: The Policy Framework in the Federal Workplace and the Roles of EEOC and OPM* (2005);
- *Women's Earnings: Work Patterns Partially Explain Difference between Men's and Women's Earnings* (2003);
- *Equal Employment Opportunity: Discrimination Complaint Caseloads and Underlying Causes Require EEOC's Sustained Attention* (2000);
- *Equal Employment Opportunity: DOL Contract Compliance Reviews Could Better Target Federal Contractors* (1995); and
- *EEOC: An Overview* (1993).

### Cross-Checking the Integrity of EEO Data

An additional justification for the collection of pay data is that they may help to improve the integrity of EEO employment data. Smith and Welch (1984) found some evidence that the number of minorities and women reported to be in high-level occupations by their employers on EEO-1 forms exceeded the number who reported themselves to be in those occupations in the Current Population Survey. To the extent that some employers of minority- or female-intensive occupations systematically upgrade (or misclassify) them, it would cause unusual pay compression across EEO-1 job categories and unusual pay dispersion within the higher level occupations. Being able to make such assessments by using pay data would be valuable for evaluation purposes.

SJA124
Copyright National Academy of Sciences. All rights reserved.

# 2

# Alternative Sources of Wage Data

The charge to this panel included a request to "evaluate currently available and potential data sources" for measuring and collecting pay information from U.S. employers for the purpose of administering Section 709 of the Civil Rights Act of 1964. We begin our response to this part of the charge with a discussion of the collection of earnings data from public-sector employers on the EEO [equal employment opportunity] form 4, or EEO-4. Indeed, the Equal Employment Opportunity Commission (EEOC) has some experience from which to draw when considering the collection of earnings data because the agency now collects wage band information on the EEO-4 form.

We also discuss other possible sources of wage information and the experiences of other agencies in collecting such information.[1] We first consider the capacity of existing federal administrative data series that include earnings information from employers to meet a requirement for wage information by gender, race, and national origin. If these administrative data, mostly from tax collections, could suffice to provide the necessary wage data for use in antidiscrimination enforcement, a new data collection process could be avoided. Unfortunately, as discussed in this chapter, the use of administrative data is not a promising path because of data incompleteness and uncertain quality.

---

[1]This report does not assess another data source that has appeared recently in which individual employees self-report pay by employer, occupation, and location on a variety of websites; these self-postings sometimes include pay stubs. These self-reports are not a random sample, offer little or no demographic information, have variable or in many cases no coverage of occupations, and are difficult to verify.

SJA125
Copyright National Academy of Sciences. All rights reserved.

We then consider the experience of the Office of Federal Contract Compliance Programs (OFCCP) of the U.S. Department of Labor (DOL) with collection of earnings information on a trial basis a decade ago. The lessons learned in that experiment should be considered by EEOC as it considers collecting earnings information.

We also discuss the data collection programs of the states of New Mexico and Minnesota and the Canadian province of Ontario. These jurisdictions now gather earnings information from employers for pay equity purposes. We assess the potential of these collections to inform an EEOC decision on whether and how to collect earnings information.

Finally, we consider survey-based wage information and discuss three Bureau of Labor Statistics (BLS) surveys—the Current Employment Statistics (CES) Survey, the National Compensation Survey (NCS), and the Occupational Employment Statistics (OES) Survey. These surveys can inform the collection of wage data and provide a source of potential validation information for data series that could be collected by EEOC, but we do not judge them to be suitable sources for the wage data for EEO enforcement purposes. They do not collect data by gender, race, or national origin; they are covered by strict confidentiality provisions, which limit their use for enforcement; and they do not cover all establishments covered by EEO laws and executive orders.

## DATA FROM EEO-4 REPORTS

As noted in Chapter 1, EEO-4 reports are collected in odd-numbered years from state and local governments: in 2009 approximately 6,000 jurisdictions filed EEO-4 reports that covered 3,238,769 employees. The report collects employment data by job group and salary ranges for race/ethnicity and gender, with separate reports by function (e.g., streets and highways, health, corrections). Data are also collected separately for part-time employees and new hires.

The EEO-4 report is the only one that collects any wage-related data. It collects annual salaries by job category for eight pay bands:

1. $1,000 to $15,999
2. $16,000 to $19,999
3. $20,000 to $24,999
4. $25,000 to $32,999
5. $33,000 to $42,999
6. $43,000 to $54,999
7. $55,000 to $69,999
8. $70,000 and over

Copyright National Academy of Sciences. All rights reserved.

The pay band data are collected for eight job categories:

1. officials and administrators
2. professionals
3. technicians
4. protective service workers
5. paraprofessionals
6. administrative support
7. skilled craft workers
8. service and maintenance workers

The wage data collected on this report have some limitations, according to EEOC commissioner Stuart Ishimiru, who addressed the panel on May 24, 2011. The form requests wage data by race, ethnic origin, and gender, but the wages are reported in broad intervals that do not allow for precise comparisons. Similarly, according to the commissioner, the job categories for which wages are reported are so broad that they are rarely if ever used to conduct wage disparity analyses. Despite these limitations, the reports are used extensively by the U.S. Department of Justice (DOJ) for administrative and enforcement purposes. Academic institutions use these reports for self-assessment purposes.

## ADMINISTRATIVE DATA

The federal government and state agencies now collect a massive amount of wage data from employers and maintain them in the form of administrative records of three tax systems. Two of these systems are administered by federal agencies—the Internal Revenue Service (IRS) and the Social Security Administration (SSA)—and one by state unemployment insurance agencies under the auspices of the DOL's Employment and Training Administration (for details, see Greenia, Appendix B of this volume). The three administrative data systems are used primarily to collect taxes and determine benefits for the purposes of administering and funding the federal income tax system (by the IRS), the Social Security and Medicare programs (by SSA), and the joint state-federal unemployment insurance (UI) system.

The data are used by the programs that collect them for purposes of enforcement of their own laws and regulations. In select circumstances, federal legislation has also authorized use of these data for enforcement purposes in other programs. For example, a new hires database derived from UI filings is used by the Administration for Children and Families in the U.S. Department of Health and Human Services to facilitate finding employed parents who are not making required child support payments

Copyright National Academy of Sciences. All rights reserved.

under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996.[2]

National compilations of statistics are produced from the three sets of data by the pertinent statistical offices of IRS and SSA, as well as the Bureau of Labor Statistics (BLS).[3] In addition, the data are used for policy analysis by the Joint Committee on Taxation of Congress, the Congressional Budget Office, and the Office of Tax Analysis in the U.S. Department of the Treasury. The data are also used for analysis by academic researchers, through the Intergovernmental Personnel Act, as well as through the U.S. Census Bureau's Research Data Centers. Table 2-1 summarizes the availability of items from each of these administrative records sources.

According to Greenia (Appendix B of this volume), the three sets of data are interrelated. For example, the three tax-based systems depend on the social security numbers (SSNs) assigned by SSA, the employer identification numbers (EINs) assigned by IRS, the reporting of employment and payroll at both the firm and individual worker level for federal and state purposes, and other information from the administrative systems, such as changes in name and address, to update the records.

The IRS has the duty to determine which workers are employees and which are contractors. "The IRS decision is obtained by the filing of a Form SS-8 for a firm or worker seeking to have IRS establish officially the employee or independent contractor status of a particular worker. This transaction then has ramifications for the other employee data collection systems that are mandated by such legislation as the State Unemployment Tax Act (SUTA) and the Federal Unemployment Tax Act (FUTA)" (Greenia, Appendix B of this volume).

Thus, although only the SSA system has data on earnings by gender, race, and national origin (items needed for enforcement purposes), it is possible, by virtue of their coverage and interrelationships, to link data from the three tax systems so that each of them could produce some data on employee earnings by gender, race and ethnicity, nativity, and age, by employer. These data could be used to inform EEOC's enforcement programs, although they most likely could not be used directly in enforcement actions.

---

[2]For details, see http://www.acf.hhs.gov/programs/cse/newhire/library/ndnh/background_guide.htm [July 2012].

[3]IRS data are primarily published by the Statistics of Income Division of IRS: see http://www.irs.gov/taxstats/productsandpubs/article/0,,id=125133,00.html [July 2012]. SSA data are published by the Office of Retirement and Disability Policy: see http://www.ssa.gov/policy/docs/statcomps [July 2012]. And BLS data are published in the Quarterly Census of Employment and Wages series: see http://www.bls.gov/cew/cewbultn10.htm [July 2012]. The Census Bureau also uses these data sets as input to several of its statistical programs.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-1** Available Items in Administrative Records Relevant to EEO

| Source | Earnings at Employee Level | Identity of Employer | Employee Gender | Employee Race/Ethnicity | Employee Nativity |
|---|---|---|---|---|---|
| State Unemployment Insurance | YES | YES | NO | NO | NO |
| State Employment Security Agency | NO | YES | NO | NO | NO |
| Internal Revenue Service | YES | YES | NO | NO | YES[a] |
| Social Security Administration | YES | YES | YES | YES | YES |

[a]Only from individual taxpayer identification number (ITIN) applications.
SOURCE: Adapted from Greenia (Appendix B of this volume).

SJA129
Copyright National Academy of Sciences. All rights reserved.

## State Unemployment Insurance Data

In addition to complying with the Federal Unemployment Tax Act, employers must also comply with the State Unemployment Tax Act by withholding and depositing tax or insurance payments from each employee's wages with state unemployment offices. These state unemployment taxes fund unemployment benefits in each state or territory (including the District of Columbia, Puerto Rico, and the Virgin Islands; see Greenia, Appendix B of this volume).

This section presents a brief summary of the UI wage records and the Quarterly Census of Employment and Wages (QCEW) Program that draws on them. It discusses how the UI data are reported, collected, and shared with the federal government, and assesses the potential usefulness of these data for EEO enforcement purposes.

UI tax rates and coverage vary by state, as do the content and format of the records a particular state collects. In general, all workers are covered by the UI system with the exception of federal employees, independent contractors, the self-employed, and some agricultural workers. A state collects detailed employment and compensation data in quarterly reports from each employer. The data include the SSN, name, and quarterly compensation for each individual employee, as well as the employer name and EIN.[4] The products of this collection are known as UI wage records.

State employment security agencies also collect aggregate monthly employment (for the pay period containing the 12th of the month) for each quarter and aggregate quarterly employee compensation from each employer in the state covered by state UI laws and for federal workers covered by the Unemployment Compensation for Federal Employees (UCFE) Program. This data collection program, the QCEW, is administered and partially funded by BLS.

Although states request data from employers at the establishment level for multiple worksites or multi-establishment employers, there is no disincentive for an employer that does not comply with the request as long as total employment is reported accurately and the appropriate amount of UI tax is paid to the states (Greenia, Appendix B of this volume).

In considering wage data for purposes of EEO enforcement, the UI data system provides the earnings data needed and at the employee level, but it also has several shortfalls:

- It is difficult, if not impossible, to disaggregate the data from multi-establishment employers to the worksite level to match with the EEO-1 reports (see Chapter 1).

---

[4]The coverage varies by state; see Stevens (2002) for a complete review.

Copyright National Academy of Sciences. All rights reserved.

- There are no gender, race and ethnicity, or nativity data collected for UI wage records, though there have been instances in which demographic data from other sources, such as driver's licenses files, have been associated with the wage records (Glover, 2011; Moore, 2011) to enable analysis of UI wage information by gender. As discussed below, it would be possible to match these records to SSA demographic data.
- In order to obtain either of the two data components provided to the states by employers—especially the detailed employee earnings—it would be necessary to obtain the data directly from employers (who would submit a copy of their UI filings to EEOC) or to enter into separate agreements with each state, and it is likely that both of these actions would require a legal action.

### Internal Revenue Service Data

Since 1976, when the current simplified Combined Annual Wage Reporting (CAWR) program was established by the Tax Reform Act, employers have reported individual earnings statements and the amount of taxes withheld (including federal income tax, Social Security tax, and Medicare tax) on a single form (Form W-2 Wage and Tax Statement) for both IRS and SSA purposes. The earnings details available from the W-2 are rich: wages and salaries, deferred compensation (part of total compensation, even if not taxable currently), and certain fringe benefits are reported, in addition to capped Social Security earnings and uncapped Medicare earnings. Together, the W-2 earnings variables provide a unique and comprehensive window on earnings data at the employee level.

These individual W-2 forms are transmitted with another form (Form W-3, Transmittal of Income and Tax Statements), which cumulates the information from the W-2 forms for each reporting establishment. Because of this arrangement, it would be possible to obtain detailed annual employee compensation, quarterly and annual aggregate employee compensation, and number of employees at both the employee and employer level with links to Social Security information through an SSN and EIN crosswalk. The industry codes available at SSA, in full North American Industry Classification System (NAICS) levels, can provide a further source of rich classifier information on employers' business activities. In addition, other tax forms can provide various components of aggregate and even detailed employee compensation: for example, compensation to corporate officers. Finally, EIN and individual taxpayer identification numbers (ITINs) assignment and other transactions would enable the tracking of new business births, foreign-born workers without SSNs, and even the employee or contractor status of a worker.

Copyright National Academy of Sciences. All rights reserved.

An employer is required to file an annual FUTA tax return (Form 940)[5] for purposes of reporting and paying the federal unemployment taxes required by FUTA. Filing is required—at the aggregate employment level—for each nonagricultural employee earning at least $1,500 in any quarter of the year or for each employee who was employed for part or all of a day in any 20 different weeks of the year.[6] Although Form 940 does report annual total compensation, it does not report the number of employees. However, the compensation information may be useful for benchmarking compensation data reported on other federal tax forms, such as Form W-2 and Form 941, as well as the UI data.

In summary, IRS data include a wealth of earnings information for individual employees and employers. However, a limitation is that the IRS data include establishment data only when the establishment is also an enterprise (and has an EIN). Another limitation is that the tax data contain no information by gender (except, sporadically, for the IRS Statistics of Income Division individual Form 1040 tax sample), race and ethnicity, or nativity (except for ITIN applications).

## Social Security Administration Data[7]

The data of most interest for examining pay equity issues are the demographic data that are available on the application for a Social Security Number (Form SS-5),[8] which can be linked to federal tax data shared by IRS. The application for an SSN captures gender, race and ethnicity, and nativity—often shortly after birth for most U.S. citizens. In addition, it captures citizenship status, which might be used as a proxy for or to supplement nativity information.

Although the Form SS-5 data are self-reported (by the individual or a parent), SSA uses supporting documentation for verification, particularly for changes, such as a marriage license (name), passport (citizenship), and birth certificate (place of birth). The Form SS-5 data, including updates, are maintained in SSA's Numerical Identification System file, referred to as the Numident file.

Despite the richness of the demographic detail, the Numident file data have some limitations. They are not updated as often as tax information for such changes as name and address due to marriage or divorce (the tax

---

[5]The form is available at: http://www.irs.gov/pub/irs-pdf/f940.pdf [December 2011].

[6]For 2009 and 2010, agricultural employers were required to file if they paid cash wages of $20,000 or more to farm workers during any calendar quarter or if they employed 10 or more farm workers during some part of the day (whether or not at the same time) during any 20 or more different weeks in either year.

[7]Information in this section is based largely on Greenia (Appendix B of this volume).

[8]This form is available at: http://www.ssa.gov/online/ss-5.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

information at IRS may be updated before the Numident data). In addition, although nativity data classified by country might be considered relatively reliable, researchers have noted that some of the "foreign born" may be, in fact, the progeny of U.S. citizens, say, for military and other Americans stationed overseas, where birth occurs. In conjunction with citizenship status, however, the data are probably useful for indicating native versus foreign-born status.

## EQUAL OPPORTUNITY SURVEY PILOT

In order to identify federal contractors with potential problems of pay discrimination that could warrant further review or evaluation by OFCCP or to support a contractor self-audit, OFCCP has long been interested in developing a screening tool to enable the agency to identify supply and service contractors whose compensation data indicate that further investigation is warranted. This interest led to initiation of a pilot survey to collect earnings data with demographic and job group information from federal government contractors. An employer survey was developed and undertaken by the OFCCP. The OFCCP experience is instructive for EEOC as it considers collecting wage information by gender, race, and national origin.

As discussed in Chapter 1, the authority for this collection rests in Executive Order 11246, as amended, which requires that federal government contractors and subcontractors "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin." Affirmative action under the executive order requires that contractors take affirmative steps to identify and eliminate impediments to equal employment opportunity. The affirmative steps include numerous record-keeping obligations designed, first, to assist the contractor and then OFCCP in monitoring the contractor's employment practices.[9]

In the early 2000s, the OFCCP listed three objectives for the survey (71 FR 3374):

1. to improve the deployment of scarce federal government resources toward contractors most likely to be out of compliance;
2. to increase agency efficiency by building on the tiered-review process already accomplished by OFCCP's regulatory reform efforts, thereby allowing better resource allocation; and
3. to increase compliance with equal opportunity requirements by improving contractor self-awareness and encourage self-evaluations.

---

[9]For full text of Executive Order 11246, as amended, see http://www.dol.gov/ofccp/regs/statutes/eo11246.htm [July 2012].

Copyright National Academy of Sciences. All rights reserved.

Field testing for the survey of federal contractors to collect wage information, as well as other new data items, was conducted in 1999. In 2000, OFCCP issued a requirement that nonconstruction contractor establishments designated by OFCCP prepare and file the new Equal Opportunity Survey. On a pilot basis, in April 2000, the EO Survey was sent to 7,000 contractors. One part of the survey (Part C) collected data on monetary compensation (expressed as an annual amount) and on tenure for four groups—minority females, nonminority females, minority males, and nonminority males—by the EEO-1 report categories applicable at that time: (1) officials and managers; (2) professionals; (3) technicians; (4) sales workers; (5) office and clerical workers; (6) craft workers; (7) operatives; (8) laborers; and (9) service workers. The questionnaire instructions defined annual monetary compensation as "an employee's base rate (wage or salary), plus other earnings such as cost-of-living allowance, hazard pay, or other increment paid to all employees regardless of tenure on the job, extrapolated and expressed in terms of a full year."[10] The annual monetary compensation measure was not to include the value of benefits, overtime, or one-time payments, such as relocation expenses.

The survey did obtain annual monetary compensation information—98.3 percent of respondents provided a numerical response to the compensation item. Reported median average annual compensation by gender and occupation appeared to be "broadly consistent" with other well-established data sets, such as the decennial census, the Current Population Survey, and other salary surveys (Bendick, 2000, p. 9).

After receipt of pilot survey responses, OFCCP commissioned a study to determine whether the pilot survey results could be used to predict whether a contractor would have findings of noncompliance. The study concluded, based on the first wave of survey responses, that the survey could contribute to improvements in procedures for selecting establishments for compliance evaluations (Bendick, 2000, p. i).

The OFCCP proceeded with the EO Survey that was sent to contractors beginning in December 2000 and continuing to December 2004. It included information, in summary form, about personnel activities, compensation, and tenure, as well as the contractor's affirmative action program. A total of 53,000 forms were sent.

To assess the quality and usefulness of these data, the OFCCP engaged an outside contractor to evaluate the collection to that point. The evaluation criteria were based on comparisons of survey results with the results of OFCCP compliance evaluations of a sample of supply and service contractor establishments that had completed the 2002 EO Survey. The

---

[10]U.S. Department of Labor form, available at: http://www.management-advantage.com/media/eosurvey.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

comparison study focused on 1,888 establishments that had completed compliance reviews and had reliable EO Survey data. Of these 1,888 cases, OFCCP found systemic discrimination in 67 cases (3.5 percent). Results of the compliance reviews and survey data were analyzed to determine whether a model could be developed that would predict which contractors in the sample were engaged in systemic discrimination based solely on the EO Survey data submitted (Abt Associates, Inc., 2005, pp. 23–37).

Based on that evaluation, OFCCP concluded that the EO Survey did not improve deployment of enforcement resources toward contractors most likely to be out of compliance and did not lead to greater self-awareness or encourage self-evaluations. OFCCP further concluded that the information in the survey largely duplicated information gathered in compliance visits, although that finding does not necessarily undercut the potential value of the survey, given that the purpose of such a survey is to obtain similar data as those gathered in compliance visits for the purpose of targeting enforcement resources.

The evaluation also found that the EO Survey imposed a burden on respondents. Each survey form was estimated to take each respondent 21 hours to complete. Based on an estimated 10,000 respondents per year, the EO Survey was estimated to cost contractor establishments 210,000 hours per year. Using data from the BLS 2004 National Compensation Survey, the total annual cost imposed on the regulated community by the survey requirements was close to $6 million. However, whether this level of burden was large or small compared with other regulatory requirements was not established, nor was the burden considered in relationship to the costs to employees of instances of wage discrimination that the survey might help uncover.

OFCCP's bottom-line conclusion was that the EO Survey had failed to provide the utility anticipated when the regulation was promulgated in 2000, and, consequently, it eliminated the survey. Reinstatement of the EO Survey, or the establishment of a similar survey, would require regulation or legislation.

Yet Bendick (2006) pointed out that the data on which both the Bendick (2000) and Abt Associates, Inc. (2005) studies drew had limitations that make it difficult to reach definitive conclusions about the value—or lack of value—of the EEO Survey for targeting enforcement resources. For example, the survey data were contaminated by the fact that compliance evaluations were conducted for many of the employers in the sample before the survey, so that employers had the opportunity to improve their practices by the time the survey was fielded.

The current OFCCP initiative is summarized by the National Equal Pay Enforcement Task Force (2010, p. 5):

Copyright National Academy of Sciences. All rights reserved.

Through publication of an Advance Notice of Proposed Rulemaking (ANPRM) [in 2010],[11] OFCCP [has sought] the input of stakeholders in evaluating whether the EO Survey should be redesigned to collect different data than previously sought, and whether there are any ways to further limit the burden of data collection for employers. The implementation of a redesigned survey is expected to result in better identification of those contractors who are likely to be out of compliance, particularly with regard to compensation discrimination; a narrowing of the issues on which the resulting review will focus; and identification of contactors for corporation-wide and industry-focused reviews.[12]

## U.S. STATE AND CANADIAN PROVINCIAL SURVEYS

On their own initiative, two U.S. states and a Canadian province have designed and fielded data collections to provide information on earnings by demographic characteristics for pay equity purposes. Though small and localized and based on comparable worth comparisons and thus not fully responsive to the needs of the EEOC, these initiatives provide experience in evaluating the feasibility of collecting wage information for antidiscrimination enforcement purposes. The lessons from these initiatives are summarized in this section.

### Earnings Data Collection in New Mexico

As reported by Martha Burk in a presentation to the panel, in 2003 the New Mexico state legislature created a Pay Equity Task Force to study wage disparities between men and women and between minorities and non-minorities in both the public and private sectors. The task force issued a report with numerous recommendations, and, in January 2009 Governor Bill Richardson issued an executive order declaring pay equity a priority for the state.[13]

In September 2009, the Pay Equity Task Force issued a report addressing pay gaps and job segregation in the state workforce and in the workforce of state contractors. With respect to the latter, the report provided a rationale and model for requiring entities receiving state contracts to submit pay gap reports as a condition of contracting.[14] In December 2009, Governor Richardson issued a second executive order directing that

---

[11]The ANPRM was published as 76 FR 49399.

[12]The report further notes on p. 5 that "the EEO Survey has been rescinded, and its reinstatement, or the establishment of a similar survey, must be by regulation or legislation."

[13]For details, see *New Mexico Pay Equity Initiative*, available at: www.generalservices.state.nm.us/spd/pay_e.html [July 2012], p. 2.

[14]Available at: http://www.generalservices.state.nm.us/spd/report093009.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

a contractor reporting system be implemented and appointing a working group to design and facilitate such reporting.[15]

The new requirements were phased in gradually and, beginning July 1, 2010, all recipients of state contracts were required to submit a gender pay equity report after a contract was awarded. More recently, these reports have been required to be submitted as part of the response to a solicitation or request for proposal (RFP). The reporting requirement applies to all state agencies that let contracts and all categories of purchasing.

In her testimony to the panel, Burk stated that the early experience with collecting these data is noteworthy for the lack of resistance by employers and the absence of reports of difficulties in complying. About 3,200 firms are covered by the reporting requirement, ranging in size from Intel (New Mexico's largest employer, with more than 3,000 employees) to firms with only 10 employees. Over the first 7 months of implementation, fewer than 50 contractors contacted the state for assistance in understanding the requirement or preparing their reports.[16] Contractors seem generally to have accepted the requirement as a normal part of the contracting process and have lodged no complaints about the requirement.

As of early 2011, cataloguing of contractor reports was in progress, and systematic analysis had not begun. However, cursory examination of selected reports indicated that a majority of reporting employers have employees in only three or four of the nine EEO-1 form job categories provided for on the reporting forms, and a few (e.g., janitorial companies) have employees in only one job category besides the owner/manager. Moreover, job segregation by gender is not unusual, in which case gender pay disparities cannot be computed because of lack of wage data for both genders. When pay comparisons can be made, percentage gender pay gaps tend to range as low as 2–3 percent, with most in the 10–25 percent range. An unusual few were observed as high as 45 percent.

The report uses EEO-1 job categories for reporting because many contractors and payroll processing firms are already familiar with these categories. Using them avoided the need for a new taxonomy and also avoided the difficulties of analyzing data for job titles or groupings that were not comparable across firms.

The data each contractor is required to report consist of the number of employees by gender (including full- and part-time workers) in each EEO-1

---

[15]Executive Order 2009-049, available at: http://www.generalservices.state.nm.us/spd/pay_e.html [July 2012].

[16]In addition to offering "live" assistance by telephone, the state provides easy access on a website (see http://www.generalservvices.state.nm.us/spd/pay_e.html [July 2012]) to documents, including worksheets with instructions and reporting forms with instructions.

Copyright National Academy of Sciences. All rights reserved.

job category and the gender pay gap (stated as a percentage) in each category. Individual compensation is not reported.

Uniform reporting is enhanced by the fact that average hourly wages by gender and job category, taking into account hours worked, are computed following detailed instructions for producing these averages and entered into a worksheet. (Average hourly wages in each job category are computed by dividing the total compensation by gender by the total hours worked by that gender.)

Employers generally enter the appropriate numbers in the worksheet by use of an accounting/payroll system that is capable of classifying employees and aggregating compensation and hours worked by gender and job category. If employers do not have such a system to classify employees by job category, gender, time worked, and compensation levels, the state has provided an alternative downloadable employee data entry spreadsheet for performing the necessary calculations "from scratch." Using this spreadsheet, employers enter employee identification, job category, gender, whether full or part time, total annual compensation, and total hours worked for each employee.

Standard formulas for computing the gaps are embedded in required spreadsheets, which are provided to employers online, and the results of the computations are exported to a standard final report format. To maintain confidentiality of the wage and gender information, contractors do not turn in worksheets showing dollar amounts, but instead report only the ratios of average earnings for women to those of men in the same EEO-1 job category. Proprietary information is retained by contractors. However, they are encouraged to use this information for internal tracking of potential compensation disparities between women and men.

The Office of the State Auditor has oversight over state agencies' implementation of the reporting requirement and over the reports submitted. Procedures for auditing are still under development, and no audits have yet taken place. To date, the requirement is simply to submit a report; however, bids that fail to comply with the reporting requirement are disqualified.

### Minnesota Pay Equity Survey

Since 1982 the state of Minnesota has had a pay equity law for state employees based on the concept of comparable worth. The law was extended to all city, county, school, and other public jurisdictions by the 1984 Local Government Pay Equity Act. The 1984 law requires each local government jurisdiction to use a job evaluation system to determine comparable work value and to submit a report to the state government at 3-year intervals with a comparable worth value estimate (the value of work as measured by skill, effort, responsibility, and working conditions)

Copyright National Academy of Sciences. All rights reserved.

and the minimum and maximum monthly salary for the job class by gender. The state uses the reports to assess how well the local jurisdictions are complying with the state law. Pay equity laws in Minnesota address only gender-based wage disparities.

### Ontario Pay Equity Survey

A relatively recent pay equity survey in Ontario, Canada, collects wage information from the province's relatively large employers. The collection was enabled by a 2009 amendment to the Ontario Pay Equity Act, which provides that the Pay Equity Office may collect information for the purpose of providing reports to the Minister of Labour. The program was launched in January 2011. It involves canvassing all Ontario employers using a simple form that employers populate to provide current compensation data: see Table 2-2. The raw data are submitted to the Pay Equity Office, which assesses the data to determine if a wage gap exists.

For the first phase, Ontario workplaces with more than 500 employees were selected to enter the program. Using lists of Ontario employers developed by an external provider, employers who had not been visited by a review officer in the past 10 years and were not unionized were requested to submit current, basic wage data on the positions and incumbents in their organizations.

The information is analyzed to determine whether a wage gap appears to exist against a set of criteria developed by seasoned review officers. A committee of review officers meets monthly to review the analyses and findings and finalize the assessment. The employer of the establishment is advised whether the review officer determined there is an apparent wage gap and is provided with tools and information to allow the employer to consider whether they are pay equity compliant.

**TABLE 2-2** Ontario Pay Equity Form

| Job Title/Position | Employee (may use symbol rather than name) | Held by: Male/Female | Pay as of December 31, 2010—hourly, weekly, annually | Salary Range of Position (if applicable) | Years of Service |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Copyright National Academy of Sciences. All rights reserved.

The response rate for the first mailings was about 80 percent. This relatively high response rate was attained by significant follow-up efforts; in addition, response is encouraged because nonresponders are singled out for investigation through a proactive monitoring program for compliance.

## SURVEY-BASED WAGE INFORMATION

In this section we consider the experience of surveys that collect wage information, specifically, three BLS employer surveys: the National Compensation Survey (NCS), the Current Employment Statistics (CES) survey, and the Occupational Employment Statistics (OES) survey.

We do not discuss Census Bureau data sources. The Census Bureau's business surveys have extensive establishment coverage but do not collect wage or demographic information. The decennial population census captures data on gender, race, and ethnicity, but, of course, only every 10 years and without socioeconomic establishment detail. The Current Population Survey and the American Community Survey collect wage data by gender, race/ethnicity, nativity (native/foreign born), and many other characteristics, but not by establishment. The Census Bureau's Longitudinal Employer-Household Dynamics (LEHD) System links UI and QCEW data on employers and employees (obtained through individual agreements with states) with additional employer and employee data from censuses and surveys. The data, which include wage information, are available only to qualified researchers at one of the Census Bureau's Research Data Centers.[17]

All information collected by the federal government for statistical purposes, including the data in these three BLS surveys, is collected under a pledge of confidentiality according to the provisions of the 2002 Confidential Information Protection and Statistical Efficiency Act (CIPSEA). This means that the data cannot be shared for purposes of antidiscrimination enforcement; however, the information may be used to assist in analysis relevant to wage discrimination, and the ability of the survey to collect wage information may be instructive for EEOC.

### National Compensation Survey

The NCS is an establishment-based survey that annually provides estimates of occupational earnings, employer costs for employee compensation, compensation trends, wages in one geographic area relative to other geographic areas, the incidence of employer-provided benefits among workers, and provisions of employer-provided benefit plans. The employment cost

---

[17]For details, see http://lehd.did.census.gov/led/ [July 2012].

Copyright National Academy of Sciences. All rights reserved.

index (ECI)—a principal federal economic indicator—is estimated from data collected by the NCS.[18]

The NCS samples private industry establishments with one or more workers and state and local governments across the 50 states and the District of Columbia. Each sampled establishment—over 35,000 establishments in 2010—is asked to report on selected occupations. As stated in the *BLS Handbook of Methods*, major exclusions from the survey are workers in federal and quasi-federal agencies, military personnel, agricultural workers, workers in private households, the self-employed, volunteers, unpaid workers, individuals receiving long-term disability compensation, and individuals working overseas. Currently, the NCS also excludes individuals who set their own pay (e.g., proprietors, owners, major stockholders, and partners in unincorporated firms) and family members being paid token wages; however, these exclusions are being reevaluated (Bureau of Labor Statistics, no date).

Among the products of the survey are estimated average hourly wages for over 800 occupations in approximately 80 metropolitan and selected nonmetropolitan localities, weekly and annual earnings and hours for full-time workers, and earnings by work level that permit wage comparisons across occupational groups. The survey collects no demographic detail, however, and it is therefore not directly useful for analysis that might facilitate antidiscrimination enforcement.

### Current Employment Statistics Survey

The CES is an establishment payroll survey that is based on a monthly survey of approximately 141,000 businesses and government agencies representing approximately 486,000 worksites throughout the United States.[19] The primary statistics derived from the survey are monthly estimates of employment, hours, and earnings for the nation, states, and major metropolitan areas. Preliminary national estimates for a given reference month are typically released on the third Friday after the conclusion of the reference week, which is the week that includes the 12th of the month.

National estimates of average weekly hours and average hourly earnings are made for the private sector for all employees and for production and nonsupervisory employees. Detail is available for about 750 industries. Average weekly overtime hours in manufacturing are also available.

Hours and earnings are derived from reports of gross payrolls and corresponding paid hours. However, hours for salaried workers who may have

---

[18]For details, see http://www.bls.gov/eci/# [July 2012].

[19]Information in this section is largely reproduced from http://www.bls.gov/ces/cescope.htm [July 2012].

Copyright National Academy of Sciences. All rights reserved.

set compensation but volatility in their hours are often reported as standard weekly hours rather than hours actually worked and paid. The payroll for employees covered by the CES is reported before deductions of any kind, for example, for Social Security, federal and state withholding tax, union dues, or retirement plans. Included in the payroll reports is pay for overtime, vacations, holidays, and sick leave paid directly by the firm. Bonuses, commissions, and other types of nonwage cash payments are excluded unless they are earned and paid regularly (at least once a month). Employee benefits paid by the employer, as well as in-kind payments, are excluded.

Total hours during the pay period include all hours worked (including overtime hours), and hours paid for holidays, vacations, and sick leave. Total hours differ from the concept of scheduled hours worked. Average weekly hours reflect effects of numerous factors, such as unpaid absenteeism, labor turnover, part-time work, strikes, and fluctuations in work schedules for economic reasons. Overtime hours in manufacturing are collected when overtime premiums were paid and the hours were in excess of the number of straight-time hours in a workday or workweek. No information is collected by gender, race/ethnicity, or nativity.

## Occupational Employment Statistics Survey

The OES survey is a semiannual mail survey designed to measure occupational employment and wage rates among full- and part-time wage and salary workers in nonfarm establishments in the United States.[20] The survey does not include the self-employed, owners and partners in unincorporated firms, household workers, or unpaid family workers.

The OES survey is a cooperative program between BLS and state workforce agencies (SWAs). BLS funds the survey and provides the procedures and technical support, while the SWAs collect most of the data.[21]

The OES is a very large survey. Its estimates are constructed from a sample of about 1.2 million establishments grouped into six semiannual panels over a 3-year period. Each year, forms are mailed to two panels of approximately 200,000 establishments, one panel in May and the other in November. Thus, for example, the May 2010 estimates were based on responses from six panels—May 2010, November 2009, May 2009, November 2008, May 2008, and November 2007.

The overall national response rate for six panels is about 78 percent based on establishments and 74 percent based on employment. The survey covers all employer size classes, and response rates are actually higher among smaller employers. The survey's coverage is extensive—approximately 63

---

[20]Information in this section is largely reproduced from http://www.bls.gov/oes/ [July 2012].
[21]Data for 180 large firms are collected directly by BLS.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-3** Occupational Employment Statistics by Number of Employees, May 2010

| Number of Employees | Viable Sample Units | Respondents |
|---|---|---|
| 1–9 | 437,389 | 380,215 |
| 10–19 | 195,755 | 155,320 |
| 20–49 | 202,642 | 148,143 |
| 50–99 | 107,175 | 71,562 |
| 100–249 | 84,492 | 55,090 |
| 250–499 | 35,225 | 22,780 |
| 500–999 | 13,620 | 8,778 |
| More than 999 | 8,747 | 6,346 |

NOTE: The respondents were establishments.
SOURCE: Data from Bureau of Labor Statistics special tabulation for the panel.

percent of total national employment is represented by the unweighted employment of sampled establishments across all six semiannual panels.

The OES survey draws its sample from state UI files. The survey sample is stratified by metropolitan and nonmetropolitan area, industry, and size. To provide the most occupational coverage, larger employers are more likely to be selected than smaller employers (see Table 2-3).

The data available from the OES include cross-industry occupational employment and wage estimates for over 500 areas, including the nation, states, and the District of Columbia, metropolitan statistical areas (MSAs), metropolitan divisions (the result of MSA subdivisions) nonmetropolitan areas, and territories; national industry-specific estimates at the 2007 NAICS 3-, 4-, and selected 5-digit industry levels; and national estimates by ownership across all industries and for schools and hospitals (Bureau of Labor Statistics, 2010a). No data are collected by gender, race/ethnicity, or nativity.

The OES survey categorizes workers into nearly 800 detailed occupations based on the Office of Management and Budget's Standard Occupational Classification (SOC) system. The detailed occupations cover 22 of the 23 SOC major occupational groups. The May 2010 OES estimates mark the first set of estimates based in part on data collected using the 2010 SOC system, and after May 2012, the OES data will reflect the full set of detailed occupations in the 2010 SOC. Importantly, the 2010 SOC occupations will be capable of being cross-walked into the EEOC job categories when EEOC completes an update of the crosswalk between the EEOC job categories and the 2010 SOC.

Copyright National Academy of Sciences. All rights reserved.

## SUMMARY

Several surveys have been developed specifically to measure pay discrimination, and there are several survey-based and administrative records-based sources of estimates of earnings. They vary widely in their approach to measurement, their coverage of employers, and their content: for example, only some of them collect demographic as well as earnings information. Only two of the data sources for establishments contain information on hours and whether the employee is on a temporary or permanent schedule, and neither of those sources includes demographic information.

It is clear that there is no current source of earnings data that incorporates the demographic, occupation, work schedule, and employer information necessary to support an antidiscrimination enforcement and analytical program. A new reporting mechanism would have to be put in place to produce earnings by gender, race, and ethnicity for establishments.

Nonetheless, the fact that earnings data are now generally reported to the taxing authorities and to federal (and state) government statistical and enforcement agencies suggests that it might be feasible to collect earnings information by gender, race, and national origin in an EEOC data collection program. It also suggests that the EEOC may be able identify other data collections that could serve as sources of benchmarks to assist in validating the information that might be collected as part of a new reporting arrangement.

Copyright National Academy of Sciences. All rights reserved.

# 3

# Pay Concepts and Definitions

Pay is an important indicator of discriminatory practices. Employees with the same productivity and working conditions (including hours) in the same jobs at the same employer location could be subject to pay discrimination if they are systematically paid differently because of their membership in a particular demographic group. Employment discrimination can affect pay through a number of different channels, such as different pay rates, different noncash compensation, different hours offered, and different job assignments to otherwise similar applicants. Each of these channels poses measurement challenges.

A major challenge in considering an appropriate earnings measure to use in determining whether or not there is pay discrimination is that there is no standardized and universally accepted measure of earnings. Earnings (pay) can be represented in a variety of ways depending on the use to which the definition will be put:

- as annual, monthly, or weekly amounts;
- as totals, averages, rates, or pay bands;
- narrowly, as straight-time pay or regular salaries;
- broadly, to include straight-time pay or regular salaries and other forms of compensation, such as commissions, overtime, incentives, bonuses, shift differentials, stock options, and premium pay; and
- in relation to terms of employment, such as time worked, and the conditions of employment, such as whether the employee is full or part time and permanent or temporary.

*46*

SJA145
Copyright National Academy of Sciences. All rights reserved.

Although disparities in any of these measures could signal discriminatory practices, the most applicable earnings measure to comprehensively identify pay discrimination may well be a broad measure that encompasses all, or nearly all, measures of compensation, such as the broadest measure noted above, as well as the terms and conditions of employment. Such a measure, however, may not be easily collectable. Furthermore, even if it were collectable, it may not be fully comparable across demographic and job groupings, as discussed below. Thus, it may be that any earnings measure selected by the U.S. Equal Employment Opportunity Commission (EEOC) may depend as much on whether the information is available and collectable than on the purpose for which it is collected and how it will be used.

In this chapter, we discuss the various components of employee compensation that can be considered when selecting the most appropriate definition of earnings for antidiscrimination purposes. We also consider trends over time in compensation practices. Finally, we assess several possible definitions from the perspectives of scope, coverage, frequency, reliability, and collectability.

## ROLE OF COMPENSATION

Compensation plays many roles in the modern economy. According to Kevin Hallock, director of the Cornell University Institute of Compensation Studies, who discussed compensation issues with the panel, compensation depicts market pricing of an essential component in the production function, and, in most instances, helps to match supply and demand for a workforce and for particular skills and qualifications.[1] It can be a measure of responsiveness to offers. It can be adjusted to fit time, place, and circumstance by adjusting the pieces of compensation (wages, benefits, schedule, and other pay). Nowhere have these kinds of adjustments been more aggressive than with executive and highly paid professional compensation, for which a rich array of compensation options has emerged in recent years.

Compensation policies also play a large role in business strategy. These policies undergird and give meaning to job analysis and job evaluation processes, and they enable pay-for-performance and other productivity enhancement strategies. They facilitate internal comparisons and, when data are available, facilitate external comparisons, which are a component of competitive analysis.

---

[1]Various administrated pay systems (such as much of the civil service) and structures that constrain supply (e.g., licenses and apprenticeship systems) may include departures from the generalization that compensation reflects the operation of the unfettered labor market.

SJA146
Copyright National Academy of Sciences. All rights reserved.

More and more, compensation policies are a key element in corporate strategies to improve efficiency, effectiveness, and marketplace viability. In a broad sense, they have been identified as "total rewards" strategies (WorldatWork Association, 2011). In addition to their importance as compensation in corporate business strategies, employers also seek through these policies to achieve balance in work-life considerations, performance and recognition policies, and development and career opportunities for their workforce.

There are common elements to compensation strategies across the occupational spectrum. However, one result of strategic "fine tuning" by businesses is that wages and total compensation have come to vary among occupational groups, which adds to the difficulty of making cross-occupational comparisons. Data from the National Compensation Survey (NCS)—administered by the Bureau of Labor Statistics (BLS)—indicate that wages and salaries make up a larger proportion of its definition of compensation (wages and salaries plus benefits, including supplemental pay) for management, sales, and service workers than for construction and production workers: see Figure 3-1. Total compensation may encompass much more than hourly earnings, so it is important to consider broader measures of compensation.

## EARNINGS DATA AVAILABLE IN FIRMS

It is important to define earnings in a way that makes economic sense, but it is also critical to define earnings in a way that reporting employers can understand. Earnings should be capable of being reported using records readily available in the firm because they are otherwise necessary to meet the requirements of law or regulation or because they are needed for the efficient operation of the firm. Existing laws and regulations help delineate the kinds of compensation and demographic data that employers maintain.

At a minimum, all employers covered by the Fair Labor Standards Act (FLSA)[2] must keep certain records for each covered, nonexempt worker.[3] Although there is no required format for the records, the content of the records is specified: The records must include accurate information about the employee and data about the hours worked and the wages earned, to include[4]

---

[2]Employers covered by FLSA are those with at least two employees and an annual dollar volume of sales or business of at least $500,000. See http://www.dol.gov/whd/regs/compliance/whdfs14.pdf [December 2011].

[3]Under the FLSA, some employees are exempt from the act's overtime provisions. These employees include executive, administrative, professional, and outside sales employees who are paid on a salaried basis, some commissioned sales employees, and some seasonal employees.

[4]For details, see http://www.dol.gov/dol/topic/wages/wagesrecordkeeping.htm [July 2012].

Copyright National Academy of Sciences. All rights reserved.



**FIGURE 3-1** Hourly wage and salary and total pay by major occupational group, 2011.
SOURCE: Presentation by Kevin Hallock at panel workshop on May 24, 2011, based on data from National Compensation Survey. Reprinted with permission.

- employee's full name, as used for Social Security purposes, and on the same record, the employee's identifying symbol or number if such is used in place of name on any time, work, or payroll records;
- address, including zip code;
- birth date, if younger than 19;
- sex;
- occupation; time and day of week when employee's workweek begins; hours worked each day and total hours worked each workweek;
- basis on which employee's wages are paid;
- regular hourly pay rate;
- total daily or weekly straight-time earnings;
- total overtime earnings for the workweek;
- all additions to or deductions from the employee's wages;

SJA148
Copyright National Academy of Sciences. All rights reserved.

- total wages paid each pay period; and
- date of payment and the pay period covered by the payment.

Given these FLSA requirements, it is safe to assume that employers covered by FLSA will maintain wage information by gender. However, wage data may not be universally available by race and national origin (data on these characteristics are required by equal employment opportunity [EEO] legislation, but not necessarily with wage data associated with them).

Other statutory and administrative requirements dictate the kind of data that employers should maintain on employee compensation. For example, those firms that have adopted employer-matching 401(k) plans called Safe Harbor plans must use the Internal Revenue Service definition of compensation, which includes all wages; salaries; other amounts received that are includible in the employee's gross income, including overtime; other items including commissions, fees for professional services, tips, bonuses, fringe benefits, and reimbursements for some other expense allowances; and foreign earned income. All of these compensation items must be accounted for: thus, for firms with this type of 401(k) plan, the compensation information is likely to be obtainable from the firm's compensation records.

Although FLSA coverage and other administrative reporting requirements tend to define the mandatory wage information that is likely to be maintained by employers that report to EEOC, the specific data that are maintained by any particular employer are defined by the particular payroll and human resource systems that support the business's operations. In many cases, these systems are developed within the company, although, increasingly, company payroll and human resource systems are developed by outside firms that specialize in providing software or "turnkey" human resources and payroll management services (see Chapter 1). Thus, a good rule of thumb would be that earnings measures for EEOC reporting would need to be compatible with data elements available from vendor systems or, at least, only require changes that could be easily implemented in vendor software.

## FEASIBLE DEFINITIONS OF EARNINGS

There is no single, commonly accepted definition of earnings. Table 3-1 shows the wide and rich variety of definitions embedded in the major survey and tax collection systems (discussed in Chapter 2). Because earnings data are now being collected according to various definitions, any of the definitions could be considered collectable. However, not all definitions have a history of being collectable with the addition of occupational and demographic information.

Two employer-based BLS data collections now bring together data on the establishment, compensation, occupation, and hours—the Occupational

Copyright National Academy of Sciences. All rights reserved.

*continued*

**TABLE 3-1** Comparison of Earnings Definitions and Data Availability for Key Earnings Data Sources

| Data Source | Definition of Earnings | Occupational Coverage | Demographic Information |
|---|---|---|---|
| | **Employer/Establishment-Based Surveys** | | |
| Occupational Employment Survey (Bureau of Labor Statistics) | Wages for the OES survey are straight-time, gross pay, exclusive of premium pay. Earnings include base rate; cost-of-living allowances; guaranteed pay; hazardous-duty pay; incentive pay, including commissions and production bonuses; and tips. Excluded are overtime pay, severance pay, shift differentials, nonproduction bonuses, employer cost for supplementary benefits, and tuition reimbursements. | The OES survey categorizes workers into nearly 800 detailed occupations based on the Office of Management and Budget's Standard Occupational Classification (SOC) system. | None |
| Current Employment Statistics Survey (Bureau of Labor Statistics) | Provides arithmetic averages (means) of the hourly and weekly earnings of all production and nonsupervisory jobs in the private nonfarm sector of the economy. The hours and earnings are derived from reports of gross payrolls and corresponding paid hours. Payroll is reported before deductions of any kind, e.g., for old-age and unemployment insurance, tax withholding, union dues, or retirement plans. Included in the payroll reports is pay for overtime, vacations, holidays, and sick leave paid directly by the firm. Bonuses, commissions, and other types of nonwage cash payments are excluded unless they are earned and paid regularly (at least once a month). Employee benefits paid by the employer, as well as in-kind payments, are excluded. | None | None |

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-1 Continued

| Data Source | Definition of Earnings | Occupational Coverage | Demographic Information |
|---|---|---|---|
| National Compensation Survey (Bureau of Labor Statistics) | Wages and salaries, or earnings, are defined as regular payments from the employer to the employee as compensation for straight-time hourly work for or any salaried work performed. Includes incentive pay, including commissions, production bonuses, and piece rates; cost-of-living allowances; hazard pay; payments of income deferred because of participation in a salary reduction plan; and deadhead pay, defined as pay given to transportation workers returning in a vehicle without freight or passengers. | Standard Occupational Classification (2010) definitions are used for initial data collection at an establishment. (The 2010 SOC system contains 840 detailed occupations, aggregated into 461 broad occupations.) | None |
| EEO-4 Survey (state and local governments) | Annual salary including all special increments of an employee's annual earnings that are regular and recurrent. Overtime pay is not included. Where employees are paid on an other-than-annual basis, their regular earnings in the payroll period that includes June 30 are to be expanded and expressed in terms of an annual income. | Officials and administrators; professionals; technicians; protective service workers; paraprofessionals; administrative support (including clerical and sales); skilled craft workers; service-maintenance. | White (not of Hispanic origin); Black (not of Hispanic origin); Hispanic; Asian or Pacific Islander; American Indian or Alaskan Native, by male and female |
| OFCCP EO Survey | Annual monetary compensation: the employee's base rate (wage or salary) plus other earnings, such as cost-of-living allowance, hazard pay, or other increment paid to employees regardless of tenure on the job. The annual monetary compensation measure was not to include the value of benefits, overtime, or one-time payments such as relocation expenses. | (1) Officials and managers; (2) professionals; (3) technicians; (4) sales workers; (5) office and clerical workers; (6) craft workers; (7) operatives; (8) laborers; and (9) service workers. | Minority females, non-minority females, minority males, non-minority males |

SJA151
Copyright National Academy of Sciences. All rights reserved.

*continued*

| | | | |
|---|---|---|---|
| Ontario Pay Equity Survey | Pay as of December 31 expressed in hourly, weekly, or annual amounts. | Job/position title | Male and female |
| Minnesota Pay Equity Survey | Minimum and maximum monthly salary. | Job class | Male and female |
| New Mexico Pay Equity Survey | Total annual compensation converted to average hourly wages in each job category are computed by adding the total compensation by gender divided by the total hours worked by that gender. | EEO-1 job categories | Male and female |

**Administrative Records**

| | | | |
|---|---|---|---|
| Employer's Quarterly Contribution and Wage Report | Total quarterly wages paid to all regular, part-time, temporary, or casual employees, without regard to age; wages paid for services performed for a partnership by the wife, husband, child, or other relative of a partner; wages paid by an individual owner to a son or daughter who is 18 or more years of age; salaries and other payments made to corporate officers for their services to the corporation (including Subchapter S corporations); tips reported by employees for Internal Revenue Service purposes by the 10th day of the month of receipt; reasonable cash value of meals, lodging, merchandise, and other types of remuneration furnished for services; commissions and bonuses paid to employees; vacation payments; dismissal pay, severance pay, or wages in lieu of notice; salary reductions pursuant to Internal Revenue Code (IRC) Section 125 (cafeteria plans) or 401(k) plans. | None | None |

SJA152
Copyright National Academy of Sciences. All rights reserved.

**TABLE 3-1** Continued

| Data Source | Definition of Earnings | Occupational Coverage | Demographic Information |
|---|---|---|---|
| IRS W-2 Form | Wages and salaries, deferred compensation (part of total compensation, even if not taxable currently), and certain fringe benefits are reported in addition to capped Social Security earnings and uncapped Medicare earnings. | None | None |
| IRS 941 and 943 Forms | Total compensation; employer reported W-2 income and tips. | None | None |
| Social Security Master Earnings File | OASDI and Medicare taxable wages, and total wages reportable as IRS-taxable income on Form 1040, which includes wages above the OASDI taxable maximum, noncovered wages, and deferred-compensation distributions, but not deferred-compensation contributions. | None | Gender; self-reported race and ethnicity data provided on voluntary basis |
| Fair Labor Standards Act (FLSA) | Time and day of week when employee's workweek begins; hours worked each day and total hours worked each workweek; basis on which employee's wages are paid; regular hourly pay rate; total daily or weekly straight-time earnings; total overtime earnings for the workweek; all additions to or deductions from the employee's wages; total wages paid each pay period; date of payment and the pay period covered by the payment. | Occupation | Age; sex |

Copyright National Academy of Sciences. All rights reserved.

| Safe Harbor 401(k) Plans | All wages, salaries; other amounts received that are includible in the employee's gross income, including overtime; other items, including commissions, fees for professional services, tips, bonuses, fringe benefits, and reimbursements for some other expense allowances; and foreign earned income. | None | None |

NOTE: EEO = Equal Employment Opportunity, EO = Equal Opportunity Survey, IRS = Internal Revenue Service, OASDI = Old-Age, Survivors, and Disability Insurance Program, OES = Occupational Employment Survey, OFCCP = Office of Federal Contract Compliance Programs.

SOURCES: Information from Current Employment Statistics forms (available at: http://www.bls.gov/ces/cescope.htm [July 2012]); Employer's Quarterly Contribution and Wage Report (available at: https://uitax.nvdetr.org/crppdf/nucs-4072.pdf [July 2010]); and Recordkeeping Requirements under the Fair Labor Standards Act (available at: http://www.dol.gov/whd/regs/compliance/whdfs21.htm [July 2012]).

SJA154
Copyright National Academy of Sciences. All rights reserved.

**TABLE 3-2** Occupational Employment Statistics Survey Wage Intervals, May 2010

| Wage Intervals | Hourly | Annual |
|---|---|---|
| Range A | Under $9.25 | Under $19,240 |
| Range B | $9.25 to $11.49 | $19,240 to $23,919 |
| Range C | $11.50 to $14.49 | $23,920 to $30,159 |
| Range D | $14.50 to $18.24 | $30,160 to $37,959 |
| Range E | $18.25 to $22.74 | $37,960 to $47,319 |
| Range F | $22.75 to $28.74 | $47,320 to $59,799 |
| Range G | $28.75 to $35.99 | $59,800 to $74,879 |
| Range H | $36.00 to $45.24 | $74,880 to $94,119 |
| Range I | $45.25 to $56.99 | $94,120 to $118,559 |
| Range J | $57.00 to $71.49 | $118,560 to $148,719 |
| Range K | $71.50 to $89.99 | $148,720 to $187,199 |
| Range L | $90.00 and over | $187,200 and over |

SOURCE: Bureau of Labor Statistics (2009).

Employment Statistics (OES) survey and National Compensation Survey (NCS).[5] These survey collections do not include demographic information: such information would have to be added to the compensation, occupation, and hours data collected in these two surveys to provide the information minimally needed for antidiscrimination purposes.[6] The definitions of earnings in these surveys are discussed below.

### OES Wage Definition

Earnings in the OES survey are defined as straight-time gross pay, exclusive of premium pay. The definition includes a base rate of pay; cost-of-living allowances; guaranteed pay; hazardous-duty pay; incentive pay, including commissions and production bonuses; and tips. The definition excludes overtime pay, severance pay, shift differentials, nonproduction bonuses, employer costs for supplementary benefits, and tuition reimbursements.

The OES survey collects wage data from private-sector employers in 12 intervals (or bands): see Table 3-2. For each occupation, respondents are

---

[5]This discussion is limited to measures of compensation that can be collected from employers rather than from individuals because of the requirement to identify the possibility of pay discrimination at the point of employment, even though the most complete view of compensation and demographics can be developed from household and individual surveys (Abowd and Hallock, 2007; Zhao, 2010).

[6]As discussed in Chapter 2, data from these surveys are collected under a pledge of confidentiality and are not available for enforcement purposes. However, the data could serve a benchmarking role for EEOC surveys; moreover, the surveys indicate the feasibility of data collection by establishment on occupation, hours, and earnings.

Copyright National Academy of Sciences. All rights reserved.

asked to report the number of employees paid within each wage intervals. The effect of having a relatively large number of intervals in the OES survey is to narrow the bands so as to minimize the possibility of concealing pay disparities that could signal discrimination, which might occur with broad bands. The intervals are defined both as hourly rates and the computed corresponding annual rates: the annual rate for an occupation is calculated by multiplying the hourly wage rate by a typical work year of 2,080 hours.

The responding establishments are instructed to report the hourly rate for part-time workers and to report annual rates for occupations that are typically paid at an annual rate but for less than 2,080 hours per year, such as teachers, pilots, and flight attendants. Other workers, such as some entertainment workers, are paid hourly rates, but generally do not work 40 hours per week, year round. For these workers, only an hourly wage is reported.

### NCS Earnings Definition[7]

In the NCS, wages and salaries, or earnings, are defined as regular payments from the employer to the employee as compensation for straight-time hourly work or for salaried work. The survey includes the following components as part of earnings:

- incentive pay, including commissions, production bonuses, and piece rates;
- cost-of-living allowances;
- hazard pay;
- payments of income deferred because of participation in a salary reduction plan; and
- deadhead pay, defined as pay given to transportation workers returning in a vehicle without freight or passengers.

The following items are not considered part of straight-time earnings, and data on them are not included in the NCS:

- uniform and tool allowances,
- free or subsidized room and board,
- payments made by third parties (e.g., tips), and
- on-call pay.

The following forms of payments are considered benefits and not part of straight-time earnings:

---

[7]The information in this section is largely taken from descriptions of the NCS, see http://www.bls.gov/ncs/ncswage2010.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

- payments for shift differentials, defined as extra payment for working a schedule that varies from the norm, such as night or weekend work;
- premium pay for overtime, holidays, and weekends; and
- bonuses not directly tied to production (such as Christmas and profit-sharing bonuses).

The NCS annually publishes national, Census Bureau division, and local area occupational earnings estimates of mean hourly earnings, mean and median weekly and annual earnings, and weekly and annual hours, for civilian workers (as defined by the NCS), private-industry workers, and state and local government workers. Occupational earnings data are published for some major and minor industry groups, by worker attributes (such as collective bargaining status), and by establishment characteristics (such as number of workers in the establishment). Percentile earnings by worker attributes and establishment characteristics are also published. Earnings data are presented as mean and median hourly, weekly, and annual earnings (along with hours worked weekly and annually); as percentiles; by selected worker attributes (such as full time and part time, and union and nonunion); and by establishment characteristics (such as number of employees and geographic area).

To calculate earnings for various periods (hourly, weekly, and annually), the NCS collects data on work schedules. For hourly workers, scheduled hours worked per day and per week, exclusive of overtime, are recorded, as well as the number of weeks worked annually. For salaried workers, field economists record the typical number of hours actually worked (salaried workers who are exempt from overtime provisions often work beyond the assigned work schedule).

The NCS publishes earnings estimates for occupational groups and detailed occupations; it also presents earnings estimates by work levels and combined work levels. Work levels represent a ranking of the duties and responsibilities in an occupation.

## CONCLUSION

Of the two feasible wage definitions that could be used, we conclude that the definition used in the OES should be considered for use for antidiscrimination purposes because its current coverage is so widespread. Most employers who are in the industries and size classes that report employment by gender, race, and national origin to the EEOC already have experience in assembling and reporting hours and earnings together by occupation in order to complete the OES (see Chapter 2). There is strong reason to believe that the information is available and retrievable in the firms that would be called on to report earnings data to the EEOC.

Copyright National Academy of Sciences. All rights reserved.

# 4

# Survey Design and Statistical Methodology

When considering the collection of earnings data by gender, race, and national origin, the U.S. Equal Employment Opportunity Commission (EEOC) confronts several key decisions in the realm of survey design and statistical methodology. The decisions involve four closely associated issues: collectability, quality (defined as fitness for use), utility for statistical analysis, and response burden.

In this chapter we discuss the pros and cons of options for collecting earnings data from employers by adding items to existing equal employment opportunity (EEO) forms or developing a new collection instrument. We consider the fitness for use of the data, which addresses the relevance of the data to users' needs. We illustrate a model-based approach to identifying the utility of the categorical variables that would also be collected if wage data are collected. We address the question of employer burden and assess various options for minimizing the burden on reporting units. The last issue is complicated by the fact that there is a differential burden faced by employers of different sizes and with different levels of sophistication in their human resource and payroll systems. In the case of collection of earnings data by gender, race, and national origin, one approach may not be appropriate for all respondents.

SJA158
Copyright National Academy of Sciences. All rights reserved.

## OPTIONS FOR DATA COLLECTION

### Modify Current EEO Forms

The most direct solution to obtaining earnings information for EEOC purposes would be to add earnings items to existing EEO reports. The collection instrument that it would likely make most sense to modify for this purpose would be the EEO-1 form, for several reasons. First, it enjoys substantial coverage. As discussed in Chapter 1, the mandatory EEO-1 reports in 2010 covered about 67,000 private-sector respondents, with about 55 million employees.

Second, the form is part of the everyday operations of the antidiscrimination agencies. The EEO-1 reports are used by the EEOC and the Office of Federal Contract Compliance Programs (OFCCP) to trigger enforcement and technical assistance based on the identification of potential EEO problems, which is determined from data provided by employers on the reports.

Third, it is expected that the necessary modifications to the EEO-1 form would be quite manageable for both EEOC and the respondents. The addition of the earnings data could be accomplished in much the same way that earnings data are collected on the EEO-4 form: that is, either by adding another column to the form that requests the earnings data or adding another row for each occupation, which would collect average pay in addition to the current row that collects number of employees by race/ethnicity group. An alternate collection design would be to simply duplicate the existing EEO-1 form and have employers place in the cells of one table the number of employees, as they now do, and in the second table enter the pay corresponding to those employees.

### Design a New Collection Instrument

A second option would be to design a new and, one hopes, a more streamlined collection instrument that would collect both employment and earnings information. The design of such a new instrument could be informed by the current effort by OFCCP to develop a collection instrument to replace the defunct Equal Opportunity Pilot Survey discussed in Chapter 2. As this report was being prepared, the OFCCP had issued an Advance Notice of Proposed Rulemaking (ANPRM) that solicited comments on several issues important for designing a new collection instrument. For example, OFCCP asks whether expanded information should be collected in order for OFCCP to assess whether further investigation into a contractor's compensation decisions and policies is warranted. To collect such data as average starting or initial total compensation (including paid leave, health and retirement benefits, etc.); average pay raises; average bonuses;

Copyright National Academy of Sciences. All rights reserved.

minimum and maximum salary; standard deviation or variance of salary; the number of workers in each gender and race/ethnicity category; average tenure; and average compensation data by job series (e.g., all engineers within a particular department or all secretaries throughout the establishment) would require a substantial redesign of the collection form.

Some of the items that might be useful in understanding the EEO environment in establishments would likely require open-ended questions, such as on topics suggested in the OFCCP ANPRM pertaining to company policies related to promotion decisions, bonuses, shift pay, and setting of initial pay. This information is difficult to collect and to process efficiently in a standardized manner.

## FITNESS FOR USE

### Types of Uses

Quality of information is generally defined in terms of its fitness for use. This is a multidimensional concept embracing the relevance of the information to users' needs and the accuracy, timeliness, accessibility, interpretability, and coherence that affect how the data can be used. There is a considerable literature on statistical quality and the steps that should be taken to make data useful for its intended purpose (see, e.g., Brackstone, 1999; U.S. Office of Management and Budget, 2002). The literature highlights the importance of clearly understanding the requirements for the data before collection begins. It is important in this context to consider the need of the EEOC for earnings information.

The major use of the EEO compensation data would be to aid enforcement of pay discrimination statutes in two ways: targeting enforcement actions and carrying out enforcement actions against an employer that has been targeted. Targeting is primarily a matter of selecting among the complaints the EEOC receives to identify those firms that are most likely to be found to have discriminatory practices.

There are, however, secondary uses, such as analysis of overall trends in pay discrimination and trends by industry and location, as well as research on compensation trends. If such new compensation data become available, they would be a powerful supplement to existing sources of compensation data, such as those discussed in Chapters 2 and 3.

Because the data collected by this survey would be so important to collect correctly, it is incumbent on EEOC to identify the potential uses of the data early in a design process so that the data items to be collected can be identified and issues of data quality considered. Again, the requested comments in the OFCCP ANPRM are instructive when paraphrased in EEOC terms:

SJA160
Copyright National Academy of Sciences. All rights reserved.

- Should the data be used to conduct industrywide compensation trend analyses? If so, what type of compensation trend analyses would be appropriate to conduct on an industrywide basis?
- For each type of analysis identified, identify the categories of data that should be collected in order to compare compensation data across employers in a particular industry and the job groupings that should be used.
- Should the data be used to identify employers in specific industries for industry-focused compensation reviews?
- What specific categories of data would be most useful for identifying employers in specific industries for industry-focused compensation reviews?
- Should the data be collected by individual establishment for multi-establishment employers? What specific categories of data would be most useful for conducting compensation analyses across an employer's various establishments?

### Utility of the Data Items for Statistical Analysis

In this section we consider how the EEOC could develop a statistical model for use in screening individual employers for possible violations of pay discrimination. There are several key considerations here. First, the data to be used in this model would, of course, be reported by each individual employer. In addition to the information already requested for the EEO-1 report (e.g., employment by occupation, sex, and race/ethnicity), a form would collect pay (measured as discussed in Chapter 3) and possibly other information, such as employees' years of service. Given these data, one could conduct a multiple regression analysis of pay in relation to demographic variables (e.g., the EEO-1's 14 sex and race/ethnicity groups) and other characteristics, usually called "control variables," such as occupational category and years of service. More complex models might include controls for occupation or job categories or more elaborate controls for education and labor force experience. Still more complex models might include more detailed occupational or job categories and more elaborate controls for previous experience and qualifications.

There are a large number of potential control variables that could be included in such regression models, and, especially for employers with small numbers of employees, there would be benefits from keeping the number of covariates in such models relatively small. To do that, there are a variety of statistics, including Mallows' $C_p$, Akaike Information Criterion (AIC), and Bayesian Information Criterion (BIC), that could be employed to remove control variables that were not contributing substantially to the fit of the model.

Copyright National Academy of Sciences. All rights reserved.

While there is substantial disagreement over the most appropriate models to use for establishing a reasonable claim of possible wage discrimination, or defending one, it is not necessary to have a definitive model to assess the potential quality of certain basic statistical tests that might be reasonably performed by EEOC. We undertake such an analysis here. We emphasize that the regression model we describe below is intended, first and foremost, as an illustrative example of a methodology for undertaking some of these basic statistical tests. For this purpose, we need to provide enough specifics to allow a clear and straightforward discussion of the general nature of the issues that would arise in such an exercise.

The regression model we use is a general linear model of the form:

$$y_i = \beta_0 + d_i \beta_1 + x_i \beta_2 + \varepsilon_i$$

Here, $y_i$ is the logarithm of the wage measure for individual $i$, $d_i$ is the vector of design variables that indicate the EEO-1 categories occupied by individual $i$, $x_i$ is a vector of control variables, $\varepsilon_i$ is the statistical error, $\beta_0$ is the intercept, $\beta_1$ is the vector of EEO-1 log wage differentials from a specified reference group (usually white, non-Hispanic males), $\beta_2$ is the vector of effects associated with the control variables, and $i = 1,...,N$, where $N$ is the total number of employees in the analysis.[1]

For an agency such as EEOC or OFCCP, the results from this kind of regression analysis that will be of greatest concern will be the estimates of the coefficients for gender and race/ethnicity: that is, the betas, because the estimates of these coefficients indicate the extent (if any) to which women or nonwhites are paid less than men or whites who are the same in terms of the other factors (the "control variables") included in the analysis. It will be particularly important to perform a test to determine if these coefficients are statistically significantly different from zero (i.e., are unlikely to have occurred simply as a result of random or chance factors).

Assuming that design vectors $d_i$ and $x_i$ are statistically exogenous with respect to $\grave{o}_1$ and that $\grave{o}_1$ has a normal distribution with zero mean, constant variance, and independence over individuals, there is a well-known *F*-test for the null hypothesis: $\beta_1 = 0$. This statistic tests the hypothesis that all of

---

[1]The earliest analyses that used the logarithm of wages were Blinder (1973) and Mincer (1974). Their work discussed specifications in the logarithm and levels. Since the early 1970s the prevailing practice in economics has been to use the logarithm of the rate of pay as the dependent variable. The regression model has been selected because when analysis is expressed in logs, pay gaps can be expressed in a comparable way (i.e., as percentages) even for dates that are wide apart. This also means that estimated coefficients in log regressions can be interpreted as showing the *percentage change* in *y* that occurs as a result of a change in *x* and when *x* is an indicator for race or gender, it measures the percentage difference in pay between the indicated group relative to a reference group.

Copyright National Academy of Sciences. All rights reserved.

the EEO-1 log wage differentials are jointly zero versus the alternative that at least one of the differentials is nonzero. The usual $F$-statistic is based on the Type-III sum of squares for the model component associated with the design vector $d_i$: that is, the conditional model sum of squares for $d_i$ given the other variables, $x_i$, in the model. This statistic is invariant to the choice of reference group.

An automated test of the hypothesis $\beta_1 = 0$ could be conducted from an enhanced EEO-1 report that included appropriate wage data. The suitability of such a test depends on how likely it is that the test would detect a departure from $\beta_1 = 0$ for realistic configurations of employer data and with appropriate controls. We approach this question by attempting to measure the power of the standard $F$-test for $\beta_1 = 0$ in scenarios that resemble best-case outcomes for such an automated procedure.

The power of a test is the probability that it will reject the null hypothesis when that hypothesis is false. In other words, the power of a test is the probability that it will actually find a sex or race/ethnicity difference when such a difference exists. In colloquial terms, one might say that the power of a test is the probability that it will detect a potentially discriminating ("guilty") party. The power depends on the magnitude of the departure from the null hypothesis (how big the differentials are) and the precision with which those differentials can be estimated. In turn, the precision of the estimate(s) depends critically on the number of data points used in forming the estimates.

In the present context, it is crucial to note that the power of the statistical model for screening employers will be sensitive to the number of data points used in its construction. It is simple common sense that, other things being equal, a poll of 1,000 people is likely to be much more precise (will have much greater power) than a poll of 100 people; similarly, regression estimates of sex or race/ethnicity pay differences that are based on many data points will have greater power than estimates based on only a few data points. Finally, note that the number of data points in an analysis of a particular employer will depend on the size of the employer's work force: the greater the number of employees, the greater the number of data points, and the greater the power of the statistical model used in screening employers. Thus, when the number of employees is small, any screening model that EEOC might develop will have very low power, and when the number of employees is large, the screening model will have high power. The important question is thus obvious: How many data points must there be—how large does the employer's work force have to be—to yield "enough" power?

For general linear models, there is standard software to assist with this power assessment. The inputs consist of estimates of the magnitude of the likely discrepancy and summary measures of the estimation precision. We next describe how we estimated those components.

Copyright National Academy of Sciences. All rights reserved.

We considered an employer-size power analysis that is based on the predictions and estimation precision of models fit on the March 2010 Current Population Survey (CPS) Annual Social and Economic Supplement. Essentially, we are asking: "How many employees must a respondent firm have in order for the *F*-test to have the specified power to detect log wage differentials as big as the ones in the overall economy, as measured in March 2010?" This is a "best-case" scenario for two reasons. First, the differentials in the overall economy are larger than those typically found at a single employer because the heterogeneity in job types between employers is much greater than the heterogeneity of job types for a given employer. Second, because the overall workforce is more heterogeneous than the workforce of a given employer, most effects are estimated more precisely in the March CPS than they would be in a sample drawn from a single employer.

Because the CPS data are more heterogeneous than microdata from a single employer, they permit estimation of models that strongly resemble the ones that might be used by EEOC to screen EEO-1 reports that included wage data developed according to either of the two pilots recommended in this report (see Chapter 6). And because they allow a plausibly "best-case" power analysis, it is reasonable to consider them before investing heavily in data that might permit a more precise answer.

To minimize the effects of different definitions of the wage rate, we selected previous-year wage and salary earners only. The selected individuals were full-time employees (at least 35 hours/week) for at least 50 weeks in 2009 (the reference year for the March 2010 CPS supplement) and were between the ages of 16 and 75. We coded these individuals into the appropriate gender and race/ethnicity categories corresponding to the EEO-1 form. The design of these log wage differentials has 13 degrees of freedom. We used the major occupation codes (a taxonomy of 10 occupation groups) and the detailed occupations (a taxonomy of about 500 categories).[2] The use of 10 major occupation code categories is a reasonable proxy for the EEO-1 occupations for the purposes of these power studies.

In addition to occupation categories, we also used 16 educational categories. These were entered as control variables in some analyses and used in combination with age to create a measure of time since leaving school, which is called "potential experience."

Analyses based on the public-use CPS data are necessarily between-employer estimates, rather than within employer estimates, as any analysis of EEO-1 wage data would be. We included a control for major industry (13 categories) to allow the power analyses to be closer to those that a full

---

[2]We chose this approach because a standardized recoding of the CPS occupational codes to EEO-1 categories would have involved about as much measurement error as the error associated with the coding to major and detailed occupations in the first place.

Copyright National Academy of Sciences. All rights reserved.

pilot might produce. Model 1 controls for occupation only; Model 2 controls for occupation and covariates; Model 3 controls for detailed occupations and covariates. Figure 4-1 compares the estimates of the three models.

Model 1, shown in the Table 4-1 below, estimates the EEO-1 differentials within major occupational categories. It corresponds to the test $\beta_1 = 0$ conditioning on main effects only for the major occupational group. Not surprisingly, relative to the base group of white non-Hispanic males, all of the estimated differentials are large. Jointly, the $F$-test rejects $\beta_1 = 0$ with a $P$-value of less than 0.0001, and individually all of the differentials are statistically significant at the 0.05 level or higher. The $R^2$ for this equation is 0.25, and the residual variance is 0.37. These two statistics are also used in the power analysis.

The first power analysis asks what the minimum employer size would be in order to detect differentials as large as those in Model 1 and with employer-specific data that had the same design and explanatory power. The line labeled "Controls EEO-1 Occupation Only" answers this question. All power analyses assume that the basic $F$-test has size 0.05 at $\beta_1 = 0$: that is, the probability of rejecting a true null hypothesis is fixed at 0.05 throughout.

A regression analysis of an employer with approximately 99 employees has power of 0.50: it is equally likely to accept or reject the null hypothesis $\beta_1 = 0$ for wage differentials on the magnitude of those in Model 1. Employment of 200 is needed to boost the power to 0.90, a value that is often used as the standard for acceptable power.[3]

Model 2, shown in Table 4-2 computes the EEO-1 log wage differentials with controls for main effects of the major occupation category as well as main effects of education, major industry, and a quartic in potential experience. The estimated log wage differentials are much smaller than in Model 1, although still quite substantial in magnitude. The $F$-test for the joint significance is 238.41 with a $P$-value less than 0.0001. The $R^2$ for this equation is 0.39, and the residual variance is 0.30. As can be seen in Figure 4-1, an analysis based on 155 employees delivers power of 0.50 in this case, and an analysis of an employer of size 318 is required for power of 0.90.

Model 3 is shown in Table 4-3 below. In this estimation, we control for detailed occupation in addition to the covariates that were included in Model 2. The $F$-statistic falls to 138.38 but with a $P$-value that is still less than 0.0001. Estimated differentials also fall substantially. The $R^2$ for

---

[3] All model estimation was conducted in SAS (statistical analysis software) version 9.3 using PROC GLM. All power analysis was conducted in SAS version 9.3 PROC GLMPOWER. The design matrices, estimated subgroup means, and regression summary statistics used in the power analysis were computed from the March CPS data in the statistical summaries shown in all three of our models.

Copyright National Academy of Sciences. All rights reserved.



**FIGURE 4-1** Comparisons of analytic power and employer size for selected EEO-1 wage reports, three models.
NOTE: See Tables 4-1, 4-2, and 4-3 and text discussion of these models.
SOURCE: Analysis by panel using Current Population Survey data.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 4-1** Base Model for Estimating EEO-1 Log Wage Differentials (Current Population Survey, March Supplement 2010)

| | Model 1 | | | |
|---|---|---|---|---|
| Parameter | Estimate | Standard Error | t Value | Pr > \|t\| |
| Intercept [base is white (only) non-Hispanic male] | 10.57427 | 0.010841 | 975.37 | <.0001 |
| Hispanic male | −0.31926 | 0.009651 | −33.08 | <.0001 |
| Hispanic female | −0.53986 | 0.011632 | −46.41 | <.0001 |
| White (only) non-Hispanic female | −0.35903 | 0.006372 | −56.35 | <.0001 |
| Black or African American (only) non-Hispanic male | −0.24208 | 0.011809 | −20.5 | <.0001 |
| Black or African American (only) non-Hispanic female | −0.46951 | 0.011104 | −42.28 | <.0001 |
| Native Hawaiian Islander or Other Pacific Islander (only) male | −0.15631 | 0.072491 | −2.16 | 0.0311 |
| Native Hawaiian Islander or Other Pacific Islander (only) female | −0.36209 | 0.07278 | −4.98 | <.0001 |
| Asian (only) male | −0.03405 | 0.015258 | −2.23 | 0.0257 |
| Asian (only) female | −0.23185 | 0.017217 | −13.47 | <.0001 |
| American Indian or Alaska Native (only) male | −0.18747 | 0.04766 | −3.93 | <.0001 |
| American Indian or Alaska Native (only) female | −0.61771 | 0.046857 | −13.18 | <.0001 |
| Two or more races male | −0.13671 | 0.034945 | −3.91 | <.0001 |
| Two or more races female | −0.38639 | 0.037565 | −10.29 | <.0001 |
| | DF Model | DF Error | F Value | Pr > F |
| EEO-1 differentials | 13 | 62001 | 410.19 | <.0001 |

NOTE: Controls for major occupation only (10 categories).
SOURCE: Analysis by panel using Current Population Survey data.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 4-2** Model for Estimating EEO-1 Log Wage Differentials Controlling for Education, Major Industry, and Potential Experience (Current Population Survey, March Supplement 2010)

| Parameter | Estimate | Standard Error | t Value | Pr > \|t\| |
|---|---|---|---|---|
| | | Model 2 | | |
| Intercept [base is white (only) non-Hispanic male] | 10.76643118 | 0.02673094 | 402.77 | <.0001 |
| Hispanic male | −0.14657715 | 0.00912375 | −16.07 | <.0001 |
| Hispanic female | −0.35794272 | 0.01073877 | −33.33 | <.0001 |
| White (only) non-Hispanic female | −0.27917604 | 0.00593934 | −47 | <.0001 |
| Black or African American (only) non-Hispanic male | −0.18823432 | 0.01062293 | −17.72 | <.0001 |
| Black or African American (only) non-Hispanic female | −0.36062882 | 0.01018799 | −35.4 | <.0001 |
| Native Hawaiian Islander or Other Pacific Islander (only) male | −0.08203944 | 0.06499172 | −1.26 | 0.2068 |
| Native Hawaiian Islander or Other Pacific Islander (only) female | −0.30479654 | 0.06524491 | −4.67 | <.0001 |
| Asian (only) male | −0.08434892 | 0.01375719 | −6.13 | <.0001 |
| Asian (only) female | −0.20779203 | 0.01551098 | −13.4 | <.0001 |
| American Indian or Alaska Native (only) male | −0.12243174 | 0.04276004 | −2.86 | 0.0042 |
| American Indian or Alaska Native (only) female | −0.4567789 | 0.04207129 | −10.86 | <.0001 |
| Two or more races male | −0.0878382 | 0.03133437 | −2.8 | 0.0051 |
| Two or more races female | −0.27586943 | 0.03371475 | −8.18 | <.0001 |

| | DF Model | DF Error | F Value | Pr > F |
|---|---|---|---|---|
| EEO-1 differentials | 13 | 61970 | 238.41 | <.0001 |

NOTE: Controls for major occupation (10 categories), education (16 categories), major industry (13 categories), and potential experience (quartic).
SOURCE: Analysis by panel using Current Population Survey data.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 4-3** Model for Estimating Detailed Occupational Log Wage Differentials Controlling for Education, Major Industry, and Potential Experience (Current Population Survey, March Supplement 2010)

| Parameter | Estimate | Standard Error | t Value | Pr > \|t\| |
|---|---|---|---|---|
| | | Model 3 | | |
| Intercept [base is white (only) non-Hispanic male] | 10.86089272 | 0.10171189 | 106.78 | <.0001 |
| Hispanic male | −0.10250055 | 0.00874789 | −11.72 | <.0001 |
| Hispanic female | −0.26943452 | 0.0104887 | −25.69 | <.0001 |
| White (only) non-Hispanic female | −0.22408845 | 0.00603451 | −37.13 | <.0001 |
| Black or African American (only) non-Hispanic male | −0.12759486 | 0.01016768 | −12.55 | <.0001 |
| Black or African American (only) non-Hispanic female | −0.27720803 | 0.00998411 | −27.76 | <.0001 |
| Native Hawaiian Islander or Other Pacific Islander (only) male | −0.06154783 | 0.06152922 | −1 | 0.3172 |
| Native Hawaiian Islander or Other Pacific Islander (only) female | −0.22666618 | 0.06175392 | −3.67 | 0.0002 |
| Asian (only) male | −0.07824855 | 0.01319245 | −5.93 | <.0001 |
| Asian (only) female | −0.17077671 | 0.01501089 | −11.38 | <.0001 |
| American Indian or Alaska Native (only) male | −0.10341199 | 0.04060558 | −2.55 | 0.0109 |
| American Indian or Alaska Native (only) female | −0.37084016 | 0.0398942 | −9.3 | <.0001 |
| Two or more races male | −0.08577552 | 0.02967712 | −2.89 | 0.0039 |
| Two or more races female | −0.22016021 | 0.03197085 | −6.89 | <.0001 |
| | DF Model | DF Error | F Value | Pr > F |
| EEO-1 differentials | 13 | 61483 | 138.38 | <.0001 |

NOTE: Controls for detailed occupation (497 categories), education (16 categories), major industry (13 categories), and potential experience (quartic).
SOURCE: Analysis by panel using Current Population Survey data.

SJA169
Copyright National Academy of Sciences. All rights reserved.

this equation is 0.47, and the residual variance is 0.26. As can be seen in Figure 4-1, 545 employees are required for a power of 0.50 in this case, while about the same sample size (551 employees) yields a power of 0.90. The power curve for this model is flat because there are 496 degrees of freedom for the detailed occupation controls. Once there are adequate data to fit this model, about 50 additional observations are needed to achieve the target power for the EEO race and gender test.

## MINIMIZATION OF REPORTING BURDEN

### Estimation of Burden

One reason for the outcry on the part of the business community when the Paycheck Fairness Act was under consideration in Congress was the perception that the legislation would impose a significant new reporting burden on employers, particularly on small employers. The Paperwork Reduction Act of 1995 specifically requires agencies to demonstrate the practical utility of the information that they propose to collect and to balance this against the burden imposed on the public.

EEOC currently calculates the cost and burden of its data collections in its submissions of Information Collection Requests to the U.S. Office of Management and Budget (OMB). The number of respondents (including multi-establishment respondents), responses (usually at the establishment level), estimated burden hours, costs, and mode of collection for the four major EEO data collections in the most recent reports of EEOC to OMB are shown in Table 4-4.

The estimates of burden costs and hours in Table 4-4 are based on the EEOC's best estimates of the amount of time it takes for clerks to retrieve and enter the data to paper records. However, because less than one-fourth of employers who report now file paper records, the burden estimates may be overstated.

### Options for Minimizing Response Burden

To the extent that the current burdens data are representative, the addition of earnings data to the existing EEOC data collection forms that do not now collect the data, in much the same manner in which earnings data are collected in the EEO-4 form, could be expected to nearly double the current burden on employers. In the case of the largest collection, the current average of 3.5 hours per EE0-1 form might increase to somewhere near the average of 6.6 hours now reported for the EE0-4 form. This is not an inconsequential increase in response burden. It would behoove EEOC to consider taking steps to reduce the increase in response burden.

Copyright National Academy of Sciences. All rights reserved.

72

TABLE 4-4 Estimated Cost and Burden of EEOC Data Collections

| Form | Frequency | Respondents | Responses | Estimated Burden Hours | Estimated Cost | Percent Electronic Reported |
|------|-----------|-------------|-----------|------------------------|----------------|-----------------------------|
| EEO-1 | Annual | 45,000 | 170,000 | 599,000 | $11,400,000 | 80 |
| EEO-3 | Biannual | 1,399 | 1,399 | 2,098 | 85,000 | 79 |
| EEO-4 | Biannual | 6,018 | 6,018 | 40,000 | 700,000 | 76 |
| EEO-5 | Biannual | 1,135 | 1,135 | 10,000 | 190,000 | 58 |

SOURCE: Data from EEOC Form 83-I submissions to OMB.

SJA171
Copyright National Academy of Sciences. All rights reserved.

Several options are available for reducing the burden on reporters. Three are discussed in this section—less frequent data collection, use of a rotating scheme for certain employer size classes, and raising the size cutoff so that fewer employers would be in the scope of the collection.

## Less Frequent Collection

The EEO-1 report is now collected annually, while the other forms are collected on a biannual basis. The main issue is with the EEO-1 form. The law does not require the annual collection of EEO-1 data. The timing of collection is an administratively imposed requirement. By administratively reducing the frequency of data collection, the burden might also be reduced, though the extent to which it might be reduced is not entirely clear.

On the negative side, the less frequent availability of the reports would mean that the information that supports EEOC enforcement functions would be less current, by a year or so. This lag could be an important issue during economic turning points, when hiring or layoffs could significantly influence the employment and earnings profiles of covered firms. The time lag for EEOC's investigations of potential discrimination would increase, and the ability of the agency to be responsive to complaints in a timely manner would be negatively affected.

## Rotating Sample

It might be possible to continue to collect data annually but from only a part of the current reporting population and to permit firms with certain characteristics, such as not meeting a threshold size or in a selected industry group, to report less frequently. The selection of annual versus biannual reporters could, for example, be based on an analysis by EEOC of the probability of discrimination based, in turn, on the experience of the agency with enforcement. This tailored approach to selection of those firms that could report less frequently, however, would be hard to administer and could well be difficult to implement fairly in practice.

Moreover, this nuanced approach might actually complicate matters for employers. Because so many firms automate their reporting, it is now a routine matter, and rotating the reporting requirement might actually increase the administrative burdens. Employers would need to figure out when they needed to report, and the task of developing a database to capture the reports might be much more burdensome for EEOC.

SJA172

Copyright National Academy of Sciences. All rights reserved.

*Raising the Size Cutoff*

The current employment cutoff for the annual requirement to submit an EEO-1 form is 100 employees (50 employees if the firm is a federal government contractor). This cutoff limits the overall potential response burden significantly. By raising the size cutoff to, say, 200 employees (based on the statistical power analysis presented above), the number of firms that would have to report earnings would be reduced by half, but the employment coverage would be reduced by less than 10 percent (see Table 1-1, in Chapter 1). One consequence of raising the cutoff size would be a relative reduction in coverage of the earnings of females and minorities. The firms in the size classes for which the reporting requirement would be eliminated are those in which women and minorities are more heavily represented. Experiments with different cutoff sizes to better determine the tradeoffs between burden and coverage could be useful to include in the pilot study that the panel recommends (see Chapter 6).

## HUMAN RESOURCE AND PAYROLL SYSTEMS

Most companies of the size covered by EEO regulations have at least somewhat automated payroll and human resource management systems. Today, larger companies are more able to comply with a potential requirement for compensation data by gender, race, and national origin because they can gather compensation information from automated payroll systems and demographic data from automated human resource systems.

The panel reviewed the state of automation of company payroll systems from the perspective of three service providers—a large payroll-providing service firm, a firm that specializes in the emerging software-as-a-service (SaaS) market, and a firm that specializes in using companies' own internal data to analyze EEO status and prepare Affirmative Action Plans for those companies. In summary, we found that automated systems were expanding rapidly among U.S. employers, but that there are differences in the extent of implementing these applications by size of firm.

Currently, larger firms are likely to have human resource and payroll management systems, and they are likely to have an easier time in complying with a new requirement to provide compensation data by demographic characteristics than would smaller firms. Over time, one would expect that the use of such systems will grow and spread among smaller firms. In the long term, these automated systems may well serve as the basis for EEOC employment and wage data collection. As discussed in Chapter 6, the panel recommends a pilot test to collect information on the extent of penetration of these human resource and automated systems: see Appendix C.

Copyright National Academy of Sciences. All rights reserved.

## Payroll and Human Resource Providers

The industry of payroll and human resource providers is characterized by a growth in services beyond the usual provision of timekeeping and payroll functions. Most recently, the industry has expanded to include human resource management. As a result, one provider can bring together information on hours, earnings, and the demographics and work histories of the workforce. These data are captured directly from a client's data systems, often without client intervention.

The panel interviewed a large payroll-providing company to determine the influence of the growth of this sector on the reporting of earnings data to EEOC. This company lists 600,000 clients, representing, in the company's estimation, one of every six U.S. employees. The clients employ as few as 1 and as many as 1 million employees.

The company has a line of business that focuses on smaller employers—those with fewer than 100 employees—to provide a total source of payroll and human resource services. The company estimates that about 40 percent of these smaller employers use human resource services as well as payroll services. One product for the clients who use human resource services and who have an OFCCP or EEOC requirement is to produce EEO-1 reports.

## Growth of Software-as-a-Service Applications

The workshop presentation by Karen Minicozzi of Workday, Inc., representing an enterprise software solution, highlighted the unified human capital management solutions offered by the enterprise software and services provider, Workday, Inc. The company is one of a growing number of firms that provide turnkey payroll and human resource management solutions to businesses under the general label of SaaS. The solutions provide a new, global core system of record to replace legacy systems that have been maintained by the establishments themselves. The approach taken by these service providers is through a multitenant architecture: that is, one version of the application with common hardware, networking, and operating systems is used for all customers ("tenants"). The applications are often supported in the "cloud," that is, through Internet connectivity. The fact that these new service approaches have so much in common allows the generation of common reports (such as EEO reports) across the system, drawing on data from both the human resource and payroll functions of the serviced companies. Most of the companies that use this service are mid-size, large, and very large companies. Workday, Inc. has 246 customers.

These SaaS providers have been enjoying remarkable growth. An annual survey of employing establishments by the consulting firm CedarCrestone,

Copyright National Academy of Sciences. All rights reserved.

to ascertain the penetration of human resource applications in business, found them to be widespread, and it forecast SaaS as a deployment option will likely continue that growth as organizations move from licensed on-premise solutions to the cloud. The source of this information is the *CedarCrestone 2010–2011 HR Systems Survey.* The survey is based on 1,289 responses, representing employers of over 20 million employees (CedarCrestone, 2011). The survey also found that there were measurable differences in the penetration of these administrative applications by size of firm. In the most recent survey, 94 percent of employers with 10,000 or more employees had such systems, compared with 87 percent for employers with 250 to 2,499 employees. The CedarCrestone survey found that most of the applications were still licensed software, but the subscription-based SaaS applications and outsourcing solutions were growing in use.

### Analysis of Salary and Related Data for Pay Equity Purposes

In order to ensure that their firms are in compliance with the Equal Pay Act, Title VII, and Executive Order 11246 provisions, many employers use firms that perform compensation analysis and, in many cases, actually prepare automated Affirmative Action Plans. Other firms use software to support this analysis internally.

The panel heard testimony from Liz Balconi and Michele Whitehead, representatives of Berkshire Associates, a company that is very active in the compensation analysis business. This company obtains the following information from its client firms: employee identifier; job code; race; gender; date of hire; annualized base salary or hourly rate; grade, band, or classification (if applicable); time in current position, or date of last title change; date of last degree earned, or date of birth; full time or part time status; exempt or non-exempt status; title; employee location; years of relevant experience (or date of birth); factors that may legitimately impact pay in an organization, such as performance rating; education; date in grade; professional certifications; division; job group; starting salary; and annualized total compensation (including bonuses, commissions, cost of living allowances, and overtime).

The firm uses these data (which are generally available from their clients) to conduct two kinds of analyses: cohort analysis, which is a nonstatistical comparison of similarly situated incumbents within a group based on factors such as time in the company, educational background, and performance assessment; and statistical (regression) analysis to study the combined effect of factors on pay between comparator groups. Although not all of these data elements may be necessary to identify potentially discriminatory practices, prudent employers can be expected to have these types of data available and to use them to evaluate their own practices, using algorithms developed by specialty firms such as Berkshire Associates.

Copyright National Academy of Sciences. All rights reserved.

# 5

# Confidentiality, Disclosure, and Data Access

In contrast to the usual situation in federal government survey data collections—in which the data are available for statistical use but are protected from being used for compliance and enforcement purposes—data on equal employment opportunity (EEO) issues are available for compliance purposes but are closely held and not often made available for research and statistical analysis purposes. This anomalous situation poses interesting challenges to the U.S. Equal Employment Opportunity Commission (EEOC) and the other federal agencies that have responsibility for the data collected from public- and private-sector employers and unions for antidiscrimination enforcement purposes.

In addition to internal EEOC compliance and analytical uses, the data collected from employers have value to other federal and state agencies for their compliance and analytical purposes, to researchers to support analysis of discrimination practices, and to those who evaluate the effectiveness and efficiency of antidiscrimination programs. These uses outside of EEOC require the agency to develop practices and procedures to protect the data that are collected from employers under a pledge of confidentiality.[1]

---

[1]That pledge derives from Title VII, Section 709(e) of the Civil Rights Act of 1964, which sets the requirements for confidentiality:

It shall be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty, of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000 or imprisoned not more than one year.

SJA176
Copyright National Academy of Sciences. All rights reserved.

In this chapter we discuss current EEOC procedures for protecting confidential employer data in tabular and microdata form, evaluate the effectiveness of those measures, and suggest possible enhancements to those measures.

## STATISTICAL PROTECTION OF TABULAR DATA AND MICRODATA

As discussed in Chapter 1, the EEOC now publishes a large amount of data that are derived from the collection of information from employers, both private and public. These data are generally published in aggregated form by geographic area and industry group detail in standard tabular packages that are posted on the EEOC website and otherwise made available to the public. To comply with the confidentiality provisions of Title VII that govern release of individually identifiable information from EEO-1 reports (see Chapter 1), the tables are assembled under reportedly elaborate but unpublished rules that provide for suppression of data that could identify a particular establishment or multi-establishment firm.

In releasing aggregated data of private employers collected from annual EEO-1 surveys, the EEOC uses a data suppression rule that is quite similar to the rule used by other federal government agencies for statistical data based on information collected from employers, including the Quarterly Census of Employment and Wages (QCEW) Program from the Bureau of Labor Statistics (BLS).[2] The EEOC suppression rule is triggered when it meets the two primary suppression stipulations: (1) the group has three or fewer employers, or (2) one employer makes up at least 80 percent of the group employment in the aggregate.

In applying the suppression rules to industry group or geography entity or any combination of aggregates, the EEOC withholds any group's numbers if the group (an industry or a geography entity or an industry-by-geography group, etc.) contains fewer than three firms (represented by the presence of any number of establishment(s) of an individual firm within the group) or if any one firm in the group (represented by the total numbers of all the establishment(s) of the same firm within the given group) constitutes more than 80 percent of the group totals.

Unlike some other federal agencies, EEOC does not withhold aggregated data beyond its two primary suppression rules. There are no secondary suppression rules, and the agency does not further screen the aggregated data if the data have passed the fewer-than-three rule test. But although

---

[2]For more information on suppression, see http://www.bls.gov/opub/hom/homch5_d.htm#Presentation [December 2011].

Copyright National Academy of Sciences. All rights reserved.

EEOC literature documents the above rules, as a general practice EEOC does not disclose the detailed methodology for suppression because the agency wants to prevent users from reverse-engineering the data in order to obtain the suppressed numbers.

Cell suppression is just one means of protecting tabular data. Because there is always a risk of secondary disclosure, other means have been explored in recent years by U.S. government agencies to protect data by perturbing the data in some way (see Reznek, 2006, p. 3). Two methods are discussed here: adding noise and controlled tabular adjustment.

Noise addition is accomplished by adding random "noise" to the underlying establishment-reported data before they are tabulated. In this data perturbation method, cell values that would normally meet the criteria for suppression are changed by a large amount, while cell values that are not as sensitive are changed by a smaller amount. This technique is less complicated than cell suppression, and, by adding noise, an agency can show data for all cells and for all tables, which preserves the ability to draw inferences from all cells.[3] Another effort to preserve the analytical value of protected sensitive data is being developed using a controlled tabular adjustment technique. In this technique, a sensitivity rule determines which cells are sensitive, and the technique replaces each sensitive value with a safe value that is some distance away from the sensitive value. To preserve additivity, the nonsensitive values are minimally adjusted (Reznek, 2006, p. 5).

Another increasingly popular technique that is intended to make data available for research and analytical purposes is to generate synthetic data: for generation of synthetic microdata, see Reiter (2005); for generation of synthetic tables, see Slovkovic and Lee (2010). This technique relies on sampling and simulations. Typically, a model is developed to generate synthetic or partially synthetic data that have some of the same properties as the original data by sampling from the posterior predictive distribution of the confidential data. A typical method would be to use a sequential regression imputation. In this procedure, the original value of each variable is blanked-out and replaced by a model-generated value. The technique has been used at the Census Bureau to develop a synthesized microdata file linking Social Security Administration earnings data with data from a Census Bureau demographic survey (Reznek, 2006, p. 6).

Creating publicly available data products that are statistically valid and in which confidential data are protected is a complicated process.

---

[3]The technique is currently being used by the Census Bureau to protect confidential microdata from the Longitudinal Employer-Household Dynamics (LEHD) Program used in the Quarterly Workforce Indicators, which use, as inputs, sensitive data from unemployment insurance wage records and Census Bureau demographic and economic information (Abowd et al., 2006).

Copyright National Academy of Sciences. All rights reserved.

The best procedure to use depends on the type of data and their intended purposes, as well as on the risks of disclosure. For an overview of current statistical disclosure limitation practices in the United States, see Federal Committee on Statistical Methodology (2005). Many new techniques are being developed. The most recent ones combine techniques from statistics and computer sciences and aim to account for increased disclosure risk due to the presence of more externally available information and better record linkage technologies. Recent advances in data redaction strategies and data sharing, which include, among others, virtual research data centers, remote access servers, privacy-preserving mechanisms for distributed databases, and differentially private mechanisms, are highlighted in a special 2009 issue of the *Journal of Privacy and Confidentiality* (Kinney, Karr, and Gonzalez, 2009).

## PROTECTING ORIGINAL DATA

### EEOC Procedures

The actual, original data collected from the forms that employers submit to EEOC are now shared with the Office of Federal Contract Compliance Programs (OFCCP) of the U.S. Department of Labor, the Civil Rights Division of the U.S. Department of Justice (DOJ), and 95 state-level fair employment practices agencies (FEPAs). There are other sharing arrangements with the U.S. Department of Education and with researchers. Often these agencies have their own procedures for assuring the confidentiality of the shared data.

The specific arrangements vary in each instance. For example, OFCCP is a statutory member of the Joint Reporting Committee with EEOC for the collection of the EEO-1 reports. This arrangement is made known in advance to companies that provide their data to the EEOC.[4] According to protocols that are in place for the Joint Reporting Committee, EEOC collects the data, edits them as needed, appends some additional identifiers to the records, and transmits a copy of the entire statistical file to OFCCP.

The DOJ Civil Rights Division is a member of a joint state and local reporting committee with EEOC for the collection of EEO-4 reports (see Chapter 1). As it does with the EEO-1 data, EEOC collects the data and at the conclusion of the survey forwards a copy of the EEO-4 statistical file

---

[4]The EEO-1 instruction booklet (p. 1) states:

In the interests of consistency, uniformity and economy, Standard Form 100 has been jointly developed by the Equal Employment Opportunity Commission and the Office of Federal Contract Compliance Programs of the U.S. Department of Labor, as a single form which meets the statistical needs of both programs.

Copyright National Academy of Sciences. All rights reserved.

to DOJ.[5] It also transmits copies of the actual individual EEO-4 reports directly to DOJ officials, allowing immediate access to reports during the reporting period, as well as access to historical data.

FEPAs are state or local authorities that investigate and resolve charges of employment discrimination filed under Title VII, the Americans with Disabilities Act (ADA), the Age Discrimination Employment Act (ADEA), and comparable state laws and local ordinances in partnership with EEOC. Over the years, EEOC has negotiated work-sharing agreements with these agencies that allow the sharing of data. EEO-1 data are shared routinely in a charge tracking system that EEOC provides, which enables the FEPAs to retrieve the reports and run statistical comparisons. Other data are shared on an ad hoc basis.

Under the auspices of a school reporting committee, the EEOC shares EEO-5 data (see Chapter 1) with DOJ and the U.S. Department of Education. Statistical files are shared with both agencies. Specific requests for EEO-5 data are also honored, most often for DOJ.

From time to time, EEOC has entered into agreements with other federal agencies to allow the sharing of survey data. Currently, the only active agreement is with DOJ to share EEO-1 data. The memorandum of understanding (MOU) agreement, discussed below, spells out strict provisions for the protection of the confidentiality of the data.

The EEOC has also historically entered into agreements with individual researchers to allow the sharing of data: see Box 5-1. This has been a practice of the EEOC since 1969, when EEOC entered into an agreement with Eleanor Brantley Schwartz of Georgia State University to study women in management. The mechanism for sharing data in a protected environment is quite detailed, complicated, and time consuming, and it relies on giving the potential data user the status of a sworn federal employee.

### Office of Federal Contract Compliance Programs Procedures

OFCCP confidential data are derived from a "scheduling letter" process in which compliance reviews are initiated and certain documents and data sets are requested. The documents consist of the written Affirmative Action Plan (AAP) for the scheduled facility, certain compensation data, and information on additional personnel practices and policies to demonstrate compliance obligations.

---

[5]This arrangement is described in the EEO-4 booklet (p. 1):
  In the interests of consistency, uniformity and economy, State and Local Government EEO-4 is being used by Federal government agencies that have responsibilities for equal employment opportunity. A joint State and Local Reporting Committee, with which this report must be filed, represents those various agencies.

SJA180
Copyright National Academy of Sciences. All rights reserved.

---

**BOX 5-1**
**Intergovernmental Personnel Act Agreements with Researchers**

EEOC has used Intergovernmental Personnel Act agreements that detail outside persons to an employment arrangement to allow the sharing of survey data. These agreements give the researcher the status of a federal employee and access to the data. The researcher signs an agreement that prohibits disclosure of the data to anyone (including professors, advisers, and colleagues), except those persons directly employed by the project. It also requires the researcher to submit any work based on the EEOC information to the EEOC to (a) determine whether it contains any confidential information and (b) approve any language describing the relationship between the researcher and the EEOC. The data are to be returned to EEOC at the conclusion of the project, and all working files are to be certified as destroyed. The penalties for disclosure of confidential data in Title VII are formally transferred to the researcher.

SOURCE: Summary by panel staff of sample EEOC Intergovernmental Personnel Act agreement for external researchers, provided by EEOC staff on November 28, 2011.

---

Unlike EEOC, OFCCP has no formal data-sharing arrangement with federal or state agencies. Its data sharing occurs on an ad hoc or informal basis, such as when OFCCP refers cases to DOJ or EEOC to pursue enforcement. Sharing can also occur on a very limited basis under the MOU with EEOC. For data collected only by OFCCP, the past instances of data sharing have been infrequent, although additional sharing with EEOC can be foreseen.

Unlike Title VII of the Civil Rights Act of 1964 as amended, Executive Order 11264, which comprises the legal basis for OFCCP, is silent on rules and penalties for confidentiality of data from employers. However, confidentiality provisions that cover OFCCP are spelled out in the agency's regulations (see 41 C.F.R. 60-1.20(f)–(g) and 60-1.43). The regulations essentially state that the disclosure of data to the public is subject to the Freedom of Information Act and the Privacy Act and also to the procedures for preclusion of certain data due to assertion of privileges during litigation.[6]

---

[6]OFCCP rules were spelled out in the regulation that authorized the collection of the Equal Opportunity Survey (41 C.F.R. 60-2.18(d)). These rules state:

(d) Confidentiality. OFCCP will treat information contained in the Equal Opportunity Survey as confidential to the maximum extent the information is exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. 552. It is the practice of OFCCP not to release data where the contractor is still in business and, where the contractor indicates, and through the Department of Labor review process it is determined, that the data are confidential and sensitive and that the release of data would subject the contractor to commercial harm.

Copyright National Academy of Sciences. All rights reserved.

The OFCCP approach to data confidentiality is evolving in the direction of greater transparency. An example is a new initiative under the umbrella of the Open Government Directive,[7] under which the Department of Labor (DOL) has developed a searchable "enforcement database" comprised of DOL enforcement agencies, including OFCCP.[8] This database is available for viewing by academic researchers, stakeholders, and the public. Users can retrieve data by state or zip code, the company name, North American Industry Classification System codes, violation, and year. The database divides OFCCP data into two categories: evaluations (compliance reviews) and investigations (complaints). In making these administrative data available for the first time, OFCCP has a policy of limiting disclosed information. For example, it provides only data specific to the facility reviewed and only summary data (yes/no) for violations found, if any. However, it should be noted that the true underlying disclosure risks with such data are not fully understood.

### Department of Justice Procedures

As noted above, DOJ's Civil Rights Division obtains EEO-4 data from EEOC on a regular basis and holds it in confidence as a member of the joint state and local reporting committee. The DOJ uses the EEO-4 data to identify investigations that it believes should be launched, but it does not use the data directly in the investigation, nor are the data directly used in court cases. Instead, DOJ uses the data collected in the process of discovery to support its litigation.

The transmittal of EEO-1 data from EEOC to DOJ is covered by an MOU that was executed in May 2011.[9] The MOU calls on EEOC to provide DOJ with data for the most recent reporting period as soon as practicable after the EEOC has reconciled and finalized the statistical file. Historical EEO-1 files are also to be provided. In turn, DOJ agrees to preserve the confidentiality of the data in the same manner that EEOC employees are required by Title VII of the Civil Rights Act of 1964 as amended.

Among the steps leading to identification of a possible infringement of EEO laws, the DOJ compares the profiles of the public sector organizations

---

[7]White House, Memorandum on Transparency & Open Government, M-10-06. December 8, 2009. See http://www.whitehouse.gov/sites/default/files/omb/assets/memoranda_2010/m10-06.pdf [October 2012].

[8]For details, see http://ogesdw.dol.gov [July 2012].

[9]U.S. Equal Employment Opportunity Commission, Memorandum of Understanding Between the U.S. Equal Employment Opportunity Commission and the U.S. Department of Justice–Civil Rights Division for Sharing of Employer Information Report (EEO-1) Data, May 12, 2011.

Copyright National Academy of Sciences. All rights reserved.

under the agency's jurisdiction with similar organizations in the private sector, using the EEO-1 data that are obtained from EEOC.

## FURTHER PROTECTION OF SHARED EEO DATA

As the above discussion indicates, the EEOC shares sensitive EEO-4 and EEO-1 report data with other agencies in the federal government and with the FEPAs through rather informal arrangements, most of which are not backed by force of law. This practice is in contrast to the usual practice of federal statistical agencies that protect shared data through formal agreements backed by clear legislative authority that is enforced by stern penalties. For EEOC, even when there is an agreement, such as the one with DOJ, to share EEO-1 data, there is no indication that the data are shielded from court challenge or from requests under the Freedom of Information Act when they are shared.

In recent years, a procedure for protecting shared data has been implemented by several federal statistical agencies that might well serve as a model for protecting the EEOC employer data. The Bureau of Labor Statistics, Census Bureau, and Bureau of Economic Analysis can now share confidential data obtained from employers under provisions of the Confidential Information Protection and Statistical Efficiency Act (CIPSEA). This statute, under the umbrella of the U.S. Office of Management and Budget, prohibits disclosure or release, for nonstatistical purposes, of information collected under a pledge of confidentiality. Under this law, data may not be released to unauthorized persons. Willful and knowing disclosure of protected data to unauthorized persons is a felony punishable by up to 5 years imprisonment and up to a $250,000 fine—penalties that are significantly more stringent than those that are enumerated in the Title VII legislation.

It is certain that the sensitivity of the data that employers provide to EEOC will be heightened if earnings data were to be added to the EEO data records. Employee compensation data are generally considered to be highly sensitive; they are even considered proprietary information by many private-sector employers.

As this chapter points out, EEOC provides data to agencies that do not have the same level of confidentiality protections and are not covered by the same penalties that apply to EEOC employees and researchers under Interagency Personnel Act (IPA) agreements. Legislation patterned after the CIPSEA law could increase the protection of confidentiality of EEO data, specifically, to authorize sharing agreements between EEOC, OFCCP, DOJ, and the state and local FEPAs and extend the Title VII penalties beyond EEOC and its IPA researchers.

Copyright National Academy of Sciences. All rights reserved.

Such protection could be expected to increase the willingness of employers to provide detailed employment data. It could also help mitigate concerns of other federal agencies about the matching of the EEO-1 survey records to administrative data (such as those discussed in Chapter 2) if such matching was some day deemed useful to help improve the quality of the data.

SJA184
Copyright National Academy of Sciences. All rights reserved.

# 6

# Conclusions and Recommendations

The panel was invited to make recommendations to assist the U.S. Equal Employment Opportunity Commission (EEOC) in formulating regulations on methods for measuring and collecting pay information by gender, race, and national origin from U.S. employers for the purpose of administering Section 709 of the Civil Rights Act of 1964 as amended, if a decision is made to proceed with such a data collection. We have considered currently available and potential data sources, as well as methodologies and statistical techniques for the measurement and collection of such employer pay data. The panel's recommendations are made with an appreciation that such a new data collection would be a significant undertaking for EEOC and that it could well generate an increased reporting burden on some employers, and so any new data collection would have to be fully justified.

## PURPOSE OF A NEW DATA COLLECTION

Based on the literature we reviewed and the papers and presentations made to us by the staff of EEOC, the Office of Federal Contract Compliance Programs (OFCCP) in the U.S. Department of Labor, and the U.S. Department of Justice, the panel finds that there is no clearly articulated vision of how data on wages would be used in the conduct of the enforcement responsibilities of these agencies. As discussed in Chapter 1, the use of the employment data from the EEO-1 reports for the purpose of targeting potentially noncompliant firms was highlighted by EEOC and OFCCP leadership as an objective of the collection of earnings data by gender, race, and national origin. Thus, targeting is broadly given as the objective

SJA185
Copyright National Academy of Sciences. All rights reserved.

of collection of earnings data by both OFCCP and EEOC, but the specific mechanisms by which the data would be assembled, assessed, compared, and used in a targeting operation are not well developed by either agency. The panel found no evidence of a clearly articulated plan for using the earnings data if they are collected: the fundamental question that would need to be answered is how earnings data should be integrated into the compliance programs that have to date been triggered mainly by a complaint process, which, in their absence, includes relatively few complaints about pay matters.

With regard to existing studies of the cost-effectiveness of an instrument for collecting wage data, the panel concludes that they are inadequate to assess any new survey program. For example, unless the agencies have a comprehensive plan that includes the form of the data collection, it will not be possible to reliably determine the actual burden on employers and the costs and benefits of the collection.

As discussed in Chapter 3, it is important to clearly understand the requirement and potential uses of data as a first step in determining their fitness for use, that is, the quality of the data. Although it is assumed that, if these data are collected, they could greatly enhance the enforcement process, until EEOC and its cooperating agencies gain experience with collecting, processing, and using earnings data in field investigations and in litigation, it will not be known if the data are of sufficient reliability to support enforcement.

Other potential benefits of the possible collection of pay data remain to be fully articulated but are of interest. In addition to targeting, the collection of earnings data could well be used in research on discrimination and pay equity. Analysts would be able to associate pay differentials by type of establishment, location, job category (occupation), and demographic detail, which cannot currently be done with existing data. For such use, however, systems for maintaining, retrieving, archiving, and processing the data in a protected environment would have to be developed.

> **Recommendation 1: In conjunction with the Office of Federal Contract Compliance Programs of the U.S. Department of Labor and the Civil Rights Division of the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission should prepare a comprehensive plan for use of earnings data before initiating any data collection.**

## PILOT STUDY

With a comprehensive plan in hand, the next logical step would be to test it. Because of the current paucity of evidence about such a data collection, the panel concludes that reliable information about the costs and

SJA186
Copyright National Academy of Sciences. All rights reserved.

benefits of the proposed collection would best be provided by an independent pilot study. The panel's two-pronged approach to conducting a pilot study (to be done by an independent contractor) is outlined below and detailed in Appendix C.

The first approach—a microdata pilot test—would collect a number of core demographic variables—using the categories on the Equal Employment Opportunity (EEO)-1 form and adding an annual wage measure for individual employees. This approach would test targeting firms for enforcement purposes, as well as testing the collection of additional variables that could illuminate the relevant characteristics of targeted firms. For example, age and years-on-the-job variables could assist in controlling for the legitimate effect of these characteristics on wages. In developing the test, the public responses to the OFCCP ANPRM could well be instructive.

The second approach—a simplified aggregated-data pilot test—would develop and test an enhanced EEO-1 report that would include all the summary data required for the computation of test statistics comparing wage data in existing EEO-1 occupations. This pilot would use grouped data techniques that would produce standardized wage rates and other measures of interest.

Both approaches to the pilot study could test various earnings definitions. On the basis of our analysis, we conclude that the definition used in the Occupational Employment Statistics (OES) survey is the most feasible (see under heading Definition of Compensation). The tests could also assess the possibility of reducing employers' response burden through building in compatibility with the electronic record-keeping systems that are now in use in larger companies.

The quality of the data from the pilot tests would have to be assessed in light of the analysis plan that results from Recommendation 1. It would also be desirable for the quality of the data collected in the pilot to be verified by independent record checks of reporting establishments or by comparison of aggregated results with administrative databases (see Chapter 2), again using the criteria developed as part of the analysis plan in Recommendation 1.

> **Recommendation 2: After the U.S. Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, and the U.S. Department of Justice complete the comprehensive plan for use of earnings data, the agencies should initiate a pilot study to test the collection instrument and the plan for the use of the data. The pilot study should be conducted by an independent contractor charged with measuring the resulting data quality, fitness for use in the comprehensive plan, cost, and respondent burden.**

Copyright National Academy of Sciences. All rights reserved.

## AGENCY CAPACITY AND BURDEN

It is important to consider the administrative capacity for the collection, analysis, and protection of pay data. The EEOC has a small data collection and analytical program, which has traditionally been focused nearly exclusively on collecting employment data and assessing employer compliance through the means of rather straightforward statistical tests.

If EEOC undertakes a major new activity, it is not clear that it could administratively handle the work given available resources. If data on compensation is added to an existing form, or collected in a new instrument, the agency's resources for both collection and analysis are likely to be severely strained. Thus, EEOC needs to consider its capacity to undertake any new collection. To take full advantage of new opportunities for analytics and compliance using more sophisticated measures enabled by the availability of detailed earnings data will surely require an enhancement of EEOC's analytical and data processing capacity, as well as its capability to protect the confidentiality of the information.

**Recommendation 3: The U.S. Equal Employment Opportunity Commission should enhance its capacity to summarize, analyze, and protect earnings data.**

## MEASURES FOR COLLECTION OF PAY INFORMATION

Several possible measures of pay information could be used for the possible new data collection, ranging from pay bands (the measure now used on the EEO-4 form) to rates of pay (e.g., annual salaries, hourly wages, etc.). Though pay band collection is attractive in that it aligns with the way that human resource managers tend to look at compensation, the best data are collected from payroll records, and those data are most likely to be rates of pay or average annual earnings as computed using total wage and hours information. Rates of pay as a measure have the advantage of being more likely to provide valid measures of both central tendency and dispersion, important quality checks and analytical capabilities that pay band data cannot provide. Rates of pay collection would add rigor to the collection process and subsequent analysis.

**Recommendation 4: The U.S. Equal Employment Opportunity Commission should collect data on rates of pay, not actual earnings or pay bands, in a manner that permits the calculation of measures of both central tendency and dispersion.**

SJA188
Copyright National Academy of Sciences. All rights reserved.

## DEFINITION OF COMPENSATION

A number of definitions of compensation are currently in use, ranging from comprehensive measures of total compensation to simple straight-time hourly pay. As noted above and in Chapter 3, we conclude that the best definition is that in the OES survey, and we urge that a test of collection of data from employers by gender, race and national origin be conducted as part of the pilot test program.

As noted in Chapter 3, earnings in the OES survey are defined as straight-time, gross pay, exclusive of premium pay. The definition includes a base rate of pay, cost-of-living allowances, guaranteed pay, hazardous-duty pay, incentive pay (including commissions and production bonuses), and tips. The definition excludes overtime pay, severance pay, shift differentials, nonproduction bonuses, employer cost for supplementary benefits, and tuition reimbursements.

Earnings data by occupation are collected in the OES survey with use of this definition from more than 1.2 million establishments in the United States with response rates of nearly 80 percent. Clearly, most of the firms that fall within the scope of the EEO statutes and are now required to complete an annual EEO-1 report have the ability to provide these data from their existing payroll and human resource systems.

With the growth of highly sophisticated electronic systems, such as those represented in software-as-a-service applications, the ability to transfer data efficiently between the payroll and human resource systems is expected to expand in the future. By monitoring these quickly changing software developments and continuing its work with reporting employers, EEOC could capitalize on advances in electronic reporting.

## ACCESS TO PAY INFORMATION IN A PROTECTED ENVIRONMENT

If the pilot tests and other developmental activities recommended in this report bear fruit and if EEOC begins collection of pay data from employers, the data will comprise an important new source of information for research and analytical purposes, in addition to their intended use in enforcement. We expect that there will be great demand on the part of other federal agencies, researchers, analysts, compensation-setting bodies, and others for access to these powerful new data. EEOC would be well advised to start taking steps now to develop policies to provide access in a protected environment.

**Recommendation 5: In anticipation of increased user demand for microdata on pay information by demographic detail for research and**

Copyright National Academy of Sciences. All rights reserved.

**analytical purposes if such data are collected by the U.S. Equal Employment Opportunity Commission, the agency should consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data, to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications.**

Though there have been no known breaches of the EEOC's ability to protect EEO data, the consequences of a breach in the protection of data provided in confidence are, as other federal agencies have discovered, painful and of lasting consequence. Thus, EEOC should consider providing the same protections to the organizations and individuals that become parties to data-sharing agreements as it now has with its own employees.

**Recommendation 6: The U.S. Equal Employment Opportunity Commission should seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to nonagency employees.**

SJA190
Copyright National Academy of Sciences. All rights reserved.

SJA191
Copyright National Academy of Sciences. All rights reserved.

# References

Abowd, J.M., and Hallock, K.F. (2007). *Wages v. Total Compensation: Data Quality Issues and Proposals.* Prepared for the Princeton Data Improvement Initiative, February 6. Available: http://harris.princeton.edu/admin/pdfs/abowd-hallock-20070206.pdf [October 2012].

Abowd, J.M., Stephens, B., Vilhuber, L., Andersson, F., McKinney, K., Roemer, M., and Woodcock, S. (2006). *The LEHD Infrastructure Files and the Creation of the Quarterly Workforce Indicators.* LEHD Technical Paper No. 2006-01. Available: http://lehd.did.census.gov/library/techpapers/tp-2006-01.pdf [October 2012].

Abt Associates, Inc. (2005). An Evaluation of OFCCP's Equal Opportunity Survey. Cambridge, MA: Abt Associates, Inc.

Ashenfelter, O., and Heckman, J. (1976). Measuring the effect of an anti-discrimination program. Pp. 46–89 in *Evaluating the Labor-Market Effects of Social Programs*, O. Ashenfelter and J. Blum, eds. Princeton, NJ: Princeton University Press.

Bendick, M., Jr. (2000). *Using EEO-1 Data to Analyze Allegations of Employment Discrimination.* Presentation to the American Bar Association National Conference. Available: http://www.meetings.abanet.org/labor/lel-aba-annual/papers/2000/bendick.pdf [July 2012].

Bendick, M., Jr., Miller, J., Blumrosen, A., and Blumrosen, R. (2000). *The Equal Opportunity Survey: Analysis of a First Wave of Survey Responses.* Washington, DC: Bendick and Egan Economic Consultants.

Blinder, A. (1973). Wage discrimination: Reduced form and structural estimates. *Journal of Human Resources* 8(4):436–455. University of Wisconsin Press. Available: http://www.jstor.org/stable/144855 [July 2012].

Brackstone, G. (1999). Managing data quality in a statistical agency. *Survey Methodology* 25:139–149.

Bureau of Labor Statistics. (2009). *Occupational Employment and Wages, May 2009.* USDL-10-0646. [News release.] Washington DC: U.S. Department of Labor. Available: http://www.bls.gov/news.release/archives/ocwage_05142010.pdf [October 2012].

SJA192
Copyright National Academy of Sciences. All rights reserved.

Bureau of Labor Statistics. (2010a). *Occupational Employment and Wages, May 2010.* USDL 11-0722. Available: http://www.bls.gov/news.release/ocwage.htm [September 2011].

Bureau of Labor Statistics. (2010b). *Survey Methods and Reliability Statement for the May 2010 Occupational Employment Statistics Survey.* Available: http://www.bls.gov/oes/current/methods_statement.pdf [October 2010].

Bureau of Labor Statistics. (No date). *Handbook of Methods.* Washington, DC: U.S. Department of Labor. Available: http://www.bls.gov/opub/hom/homch8.htm [October 2012].

CedarCrestone. (2011). *CedarCrestone 2010–2011 HR Systems Survey: HR Technologies, Service Delivery, Approaches, and Metrics, 13th Annual Edition.* Available: http://www.cedarcrestone.com/media/whitepapers/CC_2010-2011_HRS_Survey_WP.pdf [October 2012].

Chay, K. (1998). The impact of federal civil rights policy on black economic progress: Evidence from the equal opportunity act of 1972. *Industrial Labor Relations Review* 51(4):608–632.

Consad Research Corporation. (2009). *An Analysis of Reasons for the Disparity of Wages between Men and Women.* Available: http://www.consad.com/content/reports/Gender%20Wage%20Gap%20Final%20Report.pdf [May 2012].

Dobbin, F., Kalev, A., and Kelly, E. (2006). Best practices or best guesses?: Assessing the efficacy of corporate affirmative action and diversity policies. *American Sociological Review* 71(August):589–617.

Donohoe, J., and Levitt, S. (2001). The impact of race on policing and arrests. *Journal of Law and Economics* 44(2):367–394.

Federal Committee on Statistical Methodology. (2005). *Report on Statistical Disclosure Methodology.* Working Paper No. 22 (2nd Version), Confidentiality and Data Access Committee, Office of Management and Budget, Executive Office of the President. Washington, DC. Available: http://www.fcsm.gov/working-papers/wp22.html [July 2012].

Follett, R.S., Ward, M.P., and Welch, F. (1993). Problems in assessing employment discrimination. *The American Economic Review* 83(2):73–78. (Papers and Proceedings of the Hundred and Fifth Annual Meeting of the American Economic Association.)

Gastwirth J.L., and Greenhouse S. (1987). Estimating a common relative risk: Application in equal employment. *Journal of the American Statistical Association* 82(397):38–45.

Gastwirth, J.L., and Haber, S. (1976). Defining the labor market for equal opportunity standards. *Monthly Labor Review* 99(March):32–36.

Glover, T. (2011). Examining the gender wage gap among new hires in Wyoming's manufacturing industry. *Wyoming Labor Force Trends* 48(8). (Wyoming Department of Workforce Services.) Available: https://doe.state.wy.us/lmi/trends/0811/toc.htm [September 2012].

Goldstein, M., and Smith, R. (1976). The estimated impact of the antidiscrimination program aimed at federal contractors. *Industrial Labor Relations Review* 29(3):524–543.

Griffin, P. (1992). The impact of affirmative action on labor demand: A test of some implications of the Le Chatelier principle. *The Review of Economics and Statistics* 74(2):251–260. Available: http://www.jstor.org/stable/2109656 [October 2011].

Hirsh, E. (2008). Settling for less? The organizational determinants of discrimination-charge outcomes. *Law and Society Review* 42(2):239–274.

Hirsh, E. (2009). The strength of weak enforcement: The impact of discrimination charges on sex and race segregation in the workplace. *American Sociological Review* 74(2):245–271.

Hirsh, E., and Kmec, J. (2009). Human resource structures: Reducing discrimination or raising rights awareness? *Industrial Relations* 48(3):512–532.

Hirsh, E., and Kornrich, S. (2008). The context of discrimination: Workplace conditions, institutional environments, and sex and race discrimination charges. *American Journal of Sociology* 113(5):1,394–1,432.

Copyright National Academy of Sciences. All rights reserved.

Holzer, H., and Neumark, D. (2000a). Assessing affirmative action? *Journal of Economic Literature* 38(3):483–568.

Holzer, H., and Neumark, D. (2000b). What does affirmative action do? *Industrial and Labor Relations Review* 53(2):240–272.

Huffman, M., Cohen, P., and Pearlman, J. (2010). Engendering change: Organizational dynamics and workplace gender desegregation, 1975–2005. *Administrative Science Quarterly* 55(2):255–277.

Kalev, A. (2009). Cracking the glass cages? Restructuring and ascriptive inequality at work. *American Journal of Sociology* 114(6):1,591–1,643.

Kalev, A., and Dobbin, F. (2009). Enforcement of civil rights law in private workplaces: The effects of compliance reviews and lawsuits over time. *Law & Social Inquiry* 31(4):855–903.

Kellough, J.E. (1990a). Federal agencies and affirmative action for blacks and women. *Social Science Quarterly* 71:83–92.

Kellough, J.E. (1990b). Integration in the public workplace: Determinants of minority and female employment in federal agencies. *Public Administration Review* 50(5):557–566.

Kerr, B., Reid, M., and Miller, W. (1999). A national study of gender-based occupational segregation in municipal bureaucracies: Persistence of glass walls. *Public Administration Review* 59(3):218–230.

Kerr, B., Reid, M., and Miller, W. (2000a). Occupational segregation in municipal government bureaucracies: Persistence of glass ceilings. *Women in Politics* 21(1):35–53.

Kerr, B., Reid, M., and Miller, W. (2000b). The changing face of urban bureaucracy: Is there inter-ethnic competition for municipal government jobs? *Urban Affairs Review* 35(July):770–793.

Kerr, B., Reid, M., and Miller, W. (2002). Sex-based occupational segregation in U.S. state bureaucracies, 1987–1997. *Public Administration Review* 62(July/August):412–423.

Kerr, B., Reid, M., and Miller, W. (2003). *Glass Walls and Glass Ceilings: Women's Employment Progress in State and Municipal Bureaucracies*. Westport, CT: Praeger Press.

Kerr, B., Reid, M., and Miller, W. (2004). Sex-based glass ceilings in U.S. state-level bureaucracies, 1987–1997. *Administration and Society* 36(4):377–405.

Kinney, S.K., Karr, A.F., and Gonzalez, J.F. (2009). Data confidentiality: The next five years. *Journal of Privacy and Confidentiality* 1(2):125–134.

Leonard, J.S. (1984a). Anti-discrimination or reverse discrimination: The impact of changing demographics, Title VII and affirmative action on productivity. *Journal of Human Resources* 19(2):145–174.

Leonard, J.S. (1984b). The impact of affirmative action on employment. *Journal of Labor Economics* 2(4):439–463.

Leonard, J.S. (1990). The impact of affirmative action regulation and equal employment opportunity law on black employment. *Journal of Economic Perspectives* 4(4):47–63.

McCrary, J. (2007). The effect of court-ordered hiring quotas on the composition and quality of police. *American Economic Review* 97(1):318–353.

Miller, A., and Segal, C. (2011). Does temporary affirmative action produce persistent effects? A study of black and female employment in law enforcement. *Review of Economics and Statistics* May. Available: http://www.mitpressjournals.org/doi/abs/10.1162/REST_a_00208 [July 2012].

Mincer, J. (1974). *Schooling, Experience, and Earnings*. National Bureau of Economic Research. New York: Columbia University Press.

Moore, M. (2011). Wyoming new hires: Examining the wage gap. *Wyoming Labor Force Trends* 48(3):1–10.

Naff, K. (2001). *To Look Like America: Dismantling Barriers for Women and Minorities in the Federal Civil Service*. Boulder, CO: Westview Press.

Copyright National Academy of Sciences. All rights reserved.

National Equal Pay Enforcement Task Force. (2010). *Report of the National Equal Pay Enforcement Task Force*. Task force included Equal Employment Opportunity Commission, the U.S. Department of Justice, U.S. Department of Labor, and Office of Personnel Management. Available: http://www.whitehouse.gov/sites/default/files/rss_viewer/equal_pay_task_force.pdf [June 2012].

Naylor, L.A., and Rosenbloom, D.H. (2004). Adarand, Grutter, and Gratz: Does affirmative action in federal employment matter? *Review of Public Personnel Administration* 24(2):150–174.

Office of Federal Contract Compliance Programs. (2009). *Technical Assistance Guide for Federal Construction Contractors*. Available: https://www.dol.gov/ofccp/TAguides/consttag.pdf [May 2012].

Office of Federal Contract Compliance Programs. (2011). *Non-Discrimination in Compensation; Compensation Data Collection Tool, Advance Notice of Proposed Rulemaking*. 41 C.F.R.49398–49401. Available: http://www.gpo.gov/fdsys/pkg/FR-2011-08-10/html/2011-20299.htm [October 2012].

Office of Federal Contract Compliance Programs. (No date). *Guide for Small Businesses with Federal Contracts*. Available: http://www.dol.gov/ofccp/TAguides/sbguide.htm#Q4 [July 2012].

Reiter, J. (2005). Releasing multiply imputed, synthetic public use microdata: An illustration and empirical study. *Journal of the Royal Statistical Society. Series A* 168(1):185–205.

Reznek, A.P. (2006). *Recent Confidentiality Research Related to Access to Enterprise Microdata* Prepared for the Comparative Analysis of Enterprise Microdata Conference, September 18–19, 2006, U.S. Census Bureau. Available: http://www.oecd.org/dataoecd/6/30/37503027.pdf [December 2011].

Robinson, C., Taylor, T., Tomaskovic-Devey, D., Zimmer, C., and Irvin, M. (2005). Studying race and sex segregation at the establishment-level: Methodological concerns and substantive opportunities in the use of EEO-1 data. *Work and Occupations* 32:5–38.

Rodgers, W., and Spriggs, W. (1996). The effect of federal contractor status on racial differences in establishment-level employment shares, 1979–1992. *American Economic Review* 86(2):290–293.

Selden, S.C. (2006). A solution in search of a problem? Discrimination, affirmative action, and the new public service. *Public Administration Review* 66(6):911–923.

Skaggs, S. (2008). Producing change or bagging opportunity? The effects of discrimination litigation on women in supermarket management. *American Journal of Sociology* 113:1,148–1,183.

Slavkovic, A.B., and Lee, J. (2010). Synthetic two-way contingency tables that preserve conditional frequencies. *Statistical Methodology* 7(3):225–239.

Smith, J.P., and Welch, F. (1984). Affirmative action and labor markets. *Journal of Labor Economics* 2(2):269–301. Published by The University of Chicago Press on behalf of the Society of Labor Economists and NORC at the University of Chicago. Available: http://www.jstor.org/stable/2534898 [July 2012].

Stainback, K., and Tomaskovic-Devey, D. (2009). Intersections of power and privilege: Long-term trends in managerial representation. *American Sociological Review* 74(5):800–820.

Stainback, K., Robinson, C., and Tomaskovic-Devey, D. (2005). Race and workplace integration: A politically mediated process? *American Behavioral Scientist* 48(9):1,200–1,228.

Stephanopoulos, G., and Edley, Jr., C. (1995). *Review of Federal Affirmative Action Programs*. Unpublished White House document, Washington, DC.

Stevens, D.W. (2002). *Unemployment That Is Not Covered by State Unemployment Insurance Laws, Longitudinal Employer-Household Dynamics*. Technical Paper No. TP-2002-16, U.S. Census Bureau. Available: http://lehd.did.census.gov/led/library/techpapers/tp-2002-16.pdf [December 2011].

Copyright National Academy of Sciences. All rights reserved.

U.S. Equal Employment Opportunity Commission. (2010). *EEOC Dramatically Slows Growth of Private Sector Charge Inventory*. Press Release, November 23. Available: http://www.eeoc.gov/eeoc/newsroom/release/11-23-10.cfm [May 2012].

U.S. General Accounting Office. (1993). *EEOC: An Overview*. GAO/T-HRD-93-30. Washington, DC: U.S. General Accounting Office.

U.S. General Accounting Office. (1995). *Equal Employment Opportunity: DOL Contract Compliance Reviews Could Better Target Federal Contractors*. GAO/HEHS-95-177. Washington, DC: U.S. General Accounting Office.

U.S. General Accounting Office. (2000). *Equal Employment Opportunity: Discrimination Complaint Caseloads and Underlying Causes Require EEOC's Sustained Attention*. GAO/T-GGD-00-104. Washington, DC: U.S. General Accounting Office.

U.S. General Accounting Office. (2003). *Women's Earnings: Work Patterns Partially Explain Difference between Men's and Women's Earnings*. GAO-04-35. Washington, DC: U.S. General Accounting Office.

U.S. Government Accountability Office. (2005). *Equal Employment Opportunity: The Policy Framework in the Federal Workplace and the Roles of EEOC and OPM*. GAO-05-195. Washington, DC: U.S. Government Accountability Office.

U.S. Government Accountability Office. (2006). *Financial Services Industry: Overall Trends in Management-Level Diversity and Diversity Initiatives, 1993–2004*. GAO-06-617. Washington, DC: U.S. Government Accountability Office.

U.S. Government Accountability Office. (2008). *Sharing Promising Practices and Fully Implementing Strategic Human Capital Planning Can Improve Management of Growing Workload*. GAO-08-589. Washington, DC: U.S. Government Accountability Office.

U.S. Office of Federal Contract Compliance Programs. (2011). *Non-Discrimination in Compensation; Compensation Data Collection Tool*. 41 C.F.R. Parts 60-1. *Federal Register* 76(154):49398.

U.S. Office of Management and Budget. (2002). *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*. Available: http://www.whitehouse.gov/omb/fedreg/reproducible.html [May 2012].

WorldatWork Association. (2011). *What Is Total Rewards?* Available: http://www.worldatwork.org/waw/home/html/compensation_home.jsp [May 2012].

Zhao, Z. (2010). *Earnings Instability and Earnings Inequality in Urban China 1989-2006*. IZA Working Paper No. 3270. Available: http://ideas.repec.org/p/ess/wpaper/id2783.html [October 2012].

Copyright National Academy of Sciences. All rights reserved.

SJA197
Copyright National Academy of Sciences. All rights reserved.

# Appendix A

# EEO Report Forms

This appendix reproduces the four equal employment opportunity (EEO) reports that collect data relevant to wages and employment, discussed in Chapter 1:

- EEO-1, required from private employers with 100 or more employees or 50 or more employees and a federal contract;
- EEO-3, required from referral unions, primarily unions with exclusive hiring arrangements with an employer;
- EEO-4, required from state and local governments; and
- EEO-5, required from primary and secondary public school districts.

SJA198
Copyright National Academy of Sciences. All rights reserved.

| Joint Reporting Committee | **EQUAL EMPLOYMENT OPPORTUNITY** | Standard Form 100 REV. 01/2006 |
|---|---|---|
| ● **Equal Employment Opportunity Commission** | **EMPLOYER INFORMATION REPORT EEO—1** | O.M.B. No. 3046-0007 EXPIRES 01/2009 100-214 |
| ● **Office of Federal Contract Compliance Programs (Labor)** | | |

**Section A—TYPE OF REPORT**
Refer to instructions for number and types of reports to be filed.

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

    (1) ☐ Single-establishment Employer Report

Multi-establishment Employer:
(2) ☐ Consolidated Report (Required)
(3) ☐ Headquarters Unit Report (Required)
(4) ☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)
(5) ☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only)

**Section B—COMPANY IDENTIFICATION** *(To be answered by all employers)*    OFFICE USE ONLY

1. Parent Company

   a. Name of parent company (owns or controls establishment in item 2) omit if same as label

a.

Address (Number and street)

b.

| City or town | State | ZIP code |
|---|---|---|

c.

2. Establishment for which this report is filed. (Omit if same as label)

   a. Name of establishment

d.

| Address (Number and street) | City or Town | County | State | ZIP code |
|---|---|---|---|---|

e.

   b. Employer identification No. (IRS 9-DIGIT TAX NUMBER)    | | | | | | | | | |

f.

   c. Was an EEO-1 report filed for this establishment last year? ☐ Yes ☐ No

**Section C—EMPLOYERS WHO ARE REQUIRED TO FILE** *(To be answered by all employers)*

☐ Yes ☐ No    1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?

☐ Yes ☐ No    2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?

☐ Yes ☐ No    3. Does the company or any of its establishments (a) have 50 or more employees <u>AND</u> (b) is not exempt as provided by 41 CFR 60–1.5, <u>AND</u> either (1) is a prime government contractor or first-tier subcontactor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?
If the response to question C–3 is yes, please enter your Dun and Bradstreet identification number (if you have one): | | | | | | | | | |

NOTE: If the answer is yes to questions 1, 2, or 3, complete the entire form, otherwise skip to Section G.

Copyright National Academy of Sciences. All rights reserved.

SF 100 – Page 2

**Section D-EMPLOYMENT DATA**

Employment at this establishment – Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | | Number of Employees (Report employees in only one category) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Race/Ethnicity | | | | | | | | | | | | | |
| | | Hispanic or Latino | | Not-Hispanic or Latino | | | | | | | | | | | Total Col A – N |
| | | | | Male | | | | | | Female | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers | 1.1 | | | | | | | | | | | | | | | |
| First/Mid-Level Officials and Managers | 1.2 | | | | | | | | | | | | | | | |
| Professionals | 2 | | | | | | | | | | | | | | | |
| Technicians | 3 | | | | | | | | | | | | | | | |
| Sales Workers | 4 | | | | | | | | | | | | | | | |
| Administrative Support Workers | 5 | | | | | | | | | | | | | | | |
| Craft Workers | 6 | | | | | | | | | | | | | | | |
| Operatives | 7 | | | | | | | | | | | | | | | |
| Laborers and Helpers | 8 | | | | | | | | | | | | | | | |
| Service Workers | 9 | | | | | | | | | | | | | | | |
| TOTAL | 10 | | | | | | | | | | | | | | | |
| PREVIOUS YEAR TOTAL | 11 | | | | | | | | | | | | | | | |

1. Date(s) of payroll period used: _____ (Omit on the Consolidated Report.)

**Section E - ESTABLISHMENT INFORMATION** (Omit on the Consolidated Report.)

1. What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title insurance, etc. Include the specific type of product or type of service provided, as well as the principal business or industrial activity.)

**Section F - REMARKS**

Use this item to give any identification data appearing on the last EEO-1 report which differs from that given above, explain major changes in composition of reporting units and other pertinent information.

**Section G - CERTIFICATION**

Check one   1 ☐   All reports are accurate and were prepared in accordance with the instructions. (Check on Consolidated Report only.)
      2 ☐   This report is accurate and was prepared in accordance with the instructions.

| Name of Certifying Official | Title | Signature | Date |
|---|---|---|---|

| Name of person to contact regarding this report | Title | Address (Number and Street) | |
|---|---|---|---|

| City and State | Zip Code | Telephone No. (including Area Code and Extension) | Email Address |
|---|---|---|---|

All reports and information obtained from individual reports will be kept confidential as required by Section 709(e) of Title VII.
WILLFULLY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001

SJA200
Copyright National Academy of Sciences. All rights reserved.

Union Reporting Program
Washington, DC 20507

## EQUAL EMPLOYMENT OPPORTUNITY
## LOCAL UNION REPORT (EEO-3)

Approved by OMB
No. 3046-0006
Expires: 12/31/04

---

### Part A. LOCAL UNION IDENTIFICATION

1. Full name of local union for which this report is filed. (Include local number, if any.)

2. Mailing address.

   a. Where official mail should be sent to the union.

   Number and street

   City

   County

   State

   Zip Code

b. Union office, if different from 2a.

   Number and street

   City

   County

   State　　　Zip Code

3. Indicate type of local union report by a check in applicable box:

   a. ☐ Report filed by local union in its own behalf

   b. ☐ Other (explain)

4a. Are you affiliated with or chartered by a national or international union or national federation?　Yes ☐　No ☐

   b. If "Yes" to item 4a, give name and address of such national or international organization.

5. Are you affiliated with the AFL-CIO?　Yes ☐　No ☐

---

### Part B. LOCAL UNION PRACTICES

1. To the best of your knowledge, does your membership include any:

   | | Yes | No |
   |---|---|---|
   | a. Blacks (Non-Hispanic)? | ☐ | ☐ |
   | b. Hispanics? | ☐ | ☐ |
   | c. Women? | ☐ | ☐ |

3. To the best of your knowledge, has your international union chartered a separate local within the same work and/or area jurisdiction which consists only of:

   | | Yes | No |
   |---|---|---|
   | a. Persons of the same race/ethnic identity... | ☐ | ☐ |
   | b. Persons of the same sex? | ☐ | ☐ |

2. If "No" to any items 1a, 1b, or 1c, is this because the group or groups not represented:

(CHECK ALL APPLICABLE BOXES)

| | BLACK NON-HISPANIC 1 (a) | HISPANIC 1 (b) | WOMEN 1 (c) |
|---|---|---|---|
| a. Are not in the local community? | | | |
| b. Are not in the bargaining unit? | | | |
| c. Are excluded by provision in constitution or bylaws? | | | |
| d. Have not applied for membership? | | | |
| e. Have applied, but did not have a sponsor? | | | |
| f. Have applied, but did not meet qualifications other than sponsorship? | | | |
| g. Other reason(s) (Explain) | | | |

---

### Part C. LOCAL UNIONS REQUIRED TO FILE

|  | Yes | No |
|---|---|---|
| 1. Has the local union had 100 or more members at any time since December 31 of the preceding year? | ☐ | ☐ |

The union must complete the entire report if it answered "YES" to Item 1, *AND* the answer is "YES" to any of the three questions in Item 2.

The union is not required to complete the entire report if it answered "NO" to Item 1, OR "NO" to all three questions in Item 2. If that is the case, the union must complete Parts A, B, C and E and return this form to the specified address.

2. Does the local union, or any unit, division, or agent of the local union, or any labor organization which performs, within a specific jurisdiction, the functions ordinarily performed by a local union, whether or not it is so designated:

   a. Operate a hiring hall or hiring office?　☐　☐

   b. Have an arrangement under which one or more employers are required to consider or hire persons referred by the local union or an agent of the local union?　☐　☐

   c. Have 10 percent or more of its members employed by employers which customarily and regularly look to the union, or any agent of the union, for employees to be hired on a casual or temporary basis, for a specified period of time, or for the duration of a specified job?　☐　☐

EEOC FORM 274, JUN 88　PREVIOUS EDITIONS ARE OBSOLETE

PAGE 1

Copyright National Academy of Sciences. All rights reserved.

Part D. REMARKS

## Part E. IDENTIFICATION AND SIGNATURE

To the best of my knowledge and belief, the information contained in this report is true and complete. It is further certified that to the extent any data in Schedule I, Items 1 or 2, are based on self-identification by individuals, this information was gathered only after they were advised of its confidential nature and purposes.

1. Type or print name, title, address and telephone number for union business of designated representative

Name _____

Title _____

Work address _____

Telephone number (including area code) _____

2. Signature of designated representative        3. Date

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both." Title 18, Section 1001, United States Code.

### SCHEDULE I—LOCAL UNION REPORT (EEO—3)

### MEMBERSHIP, APPLICANT and REFERRAL INFORMATION

1. Method of identification

How was information as to race/ethnic identification and sex in Item 2 below obtained?

This information may be obtained by visual survey, from records made after employment, from personal knowledge or by self-identification. The self-identification method may be used subject to the conditions set forth in the instructions. No State law prohibiting the self-identification method applies, since the Equal Employment Opportunity Commission's regulations supersede such laws.

Check all applicable boxes

| | |
|---|---|
| a. Existing Record | |
| b. Visual Survey | |
| c. Tally from Personal Knowledge | |
| d. Self-Identification | |
| e. Other (Specify) | |

2. Statistics

| | TOTAL (COLUMNS B-K) A | MALE | | | | | FEMALE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | NON-HISPANIC ORIGIN | | HISPANIC | ASIAN OR PACIFIC ISLANDER | AMERICAN INDIAN OR ALASKAN NATIVE | NON-HISPANIC ORIGIN | | HISPANIC | ASIAN OR PACIFIC ISLANDER | AMERICAN INDIAN OR ALASKAN NATIVE |
| | | WHITE B | BLACK C | D | E | F | WHITE G | BLACK H | I | J | K |
| a. MEMBERSHIP IN REFERRAL UNIT | | | | | | | | | | | |
| (1) MEMBERS | | | | | | | | | | | |
| (2) APPLICANTS FOR MEMBERSHIP DURING THE PAST YEAR | | | | | | | | | | | |
| b. REFERRALS DURING 2-MONTH PERIOD | | | | | | | | | | | |
| (1) NUMBER OF PERSONS REFERRED | | | | | | | | | | | |
| (2) NUMBER OF REFERRALS | | | | | | | | | | | |
| (3) APPLICANTS FOR REFERRAL | | | | | | | | | | | |

3. Period Used For Referral Date

You should obtain the figures reported in Item 2 "Statistics" using any 2-month period between August 1 and November 30.

Dates of 2-month Period _____

EEOC FORM 274, JUN 88    PREVIOUS EDITIONS ARE OBSOLETE      EEOC ORIGINAL      Page 2

Copyright National Academy of Sciences. All rights reserved.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**STATE AND LOCAL GOVERNMENT INFORMATION (EEO-4)**

EXCLUDE SCHOOL SYSTEMS AND EDUCATIONAL INSTITUTIONS
(Read attached instructions prior to completing this form)

APPROVED BY OMB
3046-0008

EXPIRES
12/31/2005

| DO NOT ALTER INFORMATION PRINTED IN THIS BOX | MAIL COMPLETED FORM TO:<br>EEO-4 Reporting Center<br>PO Box 1898<br>Chicago, IL 60690-1898 |
|---|---|

## A. TYPE OF GOVERNMENT (Check one box only)

☐ 1. State    ☐ 2. County    ☐ 3. City    ☐ 4. Township    ☐ 5. Special District

☐ 6. Other (Specify)_____

## B. IDENTIFICATION

1. NAME OF POLITICAL JURISDICTION (If same as label, skip to Item C)

| 2. Address--Number and Street | CITY/TOWN | COUNTY | STATE/ZIP | EEOC USE ONLY<br>A<br>B |
|---|---|---|---|---|

## C. FUNCTION

(Check one box to indicate the function(s) for which this form is being submitted. Data should be reported for all departments and agencies in your government covered by the function(s) indicated. If you cannot supply the data for every agency within the function(s) attach a list showing name and address of agencies whose data are not included.)

| | | | |
|---|---|---|---|
| | 1.Financial Administration. Tax billing and collection, budgeting, purchasing, central accounting and similar financial administration carried on by a treasurer's, auditor's or comptroller's office and<br><br>GENERAL CONTROL. Duties usually performed by boards of supervisors or commissioners, central administration offices and agencies, central personnel or planning agencies, all judicial offices and employees (judges, magistrates, bailiffs, etc.) | | 8. HEALTH. Provision of public health services, out-patient clinics, visiting nurses, food and sanitary inspections, mental health, alcohol rehabilitation service, etc.<br><br>9. HOUSING. Code enforcement, low rent public housing, fair housing ordinance enforcement, housing for elderly, housing rehabilitation, rent control. |
| | 2. STREETS AND HIGHWAYS. Maintenance, repair, construction and administration of streets, alleys, sidewalks, roads, highways and bridges. | | 10. COMMUNITY DEVELOPMENT. Planning, zoning, land development, open space, beautification, preservation. |
| | 3. PUBLIC WELFARE. Maintenance of homes and other institutions for the needy; administration of public assistance. (Hospitals and sanatoriums should be reported as item7.) | | 11. CORRECTIONS. Jails, reformatories, detention homes, half-way houses, prisons, parole and probation activities |
| | 4. POLICE PROTECTION. Duties of a police department sheriff's, constable's, coroner's office, etc., including technical and clerical employees engaged in police activities. | | 12. UTILITIES AND TRANSPORTATION. Includes water supply, electric power, transit, gas, airports, water transportation and terminals. |
| | 5. FIRE PROTECTION. Duties of the uniformed fire force and clerical employees. (Report any forest fire protection activities as item 6.) | | 13. SANITATION AND SEWAGE. Street cleaning, garbage and refuse collection and disposal. Provision, maintenance and operation of sanitary and storm sewer systems and sewage disposal plants. |
| | 6. NATURAL RESOURCES. Agriculture, forestry, forest fire protection, irrigation drainage, flood control, etc., and<br>PARKS AND RECREATION. Provision, maintenance and operation of parks, playgrounds, swimming pools, auditoriums, museums, marinas, zoos, etc. | | 14. EMPLOYMENT SECURITY STATE GOVERNMENTS ONLY |
| | 7. HOSPITALS AND SANATORIUMS. Operation and maintenance of institutions for inpatient medical care. | | 15. OTHER (Specify on Page Four) |

EEOC FORM 164 FEB 97 (Previous Editions are Obsolete)          PAGE 1

SJA203
Copyright National Academy of Sciences. All rights reserved.

## D. EMPLOYMENT DATA AS OF JUNE 30
(Do not include elected/appointed officials. Blanks will be counted as zero)

1. FULL-TIME EMPLOYEES (Temporary employees are not included)

| JOB CATEGORIES | ANNUAL SALARY (In thousands 000) | TOTAL (COLUMNS B-K) | MALE | | | | | FEMALE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | NON-HISPANIC ORIGIN | | HISPANIC | ASIAN OR PACIFIC ISLANDER | AMERICAN INDIAN OR ALASKAN NATIVE | NON-HISPANIC ORIGIN | | HISPANIC | ASIAN OR PACIFIC ISLANDER | AMERICAN INDIAN OR ALASKAN NATIVE |
| | | | WHITE | Black | | | | White | Black | | | |
| | | A | B | C | D | E | F | G | H | I | J | K |
| **OFFICIALS ADMINISTRATORS** | 1. $0.1-15.9 | | | | | | | | | | | |
| | 2. 16.0-19.9 | | | | | | | | | | | |
| | 3. 20.0-24.9 | | | | | | | | | | | |
| | 4. 25.0-32.9 | | | | | | | | | | | |
| | 5. 33.0-42.9 | | | | | | | | | | | |
| | 6. 43.0-54.9 | | | | | | | | | | | |
| | 7. 55.0-69.9 | | | | | | | | | | | |
| | 8. 70.0 PLUS | | | | | | | | | | | |
| **PROFESSIONALS** | 9. $0.1-15.9 | | | | | | | | | | | |
| | 10. 16.0-19.9 | | | | | | | | | | | |
| | 11. 20.0-24.9 | | | | | | | | | | | |
| | 12. 25.0-32.9 | | | | | | | | | | | |
| | 13. 33.0-42.9 | | | | | | | | | | | |
| | 14. 43.0-54.9 | | | | | | | | | | | |
| | 15. 55.0-69.9 | | | | | | | | | | | |
| | 16. 70.0 PLUS | | | | | | | | | | | |
| **TECHNICIANS** | 17. $0.1-15.9 | | | | | | | | | | | |
| | 18. 16.0-19.9 | | | | | | | | | | | |
| | 19. 20.0-24.9 | | | | | | | | | | | |
| | 20. 25.0-32.9 | | | | | | | | | | | |
| | 21. 33.0-42.9 | | | | | | | | | | | |
| | 22. 43.0-54.9 | | | | | | | | | | | |
| | 23. 55.0-69.9 | | | | | | | | | | | |
| | 24. 70.0 PLUS | | | | | | | | | | | |
| **PROTECTIVE SERVICE** | 25. $0.1-15.9 | | | | | | | | | | | |
| | 26. 16.0-19.9 | | | | | | | | | | | |
| | 27. 20.0-24.9 | | | | | | | | | | | |
| | 28. 25.0-32.9 | | | | | | | | | | | |
| | 29. 33.0-42.9 | | | | | | | | | | | |
| | 30. 43.0-54.9 | | | | | | | | | | | |
| | 31. 55.0-69.9 | | | | | | | | | | | |
| | 32. 70.0 PLUS | | | | | | | | | | | |
| **PARA - PROFESSIONALS** | 33. $0.1-15.9 | | | | | | | | | | | |
| | 34. 16.0-19.9 | | | | | | | | | | | |
| | 35. 20.0-24.9 | | | | | | | | | | | |
| | 36. 25.0-32.9 | | | | | | | | | | | |
| | 37. 33.0-42.9 | | | | | | | | | | | |
| | 38. 43.0-54.9 | | | | | | | | | | | |
| | 39. 55.0-69.9 | | | | | | | | | | | |
| | 40. 70.0 PLUS | | | | | | | | | | | |
| **ADMINISTRATIVE SUPPORT** | 41. $0.1-15.9 | | | | | | | | | | | |
| | 42. 16.0-19.9 | | | | | | | | | | | |
| | 43. 20.0-24.9 | | | | | | | | | | | |
| | 44. 25.0-32.9 | | | | | | | | | | | |
| | 45. 33.0-42.9 | | | | | | | | | | | |
| | 46. 43.0-54.9 | | | | | | | | | | | |
| | 47. 55.0-69.9 | | | | | | | | | | | |
| | 48. 70.0 PLUS | | | | | | | | | | | |

EEOC FORM 164, FEB 97 (Previous Editions are Obsolete)      PAGE 2

SJA204

Copyright National Academy of Sciences. All rights reserved.

**D. EMPLOYMENT DATA AS OF JUNE 30 (Cont.)**
(Do not include elected/appointed officials. Blanks will be counted as zero)

### 1. FULL-TIME EMPLOYEES (Temporary employees are not included)

| JOB CATEGORIES | ANNUAL SALARY (In thousands 000) | TOTAL (COLUMNS B-K) | MALE | | | | | FEMALE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | NON-HISPANIC ORIGIN | | HISPANIC | ASIAN OR PACIFIC ISLANDER | AMERICAN INDIAN OR ALASKAN NATIVE | NON-HISPANIC ORIGIN | | HISPANIC | ASIAN OR PACIFIC ISLANDER | AMERICAN INDIAN OR ALASKAN NATIVE |
| | | | WHITE | Black | | | | White | Black | | | |
| | | A | B | C | D | E | F | G | H | I | J | K |
| SKILLEDCRAFT | 49. $0.1-15.9 | | | | | | | | | | | |
| | 50. 16.0-19.9 | | | | | | | | | | | |
| | 51. 20.0-24.9 | | | | | | | | | | | |
| | 52. 25.0-32.9 | | | | | | | | | | | |
| | 53. 33.0-42.9 | | | | | | | | | | | |
| | 54. 43.0-54.9 | | | | | | | | | | | |
| | 55. 55.0-69.9 | | | | | | | | | | | |
| | 56. 70.0 PLUS | | | | | | | | | | | |
| SERVICE MAINTENANCE | 57. $0.1-15.9 | | | | | | | | | | | |
| | 58. 16.0-19.9 | | | | | | | | | | | |
| | 59. 20.0-24.9 | | | | | | | | | | | |
| | 60. 25.0-32.9 | | | | | | | | | | | |
| | 61. 33.0-42.9 | | | | | | | | | | | |
| | 62. 43.0-54.9 | | | | | | | | | | | |
| | 63. 55.0-69.9 | | | | | | | | | | | |
| | 64. 70.0 PLUS | | | | | | | | | | | |
| 65. TOTAL FULL TIME (LINES 1 – 64) | | | | | | | | | | | | |

### 2. OTHER THAN FULL-TIME EMPLOYEES (Including temporary employees

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 66. OFFICIALS/ADMIN | | | | | | | | | | | |
| 67. PROFESSIONALS | | | | | | | | | | | |
| 68. TECHNICIANS | | | | | | | | | | | |
| 69. PROTECTIVE SERVICE | | | | | | | | | | | |
| 70. PARA-PROFESSIONAL | | | | | | | | | | | |
| 71. ADMIN. SUPPORT | | | | | | | | | | | |
| 72. SKILLED CRAFT | | | | | | | | | | | |
| 73. SERVICE/MAINTENANCE | | | | | | | | | | | |
| 74. TOTAL OTHER THAN FULL TIME (LINES 66 – 73) | | | | | | | | | | | |

### 3. NEW HIRES DURING FISCAL YEAR - Permanent full time only JULY 1 – JUNE 30

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 75. OFFICIALS/ADMIN | | | | | | | | | | | |
| 76. PROFESSIONALS | | | | | | | | | | | |
| 77. TECHNICIANS | | | | | | | | | | | |
| 78. PROTECTIVE SERVICE | | | | | | | | | | | |
| 79. PARA-PROFESSIONAL | | | | | | | | | | | |
| 80. ADMIN. SUPPORT | | | | | | | | | | | |
| 81. SKILLED CRAFT | | | | | | | | | | | |
| 82. SERVICE/MAINTENANCE | | | | | | | | | | | |
| 83. TOTAL NEW HIRES (LINES 75 – 82) | | | | | | | | | | | |

EEOC FORM 164, FEB 97 (Previous Editions are Obsolete)     PAGE 3

SJA205
Copyright National Academy of Sciences. All rights reserved.

REMARKS (List National Crime Information Center (NCIC) number
assigned to any Criminal Justice Agencies whose data
are included in this report)

***LIST AGENCIES INCLUDED ON THIS FORM***

CERTIFICATION. I certify that the information given in this report is correct and true to the best of my knowledge and was reported in accordance with accompanying instructions. (Willfully false statements on this report are punishable by law, US Code, Title 18, Section 1001.)

| NAME OF PERSON TO CONTACT REGARDING THIS FORM | TITLE | |
|---|---|---|
| ADDRESS (Number and Street, City, State, Zip Code) | TELEPHONE NUMBER<br><br>extension:<br><br>FAX NUMBER | |
| DATE<br><br>E-MAIL | TYPED NAME/TITLE OF AUTHORIZED OFFICIAL | SIGNATURE |

EEOC  FORM 164, FEB 97 (Previous Editions Obsolete)                                  PAGE 4

Copyright National Academy of Sciences. All rights reserved.

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br>ELEMENTARY-SECONDARY STAFF INFORMATION (EEO-5)<br><br>Public school systems | FORM APPROVED BY OMB<br>NO. 3046-0003<br>APPROVAL EXPIRES<br>This is a joint requirement of the EEOC and the Office for Civil Rights, U.S. Department of Education and the U.S. Department of Justice. |
|---|---|

**DO NOT ALTER INFORMATION PRINTED IN THIS BOX.**

**NOTE: ALL EMPLOYEES IN YOUR SCHOOL DISTRICT MUST BE INCLUDED ON THIS FORM.** Additional Copies of this form may be obtained from the address below.  Send your full report to:

**PART I.  IDENTIFICATION**

**A.  TYPE OF AGENCY WHICH OPERATES THE REPORTING SCHOOL SYSTEM**

☐ Local  Public School             ☐ Special Regional Agency             ☐ State Education Agency

☐ Other (Specify) _____

**B.  SCHOOLS SYSTEMS IDENTIFICATION (OMIT IS SAME AS LABEL)**

NAME

| STREET AND NO. OR POST OFFICE BOX | CITY/TOWN | COUNTY | STATE | ZIP |
|---|---|---|---|---|

**C.  GENERAL STATISTICS**

| NUMBER OF SCHOOLS OPERATED | NUMBER OF ANNEXES OPERATED | OCTOBER 1ST  ENROLLMENT |
|---|---|---|

**D.   REMARKS**

EEOC FORM 168A                                                                                          Page 1

Copyright National Academy of Sciences. All rights reserved.

**PART II.** Staff Statistics of (DATE) _____    DO NOT INCLUDE ELECTED/APPOINTED OFFICIALS (SEE DEFINITION IN APPENDIX)

**DISTRICT NAME:** _____

| Activity Assignment Classification | A. FULL-TIME STAFF | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Race/Ethnicity | | | | | | | | | | | | | | |
| | Hispanic or Latino | | Non-Hispanic or Latino | | | | | | | | | | | | Total Col A - N |
| | | | Male | | | | | | Female | | | | | | |
| | Male | Female | White | Black or African American | Asian | Native Hawaiian or Other Pacific Islander | American Indian or Alaska Native | Two or more races | White | Black or African American | Asian | Native Hawaiian or Other Pacific Islander | American Indian or Alaska Native | Two or more races | |
| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| 1. Officials, Administrators, Managers | | | | | | | | | | | | | | | |
| 2. Principals | | | | | | | | | | | | | | | |
| 3. Assistant Principals, Teaching | | | | | | | | | | | | | | | |
| 4. Assistant Principals, Non-teaching | | | | | | | | | | | | | | | |
| 5. Elementary Classroom Teachers | | | | | | | | | | | | | | | |
| 6. Secondary Classroom Teachers | | | | | | | | | | | | | | | |
| 7. Other Classroom Teachers | | | | | | | | | | | | | | | |
| 8. Guidance | | | | | | | | | | | | | | | |
| 9. Psychological | | | | | | | | | | | | | | | |
| 10. Librarians/ Audiovisual Staff | | | | | | | | | | | | | | | |
| 11. Consultants & Supervisors of Instruction | | | | | | | | | | | | | | | |
| 12. Other Professional Staff | | | | | | | | | | | | | | | |
| 13. Teachers Aides | | | | | | | | | | | | | | | |
| 14. Technicians | | | | | | | | | | | | | | | |
| 15. Administrative Support Workers | | | | | | | | | | | | | | | |
| 16. Service Workers | | | | | | | | | | | | | | | |
| 17. Skilled Crafts | | | | | | | | | | | | | | | |
| 18. Laborers and Helpers | | | | | | | | | | | | | | | |
| 19. TOTALS (1-18) | | | | | | | | | | | | | | | |

SJA208
Copyright National Academy of Sciences. All rights reserved.

| Activity Assignment Classification | B. PART-TIME STAFF | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Race/Ethnicity | | | | | | | | | | | | | | |
| | Hispanic or Latino | | Non-Hispanic or Latino | | | | | | | | | | | | |
| | | | Male | | | | | | Female | | | | | | |
| | Male | Female | White | Black or African American | Asian | Native Hawaiian or Other Pacific Islander | American Indian or Alaska Native | Two or more races | White | Black or African American | Asian | Native Hawaiian or Other Pacific Islander | American Indian or Alaska Native | Two or more races | |
| 20. Professional Instructional | | | | | | | | | | | | | | | |
| 21. All Other | | | | | | | | | | | | | | | |
| 22. TOTALS (20-21) | | | | | | | | | | | | | | | |
| C. NEW HIRES FULL-TIME (JULY THRU SEPT. OF THE SURVEY YEAR) | | | | | | | | | | | | | | | |
| 23. Officials, Administrators, Managers | | | | | | | | | | | | | | | |
| 24. Principals/Assistant Principals | | | | | | | | | | | | | | | |
| 25. Classroom Teachers | | | | | | | | | | | | | | | |
| 26. Other Professional Staff | | | | | | | | | | | | | | | |
| 27. Nonprofessional Staff | | | | | | | | | | | | | | | |
| 28. TOTALS (23-27) | | | | | | | | | | | | | | | |

**CERTIFICATION: I certify that the information given in this report is correct and true to the best of my knowledge and was prepared in accordance with accompanying instructions. Willfully false statements on this report are punishable by law, U.S. Code, Title 18, Section 1001.**

| Date | Phone:<br>Fax:<br>Email: | Typed Name/Title of Person Responsible for Report | Signature |
|---|---|---|---|

EEOC FORM 168A             PREVIOUS EDITIONS ARE OBSOLETE

Copyright National Academy of Sciences. All rights reserved.

# Appendix B

# Study of Employment Earnings for the Equal Employment Opportunity Program: A Possible Role for Administrative Data from Three Tax Systems

*Nicholas Greenia*

## INTRODUCTION

The proposed Paycheck Fairness Act of 2009 (H.R. 12 in the 112th Congress) would have required the U.S. Equal Employment Opportunity Commission (EEOC) to issue regulations mandating the provision of earnings data from employers to the EEOC classified by the race, gender, and national origin of their employees. According to the proposed legislation, these pay or earnings data are needed to bolster the related employment and other data already collected through the equal employment opportunity (EEO) reports, particularly the EEO-1 reports, for purposes of enforcing compliance with statutory nondiscrimination employment practices. The new data were argued to be critical in continuing to administer Section 709 of the Civil Rights Act of 1964, as amended.

This paper explores the feasibility of using existing data from the administrative records of three tax systems for accomplishing the EEO-1 stated goals for new data collection. It discusses the data collected from and the interrelationships among three tax systems: two administered by federal agencies, the Internal Revenue Service (IRS) and the Social Security Administration (SSA), and one by the state agencies, the unemployment insurance (UI) offices that operate as federal-state partnerships under the Employment and Training Administration (ETA) of the U.S. Department of Labor. It continues by discussing how the interrelationships of the three tax systems benefit data quality, including timeliness, for EEO-1 purposes. It also provides an overview of the sources, including the forms that could

SJA210
Copyright National Academy of Sciences. All rights reserved.

provide the needed data. The paper concludes by presenting major concerns on confidentiality.

These systems hold particular promise for a number of reasons. One is the coverage of the taxes reported and collected: federal income taxes for funding many federal programs that benefit all U.S. residents, taxes that help fund the Social Security and Medicare programs for retirees and other qualified recipients, and unemployment insurance taxes that fund the unemployment benefits of workers who are laid off during difficult economic times, particularly for extended periods such as during the recent deep recession. Another is data quality: the data records tend to have, in general, high levels of compliance because of the importance of these programs—highlighted by the penalties for noncompliance—for the nation's safety net and in funding congressionally mandated expenditures. A third is the potential for triangulation of firm and worker levels of reporting by the use of all three systems. Although there are some issues with response rates in each system, such as the tax gap for federal income taxes, partial participation is likely to result in detection by one of the three systems.

Although each administrative record data set holds promise for supplementing EEO-1 data, there are also challenges associated with the use of these administrative data. Like any data system, these three administrative record systems are imperfect in terms of response rates, accuracy, and all levels of granularity, such as multiemployer member reporting in the UI system. In addition, each also has constraints, including purposes and access.

How the EEOC decides to approach the enhancement of its data, including any redesign of its own EEO-1 collection system, may be key to determining not only the most useful plan, but also the most viable for purposes of obtaining earnings data classified by gender, race/ethnicity, and nativity.

## A BRIEF OVERVIEW OF THE THREE TAX SYSTEMS

This section presents an overview of the purpose, coverage, data availability, national importance, and interrelationships of the three systems. These administrative earnings data are captured by multiple administrative forms, reported in various components, and available across multiple years from the three tax systems. The classifier variables for gender, race/ethnicity, nativity, and even age, also exist at the employee record level although they are not universally captured in the databases. All of these data could be linked to a specific employer for an employee, including for multiple employers.

Copyright National Academy of Sciences. All rights reserved.

## Purpose

The three data systems are used primarily to collect taxes for administering and funding vital mandated programs: the federal income tax system by IRS, the Social Security and Medicare programs by SSA, and the state UI systems, which are operated by state Employment Security Agencies (ESAs) under a federal-state partnership. Related national statistics are produced from all three sets of data by the statistical offices of SSA and IRS, as well as the Department of Labor's Bureau of Labor Statistics and the U.S. Census Bureau. In addition, they are used for policy analysis in a wide range of offices, including the Joint (Senate-House) Committee on Taxation, the Congressional Budget Office, and the Office of Tax Analysis at the U.S. Department of the Treasury, and for analytical research by top academics through the Intergovernmental Personnel Act as well as the Census Bureau's Research Data Centers.

Such robust—and visible—uses of the data have beneficial consequences for the EEO-1 Program because weaknesses, limitations, and inaccuracies in the data systems tend to become known and corrective measures taken in order to ensure the utility and consistency of the data over time. In addition, because the U.S. statistical system is decentralized, it is more difficult for any one system's data anomalies to go unnoticed, given the cross-checks implicitly or explicitly built in across these quasi independent systems—particularly for financial data, including employment earnings.

## Coverage

Across the three systems, as well as the U.S. Census Bureau, establishments and workers needed for EEO-1 purposes would be covered. The data are reported on IRS income tax returns (for individuals and businesses), employment tax returns (for both the Federal Income Contributions Act [FICA] and the Federal Unemployment Tax Act [FUTA]), information returns (including for tax-exempt nonprofit organizations), applications for Social Security Numbers (SSNs), and on UI-related forms. Several federal agencies play major roles in either funding or helping process the data and payments for these programs: the Department of Labor (DOL)—particularly its Bureau of Labor Statistics (BLS) and ETA—SSA and IRS. In addition, the states play a major role in administering the State Unemployment Tax Authority (SUTA) Program as well as the employment and training administration system funded in large part by ETA.

SJA212
Copyright National Academy of Sciences. All rights reserved.

**Data Availability**

Table B-1 summarizes availability of the EEO-1 items needed by source, including the Census Bureau.

*National Importance*

The data are critical for funding many federal programs that benefit all U.S. residents, taxes that help fund the Social Security and Medicare programs for retirees and other qualified recipients, and unemployment insurance taxes that fund the unemployment benefits of workers who are laid off during difficult economic times.

*Inter-Relationships*

The three sets of data are interrelated, albeit sometimes in subtle ways. For example, all three systems depend on the SSNs assigned by SSA, the employer identification numbers (EINs) assigned by IRS, the reporting of employment and payroll at both the firm and individual worker level for federal and state purposes, and related information to update them, such as changes in name or address. Similarly, the IRS determination of which workers are employees and which are contractors has an impact on the other systems. The IRS decision is obtained by the filing of a Form SS-8 for a firm or worker seeking to have IRS establish officially the employee or independent contractor status of a particular worker. This transaction then has ramifications for the other employee data collection systems, such as SUTA and FUTA, and could also be used to inform and supplement the EEO-1 reports.

*EEO-1 Utility*

Because of the coverage, availability, and interrelationships, the three tax systems hold considerable promise for providing the employee earnings data needed by gender, race/ethnicity, nativity, and even age, by employer. In addition, these systems could be useful also because of the other data they contain, in addition to employee earnings, for supplementing the EEO-1 report data currently collected, including across time both retrospectively and prospectively.

## STATE UNEMPLOYMENT INSURANCE DATA

This section presents a brief summary of why and how UI and Quarterly Census of Employment and Wages (QCEW) data are reported, collected,

Copyright National Academy of Sciences. All rights reserved.

**TABLE B-1** Summary of Available Population/Universe Data by Agency

| Source | Earnings at Employee Level | Earnings at Employer Level | Employee Gender | Employee Race/Eth. | Employee Nativity |
|---|---|---|---|---|---|
| State UI[a] | YES | YES | NO | NO | NO |
| State ESA[b] | NO | YES | NO | NO | NO |
| IRS | YES | YES | NO | NO | YES[c] |
| SSA | YES | YES | YES | YES | YES |
| Census[d] | YES | YES | YES | YES | YES |

[a]Based on household surveys (samples), BLS does publish employment and compensation data by gender, race/ethnicity, and nativity. These could be useful, at a minimum, as benchmark estimates for purposes of EEO-1 expansion. However, BLS does not presently have access to the states' detailed employee earnings records.

[b]ESA = Employment Security Agency.

[c]Only from applications for individual taxpayer identification numbers (ITINs).

[d]Earnings data exist annually in extracts of tax data from IRS. The decennial census captures gender, race, and ethnicity, but, only every 10 years. However, the Census Bureau's American Community Survey (ACS) captures gender, race/ethnicity, and nativity (native/foreign born). Although it is a sample, the ACS is sufficiently large—approximately 2 million respondent households annually—that, at a minimum, its data could be useful for benchmark estimates and perhaps for matching to the EEO-1 report population on a statistically significant basis.

SJA214
Copyright National Academy of Sciences. All rights reserved.

and shared with the federal sector, and the significance for the EEO-1 Program.

## Purpose

In addition to complying with FUTA, employers must also comply with SUTA by withholding and depositing tax or insurance payments from each employee's wages with the state unemployment offices. Although federal unemployment taxes serve several purposes, state unemployment taxes are used only to fund unemployment benefits in a particular state or territory (including the District of Columbia, Puerto Rico, and the Virgin Islands).

## Coverage

Tax rates and coverage vary by state, as do the content and format of the records a particular state collects. In general, workers not covered by this system include federal employees, independent contractors, the self-employed, and some agricultural workers.

## Content

A state collects the employment and compensation data in two parts. The first part is detailed earnings data[1] collected as part of the UI system. The state UI agency collects reports from each employer that include the SSN, name, and quarterly compensation for each individual employee (as well as the employer name and EIN).[2] This collection of detailed employee earnings, often called UI wage records, provides the most frequent and granular information about employee earnings across the three tax systems.

For the second part, the state ESA collects aggregate monthly employment (for the pay period containing the 12th of the month[3]) for each quarter and the aggregate quarterly employee compensation from each employer in the state covered by state UI laws and federal workers covered by the Unemployment Compensation for Federal Employees (UCFE) Program.[4] This program, administered by the BLS, also includes the collection of monthly

---

[1]See, for example, http://detr.state.nv.us/uicont/forms/NUCS-4072.PDF [July 2012].

[2]The coverage varies by state. For a complete review, see Stevens (2002), available at: http://lehd.did.census.gov/led/library/techpapers/tp-2007-04.pdf [July 2012].

[3]The 12th of the month is the same date used for reporting of employment on the IRS quarterly employment FICA tax returns (Form 941 series) that is, March 12, June 12, etc.

[4]This quarterly reporting of aggregate compensation provides more commonality with the IRS Form 941 series, which also reports quarterly aggregate employee compensation: see, for example, http://www.bls.gov/cew/forms/mwr_nm.pdf [July 2012], also see http://www.bls.gov/cew/cewover.htm [July 2012].

Copyright National Academy of Sciences. All rights reserved.

employment data and provides the most frequent aggregate employment data across the three tax systems.

The second part data collection is partly funded by BLS, and after a state edits the data, it transmits electronic summaries to BLS for its statistical needs. Although data are also requested for multiple worksite or multi-establishment employers, there is no disincentive for an employer that does not comply with the multisite request as long as total employment is reported accurately and the appropriate amount of UI taxes is paid to the states.

### EEO-1 Utility

For purposes of expanding the EEO-1 Program, the UI data system provides the earnings data needed and at the employee level, but it also presents three problems. First, because of the lack of a disincentive for nonreporting of multisite employer detail, there may be a disconnect in matching to multi-establishment employer data at the worksite level—but not the enterprise level—from the EEO-1 reports. It would be up to the EEOC to determine how big a problem this represents for its enforcement needs. Second, gender, race/ethnicity, and nativity data are not collected for either of the two parts described above. However, if the detailed employee earnings data could be matched to SSA Numident (Numerical Identification System) data, this problem could be reduced if not resolved. Third, and perhaps most daunting, in order to obtain either of the two data parts provided to the states—especially the detailed employee earnings—it would be necessary to obtain separate agreements with each state as was done so laboriously for the Longitudinal Employer-Household Dynamics (LEHD) Program at the Census Bureau starting in the 1990s.[5]

### INTERNAL REVENUE SERVICE DATA

This section presents a summary of several tax and information forms, especially Form W-2, Form 941, and Form 940, and why they might be of interest to expand the EEO-1 reports on employment and earnings data. In addition, it discusses the close relationship IRS and SSA have in terms of the first two forms, particularly for validating and reconciling amounts withheld for income, Social Security, and Medicare taxes.

---

[5]The LEHD program is briefly described in Chapter 2.

Copyright National Academy of Sciences. All rights reserved.

## Purpose

In 1976,[6] the current simplified Combined Annual Wage Reporting (CAWR) Program was established by law to ensure that employers pay and report the correct amount of tax, including federal income tax withholding and that they file timely all necessary forms with SSA. That same year, Form W-2 (Wage and Tax Statement) was redesigned to include Social Security information, and Form W-3 (Transmittal of Income and Tax Statements), was amended to include cumulative totals of each money field appearing on the associated Form W-2s.

## Content

Detailed annual employee compensation, quarterly and annual aggregate employee compensation, and number of employees are provided at both the employee and employer level and are linkable by the SSN/EIN crosswalk also provided. In addition, other tax forms provide various components of aggregate and even detailed employee compensation, such as compensation to corporate officers. Finally, EIN and ITIN assignment and other transactions enable the tracking of new business births, foreign born workers without SSNs, and even the employee or contractor status of a worker.

For purposes of expanding EEO-1 reports, three forms in particular figure prominently in the CAWR process: Form W-2, Form 941, and Form 940.[7]

## Form 940, Employer's Annual Federal Unemployment Tax Act (FUTA) Tax Return[8]

*Purpose*

Form 940 is required to be filed annually by an employer for purposes of reporting and paying the federal unemployment taxes required by FUTA. These taxes are used to fund state workforce agencies, pay half the cost of extended unemployment benefits in severe economic downturns, and also for loans to states to help them pay unemployment benefits, including extended unemployment benefits.

---

[6]The Tax Reform Act of 1976 (TRA76) also established the present confidentiality statute in the tax code, namely, Section 6103.

[7]Schedule H, filed with Form 1040 to report household employees, is omitted from this discussion.

[8]See http://www.irs.gov/pub/irs-pdf/f940.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

*Coverage*

Filing is required—at the aggregate employment level—for each nonagricultural employee earning at least $1,500 in any quarter of the year or for each employee who was employed for part/all of a day in any 20 different weeks of the year.[9]

*EEO-1 Utility*

Although Form 940 does report annual total compensation, it does not report the number of employees. However, for purposes of this analysis, the compensation information may be useful for benchmarking compensation data reported on other federal tax forms, say, Form W-2, and Form 941, as well as the UI data.

**Form W-2, Wage and Tax Statement**[10]

*Purpose*

Form W-2 is required to be filed by both employees, with their individual tax returns (Form 1040), and employers, transmitted under the summary Form W-3. The form's major tax purpose is threefold: reporting of federal income tax, Social Security tax, and Medicare tax withheld from employees' compensation. The W-2 is also required to be filed if these taxes were not withheld but should have been.

*Coverage*

Withholding of federal income tax is not required for an employee who had no federal tax liability in the previous year and is expected to have none in the current year. However, because Social Security and Medicare taxes must be withheld, a Form W-2 must be filed for such an employee. Thus, this is an extremely potent building block for employment and wage data—at the employee level, but cross-referenced to the employer level by the cross-walk of SSN/EIN—even for low-wage employees. In addition, because a different W-2 must be filed by each employer of an employee, these data can provide multiple employer information for an employee with multiple jobs.

---

[9]For 2009 and 2010, agricultural employers were required to file if they paid cash wages of $20,000 or more to farm workers during any calendar quarter or if they employed 10 or more farm workers during some part of the day (whether or not at the same time) during any 20 or more different weeks in either year.

[10]See http://www.irs.gov/pub/irs-pdf/fw2.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

*EEO-1 Utility*

The industry codes available at SSA (at the full 6-digit level of the North American Industry Classification System) can provide a further source of rich classifier information on employers' business activities. Earnings detail is also rich: wages and salaries, deferred compensation (part of total compensation, even if not taxable currently), and certain fringe benefits are reported, in addition to capped Social Security earnings and uncapped Medicare earnings. Together, the W-2 earnings variables provide a unique and comprehensive window on earnings data at the employee level.

### Form 941, Employer's Quarterly Tax Return[11]

*Purpose*

Form 941 is required to be filed quarterly by an employer in order to report and pay federal income tax withheld for employees, and both the employer's and employees' share of Social Security and Medicare Taxes. Similarly, Form 943, Employer's Annual Federal Tax Return for Agricultural Employees,[12] is required to be filed annually for the same reasons, but for agricultural employees.

*Coverage*

In general, coverage of FICA employees by the Form 941 series is very similar to that of FUTA employees by the Form 940.

*EEO-1 Utility*

Both the Form 941 series and Form 943 contain a number of useful fields, especially the total number of employees and their total compensation—quarterly for the Form 941, annually for Form 943. In addition, the forms report taxable Social Security wages (which are capped at the SSA ceiling) and taxable Medicare wages (which are not capped and, thus, equivalent to total wages).

*Data Quality: IRS and SSA Reconciliation*

IRS and SSA use a reconciliation process involving the filings of both Form W-2 and Form 941 in order to determine discrepancies and possible

---

[11]See http://www.irs.gov/pub/irs-pdf/f941.pdf [July 2012].
[12]See http://www.irs.gov/pub/irs-pdf/f943.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

tax delinquencies. Specifically, they compare taxable SSA wages, taxable SSA tips, taxable Medicare wages, and federal income tax withheld. Discrepancies result in the direct contact of employers, and consequences for noncompliance—and even nonresponse—can be serious. For example, in addition to monetary penalties that may result, so-called bad boy employers have been required to file Form 941 on a monthly, instead of a quarterly, basis.

IRS uses a similar cross-check system involving more tax forms, such as the Form 1040[13] series of individual tax returns, to ensure that an individual's total reported income jibes with other reports of the income source; for example, the Form W-2 for earnings and other compensation and Form 1099R for income such as interest, dividends, and pension distributions.

The consequences of being noncompliant with the federal income tax system are well known and potentially include not only prison, monetary penalties and interest, but also damage to one's credit ratings for both individuals and firms. For a firm, such damage can extend to its reputation in the business community, for example, for partnering and other collaborative efforts, and adversely affect attempts to raise capital publicly, say, with an initial public offering, and privately.

Because of the adverse consequences of tax noncompliance, firms are generally highly incentivized to comply and provide accurate and timely information to both IRS and SSA. If they are not, IRS enlists an array of tools for enforcing compliance that include a discriminant function (DIF) system scoring[14] of individual and some business tax returns and numerous auditors and agents to ensure that tax laws are obeyed and corrective measures taken when they are not.

### Data Quality: IRS and State UI Reconciliation

Although a similar relationship exists between IRS and the state workforce agencies[15] for purposes of ensuring the timely and accurate payment of both state and federal unemployment taxes, Form 940 earnings data— annual employment compensation by employer—may be less useful for

---

[13]See http://www.irs.gov/pub/irs-pdf/f1040.pdf [July 2012].

[14]Under this system, IRS computer programs assign each return a numeric DIF score rating the potential for necessary changes to the return, based on past IRS experience with similar returns. The unreported income DIF score is used to rate the return for the potential of unreported income. IRS staff screen the highest-scoring returns, selecting some for audit and identifying the items on these returns that are most likely to need review.

[15]Under Section 6103 of the tax code (and reciprocating state and municipal laws), IRS, state, and even municipal tax authorities have long shared data for mutual benefit involving tax administration. For states, such sharing has included data to administer both income taxes and employment or payroll taxes.

Copyright National Academy of Sciences. All rights reserved.

purposes of expanding EEO-1 reports than the more detailed information on the Form W-2 and Form 941. However, the information sharing between IRS and the state workforce agencies also helps ensure the accuracy of the data reported to the states at both the firm and employee level for purposes of both federal and state unemployment taxes. The importance of the interagency relationship for ensuring that these taxes are paid correctly and timely is a major reason these data from all three tax systems may hold such promise for expanding the earnings data on the EEO-1 reports.

### Form SS-4, Application for Employer Identification Number[16]

In addition to starting the process for assigning an EIN for an entity (usually, but not always, a business), the Form SS-4 establishes an employer's account on the IRS Business Master File (similar to the business registers at BLS and the Census Bureau, but for tax administration), including filing requirements for income tax returns (Form 1120 series, Form 1065 series, Form 990 series) and employment tax returns (Form 940 and Form 941 series). It also provides the SSN-EIN crosswalk for a sole proprietorship converting from nonemployer to employer status, important information in order to link the Schedule C posting to the Individual Master File on SSN with the accompanying Form 1040, to the sole proprietorship's employment tax returns posting on EIN to the Business Master File. IRS also provides SS-4 population data to SSA (and the Census Bureau), which uses the detailed alpha information on business activity to assign full 6-digit industry codes,[17] which should be useful industry classification for EEO-1 reports. In summary, this short form initiates actions in several systems— both statistical and administrative—which begin the cross-tracking of many events for a central use of the form, the identification of new businesses.

### Form W-4, Employee's Withholding Allowance Certificate[18]

Form W-4 identifies a new employee's withholding status for purposes of the required Form W-2 that is later filed with an employee's Form 1040 individual income tax return. Although the W-4 is not required to be filed with IRS, it is required to be filed by federal and state agencies for

---

[16]See http://www.irs.gov/pub/irs-pdf/fss4.pdf [July 2012].

[17]The 6-digit North American Industry Classification System (NAICS) codes replaced the 4-digit Standard Industrial Classification (SIC) codes in 1997, but continuity mappings (from SIC to NAICS) exist at many federal agencies using these codes. IRS uses NAICS-based codes for its tax returns, but only what can fit on the allotted one page of the form instructions. These vary by business entity according to the business activity distribution; for example, Form 1065 codes differ from those for Form 1120.

[18]See http://www.irs.gov/pub/irs-pdf/fw4.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

employers, as part of the National Directory of New Hires at the U.S. Department of Health and Human Services (HHS) (see related discussion below under Confidentiality). One use of this form, in addition to its potential for identifying increases in national employment on practically a real-time basis, is that it individually identifies new employees, something that may be of interest for EEO-1 reports to track employment by employers.

### Form W-7, Application for IRS Individual Taxpayer Identification Number (ITIN)[19]

Form W-7 is filed for foreign workers, regardless of immigration status,[20] in place of an application for SSN. The ITIN is important not only because of the foreign nativity information it contains, but also because it helps complete identification of the worker universe information, supplementing and complementing the SSNs reported for more permanent status workers. Thus, it indirectly helps provide detailed worker information on the forms filed with the states as well as a more complete picture of the employee/employer relationships revealed by Form W-2 filings. In addition, most immigrants—even in illegal status—have incentives to have an ITIN so that they and their employers can file required tax returns. The worker may have the additional incentive of obtaining a tax refund later.

### Form SS-8, Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding[21]

Although Form SS-8 is not required, it may be filed by either a worker or firm to determine whether a worker should be considered an employee or independent contractor. The resulting determination may have ramifications for not only IRS forms, such as the W-2 and employment tax returns, but also for UI and related record filings with the states for SUTA and their employment training administration programs. One purpose of a related return, Form 1099 Miscellaneous,[22] is to report payments to contractor workers. Thus, this information, in conjunction with compensation information reported for employees, can help provide a complete worker compensation picture by employer.

In addition to helping capture information for contractors required to complete EEO-1 reports, such information might also be helpful for EEOC

---

[19]See http://www.irs.gov/pub/irs-pdf/fw7.pdf [July 2012].

[20]From a general policy perspective, IRS has not cared about an immigrant's legal or illegal status, only that the employee and employer file required returns and withhold and pay all required taxes.

[21]See http://www.irs.gov/pub/irs-pdf/fss8.pdf [July 2012].

[22]See http://www.irs.gov/pub/irs-pdf/f1099msc.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

in determining which employers might be avoiding compliance with EEOC requirements and which are evading compliance. To paraphrase IRS compliance parlance, avoidance would be considered legal, but not evasion.

### Additional Income Tax Returns

Finally, several returns report earnings at both the individual and firm levels. For the former, Form 1040 and the related Schedule C (for sole proprietorships) report individual and self-employment earnings. Moreover, when the Schedule C's filer is also an employer, the Schedule C will contain compensation information for the firm's workers; for example, Cost of Labor. At the firm level, aggregate employment compensation—salaries and wages, cost of labor—can be found on the Form 1120 series,[23] in addition to an item of possible interest for expanding EEO-1 reports, namely, compensation to officers of the corporation. Aggregate employment compensation is also reported on pass-through forms, such as the Form 1065 series[24] for partnerships and Form 1120-S[25] for subchapter S investors. Income and taxes are reported for the individual partner or investor on Schedule K-1[26] and the respective Form 1040 (although partners and investors may be businesses, not individuals).

An additional sector of employers may also be of interest for the EEOC, namely, nonprofit or tax-exempt organizations that have to file Form 990, Return of Organization Exempt from Income Tax,[27] (or the related Form 990-T,[28] Exempt Organization Business Income Tax Return). Both forms, especially the former, report a number of earnings items of potential interest, including aggregate cost of labor and compensation to officers, as well as detailed individual compensation to officers, directors, trustees, and highly compensated employees.

### Limitations of IRS Data

Although IRS data include a wealth of earnings data by individual employee and employer, they include establishment data only when an establishment is also an enterprise (and has an EIN). Another limitation is that they contain no data by gender (except, sporadically, for the Statistics of

---

[23]See http://www.irs.gov/pub/irs-pdf/f1120.pdf [July 2012].

[24]See http://www.irs.gov/pub/irs-pdf/f1065.pdf [July 2012].

[25]See http://www.irs.gov/pub/irs-pdf/f1120s.pdf [July 2012].

[26]See http://www.irs.gov/pub/irs-pdf/f1065sk1.pdf [July 2012] and http://www.irs.gov/pub/irs-pdf/f1120ssk.pdf [July 2012].

[27]See http://www.irs.gov/pub/irs-pdf/f990.pdf [July 2012].

[28]See http://www.irs.gov/pub/irs-pdf/f990t.pdf [July 2012].

Copyright National Academy of Sciences. All rights reserved.

Income [SOI] individual Form 1040 tax sample), race/ethnicity, or nativity (except for ITIN applications).

## SOCIAL SECURITY DATA

Although a massive amount of data exist at SSA, the data of most interest for expanded EEO-1 reports are captured from the application for an SSN and the linkable federal tax data shared by IRS. Thus, only these data are discussed below.

### Purpose

The data at SSA are used for administering the Social Security and Medicare programs mandated by law. Nevertheless, a related purpose is the statistical analysis necessary for such administration, conducted by not only the Office of the Actuary, but also the Office of Research, Evaluation, and Statistics (ORES). The latter would most likely be the office with which the EEOC would need to discuss any future work involving EEO-1 report data.

### Content

Form SS-5,[29] Application for Social Security Number, is administered by SSA and captures gender, race/ethnicity, and nativity—often shortly after birth for most U.S. citizens. In addition, it captures citizenship status, which might be used as a proxy for or to supplement nativity information. Although the Form SS-5 data are self-reported, SSA uses supporting documentation for verification—particularly for changes, such as a marriage license (name), passport (citizenship), and birth certificate (place of birth). The Form SS-5 data, including updates, are maintained on SSAs Numident file. Because many people, such as nonretirees, have more incentives to update their tax information changes, say, name and address due to marriage or divorce, the tax information at IRS may be updated before the Numident data. However, because of the Form W-2/941 reconciliation process partnered by SSA and IRS on withholding for income, Social Security, and Medicare taxes, SSA has these data as an additional source for updating changes to the Numident, and can also query the individuals and firms in case of doubt.

---

[29]See http://www.ssa.gov/online/ss-5.pdf [July 2012].

SJA224
Copyright National Academy of Sciences. All rights reserved.

## Quality

Because of the supporting documentation, the SSA-IRS relationship (as well as the SSA-Census Bureau relationship), and penalties for non-compliance, filers should have incentives to provide accurate and timely data, although some limitations may be inherent. For example, although nativity data classified by country might be considered relatively reliable, researchers have noted that some of the "foreign born" may be, in fact, the progeny of American citizens, say, for military and other Americans stationed overseas, where birth occurs. In conjunction with the citizenship status, however, the data are probably useful for indicating native vs. foreign born status—the same nativity classifications published by BLS for its household surveys.

Like IRS and UI administrative data, SSA data are imperfect, but the interrelationship of these seemingly disparate data sets is usually a strength. For example, incorrect decedent data[30] might be passed on from SSA to the IRS (for individuals on its Individual Master File), but ultimately, a tax return, say, the Form W-2, could help rectify the mistake, even if it had not already been corrected through other means.

## Utility for EEO-1

Together with the detailed earnings data obtained from the IRS Form W-2 and Form 941, SSA classification data of gender, race/ethnicity, and nativity should be considered a potent source of information at the individual employee level, with the essential crosswalk of SSN (or ITIN) and EIN enabling linkage to the respective employers.

## U.S. CENSUS BUREAU

Although the U.S. Census Bureau is a federal statistical office and does not collect administrative data directly or participate in the administration of the related programs, it may play a unique role in the utilization of administrative data for purposes of expanded EEO-1 reports for several reasons.

First, the Census Bureau is an established and long-time user of administrative data for statistical purposes, and it has developed institutional expertise in the integration of these data with its own statistical survey and census data. For example, the bureau has long considered IRS tax data to be the "lifeblood" of its business register and related business programs, and

---

[30]For example, see "Social Security Wrongly Declares 14,000 People Dead Each Year," CNN, August 17, 2011, available at: http://money.cnn.com/2011/08/17/pf/social_security_ deaths_mistakes/index.htm [July 2012].

SJA225
Copyright National Academy of Sciences. All rights reserved.

uses these tax data both for sampling frame purposes and to supplement and improve the quality of its own data programs. Moreover, although IRS data are not necessarily reported at the establishment level, the Census Bureau integrates them in the business data system it maintains at the establishment level. Thus, the bureau could be an important resource in the establishment as unit of measurement.

Second, the Census Bureau has partnered with other statistical agencies, such as ORES and BLS, on mutually beneficial programs. For example, SSA and the Census Bureau collaborate on work matching individual record data from the Current Population Survey (CPS) and the Survey of Income and Program Participation (SIPP) to Numident data and Form W-2 tax data at SSA. In addition, the Census Bureau and BLS have collaborated on work involving the record to record comparison of their respective business registers, including IRS tax data on the bureau's register.

Third, the Census Bureau is authorized to access earnings data from federal tax data that most other federal agencies, including SSA, are not authorized to access, for example, from income tax returns for individuals and employers.

Fourth, the Census Bureau has a unique vehicle, the special sworn status process, which enables outsiders—from other federal agencies and even outside the federal sector—to access non-anonymized or confidential data. Such access might be granted to experts to help ensure that the work being done by the bureau for an outside sponsor is conducted according to the sponsor's ultimate needs.

Finally, the Census Bureau has not only considerable resources as an advantage over most other statistical agencies—conferring significant economies of scale—but also a wealth of data in its own Title 13 programs, such as individual gender and race/ethnicity data from the decennial census.

For purposes of the EEO-1 reports, these factors suggest that the Census Bureau might play an important role in providing data access to EEOC staff (or its contractors, with special sworn status), under mutually suitable terms, and also in partnering with other agencies, such as SSA, in order to use data that the Census Bureau may not possess on a regular basis for the population of employees.

## CONFIDENTIALITY AND DATA ACCESS

### IRS Data

In general, individually identifiable tax data at IRS, frequently referred to as federal tax information, are considered confidential and nondisclosable unless such disclosure or access is authorized by statute, meaning that both bodies of Congress have passed a bill signed into law by the president.

SJA226
Copyright National Academy of Sciences. All rights reserved.

De-identification (removing identifier information such as name, SSN, address, etc.) of the data is considered a necessary but insufficient measure for anonymizing tax data, and statute (e.g., sections 6108(c) and 6103(j)(4) of Title 26 of the U.S. Code) requires that publicly released data be protected from both direct and indirect re-identification (e.g., in conjunction with other publicly released data by other agencies). Also, in general, tax data must be used for purposes of tax administration, which includes both a statistical and research component. Thus, the IRS SOI and the IRS Research Office are statutorily authorized users of identifiable tax data within the tax agency. Non-tax administration uses are discouraged, and IRS policy—and sometimes statute, e.g., for the Census Bureau—has been that even authorized tax data access should be to the minimal extent necessary to accomplish an authorized purpose. Over the years the overriding concern manifested by IRS has been the protection of the voluntary tax system, and confidentiality protection is seen as a cornerstone of such protection. Thus, any usage or proposed usage of tax data, even by authorized users, that is perceived by the public or IRS (or third-party scrutiny—Congress, the media, privacy advocates, etc.) to threaten taxpayer confidentiality is unlikely to be entertained and likely to be rejected.

However, non-tax administration accesses exist statutorily and certain exceptions have been made—rarely—to statutory access. Thus, HHS is authorized to access limited federal tax information for purposes of its child support program. The Census Bureau and a few other agencies (such as the Bureau of Economic Analysis) are statutorily authorized to access selected tax data for another non-tax administration purpose, namely, statistical purposes. Sometimes, a statute requires that the Treasury Department's regulations specify exactly which tax items may be accessed; e.g., for Census, but not for the Congressional Budget Office and SSA. These latter uses must be argued on a case-by-case basis, a less arduous process than changing statute and the regulations, but not an easy one, as IRS must be convinced[31] with a compelling business case that does not compromise even the perception of confidentiality protection and the voluntary compliance tax system.

BLS, which is not statutorily authorized to access federal tax information, has accessed identifiable tax data, both through special sworn status at Census/IRS-approved facilities, say, for the Census-BLS business register comparison project mentioned above, but also as BLS employees. The latter access involves only "minor" tax data access, such as EINs, for a long-standing procedure enabling the two agencies to compare industry codes in order to better harmonize some national statistics by that classification.

---

[31]Furthermore, Treasury's Assistant Secretary for Tax Policy must officially approve an amendment to the regulations.

Copyright National Academy of Sciences. All rights reserved.

Another way to access tax data is to obtain the taxpayers' waivers of their confidentiality rights for specific tax data through an established, formal IRS documentation process. This method has been employed successfully for a limited amount of tax data for the Health and Retirement Study (HRS). However, as one might imagine, obtaining these waivers for a sample size similar to that of HRS is probably more plausible than for the EEO-1 universe.

### SSA Data

As indicated above, SSA's classification data—gender, race/ethnicity, nativity—on the Numident have been linked to tax data as well as data from important surveys, such as the CPS and SIPP, in a long-standing collaborative arrangement with the Census Bureau. However, this work has been for exclusively statistical purposes, a factor that EEOC would need to consider in formulating a data request.

Nevertheless, statistical needs might be joined to the administrative needs of both SSA and the EEO-1 Program, perhaps under a mutually beneficial agreement involving data from the National Directory of New Hires (NDNH) database at HHS (maintained at the SSA National Computing Center). SSA's National Computing Center stores and maintains the NDNH, which also includes other data that may be of interest to the EEO-1 Program, such as from Form W-4, Employee's Withholding Allowance Certificate,[32] completed for most employees on the first day of employment. The W-4 can thus be used to identify not only new employees, but also new employment in the aggregate, and on a virtually real-time basis. It may be worth considering whether such an arrangement, perhaps most viable as a statistical research program under the child support statute underpinning the NDNH, might make sense, especially if HHS might derive some benefit as well. One proposal might involve a detailed analysis of EEO-1 employees who had experienced job discrimination and any relationship of such discrimination to the status of such employees as absent parents. This is only a simple example for illustration; surely, more sophisticated research proposals could be devised that might meet some of the needs of all three agencies.

### State Data

Although the collection of UI data is largely funded by ETA, the quarterly detailed employment and compensation data are retained by states and shared outside the states only rarely. Two important exceptions include the NDNH and the Census Bureau's LEHD Program.

---

[32]See http://www.irs.gov/pub/irs-pdf/fw4.pdf [July 2012].

SJA228
Copyright National Academy of Sciences. All rights reserved.

HHS's Federal Office of Child Support Enforcement (OCSE) operates the NDNH, a database established pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. The primary purpose of the NDNH is to assist state child support agencies in locating parents and enforcing child support orders[33]; however, Congress has authorized a limited number of other state and federal agencies to receive information from the NDNH for authorized purposes, including for statistical research related to the child support mandate.

Beginning in the 1990s, the Census Bureau began negotiating individual agreements with the states that resulted in their providing these detailed data to Census for the LEHD Program. Any use of these data by the EEOC should probably include some benefits for the states—as occurred with the Census Bureau collaboration.

The above examples are only illustrative of what is exceptional: in general, the data are not shared, even with a statistical agency such as the Bureau of Labor Statistics.

---

[33]This program is sometimes referred to as the "deadbeat dads" program, although either parent may be in its scope.

Copyright National Academy of Sciences. All rights reserved.

# Appendix C

# Proposed Pilot Tests of Compensation Data Collection

In Chapter 6, the panel recommends that the Equal Employment Opportunity Commission (EEOC) sponsor a pilot study to be conducted by an independent contractor that would provide much more reliable information about the costs and benefits of the proposed collection than the panel can provide based on existing evidence. In this Appendix, we outline two possible approaches to conducting an independent pilot study.

## MICRODATA PILOT

This approach would seek to gain an understanding of the availability, sensitivity, and reliability of the employer earnings data for their employees. The pilot would be conducted by an independent contractor. This recommendation that EEOC should use an independent contractor to conduct the pilot is based on the belief that an independent contractor could gain access to information that might not be possible to collect if the data were to be used for enforcement purposes. The process of contracting with an independent contractor would also give EEOC a strong incentive to make the plan for data use sufficiently comprehensive so that the potential contractors for the pilot would develop competitive study designs and plans for analysis of the results.

The first priority of the microdata pilot test would be to assess the availability and retrievability of data items of interest for individual employees. This would likely require conducting an employer records check of employers in different industries and size classes. The records check would focus on questions of interest and would parallel the questions that have

SJA230
Copyright National Academy of Sciences. All rights reserved.

been posed in the Office of Federal Contract Compliance Programs (OFCCP) Advanced Notice of Proposed Rulemaking (ANPRM) (OFCCP, 2011). In particular, at the establishment level, how do employers record and maintain compensation data? What internal actions would employers need to take to assemble earnings and earnings-related data? What categories of compensation-related data are maintained in computer-accessible personnel and payroll systems? How easy is it for employers to cross-haul data between the payroll record systems (earnings and hours measures) and their human resource management systems (employee characteristics and work histories)? How do these systems vary by type and size of company? How costly is it on the margin to retrieve and report these data? How much time is spent in retrieving and reporting these data (for purposes of quantifying the response burden to be reported to the Office of Management and Budget under the Paperwork Reduction Act)?

Second, it would be important to validate the availability and reliability of variables that would help to gain an understanding of the role of earnings in affirmative action and antidiscrimination enforcement. In addition to annual and hourly wages, the pilot would collect a number of core demographic variables by the present EEO-1 categories using an annual wage measure in order to test targeting firms for enforcement purposes. To the extent it is possible, the pilot should also collect additional variables that could help to explain the equal opportunity environment in the establishment and the possible influence of these variables on wage differences that may be observed. These variables might include birth date, entry level wage, and hire date. Such variables could assist in refining indicators that could help identify the possibility of discrimination based on age or seniority. These new earnings-related variables should be audited, on a random basis, to ensure that they appropriately reflect the data that reside in the employer's data systems.

The pilot could also test various earnings definitions, such as that used in the Bureau of Labor Statistics Occupational Employment Survey. In developing the test, the public responses to the OFCCP ANPRM could well be instructive.

With the results of the pilot data collection in hand, the contractor could turn to assessing the quality of the data. The contractor should compute earnings means with measures of dispersion for the estimates. With these measures in hand, the contractor should analyze the data as if the data were used by EEOC to select cases for further investigation (e.g., does earnings data assist in identifying potential discrimination cases and does it support a reasonable "threshold analysis" to determine whether or not an employer should be subject to further review and evaluation), and also as if the data were the subject of litigation (e.g., how well do the earnings data meet tests of reliability and appropriateness). The power of tests (as

Copyright National Academy of Sciences. All rights reserved.

illustrated in Chapter 4 of this report) to detect discrimination can be calculated to shed light on the size of the groups required to have a good chance of detecting discrimination.

Another useful test would be to use data from the Social Security Administration, the Internal Revenue Service, the states, and the Census Bureau (as discussed in Chapter 2)—or even from other data systems such as state driver's license files, passports, and visas—to explore the development of an ongoing data quality assessment tool through which the EEOC earnings data would be benchmarked against other sources, at fine levels of granularity, to assess the closeness of their match to the EEOC earnings data. There is precedent for gaining such access to otherwise confidential tax and administrative data sources. For example, the Internal Revenue Service (IRS) Statistics of Income statistical sample files have been provided to compliance offices in the IRS for statistical analysis related to their compliance (audit) needs in a manner that does not adversely compromise the statistical integrity of those sample files (see discussion in Appendix B).

The results of the pilot test could be anonymized to permit a peer review of the independent findings.

## SIMPLIFIED AGGREGATED-DATA PILOT

An alternative, simplified pilot could be performed by an independent contractor using a revised EEO-1 report format. The design would be a simplified version of the pilot described below. The contractor would prepare prototype EEO-1 reports that contained sufficient wage information to permit the EEOC to calculate grouped-data test statistics for differences in the mean standardized earnings across race/ethnicity and gender groups.

The standardized wage rates (full-year earnings, not actual earnings) would have to be integrated with the other data used to produce the EEO-1 report. Audited formulas for computing the average and the relevant variances would be developed for the data within EEO-1 occupation and race/ethnicity or gender group. Audited formulas for computing all relevant test statistics would also be developed. These could be based on existing statistical analysis software, or simply vetted using such software.

In prototyping a report that permitted statistical screening using grouped data techniques, the contractor would also be directed to experiment with tabulations that controlled for birth and hire date. Once again, the goal would be to produce standardized enhancements to the EEO-1 report that properly integrated the relevant data on standardized wage rates, birth dates, and hire dates with the other data used to compute the EEO-1 report. Once the data have been integrated, the report would generate validated sufficient statistics for the grouped data comparison of conditional means, given birth date and hire date. Audited formulas for computing

SJA232
Copyright National Academy of Sciences. All rights reserved.

all relevant test statistics based on the conditional means would also be developed. Once again, these could be computed using existing statistical analysis software or simply vetted with such software.

Because of the complexity of these calculations, and the difficulty of interpreting the raw report data, the contractor would be used to develop an electronic reporting format that the agency could then use for preliminary screening of the EEO-1 reports. The electronic reporting format, encompassing the audited formulas, could then be implemented by integration into payroll and human resource management software reporting systems, just as the option to produce the current EEO-1 report has been incorporated into such products.

Copyright National Academy of Sciences. All rights reserved.

# Appendix D

# Biographical Sketches of Panel Members and Staff

**JOHN M. ABOWD** (*Chair*) is Edmund Ezra Day professor of economics and professor of information science at Cornell University, research associate at the National Bureau of Economic Research, research affiliate at the Centre de Recherche en Economie et Statistique (Paris, France), and research fellow at the Institute for Labor Economics (Bonn, Germany). He is a fellow of the American Statistical Association (2009) and of the Society of Labor Economists (2006). He was also the distinguished senior research fellow at the U.S. Census Bureau (1998–2009). He served as director of the Cornell Institute for Social and Economic Research from 1999 to 2007. His current research focuses on the creation, dissemination, privacy protection, and use of linked, longitudinal data on employees and employers. In his work at the Census Bureau, he provided scientific leadership for the Longitudinal Employer-Household Dynamics Program, which produces research and public-use data integrating censuses, demographic surveys, economic surveys, and administrative data. His research on integrated labor market data is done in collaboration with the Institut National de la Statistique et des Etudes Economiques, the French national statistical institute. He is currently the principal investigator or co-principal investigator for multiyear grants and contracts from the National Science Foundation and the U.S. Census Bureau. He has published articles in the *American Economic Review*, *Econometrica*, the *Review of Economics and Statistics*, the *Quarterly Journal of Economics*, the *Journal of the American Statistical Association*, and other major economics and statistics journals. Dr. Abowd served on the faculty at Princeton University, the University of Chicago, and the Massachusetts Institute of Technology before coming to Cornell. His National

SJA234
Copyright National Academy of Sciences. All rights reserved.

Academies' service includes membership on the Committee on National Statistics (CNSTAT) Panel on Measuring Business Formation, Dynamics, and Performance and the Panel on Access to Research Data: Balancing Risks and Opportunities, and he is currently a member of CNSTAT. He has an M.A. and a Ph.D. in economics from the University of Chicago.

**H. JUANITA (NITA) BEECHER** is chair of the Employment Law & Litigation Group (ELLG), a network of senior corporate in-house labor and employment lawyers for Mercer LLC, and the compliance chair for the company's U.S. diversity networks. She has more than 25 years experience in labor and employment law, particularly with class investigations by the U.S. Equal Employment Opportunity Commission (EEOC) and the Office of Federal Contract Compliance Programs (OFCCP). After serving as an in-house counsel in major corporations for more than 20 years, Ms. Beecher joined Mercer (then ORC) in 2000, and became the chair of the ELLG in 2003. In her role as compliance chair, she works with the OFCCP and the EEOC on matters of interest to Workforce Opportunity Network and ELLG members. Her corporate experience includes positions at E.I. du Pont de Nemours & Company, the Consolidation Coal Company, Arch Mineral (now Arch Coal), and McDonnell Douglas/The Boeing Company. She is a graduate of the University of North Carolina School of Law.

**MARC BENDICK, JR.,** is an economist specializing in public and private initiatives to enhance mainstream economic opportunities for traditionally excluded individuals, families, businesses, and communities. He is the author of more than 125 books, articles in refereed journals, and testimony before congressional committees. He has also served as an expert witness in more than 175 employment discrimination cases representing both plaintiffs and defendants, including many of the nation's largest class actions. He has been a consultant on discrimination and workforce diversity management to the U.S. Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, the U.S. Department of Justice, and some of the nation's largest employers. Since 1984, he has been a principal in Bendick and Egan Economic Consultants, Inc. He holds a Ph.D. in economics from the University of Wisconsin and a B.A. in economics and social psychology from the University of California, Berkeley.

**CHARLES C. BROWN** is professor of economics and a research professor at the Survey Research Center, Institute for Social Research (ISR), University of Michigan. His past research has focused on topics such as compensating differentials, effects of minimum wage laws and of equal employment opportunity policies, the determinants of enlistment and re-enlistment in the military, and the relationship between employer size and

Copyright National Academy of Sciences. All rights reserved.

labor market outcomes. Current work focuses on measurement error in survey data, early-retirement windows, and consequences of the relatively equal opportunity in the military for children of black soldiers. He has been involved in the design and updating of the labor market status sections of the Heath and Retirement Study (HRS), and is currently analyzing data on early out windows offered to HRS respondents. Other current projects include an analysis of the relationship between age of firm and wages, and an exploratory study on children from military families. In addition to his research responsibilities for ISR's Michigan Retirement Research Center, he is assisting the director in an advisory capacity. He holds a Ph.D. in economics from Harvard University.

**ELIZABETH HIRSH** is assistant professor in the Department of Sociology, University of British Columbia. Her research interests include examining gender and race inequality, organizations, and the law. Much of her research in these areas focuses on employment discrimination and the consequences of legal prohibitions and organizational policies on labor market inequality. Current research includes a project examining the market, political, and organizational conditions under which employment discrimination lawsuits filed under U.S. equal employment opportunity laws bring about change in sex and race inequality in the workplace and a study of the impact of human resources practices on discrimination disputes. Other projects include an analysis of how status characteristics, workplace conditions, and neighborhood contexts influence workers' self reports of race discrimination; an analysis of corporate adoption of gender identity and expression non-discrimination policies, and a study of the extent of occupational segregation by sex, race, ethnicity, and Hispanic origin in the U.S. labor force. She holds a Ph.D. in sociology from the University of Washington.

**MARK R. KILLINGSWORTH** is a professor of economics at Rutgers University in New Brunswick, New Jersey. He was previously on the faculty of Barnard College and Fisk University. His research focuses on labor economics. He is the author of *Labor Supply* and *The Economics of Comparable Worth*, and has written on comparable worth and pay equity issues. He has testified on immigration reform and comparable worth before committees of the U.S. Congress, and has been a consultant to the Canadian Department of Justice, and the U.S. Departments of Justice and Labor. He was an undergraduate at the University of Michigan, and received M.Phil. and D.Phil. degrees from the University of Oxford, where he was a Rhodes Scholar. His recent work has been concerned with family members' labor force participation decisions, labor market influences on fertility, and the effect of childhood religious instruction on adult earnings.

SJA236
Copyright National Academy of Sciences. All rights reserved.

**JONATHAN S. LEONARD** is George Quist chair in business ethics in the Economics Analysis and Policy Group at the Haas School of Business, University of California, Berkeley. He has served as a senior economist for the President's Council of Economic Advisors and a fellow of the National Bureau of Economic Research. He holds a Ph.D. in economics from Harvard University. His research focuses on affirmative action, workplace regulation, job creation, and employee incentives.

**JANICE F. MADDEN** is professor of regional science, sociology, and real estate at the University of Pennsylvania where she has been vice provost for graduate education. She is also a research associate at the University of Pennsylvania's Population Studies Center and has previously served as director of the Alice Paul Research Center and the Women's Studies Program at the university. She has been a founder and has served on the board of directors of, and a consultant with, Econsult Corporation of Philadelphia. She has written on the economics of sex discrimination, changes in income and inequality within U.S. metropolitan areas, and wages and poverty. She has previously served on the National Research Council's Committee on Vocational Education and Economic Development in Depressed Areas and chaired the Committee to Assess the Portfolio of the Division of Science Resources Studies of the National Science Foundation. She holds a Ph.D. in economics from Duke University and a B.A. in economics from the University of Denver.

**THOMAS J. PLEWES** (*Study Director*) is a senior program officer for the Committee on National Statistics (CNSTAT) and interim director of the Committee on Population. He was director for previous National Research Council studies on data collection sponsored by the U.S. Department of Education—a study of the estimation of English language learners—and the U.S. Department of Agriculture—a review of the Agricultural Resource Management Survey. He has also directed several studies for CNSTAT sponsored by the National Science Foundation on topics such as research and development statistics and survey methodology. Previously, he was associate commissioner for employment and unemployment statistics of the Bureau of Labor Statistics. He was a member of the Federal Committee on Statistical Methodology and is a fellow of the American Statistical Association. He has a B.A. in economics from Hope College and an M.A. in economics from the George Washington University.

**ALEKSANDRA (SESA) SLAVKOVIC** is associate professor of statistics with appointments in the Department of Statistics and the Institute for CyberScience at the Pennsylvania State University, University Park, and in

Copyright National Academy of Sciences. All rights reserved.

the Department of Public Health Sciences, Pennsylvania State College of Medicine, Hershey. She is currently serving as an associate editor of the *Annals of Applied Statistics* and *Journal of Privacy and Confidentiality*. Her primary research interest is in the area of data privacy and confidentiality. Other related past and current research interests include statistical analysis of usability evaluation methods and human performance in virtual environments, statistical data mining, application of statistics to social sciences, algebraic statistics, and causal inference. She served as a consultant to the National Academy of Sciences/National Research Council Committee to Review the Scientific Evidence on the Polygraph in 2001 and part of 2002. She holds a Ph.D. in statistics from Carnegie Mellon University.

**FINIS R. WELCH** is president of Welch Consulting. He testifies frequently on statistical and economic issues involving a variety of issues from allegations of employment discrimination to underwriting criteria for insurance companies. He is also distinguished professor emeritus of economics at Texas A&M University and professor emeritus of economics at the University of California, Los Angeles. He earned his Ph.D. at the University of Chicago and taught microeconomic theory, econometrics, and labor economics to graduate students for 39 years. He has testified before Congress on various issues relating to public policy; his publications on the economics of income, education, and employment have been frequently cited in the professional literature. He is an elected member of the American Academy for the Advancement of Science and a fellow of the Econometric Society. He is past vice president of the American Economic Association and past president and vice president of the Society of Labor Economists.

**VALERIE RAWLSTON WILSON** is an economist and vice president of research at the National Urban League Policy Institute in Washington, DC, where she chairs the National Urban League's Research Council and is responsible for planning and directing the Policy Institute's Research Agenda. She is also a member of the National Urban League President's Council of Economic Advisors, which assists the League in shaping national economic policy. Under her direction, the Policy Institute recently launched *State of Urban Jobs,* a component of Iamempowered.com, that features the Institute's research and policy analysis and serves as a vehicle for communicating the latest information related to African American and urban employment issues. Dr. Wilson has served as managing editor, associate editor, and contributing author for the National Urban League's annual *The State of Black America* report and oversees production of the National Urban League's annual Equality Index™. In 2001, a report she co-wrote with William E. Spriggs—formerly executive director of the National Urban

Copyright National Academy of Sciences. All rights reserved.

League's Institute for Opportunity and Equality (IOE)—earned the IOE the Winn Newman Award from the National Committee on Pay Equity. Dr. Wilson earned a Ph.D. from the Department of Economics at the University of North Carolina at Chapel Hill. Her fields of specialization include labor economics, racial and economic inequality, and economics of higher education.

SJA239
Copyright National Academy of Sciences. All rights reserved.

## COMMITTEE ON NATIONAL STATISTICS

The Committee on National Statistics (CNSTAT) was established in 1972 at the National Academies to improve the statistical methods and information on which public policy decisions are based. The committee carries out studies, workshops, and other activities to foster better measures and fuller understanding of the economy, the environment, public health, crime, education, immigration, poverty, welfare, and other public policy issues. It also evaluates ongoing statistical programs and tracks the statistical policy and coordinating activities of the federal government, serving a unique role at the intersection of statistics and public policy. The committee's work is supported by a consortium of federal agencies through a National Science Foundation grant.

SJA240
Copyright National Academy of Sciences. All rights reserved.

SJA241
Copyright National Academy of Sciences. All rights reserved.

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.

*Home • The Administration • Office of Management and Budget*

 **Office of Management and Budget**

About | OMBlog | Budget | Management | Regulation & Information | Intellectual Property | Legislative | Join | Contact

# Estimating Paperwork Burden

**OFFICE OF MANAGEMENT AND BUDGET**

**Office of Information and Regulatory Affairs**

**Estimating Paperwork Burden**

**AGENCY:** Office of Information and Regulatory Affairs, Office of Management and Budget

**ACTION:** Notice of reevaluation of OMB guidance on estimating paperwork burden.

**SUMMARY:** The Paperwork Reduction Act (PRA) seeks to ensure that Federal agencies balance their need to collect information with the paperwork burden imposed on the public in complying with the collection. Agencies must estimate the burdens that their individual collections impose on the public. The public learns of these burden estimates by PRA notices that agencies publish in the Federal Register and with the forms used for collection.

The Office of Management and Budget (OMB) has begun a preliminary reevaluation of its guidance to agencies on estimating and reporting paperwork burden. As part of this effort, OMB seeks comment on how to increase the uniformity, accuracy, and comprehensiveness of agency burden measurement. Based on comments that OMB receives, as well as its experience in evaluating agency burden estimates, OMB will prepare (and seek additional comment on) a more detailed proposal to revise its guidance to agencies on estimating and reporting paperwork burden. OMB will consider comments on its proposal before finalizing its burden guidance.

**DATES:** Written comments are encouraged and must be received on or before January 12, 2000.

**ADDRESSES:** Comments should be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, New Executive Office Building, Room 10202, 725 17th Street, NW, Washington, DC, 20503. Comments received on this notice will be available for public inspection and copying at the Office of Information and Regulatory Affairs Docket Library, New Executive Office Building, Room 10102, 725 17th Street, NW, Washington, DC, 20503. To make an appointment to inspect comments, please call (202) 395-6881.

**FOR FURTHER INFORMATION CONTACT:** Alexander T. Hunt, Policy Analyst, Commerce and Lands Branch, Office of Information and Regulatory Affairs, at (202) 395-7860 or ahunt@omb.eop.gov.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Under the 1995 PRA (44 U.S.C. Chapter 35) and OMB's implementing regulations (5 C.F.R. Part 1320), we measure PRA paperwork burden in terms of the time and financial resources the public devotes annually to meet one-time and recurring information requests. The term "burden" means the "time, effort, or financial resources" the public expends to provide information to or for a Federal agency, or otherwise fulfill statutory or regulatory requirements. 44 U.S.C. 3502(2); 5 C.F.R. 1320.3(b). This includes:

- reviewing instructions;
- using technology to collect, process, and disclose information;
- adjusting existing practices to comply with requirements;

SJA242

- searching data sources;

- completing and reviewing the response; and

- transmitting or disclosing information.

Under the Paperwork Reduction Act, agencies must take into account the burden that their information collections impose on the public. This burden is balanced with the "practical utility" of the information to be collected. In earlier decades, when information was maintained manually rather than through automation, paperwork burden could be captured by estimating the "burden hours" that an individual, a company, or other entity would have to expend in filling out a form or otherwise responding to an agency collection. Over the succeeding years, as computers and other automated systems have assumed an ever-increasing role in society, paperwork burden has increasingly come to be represented by the financial costs associated with information technology. The financial costs imposed by a Federal collection have been included as "burden" in the Paperwork Reduction Act and in OMB's implementing regulations. See 44 U.S.C. 3502(2) (1995 PRA); 44 U.S.C. 3502(3) (1980 PRA); 5 C.F.R. 1320.3(b) (regulations issued in 1995); 5 C.F.R. 1320.7(b) (regulations in effect during 1983-95).

Currently, agencies separately estimate the "hour burden" and "cost burden" of each particular information collection. This ensures that all types of burden are taken into account, but requires two calculations of burden, one in the form of "burden hours" and the other in the form of "dollars." This approach also poses difficulties for evaluating over the years a particular collection's overall burden. For example, as respondents move from manual to automated information processing, a collection's "hour burden" would typically decrease. Its "cost burden" might increase or decrease, depending on the level of offsetting "cost burden" reductions from electronic recordkeeping and reporting. While the use of automation can decrease overall burden, the current reliance on separate categories of burden poses difficulties for arriving at precise comparisons over time of a collection's overall burden. For similar reasons, the current reliance on separate burden categories can sometimes pose difficulties for comparing the overall burden imposed by different collections of information, since collections can involve significantly different mixes of "hour burden" and "cost burden." For example, in the case of collections involving household respondents, overall burden would typically consist primarily of "burden hours." In the case of collections involving large business respondents, "cost burden" would assume a larger significance, due to the greater reliance on automation.

Given these complexities, agency estimation methodologies can produce imprecise and inconsistent burden estimates. A detailed description and assessment of current burden estimation practices is provided in the FY 1999 Information Collection Budget. See *Information Collection Budget of the United States Government, Fiscal Year 1999*, Office of Management and Budget, pp. 31-36.

**II. Burden Measurement**

In reevaluating its guidance on estimating burden, OMB has relied on a number of principles:

*Consistency.* Burden estimation techniques should be applied consistently to help ensure that a burden hour reported by one agency represents a burden hour equal to that of a burden hour reported by any other agency. Since the value of precise burden estimates increases with the size of information collections, we must use competent professional judgement to balance the thoroughness of the analysis with its practical limits.

*Accuracy.* Burden measurement should incorporate recent developments in methodological, data collection, and estimation techniques and reflect changes in the collection, storage, processing, preparation, and transmission of information.

*Integrity.* Measurement should provide proper incentives to agencies to undertake initiatives that actually reduce *burden*, as opposed to initiatives that simply reduce burden *estimates*. Such measures, for example, would not rely exclusively on proxies for burden, such as the number of lines on a form.

*Sensitivity.* A burden measure should allow agencies to assess the impact of ongoing improvements in procedures and customer service that are not measured by current methodologies.

*Comprehensiveness.* The measurement of burden must capture all burden (time and out-of-pocket expenses) without double-counting and must reflect the real costs imposed on the public.

*Practicality.* Agency personnel must be able to implement measurement methods in a practical and straightforward way.

*Transparency.* Improved burden estimates should improve our understanding of the tradeoffs among burden, customer satisfaction, and the utility of collected information.

In relying on these principles, OMB hopes to minimize variation in paperwork burden measurement so that future estimates are more useful in comparing agency inventories and evaluating individual agency and governmentwide performance. It also hopes to improve the comprehensiveness, consistency, and accuracy of burden hour

SJA243

measurement and the way agencies now measure and report out-of-pocket dollar costs. Agencies can continue to report time and financial costs, but estimates of burden hours and financial costs will reflect improved estimation methodologies.

### III. Issues for Comment

OMB invites comment generally on all aspects of measuring and reporting paperwork burden. OMB welcomes any suggestions on how to address problems with the current agency practices, as well as recommendations on methodologies to improve estimates of time burden and financial burden. It specifically requests comments on burden measurement options.

Please give particular attention to these issues:

*Monetizing Burden Hours.* OMB seeks comment on the idea of monetizing the "burden hour" calculation by converting a collection's burden hours into a dollar measure of burden. If a dollar-equivalent value is calculated for a given collection's "burden hours," a single estimate - in dollar terms - of the collection's overall burden could be provided by combining the monetized "burden hour" calculation with the "cost burden" calculation. This approach would raise a number of implementation issues. Two issues deserve particular attention. The first involves improving agency burden accounting practices to resolve salient differences and improve the dollar measure of out-of-pocket expenses. The second issue involves revising OMB guidance to agencies to provide consistency in the measurement of time and financial burden.

One potential benefit of developing a unified dollar measure of burden is that it would be available for cost-effectiveness analysis. Analytically, a dollar measure has the potential to better capture opportunity cost (as explained below), as well as the burden of PRA requirements not easily measured in hours (e.g., recordkeeping). We seek comments on whether this and/or any other potential benefits would outweigh possible negative effects of this approach.

Monetizing burden hours would present a daunting methodological challenge and raises issues concerning certainty and ease of administration by agencies. The key issue would be how to estimate the value of the time devoted by the public to complying with the government's information collection requirements. Monetizing time burden presents different issues when considering information collections from firms versus collections from households. When information is collected from firms, it may be relatively easy to estimate the employee cost associated with responding to the collection. Indeed, some agencies already do this, using, for example, data on wage rates provided by the Bureau of Labor Statistics. The challenge in firm-based collections is primarily one of implementation. In order to assure a meaningful basis for comparison of costs across agencies, it will be necessary to obtain appropriate wage rates.

In estimating the appropriate wage rate, it is critical that the wage be properly "loaded" to include overhead and fringe benefit costs associated with the employee's time. For example, although a technical employee's wage may be $20 per hour, she may also receive benefits from her firm such as health and life insurance, paid vacation, and contributions to a retirement plan. To support her work activities, her employer must also purchase office supplies and services, including office space, furniture, heat and air conditioning, electricity, a telephone and telephone service, a personal computer, printer and photocopier access, and various office supplies. These costs need to be accounted for when assessing the overall impact of the Federal information collection on the resources of the respondent.

For household-based collections, the issue is inherently more complex. People are generally not paid a wage for non-work activities that they perform at home. Instead, for burden measurement purposes, the value that people place on their time is usually expressed in economic terms as "opportunity cost," or the value of an activity (for example, spending time with family or developing a new professional skill) that a person would expect to engage in were he or she not occupied in complying with a government reporting requirement. Economic theory suggests that the opportunity cost of giving up an hour of leisure will be equal to the wage foregone from the next hour the individual would have worked. In most cases, this will be the same as the respondent's average wage. In other cases - for example, if the respondent is eligible for overtime pay for her forty-first hour of work in a week - it may be more than the average wage.

Alternatively, to measure the value of leisure time, agencies could observe the actual fees paid by individuals and businesses to others (e.g., paid tax preparers, contractors) to prepare and submit information to the government. This measurement approach is sometimes referred to as "revealed preference."

Given the methodological and implementation challenges involved with monetizing burden hours, OMB requests responses to a number of specific questions:

- What are the advantages and disadvantages to trying to monetize burden hours?
- Is monetization worth doing at all?

SJA244

- Should a single valuation of time (as represented, for example, by a respondent's wage rate or the fee paid to a contractor) be used for all collections, or it should it be derived separately for different types of collections? A successful methodology may need to be tailored to individual collections and agencies.

- If the latter, should a single valuation be used for all respondents to a particular collection, or should valuations differ according to respondent characteristics. A successful methodology may need different values of time for collections responded to by individuals in different circumstances.

- Should OMB establish a means for reporting annual burden estimates rather than the three-year average burden estimates that are commonly reported today?

*Categories of Burden*. OMB also seeks comment on the advantages and disadvantages of expanding the categories of burden that agencies report to OMB. Such an approach could involve dividing estimates of Federal paperwork burden into three categories, with a fourth category representing an aggregate measure of burden. The first two categories, burden hours and financial costs, are used under the current approach, but could be improved using new procedures designed to address problems with burden estimation practices. A possible third category could be burden hours converted, or "monetized," into dollars, depending on resolution of the issue discussed above. A possible fourth category might combine financial costs and monetized burden hours to create, for the first time, a dollar measure of total Federal paperwork burden.

*Estimating Burden Hours.* Whether or not the categories of burden are expanded, OMB plans to provide guidance to agencies intended to help them improve their estimates of time burden, measured in burden hours. OMB seeks comments specifically on ways to improve current agency hour burden estimation methodologies.

OMB will review and consider all comments received in response to this notice. It will then prepare a draft revised guidance to Federal agencies and provide another opportunity for public comment before issuing final guidance to agencies.

Dated: October 4, 1999

**John T. Spotila**
*Administrator*

SJA245

EQUAL EMPLOYMENT
ADVISORY COUNCIL

SUITE 400
1501 M STREET, NW
WASHINGTON, DC 20005

TEL 202/629-5650
FAX 202/629-5651

August 15, 2016

Via Federal eRulemaking Portal: http://www.regulations.gov

Joseph B. Nye
Policy Analyst
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Re:     Comments of the Equal Employment Advisory Council on the EEOC's
        Proposed Revisions of the Employer Information (EEO-1) Report

Dear Mr. Nye:

On behalf of the Equal Employment Advisory Council (EEAC), I am pleased to submit these comments in response to the Equal Employment Opportunity Commission's (EEOC's or Commission's) proposed revision of the Employer Information (EEO-1) Report as published in the *Federal Register* on July 14, 2016.[1]

OVERVIEW OF COMMENTS

EEAC strongly opposes compensation discrimination based on protected characteristics such as sex and race. In addition, we support efforts by the EEOC and other workplace regulators to focus their limited resources in ways that effectively identify so-called bad actors. We respectfully submit, however, that by proposing that all covered employers report nearly 3 *billion* fields of data — a  twenty-fold increase over the current EEO-1 form — on an "EEO-1 reported" workforce of only 76 million people, the EEOC has failed to craft an effective and efficient enforcement tool. Instead, the proposal is in direct conflict with the purposes of the Paperwork Reduction Act (PRA), which include maximizing the utility and minimizing the burden of information collected by the federal government.[2]

The EEOC had every opportunity to craft a proposal that would have been less burdensome and of greater utility in identifying unlawful pay disparities. It chose not to do so. Indeed, past experience demonstrates that collecting summary compensation data in the format proposed by the EEOC is likely to be of negligible utility in identifying pay discrimination. This experience led the National Academy of Sciences (NAS) to recommend that the EEOC conduct a pilot study of employers to evaluate both the burdens and utility of its methodology, a step which would have been entirely consistent with both the letter and

---

[1] Equal Employment Opportunity Commission, Agency Information Collection Activities; Notice for Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), 81 Fed. Reg. 45,479. (Current Proposal).
[2] See 44 U.S.C. § 3501 (1), (2).

the spirit of the PRA. The EEOC ignored this recommendation and refused to conduct such a study, candidly admitting that it didn't want to ask your office for the required PRA approval.

As EEAC's comments will demonstrate, the EEOC's proposed revisions do not warrant PRA approval. Instead, the Office of Information and Regulatory Affairs (OIRA) should disapprove this proposal and return it to the EEOC until the Commission has complied with the recommendations of the National Academy of Sciences report the EEOC itself commissioned. While we do not support these proposed revisions for the reasons stated in these comments, should OIRA decide to  clear them, we urge you to require the EEOC to consider alternative methods of measuring pay, which would significantly reduce the burdens on employers and increase the utility of the data collected.

## STATEMENT OF INTEREST

EEAC is the nation's largest nonprofit association of employers dedicated to the advancement of practical and effective programs to eliminate employment discrimination. Formed in 1976, EEAC's membership includes approximately 260 of the nation's leading and largest employers, all of which are firmly committed to the principles and practice of workplace nondiscrimination. All of our members are employers subject to the compliance, recordkeeping, and reporting requirements imposed by federal statutes and regulations prohibiting workplace discrimination. In addition, nearly all of our members are federal contractors subject to the additional recordkeeping, reporting, and compliance requirements imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and their implementing regulations.

EEAC has a long track record of working closely with the EEOC to ensure that the EEO-1 Report maintains its relevance and utility to both the Commission and the employers who file it. Over the years, EEAC frequently has been the only organization to submit public comments in response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1 Report under the federal Paperwork Reduction Act.[3] And for more than four decades, we have worked and communicated less formally with Commission staff to resolve practical concerns regarding the EEO-1 reporting process in ways that benefitted both the Commission and employers.

EEAC also has a long history of researching and providing feedback on other federal agency initiatives to collect compensation data from employers on a broader scale, including those implemented or proposed by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). These include OFCCP's Equal Opportunity Survey, which collected summary compensation data from a sample of federal contractors during a five-

---

[3] See, for example, the supporting documents maintained by the Office of Management and Budget related to EEOC's 2014, 2011, and 2009 information collection requests for approval of the EEO-1 Report, *available at* http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001, http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201104-3046-003, and http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200901-3046-001.

year period between 2000 and 2004,[4] as well as OFCCP's more recent proposed Equal Pay Report.[5]

## EEOC IS PROPOSING TO COLLECT A BOTTOM-OF-RANGE ESTIMATE OF 3 BILLION CELLS OF DATA EVERY YEAR FROM COVERED EMPLOYERS

Census data indicate that the size of the workforce employed by employers that would be required to report compensation and hours worked data under the proposed revision is about 76 million employees.[6] But to summarize the compensation paid to these 76 million employees, and using a bottom-of-range estimate of the total number of employers who would be required to complete one of the "full-grid" EEO-1 Report types, the EEOC has constructed a compensation data collection tool that would require employers to complete, or review and skip over, nearly *3 billion* fields of data.

The EEOC does not acknowledge anywhere in its proposal that it would, in fact, require covered employers to submit between 3 billion and 5 billion data points every year. In fact, the EEOC had not publicly released the number of "full-grid" EEO-1 Reports that employers filed until EEAC requested the information as part of our efforts to respond to the agency's proposal.[7] According to the EEOC, 1,482,810 EEO-1 Reports were filed in 2014, 810,390 of which were "full-grid" reports, and 672,420 of which were "Type 6" summary reports. As many as 9,129 reports were filed by smaller employers that would not be subject to the new compensation and hours worked reporting requirements.

The existing version of the full-grid EEO-1 Report contains 180 data fields. The EEOC's proposal would expand the full-grid report from 180 data fields to 3,660 data fields, with 1,830 of these fields containing employee headcount data for 12 new pay bands within each job category, and an additional 1,830 fields containing hours worked data for the employees reported in each of the first 1,830 data fields.

If the same number of covered employers continued to file EEO-1 Reports in the same number and in the same manner as they did in 2014, then in 2018, these employers would be required to complete, or review and skip over, 2,932,615,260 data fields on their

---

[4] OFCCP formally repealed the EO Survey in 2006. Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors, Equal Opportunity Survey, 71 Fed. Reg. 53,032 (Sept. 8, 2006).

[5] Office of Federal Contract Compliance Programs, Notice of Proposed Rulemaking, Government Contractors, Requirement to Report Summary Data on Employee Classification, 79 Fed. Reg. 46,561 (Aug. 8, 2014).

[6] The civilian non-institutionalized workforce consists of approximately 159 million workers. Bureau of Labor Statistics, Employment Situation Summary Table A. Household data, seasonally adjusted, *available at* http://www.bls.gov/news.release/empsit.a.htm. According to census data, about 76 million workers are employed by employers with 100 or more employees. Census Bureau, Statistics of U.S. Businesses Employment and Payroll Summary: 2012 (released Feb. 2015), *available at* https://www.census.gov/content/dam/Census/library/publications/2015/econ/g12-susb.pdf.

[7] Letter from Carol R. Miaskoff, Acting Associate Legal Counsel, *Equal Employment Opportunity Commission*, to Joseph S. Lakis, President, *Equal Employment Advisory Council* (Feb. 18, 2016), *available (redacted)* at https://www.eeoc.gov/eeoc/foia/letters/2016/title_vii_revision_eeo1_report_2_18.html.

EEO-1 Reports (801,261 full-grid reports multiplied by 3,660 data cells per report).[8] The Commission does not — and cannot — dispute the magnitude of this bottom-of-range estimate.

We have repeatedly questioned whether forcing employers to complete or skip over nearly 3 billion data cells each year for an EEO-1 reported covered workforce of approximately 76 million people is an effective or efficient reporting framework for any purpose. And while the Commission has increased its estimate of this proposal's annual burden — from an unrealistically low $9.7 million to $53.5 million — it has not seriously considered any alternatives that would significantly reduce the number of EEO-1 data fields to something less than 38 separate fields for each individual employee in the entire EEO-1 reported workforce.

This analysis also reveals that the vast majority of these data cells — and by vast majority we mean in the billions — will be zero, even when aggregated across the entire workforce. The EEOC tacitly acknowledges this, stating that, "No EEO-1 filers enter data in every cell, so basing the annual PRA burden on the total number of cells on the EEO-1 form would be inaccurate." However, what the EEOC glosses over is that employers can't ignore the 3,660 data fields on each form — instead they must navigate through them, determining whether each cell requires some entry (not to mention review) of data for the specific race/ethnicity, gender, job category, and pay band that corresponds to that cell. For the overwhelming majority of employers that use the EEOC's on-line portal, simply searching for the right fields to fill in will take time — and it will take considerably more time to find the proper fields among 3,660 choices than it will among the existing 180 choices.

Employers that use the data file upload option for filing their EEO-1s are not relieved of this burden either, as the EEOC seems to suggest by heavily relying on the availability and usage of Human Resources Information Systems (HRIS) and other software solutions in its burden estimate. Even if an employer utilizes an information system that includes all relevant data, and our members report that few if any employers are in such a position today, the simple fact is that no employer will simply transfer data from its HRIS or other system to the EEOC without taking the time to review its data for accuracy and completeness. This is especially true for a government form that is filed *under penalty of perjury*. Part of this review is an examination of whether the correct data is correctly entered into each of the 3,660 data fields and, at some stage of the process, it is likely that the employer will review a hard copy, or its electronic equivalent, of each full-grid report. Even if employers will not be required to manually enter a zero into each of the billions of empty data fields, they will be required to spend time locating and verifying that the correct fields are being utilized and that the correct data are reported in each field.

---

[8] In our April 1, 2016, comments to the EEOC we stated that the total number of data fields would be up to 2,966,027,400, acknowledging that we did not know the number of reports filed by smaller employers that would not be subject to the new reporting requirements for compensation and hours worked. For purposes of our current analysis, we assume 9,129 establishment reports will be filed by 6,260 filers not subject to the compensation and hours worked requirements based on the EEOC's Paperwork Reduction Act statement. See Current Proposal, 81 Fed. Reg. at 45,496 n.118.

As one example of how the EEOC could cut the reporting burden in half, we support the NAS recommendation that the EEOC not collect pay information based on W-2 wages. If an alternative such as base pay or annualized compensation is used, there would be no need to collect information on hours worked, immediately removing one-half (1,830) of the data fields from the proposed report without any decrease in the utility of the data it collects. In addition, by not measuring compensation using W-2 data, employers would not need to construct ways for different information systems to communicate with each other. While the EEOC's proposal does describe why it prefers collecting W-2 wages to base pay or annualized compensation, it does not perform any sort of cost-benefit analysis related to the collection of pay information based on W-2 wages. Again, a proper pilot study would enable the EEOC to test more than one methodology, measure the utility of data collected, and accurately evaluate respondent burden.

## OMB Should Require the EEOC To Adhere To the Recommendations Made in the NAS Report

In 2010, President Obama's National Equal Pay Task Force recommended that the EEOC engage the NAS to "conduct a study assessing how to most effectively collect pay data to support its wage discrimination law enforcement efforts."[9] This recommendation led to a NAS panel report that reviewed options and made several important recommendations regarding actions that the EEOC, OFCCP, and other agencies should take before implementing a new compensation data collection instrument. The report discussed numerous issues relevant to the development of any data collection tool that would collect compensation data from private-sector employers. As summarized below, the Commission has for the most part disregarded the NAS panel's recommendations. OMB should withhold approval of the EEOC's proposed revisions until the Commission complies with the NAS panel's recommendations.

| NAS Recommendation | EEOC's Initial Proposal | EEOC's Current Proposal |
|---|---|---|
| 1. The EEOC should prepare a **comprehensive plan** for use of earnings data before initiating any data collection. | While the proposal briefly states that enforcement agencies have consulted on how EEO-1 data might be used in enforcement and that development of software tools and guidance is also anticipated, no comprehensive plan has been presented. | No comprehensive plan has been presented. However, the proposal states that the EEOC's primary goal is to focus investigations and employer information requests when a charge of pay discrimination is raised. The EEOC did not address the NAS panel's primary concerns about use of pay data without a comprehensive plan. |

---

[9] Equal Employment Opportunity Commission, Proposed Revision of the Employer Information Report (EEO-1) and Comment Request, 81 Fed. Reg. 5113, 5114 (February 1, 2016) (Original Proposal).

| NAS Recommendation | EEOC's Initial Proposal | EEOC's Current Proposal |
|---|---|---|
| 2. After completing a comprehensive plan a **pilot study** should test the collection instrument and plan for the use of data. An independent contractor should conduct the study and measure the resulting data quality, fitness for use, cost, and respondent burden. | While a "pilot study" was conducted, it was conducted before development of a comprehensive plan and **did not** test the plan for use of data. The study **did not** use actual data collected from employers, **did not** examine cost or respondent burden, and **did not** determine fitness for use. | The EEOC claims that its use of "synthetic data" was "real." However, it does not and cannot assess whether its methodology will allow it to efficiently target enforcement resources, focus investigations, develop information requests, or assess responded burden because synthetic data is not capable of measuring real-world impacts. |
| 3. The EEOC should **enhance its capacity** to summarize, analyze, and protect earnings data. | Not addressed. | Not addressed. |
| 4. The EEOC should collect data on **rates of pay**, not actual earnings or pay bands, in a manner that permits calculation of both central tendency and dispersion. | Rejected. | Rejected. |
| 5. The EEOC should consider implementing data protection techniques to **protect the confidentiality** of the data. | Referenced in passing in a footnote. | Not addressed (not even in a footnote). |
| 6. The EEOC should **seek legislation** that would increase the ability of the agency to protect confidential data. | Not addressed. | Not addressed. |

The EEOC's response to each of these recommendations is discussed in turn.

**THE COMMISSION MUST ARTICULATE A COMPREHENSIVE PLAN FOR THE USE OF COMPENSATION DATA BEFORE AN APPROPRIATE DATA COLLECTION TOOL CAN BE DEVELOPED**

The first recommendation of the NAS panel was for the EEOC, operating in conjunction with the Labor Department's Office of Federal Contract Compliance Programs

and the Civil Rights Division of the Department of Justice (DOJ), to "prepare a comprehensive plan for the use of earnings data before initiating any data collection."[10] The NAS panel made this recommendation after observing that:

> [T]here is, at present, no clearly articulated vision of how the data on wages could be used in the conduct of the enforcement responsibilities of the relevant agencies. The main purpose for which the wage data would be collected, as articulated to the panel by EEOC and OFCCP representatives, is for targeting employers for investigation regarding their compliance with antidiscrimination laws[.] But beyond this general statement of purpose, the specific mechanisms by which the data would be assembled, assessed, compared, and used in a targeting operation are not well developed by either agency.[11]

After reviewing OFCCP's 2011 Advanced Notice of Proposed Rulemaking regarding the development of a compensation data collection tool:

> [T]he panel found no evidence of a clearly articulated plan for using the earnings data if they are collected. The fundamental question that would need to be answered is how the earnings data should be integrated into compliance programs, for which the triggers for the EEOC and DOJ have primarily been a complaint process that has generated relatively few complaints about pay matters.[12]

Finally, the panel observed that, "[u]nless the agencies have a comprehensive plan that includes the form of the data collection, it will not be possible to determine, with precision, the actual burden on employers and the probable costs and benefits of the collection."[13]

The EEOC's original proposal acknowledges this recommendation, and in response stated:

> Similarly, the NAS Report recommended that the federal EEO enforcement agencies develop a coordinated plan for using compensation data. In the course of developing this EEO-1 proposal, the EEOC and OFCCP together consulted with the Department of Justice, focusing on how EEO-1 pay data would be used to assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities that might warrant further examination. The EEOC and OFCCP plan to develop statistical tools that would be available to staff on their computers, to utilize the EEO-1 pay data for these purposes. They also anticipate developing software tools and guidance for stakeholders to support analysis of aggregated EEO-1 data. Finally, the EEOC and OFCCP anticipate that the process of reporting pay data may

---

[10] National Research Council of the National Academies, *Collecting Compensation Data From Employers* 2, 87 (2012) (hereinafter "NAS Report").
[11] NAS Report at 2.
[12] *Id.*
[13] *Id.*

encourage employers to self-monitor and comply voluntarily if they uncover pay inequities.[14]

The EEOC's original proposal also stated:

The EEOC and OFCCP plan to develop a software tool that will allow their investigators to conduct an initial analysis by looking at W-2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data. This application would highlight statistics of interest.[15]

These statements fall far short of the "comprehensive plan" unequivocally recommended by the NAS panel. Indeed, they serve as little more than the general statement of purpose criticized by the NAS panel in the first place.

In its present proposal, the EEOC does not directly address the issue of developing a comprehensive plan at all.[16] However, it does include a discussion of how the EEOC will use reported data. This discussion reveals that the EEOC apparently no longer intends to use the reported data to target employers for investigation. Instead, the proposal states that the data will be used, after receiving a charge of discrimination, to "decide how to focus the investigation and what information to request from the employer." Further, the EEOC concludes that statistical tests "provide insights that are useful in developing a request for information or deciding whether an investigation of a charge should have a more limited scope."[17]

While we are aware of no data showing the number of employers alleged to have engaged in compensation discrimination annually, the NAS report described the rate of compensation discrimination charges as "relatively few."[18] This is consistent with EEOC's reported data that show pay discrimination charges account for a relatively small percentage of all Title VII charges, and that all Equal Pay Act charges combined account for approximately one percent of total charges filed with the agency.[19] Further, as with all charges filed with the EEOC, most are non-meritorious. In FY 2015, 67 percent of Title VII charges and almost 64 percent of EPA cases were closed with a finding of no reasonable cause.[20]

Given the small number of charges alleging pay discrimination and the EEOC's new stated plan that the primary use of the pay data will be to frame those charge investigations, we are left wondering why the EEOC has chosen an approach that will require covered

---

[14] Original Proposal, 81 Fed. Reg. 5115.
[15] Original Proposal, 81 Fed. Reg. 5118 (footnote omitted).
[16] In fact, the Department of Justice isn't even mentioned in the *Federal Register* notice.
[17] Current Proposal, 81 Fed. Reg. at 45,490.
[18] NAS Report at 87.
[19] For data on the number of wage discrimination charges filed under Title VII and other nondiscrimination laws, see https://www.eeoc.gov/eeoc/statistics/enforcement/bases_by_issue.cfm.
[20] For Title VII charge resolution statistics, see https://www.eeoc.gov/eeoc/statistics/enforcement/titlevii.cfm. For EPA charge resolution statistics, see https://www.eeoc.gov/eeoc/statistics/enforcement/epa.cfm.

employers to annually report nearly 3 billion data fields for approximately 76 million employees working in roughly 800,000 establishments.

## A MEANINGFUL PILOT STUDY IS ESSENTIAL BEFORE PROCEEDING

One of the most important recommendations made by the NAS panel was the need to conduct a pilot study before proceeding with a new compensation data collection mandate. Specifically, the NAS panel stated that the enforcement agencies "should initiate a pilot study to test the collection instrument and the plan for the use of the data. The pilot study should be conducted by an independent contractor charged with measuring the resulting data quality, fitness for use in the comprehensive plan, cost, and respondent burden."[21]

The EEOC states that it commissioned an independent pilot study to identify the most efficient means to collect pay data. However, the pilot study commissioned by the EEOC is wholly inadequate as *it did not analyze any compensation data collected from actual employers*. It also failed to assess the utility of data collected and made no attempt to understand the actual burdens imposed on employers by the proposed collection tool.

In the 109-page final report prepared by Sage Computing, there is no discussion of a pilot study that used actual employer data, no discussion of a pilot study that examined the time for employers to compile and submit actual data, and no discussion of a pilot study that analyzed collected data for use in enforcement. Astonishingly, the Sage report discussion of employer burdens is less than one page long, and no more than a handful of private-sector employers were contacted to gather this information. It also implies that the limited data Sage did receive simply did not enable it to provide any meaningful estimates of the proposal's true burdens.

Why didn't Sage reach out to a representative sample of employers to help answer any of these questions? Incredibly, according to a footnote in the Commission's original proposal, it was because doing so would have required the EEOC to seek OMB's approval: Footnote 17 states, "Synthetic pay data was used because conducting a test survey of nine or more companies would require [Paperwork Reduction Act] Approval."[22] In other words, the EEOC made a conscious decision to forgo a rigorous pilot test using actual employers and actual employer data because it didn't want to ask OMB for permission to conduct the very pilot study specifically recommended by the NAS panel. This is plainly inconsistent with both the letter and spirit of the Paperwork Reduction Act.

In our previous comments to the EEOC, we recommended that the Commission seek OMB approval for a pilot study involving a sufficient number of employers of different sizes, and with different employee populations, to generate data that would yield accurate and meaningful estimates of the proposed revisions' burdens and utility. We also recommended that the EEOC test alternate versions of its proposal so that meaningful comparisons of

---

[21] NAS Report at 88.
[22] Original Proposal, 81 Fed. Reg. at 5114 n.17.

burden and utility could be performed, published, and evaluated by all interested stakeholders.

The EEOC did not address our concerns and recommendations, other than to defend its synthetic data as "real."[23] But the EEOC does not and cannot show how its "real" synthetic data helped target employers for enforcement or develop information requests for employers who have been charged with pay discrimination. Nor can the EEOC derive any information about employer burdens related to its "real" data.

Given the recommendations of the NAS panel and the history of the federal government's use of compensation data to target employers, which is discussed more fully below, OMB should reject the EEOC's proposed revisions and require the EEOC to conduct a rigorous pilot test before re-submitting a similar compensation data collection proposal for PRA approval.

## THE EEOC HAS NOT ADDRESSED QUESTIONS REGARDING ITS CAPACITY TO PROCESS AND PROTECT COMPENSATION DATA

The third recommendation by the NAS panel was for the EEOC to enhance its capacity to summarize, analyze, and protect earnings data. As described by the NAS panel, the EEOC "has a small and lightly resourced data collection and analytical program that has traditionally been focused nearly exclusively on collecting employment data, developing summary statistics, and assessing individual employer compliance through the means of rather straightforward statistical tests."[24] For this reason, the panel recommended that more be done to "prepare the ground prior to commencing any data collection."[25]

While the Sage report provides very general estimates of burdens that might be imposed on the EEOC should it expand the EEO-1 reporting requirement as proposed, the proposal does not indicate that any efforts have been made by the Commission to enhance its capacity to process, let alone analyze, the significant increase in reported data.

## ANNUALIZED COMPENSATION OR BASE RATES OF PAY ARE MORE APPROPRIATE THAN W-2 WAGES FOR THIS REPORTING REQUIREMENT

The NAS panel recommended that the EEOC collect data based on rates of pay, not actual earnings or pay bands. The EEOC rejects this recommendation and would require employers to report their establishment-level headcount and hours worked data using *both* actual earnings *and* pay bands. More specifically, covered employers would be required to report headcount and hours worked data by race/ethnicity and gender in 12 new *pay bands* within each of the existing 10 EEO-1 job categories using each employee's W-2 wages (*i.e.*, actual earnings) to determine the pay band in which the employee would be reported.

---

[23] See Current Proposal, 81 Fed. Reg. at 45,490.
[24] NAS Report at 3-4.
[25] NAS Report at 3.

Collecting W-2 wages is likely to be problematic, however. First, W-2 wages are among the measures of compensation least likely to reflect discriminatory practices, given that they reflect a mixture of employer and employee decisions. They therefore are a poor choice if the Commission is seeking to maximize the utility of data it intends to collect to find evidence of employer discrimination. Second, it is significantly more burdensome and difficult for employers to report W-2 wages than it is for them to report annualized compensation or base rate of pay.

More specifically, W-2 wages are a poor choice for this reporting requirement because they reflect numerous components driven primarily by the choices of individual employees and other factors that have no bearing on the employer's decision as to how much an employee earns. These include, but are not limited to: parking stipends, mass transit stipends, relocation and travel stipends, military stipends, expense reimbursements, 401(k) contributions, certain insurance premiums, sick pay, severance payments, back wages, deferred compensation, and profit sharing.

Reporting W-2 wages also conflicts with the single-point-in-time "snapshot" nature of the EEO-1 Report. Whereas employers report each employee's EEO-1 job category as of the specific date selected within the reporting window, the proposed revisions would have employers also report an entire year's worth of each employee's earnings, at least for those employees who had been with the employer for an entire 12-month period. For employees who changed EEO-1 categories during the prior year, their EEO-1 category on the snapshot date might not match their prior year's earnings, skewing the aggregate data and inviting inaccurate inferences and conclusions. We submit that rates of pay or annualized salary would correct for this potential mismatch, as they would be drawn from the same snapshot date as the EEO-1 job category.

Using rates of pay or annualized compensation to determine pay band placement also would reduce the burden on employers because pay *rates* are typically stored in the same human resources information system in which current EEO-1 Report data are stored, whereas *wages earned* data typically are stored in separate payroll systems, requiring covered employers to retrieve, analyze, tabulate, and reconcile data from entirely separate systems at significant difficulty, burden, and expense. In addition, reporting by pay rate would remove the requirement to report hours worked, which would effectively halve the burden imposed on employers by the proposed revisions.

Importantly, the NAS panel also explicitly recommended collecting data on rates of pay, not actual earnings or pay bands. Reporting by pay rate is consistent with the recommendation of the NAS panel that enforcement agencies should evaluate pay in the manner in which employers actually look at compensation. Rates of pay thus provide better data points to evaluate compensation for indicators of unlawful discrimination.

## An Overinclusive Definition of Compensation Will Not Help Direct Enforcement Resources or Identify Meaningful "Statistics of Interest"

At the March 16, 2016, public hearing the EEOC held on its proposal, some witnesses urged the agency to adhere to its proposed measure of compensation utilizing W-

2 wages because W-2 wages are among the most comprehensive measures of compensation.[26] One argument raised in favor of using a comprehensive measure of compensation is that it will catch employers engaged in a variety of unlawful practices, such as awarding overtime, bonuses, or stock options in a discriminatory manner, that otherwise would not be identified using base pay or annualized compensation. This is the approach adopted by the EEOC in its present proposal.

While we understand the desire to use a comprehensive measure in order to ensure that no component of compensation is hidden or overlooked, using a comprehensive measure of pay such as W-2 wages will only serve to obfuscate the most important elements of pay. As noted above, W-2 wages are impacted significantly by decisions not made by employers, such as whether an employee should max-out his or her 401(k) contribution or what health care plan to sign-up for. In addition, W-2 wages also include many components that are not necessarily best analyzed in the aggregate to detect potential discrimination.

As noted in one commentary on the Commission's original proposal, "[b]ecause the decision-making process varies across different forms of compensation (*e.g.*, base pay versus bonus), it is more appropriate to model each type of pay individually and not in the aggregate."[27] In other words, a rogue manager with a discriminatory practice of paying one group of workers less based on sex or race will be harder to identify if base pay is included with numerous other components of total compensation set by different officials. The simple fact is that if the EEOC wants its pay data collection tool to show more meaningful pay differences, then it must limit the components by which compensation is evaluated. Like the NAS panel, we suggest base pay or annualized compensation for this purpose.

OFCCP's experience indicates that even when obtaining a very detailed breakdown of individual compensation information, meaningful pay disparities are hard to find. More specifically, from fiscal year 2010 to the present, OFCCP has conducted more than 24,000 compliance reviews covering nearly 10 million employees, but in only 30 of those reviews has it identified a potential systemic pay violation. The table below shows the data for each year from 2010 to the present, along with totals for two periods: (1) 2010 to the present; and (2) 2004 (the year EEAC first started collecting enforcement data) to the present.

---

[26] See, for example, written testimony of Emily J. Martin, National Women's Law Center, *available at* http://www.eeoc.gov/eeoc/meetings/3-16-16/martin.cfm.
[27] Gurkan Ay, Ph.D., *et al.*, *Interpreting EEOC's Equal Pay Data Statistical Tests*, Law 360 (Feb. 10, 2016).

| Fiscal Year | Compliance Evaluations | Conciliation or Consent Agreements & Financial Settlements | Flagged for Pay or Salary Violations | Flagged for Systemic Violations |
|---|---|---|---|---|
| FY2010 | 4,942 | 923 | 17 | 7 |
| FY2011 | 4,007 | 1,109 | 29 | 4 |
| FY2012 | 4,005 | 1,330 | 38 | 0 |
| FY2013 | 4,100 | 1,135 | 24 | 2 |
| FY2014 | 3,839 | 570 | 11 | 8 |
| FY2015 | 2,602 | 467 | 7 | 4 |
| FY2016* | 603 | 148 | 10 | 5 |
| FY2010-Present | 24,098 | 5,682 | 136 | 30 |
| FY2004-Present | 46,768 | 8,156 | 171 | 42 |

* FY2016 data include all updates made to OFCCP enforcement data through March 14, 2016.[28]

The self-evident conclusion from these figures is that even when armed with very detailed compensation data — indeed, far more detailed data than the EEOC is proposing to collect — OFCCP has not found many instances of unlawful pay practices. It is hard to see how less detailed compensation data will produce more meaningful results.

## THE PROPOSAL DOES NOT APPROPRIATELY ADDRESS CONFIDENTIALITY CONCERNS OF EITHER EMPLOYEES OR EMPLOYERS

Many employers view the data reported on the current EEO-1 Reports to be confidential and proprietary. These concerns will only be heightened by revising EEO-1 Reports to include data related to compensation and hours worked. In addition to employers' confidentiality concerns, the Commission's proposal raises significant concerns that individually identifiable pay data will be publicly disclosed. As described in more detail below, these concerns have been recognized by the NAS panel, the Sage report, employer stakeholders, and others. While the preamble to the EEOC's original proposal states that the Commission intends to address some of these concerns, it has not. OMB should require the EEOC to commit to fully protecting data confidentiality before proceeding with its proposal.

### Current Reporting Does Not Adequately Protect Individually Identifiable Data

A review of current EEOC practices indicates that the Commission does not prioritize protecting individually identifiable data. This concern will be significantly heightened if pay data are collected on the EEO-1 Report and aggregated for public disclosure.

---

[28] We attempted to update this chart with data taken from the OFCCP enforcement database on August 10, 2016. However, the dataset available from OFCCP's website at that time listed no systemic violations from FY 2011 through FY 2016. Rather than use obviously flawed data, we repeat here data we updated for our earlier comments in March.

CURRENT AGGREGATED DATA REVEALS INDIVIDUAL CHARACTERISTICS

In the instructions to the current EEO-1 Report, the EEOC provides language that employers may use to notify employees regarding the voluntary nature of self-identification of demographic information. In part, that statement says, "The information obtained will be kept confidential .... When reported, data will not identify any specific individual."[29] However, currently reported aggregate data make it possible to discern some individually identifying data.

The EEOC collects and aggregates EEO-1 data and makes aggregated data publicly available on its website.[30] The public may search nationally aggregated EEO-1 data using the North American Industry Classification System (NAICS) code down to the five-digit NAICS industry detail. Broader searches by two-, three-, and four-digit NAICS codes are also possible. The EEOC also makes geographical aggregates and industry aggregates available, but only at the two- and three-digit levels. While aggregating data will mask individually identifiable data points for many, or even most, employees, it will not mask all personally identifiable information.

This is easily shown by a casual search of the EEOC's 2014 data. The EEOC's data shows that in the District of Columbia, employers identifying by NAICS two-digit code 72 (Accommodation and Food Services) employed 24,585 employees. However, in looking at these data, there are several instances where very small numbers are reported that could be used to reveal personally identifiable information.

Of the reported data, only one woman is identified in the EEO-1 job category of technician. Looking further, we learn that she is white. The same data set also reveals a single Asian male in the job category of Executive/Senior Level Officials and Managers. What's more, in nearly every job category the data reported for American Indians and those identifying as Native Hawaiian are very small. And if the Commission's proposed revisions are approved, it would be possible to determine not only how many hours these individuals worked each year, but also what bracket their total earnings fell within.

This trend is seen in nearly all EEOC aggregate datasets.

EEOC'S DATA SUPPRESSION RULES CURRENTLY DO NOT PROTECT AGAINST DISCLOSURE OF INDIVIDUALLY IDENTIFIABLE INFORMATION

While EEOC has not detailed the steps it takes to protect individually identifiable data, the NAS panel report provides a summary. After noting that the EEOC publishes aggregate EEO-1 data by geographic area and industry group, the report summarizes the steps that the EEOC takes to protect individually identifiable data as follows:

In releasing aggregated data of private employers collected from annual EEO-1 surveys, the EEOC uses a data suppression rule that is quite similar to the rule used

---

[29] See EEO-1 Instruction Booklet at 5.
[30] See http://www.eeoc.gov/eeoc/statistics/employment/index.cfm.

by other government agencies for statistical data based on information collected from employers . . . . The EEOC suppression rule is triggered when it meets the two primary suppression stipulations: (1) the group has three or fewer employees, or (2) one employer makes up at least 80 percent of the group employment in the aggregate.

In applying the suppression rules to industry group or geography entity or any combination of aggregates, the EEOC withholds any group's numbers if the group (an industry or a geography entity or an industry-by-geography group, etc.) contains fewer than three firms (represented by the presence of any number of establishment(s) of an individual firm within the group) or if any one firm in the group (represented by the total numbers of all the establishment(s) of the same firm within the given group) constitutes more than 80 percent of the totals.

Unlike some other federal agencies, EEOC does not withhold aggregated data beyond its two primary suppression rules. There are no secondary suppression rules, and the agency does not further screen the aggregated data if the data have passed the fewer-than-three rule test.[31]

While not a model of clarity, this summary appears to say that the EEOC does not make any additional effort to suppress aggregated EEO-1 Report data even if that data tends to identify particular individuals, so long as the particular group includes three or more employers and no single employer's employees account for more than 80 percent of the total group.

Further, when the EEOC in the past has sought approval of the EEO-1 Report from the Office of Management and Budget, it has not focused on individually identifiable information. Instead, it has represented that, "All reports and information from individual reports are subject to the confidentiality provisions of ... Title VII, and may not be made public by EEOC prior to the institution of any proceeding under Title VII. However, aggregate data may be made public in a manner so as *not to reveal any particular employer's statistics*" (emphasis added).[32]

In its present submission, the EEOC has used different language, instead stating, "The EEOC may publish aggregated data but only in a manner that *does not reveal any particular respondent's information*" (emphasis added).[33] This language change comes with no explanation and we are left to assume that the EEOC has no plans to further protect individually identifiable information.

---

[31] NAS Report at 78.

[32] See Supporting Statement, Recordkeeping and Reporting Requirements for Employer Information Report (EEO-1) (Oct. 23, 2014), *available at* http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001.

[33] Supporting Statement, Recordkeeping and Reporting Requirements for Employer Information Report (EEO-1) (Jul. 14, 2016), *available* at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201607-3046-001.

PROPOSED EXPANSION OF THE EEO-1 REPORT WILL SIGNIFICANTLY INCREASE THE POTENTIAL DISCLOSURE OF PERSONALLY IDENTIFIABLE SENSITIVE INFORMATION

As described above, even aggregations of the data currently collected reveal a significant amount of data fields populated by very low numbers that make individual identification possible. Dividing job groups into 12 different pay bands will multiply this problem considerably. When small numbers are present and disclosed, it may be relatively easy to discern the pay band of particular individuals simply based on their demographics, state, or statistical area.

Unfortunately, we cannot estimate the frequency with which low numbers will be reported, but our experience with the current reporting regime indicates it will be significant. Many individuals view information about their compensation to be much more sensitive than information about their race or gender. Perhaps this is why the EEOC has regularly represented to OMB that the current EEO-1 reporting requirement "does not solicit any information of a sensitive nature from respondents."[34] In its current proposal, the Commission has changed its representation, instead saying that "no employee's personal information will be reported."[35] However, unless the Commission changes its practices, it will be possible to discern sensitive pay information of potentially tens of thousands of employees.

EEOC HAS NOT PROPERLY ADDRESSED THESE WELL-KNOWN CONCERNS ABOUT DISCLOSURE OF PERSONALLY IDENTIFIABLE INFORMATION

As noted above, the NAS panel summarizes the EEOC's current process and then suggests that additional data protection techniques may be appropriate, such as "adding noise and controlled tabular adjustment."[36] The panel report then observes that, "Creating publicly available data products that are statistically valid and in which confidential data are protected is a complicated process. The best procedure to use depends upon the types of data and their intended purposes, as well as on the risks of disclosure."[37] The report concludes with the following recommendation:

> [T]he agency should consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data, to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications.[38]

---

[34] See Supporting Statement, Recordkeeping and Reporting Requirements for Employer Information Report (EEO-1) (Oct. 23, 2014), *available at* http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001.

[35] Supporting Statement, Recordkeeping and Reporting Requirements for Employer Information Report (EEO-1) (Jul. 14, 2016), *available* at: http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201607-3046-001.

[36] NAS Report at 79.

[37] NAS Report at 79-80.

[38] NAS Report at 91.

The Commission's original proposal states that the EEOC has "balanced enforcement objectives with the burden and confidentiality concerns of respondents."[39] However, the original proposal addressed concerns regarding confidentiality of individually identifiable data in only two ways. First, the EEOC stated that increased confidentiality is one of the reasons it is requiring the reporting of data in pay bands. However, as shown above, even reporting data only in pay bands and releasing only aggregate data will result in publishing a substantial amount of highly sensitive, individually identifiable pay data.

The Commission acknowledged this in a footnote, stating that the "EEOC intends to re-examine the rules for testing statistical confidentiality for publishing aggregate data to make certain that tables with small cell-counts are not made public."[40] While this is a good first step, the EEOC should disclose the specific steps it is considering taking and invite public comment on those processes to ensure they sufficiently address the concerns regarding disclosure of personally identifying information without imposing further unintended consequences. In its current proposal, the EEOC has not revisited this issue. OMB should not permit the EEOC to proceed until it convincingly demonstrates that it has developed an objectively reasonable plan to appropriately protect confidential employee data.

<u>**The Proposal Only Partially Addresses Employer Confidentiality Concerns**</u>

The proposal summarizes current practices with respect to the confidentiality of EEO-1 Reports submitted by employers, including the statutory requirements prohibiting Commission staff from disclosing reports or related data under pain of criminal sanctions, and OFCCP's practice of treating EEO-1 Reports as confidential "to the maximum extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act."[41] The proposal notes, but does not detail, that the EEOC shares EEO-1 Report data with other federal and state agencies. The proposal does not address employers' increased confidentiality concerns regarding disclosure of pay data.

Confidentiality concerns were recognized by the NAS panel. As noted in the panel's report, "In order to assure reporting employers that their data are indeed protected from disclosure, it will be important to establish clear and legally enforceable protections for sharing the data that employers provide in confidence."[42] According to the NAS panel report, the EEOC's data sharing practices are not consistent with or as strong as those used by other agencies:

> [T]he EEOC shares sensitive EEO-4 and EEO-1 report data with other agencies across the federal government and with the FEPAs through rather informal arrangements, most of which are not backed by the force of law. This practice is in contrast to the usual practice of federal statistical agencies that protect shared data through formal agreements backed by clear legislative authority that is enforced by stern penalties.

---

[39] Original Proposal, 81 Fed. Reg. at 5121.
[40] Original Proposal, 81 Fed. Reg. at 5115 n.18.
[41] Original Proposal, 81 Fed. Reg. at 5118.
[42] NAS Report at 5.

For EEOC, even where there is no formal agreement, such as the one with DOJ, there is no indication that the data are shielded from court challenge or from requests under the Freedom of Information Act when they are shared.[43]

Recognizing the current deficiencies in practices regarding confidentiality of EEO-1 data and increased concern associated with reporting compensation data, the NAS panel recommended that the EEOC:

[S]hould seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to nonagency employees.[44]

These observations by the NAS panel, including its recommendation for legislating further confidentiality protections, are not addressed in the proposal. The very fact that the NAS panel made legislative recommendations strongly implies that the EEOC lacks sufficient authority to appropriately safeguard the sensitive data it now seeks to collect on a massive scale. Nevertheless, the EEOC has included strong language in its current proposal stating that it does not give agencies (other than OFCCP) access to EEO-1 data unless they agree, by letter or memorandum of understanding, to comply with the confidentiality provisions of Title VII. We appreciate this assurance. However, given the strong concerns expressed by the NAS panel, we believe this is an area that warrants greater scrutiny.

## THE EEOC HAS SERIOUSLY UNDERESTIMATED THE REPORTING BURDEN

The EEOC's estimate of the burdens imposed by the proposed revisions has changed significantly since its original proposal. For example, the total annual burden for employers subject to the proposed requirement to report compensation and hours worked data has been revised from $9.7 million to $53.5 million. While the EEOC's new estimate is based on more appropriate methodology than its original proposal, it still dramatically understates the true burden that the revisions will impose on employers. Again, it should be emphasized that the EEOC could have significantly bolstered the credibility of its burden estimates had it conducted a credible pilot study involving real employers and real data.

Among the problems with the EEOC's estimates are the following:

- Failing to consider alternatives that are less burdensome than requiring employers to submit a minimum of nearly three billion fields of compensation-related data based on a total U.S. civilian workforce of approximately 159 million people, fewer than half of whom work for employers covered by the EEO-1 reporting requirement;

---

[43] NAS Report at 84.
[44] NAS Report at 91.

- Underestimating the burdens associated with the current EEO-1 reporting requirement;

- Basing estimates on the proposed revisions almost entirely on inappropriately low estimates of current burdens;

- Failing to appropriately account for the dramatic increase in data fields that employers must report; and

- Underestimating the burdens associated with developing systems to communicate between payroll and HRIS platforms or otherwise query and report payroll data.

**METHODOLOGY SIGNIFICANTLY UNDERSTATES CURRENT REPORTING BURDEN**

In prior years, the EEOC has estimated the burdens imposed by the EEO-1 Report based on estimates of the amount of time required to complete and submit each report. In the past, the Commission has estimated that these tasks took employers 3.4 hours per establishment. Assuming all other things remained equal, with the number of data cells on the proposed EEO-1 Report increasing twenty-fold (or 2,000 percent) from 180 to 3,660, if the burden hours to complete each EEO-1 Report were to double (an assumption we submit is far lower than the true increase in burden hours), the annual total burden hour estimate resulting from the proposed revisions would be more than 5,510,000 burden hours (810,390 (the number of full-grid reports filed in 2014) multiplied by 3.4 x 2).

But according to the Commission's proposal, all other things are not remaining equal. In its original proposal, the EEOC changed its longstanding methodology by stating:

> [E]mployers now rely extensively on automated HRIS to generate the information they submit on the EEO-1 Report. As a result, each additional report filed has just a marginal additional cost. To accurately reflect the manner in which employers now collect and submit the data for filing, the estimated reporting burden ... is calculated per firm, rather than per report. This burden calculation is based on the time spent on the tasks involved in filing the survey, rather than on "key strokes" or data entry. As such it more accurately reflects how virtually all employers actually complete the EEO-1 ....[45]

After applying its new methodology, the EEOC estimated that the annual burden hours for filing Component 1 data would be 3.4 hours *per employer* instead of 3.4 hours *per establishment*. This significant change in methodology was the subject of much criticism in our comments to the EEOC because EEAC members report that *current* requirements impose a burden greater than 3.4 hours per *establishment*. Changing the methodology to measure costs only on a per-employer level, and then not increasing that estimate to

---

[45] Original Proposal, 81 Fed. Reg. at 5120 (footnotes omitted).

account for the actual burdens on employers, results in extraordinarily low burden calculations.

The EEOC's current proposal is largely consistent with its original proposal. However, it also provides a minor component for per-establishment burdens. Specifically, the agency now asserts that employer-level costs will total 8 hours with per-establishment costs of 1 hour. While the Commission's methodology in calculating some costs at the employer level and some costs at the establishment level is likely more appropriate than that originally proposed, it is still using time estimates that have no basis in reality.

As part of our effort to analyze the burdens that would be imposed by the proposal, we asked EEAC members to explain to us their processes and estimate the time and dollars spent to comply with current reporting requirements. These estimates indicate that the EEOC's assumption, used in prior years, of 3.4 hours *per establishment* is low, although it is somewhat appropriate. On the low-end, one large EEAC member with approximately 1,000 establishments provided us with in-depth cost estimates showing that the employer, which does not outsource any EEO-1 reporting functions, spends about 3,800 hours to comply with the annual reporting requirement for a total cost of approximately $132,750 per year.

Under the EEOC's methodology, this employer should be able to complete its *current* EEO-1 reporting responsibilities in 1,008 hours (1 hour for each of 1,000 establishments plus 8 hours at headquarters). However, in actuality, the EEOC's methodology only captures about one-quarter of the actual burden imposed. Furthermore, other EEAC members showed higher per-establishment costs, ranging as high as three times the EEOC's previous estimate of 3.4 hours per *establishment*. It bears repeating that this does not yet take into account the burdens of EEOC's proposed revisions.

Given these experiences, it is clear that the EEOC's estimates of the burdens associated with the current EEO-1 reporting requirement are dramatically lower than that actually experienced by employers. The EEOC should first derive a more accurate estimate of current requirements before making assumptions about the burdens imposed by its proposed revisions.

### THE EEOC'S FAULTY ESTIMATES OF CURRENT BURDEN TAINT ITS ESTIMATES OF BURDENS IMPOSED BY ITS PROPOSED REVISIONS

As discussed above, the EEOC estimates that current EEO-1 reporting requirements will impose 8 hours of burden per employer and 1 additional hour per establishment. This is the same burden imposed on employers who will only need to file Component 1 of the EEO-1 Report in the future. The EEOC estimates that adding Component 2 will increase employer burdens by 90 percent. For employers that use the on-line portal method of filing, the estimate is 15.2 hours per firm and 1.9 hours per establishment. For those employers who use the data file upload method, the estimate is 15.2 hours per firm and 0.95 hours per establishment. The EEOC does not explain the basis for its assumption that adding

Component 2 will increase the burden by 90 percent other than to say it is "[b]ased on information received during the comment period."[46]

While we question the basis for the EEOC's assumption, the more important point is that the burden estimate for Component 2 is based entirely upon faulty burden estimates for Component 1. In our comments to EEOC, we noted one member with about 1,000 establishments that estimated compliance with the proposed revisions would taken roughly 4,600 hours of staff time, for a per *establishment* burden of 4.6 hours. However, using the EEOC's methodology, this employer would spend only 965.2 hours complying with the new reporting requirements — barely 20 percent of the amount of time this employer estimated it would take. More accurate burden estimates of current costs would help mitigate the inaccurate estimates associated with reporting pay and hours worked data.

### ESTIMATES INAPPROPRIATELY MINIMIZE TIME NECESSARY TO COMPLETE OR VERIFY REPORTS

The EEOC's methodology moves away from calculating burdens based on the time it takes to complete individual EEO-1 Reports, justifying this change by pointing to the increased use of software systems in completing reports. The EEOC brushes aside comments that the number of data fields is an important factor in determining burden, stating that, "No EEO-1 filers enter data in every cell, so basing the annual PRA burden on the total number of cells on the EEO-1 form would be inaccurate."[47]

We disagree. The number of data fields on the reporting form is a very important factor in determining respondent burden. This is most obvious for the vast majority of employers who report using the on-line portal. These filers must literally tab through each field on the form or must spend time looking for the correct field in which to enter data. It is beyond question that finding the correct data field in a grid of 3,660 data fields for each location will take considerably more time than finding a data field in a grid of 180.

The number of data fields is also relevant for employers who use the data file upload option. As noted above, it is highly unlikely that any EEO-1 filers will submit a report without reviewing a printed or electronic version of the form. These employers will also spend time locating the correct data fields before confirming that the reported data are accurate. Again, it should be obvious that it will take considerably longer to identify the proper data field on a grid of 3,660 than a grid of 180.

The simple fact is that advances in technology, while helpful in filing reports such as the EEO-1, do not magically mitigate the proposed 20-fold increase in data cell reporting. Such an increase in reported data cannot come without a significant increase in respondent burden.

---

[46] Current Proposal, 81 Fed. Reg. at 45,494.
[47] Current Proposal, 81 Fed. Reg. at 45,493.

**THE EEOC'S ASSUMPTION THAT EMPLOYERS CAN "BRIDGE HR AND PAYROLL" IN A MERE EIGHT HOURS IS NOT SUPPORTED BY EMPLOYER EXPERIENCE**

The EEOC's proposal estimates that employers who must file both Component 1 and Component 2 will incur one-time costs of just over $27 million to develop queries related to the new compensation reporting requirements, and that such queries are estimated to take eight hours per filer at an average wage rate of $55.81 per hour. This is the same burden estimate originally proposed by the EEOC, except that a slightly higher wage rate was used in developing the estimate. Based on feedback from our members who have attempted to determine what changes will be required to their systems, these assumptions appear entirely unrealistic.

The EEOC dismisses concerns about the complexity of making systems changes by stating that it has reviewed three available software products that appear to have fields to capture the required data and that the existence of such products "suggests that creating software solutions for the EEO-1, Components 1 and 2, may not be as complex or novel as some comments suggest."[48] This statement demonstrates that the EEOC has no understanding of corporate information technology systems and the processes needed to make even minor modifications. Indeed, as we reported to the EEOC in response to its original proposal, making changes to corporate IT systems imposes burdens that are orders of magnitude above what the agency has assumed.

For many employers, the task will be extremely complicated. For example, one EEAC member reported that the employees from the following departments would need to be involved in creating a technology solution to help comply: data governance, global employee data, systems, reporting analytics, business optimization, and data security and privacy. This employer projected that such a project would take hundreds of hours and a minimum of seven months lead time. Rushing an IT project at this speed means putting off other planned projects and involving senior leadership to make decisions about which projects are prioritized. This illustrates that making changes in large corporate IT systems can be extremely complex, challenging, and time consuming.

In addition, some employers will have significant challenges posed by the current use of multiple payroll systems. This can be common when a company has evolved through corporate acquisitions and mergers and legacy systems remain in place. For some of these employers, compliance cannot be achieved by simply programming a patch or query. They will need to decide whether to comply by manually pulling and sorting numerous reports or transition to new systems at a significant cost.

Finally, the EEOC should not assume that all employers use their HRIS platform in any particular manner. For example, one EEAC member reported using its HRIS platform to track nonemployees for compliance with unrelated regulations in a heavily regulated industry. This employer uses its HRIS platform to track independent contractors, temporary workers, and franchised employees without any specific tag distinguishing employees from

---

[48] Current Proposal, 81 Fed. Reg. at 45,487.

nonemployees. This has not been an issue for EEO-1 compliance because they complete their EEO-1 Reports through manual processes that do not rely on a simple HRIS query. Adoption of the EEOC's proposal will require this employer to make significant changes to how it uses its HRIS platform and to consider whether additional changes are necessary to comply with other regulations.

## THE CURRENT PROPOSAL DOES INCLUDE SOME MODEST IMPROVEMENTS FROM THE EEOC'S INITIAL PROPOSAL

While we do not support the current proposal, we acknowledge that it contains some positive changes from the EEOC's original proposal, specifically:

- Inclusion of definitions of "hours worked" and "W-2 wages";

- Aligning the reporting period for compensation with the calendar year; and

- Modestly improved methodology for determining actual burdens imposed by the proposal.

Aligning the reporting period and calendar year and providing definitions of key terms improve this proposal over that originally proposed and will modestly ease compliance burdens. We appreciate these modest revisions.

## CONCLUSION

EEAC urges OIRA to disapprove the EEOC's proposed revisions of the EEO-1 Report and to maintain the current EEO-1 Report until the EEOC has thoroughly addressed the recommendations of the National Academy of Sciences panel, including the completion of a meaningful pilot study that examines actual employer data and includes a more complete assessment of both burden on respondents and utility of data collected.

EEAC is committed to working with the Commission and OIRA on the matters raised in the current proposal. Please do not hesitate to contact me if EEAC may be of further assistance as you consider these important matters.

Thank you for your consideration of these comments.

Sincerely,

Michael J. Eastman
Vice President, Public Policy

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2019, I electronically filed the foregoing

Supplemental Joint Appendix with the Clerk of the Court for the United States Court

of Appeals for the District of Columbia Circuit by using the appellate CM/ECF

system. Participants in the case are registered CM/ECF users, and service will be

accomplished by the appellate CM/ECF system.

*/s/ Camille A. Olson*
CAMILLE A. OLSON
*COUNSEL FOR AMICI*