**[ORAL ARGUMENT NOT SCHEDULED]**
**No. 19-5130**

*In the*

# United States Court of Appeals

*for the*

# District of Columbia Circuit

———————————————

NATIONAL WOMEN'S LAW CENTER, *et al.*,

*Plaintiffs-Appellees,*

— v. —

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,

*Defendants-Appellants.*

———————————————

On appeal from the
United States District Court for the District of Columbia
Case No. 17-2458 (Chutkan, J.)

———————————————

**BRIEF FOR APPELLEES**

———————————————

EMILY MARTIN
SUNU P. CHANDY
MAYA RAGHU
*National Women's Law Center*
*11 Dupont Center, Suite 800*
*Washington, D.C. 20036*
*(202) 588-5180*

JAVIER M. GUZMAN
ROBIN F. THURSTON
JEFFREY B. DUBNER
*Democracy Forward*
*Foundation*
*P.O. Box 34553*
*Washington, D.C. 20043*
*(202) 448-9090*

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 the undersigned counsel certifies

that neither appellee is a nongovernmental entity with a parent

corporation or a publicly held corporation that owns 10 percent or more

of its stock.

**CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES**

## A.    Parties And *Amici*.

All parties, intervenors, and *amici* appearing before the District Court are listed in the Brief for Appellants. To date, the following entities are participating as *amici* in this Court:

> Eagle Forum Education & Legal Defense Fund
> Chamber of Commerce
> HR Policy Association
> National Association of Manufacturers
> American Bankers Association
> American Society of Employers
> Associated Builders and Contractors
> Associated General Contractors of America
> Center for Workplace Compliance
> Institute for Workplace Equality
> National Federation of Independent Business
> National Retail Federation
> Restaurant Law Center
> Retail Litigation Center, Inc.
> Society for Human Resource Management

In addition, Appellees anticipate that several individuals and entities may file *amicus* briefs after Appellees' brief is submitted.

## B.    Rulings Under Review.

References to the rulings at issue appear in the Brief for Appellants.

## C.    Related Cases.

This case has not previously been before this Court, and counsel is not aware of any related case within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Robin F. Thurston
Robin F. Thurston

# TABLE OF CONTENTS

Introduction ......................................................................................... 1

Jurisdiction ......................................................................................... 3

Counter-Statement of The Issues Presented for Review ................... 4

Counter-Statement of the Case........................................................... 5

    A.   Legal Background........................................................... 5

    B.   Factual Background ....................................................... 8

    C.   Procedural Background ............................................... 11

Summary of the Argument ............................................................... 30

Standard of Review .......................................................................... 32

Argument .......................................................................................... 33

I.     The District Court Correctly Concluded That Plaintiffs Have Organizational Standing To Challenge Defendants' Unlawful Stay ................................................................................. 33

    A.   An organizational plaintiff that demonstrates a frustration of mission and diversion of resources resulting from the loss of information has a cognizable injury regardless of whether Congress created a legal entitlement to the information ..................... 34

    B.   Plaintiffs have a legally cognizable injury under *Action Alliance* and *PETA* ............................................... 38

    C.   *EPIC* Does Not Change This Conclusion ................... 42

    D.   The District Court correctly concluded that Plaintiffs' injuries were redressable based on EEOC's historical practice and stated plans to periodically publish information based on the pay data collection.................... 47

II.    The District Court Correctly Ordered Further Relief To Ensure Compliance With Its Summary Judgment Order Vacating The Stay......................................................................... 50

    A.   Extension of relief to EEOC was required ................... 53

    B.   The District Court's April 25 Order Was Necessary To Restore The Pre-Stay Status Quo, Especially Given The Government's Unclean Hands.......................... 57

Conclusion........................................................................................ 65

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,*
789 F.2d 931 (D.C. Cir. 1986) ..............30, 36, 38, 39, 40, 41, 42, 43, 46

*Action on Smoking & Health v. C.A.B.,*
713 F.2d 795 (D.C. Cir. 1983) ...........................................................57

*Alegent Health-Immanuel Med. Ctr. v. Sebelius,*
917 F. Supp. 2d 1 (D.D.C. 2012) ......................................................65

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
659 F.3d 13 (D.C. Cir. 2011) .............................................................32

*Andrulis Research Corp. v. Small Bus. Admin.,*
1990 WL 169318 (D.D.C. Oct. 19, 1990)..........................................62

*Baystate Med. Ctr. v. Leavitt,*
587 F. Supp. 2d 37 (D.D.C. 2008) ....................................................65

*Bennett v. Donovan,*
703 F.3d 582 (D.C. Cir. 2013) ...........................................................58

*Brown v. Plata,*
563 U.S. 493 (2011)...........................................................................51

*Croplife Am. v. EPA,*
329 F.3d 876 (D.C. Cir. 2003) ...........................................................57

*Duberry v. D.C.,*
924 F.3d 570 (D.C. Cir. 2019) ...........................................................49

*EPIC v. Presidential Advisory Comm'n on Election Integrity,*
878 F.3d 371 (D.C. Cir. 2017) ................................ 31, 42, 43, 44, 45, 47

*FEC v. Akins,*
  524 U.S. 11 (1998) ................................................................. 36

*Food & Water Watch, Inc., v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ............................................... 33

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016) ......................................... 34, 37

*Gen. Comm. of Adjustment, GO-386 v. Burlington N. &*
*Santa Fe Ry. Co.,*
  295 F.3d 1337 (D.C. Cir. 2002) ............................................. 43

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ............................................... 35, 37, 38

*Int'l Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983) ............................................... 49

*Kramer v. Sec'y of Defense,*
  29 F. Supp. 2d 54 (D.D.C. 1999) ......................................... 29

*McKenzie v. Kennickell,*
  825 F.2d 429 (D.C. Cir. 1987) ............................................... 60

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ............................................... 51

*Mendoza v. Perez,*
  72 F. Supp. 3d 168 (D.D.C. 2014) ............................... 29, 61, 62

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ....................................................... 32, 51

*N.C. Fisheries Ass'n v. Gutierrez,*
  550 F.3d 16 (D.C. Cir. 2008) ................................................. 60

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ............................................. 58

*Palisades General Hospital v. Leavitt*
  426 F.3d 400 (D.C. Cir. 2005) ............................................... 59

*People for the Ethical Treatment of Animals v. USDA,*
797 F.3d 1087 (D.C. Cir. 2015) ...... 30, 36, 37, 38, 39, 40, 42, 43, 46, 47

*Pub. Citizen v. Dep't of Justice,*
491 U.S. 440 (1989) ............................................................ 37

*Reid ex rel. Reid v. D.C.,*
401 F.3d 516 (D.C. Cir. 2005) ............................................. 60

*Sierra Club v. Morton,*
405 U.S. 727 (1972) ............................................................ 39

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016) ............................................. 31, 34, 36

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
280 F. Supp. 3d 187 (D.D.C. 2017) ...................................... 59

*Wannall v. Honeywell, Inc.,*
775 F.3d 425 (D.C. Cir. 2014) ....................................... 54, 63

*West v. Lynch,*
845 F.3d 1228 (D.C. Cir. 2017) ................................. 31, 47, 48

*Wheaton Coll. v. Sebelius,*
703 F.3d 551 (D.C. Cir. 2012) ............................................. 49

## STATUTES, RULES, AND REGULATIONS

5 C.F.R.

§ 1320.10(f)-(g) ...................................................... 6, 10, 18

29 C.F.R.

§ 1602.7 ............................................................... 7, 56

41 C.F.R.

§ 60-1.7 ................................................................... 7

44 C.F.R.

§ 90.43(b)(4) ................................................................. 41

§ 90.44 ........................................................................... 41

§ 90.45 ........................................................................... 41

44 Fed. Reg. 33,776 (June 12, 1979) ..................................... 41

81 Fed. Reg. 5,113 (Feb. 1, 2016). ........................................... 8

81 Fed. Reg. 45,479 (July 14, 2016) .................................... 8, 9

5 U.S.C.

§ 701 ............................................................................... 3

§ 706(2) ......................................................................... 55

28 U.S.C.

§ 1291 .............................................................................. 4

§ 1331 .............................................................................. 3

42 U.S.C.

§ 2000e-8(c) ..................................................................... 6

§ 3501 .......................................................................... 3, 5

§ 3506(c)(1)(A) ................................................................. 5

44 U.S.C.

§ 3506(c)(2)(A) ................................................................. 5

§ 3507 ........................................................... 5, 6, 52, 56

§ 3508 .............................................................................. 6

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EEOC | Equal Employment Opportunity Commission |
| EEO-1 | Employer Information Report EEO-1 |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |
| PRA | Paperwork Reduction Act |
| SA | Supplemental Appendix |

## INTRODUCTION

Over seven years of careful study, EEOC developed a pay data collection requirement for employers to better enforce anti-discrimination law against persistent race- and sex-based pay disparities: Component 2 of the longstanding annual EEO-1 report. Following two rounds of public notice and comment, OMB approved the pay data collection pursuant to its PRA authority. But one year later, shortly before employers would begin reporting, OMB reversed course, staying the data collection with scant explanation and with EEOC's acquiescence. As the District Court concluded—and as EEOC and OMB do not contest—the stay violated the APA because the decision did comply with OMB's own regulations and "totally lacked the reasoned explanation that the APA requires." JA 167.

The District Court vacated the stay and ordered that the previously approved pay data collection take effect; JA 173-74, and it did so in time for the reporting period scheduled to begin in March 2019. JA 9. Rather than timely implement the pay data collection by administering it along with Component 1 of the EEO-1, however, EEOC did nothing, and continued to do nothing as the time period for OMB's

original PRA approval dwindled. Alarmed by EEOC's inaction, Plaintiffs-Appellees requested, and, after extensive fact-finding, the District Court issued, limited ancillary relief necessary to ensure that EEOC actually treat the stay as vacated and implement Component 2. JA 3-4.

Instead of contesting the District Court's conclusion on the merits or addressing their own failure to comply promptly with the summary judgment order, Defendants seek reversal on standing grounds and to invalidate the post-summary judgment remedial order. Neither argument has merit.

As to standing, the District Court correctly applied binding circuit precedent to determine that the loss of pay data was an injury-in-fact because it caused a concrete and demonstrable injury to the Plaintiff organizations' missions, which required the use of their resources to counteract. JA 148. That Plaintiffs have suffered such a concrete and demonstrable injury and diverted their resources in response is factually and legally uncontested. Instead, Defendants only argue that Plaintiffs have not suffered a legally cognizable injury because

Plaintiffs do not have a statutory entitlement to the information. This theory fails under circuit precedent.

And as to the remedial order, the District Court appropriately reached EEOC, a party to the case. It was also entirely within the District Court's equitable authority to ensure that Defendants complied with the vacatur order, especially given the Court's conclusion that the Government was "not committed to a prompt collection of Component 2" pay data. JA 12. This conclusion is further reinforced by the District Court's additional finding—unaddressed by Defendants in their opening brief—that the Government "does not have clean hands" in the litigation. JA 16.

Accordingly, Plaintiffs-Appellees respectfully request that this Court affirm the District Court's decision.

## JURISDICTION

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiffs challenged Defendants' actions under federal law, specifically the APA, 5 U.S.C. § 701, *et seq*., and the PRA, 44 U.S.C. § 3501, *et seq*. As set forth in the Brief for Appellants,

their appeal was timely. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court correctly concluded that Plaintiffs had established cognizable and redressable injuries, based on its undisputed findings that Plaintiffs suffered concrete and specific harms due to the failure to collect EEO-1 pay data, which required diversion of their resources to counteract; and that EEOC has historically published reports based on EEO-1 data and had stated its intent to do so with respect to pay data.

2.    Whether the District Court, after it held unlawful and set aside Defendants' stay of the pay data collection, correctly ordered further relief to effectuate the collection on a timeline suggested by Defendants, after finding that EEOC had begun the EEO-1 reporting period without requiring the pay data component, that Defendants' conduct evinced unclean hands, and that additional measures were necessary to ensure that EEOC would in fact comply with the Court's order reinstating the pay data collection.

## COUNTER-STATEMENT OF THE CASE

### A.     Legal Background

#### 1.     *The Paperwork Reduction Act*

The Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq*., seeks to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society." 44 U.S.C. § 3501(4). To that end, the PRA establishes a process by which agencies obtain approval from OMB to collect certain types of information from the public. The agency must first evaluate the proposed information collection, including the need for the information and the burden imposed. 44 U.S.C. § 3506(c)(1)(A). Generally, the PRA requires that an agency publish a notice in the Federal Register soliciting public comment on the proposed collection. 44 U.S.C. § 3506(c)(2)(A). Following the agency's consideration of the public's comments and any appropriate revisions, the agency then submits the proposed information collection to OMB and publishes a second Federal Register notice to announce the start of OMB review and an additional comment period. 44 U.S.C. § 3507(a)-(b).

OMB may then approve or disapprove the proposed collection of information. 44 U.S.C. § 3507(c). Approval requires a determination

that the collection of information "is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." 44 U.S.C. § 3508. An OMB approval of a collection of information lasts for up to three years, after which the agency must seek an extension. 44 U.S.C. § 3507(g)-(h).

During the approval period, OMB may "review" an ongoing and previously approved collection of information only when "relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error." 5 C.F.R. § 1320.10(f). In either scenario, if the information collection is not contained in a current rule, OMB may stay the prior approval, but only for "good cause." 5 C.F.R. § 1320.10(g).

2.     *Title VII and the EEO-1 Information Collection*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, requires employers to "make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed," to preserve such records, and to produce reports as EEOC requires. 42 U.S.C. § 2000e-8(c). Pursuant to this statutory authority, since 1966, EEOC has required that employers with one

6

hundred or more employees file a survey known as the "Employer Information Report EEO-1" ("EEO-1"). 29 C.F.R. § 1602.7; *see also* 41 C.F.R. § 60-1.7 (applying EEO-1 reporting requirement to certain federal contractors and subcontractors with more than fifty employees). Before the revision requiring the submission of pay data at issue, EEOC had long required covered employers to report annually the number of individuals employed by job category and by sex, race, and ethnicity via the EEO-1. JA 359.

EEOC reviews employers' EEO-1 data as a source of critical information in connection with its mandate to enforce civil rights laws. This includes analyzing and informing the public about employment patterns, such as the representation of women and minorities within varying levels and positions in companies, industries, or regions. JA 340. EEO-1 data also helps to show trends regarding hiring, promotions, and employee turnover within certain sectors. JA 350. Although EEOC keeps individually identifiable information confidential, JA 350-51, it makes aggregate EEO-1 information for major geographic areas and industry groups publicly available and periodically publishes reports based on EEO-1 data. JA 153 n.3, 350.

### B.    Factual Background

EEOC's decision to collect employee pay data resulted from an

interagency process of careful analysis and robust public comment. JA

137-40. On February 1, 2016, after several years of study, EEOC

published a Federal Register notice announcing it would seek a three-

year PRA approval from OMB of a revised EEO-1 and requesting

comment. 81 Fed. Reg. 5,113, 5,113 (Feb. 1, 2016). The notice explained

that the

> revised data collection has two components. Component 1
> collects the same data that is gathered by the currently
> approved EEO-1: Specifically, data about employees'
> ethnicity, race, and sex, by job category. Component 2
> collects data on employees' W-2 earnings and hours worked,
> which EEO-1 filers already maintain in the ordinary course
> of business.

Id. For the measure of employee pay, EEOC proposed "collect[ing]

aggregate W-2 data in 12 pay bands for the 10 EEO-1 job categories."

Id. at 5117.

On July 14, 2016, EEOC published a second Federal Register

notice, as required by the PRA, and adjusting its proposal in response to

comments. 81 Fed. Reg. 45,479, 45,495 (July 14, 2016). This notice set

forth EEOC's conclusion that its proposed revision to the EEO-1 was

8

necessary for the enforcement of equal pay laws. *Id.* at 45,481-83.

EEOC stated that it would use the collection in multiple ways,

including: (1) to support its enforcement efforts, by enabling its staff to

use statistical analysis to assist in an early assessment of pay

discrimination charges against an employer; (2) to periodically publish

reports on pay disparities by race, sex, industry, occupational

groupings, and Metropolitan Statistical Area; and (3) to provide

training and outreach both internally and to employers and other

stakeholders on, among other things, how to use the reports. *Id.* at

45,490-91.

OMB approved the proposed collection on September 29, 2016. JA

140. The pay data collection was scheduled to go into effect for the 2018

reporting period (collecting 2017 calendar year data). 81 Fed. Reg. at

45,484.

On August 29, 2017, before the 2018 reports were due, OMB

announced a review and stay of the pay data collection. JA 175. OMB

provided its entire rationale in two paragraphs:

OMB has determined that each of the[] conditions [under 5 CFR 1320.10(f) and (g)] for review has been met. For example, since approving the revised EEO-1 form on September 29, 2016, OMB understands that EEOC has released data file specifications for employers to use in submitting EEO-1 data. These specifications were not contained in the Federal Register notices as part of the public comment process nor were they outlined in the supporting statement for the collection of information. As a result, the public did not receive an opportunity to provide comment on the method of data submission to EEOC. In addition, EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate.[1]

OMB has also decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as we believe that continued collection of this information is contrary to the standards of the PRA. Among other things, OMB is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues.

JA 175-6. On September 15, 2017, EEOC followed suit, publishing a Federal Register notice implementing the stay. JA 141. While the memorandum staying the pay collection stated, "In these circumstances, the regulations at 5 C.F.R. 1320.10(f) and (g) require

_____

[1] The District Court ultimately rejected OMB's reliance on the data file specifications as justification for the stay as "misdirected, inaccurate, and ultimately unpersuasive." JA 163; *see also id*. at 163-166 (discussing data file specifications).

10

EEOC to submit a new information collection package for the EEO-1 form to OMB to review," neither OMB nor EEOC took any further public action regarding the stay or the EEO-1 form prior to the District Court summary judgment decision. JA 10.

## C.     Procedural Background

### 1.     *Timing Considerations Preceding District Court Ruling*

In November 2017, Plaintiffs, the National Women's Law Center ("NWLC") and the Labor Council for Latin American Advancement ("LCLAA"), sued OMB and EEOC to challenge the stay under the APA and the PRA. JA 282. Plaintiffs alleged that they were joining EEOC as a "necessary part[y] for relief . . . because [it] acted consistently with [OMB's directive] to notify employers that they were not required to submit pay data." JA 287, 312. Plaintiffs named EEOC in all four counts, alleging that it had "acceded to [OMB's] unlawful action." JA 313-15. And as relief, Plaintiffs prayed that the District Court "reinstate the revised EEO-1 reporting requirements," "[o]rder EEOC Defendants to publish a Federal Register Notice announcing this reinstatement or to take other equivalent action necessary to

immediately reinstate the pay data collection," and "[g]rant such other relief as the Court may deem just and proper." JA 315-16.

But for the stay, OMB's approval of the Component 2 collection would have expired by September 30, 2019, making the spring 2019 reporting period the last expected opportunity to collect pay data absent a new PRA approval by OMB or a finding that the stay tolled the three-year approval window. JA 18-23. At that point the collection that would have occurred in spring 2018, but for the stay, of 2017 calendar year data had already been missed. Thus, throughout the litigation, Plaintiffs informed Defendants and the District Court that they sought to resolve the litigation sufficiently in advance of spring 2019 so that, should they prevail, Component 2 pay data would be collected for that reporting period. *See*, *e.g*., D.Ct. ECF No. 24 (consenting to Defendants' motion for extension of time "so long as the extension gives the Court sufficient time to resolve the pending motions in advance of the scheduled March 31, 2019 data collection, so that the 2019 data collection could include the stayed pay data collection.").

Pursuant to their timing concern, during negotiations on the summary judgment briefing schedule, Plaintiffs asked Defendants how

12

long it would take to "get Component 2 live" for employer filing purposes should Plaintiffs prevail—relevant information for Plaintiffs to agree to Defendants' repeated requests to extend deadlines. JA 6-7. Defendants represented that it would take OMB "1 day" to "get Component 2 'live,'" but noted that they were still awaiting EEOC's time estimate. SA 1, 5. Following that representation, Plaintiffs' counsel agreed to the requested extension of a deadline that was then three days away. *Id.*; *see also* JA 328. As of the Court's summary judgment decision, Defendants had not suggested that the "1 day" representation was incorrect or provided any contradictory information on the timing of reinstating Component 2.[2]

### 2.    *Summary Judgment Ruling*

Defendants moved to dismiss Plaintiffs' complaint, and that motion was carried forward with cross-motions for summary judgment. JA 134.

---

[2] As discussed below, Defendants were aware at least as soon as the following day that EEOC disagreed with the "1 day" representation. JA 41. Defendants did not provide this information to Plaintiffs or the Court until after the remedial proceedings began. JA 39-49.

In briefing, Plaintiffs, both of which sued on their own behalf, supported organizational standing with unchallenged declarations setting forth their injuries. NWLC explained that one of its primary and longstanding priorities is to close the gender wage gap, especially for women of color. JA 141. To that end, NWLC strives to "educate employers, the public, and policymakers about race and gender wage gaps," and "has published numerous analyses and reports about workplace pay disparities." *Id*. Many of these reports "cite data on pay inequality across a number of factors and reflect time-consuming analysis of Bureau of Labor Statistics and Census data undertaken by NWLC staff." *Id.* In addition, NWLC represents clients pro bono in pay discrimination claims. JA 148-49. LCLAA explained that it represents the interests of approximately 2 million Latino/a trade unionists throughout the United States and Puerto Rico, as well as other non-unionized Latino/a workers. JA 142. In recent years, closing the pay gap has been a focus of LCLAA's work, which it has addressed through initiatives for Latina workers and education campaigns for its members, including as to bargaining with employers. JA 142.

14

On March 4, 2019, the District Court granted summary judgment for Plaintiffs and denied Defendants' motions to dismiss and for summary judgment. JA 132 (Order), JA 134 (Memorandum Opinion).

As to standing, the District Court found, based on Plaintiffs' unrefuted declarations, that "the loss of pay data caused a 'concrete and demonstrable injury' that is 'more than simply a setback to [their] abstract social interests.'" JA 148 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). For NWLC and its mission to eradicate the gender wage gap, that injury took several forms. EEOC's collection of and reporting on aggregate pay data "could have revealed new information about the race and gender gaps . . .. which would have made NWLC's reports and advocacy more robust." *Id.* (citing Johnson Decl. ¶¶ 4,6). Additionally, the data would have enabled NWLC to focus its efforts where intervention was most urgent. *Id.* (citing Johnson Decl. ¶ 7). Furthermore, the data would have bolstered NWLC's pro bono representation of pay discrimination victims by allowing NWLC to more easily evaluate clients' claims compared to industry benchmarks, to request that EEOC evaluate a claim based on its internal pay data, and

15

to reduce the cost of amassing comparator pay data. JA 148-49 (citing Johnson Decl. ¶ 11).

LCLAA also was impaired in its advocacy and educational work on pay discrimination encountered by Latinos/as in the workforce. It would have used the EEO-1 aggregate pay data to present "statistics on pay equity within industries and across the nation." JA 149 (citing Sanchez Decl. ¶¶ 9, 11). Furthermore, pay data information "would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAAs mission of improving the condition of Latinos and Latinas in the workforce." *Id.* (quoting Sanchez Decl. ¶ 11).

The District Court also concluded that Plaintiffs had demonstrated that they had used their resources to counteract these harms. JA 150. NWLC had "'expended funding and staff time . . . to engage with employers to encourage voluntary compliance with equal pay laws and changes in compensation practices and policies" and "voluntary self-audits of pay practices and internal wage gaps.'" *Id.* (quoting Johnson Decl. ¶¶12-14). It also had diverted funds and time to advocate for state and local pay data collection legislation, draft model

16

laws and educational materials, and build coalition and grassroots support in targeted jurisdictions. *Id.* (citing Johnson Decl. ¶ 13). To make up for the lost pay data, LCLAA faced the task of convincing thousands of employers to voluntarily provide data and then employing statisticians to analyze that data, an endeavor that was not only an "enormous expense" but unlikely to be successful given LCLAA's inability to require employers to comply. JA 150-51 (citing Sanchez Decl. ¶ 12). LCLAA also was forced to divert limited staff resources from vital work such as educational materials on NAFTA's impact on Latino/a workers. JA 151 (citing Sanchez Decl. ¶¶ 14, 16).

The District Court then found that Plaintiffs' injuries were redressable, reasoning that the "key issue . . . is whether Plaintiffs have shown that EEOC likely would have publicly published the aggregate pay data collected from Component 2." JA 152. The District Court held yes, based on EEOC's unrepudiated statement in the Federal Register that it "expects to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area," and its statement that these reports "will provide useful comparative data," especially "for smaller employers and others that do

17

not hire consultants to analyze their compensation structures." *Id.* (quoting 81 Fed. Reg. at 45,491).

As to the merits, the District Court ruled that the review and stay violated the APA. JA 163-172.[3] First, it concluded that OMB had not met the standard under its own regulations to review and stay a previously approved information collection. JA 163; *see also* 5 C.F.R. § 1320.10(f), (g). OMB did not show that the prior burden estimate was "materially in error"; rather it provided only "unsupported conjecture" that fell "short of showing *any* prior error, let alone a material one." JA 165-66 (emphasis in original). OMB also failed to demonstrate good cause for the stay because "[i]t did not explain in any substantive way why it believed that the revised EEO-1 was contrary to PRA standards." JA 166. The District Court concluded that the review and stay was also arbitrary and capricious "for the same reasons the agency violated its own regulations: OMB's decision to stay the collection of information totally lacked the reasoned explanation that the APA requires." JA 167.

---

[3] The District Court concluded that the stay was final agency action, rejecting Defendants' argument to the contrary. JA 158-162. This issue is uncontested on appeal.

As to remedy, the District Court vacated the stay and "[o]rdered that the previous approval of the revised EEO-1 form shall be in effect." JA 173-174. It rejected Defendants' against vacatur, explaining that the "deficiencies were substantial, and the court finds it unlikely that the government could justify its decision on remand" because "OMB's reasoning lack[s] support in the record." JA 172-173. Further, the Court rejected Defendants' argument that the stay could have disruptive consequences as "speculation" that is "unsupported by the record." JA 173. While Defendants argued that remand without vacatur was the proper remedy, they did not raise any timing constraints regarding implementation of the pay data collection during their summary judgment briefing. *See generally* D.Ct. ECF Nos. 27, 36.

### 3. *Remedial Proceedings and Ruling Granting Further Relief*

The summary judgment order did not conclude the proceedings. Instead, Defendants' failure to timely comply with the District Court's ruling would necessitate a series of supplemental filings and hearings, which culminated in the District Court granting further relief to ensure implementation of its summary judgment order.

19

On March 18, 2019, two weeks after the order, EEOC opened the EEO-1 reporting period for 2018 data, but for Component 1 data *only*, stating that it is "working diligently on next steps" regarding Component 2 and that it would "provide further information as soon as possible." SA 2. At that time, employers' filing deadline was May 31, 2019. *Id.* Notably, EEOC had not issued a Federal Register notice lifting the stay at this point, and did not advise employers in this statement or elsewhere that they would need to submit Component 2 data in 2019.

Within hours of EEOC opening the EEO-1 reporting period without Component 2, Plaintiffs requested a status conference, which the Court scheduled for the following day. JA 331. Plaintiffs noted in their request that the delay was "especially concerning" in light of the Defendants' previous representation that it would take "'1 day' to 'get Component 2 "live"'" should plaintiffs prevail in this case." SA 3.

At the status conference, the Court expressed concern that Defendants were "ignoring a very real time constraint here, [] the May 31st deadline" for EEO-1 reports, SA 15, and ordered them to submit information about their plans and timeline to come into compliance

with the Court's order by April 3, 2019. SA 25-26. The Court also

ordered Defendants to respond to (1) Plaintiffs' concern that

"approaching the expiration of the three-year period there could be a

dispute about whether EEOC is still bound by the Court's order" and (2)

Plaintiffs' stated view that the unlawful stay tolled the PRA expiration

for the Component 2 approval (which otherwise would have expired on

September 30, 2019). SA 23.

Nevertheless, in their April 3, 2019 filing, Defendants did not

address the tolling issue. Nor did they question whether the District

Court's summary judgment decision required EEOC to collect

Component 2 data. Rather, they only proposed a compliance timeline

under which the EEOC Acting Chair would exercise her purported

administrative authority to delay the Component 2 collection deadline

to September 30, 2019, in order to accommodate the practical

challenges perceived in reinstating the collection. D.Ct. ECF No. 54 at

2. Defendants also attached a declaration from EEOC's Chief Data

Officer, Dr. Samuel C. Haffer, in which he stated that EEOC would use

a data and analytics contractor to perform the collection. *Id.* at 3.

Defendants agreed that, but for the unlawful stay, employers would

have submitted pay data for calendar years 2017 and 2018. *Id*. at 2.
They stated, however, that they had concerns about collecting calendar
year 2017 data at the same time as 2018 data. *Id*. at 4. They did not
provide further information about how they would collect a second year
of Component 2 pay data or address the conflict between their newly
stated need for almost six more months to collect this data and their
prior "1 day" representation. *Id*. at 1-4.

Plaintiffs in response urged the District Court to reject the
September 30 deadline timeframe and to set an earlier deadline along
with specific conditions because:

> Defendants appear not to have taken seriously plans for
> compliance to date—based on their earlier failures to alert
> Plaintiffs and the Court to the issues that they now assert
> require delay, their failure to act promptly following the
> March 4, 2019 Order, and their ongoing failure, even now to
> alert the employer community to the renewed requirement
> to gather and submit Component 2 data.

D.Ct. ECF No. 62 at 14. Plaintiffs also stated that while they
questioned Defendants' concerns about collecting 2017 pay data
simultaneously with 2018 data, an alternative would be to forego the
2017 data in favor of 2019 pay data to be collected during the 2020
reporting cycle, assuming that the PRA expiration were treated as

tolled. D.Ct. ECF No. 62 at 13 n. 19. Defendants replied, again ignoring the tolling question, and asserting that the Acting Chair had administrative authority to delay deadlines and forego collecting the 2017 pay data entirely. D.Ct. ECF No. 63.

On April 16, 2019, the District Court held a hearing at which it ordered Defendants to make available witnesses from the relevant agencies who would be prepared to testify with "particularized and thorough knowledge of all the issues addressed and questions raised in the parties' Submissions." D.Ct. ECF No. 64. The hearing began with two preliminary issues. First the Court observed that Defendants had failed to address the tolling question, which likely waived any contrary argument. JA 37. Second, Defendants' counsel addressed OMB's "1 day" representation, telling the Court and Plaintiffs for the first time that the day after OMB provided this estimate to Plaintiffs to secure their agreement to a briefing extension, EEOC had informed Defendants' counsel that implementation of the Component 2 pay data collection could take until January 2021. JA 38-45.

The District Court then examined Dr. Haffer, EEOC's proffered witness, in order "to make factual findings and allow the parties and

23

the Court to ask limited further questions [because] I do think that the

record is not complete in order for me … to approve or disapprove the

government's proposed plan." JA 33. Dr. Haffer testified *inter alia* that:

(1)   EEOC was on track to open the Component 2 collection on time before the stay, JA 64, 89;

(2)   Following the stay, EEOC deleted and declined Component 2 information for employers previously posted on its website, JA 59-63;

(3)   Despite telling the Court the Component 2 collection was under review throughout the pendency of the litigation, to Dr. Haffer's knowledge, EEOC made no efforts during the stay to review the collection or submit a new approval package to OMB, JA 91-92;

(4)   Other than general steps to improve EEOC's data collection processes, EEOC took no steps after the stay to prepare for the possibility that it would have to collect Component 2 data, JA 66-68, 93-94;

(5)   EEOC's systems meet federal standards for data security and privacy, JA 77;

(6)   Dr. Haffer had no concerns about the contractor's data security practices, JA 80;

(7)   Collecting 2018 Component 2 data this year and 2019 data next year would resolve any concerns Dr. Haffer had about collecting two years' worth of data in the 2019 collection, JA 83;

(8)   The contractor was unwilling to collect Component 2 data if the deadline was earlier than September 30, 2019, JA 74;

(9)   EEOC planned to take no action after September 30 to collect delinquent Component 2 data. JA 98-99.

The Court permitted the parties to provide post-hearing written summations. JA 333-34; *see also* SA 28-46, D.Ct. ECF No. 69. In their submission, Plaintiffs agreed to a September 30 deadline based on Dr. Haffer's testimony. (As Plaintiffs and the Court noted, however, due to timing constraints, Plaintiffs were deprived of the opportunity to depose or seek discovery from Dr. Haffer. JA 15.) Plaintiffs requested, however, additional assurances as to the timely completion of the collection based on "serious deficiencies in EEOC's plan." SA 33, 38-43.

The District Court held a third hearing on April 25, 2019, to provide its "reasoning on the record" as to further appropriate relief. JA 6. First, the Court addressed Defendants' representations about timing, stating:

> Even though the Government had information in early December 2018 indicating that EEOC would not even begin collecting Component 2 pay data until nearly two years after Plaintiffs and the Court thought it would be completed, the Government allowed Plaintiffs and the Court to continue under the misimpression about how quickly [the] collection could proceed.

JA 8. As the Court noted, this misimpression resulted from the Government's "1 day" email, its months-long delay in revealing EEOC's timing estimate, and its failure to correct statements Plaintiffs made to

the Court (including in a representation of Plaintiffs' position in Defendants' own filing) suggesting that a prompt decision by the Court would allow EEOC to include Component 2 in its March 2019 EEO-1 collection. JA 6-9. The Court concluded "at the time of the Court's summary judgment decision on March 4, both the Court and the Plaintiffs believed that the removal of the stay would allow for an efficacious and prompt collection of the Component 2 pay data for both 2017 and 2018 as part of the timeline for the Component 1 2018 pay data." JA 9.

The District Court next found that Defendants' non-disclosure adversely affected Plaintiffs' litigation decisions by "effectively forc[ing them] to accept Dr. Haffer's factual assertion about EEOC's timeline as true because discovery now would consume too much time." JA 9-10. The Court rejected as "unpersuasive" Defendants' proffered reasons for not earlier disclosing the information it possessed on timing:

> [E]ven EEOC's lawyers believed that EEOC was not credible in the information it was providing to Plaintiffs and to the Court and what impediments, if any, stood in the way of an efficient collection. Needless to say, this misrepresentation casts a shadow over the Government's current representations that it cannot promptly and efficiently collect the Component 2 information with Component 1 information.

26

JA 10-11.

The District Court further found "that the Government is not committed to a prompt collection of Component 2 information" because since the vacatur of the stay:

> [T]he EEOC has not finalized the contract [to collect Component 2 data], provided a reason why it has not yet alerted employers that they will be required to submit Component 2 data by September 30, 2019 at the latest, has not issued a Federal Register Notice to alert regulated entities that the stay has been lifted, [] has not restored the prior Component 2 guidance from its website, and [] has not revisited the internal work it did to implement the Component 2 data collection in the period before the unlawful stay.

> Additionally, in the event the collection is not completed by September 30, 2019, the Government has been unable to make any satisfactory commitments that it would collect Component 2 data beyond that date.

JA 12-14.

The District Court then addressed the need for further relief. It explained that it would accept Defendants' proposal that the deadline for completing the 2018 Component 2 collection be extended to September 30, 2019, because, like Plaintiffs, it would "assum[e] the accuracy" of the representation that the Component 2 collection could not be completed earlier, "even though the Court harbors its own doubts that it is impossible for [the contractor] or EEOC to collect the data any

27

sooner." JA 15. The Court also concluded that because of Defendants'
delay tactics, it "must impose safeguards to ensure the completeness of
the collection. These orders are even more pressing and necessary
because … the Government does not have clean hands in this case." JA
16.

As a result, the District Court stated that it had "a responsibility
to fashion an order that ensures that EEOC completes the Component 2
data collection" because "the Court does not yet have adequate
assurances from the Government" that it would do so. JA 20-21. The
Court determined that ancillary relief was required, including: (1)
establishing a measurement of completeness for reporting (when the
percentage of filers reporting pay data reaches the mean percentage of
filers in each of the previous four years); (2) periodic progress reports by
the Government to Plaintiffs and the Court (every 21 days); and (3) a
date certain by which Defendants must inform the public on EEOC's
website and in the Federal Register that EEOC would be collecting
Component 2 pay data (by April 29, 2019). JA 21-22. The Court
concluded that it had authority to issue this ancillary relief, noting that
"EEOC has always been a defendant in this case – and it must comply

with court orders." JA 23-24.[4] Further, it concluded that the Acting

Chair's authority was limited by regulation requiring EEOC to annually

collect data via the OMB-approved EEO-1 form—which upon rescission

of the stay included the Component 2 data collection. JA 23-24.

Finally, the District Court addressed the period for which data

must be collected and the effect of tolling. As to the former, the Court

stated that its summary judgment decision had required collection of

two years' worth of pay data and noted that "[t]he Government has

conceded this point in their pleadings." JA 16. The Court rejected

EEOC's concerns about collecting 2017 pay data at the same time as it

collected 2018 data as "speculative, generalized, and, at times,

unsubstantiated." JA 16. Nevertheless, the Court provided Defendants

with the option of either collecting both 2017 and 2018 pay data during

the current collection cycle or, instead, collecting 2018 pay data this

year and collecting 2019 pay data in 2020. JA 16-18. As to tolling, the

Court reiterated its view that Defendants had conceded the issue, and

---

[4] Citing *U.S. Bank Nat'l Ass'n v. Poblete*, 2017 WL 4736712 (D.D.C. Oct. 19, 2017); *Mendoza v. Perez*, 72 F. Supp. 3d 168 (D.D.C. 2014); *Kramer v. Sec'y of Defense*, 29 F. Supp. 2d 54 (D.D.C. 1999); *Nat'l Venture Capital Ass'n v. Duke*, No. 17-1912, Tr. of June 27, 2018 Hrg. (D.D.C.).

that in any event the Government's belated argument against tolling was "legally and equitably incorrect." JA 18-20.

The District Court issued a written order consistent with this oral ruling the same day. JA 3-4.

## SUMMARY OF THE ARGUMENT

At issue here is not whether Defendants acted unlawfully—they do not contend otherwise on appeal—but only whether Plaintiffs have standing to sue over that unlawful conduct and whether the relief ordered to cure that conduct was appropriate. The District Court correctly resolved both questions in the affirmative.

It correctly determined that Plaintiffs had Article III standing based on their undisputed declarations showing that (1) the loss of EEO-1 pay data harmed them in a way that was "concrete and specific" to the work in which they were engaged, and (2) that they "used their resources to counteract the harm." JA 149-50 (citations omitted). The District Court correctly applied this Court's precedent, namely *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) ("*Action Alliance*"), and *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015)

("*PETA*"), to reject Defendants' argument that absent a statutory entitlement to the publication of pay data, such an informational injury was not legally cognizable. On the contrary, the requirement of a statutory right to information for informational standing, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), does not foreclose finding an Article III injury stemming from lost information where the harm is sufficiently concrete and particular to the plaintiff. *Id*. at 1545. Nothing in *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017), changes this conclusion.

Further, the District Court correctly determined that the Plaintiffs' injuries were redressable. EEOC's historical practice and stated plans to periodically publish information based on the pay data collection made it sufficiently "likely" that it would do so, and thereby redress Plaintiffs' injury. *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017). Thus, Defendants' implicit suggestion that they could immunize themselves from this litigation by refusing to publish Component 2 pay data should be rejected out of hand.

Once EEOC began the 2018 EEO-1 collection without including the reinstated Component 2 pay data collection, the District Court

31

appropriately exercised its equitable authority to issue ancillary relief ensuring that EEOC comply with its summary judgment order. EEOC has conceded that much of this relief was required by the summary judgment order, particularly the reinstatement of Component 2 for both the 2017 and 2018 collection years, and the additional relief—a deadline for completion, a measurement of completion, and periodic status reports—are entirely typical of remedial orders. This conclusion is reinforced by the finding that the Government was not committed to implementing the Component 2 collection, JA 12, and that it did not have "clean hands" in the litigation, JA 16.

## STANDARD OF REVIEW

This Court reviews district courts' standing determinations *de novo, Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (citing *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930, 937 (D.C. Cir. 2004)), and its underlying factual findings for clear error. *Id.* (citing *Armstrong v. Geithner,* 608 F.3d 854, 857 (D.C. Cir. 2010); Fed. R. Civ. P. 52(a)(6)). It reviews a district court's determination as to remedies for abuse of discretion. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010).

# ARGUMENT

## I.     The District Court Correctly Concluded That Plaintiffs Have Organizational Standing To Challenge Defendants' Unlawful Stay.

The District Court correctly applied binding circuit precedent to determine that a loss of information could suffice to meet the injury-in-fact requirement of Article III standing. JA 148.

Defendants did not contest Plaintiffs' declarations in support of organizational standing below. And they do not challenge the District Court's conclusions that Plaintiffs showed via those declarations that the stay of the pay data collection caused a "concrete and demonstrable injury" that was "more than simply a setback to [their] abstract social interests," JA 148 (quoting *Havens Realty at* 379); and that Plaintiffs used their resources to "counteract the harm" caused by the stay, JA 150 (quoting *Food & Water Watch, Inc., v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)).

Instead, Defendants argue only that Plaintiffs' injuries are not a sufficient injury in fact because disclosure of EEO-1 data to Plaintiffs is not required by statute. According to Defendants, in other words, deprivation of information can *only* support standing if Congress has

33

expressly required provision of that information, no matter how concretely that deprivation harms a plaintiff and no matter how likely it is that the agency action will cause the deprivation. Defendants are wrong under this Court's precedent.

### A.    An organizational plaintiff that demonstrates a frustration of mission and diversion of resources resulting from the loss of information has a cognizable injury regardless of whether Congress created a legal entitlement to the information.

The familiar three elements of injury in fact, causality, and redressability constitute the "irreducible constitutional minimum of standing" … "[u]nder any theory." *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both concrete *and* particularized." *Spokeo,* 136 S. Ct. at 1545 (emphasis in original) (quotation marks and citation omitted). A "particularized" injury "affect[s] the plaintiff in a personal and individual way. *Id.* at 1548 (citations omitted). And concreteness requires that the injury "must actually exist." *Id*.

Organizations, such as Plaintiffs, may establish standing in their own right "like an individual plaintiff" by showing "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch,* 808 F.3d at 919 (quotation omitted). In this context, an organization must show that it "suffered a concrete and demonstrable injury to its activities." *Id.* (quotation omitted). To determine whether the organizational injury is legally cognizable, a court asks "first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id; see also Havens Realty*, 455 U.S. at 379. An injury to an organization's interest requires impairment of its "ability to provide services," not merely that its mission has been compromised. *Id.*

Within this framework, neither the Supreme Court nor this Circuit has held or even suggested that a loss of information that impairs an organization's ability to provide services is categorically excluded from the range of legally cognizable harms unless disclosure of that information is required by statute. On the contrary, as discussed

35

below, and as the District Court correctly concluded, this Court has found organizational standing based on the deprivation of information not required by statute in both *Action Alliance* and *PETA*. JA 145-48.

Defendants' arguments are premised on a misreading of the doctrine of "informational standing" applicable in cases brought under information-focused statutes such as the Freedom of Information Act ("FOIA") and the Federal Advisory Committee Act ("FACA"). This doctrine allows plaintiffs who are denied access to information to bring suit without showing that the loss of information impairs their ability to provide services (or causes another distinct injury); but it only applies if Congress has created a legal entitlement to the information.

Informational standing in this context is based on the principle that "the violation of a procedural right granted by statute can be sufficient … to constitute injury in fact." *Spokeo,* 136 S. Ct. at 1549. For such Congressionally created entitlements, deprivation of the information *itself* is a sufficiently concrete harm to meet the requirements of Article III: "In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id*. (*citing FEC v. Akins,* 524 U.S. 11, 20–25 (1998)

(confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III)); *Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989) (holding that two advocacy organizations' failure to obtain information subject to disclosure under FACA "constitutes a sufficiently distinct injury to provide standing to sue"); *see also Friends of Animals v. Jewell*, 828 F.3d at 992 ("the existence and scope of an injury for informational standing purposes is defined by Congress").

Such violations of a Congressionally created procedure for receiving information are distinct from the concrete impairment of ability to provide services that confers organizational standing under *Havens Realty*. The line of informational standing cases does not preclude the application of the conventional organizational standing doctrine where the requirements of concrete and particularized injury are otherwise met, nor do any of the leading informational injury cases suggest as much. *Cf. PETA*, 797 F.3d at 1105 ("the Supreme Court's decision in *Akins* did not specifically displace our precedent finding organizational standing when the failure to provide information 'impinge[d] on the plaintiff's daily operations or made normal

37

operations infeasible.") (citation omitted) (Millet, J., concurring dubitante).

### B.    Plaintiffs have a legally cognizable injury under *Action Alliance* and *PETA*.

The District Court correctly concluded that under binding circuit precedent, namely *Action Alliance* and *PETA*, Plaintiffs suffered legally cognizable injuries.

In *Action Alliance*, the plaintiffs sued HHS alleging that its regulation "significantly restrict[ed]" the flow of information otherwise made available regarding services for the elderly because it eliminated a self-evaluation requirement and reduced required compliance reports from federal funding recipients. *Action Alliance*, 789 F.2d at 937. The plaintiffs, who "devote[d] themselves to the service of senior citizens," alleged that if they possessed this information it would "enhance [their] capacity … to refer members to appropriate services and to counsel members when unlawful age discrimination may have figured in a benefit denial." *Id*. This Court concluded that just as in *Havens Realty*, "the challenged regulations deny [plaintiffs] access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities." *Id*. at 937-38.

Accordingly, "[u]nlike the mere interest in a problem" or ideological injury in *Sierra Club* [*v. Morton*, 405 U.S. 727, 735, 739 (1972)], plaintiffs had "alleged inhibitions of their daily operations, an injury both concrete and specific to the work in which they [were] engaged." *Id.* at 938.

In *PETA*, the plaintiff sued USDA to require it to extend full enforcement of the Animal Welfare Act ("AWA") to birds covered by the AWA. *PETA*, 797 F.3d at 1091. The plaintiff asserted two injuries: Absent application of the AWA to birds PETA could not submit complaints to the USDA about bird abuse and USDA necessarily would not create bird-related inspection reports that PETA could use to raise public awareness. *Id.* at 1091. PETA provided a declaration explaining that its mission is to prevent cruelty and inhumane treatment of animals; and that one of the primary ways that it accomplishes this mission is by educating the public, including by providing information about the conditions of animals in captivity. *Id.* at 1096. USDA inspection reports were PETA's primary source of information in preparing these materials, and, accordingly, deprivation of them robbed PETA of information upon which it routinely relied. *Id.* This Court

affirmed the district court's conclusion that PETA had sufficiently alleged standing, explaining "PETA's alleged injuries—denial of access to bird-related AWA information […] and a means by which to seek redress for bird abuse—are concrete and specific to the work in which they are engaged." *Id.* at 1094-95 (quotations omitted).

So too here, the District Court relied on Plaintiffs' specific, detailed, and unrefuted declarations to conclude that "[t]he loss of the pay data constitutes the type of informational harm the D.C. Circuit has found to be 'both concrete and specific to the work in which [these organizations] are engaged." JA 149 (citing *PETA*, 797 F.3d at 1095 and *Action Alliance*, 789 F.2d at 937-38). Accordingly, based on *PETA* and *Action Alliance*, it correctly concluded that this harm was a legally cognizable injury sufficient to establish organizational standing. JA 149-151.

Defendants' attempts to distinguish *Action Alliance* and *PETA* are unavailing. Contrary to their argument, Def. Br. 21-22, the decision in *Action Alliance* did not turn on whether the plaintiffs had a legal right to access the self-evaluations or compliance reports. In fact, the Court did not discuss the mechanism by which the plaintiffs would obtain this

information at all. 789 F.2d at 937. Rather, the Court relied on the concreteness and specificity of the plaintiffs' injury in concluding they had standing. *Id.* at 937-38. Indeed, the regulations at issue there provided access only for one category of information, the self-evaluations prepared by funding recipients, omitting any mechanism for accessing HHS's own compliance information and reviews. *Compare* 44 Fed. Reg. 33,776, 33,778 (June 12, 1979) (setting forth then-current 44 C.F.R. § 90.43(b)(4), governing self-evaluations), *with id.* at 33,779 (setting forth then-current 44 C.F.R. §§ 90.44 and 90.45, governing compliance information and reviews); *see also id.* at 33,777 (setting forth then-current 44 C.F.R. §§ 90.31 to 90.34, governing responsibilities of the Federal Agencies and not requiring public access to compliance information and reviews). The Court did not find it necessary to distinguish between these two provisions when it described the lack of both types of information as a cognizable harm to the plaintiffs. Thus, *Action Alliance* did not require any legal entitlement to the absent information if the plaintiffs "use [the information] in their routine information-dispensing, counseling, and referral activities." 789 F.2d at 938.

Similarly, in *PETA*, as Defendants acknowledge, publication of the missing inspection reports was not required by law. Def. Br. 22.[5] As in *Action Alliance*, the lack of a legal entitlement to this information did not foreclose the conclusion, based on PETA's specific allegations, that its injury was sufficiently "concrete and specific" to its work. 797 F.3d at 1095. While PETA's inability to seek redress for bird abuse was also a cognizable harm, Defendants' suggestion that the injury caused by the lack of inspection reports alone was not sufficient to confer standing finds no support in the Court's opinion. *Cf. id*. at 1103-04 (Millet, J, concurring dubitante) ("[T]he majority opinion's contrary determination just walks the path that circuit precedent has trodden. … [W]e have relied on *Action Alliance* for the proposition that organizational standing may exist more broadly whenever "information is essential to the injured organization's activities, and where the lack of the information will render those activities infeasible." (quotation omitted)).

### C.    *EPIC* Does Not Change This Conclusion.

---

[5] Further, as in *PETA*, NWLC has advanced a theory of harm separate from EEOC's failure to *publish* EEO-1 pay data: NWLC's *pro bono* representation would be less expensive if Component 2 forms could be obtained through discovery. *See* JA 149 (citing Johnson Decl.).

42

Defendants rely on *EPIC* to argue that informational harms cannot confer injuries in fact when the disclosure of information is not required by statute. But *EPIC* cannot bear that weight.

First and most elementary, *EPIC* does not and could not purport to overrule *Action Alliance* and *PETA. See Gen. Comm. of Adjustment, GO-386 v. Burlington N. & Santa Fe Ry. Co.*, 295 F.3d 1337, 1340 (D.C. Cir. 2002) (circuit precedent is binding on this Court "unless and until overturned by the court en banc or by Higher Authority"). Rather, *EPIC* explicitly distinguishes its holding from *PETA*'s, which it does not question. *EPIC*, 878 F.3d at 379 n. 7 (in contrast to the *PETA* plaintiffs, EPIC "has not established any equivalently "direct causal link between the defendants' inaction and EPIC's own expenditures").

Further, *EPIC* did not hold that a statutory right to withheld information is necessary to establish a legally cognizable harm for organizational standing, as the facts of that case make clear. The eponymous plaintiff in *EPIC* sought an injunction requiring the Presidential Advisory Commission on Election Integrity to undertake a privacy assessment review pursuant to the E-Government Act of 2002 before collecting voter data information. *EPIC*, 878 F.3d at 374. The

43

Court first concluded that EPIC did not have an informational injury because it did not "suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id*. at 378 (quoting *Friends of Animals*, 828 F.3d at 992). The E-Government Act is concerned with individual privacy, rendering EPIC, an organization, outside the scope of Congress's intended protections; indeed, "EPIC [wa]s not even the type of plaintiff that can suffer such harm." *Id*. Because of this essentially prudential lack of standing, *EPIC* explicitly declined to evaluate whether the statute required the Government to disclose the information. *Id*. at 378 ("We need not consider the first component of the requirement for informational injury because EPIC does not satisfy the second."). Given that *EPIC* did not evaluate whether disclosure was statutorily mandated even in its informational injury analysis, it is hard to see how it could have added it as a new requirement for organizational standing.

The Court next considered whether EPIC had suffered an organizational injury. It concluded that EPIC could not meet *Havens Realty*'s first prong—that the defendant's action or omission injured the organization's interest, *id*. at 378 (citing *PETA*, 797 F.3d at 1094)—

44

because "EPIC's sole theory of organizational injury" was a generalized "interest in using the information contained in the assessment 'to focus public attention on emerging privacy and civil liberties issues.'" *Id.* at 378-79. This contravened the familiar rule that an "abstract social interest does not give rise to organizational injury." *Id.* at 379. The Court explained that EPIC's *only* evidence of a concrete injury was that it filed a FOIA request, but it "offer[ed] no 'specific facts' demonstrating that the lack of assessment *caused* it to submit the requests." *Id.* at 379; *see also id.* at 380 ("The doctrines of informational and organizational standing do not derogate from the elemental requirement that an alleged injury be concrete and particularized … On this record, EPIC's asserted injuries do not meet that requirement."). Because the facts suggested that "EPIC would have made similar FOIA requests even if the defendants had produced" the withheld information, the Court found its injury to be "non-existent," and concluded EPIC had merely an "abstract social interest. *Id.* (citing *Feld*, 659 F.3d at 24-25).

At bottom, EPIC's organizational standing turned on the "specific facts" presented to the Court, which the Court found wanting. *Id.* (quoting *Lujan*, 504 U.S. at 561). EPIC's generalized and non-specific

45

allegations of injury are in stark contrast to the facts in *PETA*, 797 F.3d at 1093-95, and *Action Alliance*, 789 F.2d at 937-38, where the organizations sought to use the missing information in concrete and specific ways and its absence prevented or impaired specific activities. And they are in stark contrast to Plaintiffs' injuries here, as the District Court held that the Plaintiffs' unchallenged declarations sufficed to show that their injuries were "concrete and specific to the work in which they were engaged." JA 148-150. EEO-1 data would enable NWLC to focus its efforts where the need for intervention is the most urgent, publish more robust reports using fewer resources, and improve its pro bono representation by better evaluating potential claims compared to industry benchmarks and reducing costs of amassing evidence. JA 148-49. As for LCLAA, EEO-1 data would have materially improved its ability to negotiate with and educate employers. JA 149. These harms are specific to the Plaintiff organizations and concrete in a way that EPIC's generalized interest in raising public awareness was not.

Defendants make much of *EPIC*'s passing reference to the lack of an interest conferred by the E-Government Act, Def. Br. 19, but this single sentence does not support Defendants' bold conclusion that the

Court implicitly overruled *PETA* (even if it could, sitting as a panel) and set aside bedrock standing principles. 878 F.3d at 379. Rather, the Court paired the lack of a statutory right to the information with EPIC's failure to identify anything more than an abstract social interest in receiving the information. Indeed, the very next sentence cited to the familiar standard that an "abstract social interest does not give rise to organizational injury," *id.*, focusing on the fact that EPIC had *neither* a statutory right *nor* a non-abstract interest. Thus, far from overruling *PETA* and carving information-based injuries out of the ordinary standing rubric completely, *EPIC* merely reinforced the conclusion that the deficiency in that plaintiff's standing theory was the lack of concreteness and specificity.

**D.     The District Court correctly concluded that Plaintiffs' injuries were redressable based on EEOC's historical practice and stated plans to periodically publish information based on the pay data collection.**

 "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *West*, 845 F.3d at 1235 (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (en banc)). As this Court has explained, "[t]he key word is 'likely.'" *Id.*

47

(quoting *Lujan*, 504 U.S. at 561) ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

The District Court correctly concluded that if the Component 2 pay data collection were reinstated, it was "likely" that EEOC would periodically publish reports on pay disparities, as it had promised to do and as it historically has done for Component 1 data. JA 152-53 and n.3. Indeed, EEOC's contemporaneously stated plans to publish reports on pay disparities were significantly more certain and specific than Defendants now suggest on appeal. JA 152 (reports would provide information on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area (MSA)). As the Court observed, this "expressed intention" was "consistent" with EEOC's "historical practice of publishing annual reports based on aggregate EEO-1 data, in addition to periodic industry specific reports." JA 153 n.3. This Court need not, therefore, "speculate how 'independent actors not before [it] might [act],'" *West*, 845 F.3d at 1237; rather, it may simply take EEOC at its word—namely, its stated intention to publish reports based on the pay data collected. That there is no absolute

48

guarantee that EEOC will act in accordance with its repeatedly reaffirmed intention does not change the redressability analysis. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983) (plaintiffs are not "required 'to prove that granting the requested relief is certain to alleviate' their injury") (quoting *Community Nutrition Inst. v. Block*, 698 F.2d 1239, 1248 (D.C. Cir. 1983)); *see also Duberry v. D.C.*, 924 F.3d 570, 583 (D.C. Cir. 2019) ("[A] party has standing to pursue a claim so long as the relief sought will constitute a necessary first step on a path that could ultimately lead to relief fully redressing the claimant's injury.") (quotation and citations omitted).

Defendants' assertions about their subsequently identified "concerns" regarding the "feasibility and benefits of the information collection" likewise leaves the analysis intact. Def. Br. 25. "[S]tanding is assessed at the time of filing," *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012), so the post-filing reasons Defendants purport to identify for abandoning their stated plans are irrelevant. Even if they were cognizable, the District Court rejected the factual basis for Defendants' recently identified concerns about the utility of collecting

49

Component 2 data. JA 12 ("[W]hile the Government questions the adequacy of the prior pilot study and the decision to use pay bands, these issues were previously considered and dealt with during the Paperwork Reduction Act approval process."). The Court also rejected related "concerns" about the quality of data collection as "speculative, generalized, and, at times, unsubstantiated." JA 16. In short, there is no record before this Court to support the conclusion that any such valid "concerns" exist, let alone to suggest that the District Court's factual findings to the contrary were clearly erroneous.

## II.   The District Court Correctly Ordered Further Relief To Ensure Compliance With Its Summary Judgment Order Vacating The Stay.

After the District Court's summary judgment order, EEOC opened the EEO-1 data collection for 2018 *without* Component 2, in disregard of that order's requirement that Component 2 be reinstated. JA 174. Following extensive briefing by the parties and factfinding by the District Court, including live testimony by EEOC's Chief Data Officer, the Court issued a remedial order—the April 25 Order now challenged

by Defendants. JA 3-4. This Order fits easily within the District Court's broad equitable discretion.

"[T]he scope of a district court's equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (quotation omitted); *see also Monsanto*, 561 U.S. at 166. Nor does the APA displace the district court's equitable authority; in a case properly brought under the APA, "injunctive relief, preliminary or permanent, is available in the district court," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982), and courts can and frequently do award such relief.

Given EEOC's failure to comply timely with the summary judgment order, its prejudicial misrepresentations, and its intimations that it might comply incompletely if at all, the District Court appropriately set out specific requirements that EEOC take all necessary steps to do so, namely: (1) completing the Component 2 data collection by a date certain; (2) collecting two years' worth of data; and (3) providing notice to employers, including in the Federal Register, that they would be required to submit pay data. In so doing, the Court left significant discretion to EEOC, leaving all decisions regarding the

mechanism of collection to EEOC, adopting EEOC's preferred timeline for collection, and allowing the option to collect the second year of missing data either concurrently with the 2018 collection or the following year. Further, in light of the Court's finding that Defendants had "unclean hands" and were not committed to a prompt Component 2 collection, the minimal additional ancillary relief ordered—periodic status reports from EEOC during the collection and the establishment of a standard to measure the completeness of reporting—was entirely appropriate.[6]

---

[6] The Chamber of Commerce *amici's* arguments do not change this conclusion. First, the arguments regarding remand are untimely because neither they nor the Government presented the arguments to the District Court during remand briefing. *See* D.Ct. ECF Nos. 27, 36. Second, *Amici* made many of the same arguments regarding burden, utility, and confidentiality during the original public comment periods, and they were rejected by EEOC and OMB. *See* D.Ct. ECF No. 31 at 22; D.Ct. ECF No. 62 at 7-10, and n.14. Further consideration of *amici's* disagreement with the original approval is foreclosed. *Cf.* 44 U.S.C. § 3507(d)(6) ("The decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review."). In any event, the District Court considered similar arguments during summary judgment briefing (made in 2017 letters by the Chamber, among others) and determined they were insufficient to support the stay. JA 168-69.

## A.    Extension of relief to EEOC was required.

EEOC has always been a proper party to this action and conceded that vacatur of the unlawful stay would require it to reinstate Component 2. Accordingly, the District Court appropriately required EEOC to comply with its order. Defendants' arguments to the contrary simply misportray the record.

To start, Plaintiffs in filing suit named EEOC as a defendant that had "acceded to" OMB's unlawful action, named it in all counts, and demanded all appropriate relief against it. JA 313-315. And EEOC never argued that it was not a proper party or that relief could not reach it. On the contrary, it agreed that vacatur of the stay would require it to reinstate the Component 2 collection when addressing remedy in its own summary judgment brief. *See* D.Ct. ECF No. 27-1 at

---

As to the arguments that utility and burden concerns have increased, the District Court rejected much of the testimony on which these arguments rely. JA 11-12, 16. Finally, *Amici's* claims regarding confidentiality are belied by Dr. Haffer's acknowledgment that EEOC could satisfy applicable federal confidentiality standards, JA 11; while their claims regarding burden are belied by the fact that over 75% of filers have already submitted data, *infra* n. 9.

34 ("If the Court vacated OMB's decision … EEOC would have to begin

the complex process of collecting aggregate pay data."); *see also* JA 9

(setting forth the District Court's understanding, based on the

government's actions, that "removal of the stay" would result in

collection of Component 2 data for 2017 and 2018). The government's

"failure to disclose its actual position," *id*., means that EEOC has

forfeited the ability to make the belated argument that vacatur does not

require reinstatement of Component 2, and, consequently, the issue

should be deemed conceded. *Wannall v. Honeywell, Inc.*, 775 F.3d 425,

428 (D.C. Cir. 2014) ("a party cannot raise a conceded argument on

appeal") (citation omitted).

    In any event, Defendants' portrayal of EEOC as a mere bystander

in this litigation is inaccurate. It is a named defendant and has never

sought dismissal as an improper party. Further, the complaint alleges

action by EEOC in each of the counts. JA 313-15 ("EEOC Defendants

acceded to the unlawful action."). Indeed, Plaintiffs would not have been

injured but for the actions of *both* OMB (issuing the stay) and EEOC

(implementing the stay). Nor could Plaintiffs have received any relief if

EEOC were not bound by the Court's order; a decision vacating OMB's

stay but allowing EEOC to refuse to reinstate the collection would have been a hollow remedy, to say the least.

As such, the relief requested in the Complaint (to which Plaintiffs are now entitled, given the District Court's unappealed ruling on the merits) has always extended directly to EEOC—namely that the Court declare that the "revised EEO-1 [including the collection of pay data] remains in effect;" "reinstate the revised EEO-1 reporting requirements; and "[o]rder EEOC Defendants to publish a Federal Register notice announcing this reinstatement or to take other equivalent action necessary to immediately reinstate the pay data collection." JA 315. Defendants present no authority for their novel argument that an agency defendant should be excused from complying with a summary judgment order necessary to provide a plaintiff with complete relief simply because it views itself as less culpable for the unlawful agency action. Nor does this argument find support in the text of the APA, which requires that unlawful agency action be "set aside" and neither limits the effects of setting aside the action to a single agency nor compels a court to parse multiple agencies' roles in an action. 5 U.S.C. § 706(2).

Finally, Defendants' assertion that EEOC had unconstrained discretion to conduct the EEO-1 data collection for 2018 in whatever manner it saw fit, Def. Br. 29,—or not at all—is incorrect. As the District Court correctly concluded, EEOC's own regulation, 29 C.F.R. § 1602.7, requires that employers file the operative version of the EEO-1 form annually. JA 24. And the agency may not, of course, conduct such a collection of information without a current PRA approval. 44 U.S.C. § 3507(a). Following the Court's summary judgment decision, the previously approved EEO-1 form, including both Components 1 and 2, was the only PRA-approved EEO-1 information collection in effect. JA 174. EEOC agreed with this conclusion in its filings in District Court. *See*, *e.g.*, D.Ct. ECF No. 54 at 1-2 ("[T]his Submission describes how EEOC proposes to undertake and close the collection of Component 2 pay data under the revised EEO-1 information collection that is now back in effect."). EEOC was therefore required to use that information collection form for the annual EEO-1 report unless and until it received an alternate approval under the PRA for this year's collection, which it did not seek or receive.

In sum, the District Court was well within its discretion to require EEOC to comply with the summary judgment order and to provide specific requirements related to that when EEOC failed to timely comply.

**B.    The District Court's April 25 Order Was Necessary To Restore The Pre-Stay Status Quo, Especially Given The Government's Unclean Hands.**

   *1.    The District Court's equitable authority to ensure Defendants complied with its vacatur order*

Vacatur of unlawful agency action requires reinstatement of the earlier status quo. *See Croplife Am. v. EPA,* 329 F.3d 876, 884–85 (D.C. Cir. 2003) (The "consequence [of vacatur is that] the agency's previous practice ... is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation."); *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("by vacating or rescinding the rescissions proposed by [the challenged rule], the judgment of this court had the effect of reinstating the rules previously in force"). Here, that means reinstatement of the PRA approval of Component 2 of the EEO-1 collection. Accordingly, following the March 4 Order, and as previously conceded by Defendants, both OMB and EEOC were required to treat the operative EEO-1 collection as

57

including both Component 1 and Component 2 data. But EEOC did not
do so. Regardless of when or whether a district court in an APA case
has the authority to order specific relief *beyond* vacatur, surely the
district court has the authority to ensure that an agency *actually* treat
the action found to be unlawful as vacated. *See*, *e.g.*, *Nat'l Min. Ass'n v.
U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (citing
*Wagner v. Taylor,* 836 F.2d 566, 575 (D.C. Cir. 1987) (district courts'
broad authority to order equitable relief). That is all the District Court
did here.

The principle that an agency has the "prerogative" to decide how
to proceed on remand, rather than have a court dictate the outcome, *see*,
*e.g.*, *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013), does not
change this conclusion. Certainly, a district court typically would not
have jurisdiction to determine the outcome of an agency's substantive
decision-making on remand—here, for example, whether and how OMB
could exercise its authority under the PRA to review and stay the EEO-
1 in the future, or what EEO-1 data collection methodology EEOC could
seek to have OMB approve in the future. But defendant agencies
assuredly do not have the prerogative to determine *whether* to reinstate

the status quo following vacatur of an unlawful action. Accordingly, Defendants' citation to *Palisades General Hospital v. Leavitt*, Def. Br. 26-27, is irrelevant. 426 F.3d 400, 402 (D.C. Cir. 2005). *Palisades* stands for the same narrow proposition that a district court may not impose "injunctive relief relating to the relevant agency's analysis or discretion *on remand.*" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 280 F. Supp. 3d 187, 190 (D.D.C. 2017) (emphasis added). It does not hold that district courts lack equitable authority to enforce their orders.

The appropriateness of the April 25 Order is reinforced by the Government's misbehavior. As the District Court explained, after extensive factual findings, "the Court does not yet have adequate assurances from the Government that it will complete Component 2 data collection. Therefore, the Court finds it necessary to order additional ancillary relief." JA 21; *see also id.* at 14 ("this factual background reflects that the Government has not demonstrated a commitment to efficiently collect the Component 2 pay data, and over the course of several months has affirmatively left both the Court and Plaintiffs to labor under the misimpression about when and how the Government could collect this information.") The District Court would

59

impose "safeguards to ensure the completeness of the collection" made "even more pressing and necessary because … *the Government does not have clean hands* in this case." JA 16 (emphasis added).[7]

Defendants have no answer as to these findings, which appropriately informed the District Court's exercise of its equitable authority. *See N.C. Fisheries Ass'n v. Gutierrez,* 550 F.3d 16, 20 (D.C. Cir. 2008) (courts may issue "detailed remedial orders" in "extraordinary circumstances"); *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 523–24 (D.C. Cir. 2005) ("[t]he essence of equity jurisdiction" is "to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.") (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329 (1944)); *McKenzie v. Kennickell*, 825 F.2d 429, 434 (D.C. Cir. 1987) (a "finding of bad-faith resistance" to court order could "justify special remedial measures").

---

[7] Remarkably, at the time of the April 25 Order, EEOC had not even issued the Federal Register notice regarding the reinstated pay data collection, which, as it admits, was explicitly requested in the Complaint, Def. Br. 28; nor had it otherwise alerted the regulated community to their imminent obligation to report Component 2 data. During the extensive remedial proceedings, Defendants failed to provide the Court with an explanation as to this omission. JA 14.

2.    *The specific provisions of the April 25 Order were reasonable.*

The April 25 Order merely sets out the necessary steps to reinstate the pre-stay status quo. *Cf.* JA 3 ("EEOC must immediately take all steps necessary to complete EEO-1 Component 2 data collections…). And in so doing, the District Court still left the agency with significant discretion. Nothing about these specific requirements was inappropriate.

First, while the April 25 Order included a date certain to complete the Component 2 data collection, the District Court selected the agency's *own* preferred date. JA 15. It deferred to the agency's preference "even though the Court harbors its own doubts that it is impossible for [the contractor] or EEOC to collect the data any sooner," and even though Defendants' misrepresentations had deprived both the Court and the Plaintiffs of the ability to evaluate Defendants' claims. *Id*. There is nothing unusual in providing a deadline for agency action where, as here, the agency has shown a likelihood that it will not comply timely. *See Mendoza v. Perez*, 72 F. Supp. 3d 168, 171 (D.D.C. 2014) (setting timeline for agency to conduct rulemaking to replace

vacated guidance letters);[8] *Cf. Andrulis Research Corp. v. SBA*, Civ. Ac. No. 90-2569 (CRR), 1990 WL 169318, at \*2 (D.D.C. Oct. 19, 1990) (collecting cases supporting "district court's power to extend statutory deadlines to remedy improper agency delay"). The appropriateness of the deadline is reinforced by the District Court's conclusion (uncontested by Defendants) that timing "goes to the heart of the effectiveness of any relief Plaintiffs secured" because of the PRA approval's limited duration. JA 10.

Similarly, the establishment of a measurement of completion was a reasonable decision to provide an "assurance" that the "Government … will complete the Component 2 data collection." JA 21. This was particularly necessary given EEOC's remarkable assertion that it not only would not but *could not* seek compliance from employers who failed to submit data by September 30, 2019. *See* JA 99 ("If you're asking me if I believe that we could in some way reach out to people after September 30th, the answer is no."); *see also* JA 18 ("the Government still has not

_____

[8] Defendants provide no basis on which to distinguish *Mendoza* aside from their unsuccessful argument that EEOC was not bound by District Court's summary judgment order, Def. Br. 32; in all other respects *Mendoza* is entirely consistent with the District Court's exercise of its authority here. 72 F. Supp. 3d at 171.

provided an adequate plan for collecting Component 2 pay data after September 30"). Further, the Court appropriately tied this measurement to the agency's past practices—measuring completeness by the mean percentage of EEO-1 reporters that actually filed EEO-1 reports in each of the past four collection years. JA 4. Defendants fail to explain what, if anything, could be problematic with this eminently sensible effort to clarify when the agency would have completed its obligation to reinstate Component 2.

As for the explicit requirement that EEOC collect two years of data, EEOC had agreed that vacatur of the unlawful stay required retroactive collection of 2017 and 2018 data. D.Ct. ECF No. 69 at 14 (EEOC "had to resolve" … how to "modify or adjust deadlines for employers to collect and submit retroactively 2017 and 2018 pay data."); JA 16 ("EEOC was required to collect two years' worth of pay data. The Government has conceded this point in their pleadings"). Doing so was, of course, necessary to remedy the unlawful stay, a point Defendants do not now seriously contest. Thus, the District Court's finding that this issue was conceded, and in any event was the correct outcome, should be upheld. *Wannall v. Honeywell, Inc.*, 775 F.3d at 428.

Despite its concession that collecting two years of pay data was required by the summary judgment order, EEOC argued that it should collect only one year as a practical matter. The District Court rejected the basis for "these concerns as speculative, generalized, and at times, unsubstantiated." JA 16. Defendants ignore this factual finding on appeal, raising again the supposed practical burden. Def. Br. 30-31. They have done nothing to show, however, that the District Court's evaluation of the factual basis for their argument was clearly erroneous. They also fail to acknowledge that the District Court provided EEOC with the option to conduct the second year's data collection in the following year rather than concurrently, providing the agency with significant choice and the ability to avoid any issues it perceived with collecting the data concurrently. JA 17 ("the record is clear, that this option would pose none of the concerns raised about collecting 2017 data this year"). It was *EEOC's* choice, not the Court's, to combine two years of data collection into the 2019 collection, rather than simply collecting one year of data in 2019 and one year in 2020.[9]

_____

[9] The weakness of this argument is reinforced by the Government's October 8, 2019 filing informing the District Court that, as of that date,

And finally, the requirement of periodic reporting was well within the District Court's discretion. Reporting requirements are common where an agency has acted in bad faith, as here, and in cases of "unreasonable delay of agency action or failure to comply with a statutory deadline," also the case here given EEOC's tardiness in reinstating the Component 2 collection. *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008) (citing *Cobell v. Norton,* 240 F.3d 1081, 1109 (D.C. Cir. 2001)); *see also Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 917 F. Supp. 2d 1, 3 (D.D.C. 2012) ("courts have discretion to retain jurisdiction pending completion of a remand and to order progress reports in the meantime" which they may exercise "in unusual circumstances").  Defendants provide no authority to the contrary.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that this Court affirm the District Court's grant of summary judgment and its issuance of the April 25, 2019 remedial order.

---

more than 75% of filers had submitted Component 2 data for both calendar years. D.Ct. ECF No. 88 at 3.

Dated: October 18, 2019          Respectfully submitted,

/s/ *Robin F. Thurston*

Javier M. Guzman
Robin F. Thurston
Jeffrey B. Dubner
*Democracy Forward Foundation*
*P.O. Box 34553*
*Washington, D.C., 20043*
*(202) 448-9090*

Emily Martin
Sunu P. Chandy
Maya Raghu
*National Women's Law Center*
*11 Dupont Center, Suite 800*
*Washington, D.C., 20036*
*(202) 588-5180*
*Counsel for Plaintiffs-Appellees*

66

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 32(g), the undersigned counsel for Plaintiffs-Appellees certifies that this brief:

(i)    complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 12,939 words, including footnotes and excluding the parts of the brief exempted by FRAP 32(f) and Circuit Rule 32(e)(1); and

(ii)    complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: October 18, 2019                /s/ *Robin F. Thurston*
                                                       Robin F. Thurston

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2019, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM-ECF system.

Dated: October 18, 2019                         /s/ *Robin F. Thurston*
                                                Robin F. Thurston

**ADDENDUM**

# TABLE OF CONTENTS

44 U.S.C. § 3501 ................................................................................................ 1

44 U.S.C. § 3506 ................................................................................................ 3

44 U.S.C. § 3507 ................................................................................................ 12

44 U.S.C. § 3508 ................................................................................................ 17

29 C.F.R. § 1602.7 ............................................................................................. 18

5 C.F.R. § 1320.10 ............................................................................................. 19

**44 U.S.C § 3501**

**Purposes**

The purposes of this subchapter are to—

(1) minimize the paperwork burden for individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government;

(2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government;

(3) coordinate, integrate, and to the extent practicable and appropriate, make uniform Federal information resources management policies and practices as a means to improve the productivity, efficiency, and effectiveness of Government programs, including the reduction of information collection burdens on the public and the improvement of service delivery to the public;

(4) improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society;

(5) minimize the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information;

(6) strengthen the partnership between the Federal Government and State, local, and tribal governments by minimizing the burden and maximizing the utility of information created, collected, maintained, used, disseminated, and retained by or for the Federal Government;

(7) provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology;

(8) ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to—

(A) privacy and confidentiality, including section 552a of title 5;

(B) security of information, including section 11332 of title 40; and

1

(C) access to information, including section 552 of title 5;

(9) ensure the integrity, quality, and utility of the Federal statistical system;

(10) ensure that information technology is acquired, used, and managed to improve performance of agency missions, including the reduction of information collection burdens on the public; and

(11) improve the responsibility and accountability of the Office of Management and Budget and all other Federal agencies to Congress and to the public for implementing the information collection review process, information resourfces management, and related policies and guidelines established under this subchapter.

**44 U.S.C. § 3506**
**Federal agency responsibilities**

(a)

(1) The head of each agency shall be responsible for—

(A) carrying out the agency's information resources management activities to improve agency productivity, efficiency, and effectiveness; and

(B) complying with the requirements of this subchapter and related policies established by the Director.

(2)

(A) Except as provided under subparagraph (B), the head of each agency shall designate a Chief Information Officer who shall report directly to such agency head to carry out the responsibilities of the agency under this subchapter.

(B) The Secretary of the Department of Defense and the Secretary of each military department may each designate Chief Information Officers who shall report directly to such Secretary to carry out the responsibilities of the department under this subchapter. If more than one Chief Information Officer is designated, the respective duties of the Chief Information Officers shall be clearly delineated.

(3) The Chief Information Officer designated under paragraph (2) shall head an office responsible for ensuring agency compliance with and prompt, efficient, and effective implementation of the information policies and information resources management responsibilities established under this subchapter, including the reduction of information collection burdens on the public. The Chief Information Officer and employees of such office shall be selected with special attention to the professional qualifications required to administer the functions described under this subchapter.

(4) Each agency program official shall be responsible and accountable for information resources assigned to and supporting the programs under such official. In consultation with the Chief Information Officer designated under paragraph (2) and the agency Chief Financial Officer (or comparable official), each agency program official shall define program information needs and develop strategies, systems, and capabilities to meet those needs.

3

(b) With respect to general information resources management, each agency shall—

(1) manage information resources to—

(A) reduce information collection burdens on the public;

(B) increase program efficiency and effectiveness; and

(C) improve the integrity, quality, and utility of information to all users within and outside the agency, including capabilities for ensuring dissemination of public information, public access to government information, and protections for privacy and security;

(2) in accordance with guidance by the Director, develop and maintain a strategic information resources management plan that, to the extent practicable—

(A) describes how information resources management activities help accomplish agency missions;

(B) includes an open data plan for data that does not concern monetary policy that—

(i) requires the agency to develop processes and procedures that—

(I) require data collection mechanisms created on or after the date of the enactment of the OPEN Government Data Act to be available in an open format; and

(II) facilitate collaboration with non-Government entities (including businesses), researchers, and the public for the purpose of understanding how data users value and use government data;

(ii) identifies and implements methods for collecting and analyzing digital information on data asset usage by users within and outside of the agency, including designating a point of contact within the agency to assist the public and to respond to quality issues, usability issues, recommendations for improvements, and complaints about adherence to open data requirements within a reasonable period of time;

(iii) develops and implements a process to evaluate and improve the timeliness, completeness, consistency, accuracy, usefulness, and availability of open Government data assets;

(iv) includes requirements for meeting the goals of the agency open data plan, including the acquisition of technology, provision of training for employees, and the implementation of procurement

4

standards, in accordance with existing law, regulation, and policy, that allow for the acquisition of innovative solutions from public and private sectors;

(v) identifies as priority data assets any data asset for which disclosure would be in the public interest and establishes a plan to evaluate each priority data asset for disclosure on the Federal Data Catalogue under section 3511 and for a determination under 3511(a)(2)(A)(iii)(I)(bb), including an accounting of which priority data assets have not yet been evaluated; and

(vi) requires the agency to comply with requirements under section 3511, including any standards established by the Director under such section, when disclosing a data asset pursuant to such section; and

(C) is updated annually and made publicly available on the website of the agency not later than 5 days after each such update;

(3) develop and maintain an ongoing process to—

(A) ensure that information resources management operations and decisions are integrated with organizational planning, budget, financial management, human resources management, and program decisions;

(B) in cooperation with the agency Chief Financial Officer (or comparable official), develop a full and accurate accounting of information technology expenditures, related expenses, and results; and

(C) establish goals for improving information resources management's contribution to program productivity, efficiency, and effectiveness, methods for measuring progress towards those goals, and clear roles and responsibilities for achieving those goals;

(4) in consultation with the Director, the Administrator of General Services, and the Archivist of the United States, maintain a current and complete inventory of the agency's information resources, including directories necessary to fulfill the requirements of section 3511 of this subchapter;

(5) in consultation with the Director and the Director of the Office of Personnel Management, conduct formal training programs to educate agency program and management officials about information resources management; and

(6) in accordance with guidance by the Director—

(A) make each data asset of the agency available in an open format; and

(B) make each public data asset of the agency available—

(i) as an open Government data asset; and

(ii) under an open license.

(c) With respect to the collection of information and the control of paperwork, each agency shall—

(1) establish a process within the office headed by the Chief Information Officer designated under subsection (a), that is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved under this subchapter, to—

(A) review each collection of information before submission to the Director for review under this subchapter, including—

(i) an evaluation of the need for the collection of information;

(ii) a functional description of the information to be collected;

(iii) a plan for the collection of the information;

(iv) a specific, objectively supported estimate of burden;

(v) a test of the collection of information through a pilot program, if appropriate; and

(vi) a plan for the efficient and effective management and use of the information to be collected, including necessary resources;

(B) ensure that each information collection—

(i) is inventoried, displays a control number and, if appropriate, an expiration date;

(ii) indicates the collection is in accordance with the clearance requirements of section 3507; and

(iii) informs the person receiving the collection of information of—

(I) the reasons the information is being collected;

(II) the way such information is to be used;

(III) an estimate, to the extent practicable, of the burden of the collection;

(IV) whether responses to the collection of information are voluntary, required to obtain a benefit, or mandatory; and

(V) the fact that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number; and

(C) assess the information collection burden of proposed legislation affecting the agency;

(2)(A) except as provided under subparagraph (B) or section 3507(j), provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to—

(i) evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility;

(ii) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information;

(iii) enhance the quality, utility, and clarity of the information to be collected; and

(iv) minimize the burden of the collection of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology; and

(B) for any proposed collection of information contained in a proposed rule (to be reviewed by the Director under section 3507(d)), provide notice and comment through the notice of proposed rulemaking for the proposed rule and such notice shall have the same purposes specified under subparagraph (A)(i) through (iv);

(3) certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information submitted to the Director for review under section 3507—

(A) is necessary for the proper performance of the functions of the agency, including that the information has practical utility;

(B) is not unnecessarily duplicative of information otherwise reasonably accessible to the agency;

(C) reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, including with respect to small entities, as defined under section 601(6) of title 5, the use of such techniques as—

(i) establishing differing compliance or reporting requirements or timetables that take into account the resources available to those who are to respond;

(ii) the clarification, consolidation, or simplification of compliance and reporting requirements; or

7

(iii) an exemption from coverage of the collection of information, or any part thereof;

(D) is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond;

(E) is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond;

(F) indicates for each recordkeeping requirement the length of time persons are required to maintain the records specified;

(G) contains the statement required under paragraph (1)(B)(iii);

(H) has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public;

(I) uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected; and

(J) to the maximum extent practicable, uses information technology to reduce burden and improve data quality, agency efficiency and responsiveness to the public; and

(4) in addition to the requirements of this chapter regarding the reduction of information collection burdens for small business concerns (as defined in section 3 of the Small Business Act (15 U.S.C. 632)), make efforts to further reduce the information collection burden for small business concerns with fewer than 25 employees.

(d) With respect to information dissemination, each agency shall—

(1) ensure that the public has timely and equitable access to the agency's public information, including ensuring such access through—

(A) encouraging a diversity of public and private sources for information based on government public information;

(B) in cases in which the agency provides public information maintained in electronic format, providing timely and equitable access to the underlying data (in whole or in part); and

(C) agency dissemination of public information in an efficient, effective, and economical manner;

(2) regularly solicit and consider public input on the agency's information dissemination activities;

(3) provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products;

(4) not, except where specifically authorized by statute—

(A) establish an exclusive, restricted, or other distribution arrangement that interferes with timely and equitable availability of public information to the public;

(B) restrict or regulate the use, resale, or redissemination of public information by the public;

(C) charge fees or royalties for resale or redissemination of public information; or

(D) establish user fees for public information that exceed the cost of dissemination; and

(5) ensure that any public data asset of the agency is machine-readable; and

(6) engage the public in using public data assets of the agency and encourage collaboration by—

(A) publishing on the website of the agency, on a regular basis (not less than annually), information on the usage of such assets by non-Government users;

(B) providing the public with the opportunity to request specific data assets to be prioritized for disclosure and to provide suggestions for the development of agency criteria with respect to prioritizing data assets for disclosure;

(C) assisting the public in expanding the use of public data assets; and

(D) hosting challenges, competitions, events, or other initiatives designed to create additional value from public data assets of the agency.

(e) With respect to statistical policy and coordination, each agency shall—

(1) ensure the relevance, accuracy, timeliness, integrity, and objectivity of information collected or created for statistical purposes;

(2) inform respondents fully and accurately about the sponsors, purposes, and uses of statistical surveys and studies;

(3) protect respondents' privacy and ensure that disclosure policies fully honor pledges of confidentiality;

(4) observe Federal standards and practices for data collection, analysis, documentation, sharing, and dissemination of information;

9

(5) ensure the timely publication of the results of statistical surveys and studies, including information about the quality and limitations of the surveys and studies; and

(6) make data available to statistical agencies and readily accessible to the public.

(f) With respect to records management, each agency shall implement and enforce applicable policies and procedures, including requirements for archiving information maintained in electronic format, particularly in the planning, design and operation of information systems.

(g) With respect to privacy and security, each agency shall—

(1) implement and enforce applicable policies, procedures, standards, and guidelines on privacy, confidentiality, security, disclosure and sharing of information collected or maintained by or for the agency; and

(2) assume responsibility and accountability for compliance with and coordinated management of sections 552 and 552a of title 5, subchapter II of this chapter, and related information management laws.

[(3) Repealed. Pub.L. 107-296, Title X, § 1005(c)(3)(C), Nov. 25, 2002, 116 Stat. 2273]

(h) With respect to Federal information technology, each agency shall—

(1) implement and enforce applicable Governmentwide and agency information technology management policies, principles, standards, and guidelines;

(2) assume responsibility and accountability for information technology investments;

(3) promote the use of information technology by the agency to improve the productivity, efficiency, and effectiveness of agency programs, including the reduction of information collection burdens on the public and improved dissemination of public information;

(4) propose changes in legislation, regulations, and agency procedures to improve information technology practices, including changes that improve the ability of the agency to use technology to reduce burden; and

(5) assume responsibility for maximizing the value and assessing and managing the risks of major information systems initiatives through a process that is—

(A) integrated with budget, financial, and program management decisions; and

      (B) used to select, control, and evaluate the results of major
   information systems initiatives.

(i)(1) In addition to the requirements described in subsection (c), each
agency shall, with respect to the collection of information and the
control of paperwork, establish 1 point of contact in the agency to act as
a liaison between the agency and small business concerns (as defined in
section 3 of the Small Business Act (15 U.S.C. 632)).

(2) Each point of contact described under paragraph (1) shall be
established not later than 1 year after the date of enactment of the
Small Business Paperwork Relief Act of 2002.

11

**44 U.S.C. § 3507**

**Public information collection activities; submission to Director; approval and delegation**

(a) An agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information—

   (1) the agency has—

      (A) conducted the review established under section 3506(c)(1);

      (B) evaluated the public comments received under section 3506(c)(2);

      (C) submitted to the Director the certification required under section 3506(c)(3), the proposed collection of information, copies of pertinent statutory authority, regulations, and other related materials as the Director may specify; and

      (D) published a notice in the Federal Register—

         (i) stating that the agency has made such submission; and
         (ii) setting forth—

            (I) a title for the collection of information;

            (II) a summary of the collection of information;

            (III) a brief description of the need for the information and the proposed use of the information;

            (IV) a description of the likely respondents and proposed frequency of response to the collection of information;

            (V) an estimate of the burden that shall result from the collection of information; and

            (VI) notice that comments may be submitted to the agency and Director;

   (2) the Director has approved the proposed collection of information or approval has been inferred, under the provisions of this section; and

   (3) the agency has obtained from the Director a control number to be displayed upon the collection of information.

(b) The Director shall provide at least 30 days for public comment prior to making a decision under subsection (c), (d), or (h), except as provided under subsection (j).

(c)(1) For any proposed collection of information not contained in a proposed rule, the Director shall notify the agency involved of the decision to approve or disapprove the proposed collection of information.

(2) The Director shall provide the notification under paragraph (1), within 60 days after receipt or publication of the notice under subsection (a)(1)(D), whichever is later.

(3) If the Director does not notify the agency of a denial or approval within the 60-day period described under paragraph (2)—

    (A) the approval may be inferred;

    (B) a control number shall be assigned without further delay; and

    (C) the agency may collect the information for not more than 1 year.

(d)(1) For any proposed collection of information contained in a proposed rule—

    (A) as soon as practicable, but no later than the date of publication of a notice of proposed rulemaking in the Federal Register, each agency shall forward to the Director a copy of any proposed rule which contains a collection of information and any information requested by the Director necessary to make the determination required under this subsection; and

    (B) within 60 days after the notice of proposed rulemaking is published in the Federal Register, the Director may file public comments pursuant to the standards set forth in section 3508 on the collection of information contained in the proposed rule;

(2) When a final rule is published in the Federal Register, the agency shall explain—

    (A) how any collection of information contained in the final rule responds to the comments, if any, filed by the Director or the public; or

    (B) the reasons such comments were rejected.

(3) If the Director has received notice and failed to comment on an agency rule within 60 days after the notice of proposed rulemaking, the Director may not disapprove any collection of information specifically contained in an agency rule.

(4) No provision in this section shall be construed to prevent the Director, in the Director's discretion—

    (A) from disapproving any collection of information which was not specifically required by an agency rule;

    (B) from disapproving any collection of information contained in an agency rule, if the agency failed to comply with the requirements of paragraph (1) of this subsection;

    (C) from disapproving any collection of information contained in a final agency rule, if the Director finds within 60 days after the

publication of the final rule that the agency's response to the Director's comments filed under paragraph (2) of this subsection was unreasonable; or

(D) from disapproving any collection of information contained in a final rule, if—

(i) the Director determines that the agency has substantially modified in the final rule the collection of information contained in the proposed rule; and

(ii) the agency has not given the Director the information required under paragraph (1) with respect to the modified collection of information, at least 60 days before the issuance of the final rule.

(5) This subsection shall apply only when an agency publishes a notice of proposed rulemaking and requests public comments.

(6) The decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review.

(e)(1) Any decision by the Director under subsection (c), (d), (h), or (j) to disapprove a collection of information, or to instruct the agency to make substantive or material change to a collection of information, shall be publicly available and include an explanation of the reasons for such decision.

(2) Any written communication between the Administrator of the Office of Information and Regulatory Affairs, or any employee of the Office of Information and Regulatory Affairs, and an agency or person not employed by the Federal Government concerning a proposed collection of information shall be made available to the public.

(3) This subsection shall not require the disclosure of—

(A) any information which is protected at all times by procedures established for information which has been specifically authorized under criteria established by an Executive order or an Act of Congress to be kept secret in the interest of national defense or foreign policy; or

(B) any communication relating to a collection of information which is not approved under this subchapter, the disclosure of which could lead to retaliation or discrimination against the communicator.

(f)(1) An independent regulatory agency which is administered by 2 or more members of a commission, board, or similar body, may by majority vote void—

(A) any disapproval by the Director, in whole or in part, of a proposed collection of information of that agency; or

(B) an exercise of authority under subsection (d) of section 3507 concerning that agency.

(2) The agency shall certify each vote to void such disapproval or exercise to the Director, and explain the reasons for such vote. The Director shall without further delay assign a control number to such collection of information, and such vote to void the disapproval or exercise shall be valid for a period of 3 years.

(g) The Director may not approve a collection of information for a period in excess of 3 years.

(h)(1) If an agency decides to seek extension of the Director's approval granted for a currently approved collection of information, the agency shall—

(A) conduct the review established under section 3506(c), including the seeking of comment from the public on the continued need for, and burden imposed by the collection of information; and

(B) after having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the control number assigned by the Director for the currently approved collection of information, submit the collection of information for review and approval under this section, which shall include an explanation of how the agency has used the information that it has collected.

(2) If under the provisions of this section, the Director disapproves a collection of information contained in an existing rule, or recommends or instructs the agency to make a substantive or material change to a collection of information contained in an existing rule, the Director shall—

(A) publish an explanation thereof in the Federal Register; and

(B) instruct the agency to undertake a rulemaking within a reasonable time limited to consideration of changes to the collection of information contained in the rule and thereafter to submit the collection of information for approval or disapproval under this subchapter.

(3) An agency may not make a substantive or material modification to a collection of information after such collection has been approved by the Director, unless the modification has been submitted to the Director for review and approval under this subchapter.

15

(i)(1) If the Director finds that a senior official of an agency designated under section 3506(a) is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved and has sufficient resources to carry out this responsibility effectively, the Director may, by rule in accordance with the notice and comment provisions of chapter 5 of title 5, United States Code, delegate to such official the authority to approve proposed collections of information in specific program areas, for specific purposes, or for all agency purposes.

(2) A delegation by the Director under this section shall not preclude the Director from reviewing individual collections of information if the Director determines that circumstances warrant such a review. The Director shall retain authority to revoke such delegations, both in general and with regard to any specific matter. In acting for the Director, any official to whom approval authority has been delegated under this section shall comply fully with the rules and regulations promulgated by the Director.

(j)(1) The agency head may request the Director to authorize a collection of information, if an agency head determines that—

(A) a collection of information—

(i) is needed prior to the expiration of time periods established under this subchapter; and

(ii) is essential to the mission of the agency; and

(B) the agency cannot reasonably comply with the provisions of this subchapter because—

(i) public harm is reasonably likely to result if normal clearance procedures are followed;

(ii) an unanticipated event has occurred; or

(iii) the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed.

(2) The Director shall approve or disapprove any such authorization request within the time requested by the agency head and, if approved, shall assign the collection of information a control number. Any collection of information conducted under this subsection may be conducted without compliance with the provisions of this subchapter for a maximum of 180 days after the date on which the Director received the request to authorize such collection.

16

**44 U.S.C. § 3508**

**Determination of necessity for information; hearing**

Before approving a proposed collection of information, the Director shall determine whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility. Before making a determination the Director may give the agency and other interested persons an opportunity to be heard or to submit statements in writing. To the extent, if any, that the Director determines that the collection of information by an agency is unnecessary for any reason, the agency may not engage in the collection of information.

**29 C.F.R. § 1602.7**
**Requirement for filing of report**

On or before September 30 of each year, every employer that is subject to title VII of the Civil Rights Act of 1964, as amended, and that has 100 or more employees shall file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as "Employer Information Report EEO–1") in conformity with the directions set forth in the form and accompanying instructions. Notwithstanding the provisions of § 1602.14, every such employer shall retain at all times at each reporting unit, or at company or divisional headquarters, a copy of the most recent report filed for each such unit and shall make the same available if requested by an officer, agent, or employee of the Commission under the authority of section 710 of title VII. Appropriate copies of Standard Form 100 in blank will be supplied to every employer known to the Commission to be subject to the reporting requirements, but it is the responsibility of all such employers to obtain necessary supplies of the form from the Commission or its delegate prior to the filing date.

**5 C.F.R. § 1320.10**

**Clearance of collections of information, other than those contained in proposed rules or in current rules**

Agencies shall submit all collections of information, other than those contained either in proposed rules published for public comment in the Federal Register (which are submitted under § 1320.11) or in current rules that were published as final rules in the Federal Register (which are submitted under § 1320.12), in accordance with the following requirements:

(a) On or before the date of submission to OMB, the agency shall, in accordance with the requirements in § 1320.5(a)(1)(iv), forward a notice to the Federal Register stating that OMB approval is being sought. The notice shall direct requests for information, including copies of the proposed collection of information and supporting documentation, to the agency, and shall request that comments be submitted to OMB within 30 days of the notice's publication. The notice shall direct comments to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for [name of agency]. A copy of the notice submitted to the Federal Register, together with the date of expected publication, shall be included in the agency's submission to OMB.

(b) Within 60 days after receipt of the proposed collection of information or publication of the notice under paragraph (a) of this section, whichever is later, OMB shall notify the agency involved of its decision to approve, to instruct the agency to make a substantive or material change to, or to disapprove, the collection of information, and shall make such decision publicly available. OMB shall provide at least 30 days for public comment after receipt of the proposed collection of information before making its decision, except as provided under § 1320.13. Upon approval of a collection of information, OMB shall assign an OMB control number and, if appropriate, an expiration date. OMB shall not approve any collection of information for a period longer than three years.

(c) If OMB fails to notify the agency of its approval, instruction to make substantive or material change, or disapproval within the 60–day period, the agency may request, and OMB shall assign without further delay, an OMB control number that shall be valid for not more than one year.

(d) As provided in § 1320.5(b) and § 1320.6(a), an agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

(e)(1) In the case of a collection of information not contained in a published current rule which has been approved by OMB and has a currently valid OMB control number, the agency shall:

(i) Conduct the review established under § 1320.8, including the seeking of public comment under § 1320.8(d); and

(ii) After having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the OMB control number for the currently approved collection of information, submit the collection of information for review and approval under this part, which shall include an explanation of how the agency has used the information that it has collected.

(2) The agency may continue to conduct or sponsor the collection of information while the submission is pending at OMB.

(f) Prior to the expiration of OMB's approval of a collection of information, OMB may decide on its own initiative, after consultation with the agency, to review the collection of information. Such decisions will be made only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. Upon notification by OMB of its decision to review the collection of information, the agency shall submit it to OMB for review under this part.

(g) For good cause, after consultation with the agency, OMB may stay the effectiveness of its prior approval of any collection of information that is not specifically required by agency rule; in such case, the agency shall cease conducting or sponsoring such collection of information while the submission is pending, and shall publish a notice in the Federal Register to that effect.