[ORAL ARGUMENT NOT SCHEDULED]
**No. 19-5130**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NATIONAL WOMEN'S LAW CENTER, et al.,
*Plaintiffs-Appellees,*
v.
OFFICE OF MANAGEMENT AND BUDGET, et al.,
*Defendants-Appellants.*

---

**Brief of Jenny R. Yang, Former Chair, Vice Chair, and Commissioner of the Equal Employment Opportunity Commission, and Patricia A. Shiu, Former Director, Office of Federal Contract Compliance Programs, Department of Labor, as *Amici Curiae* in Support of Appellees**

---

Sarah Crawford
Pamela Coukos
Working IDEAL
1875 Connecticut Ave., NW
10th Floor
Washington, DC  20009

Ellen Eardley
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
eeardley@findjustice.com
(202) 822-5100

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)
AND AS TO PRACTICABILITY OF A SINGLE *AMICUS* BRIEF
PURSUANT TO CIRCUIT RULE 29(d)**

**A. Parties and *Amici*.**

All parties, intervenors, and *amici* appearing before the District
Court are listed in the Brief for Appellants. The entities participating as
*amici* in this Court are listed in the Brief for Appellees. *Amici* Yang and
Shiu anticipate that at least two other groups of individuals and
organizations may file *amicus curiae* briefs in support of the Appellees,
including: (1) statisticians, economists, management researchers, and
employment analysts; and (2) nonprofit civil rights and women's rights
organizations.

**B. Rulings Under Review.**

The rulings at issue appear in the Brief for Appellants.

**C. Related Cases.**

An accurate statement regarding related cases appears in the
Brief for Appellees.

**D. Practicability of a Single *Amicus* Brief in Support of Appellees.**

*Amici* Yang and Shiu submit this brief as former executive branch members who oversaw and participated in modifying the longstanding EEO-1 report to include collection of compensation data. Other proposed *amici* do not share this experience and perspective. As such, joining the brief of the statisticians, economists, management researchers, and employment analysts or the brief of the non-profit civil rights and women's rights organizations is not practicable.

Dated:  October 25, 2019                    /s/ Ellen Eardley
                                            Ellen Eardley

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1) AND AS TO PRACTICABILITY OF A SINGLE AMICUS BRIEF PURSUANT TO CIRCUIT RULE 29(d)..............i

    A.    Parties and *Amici*.......................................................i

    B.    Rulings Under Review ...........................................i

    C.    Related Cases ........................................................i

    D.    Practicability of a Single Amicus Brief in Support of Appellees......................................................ii

TABLE OF AUTHORITIES.....................................................v

GLOSSARY.........................................................................viii

STATEMENT OF IDENTITY, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE PURSUANT TO FED R. APP. P 29(a)(4)(D) .................................................1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS..........................................................2

SUMMARY OF ARGUMENT ................................................3

ARGUMENT ........................................................................4

I.    OMB's Abrupt and Unjustified Stay Undermined the Rigorous and Transparent, Multi-year Process that EEOC and OFCCP Undertook to Study the Collection of Pay Data..........4

II.    Because Discriminatory Pay Disparities Often Remain Hidden, Collecting Pay Data is Vital to EEOC and OFCCP Enforcement .................................................12

    A.    Summary Pay Data Is Critical to More Effective EEOC and OFCCP Enforcement............................13

B.     Collecting Pay Data Enhances Voluntary Compliance
with Equal Pay Laws ............................................................ 18

III.    Agency Stakeholders, Including the Plaintiffs-Appellees,
Would Be Harmed by the Termination of Existing Legal
Obligations for Employers to Report Pay Data ............................ 22

IV.    The District Court Acted Within Its Authority and
Consistent with the Paperwork Reduction Act in Directing
EEOC to Take Steps to Collect Pay Data ..................................... 24

CONCLUSION ......................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES, RULES AND REGULATIONS:**

29 C.F.R. § 1602.7 ................................................................ 8

41 C.F.R. § 60-1.7(a) ........................................................... 8

41 C.F.R. § 60-2.17 ............................................................. 20

42 U.S.C. § 2000e-8(c) ........................................................ 13

42 U.S.C. § 2000e-8(d) ........................................................ 17

44 U.S.C. § 3506(c) ............................................................. 24

44 U.S.C. § 3507(a)(3) ......................................................... 24

44 U.S.C. § 3507(g) ............................................................. 24

Fed. R. App. P 29(a) ......................................................... 1, 2

**FEDERAL REGISTER:**

Non-Discrimination in Compensation; Compensation Data
    Collection Tool, 76 Fed. Reg. 49,398
    (proposed Aug. 10, 2011) ............................................. 6, 7

Exec. Order No. 13,665, 79 Fed. Reg. 20,749 (Apr. 11, 2014) ........... 12

Government Contractors, Requirement to Report Summary
    Data on Employee Compensation, 79 Fed. Reg. 46,562
    (proposed Aug. 8, 2014) ...................................... 6, 18, 19

Agency Information Collection Activities: Revision of the
    Employer Information Report (EEO-1) and Comment
    Request, 81 Fed. Reg. 5113 (proposed Feb. 1, 2016) ......... 6, 7, 8, 11,
                                                            14, 23, 24

Agency Information Collection Activities; Notice of Submission
for OMB Review, Final Comment Request: Revision of the
Employer Information Report (EEO-1), 81 Fed. Reg. 45,479
(July 14, 2016) .........................................6-7, 8, 9, 11, 13, 14, 15, 16,
17, 18, 22, 23, 25

## OTHER AUTHORITIES:

Alexandra Kalev et al., *Best Practices or Best Guesses? Assessing
the Efficacy of Corporate Affirmative Action and Diversity
Policies*, Am. Soc. Rev. 589 (2006) ................................................21

Comm. on Nat'l Statistics, Nat'l Research Council of the Nat'l
Acads., Collecting Compensation Data from Employers,
Panel on Measuring and Collecting Pay Information from
U.S. Employers By Gender, Race and National Origin
(2012) ..............................................................................................6

EEOC, Final Report: To Conduct a Pilot Study for How
Compensation Earning Data Could Be Collected From
Employers on EEOC's Survey Collection Systems (EEO-1,
EEO-4, and EEO-5 Survey Reports) and Develop Burden
Cost Estimates for Both EEOC and Respondents for Each
of EEOC Surveys (EEO-1, EEO-4, and EEO-5) (2015) ..................6

EEOC, Supporting Statement: Recordkeeping and Reporting
Requirements for Employer Information Report (EEO-1),
OMB Control No. 3046-0007 ¶(A)(8)(e)(2) (Sept. 28, 2016)..........10

Fidan Ana Kurtulus, *Affirmative Action and the Occupational
Advancement of Minorities and Women During 1973–2003*,
Indus. Rel. 213 (2012) ....................................................................21

Frank Dobbin & Alexandra Kalev, *Why Diversity Programs Fail*,
Harv. Bus. Rev. (2016) ....................................................................21

Iris Bohnet, What Works: Gender Equality by Design (2016) ..............21

Jonathan S. Leonard, *The Impact of Affirmative Action on
Employment*, J. of Lab. Econ. (1984) ..............................................21

Lauren B. Edelman, Working Law: Courts, Corporations
and Symbolic Civil Rights (2016) ....................................................20

Michele E. A. Jayne & Robert L. Dipboye, *Leveraging Diversity to Improve Business Performance: Research Findings and Recommendations for Organizations*, Hum. Resource Mgmt. (2004)..................................................................21

# GLOSSARY

EEO:        equal employment opportunity

EEO-1:      Employer Information Report EEO-1

EEOC:       Equal Employment Opportunity Commission

JA:         Joint Appendix

OFCCP:      Office of Federal Contract Compliance Programs,
            U.S. Department of Labor

OMB:        Office of Management and Budget

PRA:        Paperwork Reduction Act

## STATEMENT OF IDENTITY, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE PURSUANT TO FED R. APP. P 29(a)(4)(D)

*Amici curiae* served as government officials responsible for the interpretation and application of federal laws prohibiting pay discrimination. From 2009 to 2016, Patricia A. Shiu served as Director of the Office of Federal Contract Compliance Programs (OFCCP) at the U.S. Department of Labor. From 2013 to 2018, Jenny R. Yang served as Chair, Vice Chair, and Commissioner of the U.S. Equal Employment Opportunity Commission (EEOC). During the terms of Ms. Shiu and Ms. Yang, EEOC and OFCCP considered proposals and finalized a process to collect summary pay data from employers and contractors.

As Executive Branch members, Ms. Shiu and Ms. Yang participated in extensive administrative processes to ensure that EEOC and OFCCP fully considered the relevant statutory law, legal precedent, regulatory guidance, scientific analysis, and the factual record in considering changes to the federal reporting requirements.

*Amici* are authorized to file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) because all parties consent to its filing.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No party's counsel authored this brief in part or in whole, and no person, other than *amici* or their counsel, contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

Pay inequality based on sex, race, ethnicity, and other protected characteristics stubbornly persists in America despite federal non-discrimination in employment and equal pay laws, including Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, and Executive Order 11246, which prohibit such discrimination. The Equal Employment Opportunity Commission (EEOC) and the Office of Federal Contract Compliance Programs, Department of Labor (OFCCP), the agencies charged with enforcing such laws, recently acted to enhance their ability to address pay discrimination. Together and with Office of Management and Budget (OMB) approval pursuant to the Paperwork Reduction Act (PRA), they modified the EEO-1 Report to require covered employers to submit pay data to EEOC.

OMB, however, abruptly stayed collection of the pay data. In doing so, OMB undermined EEOC and OFCCP's multi-year efforts to study and implement effective methods to address pay discrimination and enhance enforcement. OMB's unlawful stay frustrates EEOC and OFCCP's goal of ending pay discrimination in employment, reduces the agencies' ability to ensure voluntary compliance, and impedes efficient

enforcement activities. OMB's stay also harms EEOC and OFCCP's

stakeholders who rely upon publication of summary EEO-1 data.

Finally, the District Court's March 4, 2019, order granting summary

judgment in favor of Appellees and vacating OMB's stay required EEOC

to take prompt action to implement pay data collection, which this

Administration failed to do.

### ARGUMENT

### I. OMB's Abrupt and Unjustified Stay Undermined the Rigorous and Transparent, Multi-year Process that EEOC and OFCCP Undertook to Study the Collection of Pay Data.

In August 2017, without opportunity for public notice and

comment, OMB announced a "review and immediate stay" of EEOC's

collection of pay data from covered employers, despite the fact that

OMB had approved the same collection nearly a year earlier in

September 2016. JA 175. OMB stayed the collection citing purported

"changed" circumstances, claiming that the public had not had an

opportunity to comment on EEOC's data file specifications for

formatting a spreadsheet that employers may use for the submission of

pay data, and arguing that EEOC's burden estimates did not account

for the data file specifications. *Id*. The District Court correctly rejected

this assertion because the data file specifications simply consisted of a sample spreadsheet and explanation of how to format the spreadsheet – it did not change the content or burden of the information collected. JA 163-166. OMB's justification for the stay is belied by the robust administrative process during which EEOC described in detail the information it proposed to collect, which led to OMB's earlier approval of the data collection. Indeed, the government has not defended OMB's assertions in this appeal.

OMB's decision to abruptly halt the pay data collection stands in stark contrast to the rigorous efforts that gave rise to the pay data collection. In 2010, the National Equal Pay Enforcement Task Force, led by the White House, and comprised of members from EEOC, the Department of Labor's OFCCP and Women's Bureau, the Department of Justice's Civil Rights Division, and the Office of Personnel Management, identified the government's lack of pay data as a key obstacle to understanding and reducing the wage gap.

Over the next six years, EEOC and OFCCP, which are charged with enforcing equal pay laws, engaged in a rigorous and transparent process to study and obtain public input on how to collect pay data from

employers to strengthen enforcement, without unnecessarily burdening

employers. In 2012, the National Research Council of the National

Academies prepared a report with recommendations,[1] and EEOC

commissioned an independent pilot study to identify the most efficient

means of collecting pay data and the most appropriate statistical tests

for analyzing compensation data.[2] EEOC held a public hearing, and the

agencies published multiple notices in the Federal Register from 2011

through 2016[3] with opportunities for all stakeholders, including

employers and contractors to provide comments.

---

[1]     Comm. on Nat'l Statistics, Nat'l Research Council of the Nat'l Acads., Collecting Compensation Data from Employers, Panel on Measuring and Collecting Pay Information from U.S. Employers By Gender, Race and National Origin (2012).

[2]     EEOC, Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected From Employers on EEOC's Survey Collection Systems (EEO-1, EEO-4, and EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5) (2015), *available at* https://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf.

[3]     Non-Discrimination in Compensation; Compensation Data Collection Tool, 76 Fed. Reg. 49,398 (proposed Aug. 10, 2011); Government Contractors, Requirement to Report Summary Data on Employee Compensation, 79 Fed. Reg. 46,562 (proposed Aug. 8, 2014); Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1) and Comment Request, 81 Fed. Reg. 5113 (proposed Feb. 1, 2016); Agency Information Collection Activities;

In 2011, OFCCP issued an Advance Notice of Proposed Rulemaking, inviting public input on the development and implementation of a compensation data collection tool. Non-Discrimination in Compensation; Compensation Data Collection Tool, 76 Fed. Reg. 49,398 (proposed Aug. 10, 2011). In 2014, OFCCP issued a Notice of Proposed Rulemaking proposing to amend one of its implementing regulations for Executive Order 11246 to add a requirement that certain federal contractors submit compensation data reports to OFCCP. Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1) and Comment Request, 81 Fed. Reg. 5113 (proposed Feb. 1, 2016). Drawing from one of the recommendations of the National Academies' 2012 Report, OFCCP's proposed approach to pay data relied on the existing EEO-1 job categories. Thus, the approach of reporting pay data by EEO-1 job categories, which EEOC and OFCCP ultimately adopted, was part of the public conversation as early as 2012. Public comments submitted to OFCCP argued for the need to improve interagency coordination. *Id.*  A

_____

Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), 81 Fed. Reg. 45,479 (July 14, 2016).

7

number of commenters recommended that instead of having OFCCP develop a new pay data collection tool, that employers could report pay using EEOC's existing EEO-1 survey. *Id.*

The EEO-1 survey, authorized by Title VII and its implementing regulations, requires employers with 100 or more employees and federal contractors with 50 or more employees to report workforce demographic data by race, ethnicity, gender, and job category. 29 C.F.R § 1602.7. For over 50 years, EEOC and OFCCP have used EEO-1 workforce demographic data to identify trends, inform investigations, and focus resources. *Id.*; 41 C.F.R. § 60-1.7(a).

Responding to the concerns about interagency coordination and employer burden, EEOC initiated the extensive public consultation process required by the PRA to amend the EEO-1 to include pay data. 81 Fed. Reg. at 5113; 81 Fed. Reg. at 45,480. The Commission completed a pilot study, published two versions of the proposed data collection for public comment, and convened a public hearing. *Id.* at 45,480. EEOC considered hundreds of written comments from thousands of individuals, employers, civil rights and women's organizations, human resources and payroll associations, academics,

and Members of Congress. *Id.* EEOC refined the proposal in response to comments, including with regard to the type of data that would be collected, the time period for data collection, and the additional lead time provided for employers to prepare their reports.  In addition, EEOC directly collaborated with OFCCP in developing the pay data collection, so EEOC had the benefit of information obtained during OFCCP's prior rulemaking effort, including recommendations provided in the thousands of comments submitted in response to OFCCP's prior Federal Register notices on pay data collection.

During the extensive notice-and-comment process, some industry groups and large organizations surveyed their members and provided EEOC with estimates of the hours required to complete the proposed revised EEO-1. Consistent with EEOC's burden estimates, over two thirds of commenters that surveyed their members indicated that it would take twenty hours or fewer. The Society for Human Resources Management reported that in its survey of members, eighty percent estimated that the revised EEO-1 Form would require thirty hours or less to file. Another industry group's members indicated that it would take five hours or fewer to provide the data.

The agency concluded that the substantial benefits achieved through more effective enforcement and greater prevention of pay discrimination far outweighed this limited reporting burden. With the approval of a Commission vote, EEOC finalized the changes to the EEO-1 to collect summary pay data in 2016. JA 285. The pay data collection became known as Component 2 of the EEO-1 report.

OMB approved the revised EEO-1 and the pay data collection on September 29, 2016. EEOC originally proposed an employer reporting deadline of September 30, 2017. In response to employer feedback, EEOC granted a six-month extension to March 31, 2018. This extension allowed employers to use calendar year W-2 information for their EEO-1 reports and provided employers and human resources information system vendors with additional time to update their recordkeeping and reporting systems.[4]

The data collection requires covered employers to provide annual reports to EEOC with summary data about employee pay, broken down by job category, sex, race, and ethnicity. Agency Information Collection

---

[4]     EEOC, Supporting Statement: Recordkeeping and Reporting Requirements for Employer Information Report (EEO-1), OMB Control No. 3046-0007 ¶(A)(8)(e)(2) (Sept. 28, 2016).

Activities; Notice of Submission for OMB Review, Final Comment

Request: Revision of the Employer Information Report (EEO-1), 81 Fed.

Reg. 45,479, 45,480 (July 14, 2016). To report pay information,

employers can provide data electronically, utilizing W-2 compensation

data and drawing from their existing human resources databases

without incurring significant burden. 81 Fed. Reg. at 45,494, 45497; 81

Fed. Reg. at 5115, 5119. The pay data reporting requirement applies

only to larger employers with 100 or more employees. 81 Fed. Reg. at

45483. EEOC provided employers with over a year to prepare to submit

this data and extended the reporting deadline in response to employer

feedback.

Circumventing the transparent and extensive public notice-and-

comment process set out under the PRA, in August 2017, OMB

announced a "review and immediate stay" of the EEO-1 pay data

collection. JA 175-176. With a memorandum just over a page in length,

OMB provided no opportunity for public notice or comment before it

abruptly halted the pay data collection. *Id.*

## II.    Because Discriminatory Pay Disparities Often Remain Hidden, Collecting Pay Data is Vital to EEOC and OFCCP Enforcement.

Pay discrimination remains a persistent problem that has proven difficult for EEOC and OFCCP to address because of a culture of secrecy surrounding pay. All too often, workers have no idea they are being paid less than others doing the same job. Even when employees learn of pay discrimination, they are often silenced by a fear of retaliation. That is why President Obama issued an executive order to bar federal contractors and subcontractors from retaliating or discriminating against an employee or applicant for discussing pay. Exec. Order No. 13,665, 79 Fed. Reg. 20,749 (Apr. 11, 2014).

Moreover, some employers do not systematically evaluate employee compensation, leaving them unaware of discriminatory pay disparities. As a result, these employers fail to take action to rectify pay discrimination, in violation of Title VII, Executive Order 11246, as well as state and local laws.

EEOC and OFCCP carefully designed Component 2 of the EEO-1 to overcome these persistent challenges to pay equality. The Component 2 collection that OMB approved in 2016 prevents pay discrimination by

ensuring efficient use of the agencies' limited resources in enforcing the law and promoting voluntary compliance. OMB's 2017 review and stay of the pay data collection frustrates EEOC's and OFCCP's goals and leaves pay secrecy and other obstacles to ending pay disparities intact.

## A. Summary Pay Data Is Critical to More Effective EEOC and OFCCP Enforcement.

Title VII authorizes EEOC to collect data from employers as reasonable, necessary, and appropriate for enforcement.  42 U.S.C. § 2000e-8(c).  Collection of pay data, as originally approved by OMB, is reasonable, necessary, and appropriate for enforcement because it enables EEOC to focus its resources and make early assessments of EEOC charges. It also makes the OFCCP's enforcement activities more efficient.  Without the Component 2 data, EEOC has no access to aggregate compensation information without resorting to a detailed data request or subpoena. 81 Fed. Reg. at 45483.

In developing Component 2 of the EEO-1, EEOC and OFCCP carefully considered how compensation data could be used to enhance enforcement. For example, EEOC and OFCCP consulted with the Department of Justice on "how EEO-1 pay data would be used to assess complaints of discrimination, focus investigations and identify

employers with existing pay disparities that might warrant further examination." 81 Fed. Reg. at 5115. EEOC also tested sample databases and analyses and engaged in a pilot study. 81 Fed. Reg. at 45,490. Ultimately, EEOC and OFCCP determined that W-2 data along with hours worked data by EEO-1 job category would enhance enforcement without overburdening employers. *Id.* at 45,479-97. EEOC worked to develop a software tool to allow its investigators to examine demographic W–2 pay by employer and to compare such data to aggregate industry or metropolitan-area data. 81 Fed. Reg. at 5118.

Before the development of Component 2, EEOC's EEO-1 analytic software allowed administrative staff to assess the distribution of different demographics (sex, race, and ethnicity) in an employer's job groups. 81 Fed. Reg. at 45,490. EEOC intended to add compensation information to this tool to improve early assessment of EEOC charges. *Id.* After a substantial number of employers submitted Component 2 data, EEOC could use the software to help evaluate claims of compensation discrimination, including how to focus a potential investigation, and what kind of additional information or data to

14

request from employers in order to evaluate the pay discrimination claims. *Id.*

The Component 2 data, like the longstanding EEO-1 data collection, is particularly useful in providing context for a claim against a particular employer in order to improve the early review of EEOC charges. For example, if EEOC received a charge alleging pay discrimination based on gender by XYZ Company, EEOC's enforcement staff could use its analytic tool to generate a report comparing the pay of men and women in the same EEO-1 job category at XYZ Company and using statistical tools to determine if significant disparities existed. EEOC investigators could also compare women's pay at XYZ Company with women's pay at similar employers in the labor market – to determine whether gender pay gaps are larger or smaller at XYZ Company compared to its peers (other companies in the same industry). After considering results of these types of analyses and the allegations in the charge, EEOC enforcement staff could better decide how to focus its investigation. 81 Fed. Reg. at 45,490.

Though some critics object to EEOC's reliance on statistical analyses of data reported in broad EEO-1 pay bands, EEOC always

intended its statistical analysis of an employer's Component 2 data as one piece of information in a broader assessment of a charge. For example, comparing one employer's Component 2 data with industry peers – who may have a broadly similar mix of jobs or draw upon similar types of workers – could reduce the degree of variation within the EEO-1 categories. This means that information not explicitly captured by Component 2 data, such as differences in job titles, or education levels, may be broadly similar among peer employers, and less likely to explain away gender, race or ethnicity-based disparities.

Critically, EEOC would not assume that differences in Component 2 data are due to pay discrimination, but would continue to examine specific information and additional data provided by an employer regarding each charge. EEOC embarked on the Component 2 data collection to enhance and streamline early assessment of EEOC charges, not to eliminate an employer's opportunity to "explain its practices, provide additional data, and explain the non-discriminatory reasons for its pay practices and decisions." 81 Fed. Reg. at 45490. The EEOC pilot study, which OMB relied upon in approving Component 2, concluded that "even if collecting income data in bands results in a loss

of information, that loss would likely be small and of little concern to many researchers, and would be balanced by reduced cost and burden." *Id.*

EEOC's ability to share Component 2 data with certain state and local fair employment practices agencies, charged with enforcing state and local civil rights laws, would also increase EEOC's enforcement efficiences. 42 U.S.C. § 2000$_e$-8(d). EEOC enters into work-sharing agreements with certain state and local fair employment practices agencies to share the burden of EEOC administrative complaint investigations. *Id.* These agencies would have access to the Component 2 data and could utilize the data to bolster their initial complaint assessments, in turn, further enhancing EEOC enforcement efficiency.

The Component 2 data could similarly benefit OFCCP's enforcement activities. As OFCCP noted in 2014 when it proposed collecting certain pay data from covered contractors (a proposal which ultimately led to the creation of Component 2), collecting compensation information would allow OFCCP:

> to identify and prioritize contractors and subcontractors that are likely to have possible compensation violations, and strategically deploy its enforcement resources to investigate those contractors. In an era of increased demand for

17

> productivity with dwindling resources, this enhanced data
> collection will inure to the benefit of both OFCCP and
> compliant Federal contractors and subcontractors.

79 Fed. Reg. at 46,654. OMB's review and stay of the Component 2 pay

data collection frustrates OFCCP's enforcement activities by making

them less efficient.

These enforcement benefits are heightened because of the limited

information available to individual employees who suspect they may be

underpaid due to discrimination. Summary information about

compensation by gender, race or ethnicity improves the ability of EEOC

and OFCCP to carry out their important legal mandates.

## B. Collecting Pay Data Enhances Voluntary Compliance with Equal Pay Laws.

Requiring employers to report summary pay data fosters

increased voluntary compliance with equal pay laws because it creates

a formal mechanism to institutionalize the regular collection and review

of compensation data. *See* 81 Fed. Reg. at 45,491 ("The EEOC's

publication of aggregated pay data, in conjunction with the employer's

preparation of the EEO–1 report itself, may be useful tools for

employers to engage in voluntary self-assessment of pay practices.").

OFCCP noted the importance of such voluntary compliance when it proposed a similar data collection of compensation data, which eventually led to interagency cooperation to create Component 2. *See* Government Contractors, Requirement to Report Summary Data on Employee Compensation, 79 Fed. Reg. 46,562, (proposed Aug. 8, 2014) ("The OFCCP believes that collecting and strategically using this summary [compensation] data would have a significant deterrent effect and impact on OFCCP's enforcement program. Voluntary compliance and self-assessments by Federal contractors are critical components of this NPRM. . .").

With Component 2, EEOC and OFCCP intended to motivate employers to improve or establish systems and practices to collect and review compensation data. Covered employers need to review their pay data by demographics at least at a summary level every year. By formalizing and institutionalizing pay data reporting, collecting Component 2 data makes it more likely that employers will identify and address pay equity on their own – increasing the Component 2's positive impact.

19

Although existing laws and regulations either require employers to implement regular pay equity analyses, or create strong risk management incentives to do so, practical limitations mean progress remains uneven. Covered federal contractors must include regular self-analysis of compensation by race, ethnicity, and gender as part of their EEO obligations, and all employers are potentially subject to public or private enforcement actions under federal or state laws banning pay discrimination. 41 C.F.R. § 60–2.17.  Social scientists who study the workplace have found that formal legal requirements may not matter as much as the structures, systems and practices that companies establish to comply with those rules – and without strong and substantive programs, those formal rules may not in practice lead to meaningful diversity improvements.[5]

The efforts of EEOC and OFCCP to foster employers' self-analysis of compensation data is grounded in research that suggests that metrics and accountability are particularly effective in improving EEO and diversity outcomes. Research has found that many popular anti-

---

[5]   *See generally* Lauren B. Edelman, Working Law: Courts, Corporations and Symbolic Civil Rights (2016).

discrimination interventions, like training, appear to be far less effective than approaches focused on measurement, transparency and accountability.[6]  Collecting data and reviewing results are particularly salient.[7]

Research on similar regulatory schemes also suggests that the existence of formalized reporting and compliance mechanisms are linked to better diversity and EEO outcomes. For example, research on federal contractors has identified a relationship between affirmative action programs—which require companies to establish written plans, review data, set goals and monitor progress—and progress in the workplace for women and workers of color.[8]

---

[6]    Iris Bohnet, What Works: Gender Equality by Design (2016); Frank Dobbin & Alexandra Kalev, *Why Diversity Programs Fail*, Harv. Bus. Rev. (2016); Michele E. A. Jayne & Robert L. Dipboye, *Leveraging Diversity to Improve Business Performance: Research Findings and Recommendations for Organizations*, Hum. Resource Mgmt. (2004); Alexandra Kalev et al., *Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies*, Am. Soc. Rev. 589 (2006).

[7]    Bohnet, *supra* note 6; Dobbin & Kalev, *supra* note 6.

[8]    *See, e.g.*, Fidan Ana Kurtulus, *Affirmative Action and the Occupational Advancement of Minorities and Women During 1973–2003*, Indus. Rel. 213 (2012); Jonathan S. Leonard, *The Impact of Affirmative Action on Employment*, J. of Lab. Econ. (1984).

These research findings suggest Component 2 collection should cause employers to pay much closer attention to their own pay data and practices at the time they prepare and file reports. Further, collection of Component 2 data incentivizes employers and contractors to adopt, implement, and examine the results of regular self-analysis programs. Thus, as employers ready their Component 2 submissions, they have the opportunity to independently find—and resolve—any pay equity issues without the need for EEOC or OFCCP enforcement action. OMB's stay thwarts such opportunities to foster voluntarily internal compliance with the equal pay laws.

## III. Agency Stakeholders, Including the Plaintiffs-Appellees, Would Be Harmed by the Termination of Existing Legal Obligations for Employers to Report Pay Data.

Workers and their advocates also have a stake in pay data reporting and the outcome of this litigation. JA 299–300. Workers' advocates and academics have long utilized aggregate EEO-1 data to conduct research, track trends over time, and advocate for reform. *Id*. Employers also benefit from publicly available aggregate EEO-1 data, which can be used to compare data and set industry benchmarks within a specific geographic area. 81 Fed. Reg. at 45,491. As EEOC stated in

the Federal Register notice, "The EEOC's publication of aggregated pay data, in conjunction with the employer's preparation of the EEO-1 report itself, may be useful tools for employers to engage in voluntary self-assessment of pay practices." *Id.*

Consistent with its longstanding practice, EEOC affirmed, in the July 2016 Federal Register notice, its intent to publish aggregate EEO-1 data, including aggregate pay data. *Id.*; 81 Fed. Reg. at 5118. While the confidentiality provision of Title VII prohibits the release of individually identifiable information, EEOC has long published aggregate EEO-1 workforce demographic data by industry and region. *Id.*

EEOC also periodically issues special reports using aggregate EEO-1 data. *Id.* For example, EEOC has published reports analyzing aggregate EEO-1 data by industry, for example, in the tech industry, finance, media, and law firms. *Id.* EEOC also publishes reports analyzing aggregate EEO-1 data focusing on workforce representation of particular demographic groups, for example women of color. *Id.*

Just as EEOC has long published aggregate EEO-1 workforce demographic data, EEOC made clear its intent to publish aggregate

EEO-1 pay data for use by academics, employers, workers and their advocates to further the agency's mission to promote equal employment opportunity. *Id.*

### IV. The District Court Acted Within Its Authority and Consistent with the Paperwork Reduction Act in Directing EEOC to Take Steps to Collect Pay Data.

When employers suggested that pay data collection should utilize the existing EEO-1 rather than a new reporting mechanism issued by OFCCP, EEOC initiated and completed the rigorous process required under the PRA. 81 Fed. Reg. at 5115. The PRA mandates that federal government agencies receive approval from OMB before promulgating a paper form, website, survey or electronic submission that will impose an information collection burden on the general public. 44 U.S.C. § 3507(a)(3). Once obtained, OMB approval for the information collection must be renewed every three years. *Id.* § 3507(g). In accordance with the PRA, EEOC regularly submits to OMB a request for a three-year approval of the EEO-1 data collection. 81 Fed. Reg. at 5113.

The PRA imposes procedural requirements regarding information collection. The agency must determine a specific objective, develop a plan for use of the information, and in some cases, test the collection

method through a pilot program. 44 U.S.C. § 3506(c). The agency must ensure that forms include an explanation of the purposes of the information collection, an estimate of the burden, and whether the response is voluntary. *Id.* In most cases, agencies are required to publish a notice of a proposed information collection in the Federal Register and allow at least sixty days for public comments on the need for and burden of the requirement. *Id.* In short, the PRA subjects information collections to periodic review on a regular schedule, with the benefit of public input.

Before approving the changes to the EEO-1 in 2016, EEOC complied with these requirements of the PRA. EEOC made clear the objective of pay data collection, developed a plan for the use of pay data, conducted a pilot study, published a notice in the Federal Register, provided an estimate of the reporting burden, and incorporated changes to the proposed collection in response to public input. 81 Fed. Reg. 45479, 45480. The agency also convened a public meeting to hear testimony from experts, advocates, and stakeholders. *Id.*

By contrast, during the current administration, OMB sought to circumvent these legal requirements by issuing a brief memorandum

that was just over a page in length, without sufficient justification or

opportunity for public input. In vacating OMB's stay of pay data

collection, the District Court concluded that OMB acted illegally

because the decision to stay the collection "totally lacked the reasoned

explanation" required by law and that OMB violated its own

regulations, while "EEOC proceeded exactly as planned and as OMB

had approved." JA 162. The District Court also concluded that the

record failed to support assertions of changed circumstances. JA 170. In

April 2019, the court ruled that employers must comply with the

existing legal obligation and report the required wage data for 2017 and

2018 to EEOC by September 30, 2019. JA 3-4.

Because the District Court concluded that OMB acted illegally in

staying the collection, the collection that was approved by a

Commission vote and by OMB in 2016 remained in effect. JA 3-4, 174.

The District Court's ruling obligated EEOC to move forward with the

pay data collection in accordance with the procedures set out under the

PRA. *Id.* EEOC's failure to take prompt action to comply with the

summary judgment order justified the District Court's order of ancillary

relief, in the form of periodic status reports and the establishment of a standard to measure compliance with the reporting requirement.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court affirm: (1) the District Court's March 3, 2019, order granting summary judgment in Appellees' favor, vacating OMB's stay, and ruling that OMB's previous approval of the EEO-1 form containing the pay data collection is in full effect; and (2) its April 25, 2019 remedial order directing steps to ensure that EEOC collects the pay data.


Dated: October 25, 2019                    /s/ Ellen Eardley

                                           Ellen Eardley
                                           Mehri & Skalet, PLLC
                                           1250 Connecticut Ave., NW
                                           Suite 300
                                           Washington, DC  20036
                                           eeardley@findjustice.com
                                           (202) 822-5100

                                           Sarah Crawford
                                           Pamela Coukos
                                           Working IDEAL
                                           1875 Connecticut Ave., NW
                                           10th Floor
                                           Washington, DC  20009

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 32(g), I certify that this brief: (i) complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 5,396 words, including footnotes; and (ii) complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated:  October 25, 2019                    /s/ Ellen Eardley
                                            Ellen Eardley

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM-ECF system.

Dated:  October 25, 2019                    /s/ Ellen Eardley
                                            Ellen Eardley