[NOT SCHEDULED FOR ORAL ARGUMENT]

**No. 19-5130**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**National Women's Law Center,** *et al.,*

*Plaintiffs-Appellees,*

**v.**

**Office of Management and Budget,** *et al.,*

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Columbia
Case No. 1:17-cv-02458-TSC, Honorable Tanya S. Chutkan

---

**BRIEF *AMICI CURIAE* OF 9TO5, NATIONAL ASSOCIATION OF WORKING WOMEN; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; A BETTER BALANCE; COALITION OF LABOR UNION WOMEN; EQUAL RIGHTS ADVOCATES; EMPLOYEE RIGHTS ADVOCACY INSTITUTE FOR LAW & POLICY; CALIFORNIA WOMEN'S LAW CENTER; FAMILY VALUES @ WORK; GENDER JUSTICE; INSTITUTE FOR WOMEN'S POLICY RESEARCH; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; LEGAL MOMENTUM; LEGAL VOICE; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; THE NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE; NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; NATIONAL EMPLOYMENT LAW PROJECT; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; WOMEN EMPLOYED; THE WOMEN'S LAW CENTER OF MARYLAND; AND WOMEN'S LAW PROJECT IN SUPPORT OF APPELLEES SUPPORTING AFFIRMANCE**

_____

Ryan E. Griffin
James & Hoffman, P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, DC 20036
(202) 496-0500
regriffin@jamhoff.com

Counsel for *Amici Curiae*

Dated: October 25, 2019

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici:** All parties appearing in this Court are listed in the Brief for Appellants. All *amici* participating in the district court are listed in the Brief for Appellants. All *amici* participating as *Amici Curiae* in support of Appellants in this Court are listed in the brief filed by the Chamber of Commerce of the United States of America, *et al*. In addition to the parties to this brief, counsel understands that additional *amici* participating as *Amici Curiae* in support of Appellees in this Court are likely to include Jenny Yang, former Chair, U.S. Equal Employment Opportunity Commission; Patricia Shiu, former Director, U.S. Office of Federal Contract Compliance Programs; and the various individuals listed in Appendix A to the Brief of Statisticians, Economists, Management Researchers, and other Employment Analysts in support of Appellees.

**B. Rulings Under Review:** An accurate reference to the rulings at issue appears in the Brief for Appellants.

**C. Related Cases:** An accurate statement regarding related cases appears in the Brief for Appellants.

Dated: October 25, 2019                    /s/ Ryan E. Griffin
                                            Ryan E. Griffin

                                            Counsel for *Amici Curiae*

i

### CERTIFICATE OF COUNSEL REGARDING FILING OF SEPARATE BRIEF

Undersigned counsel hereby certifies as follows regarding the basis for filing this brief separately from other amicus briefs in support of Appellees:

A. *Amici Curiae* listed on this brief have joined together on this brief consistent with the purposes of the single brief requirement of Circuit Rule 29(d).

B. It is my understanding after conferring with counsel for Appellees that certain members of Congress and various state and local fair employment agencies may also file amicus briefs in support of Appellees. Because Circuit Rule 29(d) is inapplicable to governmental entities, *Amici Curiae* here have not sought to join with these potential amici in a single brief.

C. I am also aware of two additional amicus briefs to be filed in support of Appellees: one on behalf of former Obama Administration officials including Jenny Yang, former Chair, U.S. Equal Employment Opportunity Commission (EEOC), and Patricia Shiu, former Director, U.S. Office of Federal Contract Compliance Programs (OFCCP); and the other on behalf of a group of individual Statisticians, Economists, Management Researchers, and other Employment Analysts. After conferring with the counsel preparing each of these briefs, I believe that it would not be practicable for the *amici* herein to join with them in a single brief due to the differing expertise and perspectives each group of *amici* offers on the issues being presented for review. I further believe after conferring with

counsel that filing the instant brief will not be duplicative of the other two briefs referenced in this paragraph because those *amici* intend to present arguments distinct from those presented here, including arguments regarding the EEOC and OFCCP's roles in revising the EEO-1, the statistical usefulness of the data to be collected thereunder, and the degree of burden that such data collection may impose on employers.

D. Other than those potential amicus briefs described in Paragraphs B and C above, undersigned counsel is unaware of any other potential amicus briefs to be filed in support of Appellees.

Dated: October 25, 2019                    /s/ Ryan E. Griffin
                                           Ryan E. Griffin

                                           Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *Amici Curiae* state that none of the entities joining this brief has a parent corporation or a publicly held company that owns 10% or more of its stock.

**Table of Contents**

**Page**

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES** ........i

**CORPORATE DISCLOSURE STATEMENT** ....................................iv

**TABLE OF CONTENTS** ...........................................................v

**TABLE OF AUTHORITIES** ...................................................... vii

**GLOSSARY** ...........................................................................xi

**STATUTES AND REGULATIONS** .............................................. xii

**IDENTITY OF *AMICI*, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE** ............................................ xiii

**SUMMARY OF ARGUMENT** ......................................................1

**ARGUMENT** ...........................................................................2

    **1. The Sex-Based Wage Gap Is Stubbornly Persistent, Especially for Women of Color** ....................................................................3

    **2. Component 2 of the EEO-1 is Essential to Closing the Sex-Based Wage Gap** ........................................................................9

        **A. Component 2 Data Would Enhance EEOC and OFCCP Enforcement and Education Efforts** ....................................9

        **B. Component 2 Data Would Complement EEOC and OFCCP Enforcement Efforts by Fostering Employer Self-Assessment and Enabling Data-Driven Advocacy.** ....................................12

        **C. Component 2 Data Would Bolster State and Local Policymaking Initiatives** ................................................16

**CONCLUSION** .......................................................................17

**CERTIFICATE OF COMPLIANCE** .................................................................19

**CERTIFICATE OF SERVICE** .........................................................................20

**APPENDIX:  IDENTITY AND INTERESTS OF *AMICI*** ................................21

<h1 style="text-align:center">T<small>ABLE OF</small> A<small>UTHORITIES</small></h1>

**Page(s)**

## Cases

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 645 (2007) ....................8

## Statutes and Regulations

81 FR 45,479 (July 14, 2016) ...................................................................3–4, 9–13

Equal Pay Act of 1963,
    29 U.S.C. § 206(d)..............................................................................3,10–11

Civil Rights Act of 1964,
    42 U.S.C. § 2000e- 5(b) to 42 U.S.C. § 2000e-9 ...................................3,8,10

## Other Authorities

Am. Ass'n Univ. Women, *State and Local Salary
    History Bans* (July 31, 2019)........................................................................16

Anthony Carnevale et al., Georgetown Univ. Ctr. on Educ. and the
    Workforce, *Women Can't Win: Despite Making Educational
    Gains and Pursuing High-Wage Majors, Women Still
    Earn Less than Men* (2018). ..........................................................................4

Ariane Hegewisch & Adiam Tesfaselassie, IWPR Fact Sheet #C484, *The
    Gender Wage Gap: 2018: Earnings Differences by Gender, Race, and
    Ethnicity* (Sept. 2019). ...................................................................................4

Ariane Hegewisch & Adiam Tesfaselassie, Inst. for Women's Policy Research,
    *The Gender Wage Gap by Occupation* (Apr. 2, 2019)...............................5–6

Buck Gee & Denise Peck, Ascend, *The Illusion of Asian Success: Scant Progress
    for Minorities in Cracking the Glass Ceiling from 2007–2015.* ...................14

Christianne Corbett & Catherine Hill, Am. Ass'n of Univ. Women,

vii

*Graduating to a Pay Gap: The Earnings of Women and Men One Year After College Graduation* (2012)............................................................5

Corinne A. Moss-Racusin, *et al*., *Science Faculty's Subtle Gender Biases Favor Male Students*, 109 Proc. Nat'l Acad. Sci., (Oct. 2012)................................................................6

Ctr. for Employment Equity, *Is Silicon Valley Tech Diversity Possible Now?*........................................................15

Donald Tomaskovic-Devey, Ctr. for Employment Equity, *Industry Employment Brief: Employment Patterns in the Oil & Gas Industries* (June 2016).........................................................14

Donald Tomaskovic-Devey et al., *Private Sector Industry Disparities: A Report on Evidence of Systemic Disparities for Women, African Americans, Hispanics, Asians and Native Americans*.........................................................11

EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1)*.........................................................11–12

Emiliano J. Castilla, *Gender, Race, and Meritocracy in Organizational Careers*, 113 Am. J. Soc. 1479 (May 2008)........................................7

Francine D. Blau & Lawrence M. Kahn, *The Gender Wage Gap: Extent, Trends, and Explanations*, 55 J. Econ. Lit. (2017)..................6

EEOC, *Advancing Opportunity: A Review of the Systemic Program of the U.S. Equal Employment Opportunity Commission* (July 7, 2016)........................................................10–11

Inst. for Women's Policy Research, *Status of Women in the States: Employment & Earnings* (last visited Oct. 19, 2019).....................................4

Inst. for Women's Policy Research, *Pay Secrecy and Wage Discrimination* (Jan. 2014)........................................................7

Jeff Green & Paige Smith, *Intel to Share Gender, Racial Pay Data Most Companies Conceal*, Daily Labor Rpt., Oct. 17, 2019.................................................................13

Jeffrey Lowe, Major, Lindsey & Africa LLC, *Partner Compensation Survey 2016* (2016)..................................................5

Jessica L. Semega et al., *Income and Poverty in the United States: 2018*, Current Population Reports P60-266 (2019). ..............................................3

Joe Davidson, *High Tech Firms Lag in Diversity, EEOC Says*, The Washington Post (May 23, 2016).............................................15

Lilly Ledbetter*, My #MeToo Moment*, *The New York Times* (Apr. 9, 2018). ...................................................................7– 8

Marianne Bertrand et al., *Dynamics of the Gender Gap for Young Professionals in the Financial and Corporate Sectors*, 2 Am. Econ. J.: Applied Econ. (2010) ............................................5

Maya Beasley, *There is a Supply of Diverse Workers in Tech, So Why is Silicon Valley So Lacking in Diversity?*, Center for American Progress (Mar. 29, 2017). ......................................15–16

Nancy L. Gunzenhauser, Epstein Becker Green, *The EEOC Advocates for a More Diverse Technology Industry* (July 26, 2016). ..........15

Nat'l Women's Law Ctr., *Workplace Justice: Progress in the States for Equal Pay* (June 2018). ................................................17

*Navigating the Growing Pay Equity Movement: What Employers Need to Know About What to Do*, Harvard Bus. Rev. Analytic Servs. (2019) .......................................................8–9, 12

Open Mic, *Breaking the Mold: Investing in Racial Diversity in Tech* (Feb. 2017)...........................................................16

Rebecca Greenfield, *Big U.S. Banks Resist Pressure for More Gender Pay Gap Disclosure*, Bloomberg News, Feb. 13, 2019. .................9

Seth Fiegerman, *Facebook and Microsoft Say They've Eliminated the Gender Pay Gap*, Mashable, Apr. 11, 2016 ............................................13

Shelly J. Correll, et al., Getting a Job: Is There a Motherhood Penalty?, 112 Am. J. Soc. (Mar. 2007). ......................................................6–7

U.S. Equal Employment Opportunity Commission, *Diversity in High Tech* (2016). ...................................................................................14–15

U.S. Gov't General Accounting Office, *Diversity in the Technology Sector: Federal Agencies Could Improve Oversight of Equal Employment Opportunity Requirements*, Report to the Ranking Member, Committee on Education and the Workforce, House of Representatives (Nov. 2017). ..................................................................................................16

Valerie Bolden-Barrett, *Salesforce Drops $6M to Close its Gender Pay Gap*, HR Dive, Sept. 29, 2017..................................................13

## GLOSSARY

EEO-1      EEO-1 Report

EEOC       Equal Employment Opportunity Commission

EPA        Equal Pay Act of 1963

OFCCP      Office of Federal Program Contract Compliance

OMB        Office of Management and Budget

PRA        Paperwork Reduction Act

Title VII  Title VII of the Civil Rights Act of 1964

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in Appellants' Addendum.

## IDENTITY OF *AMICI*, INTEREST IN THE CASE, AND
## SOURCE OF AUTHORITY TO FILE

*Amici Curiae* are organizations committed to advancing women's equality, including by working to eliminate pay disparities based on sex, race, and national origin and other forms of employment discrimination. All believe that collection and publication of pay data by the EEOC and OFCCP are critical tools in combating unequal pay and that their efforts to do so will be impeded by the agencies' failure to gather such data. Specific statements of each organization's identity and interest appear in the Appendix to this Brief.

**Source of Authority to File:** *Amici* are authorized to file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) because all parties consent to its filing.

xiii

### STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for a party authored this brief in whole or in part, and no person other than *Amici*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

*Amici Curiae* are organizations dedicated to combating the persistent and widespread problem of pay disparities based on sex, race, and national origin that are caused in substantial part by discrimination. The U.S. Equal Employment Opportunity Commission's (EEOC) and U.S. Office of Federal Contract Compliance Program's (OFCCP) decision to use the annual EEO-1 report to begin collecting pay data from employers by race, national origin, and gender across occupational categories represents a crucial step in addressing this problem. Component 2 of the EEO-1 report promises new transparency with respect to private-sector pay—information that is typically shrouded in secrecy.

The District Court correctly invalidated the Office of Management and Budget's (OMB) stay of the EEOC's data collection. Appellants (together, the Government) do not appeal the merits of this ruling, but instead challenge Appellees' standing and the propriety of the District Court's remedial order directing that the EEOC proceed with the data collection. They are supported, however, by *amici* that dispute the public benefit of collecting pay data and thus call for remand to OMB in part on that basis.

*Amici* here believe it is essential to counter these contentions. They do so below in two parts: first, by providing a brief background on the systemic wage disparities that motivated the EEOC's pay data collection efforts; and second, by

explaining how collecting such data provides a substantial public benefit, including by enabling *amici* to more efficiently and effectively combat the pay gap problem.

**ARGUMENT**

The Government argues that the District Court erred in ordering the EEOC to proceed with the collection of Component 2 data instead of merely vacating OMB's stay. *See* Br. for Appellants at 26–34. The Chamber of Commerce and other employer representatives (together, the Chamber), wishing to delay or derail the EEOC's collection of pay data, seek to bolster the Government's attack on this remedy by arguing for remand to OMB, in part on the grounds that the Paperwork Reduction Act (PRA) record before it supposedly "showed questionable to no public benefit of the revised EEO-1." *See* Br. of The Chamber of Commerce of the United States of America et al., at 10, 17–21.

These challenges to the District Court's remedial order are misguided. Requiring the EEOC to proceed with pay data collection was amply justified by both the law and the circumstances, as Appellees ably demonstrate. *See* Br. for Appellees at 50–65.

*Amici* here fully concur in those arguments. They write separately, however, to correct the Chamber's assertion that collecting pay data would have little public benefit. As shown below in Section 2, such data would be beneficial in many way, including in helping the EEOC assess discrimination charges and guiding its

investigations; facilitating voluntary self-assessment and compliance by employers; helping organizations like *amici* most effectively allocate their finite resources; and enabling policymakers to assess the efficacy of state and local legislative efforts to target the wage gap, such as prohibitions on the use of salary history to set current wages.

**1. The Sex-Based Wage Gap Is Stubbornly Persistent, Especially for Women of Color.**

More than fifty years after Congress outlawed sex discrimination in pay through the Equal Pay Act of 1963 (EPA) and Title VII of the Civil Rights Act of 1964 (Title VII), substantial sex-based wage disparities remain the norm. According to the most recent Census Bureau data, women holding full-time, year-round jobs earn, on average, less than 82 cents for each dollar earned by men holding full-time, year-round positions. *See* Jessica L. Semega et al., *Income and Poverty in the United States: 2018*, Current Population Reports P60-266 (2019), at 10[1]; *see also* 81 Fed. Reg. 45,479, 45,481 (July 14, 2016) (EEOC and OFCCP submission to OMB regarding data collection citing wage gap statistics based on then-current Census data).

This gap—which deprives full-time working women of more than $10,000 in average annual earnings relative to men—persists even though women are now

---

[1] *Available at* https://www.census.gov/content/dam/Census/library/publications/2019/demo/p60-266.pdf.

substantially more likely than men to have formal education and training. *See*
Semega et al., *supra*; Anthony Carnevale et al., Georgetown Univ. Ctr. on Educ.
and the Workforce, *Women Can't Win: Despite Making Educational Gains and
Pursuing High-Wage Majors, Women Still Earn Less than Men* (2018).[2] The
resulting cumulative income loss for a woman over her career is staggering. A
college-educated woman born in the late 1950s, for example, lost on average
nearly $800,000 by age 59 relative to her male peers. *See* Inst. for Women's Policy
Research, *Status of Women in the States: Employment & Earnings* (last visited Oct.
19, 2019).[3]

For women of color, the situation is vastly worse because the gender pay gap
is compounded by pay gaps based on race and national origin. African American
women and Latinas, for example, make just 62 and 55 cents, respectively, for each
dollar earned by white, non-Hispanic men. *See* Ariane Hegewisch & Adiam
Tesfaselassie, IWPR Fact Sheet #C484, *The Gender Wage Gap: 2018: Earnings
Differences by Gender, Race, and Ethnicity* (Sept. 2019) (analyzing 2018 Census
data)[4]; *see also* 81 Fed. Reg. 45,479, 45,482 (citing then-current statistics).

---

[2] *Available at* https://cew.georgetown.edu/wp-content/uploads/Women_FR_Web.pdf.

[3] *Available at* https://statusofwomendata.org/explore-the-data/employment-and-earnings/employment-and-earnings/#CumulativeLossesfromtheGenderWageGap.

[4] *Available at* https://iwpr.org/wp-content/uploads/2019/09/C484.pdf.

The average pay gaps described above do not result solely from women's overrepresentation in lower-paying occupations. Instead, even as women have entered high-paying fields like business and law in rising numbers, pay disparities remain the norm, starting as soon as employees enter the labor market and growing over time. *See* Christianne Corbett & Catherine Hill, Am. Ass'n of Univ. Women, *Graduating to a Pay Gap: The Earnings of Women and Men One Year After College Graduation* (2012), at 9–21 (showing that pay gaps for degree-requiring positions begin immediately out of college even after controlling for major, occupation, and hours worked);[5] Marianne Bertrand et al., *Dynamics of the Gender Gap for Young Professionals in the Financial and Corporate Sectors*, 2 Am. Econ. J.: Applied Econ. 228, 236 (2010) (finding that female business school graduates earned less than their male counterparts at graduation, with gaps widening over time); Jeffrey Lowe, Major, Lindsey & Africa LLC, *Partner Compensation Survey 2016* (2016), at 15 (showing male law partner earnings that were 44% higher on average than those of female partners).[6]

Indeed, wage disparities hold across nearly every occupation regardless of whether it is male- or female-dominated. *See* Ariane Hegewisch & Adiam

---

[5] *Available at* http://www.aauw.org/files/2013/02/graduating-to-a-pay-gap-the-earnings-of-women-and-men-one-year-after-college-graduation.pdf.

[6] *Available at* https://www.mlaglobal.com/publications/research/compensation-survey-2016.

Tesfaselassie, Inst. for Women's Policy Research, *The Gender Wage Gap by Occupation* (Apr. 2, 2019) (concluding from Bureau of Labor Statistics data that women earn less than men in 18 of the 20 most common occupations for full-time working women and in all of the 20 most common occupations for full-time working men).[7] All told, a full 38% of the wage gap remains "unexplained" by industry, occupation, or other variables such as education, experience, and geography. *See* Francine D. Blau & Lawrence M. Kahn, *The Gender Wage Gap: Extent, Trends, and Explanations*, 55 J. Econ. Lit. 789, 801 (2017).[8]

Research confirms the significant role that pay discrimination plays in causing this "unexplained" wage gap. One study, for example, found that identically-qualified job applicants with traditionally male names received higher salary offers than those with traditionally female names. *See* Corinne A. Moss-Racusin, et al., *Science Faculty's Subtle Gender Biases Favor Male Students*, 109 Proc. Nat'l Acad. Sci. 16474, 16475 (Oct. 2012).[9] Another study showed that mothers applying for jobs were less likely to receive a callback than fathers, and may also face a penalty in their starting salaries. *See* Shelly J. Correll et al., *Getting a Job: Is There a Motherhood Penalty?*, 112 Am. J. Soc. 1297, 1297 (Mar.

---

[7] *Available at* https://iwpr.org/publications/gender-wage-gap-occupation-2018/.

[8] *Available at* https://pubs.aeaweb.org/doi/pdf/10.1257/jel.20160995.

[9] *Available at* http://www.pnas.org/content/109/41/16474.full.pdf.

2007).[10] An additional study identified similar dynamics for incumbent employees, with women receiving lower pay increases than men at the same levels of performance. *See* Emiliano J. Castilla, *Gender, Race, and Meritocracy in Organizational Careers*, 113 Am. J. Soc. 1479, 1479 (May 2008).[11]

But unlike most discriminatory employment actions, biased pay decisions may occur without the disadvantaged individual even knowing of the wrong that has occurred. Wage and salary levels, as well as pay-setting practices, are exceptionally opaque. Putting aside the societal taboo of "talking about money" that inhibits free exchange of such information, many employees face structural barriers to learning how their compensation measures up to that of their peers. One recent study, for instance, found that approximately 60% of private sector workers are either strongly discouraged or forbidden by their employers from discussing wage and salary information. *See* Inst. for Women's Policy Research, *Pay Secrecy and Wage Discrimination* (Jan. 2014).[12]

Indeed, Lilly Ledbetter—whose Supreme Court loss on statute of limitations grounds spurred reform of Title VII's claim accrual rules for pay discrimination

---

[10] *Available at* http://gender.stanford.edu/sites/default/files/motherhoodpenalty.pdf.

[11] *Available at* https://ideas.wharton.upenn.edu/wp-content/uploads/2018/07/Castilla-2008.pdf.

[12] *Available at* https://iwpr.org/publications/pay-secrecy-and-wage-discrimination-2/.

claims—famously was unaware that she was grossly underpaid in comparison to male peers at Goodyear Tire until she received an anonymous note in her mailbox. *See* Lilly Ledbetter, *My #MeToo Moment*, The New York Times (Apr. 9, 2018).[13] And as Justice Ginsburg noted in her dissent to the Supreme Court's ruling in Ms. Ledbetter's Title VII case, employees also may not detect pay discrimination simply because the disparities may be too small to initially trigger suspicion. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 645 (2007) (Ginsburg, J., dissenting) ("Pay disparities often occur, as they did [here], in small increments; cause to suspect that discrimination is at work develops only over time. . . . It is only when the disparity becomes apparent and sizable, *e.g.*, through future raises calculated as a percentage of current salaries, that an employee . . . is likely to comprehend her plight and, therefore, complain.").

Relatedly, many employers fail to examine for themselves whether their practices are equitable. Whether through inertia, fear of creating a damning paper trail that could be used against them in litigation, or unwillingness to take on the costs of remedying any imbalances that a self-audit might reveal, many employers do not regularly audit their own pay practices, while even those that do often do not make the results available to employees. *See*, *e.g.*, *Navigating the Growing Pay Equity Movement: What Employers Need to Know About What to Do*, Harvard

---

[13] *Available at* https://www.nytimes.com/2018/04/09/opinion/lilly-ledbetter-metoo-equal-pay.html.

Bus. Rev. Analytic Servs. (2019), 7 (finding that even in a survey focused on larger employers, only 62% conducted a pay equity audit annually)[14]; Rebecca Greenfield, *Big U.S. Banks Resist Pressure for More Gender Pay Gap Disclosure*, Bloomberg News, Feb. 13, 2019 (noting that with the exception of Citigroup, big U.S. banks have been unwilling to release average compensation figures for men and women).[15]

At this moment of unprecedented attention to workplace gender inequality, the lack of progress toward pay parity in the last half century is starker than ever. Plainly, the mere existence of laws prohibiting biased decision-making is insufficient. Systemic enforcement, employer-driven remedial efforts, education, and vigorous advocacy all are required to supplement whatever pressure individual litigants might bring to bear. Component 2 of the EEO-1 is the critical ingredient to fuel such efforts.

## 2. Component 2 of the EEO-1 is Essential to Closing the Sex-Based Wage Gap.

### A. Component 2 Data Would Enhance EEOC and OFCCP Enforcement and Education Efforts.

Component 2 Data will directly enhance the EEOC and OFCCP's enforcement efforts in at least two critical respects. First, as the Agencies

---

[14] *Available at* https://trusaic.com/hbr/.

[15] *Available at* https://www.bloomberg.com/news/articles/2019-02-13/gender-pay-gap-big-banks-tech-companies-resist-new-disclosures.

explained in the administrative record, statistical analysis of Component 2 data would be useful in guiding investigation of individual discrimination charges by, for instance, helping inform an Agency's information requests and its decisions regarding the appropriate scope of an investigation. *See* 81 Fed. Reg. 45,479, 45,489–91. The Chamber's assertion that the administrative record is silent as to the utility of pay data to the investigation of specific charges, *see* Chamber Br. at 17–21, simply ignores this portion of the record speaking directly to the specific issue it now seeks to relitigate. And while these agency assertions speak for themselves and need not be repeated here, *Amici* would note that the EEOC's explanation of the data's utility in charge investigations is not merely hypothetical; instead, the EEOC relied specifically on a pilot study in which it used statistical analyses of pay data in existing databases to determine whether sex and race affected the distribution of employees within pay bands. *See id.* at 45,490.

Second, in looking beyond the usefulness of pay data in the context of individual enforcement actions—something the Chamber fails entirely to do— analysis of Component 2 data would potentially help the EEOC to most efficiently exercise its broad investigative and prosecutorial authority in flagging for agency-initiated investigation (or future monitoring) those employers or industries with the most egregious pay disparities. *See* 42 U.S.C. § 2000e- 5(b) (authority of EEOC Commissioners to bring charges); *id.* § 2000e-6(a) (authority to bring pattern or

10

practice claims in district court); *id.* § 2000e-9 (subpoena authority); 29 U.S.C.

§206(d) (directed investigation authority under the Equal Pay Act). *See generally*

EEOC, *Advancing Opportunity: A Review of the Systemic Program of the U.S.*

*Equal Employment Opportunity Commission* (July 7, 2016) (providing an

overview of the EEOC's systemic investigations and litigation activity).[16]

Likewise, the OFCCP might use such data to conduct targeted audits of federal

contractors instead of solely relying on random audits, as is currently the practice.

*See* Donald Tomaskovic-Devey et al.*, Private Sector Industry Disparities: A*

*Report on Evidence of Systemic Disparities for Women, African Americans,*

*Hispanics, Asians and Native Americans* (explaining in a report prepared for the

EEOC how data from the pre-Component 2 EEO-1 could be used for more targeted

enforcement).[17]

Finally, in addition to directly benefiting Agency enforcement efforts, the

EEOC expressly intends to publish aggregate Component 2 pay data consistent

with past practice for other data collected by the Agency. *See* 81 Fed. Reg. 45,479,

45,491 (noting that "the EEOC expects to periodically publish reports on pay

disparities by race, sex, industry, occupational groupings, and [geography]");

---

[16] *Available at* https://www.eeoc.gov/eeoc/systemic/review/.

[17] *Available at*
https://www.umass.edu/employmentequity/sites/default/files/CEE_Private%2BSec
tor%2BIndustry%2BDisparities%2B2012.pdf.

11

EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1)*
(EEOC's annual publication of pre-Component 2 EEO-1 data).[18] The availability
of such data would have significant benefits beyond the government enforcement
arena, as explained below.

B.     **Component 2 Data Would Complement EEOC and OFCCP
       Enforcement Efforts by Fostering Employer Self-Assessment and
       Enabling Data-Driven Advocacy.**

As the EEOC noted during the 2016 notice and comment period,
"[v]oluntary compliance is an important part of the effort to prevent discrimination
and improve pay equity" and "the employer's preparation of the EEO-1 report
itself[] may be [a] useful tool[] for employers to engage in voluntary self-
assessment of pay practices." 81 Fed. Reg. 45,479, 45,483, 45,491. Indeed,
research suggests that mandatory reporting does in fact drive such corporate self-
assessment. *See Navigating the Growing Pay Equity Movement*, *supra*, at 7 (noting
that in the United Kingdom, where employers must report pay data annually, 78%
of employers conduct pay equity audits at least annually versus only 62% of
employers in the United States). And for smaller companies that lack the internal
infrastructure or consulting budget to regularly monitor and analyze their own
compensation structures, the reports that the EEOC anticipates periodically
publishing—on pay disparities by race, sex, industry, occupational groupings, and

---

[18] *Available* at https://www.eeoc.gov/eeoc/statistics/employment/jobpat-
eeo1/index.cfm.

geography—will provide useful comparative data for engaging in voluntary self-assessment. *See* 81 Fed. Reg. 45,479, 45,491.

Anecdotal evidence from some recent high-profile cases shows that such self-assessment can spur meaningful improvements in pay equity, or at the very least in the pay transparency that is critical to addressing the problem. *See, e.g.*, Valerie Bolden-Barrett, *Salesforce Drops $6M to Close its Gender Pay Gap*, HR Dive, Sept. 29, 2017 (reporting on Salesforce's $3 million expenditures in 2015 and again in 2017 to correct disparities identified through internal assessments)[19]; Seth Fiegerman, *Facebook and Microsoft Say They've Eliminated the Gender Pay Gap*, Mashable, Apr. 11, 2016 (reporting on pay equity announcements from Facebook, Microsoft, Apple, and Intel)[20]; Jeff Green & Paige Smith, *Intel to Share Gender, Racial Pay Data Most Companies Conceal*, Daily Labor Rpt., Oct. 17, 2019 (noting Intel's announcement that it planned to publicly release pay data broken down by race and gender).[21]

Moreover, aggregate EEO-1 data will not merely help employers with voluntary compliance, but will also substantially aid *amici* and other organizations

---

[19] *Available at* https://www.hrdive.com/news/salesforce-drops-6m-to-close-its-gender-pay-gap/506086/.

[20] *Available at* https://mashable.com/2016/04/11/facebook-microsoft-gender-pay-gap/.

[21] *Available at* https://www.bloomberg.com/news/articles/2019-10-17/intel-to-share-gender-racial-pay-data-most-companies-conceal.

in better tailoring their public education and advocacy efforts, for example toward industries or occupations with the highest gender pay disparities. *See, e.g.*, Buck Gee & Denise Peck, Ascend, *The Illusion of Asian Success: Scant Progress for Minorities in Cracking the Glass Ceiling from 2007–2015* (examining minority success in the tech industry based on pre-Component 2 EEO-1 data)[22]; Donald Tomaskovic-Devey, Ctr. for Employment Equity, *Industry Employment Brief: Employment Patterns in the Oil & Gas Industries* (June 2016) (using EEO-1 data to assess employment equity in the oil & gas industry).[23] And when such educational and advocacy efforts dovetail with governmental and voluntary employer efforts, the resulting synergies have the potential to move the needle on pay inequity.

Recent developments in the tech industry provide a case in point. As noted above, a number of leading tech firms have announced substantial progress in reducing or eliminating various pay gaps. *See supra* at __. These developments, however, did not appear out of thin air. Critically, the EEOC published its own study based on 2014 EEO-1 data and found significant race- and sex-based disparities in terms of the numbers of individuals employed in the industry

---

[22] Available at https://cdn.ymaws.com/www.ascendleadership.org/resource/resmgr/research/theillusionofasiansuccess.pdf.

[23] Available at https://www.umass.edu/employmentequity/industry-employment-brief-employment-patterns-oil-gas-industries.

generally and in management and executive positions in particular. *See* U.S. Equal

Employment Opportunity Commission, *Diversity in High Tech* (2016).[24] This

report garnered considerable media attention, *see, e.g.*, Joe Davidson, *High Tech*

*Firms Lag in Diversity, EEOC Says*, The Washington Post (May 23, 2016)[25];

generated alerts to tech firms from the employer-side bar, *see, e.g.*, Nancy L.

Gunzenhauser, Epstein Becker Green, *The EEOC Advocates for a More Diverse*

*Technology Industry* (July 26, 2016)[26]; prompted further analysis by investigative

journalists, *see, e.g.*, Ctr. for Employment Equity, *Is Silicon Valley Tech Diversity*

*Possible Now?*[27] and advocacy groups, *see*, *e.g.*, Maya Beasley, *There is a Supply*

*of Diverse Workers in Tech, So Why is Silicon Valley So Lacking in Diversity?*,

Center for American Progress (Mar. 29, 2017)[28]; led to efforts to address diversity

issues in the tech industry through shareholder and investor action, *see, e.g.*, Open

---

[24] *Available at*
https://www.eeoc.gov/eeoc/statistics/reports/hightech/index.cfm.

[25] *Available at*
https://www.washingtonpost.com/news/powerpost/wp/2016/05/23/high-tech-firms-lag-in-diversity-eeoc-says/.

[26] *Available at* https://www.ebglaw.com/news/five-trending-challenges-facing-employers-in-the-technology-media-and-telecommunications-industry/#_para3.

[27] *Available at*
https://www.umass.edu/employmentequity/sites/default/files/CEE_Diversity%2Bin%2BSilicon%2BValley%2BTech.pdf.

[28] *Available at*
https://www.americanprogress.org/issues/race/reports/2017/03/29/429424/supply-diverse-workers-tech-silicon-valley-lacking-diversity/.

Mic, *Breaking the Mold: Investing in Racial Diversity in Tech* (Feb. 2017) (calling on investors to engage with their companies regarding diversity)[29]; and spurred recommendations by the General Accounting Office to Congress urging that the EEOC and OFCCP go even further in their enforcement of anti-discrimination laws in the tech industry, including by improving data collection. *See* U.S. Gov't General Accounting Office, *Diversity in the Technology Sector: Federal Agencies Could Improve Oversight of Equal Employment Opportunity Requirements*, Report to the Ranking Member, Committee on Education and the Workforce, House of Representatives (Nov. 2017).[30] Such ripple effects from a single EEOC report bring into sharp relief the utility of EEO-1 data's collection and dissemination.

### C.    Component 2 Data Would Bolster State and Local Policymaking Initiatives.

A growing number of cities and states are seeking to augment federal pay equity laws. A number of jurisdictions, for example, are adopting legislation limiting or prohibiting the use of salary history in the hiring process in order to prevent the perpetuation of prior discriminatory pay decisions. *See* Am. Ass'n Univ. Women, *State and Local Salary History Bans* (July 31, 2019) (tracking state and local legislative activity on this issue around the country).[31] Similarly, many

---

[29] *Available at* http://breakingthemold.openmic.org/.

[30] *Available at* https://www.gao.gov/assets/690/688460.pdf.

[31] *Available at* www.aauw.org/article/state-local-salary-history-bans.

jurisdictions in recent years have sought to promote pay transparency by prohibiting employers from retaliating against employees for discussing their wages or requiring them to sign nondisclosure agreements pertaining to wages. *See* Nat'l Women's Law Ctr., *Workplace Justice: Progress in the States for Equal Pay* (June 2018), at 2.[32] The availability of EEOC pay data on a geographic basis would provide a valuable window into the success of such efforts in narrowing the pay gap so that future initiatives could seek to replicate or augment those successes.

*          *          *

In sum, the EEOC's and OFCCP's collection of pay data would have myriad benefits—both for the agencies in fulfilling their enforcement and public education mandates, and for all stakeholders in identifying, studying, and remedying pay inequality. More than fifty years after Congress outlawed pay discrimination, the stubbornly persistent pay gap demands that more resources, not fewer, be devoted to assuring its eradication.

## CONCLUSION

For the foregoing reasons, and those stated in the Brief of Appellees, the District Court's judgment should be affirmed.

Dated: October 25, 2019                              Respectfully submitted,

---

[32] *Available at* https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2018/06/Progress-in-the-States-for-Equal-Pay-2018-1.pdf.

/s/ Ryan E. Griffin
Ryan E. Griffin
James & Hoffman, PC
1130 Connecticut Ave. NW
Suite 950
Washington, DC 20036
(202) 496-0500
(202) 496-0555 (fax)
regriffin@jamhoff.com

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 3,473 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: October 25, 2019                    /s/ Ryan E. Griffin
                                           Ryan E. Griffin

                                           Counsel for *Amici Curiae*

### CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I electronically filed the foregoing Amicus Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: October 25, 2019                    /s/ Ryan E. Griffin
                                           Ryan E. Griffin

                                           Counsel for *Amici Curiae*

## APPENDIX: IDENTITY AND INTERESTS OF *AMICI*

**9to5, National Association of Working Women** is a 47-year-old national membership organization of directly impacted women dedicated to achieving economic justice and ending all forms of discrimination. 9to5 has a long history of supporting local, state, and national measures to combat discrimination. The outcome of this case will directly affect our members' and constituents' rights and economic well-being, and that of their families.

In 1881, the **American Association of University Women** ("AAUW") was founded by like-minded women who had defied society's conventions by earning college degrees. Since then it has worked to increase women's access to education and employment through education, research, and advocacy. Today, AAUW has more than 170,000 members and supporters, 1,000 branches, and 800 college and university partners nationwide. In adherence with our member-adopted Public Policy Program, AAUW is a staunch advocate for pay equity and seeks to uphold the protections of the Equal Pay Act and other employment discrimination laws. Eliminating pay disparities requires robust data collection to assist our agencies' enforcement of these laws and to incentivize employers to examine and address pay gaps.

**A Better Balance** is a national non-profit legal advocacy organization based in New York, NY and Nashville, TN founded with the goal of ensuring that

21

workers can meet the conflicting demands of their jobs and family needs, and that women and mothers can earn the fair and equal wages they deserve, without compromising their health or safety. Through legislative advocacy, litigation, research, and public education, A Better Balance has advanced many pioneering solutions on the federal, state, and local levels designed to combat gender-based discrimination and level the playing field for women and families. The organization also runs a free legal clinic in which the discriminatory treatment of women in violation of Title VII and other state and local laws can be seen firsthand.

The **Coalition of Labor Union Women** is a national membership organization based in Washington, DC with chapters throughout the country. Founded in 1974, it is the national women's organization within the labor movement that is leading the effort to empower women in the workplace, advance women in their unions, encourage political and legislative involvement, organize women workers into unions and promote policies that support women and working families. During our history we have fought against discrimination in all its forms, particularly when it stands as a barrier to employment or is evidenced by unequal treatment in the workplace or unequal pay.

**Equal Rights Advocates** (ERA) is a national non-profit legal advocacy organization dedicated to protecting and expanding economic and educational access and opportunities for women and girls.  Since its founding in 1974, ERA has litigated numerous class actions and other high-impact cases on issues of gender discrimination and workers' civil rights.  ERA also leads efforts to advance public policies promoting workplace justice and economic security for people of all genders.  As chair of the Equal Pay Today Campaign, ERA collaborates with national, regional, and state-based women's legal advocacy and worker justice groups across the country to eradicate the gender and race wage gap.  ERA believes that access to compensation data is key to addressing longstanding, pervasive wage disparities, which take a particularly heavy toll on women of color.  Collection of this data will allow government agencies to more efficiently identify patterns of wage disparities and will encourage employers to analyze their own pay practices to ensure they are fair and lawful.

The **Employee Rights Advocacy Institute for Law & Policy** ("The Institute") advances workers' rights through research and advocacy to achieve equality and justice in the American workplace. The Institute works hand-in-hand with the National Employment Lawyers Association to create workplaces in which there is mutual respect between employers and workers, and workplaces are free of discrimination, harassment, and retaliation. The Institute has an interest in whether

DHS's decision to wind down the DACA policy is lawful, as DACA recipients are a vital part of America's workforce. Many workers rely on DACA to maintain legal employment, free from harassment, discrimination, and unsafe work practices.   The Institute has an interest in ensuring that the important data collection that both the EEOC and the advocacy community use to address the gender-, race-, and national origin- based pay gaps is not stayed arbitrarily and capriciously.

The **California Women's Law Center** (CWLC) is a statewide, nonprofit law and policy center that breaks down barriers and advances the potential of women and girls through transformative litigation, policy advocacy and education.  CWLC's issue priorities include gender discrimination, economic justice, violence against women, and women's health. For 30 years, CWLC has been on the frontlines of the fight to secure women's economic empowerment in California, including working to end practices that contribute to the gender wage gap and women in poverty.

**Family Values @ Work** and the Labor Project for Working Families partner to lead a network of 27 state coalitions deeply engaged in economic justice policies enabling workers to earn fair wages and paid time to care. The policies we fight for address pay equity for workers historically excluded from access to benefits due to race, gender, and national origin. The transparency that Component

2 of EEO-1 provides, addresses pay equity for the same populations, ensuring that covered corporations and federal contractors include pay data.  As an organization fighting for workplace equity on all levels, we support this amicus brief urging the DC Court of Appeals to uphold the prior stay and rescission of the OMB's request to eliminate this important data collection tool.

**Gender Justice** is a nonprofit legal advocacy organization based in Minnesota that works to advance gender equity through the law. As part of its litigation program, Gender Justice provides legal advocacy as amicus curiae in cases involving issues of gender discrimination, and also represents individuals in litigation. Gender Justice has represented men, women, and non-binary people who have experienced sex discrimination. Gender Justice has an interest in eliminating all forms of gender oppression and we know that people of all genders suffer where there is gender injustice.

**Institute for Women's Policy Research** ("IWPR") is a leading economic and public policy think tank founded in 1987 that focuses on quantitative analysis of issues particularly relevant to women and their families. IWPR's research addresses issues of race, ethnicity, and socioeconomic status, and is concerned with policies that can help women achieve social and economic equality. The gender wage gap is a major contributing factor to poverty and inequality. IWPR's research finds that if women's hourly earnings rose to the level of similarly

qualified men's, poverty rates among families with working women would be reduced by half, see *The Economic Impact Case of Equal Pay by State*, https://statusofwomendata.org/featured/the-economic-impact-of-equal-pay-by-state/.

**KWH Law Center for Social Justice and Change** is a non-profit policy and advocacy Law Center organized under the provisions of 501 (c)(3) of the Internal Revenue Code.  The Law Center focuses on advancing economic opportunities and equality for women and girls in the South and Southwest.  We work to ensure that women and girls have equal access to the full range of protections provided under the United States Constitution, including access to fair and equal pay. Accordingly, the KWH Law Center for Social Justice and Change is uniquely qualified to comment on the decision to be rendered in *National Women's Law Center, et al v. Office of Management and Budget.*

**Legal Aid at Work** (formerly the Legal Aid Society – Employment Law Center) ("LAAW"), founded in 1916, is a public interest legal organization that advances justice and economic opportunity for low-income people and their families at work, in school, and in the community. Since 1970, Legal Aid has represented low-wage clients in cases involving a broad range of employment-related issues, including equal pay and sex discrimination cases. LAAW's interest

in preserving the protections afforded employees by antidiscrimination laws is longstanding.

**Legal Momentum**, the Women's Legal Defense and Education Fund, is a national non-profit civil rights organization, which for nearly 50 years has used the power of the law to define and defend the rights of women and girls. As a leading advocate for workplace equality, Legal Momentum has worked for decades to achieve workplace equality for women, litigating cutting-edge gender-based employment discrimination cases, including *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and participating as amicus curiae in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), and *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Today, Legal Momentum continues to use strategic litigation, policy advocacy, and education to advance gender equality in the workplace, including pay equity, to ensure that all employees are treated fairly regardless of their gender, sexual orientation, gender identity, or socioeconomic status.

**Legal Voice**, founded in 1978 as the Northwest Women's Law Center, is a non-profit public interest organization in the Pacific Northwest dedicated to protecting the rights of women, girls, and LGBTQ people through impact litigation, legislative advocacy, and the provision of legal information and

education. Legal Voice's work includes decades of advocacy in the courts and in the Washington Legislature to promote economic justice, including pay equity and workplace discrimination. Legal Voice has participated as counsel and as *amicus curiae* in numerous cases throughout the Northwest and the country, and serves as a regional expert and advocate in the area of gender equality and empowerment.

The **National Asian Pacific American Women's Forum** (NAPAWF) is the only national, multi-issue Asian American and Pacific Islander (AAPI) women's organization in the country. NAPAWF's mission is to build the collective power of all AAPI women and girls to gain full agency over our lives, our families, and our communities. NAPAWF's work is centered in a reproductive justice framework that acknowledges the diversity within our community and ensures that different aspects of our identity – such as ethnicity, immigration status, education, sexual orientation, gender identity, and access to health – are considered in tandem when addressing our social, economic, and health needs. Our work includes fighting for economic justice for AAPI women and advocating for the adoption of policies and laws that protect the dignity, rights, and equitable treatment of AAPI women workers.

**The National Center for Law and Economic Justice** (NCLEJ) protects the legal rights of people with limited financial means, including low-wage workers. NCLEJ focuses on impact litigation that establishes important principles for the

protection of such individuals, and is committed to ensuring that all workers are afforded dignity and fair treatment on the job. A particular focus is protecting the rights of low-income women, especially women of color. NCLEJ has been involved, as counsel or *amicus curiae*, in many of the most significant cases involving the rights of low-income individuals, families, and communities over the more than 50 years since it was founded in 1965.

The **National Employment Lawyers Association** ("NELA") is the largest professional membership organization in the country comprising lawyers who represent workers in labor, employment, and civil rights disputes. NELA advances employee rights and serves lawyers who advocate for equality and justice in the American workplace. NELA and its local affiliates have a membership of over 4,000 attorneys who are committed to working on behalf of those who have been illegally treated in the workplace. NELA's members litigate daily in every circuit, affording NELA a unique perspective on how the principles announced by the courts in employment cases actually play out on the ground. NELA strives to protect the rights of its members' clients, and regularly supports precedent-setting litigation affecting the rights of individuals in the workplace. NELA has an interest in ensuring that the important data collection that both the EEOC and the advocacy community use to address the gender-, race-, and national origin- based pay gaps is not stayed arbitrarily and capriciously.

The **National Employment Law Project** ("NELP") is a non-profit legal and research organization with 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. NELP seeks to ensure that all employees, and especially the most vulnerable ones, receive the full protection of labor and employment laws, including protections against discrimination and for fair pay based on gender. NELP has litigated and participated as *amicus curiae* in numerous cases in circuit and state and U.S. Supreme Courts addressing the importance of enforcement of labor and employment protections for all workers.

The **National Organization for Women Foundation** ("NOW Foundation") is a 501(c)(3) entity affiliated with the National Organization for Women, the largest grassroots feminist activist organization in the United States with chapters in every state and the District of Columbia. NOW Foundation is committed to advancing equal opportunity, among other objectives, and works to end sex-based pay discrimination.

The **National Partnership for Women & Families** (National Partnership), formerly the Women's Legal Defense Fund, is a national advocacy organization that develops and promotes policies that help achieve fairness in the workplace, reproductive health and rights, access to quality health care, and policies that help women achieve equality and economic security for themselves and their families. Since its founding in 1971, the National Partnership has worked to advance equal

opportunities and fairness through several means, including by challenging discriminatory practices and policies in the courts.

**Women Employed's** mission is to improve the economic status of women and remove barriers to economic equity. Since 1973, the organization has assisted thousands of working women with problems of discrimination and harassment, monitored the performance of equal opportunity enforcement agencies, and developed specific, detailed proposals for improving enforcement efforts, particularly on the systemic level. We believe that segmented data collection is critical to identify pay discrimination, to understand and address the gender-based pay gap, and to enforce equal opportunity laws.

**The Women's Law Center of Maryland**, Inc. is a nonprofit, public interest, membership organization of attorneys and community members with a goal of improving and protecting the legal rights of women. Established in 1971, the Women's Law Center achieves its mission through direct legal representation, research, policy analysis, legislative initiatives, education and implementation of innovative legal-services programs to pave the way for systematic change. Our mission is to ensure the physical safety, economic security, and bodily autonomy of women – through increasing access to justice and by ensuring our laws are fairly and justly administered.

The **Women's Law Project** ("WLP") is a nonprofit public interest law firm with offices in Philadelphia and Pittsburgh, Pennsylvania. The WLP seeks to create a more just and equitable society by advancing the rights and status of women through high impact litigation, policy advocacy, public education, and individual counseling. Founded in 1974, the WLP has a long and effective track record on a wide range of legal issues related to women's health, legal, and economic status. Economic justice and equality is a high priority for WLP. To this end, WLP advocates for elimination of pay gaps based on sex, race and ethnicity and supports litigation, legislation, and rule-making that strengthens our ability to achieve equal pay.