## ORAL ARGUMENT SCHEDULED FOR JANUARY 24, 2020

## No. 19-5130

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

──────────────

NATIONAL WOMEN'S LAW CENTER et al.,

Plaintiffs-Appellees,

v.

OFFICE OF MANAGEMENT AND BUDGET et al.,

Defendants-Appellants.

──────────────

On Appeal from the United States District Court
for the District of Columbia

──────────────

### REPLY BRIEF

──────────────

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

DANIEL TENNY
LINDSEY POWELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5372*

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT ........................................................................................... 5

    I.    Plaintiffs Lack Standing Because They Have
          No Cognizable Interest in Pay Information .................................. 5

    II.   The District Court Exceeded Its Authority in
          Requiring EEOC To Complete the Collection
          to the Court's Specifications ....................................................... 15

CONCLUSION ..................................................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                      <u>**Page(s)**</u>

*Action All. of Senior Citizens v. Heckler,*
    789 F.2d 931 (D.C. Cir. 1986) ................................................................. 3, 11

*ASPCA v. Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) ................................................................. 2, 8, 9

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................ 8

*EPIC v. Presidential Advisory Comm'n on Election Integrity,*
    878 F.3d 371 (D.C. Cir. 2017) .............................................. 1, 2, 3, 5, 6, 7, 8

*FEC v. Akins,*
    524 U.S. 11 (1998) ............................................................................. 8, 10

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ................................................................. 8

*Foundation on Econ. Trends v. Lyng,*
    943 F.2d 79 (D.C. Cir. 1991) ...................................................................10

*Friends of Animals v. Jewell,*
    828 F.3d 989 (D.C. Cir. 2016) ............................................................. 5, 8

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ......................................................................... 7, 8, 11

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ...............................................................................14

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................9

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ..............................................................21
    72 F. Supp. 3d 168 (D.D.C. 2014) ..................................................... 20, 21

*Palisades Gen. Hosp., Inc. v. Leavitt,*
   426 F.3d 400 (D.C. Cir. 2005) ........................................................................16

*PETA v. USDA,*
   797 F.3d 1087 (D.C. Cir. 2015) ............................................................... 3, 11

*Prisology, Inc. v. Federal Bureau of Prisons,*
   852 F.3d 1114 (D.C. Cir. 2017) ...............................................................9-10

*Public Citizen v. U.S. Dep't of Justice,*
   491 U.S. 440 (1989) ........................................................................................8

*Spokeo v. Robbins,*
   136 S. Ct. 1540 (2016) ..........................................................................2, 9, 10

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ............................................................................... 9, 11

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000) .....................................................................................13

*West v. Lynch,*
   845 F.3d 1228 (D.C. Cir. 2017) ..................................................................13

**Regulation:**

29 C.F.R. § 1602.7 ...........................................................................................21

**Other Authority:**

84 Fed. Reg. 18,383 (May 1, 2019).................................................................16

## GLOSSARY

| | |
|---|---|
| EEOC | Equal Employment Opportunity Commission |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |
| PRA | Paperwork Reduction Act |

## SUMMARY OF ARGUMENT

This case should never have proceeded to the merits, and it should in any event be brought to a close now. Plaintiffs lack standing because they have no cognizable interest in pay information. And the district court lacks authority to superintend the collection of such information by the Equal Employment Opportunity Commission (EEOC) because plaintiffs received all the relief to which they could be entitled when the court vacated the stay entered by the Office of Management and Budget (OMB). The district court nonetheless continues to direct EEOC's actions, even though the Commission has received responses from over 80% of covered employers and the collection is for all other purposes complete.

**I.** Plaintiffs do not attempt to show that they have a legal right to the information at issue or that their lack of access to such information is the type of harm that Congress intended to prevent. *See EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). Instead, plaintiffs urge the Court to dispense with these requirements for demonstrating informational harm, even though plaintiffs' injury is premised entirely on a lack of access to information. Plaintiffs contend that they can establish an injury-in-fact any time they allege that an agency's failure to produce more information hampered their activities in some specific way, without regard to whether they have a legal right to the information.

There is no authority to support such a sweeping assertion. It is well established that an individual cannot premise standing on the government's failure to

facilitate access to information in which the individual has no cognizable legal interest, and any use of resources resulting from the individual's own efforts to make up for the lack of such information would be self-inflicted. *See EPIC*, 878 F.3d at 379. Accordingly, an organization cannot repackage a failed informational harm as the basis for organizational standing when the organization lacks a cognizable interest in the information at issue. *Id.* at 378-79. Plaintiffs nonetheless urge that organizations may manufacture standing any time they choose to utilize information in which they have no cognizable interest. That view cannot be reconciled with the basic principle that organizations, like individuals, cannot demonstrate injury-in-fact by citing self-inflicted harms. *See ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).

Plaintiffs' position is likewise at odds with the general rule that the sufficiency of an intangible harm for purposes of standing largely depends on whether Congress intended to prevent such harm. *Spokeo v. Robbins*, 136 S. Ct. 1540, 1549 (2016). Where the denial of access to information is not the type of harm that Congress sought to prevent, the alleged injury is not of a type that can support organizational standing. *EPIC*, 878 F.3d at 379. "[A]ny resources [a plaintiff] use[s] to counteract [a] lack of" information in which it has no cognizable interest is "a self-inflicted budgetary choice that cannot qualify as an injury in fact." *Id.*

Here, plaintiffs do not attempt to demonstrate cognizable informational harm. There is no dispute that the Paperwork Reduction Act (PRA) and Title VII of the Civil Rights Act of 1964 confer no right to the information at issue, and plaintiffs do

2

not contend that Congress meant these statutes to prevent the type of informational harms that plaintiffs allege. Nor do the cases on which plaintiffs rely support a finding of standing in these circumstances. In neither *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), nor *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), did the Court find that the plaintiff lacked a legal interest in particular information and then proceed to hold that precisely the same interest in information, with nothing more, created a basis for organizational standing. *EPIC* holds that organizations cannot premise standing on a non-existent informational interest in this way, 878 F.3d at 379, and that principle controls here.

**II.** After determining the validity of OMB's stay, the district court exceeded its authority in dictating EEOC's actions on remand. There is no dispute that EEOC was a proper defendant and was bound to recognize the relief entered by the district court in resolving the only claims presented in the complaint, which concerned the validity of OMB's stay. But EEOC could, and did, recognize that the stay was vacated and the approval of the collection thereby reinstated—thus providing plaintiffs with all the relief to which they could be entitled—without taking the further actions subsequently required by the court.

In entering that further relief, the district court acted to oversee the information collection itself. Such relief would be inappropriate under any circumstances, and it is particularly problematic here given that the lawfulness of EEOC's conduct was not the subject of the summary-judgment proceedings, and no

3

statute or regulation required EEOC to take the specified actions.  If plaintiffs believed that EEOC was somehow legally required to take particular measures, they needed to litigate that claim in the ordinary course.  They did not do so, and there is no authority to support the court's decision to direct EEOC's actions.

EEOC has in any event now satisfied most of the conditions imposed by the court.  The Commission directed employers to submit two years of pay information by September 30, 2019, and it has received responses from over 80% of covered employers.  Dkt. No. 92-1, at 2.  EEOC nonetheless remains obligated to continue the collection until it receives a response from a percentage of employers to be dictated by the court.  The insistence that EEOC continue the collection until the court says it can stop marks an extraordinary degree of interference with the agency's prerogatives.  Had OMB not stayed the collection, there is no question that EEOC could have closed the collection at any point on or after the deadline for submitting information as the Commission saw fit.  And EEOC has explained why continuing the collection is both burdensome and contrary to the public interest given the connection between extended collection periods and reduced data quality.

There is likewise no merit to the suggestion that the government's litigation conduct justified these measures as a means of providing assurance that EEOC would comply with the court's summary-judgment order.  As explained above, EEOC fully complied with that order when it acknowledged that the approval of the collection had been reinstated and notified employers of that development.

4

# ARGUMENT

## I.   Plaintiffs Lack Standing Because They Have No Cognizable Interest in Pay Information.

**A.**  It is undisputed that plaintiffs do not satisfy the ordinary requirements for standing based on informational injury (Br. 33-34):  They have no legal right to the information at issue, and Congress did not intend the PRA or Title VII to prevent the informational harm plaintiffs allege.  *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  Instead, they ask the Court to dispense with these requirements because plaintiffs are organizations alleging that a lack of access to information undermines their activities in specific ways.  Br. 36-37.  This Court has never endorsed such a sweeping view of injury-in-fact.

Indeed, *EPIC v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017), forecloses the position that plaintiffs now urge.  There, the plaintiff organization "alleged one harm, packaged as two theories," asserting that a lack of access to information constituted an injury-in-fact sufficient to demonstrate either informational or organizational standing.  *Id.* at 381 (Williams, J., concurring in part).  The Court rejected both arguments on the same grounds.  The Court first considered whether EPIC had demonstrated informational standing by showing that "(1) it ha[d] been deprived of information that, on its interpretation, a statute require[d] the government or a third party to disclose to it, and (2) it suffer[ed], by being denied access to that information, the type of harm Congress sought to prevent

by requiring disclosure." *Id.* at 378. Without deciding whether the first condition was met, the Court held that the second was not because EPIC "ha[d] not suffered the type of harm that section 208 of the E-Government Act seeks to prevent." *Id.*

The Court next turned to EPIC's contention that it could nevertheless establish organizational standing based on the same lack of access to information and held that it could not. *EPIC*, 878 F.3d at 378-79. The Court noted that "EPIC's sole theory of organizational injury is that the defendants' failure to produce a privacy impact assessment injures its interest in using the information contained in the assessment 'to focus public attention on emerging privacy and civil liberties issues.'" *Id.* Because the statute at issue did "not confer any such informational interest on EPIC," the Court held that "EPIC c[ould ]not ground organizational injury on a non-existent interest" in information. *Id.* at 379.

Plaintiffs seek to rewrite *EPIC*, urging that "the deficiency in [EPIC's] standing theory was the lack of concreteness and specificity," and that EPIC had not demonstrated that its expenditures were caused by the government's failure to provide information. Br. 47. As the foregoing shows, the Court's holding was not so limited. The Court explained that EPIC's claim to standing failed "twice over," first because the relevant statute did "not confer" an "informational interest," and second because "[i]t follows that any resources EPIC used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were a self-inflicted budgetary choice that cannot qualify as an injury in fact." *EPIC*, 878 F.3d at

6

379 (quotation marks omitted).  The Court nowhere suggested that the outcome
would have been different had EPIC depended more heavily on information in which
it had no cognizable interest.  Rather, only after stating that EPIC's expenditure of
resources to counteract the lack of information "in which it ha[d] no cognizable
interest" was "a self-inflicted budgetary choice that cannot qualify as an injury in fact"
did the Court observe that "EPIC's evidence of expenditures only reinforces the
point."  *Id.* at 379.  It was thus the lack of a cognizable interest, not the pattern of
expenditures, that formed the linchpin of this Court's analysis.

Plaintiffs cannot escape *EPIC*'s key holdings by characterizing them as a
"passing reference to the lack of an interest conferred by the E-Government Act"
conveyed in a "single sentence."  Br. 46.  As noted, the Court expressly and repeatedly
premised its conclusion that EPIC lacked Article III standing—whether characterized
as informational or organizational—on the absence of any cognizable interest in
information.  *EPIC*, 878 F.3d at 378, 379.

That holding is equally applicable here.  Plaintiffs concede that neither Title VII
nor the PRA requires EEOC to collect or disclose pay information.  *See* JA 145.  And
they make no effort to show that Congress intended Title VII or the PRA to prevent
the type of informational harm that they allege.  As in *EPIC*, plaintiffs cannot ground
organizational injury in a non-existent interest.

Plaintiffs cite *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), for the
proposition that a "concrete impairment of ability to provide services" resulting from

7

loss of information can confer organizational standing even in the absence of a legal interest in the information.  Br. 37.  But the organizational plaintiff in *Havens Realty* alleged that it had been denied access to information to which the Fair Housing Act established a right, and that it thereby suffered the type of harm Congress sought to prevent.  455 U.S. at 379.  Indeed, this Court has described *Havens Realty* as a case in which the plaintiff organization "had informational standing *because* [it] sought to enforce a statutory disclosure requirement," and the Court placed it in the same category of cases as *FEC v. Akins*, 524 U.S. 11 (1998), and *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989).  *Jewell*, 828 F.3d at 994 (emphasis added).  Plaintiffs admit the latter are "informational standing" cases, yet incorrectly assert (Br. 36-37) that *Havens Realty* belongs to a wholly distinct category of "organizational standing" cases.

Plaintiffs' view circumvents the well-established rule that a party cannot premise standing on a self-inflicted injury.  *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013).  It would make no sense to treat self-inflicted injuries incurred based on a lack of access to information as an exception to that rule, and *EPIC* forecloses that result by holding that budgetary choices made in response to a failure to acquire information in which the plaintiff has no cognizable interest are the type of self-inflicted injury that cannot give rise to standing.  878 F.3d at 379.  That holding also accords with the principle that organizations suing on their own behalf have no greater right to standing than

8

similarly situated individuals and generally "must make the same showing required of individuals." *Feld*, 659 F.3d at 24.

Plaintiffs also fail to explain why injuries allegedly resulting from a lack of access to information should be treated differently from other intangible harms. The general rule is that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see Spokeo*, 136 S. Ct. at 1550 (reiterating that a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation"). Moreover, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quotation marks omitted).

The doctrine of "informational standing" marks an exception to these general rules insofar as it recognizes that plaintiffs may in some instances establish standing even though the government is not regulating them, and even though their harm is a loss of access to information rather than a more tangible injury. But the exception applies only when Congress has exercised its authority to create a right to information, the deprivation of which will necessarily affect the plaintiff individual or organization in a specific way. Thus, a person seeking records under the Freedom of Information Act "has suffered a particularized injury because he has requested and been denied information Congress gave him a right to receive." *Prisology, Inc. v. Federal Bureau of*

9

*Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017). The doctrine is limited to "information-focused statutes," Br. 36, because it is only through such statutes that Congress creates a legally cognizable right to information. Even in such cases, moreover, a court must satisfy itself that the failure to disclose information resulted in the type of harm Congress intended to prevent. *See Spokeo*, 136 S. Ct. at 1550; *Akins*, 524 U.S. at 20. The fact that plaintiffs invoke no such statute here merely underscores that they lack a legally cognizable injury; it does not mean that they can ignore conventional limitations on standing.

Plaintiffs offer no limiting principle for their theory that any type of interest can give rise to standing so long as it has an adequate effect on an organization's activities. Such an interest would be sufficient, on plaintiffs' theory, irrespective of whether the law that the organization was suing to vindicate had anything to do with the disclosure of information or whether the informational harm suffered by the plaintiff related to the interests Congress meant to protect. This argument fails to acknowledge that countless agency actions undertaken or forgone change the amount of information in the world. "'[I]nformational injury,' in its broadest sense, exists day in and day out, whenever federal agencies are not creating information a member of the public would like to have." *Foundation on Econ. Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991).

Plaintiffs' position runs headlong into Judge Millett's concern that such a boundless theory of standing would mean, for example, that an organization could

10

"disseminate reports based on a U.S. Attorney's Office's public press releases and consequently claim a justiciable interest in the enforcement of the federal criminal code because it would generate more press releases." *PETA v. USDA*, 797 F.3d 1087, 1106 (D.C. Cir. 2015) (Millett, J., dubitante). And on plaintiff's theory, presumably *Summers*, 555 U.S. 488, would have come out the other way if the plaintiff organizations had thought to argue that the absence of a notice, comment, and appeal process had impeded in concrete and specific ways their efforts to protect the environment. Myriad cases in which an injury-in-fact was found lacking could similarly be reimagined under plaintiffs' theory to state a justiciable harm.

**B.** This Court's precedents do not support such an expansive view of standing. Judge Millett appropriately expressed concern that this Court's decisions have reached "the point where organizations get standing on terms that the Supreme Court has said individuals cannot." *PETA*, 797 F.3d at 1099 (Millett, J., dubitante); *see also Havens Realty*, 455 U.S. at 378-79 (foreclosing that result); *Feld*, 659 F.3d at 24. But *EPIC* confirms that there are still limits. And the cases on which plaintiffs principally rely— *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), and *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015)—are not to the contrary. Neither case concluded that the plaintiff lacked any cognizable interest in particular information and then proceeded to hold that precisely the same incognizable interest in information, with nothing more, created a basis for organizational standing.

11

As our opening brief explained, the plaintiffs in *Action Alliance* alleged that the Department of Health and Human Services was *legally required* by government-wide regulations to provide access to information.  Plaintiffs respond only by asserting that the regulations required disclosure of only some, and not all, of the information plaintiffs sought.  Br. 41.  But that does not undermine the point that *Action Alliance* was not a case, as here, in which the plaintiff alleged no legal entitlement to information.

In *PETA*, as explained in our opening brief, the plaintiff's argument for standing was not premised solely on an alleged informational harm.  Plaintiffs respond with a double negative:  "Defendants' suggestion that the injury caused by the lack of inspection reports alone was not sufficient to confer standing finds no support in the Court's opinion."  Br. 42.  But they do not point to any statement in the Court's opinion holding that diminished access to information in which plaintiffs lack any cognizable interest can, on its own, form a basis for organizational standing, much less explain how such a principle can be reconciled with this Court's decision in *EPIC*. Moreover, the harms at issue in *PETA* were more closely tied to alleged statutory requirements, as PETA asserted that the agency was required to respond to bird-related Animal Welfare Act complaints but failed to do so.

Plaintiffs' footnote suggestion that they have "advanced a theory of harm separate from EEOC's failure to *publish* EEO-1 pay data" because they could use such information after "obtain[ing] [it] through discovery," Br. 42 n.5, does not provide a

12

non-informational basis for standing, and it once again highlights the extraordinary breadth of their position: According to plaintiffs, an organization has standing to force the government to compel third parties to report information, even if the government has no legal obligation to disclose it, based on the possibility that the organization could subsequently obtain the information through discovery.

**C.** Even if plaintiffs had alleged a cognizable informational injury, they have failed to show that it would be redressed by the relief they seek. Plaintiffs are not the object of the government action at issue, and they have no legal entitlement to pay information. *See* JA 151. In circumstances like these, in which "the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury—*i.e.*, if the injury may or may not follow from the conduct, based on a chain of contingencies— the plaintiff faces an uphill climb in pleading and proving redressability," *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017), and can prevail only by establishing "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact," *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). Plaintiffs cannot meet that standard.

The attenuated relationship between the agency action that plaintiffs challenge and the harm they allege underscores the lack of redressability. Plaintiffs alleged that OMB acted unlawfully in staying the collection of pay information, and they hoped that an order lifting the stay might produce a series of events ultimately leading to a discretionary decision by EEOC to disclose information relevant to plaintiffs'

13

mission.  But neither the vacatur of OMB's stay nor the additional inappropriate relief in the April 25 order (*see infra* Part II) are likely to remedy plaintiffs' alleged harm. Although the district court directed EEOC to collect the information in a particular manner, the decision to disclose any such information remains committed to EEOC's discretion as nothing in Title VII even arguably speaks to that issue, much less circumscribes EEOC's discretion in a judicially reviewable manner.  *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Plaintiffs note that EEOC has previously disclosed information obtained through other information collections and at one time expected to disclose pay information, but it does not follow that EEOC is substantially likely to do so.  As EEOC has explained, this novel collection of information presents numerous challenges that diminish the likelihood that employers will submit reliable, high quality information.  *See* JA 126-31.  These risks have been compounded, moreover, by the circumstances in which the district court required the collection to take place.  *See* Dkt. No. 88-1, at 1; Dkt. No. 90-1, at 2.

Plaintiffs note the district court's doubt as to whether EEOC's concerns about data quality are well founded.  Br. 49.  Again, however, the decision whether to disclose information of this type is committed to agency discretion, leaving no room for judicial second-guessing of the reasonableness of the Commission's judgment. Plaintiffs also err in suggesting that these data-quality concerns should be overlooked because standing is assessed at the time of filing, and some of these concerns arose

14

after that time.  *Id.*  Whether the problem is characterized as one of standing or

mootness, the relevant point is that any disclosure of pay information is committed to

EEOC's discretion, and plaintiffs therefore cannot show that the reinstatement of the

approval of the collection is likely to redress their alleged injury.

## II.     The District Court Exceeded Its Authority in Requiring EEOC
## To Complete the Collection to the Court's Specifications.

Even if it had been appropriate for the district court to reach the merits and to

enter the initial relief in its March 4 order on summary judgment, the court would

have had no authority to enter the extraordinary further relief in its April 25 order.

Plaintiffs' complaint asked the court to vacate OMB's stay and to direct EEOC to

publish a notice in the Federal Register announcing that the collection was reinstated.

JA 315.  The March 4 order gave plaintiffs full relief on the claims in their complaint

by vacating the stay and the Federal Register notice announcing it.  There is no

dispute that EEOC was a proper defendant and bound to recognize that order.  But

EEOC could, and did, recognize that the approval of the collection had been

reinstated without taking the further actions subsequently required by the court.

Plaintiffs cite the fact that EEOC had by April 25 not yet published a notice in the

Federal Register announcing the vacatur of OMB's stay, even though such relief "was

explicitly requested in the Complaint."  Br. 60 n.7.  But relief requested is not the

same as relief ordered, and EEOC did not violate any part of the court's summary-

judgment order by considering how best to proceed on remand before issuing a

notice to the regulated community.  In any event, EEOC published such a notice on

May 1, 2019.  84 Fed. Reg. 18,383 (May 1, 2019).

The district court's vacatur of OMB's stay should have ended the case; the

court had no basis to order EEOC to proceed with the collection in these

circumstances, much less in the specified manner.  *See Palisades Gen. Hosp., Inc. v.*

*Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).  Because EEOC nevertheless complied

with that order, the primary remedial dispute at this point is the district court's

requirement that EEOC continue the collection until it receives a rate of response

deemed satisfactory by the court.  That portion of the court's order, addressed in part

A below, provides a stark illustration of the problems inherent in micromanaging an

agency's discretionary functions.  As explained in part B, those problems reflect the

basic flaw with the court's decision to order EEOC to proceed with the collection in

these circumstances in the absence of any statutory or regulatory basis for doing so—

and indeed, without any claim, briefing, or decision that EEOC was legally required to

take such action.  Finally, as explained in part C, the district court's remedial order

cannot be justified by alleged misconduct by the government as the government has

fully complied with all of the relief to which plaintiff is even arguably entitled on the

claims that were brought, litigated, and decided.

**A.**  The inappropriateness of the remedial order is particularly evident in the

requirement that EEOC continue the collection of information until a specified

percentage of employers provide information, JA 4—essentially, until the court allows

16

the Commission to stop.  In the absence of this directive, EEOC would have stopped

collecting information no later than six weeks after the deadline for the information

collection expired, based in part on the Commission's expert judgment that the quality

of information tends to diminish when a collection is held open for months after the

deadline.  *See* Dkt. No. 88-1, at 1; Dkt. No. 90-1, at 2.

The district court's order inappropriately constrains EEOC's discretion and

mandates that the agency continue the collection despite the lack of any legal

requirement to do so, and notwithstanding the Commission's well-founded concerns.

Although plaintiffs acknowledge the general rule that "a district court may not impose

injunctive relief relating to the relevant agency's analysis or discretion on remand," Br.

59 (quotation marks omitted), they make little effort to defend this aspect of the

court's order, other than to characterize it as "a reasonable decision to provide an

'assurance' that the 'Government . . . will complete the Component 2 data collection."

Br. 62.  But the Component 2 data collection did not include a required response rate.

Had OMB never stayed the collection of pay information, and had EEOC proceeded

with the collection as initially planned, there is no question that EEOC could have

chosen to close the collection on the deadline for submitting information, or six

weeks thereafter, or at any other time EEOC chose, regardless of how many

employers had responded.  There is no basis for asserting that, if employers do not

comply with the new, and more burdensome, collection of pay information at the

same rate that they responded to the longstanding Component 1 collection with

17

which employers were already familiar, EEOC has somehow failed to complete the collection.

Recent proceedings in district court underscore the problems with the response-rate requirement. After the collection's deadline passed, EEOC filed a motion explaining that more than 75% of employers had already submitted the information required by the court's order, and that, consistent with its recent practice, EEOC planned to close the collection six weeks after the September 30 deadline. Dkt. No. 88, at 3.[1] Plaintiffs opposed this plan, urging the district court to require EEOC to continue collecting information until it attained a 98.25% response rate, and they complained that "EEOC has not provided the Court with any information regarding what steps it is taking during the current six-week post-September 30 period to maximize reporting compliance." Dkt. No. 89, at 2-3.

These arguments illustrate the problem with relief that is untethered from the law. How long to keep the collection open beyond the deadline for submitting information, and how to communicate with employers during that time, are plainly matters at the core of the Commission's discretion. Plaintiffs insist that the April 25 order left "significant discretion" to EEOC, as evidenced by the fact that the district court did not prescribe "the mechanism of collection" on remand. Br. 51-52. But the

---

[1] This response rate is consistent with the response that EEOC received in connection with past EEO-1 collections conducted over a comparable period. Dkt. No. 88, at 3-5.

fact that there are some aspects of EEOC's actions on remand that the district court did not micromanage does not justify the court's intrusion into matters that should have been left to the Commission's discretion.

**B.** These problems with the response-rate requirement reflect the basic flaw in the court's decision to order EEOC to proceed with the collection. The requirement that EEOC collect two years of pay information by a judicially imposed deadline lacks any basis in the law, and the court exceeded its authority in directing EEOC to take these measures on remand, particularly in a case in which the complaint did not allege or seek to remedy any unlawful conduct on the part of EEOC.

Plaintiffs' support of this relief is premised on a mistaken belief that the vacatur of OMB's stay somehow restricted EEOC's discretion regarding the collection of pay information. OMB had stayed its prior *approval* of EEOC's independent, discretionary decision to collect the information, and vacatur of the stay did not impose a requirement that EEOC collect information. Indeed, no law required EEOC to proceed with the collection in these circumstances, much less on the terms imposed by the court. If OMB had never entered a stay and another reason had arisen to complicate the collection of pay information over the relevant period—*e.g.*, EEOC experienced a computer database failure, or its contractor went out of business— there would have been no basis for plaintiffs to sue EEOC to obtain such relief. Similarly, once the court vacated OMB's stay, EEOC was obligated to recognize that the approval of the collection was back in effect, but it retained discretion to

19

determine whether and how to proceed with the collection in light of the host of practical issues resulting from the now-vacated stay.  There is thus no sense in which the April 25 order was necessary to effectuate the court's summary-judgment order or to provide "assurance" that EEOC would comply with its legal obligations.  Br. 62.

The question of EEOC's legal obligations was in any event not litigated. Plaintiffs raised no question regarding the lawfulness of EEOC's past or future conduct in their complaint, and the court's summary-judgment opinion did not address or answer any such question.  If plaintiffs believed that EEOC is somehow legally required to proceed with the collection in these circumstances, they needed to bring that claim and litigate it in the ordinary course.  They did not do so here, and there is no authority to support the court's decision to direct EEOC's actions in these circumstances without even purporting to analyze the Commission's rights and obligations under Title VII or the PRA.

Conspicuously absent from plaintiffs' brief is the citation of any authority to support this type of interference with agency operations and decisionmaking. Plaintiffs cite a single district court case for the idea that courts may in some instances impose deadlines for agency action.  Br. 61-62 (citing *Mendoza v. Perez*, 72 F. Supp. 3d 168, 170-71 (D.D.C. 2014)).  But the agency action for which the court imposed a deadline in *Mendoza* was the same action whose lawfulness was litigated in that case, and the government in any event agreed to the proposed schedule.  The parties had fully litigated the question whether the Department of Labor needed to go through

20

notice-and-comment rulemaking for a particular matter, *Mendoza v. Perez*, 754 F.3d

1002, 1025 (D.C. Cir. 2014), and the district court simply established a timeline for the

Department to do so, *Mendoza*, 72 F. Supp. 3d at 174.

      Here, the district court did far more than establish a timeline for agency action

that was unequivocally required by law.  And the remedial order was directed against

an agency other than the one whose conduct was principally at issue in the case.  As

the body of the complaint explains, plaintiffs sued the EEOC defendants "as

necessary parties for relief in this case because the EEOC acted consistently with a

directive from OMB Defendants to notify employers that they were not required to

submit pay data as part of their EEO-1 submissions for the current fiscal year."  JA

287.  Plaintiffs emphasize that each count of the complaint alleges that EEOC

"acceded to the unlawful action" taken by OMB.  Br. 53-54 (citing JA 313-15).  But

this means only that EEOC was treating the stay as valid for its duration.  Once the

district court vacated the stay, there is no question that it ceased to have effect.

Contrary to plaintiffs' suggestion, EEOC did not ignore the court's order and treat

the stay as still operative when the Commission did not immediately resume the

collection on plaintiffs' preferred schedule.

      Plaintiffs do not advance their argument by relying on a longstanding EEOC

regulation that generally requires employers to file EEO-1 reports on a yearly basis.

Br. 56 (citing 29 C.F.R. § 1602.7).  That regulation imposes an obligation on

employers, not the Commission, and does not address how EEOC should respond

21

when it encounters impediments to collecting data.  Nor does the provision specify the information that EEOC should collect on its EEO-1 reports, much less how EEOC should respond in the circumstances of this case.

Plaintiffs are on no firmer ground in citing the government's assertion in its summary-judgment brief that, "[i]f the Court vacated OMB's decision," rather than remanding, "OMB would be required to halt the administrative process and the EEOC would have to begin the complex process of collecting aggregate pay data." Dkt. No. 27-1, at 33 (cited in part at Br. 53-54).  This statement was made in arguing that remand without vacatur would be the appropriate course in the event the court held OMB's stay unlawful.  Dkt. No. 27-1, at 33-34.  And, indeed, part of the government's argument against vacatur noted the variety of options potentially available on remand.  *See id.* at 34 (noting that "OMB could then undertake to review and stay this collection again").  The statement cannot plausibly be read as a concession regarding EEOC's present or future legal obligations, which were not litigated in district court.

To the extent this assertion has any relevance here, it is in highlighting that multiple courses of action remained available to the agencies in these circumstances, and that EEOC contemplated that any collection of pay information would be "complex" and could not be done instantaneously.  It does not remotely suggest that EEOC meant to limit its options on remand, much less that the district court could impose a set of onerous requirements if the information collection did not

22

immediately begin.  Likewise, the government's statement in a post-summary-judgment brief "describ[ing] how EEOC proposes to undertake and close the collection of Component 2 pay data . . . that is now back in effect" (Br. 56 (quoting Dkt. No. 54, at 1-2)) cannot reasonably be understood to concede a legal obligation to take any measures.  By its terms, the statement simply acknowledges that the OMB stay no longer has legal effect and proposes how EEOC will exercise its discretion.

Throughout its post-summary-judgment briefing, the government clearly stated that the summary-judgment opinion and order did not "address the scope of EEOC's authority under" Title VII or constrain the Commission's discretion on remand.  Dkt. No. 63, at 1-2.  These briefs noted that "[p]laintiffs do not purport to challenge the EEOC's independent statutory authority to administer the operation of its collection of information, including the authority to modify and adjust the collection requirements, and the EEOC's use of the information."  Dkt. No. 54, at 3.  Then, as now, the government explained that EEOC's decisions in connection with the collection "do[] not implicate the central legal issues in this case, which concern OMB's authority under the [PRA] and implementing regulations . . . and not the EEOC's separate authorities."  Dkt. No. 63, at 2.

**C.**  Plaintiffs' suggestion that the scope of the April 25 order was justified by "the Government's misbehavior" (Br. 59) likewise lacks merit.  At the outset, plaintiffs make no effort to defend the district court's suggestion that the relief entered in the April 25 order was warranted because EEOC had not been taking

23

adequate steps during the pendency of the litigation to prepare to collect pay

information, which the district court cited as evidence of the government's bad faith.

JA 12-13, 112-13.  EEOC was under no legal obligation while OMB's stay was in

effect to take steps to prepare to collect information that might never be collected,

and the agency's failure to do something that it was not required to do cannot

evidence bad faith.  Plaintiffs likewise do not defend the district court's reliance

(JA 6-10) on the government's failure to more quickly notify plaintiffs and the court

of the possibility that it could take EEOC some time to prepare to collect pay

information.  *See* Br. 51 (citing this issue in passing).  As discussed above, there was

no claim in the case challenging EEOC's post-judgment plans, and the parties'

discussion of those plans arose in the context of scheduling.  Under the

circumstances, there is no legal basis for finding fault with the government, much less

any prejudice.

The suggestion that the court's order was justified by EEOC's decision not to

immediately begin collecting pay information following the entry of summary

judgment is similarly misplaced.  Br. 64-65.  As noted above, after the court vacated

OMB's stay, EEOC was obligated only to acknowledge the reinstatement of the

approval of the information collection, and it did so.  Any further decisions regarding

the collection were committed to EEOC's discretion.  EEOC thus had no obligation

to collect pay information in these circumstances, much less on plaintiffs' preferred

schedule, and the Commission appropriately sought to determine the best approach

24

to resuming the collection of information after the stay was lifted.  The government

did not "act[] in bad faith" (Br. 65) by failing to immediately take actions that it was

not obligated to take, and its conduct does not justify the extraordinary measures

ordered by the court.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

DANIEL TENNY
  */s/ Lindsey Powell*
LINDSEY POWELL

  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5372*
  *lindsey.e.powell@usdoj.gov*

November 2019

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,429 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Garamond 14-point font, a proportionally spaced typeface.

*/s/ Lindsey Powell*
LINDSEY POWELL

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2019, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit by using the appellate CM/ECF system.  Participants in

the case are registered CM/ECF users, and service will be accomplished by the

appellate CM/ECF system.


*/s/ Lindsey Powell*
LINDSEY POWELL